James H.M. Sprayregen
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:     (212) 446-4800
Facsimile:     (212) 446-4900

- and -

Marc Kieselstein (*pro hac vice* pending)
Ryan Blaine Bennett (*pro hac vice* pending)
Paul Wierbicki (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

Proposed Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEAR CORPORATION, et al.,[1] | ) Case No. 09-_____(___) |
| | ) |
| Debtors. | ) Joint Administration Requested |
| | ) |

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' federal tax identification number (if any), include:  Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear Corporation Canada Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC (4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings Corp. #50 (9055); Lear South Africa Limited (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol Seating, LLC (4745). The location of the Debtors' corporate headquarters and the service address for all of the Debtors is:  21557 Telegraph Road, Southfield, Michigan 48033.

**DEBTORS' MOTION FOR ENTRY OF (I) AN INTERIM ORDER (A) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (B) GRANTING ADEQUATE PROTECTION THEREFOR TO PREPETITION SECURED PARTIES AND (C) SCHEDULING A FINAL HEARING ON THE FINAL DIP ORDER, (II) A FINAL ORDER (A) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SUPERPRIORITY AND FIRST PRIORITY PRIMING LIEN BASIS, (B) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL, (C) GRANTING ADEQUATE PROTECTION LIENS TO PREPETITION SECURED PARTIES FOR PRIMING OF THEIR LIENS AND (D) GRANTING RELATED RELIEF AND (III) MODIFYING THE AUTOMATIC STAY**

The above-captioned debtors (collectively, the "Debtors") hereby move the Court, pursuant to this motion (this "Motion") for (i) entry of an interim order (the "Interim Cash Collateral Order"), substantially in the form attached hereto as Exhibit A, on an interim basis, (a) authorizing the Debtors to use Cash Collateral (as defined below), (b) granting adequate protection to the Prepetition Secured Parties (as defined below) for the priming of their existing liens in the Prepetition Collateral (as defined below) and (c) prescribing the form and manner of notice and setting the time for the final hearing on the Final DIP Order; and (ii) entry of a final order relating to Cash Collateral and to postpetition financing (the "Final DIP Order"), substantially in the form attached hereto as Exhibit B, (a) authorizing the Debtors to obtain postpetition financing on a superpriority administrative claim and first priority priming lien basis; (b) authorizing the Debtors to use Cash Collateral; (c) granting adequate protection to the Prepetition Secured Parties for the priming of their existing liens in the Prepetition Collateral; and (d) granting related relief. In support of this Motion, the Debtors respectfully state as follows:[2]

---

[2]     The facts and circumstances supporting this Motion are set forth in the Declaration of Shari L. Burgess of Lear Corporation (I) in Support of Debtors' Chapter 11 Petitions and First Day Motions and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "First Day Declaration"), filed contemporaneously herewith and incorporated herein by reference, as well as the Declaration of Durc A. Savini in Support of the Debtors' Motion for Entry of (I) An Interim Order (A) Authorizing the Debtors to Use Cash Collateral, (B) Granting Adequate Protection Therefor to Prepetition Secured Parties and (C) Scheduling a Final Hearing on the Final DIP Order, (II) A Final Order (A) Authoring the Debtors to Obtain Postpetition Financing on a Superpriority and First Priority Priming Lien Basis, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Adequate Protection Liens to

2

## Jurisdiction

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 361, 362, 363 and 364 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "<u>Local Bankruptcy Rules</u>").

## Relief Requested

4. By this Motion, the Debtors request entry of the Interim Cash Collateral Order and the Final DIP Order granting, without limitation, the following relief:

   a. **Cash Collateral:** authority to use cash collateral as such term is defined in section 363(a) of the Bankruptcy Code ("<u>Cash Collateral</u>") pursuant to sections 361 and 363 of the Bankruptcy Code (<u>see</u> Int. Ord., at ¶ 1);

   b. **Adequate Protection:** approval of the Adequate Protection Package (as defined below) proposed to be provided to the Prepetition Secured Parties to protect against a diminution in the value of the Prepetition Collateral arising from the Debtors' use thereof (<u>see</u> Int., Ord., at ¶ 3);

   c. **Modification of Automatic Stay:** modification of the automatic stay to the extent necessary to permit the Prepetition Agent to pursue its rights and remedies as to the Prepetition Collateral and Postpetition Collateral (as defined below) and to authorize the DIP Agent to pursue its rights and remedies under the DIP Credit Agreement and related documents (<u>see</u> Int. Ord., at ¶ 7; Final DIP Ord., at ¶ 8);

   d. **DIP Facility:** authority to obtain secured postpetition loans, advances and financial accommodations in the aggregate principal amount of $500 million (the "<u>DIP Facility</u>") on a superpriority claim and first priority

---

Prepetition Secured Parties for Priming of Their Liens and (D) Granting Related Relief and (III) Modifying the Automatic Stay (the "<u>Savini Declaration</u>"), which the Debtors will file before the final objection deadline to this Motion.

K&E 15009891.1

senior priming lien basis, all of which will be made available only on a final basis after a final hearing (the "<u>Final Hearing</u>");

e.   **DIP Credit Agreement:**  authority to execute and deliver that certain Credit and Guarantee Agreement (the "<u>DIP Credit Agreement</u>" together with all agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, the "<u>DIP Documents</u>"),[3] by and among Lear Corporation, as borrower, JPMorgan Chase Bank N.A. as administrative agent (in such capacity, the "<u>DIP Agent</u>"), and the several lenders from time to time lenders party thereto (together with the DIP Agent, the "<u>DIP Lenders</u>"), substantially in the form attached hereto as <u>Exhibit C</u>, and other related documents including but not limited to the Loan Documents and perform such other and further acts as may be necessary or appropriate in connection therewith;

f.   **Guarantees:**  authority to cause each of the direct and indirect domestic Wholly Owned Subsidiaries of Lear Corporation to guarantee the due and punctual payment and performance of the DIP Obligations (as defined below) pursuant to the terms in the DIP Credit Agreement;

g.   **Superpriority Claim:**  authority to grant an allowed superpriority administrative expense claim (the "<u>DIP Superpriority Claim</u>") to the DIP Lenders in respect of the U.S. Debtors' (the "<u>Domestic Debtors</u>") Obligations under the DIP Facility (the "<u>DIP Obligations</u>"), subject only to the Carve Out (as defined below), pursuant to section 364(c)(1) of the Bankruptcy Code, as set forth below;

h.   **Senior Lien:**  authority to grant to the DIP Lenders, as security for the DIP Obligations, a perfected, valid, enforceable and non-avoidable first priority (subject to permitted exceptions) lien upon, and security interest in, all present and after-acquired property of the Domestic Debtors not subject to valid, perfected, and non-avoidable liens existing at the time of filing (excluding, in all cases, 35% of the total outstanding voting Capital Stock of each new or existing Foreign Subsidiary), subject only to the Carve Out, pursuant to section 364(c)(2) of the Bankruptcy Code;

i.   **Junior Lien:**  authority to grant to the DIP Lenders, as further security for the DIP Obligations, a perfected junior lien on all present and after-acquired property of the Domestic Debtors that is otherwise subject to a valid and perfected lien on the Petition Date (other than liens securing the Prepetition Secured Obligations (as defined below) and liens that are junior to the liens securing the Prepetition Secured Obligations) or a valid lien perfected (but not granted) after the Petition Date to the extent such

---

[3]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the DIP Credit Agreement.

K&E 15009891.1

post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, subject only to the Carve Out, pursuant to section 364(c)(3) of the Bankruptcy Code;

j.  **Priming Lien:**  authority to grant to the DIP Lenders, as further security for the DIP Obligations, a perfected first priority (subject to permitted exceptions), senior priming lien on (x) all present and after-acquired property of the Domestic Debtors that is subject to a valid, perfected and enforceable lien on or after the Petition Date to secure the Prepetition Secured Obligations, (y) all present and after-acquired assets that are presently subject to valid liens in effect on the Petition Date that is junior to the liens that secured the Prepetition Secured Obligations and (z) the liens granted after the Petition Date to provide adequate protection in respect of the Prepetition Secured Obligations, subject only to the Carve Out, pursuant to section 364(d)(1) of the Bankruptcy Code;

k.  **Final Hearing:**  scheduling the Final Hearing to consider entry of the Final DIP Order granting all of the relief requested in this Motion on a final basis (see Int. Ord., at ¶ 18); and

l.  **Related Relief:**  granting related relief and such other and further relief as the Court deems just and proper.

**Background**

**A.      General Background**

5.      As described in the First Day Declaration, the Debtors and their affiliates are a leading global automotive supplier of seat systems, electrical distribution systems and electronic products globally and supply their products to all original equipment manufacturers.  The Debtors and their affiliates maintain their global headquarters in Southfield, Michigan and employ approximately 72,000 workers worldwide, including approximately 5,500 employees in the United States and Canada.  In 2008, the Debtors and their non-debtor affiliates achieved total net sales of approximately $13.6 billion.

6.      In the past year, the Debtors have experienced a significant decline in revenue due to an unprecedented downturn in the automotive industry.  The Debtors' businesses have been adversely impacted by a decrease in overall global vehicle production, particularly in North

K&E 15009891.1

America and Europe.  Furthermore, the impact in North America has been exacerbated by a shift in consumer preference away from large trucks and SUV's, which historically have generated a disproportionate share of the Debtors' sales and profitability.  In addition, raw material, energy and commodity costs have increased significantly during 2008 and remain extremely volatile. These unfavorable conditions have not only affected the Debtors' operations but have created financial distress among the original equipment manufacturers as well as automotive suppliers throughout the entire supply chain.

7.     To ensure that they maintain competitive operations, the Debtors have engaged in extensive negotiations with their prepetition secured lenders and an ad hoc committee of their unsecured noteholders regarding a comprehensive debt restructuring.  After weeks of discussions, the Debtors reached agreement with certain of their prepetition secured lenders and noteholders with respect to the terms for a chapter 11 plan that contemplates a significant de-leveraging of the Debtors' balance sheet.

8.     To evidence their support of the Debtors' restructuring, certain of the Debtors' prepetition secured lenders and noteholders have executed plan support agreements, which have attached a term sheet that sets forth the terms for a chapter 11 plan that is supported by these parties.  The Debtors intend to file shortly a proposed chapter 11 plan consistent with the terms contained in the plan term sheet.  The Debtors believe that the terms of their chapter 11 plan, among other things, will allow them to fully satisfy their ongoing vendor obligations and remain a viable, competitive going forward business.

9.     On the date hereof (the "Petition Date"), each of the Debtors filed a petition with the Court under chapter 11 of the Bankruptcy Code (collectively, the "Chapter 11 Cases") to permit them to restructure their balance sheets and operations to restore profitability.  The

K&E 15009891.1

Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Chapter 11 Cases, and no committees have been appointed or designated.  Concurrently with the filing of this Motion, the Debtors have requested procedural consolidation and joint administration of the Chapter 11 Cases.

**B.**     **Summary of the Debtors' Prepetition Indebtedness**

10.     As more fully set forth in the First Day Declaration, the Debtors' principal capital structure consists of secured revolving and term loan facilities, senior unsecured notes and equity.  As of the Petition Date, the Debtors have approximately $3.6 billion of funded debt.  The Debtors' long-term prepetition debt structure principally comprises:  (a) the Prepetition Credit Facility (as defined below); (b) the 2013 and 2016 Senior Notes; (c) the 2014 Senior Notes; and (d) the Zero Coupon Convertible Notes, each as defined below.

**1.**     **Prepetition Secured Indebtedness**

11.     Lear Corporation and certain of its subsidiaries are party to that certain Amended and Restated Credit and Guarantee Agreement dated April 25, 2006 (as amended, supplemented or otherwise modified from time to time and as in effect prior to the Petition Date, the "Prepetition Credit Agreement" and together with any security, pledge or guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified, in each case as of the Petition Date, the "Prepetition Loan Documents"), by and among Lear Corporation, as U.S. borrower, Lear Canada, as Canadian borrower, and certain subsidiaries of Lear Corporation, as subsidiary guarantors thereunder (together with Lear Corporation and Lear Canada and the Prepetition Guarantors (as defined below) collectively, the "Prepetition Loan Parties"), J.P. Morgan Chase Bank, N.A., acting as general administrative agent and as collateral agent (in such capacity, the "Prepetition Agent")

and the banks and other financial institutions from time to time parties thereto (collectively with the Prepetition Agent, the "Prepetition Lenders," and together with the Prepetition Agent and Prepetition Lenders' affiliates which entered into secured hedge agreements with the Prepetition Loan Parties, the "Prepetition Secured Parties").  The Prepetition Credit Agreement provides for aggregate commitments of approximately $2.289 billion, principally comprising (a) a term loan facility (the "Prepetition Term Facility") of $1.0 billion, maturing on April 25, 2012, and (b) a revolving facility (the "Prepetition Revolving Facility" and together with the Prepetition Term Facility, the "Prepetition Credit Facility") of $1.289 billion revolving commitments, $464 million of which mature on March 23, 2010, and, $801.2 million of which mature on January 31, 2012.  The Prepetition Credit Facility provides for multicurrency commitments in a maximum aggregate amount of $400 million, Canadian commitments in a maximum aggregate amount of $100 million and swing-line commitments in a maximum aggregate amount of $200 million, the commitments for which are part of the aggregate revolving credit commitments under the Prepetition Revolving Facility.

12.     As of the Petition Date, the outstanding principal amount under the Prepetition Revolving Facility is approximately $1.177 billion, plus approximately $73.2 million issued but undrawn letters of credit, and the outstanding principal amount under the Prepetition Term Facility is approximately $985 million (collectively, and together with certain swap claims from hedging arrangements entered into with certain Prepetition Lenders under the Revolving Credit Facility, the "Prepetition Secured Obligations").

13.     The applicable Debtors' obligations under the Prepetition Credit Facility are secured, in part, by certain assets and property of the applicable Prepetition Loan Parties, including without limitation, accounts, chattel paper, deposit accounts, documents, equipment,

general intangibles, instruments, intellectual property, inventory, investment property, letter-of-credit rights, certain commercial tort claims, pledged capital stock and other pledged interests of certain subsidiaries (with respect to foreign subsidiaries, limited to 65% of the voting capital stock of Lear Corporation's first-tier foreign subsidiaries) and other tangible and intangible personal property and the proceeds thereof (including the setoff rights described in the Loan Documents and arising by operation of law, but in each case not including any "Excluded Property" (as defined in the Prepetition Credit Agreement), collectively the "Prepetition Collateral").  In addition, the Prepetition Credit Facility is guaranteed, on a joint and several basis, by the following directly and indirectly wholly-owned subsidiaries of Lear Corporation: Lear Operations Corporation; Lear Seating Holdings Corporation #50; Lear Corporation EEDS and Interiors; Lear Automotive Dearborn, Inc.; and Lear Corporation (Germany) Ltd. (collectively, the "Prepetition Guarantors").

14.     On June 30, 2009, the applicable Prepetition Loan Parties did not make required payments in an aggregate amount of $7.15 million due and payable under the Prepetition Credit Facility.  In addition, as of July 1, 2009, the Debtors are not in compliance with the leverage ratio and interest ratio covenants and certain other provisions contained in the Prepetition Credit Facility.  As a result, the applicable Debtors are in default under the Prepetition Credit Facility and the Prepetition Lenders may accelerate the applicable Prepetition Loan Parties' obligations under the facility upon the vote of the lenders holding a majority of outstanding commitments and borrowings and exercise all other remedies available under the Prepetition Credit Facility.

15.     Due to certain provisions in the Prepetition Credit Agreement, the Prepetition Secured Obligations owing to the Prepetition Lenders are potentially undersecured.  Specifically, Section 17.24 of the Prepetition Credit Agreement limits the maximum principal amount of the

K&E 15009891.1

Prepetition Secured Obligations (excluding the obligations under the hedging agreements and the guarantees thereof) that can be secured by the Prepetition Collateral (other than capital stock of Lear Corporation's subsidiaries and the proceeds thereof). Thus, the Prepetition Secured Obligations are secured by the assets of Lear Corporation and certain cash collateral, with such collateral amount capped at 10% of the value of the consolidated total assets of Lear Corporation. Additionally, the Prepetition Secured Obligations are secured by a first priority security interest in the capital stock of certain subsidiaries of Lear Corporation and the proceeds thereof.

<strong>2.      Unsecured Debt</strong>

16.      The Debtors also have issued certain unsecured notes. Specifically, as of the Petition Date, the Debtors had outstanding approximately $1.29 billion in aggregate principal amount of senior unsecured notes, consisting of (a) certain unsecured 8.5% senior notes due 2013 and unsecured 8.75% senior notes due 2016, with Bank of New York Trust Company, N.A. as trustee (collectively, the "2013 and 2016 Senior Notes"); (b) unsecured 5.75% senior notes due 2014, with BNY Midwest Trust Company as trustee (the "2014 Senior Notes"); and (c) unsecured zero-coupon convertible senior notes due 2022 (the "Zero Coupon Convertible Notes") (collectively, the "Senior Unsecured Notes"). The Senior Unsecured Notes are unconditionally guaranteed on a senior unsecured basis by the Prepetition Guarantors, jointly and severally.

17.      The interest on the 2013 and 2016 Senior Notes is payable on June 1 and December 1 of each year, whereas interest on the 2014 Senior Notes is payable on February 1 and August 1 of each year. The Zero Coupon Convertible Notes accrue interest at 4.75%, compounded semi-annually.

K&E 15009891.1

18.     As of the Petition Date, approximately $887.25 million in aggregate principal amount of 2013 and 2016 Senior Notes and approximately $400 million in aggregate principal amount of 2014 Senior Notes remained outstanding.  The Zero Coupon Convertible Notes had approximately $819,000 in remaining aggregate principal outstanding.

19.     On June 1, 2009, the Debtors failed to make semiannual interest payments of approximately $38.4 million due on the 2013 and 2016 Senior Notes and opted instead to utilize the 30-day grace period applicable to the interest payments.  As the Debtors did not make the interest payment on either of the 2013 and 2016 Senior Notes by the expiration of the 30-day grace period, the applicable Debtors are in default under each of the 2013 and 2016 Senior Notes and the holders of 25% in aggregate principal amount of either of the 2013 and 2016 Senior Notes have the right to accelerate their respective obligations under the 2013 and 2016 Senior Notes.

20.     The chart below summarizes the Debtors' entire prepetition indebtedness, including approximate current outstanding amounts as the Petition Date.

| Debt Obligation | Original Amount | Approximate Outstanding Amount | Maturity Date |
|---|---|---|---|
| Revolving Credit Facility | $1.289 billion | $1.177 billion (plus approximately $73.2 million in issued but undrawn letters of credit) | March 23, 2010 ($464 million)<br><br>January 31, 2012 ($801.2 million) |
| Term Facility | $1 billion | $985 million | April 25, 2012 |
| 2013 & 2016 Notes | $900 million | $887.25 million | December, 2013<br><br>December, 2016 |
| 2014 Notes | $399.2 million | $400 million | August, 2014 |
| Zero Coupon Convertible Notes | $640 million | $819,000 | February, 2022 |

K&E 15009891.1

## C. Equity

21. Lear Corporation is a publicly-traded company formerly listed on the New York Stock Exchange under the symbol LEA. As of June 17, 2009, Lear Corporation had approximately 77.5 million shares of common stock outstanding. On July 2, 2009, the New York Stock Exchange announced a suspension of trading of Lear Corporation's common stock. All of Lear Corporation's stock listed on the New York Stock Exchange will be delisted. Lear Corporation does not have any preferred stock outstanding.

### Concise Statement with Respect to the Use of Cash Collateral

22. In accordance with Bankruptcy Rule 4001(d) and Local Bankruptcy Rule 4001-2, below is a summary of the nature of the Debtors' request and terms of the proposed use of Cash Collateral, as well as the form of adequate protection the Debtors propose to give to the Prepetition Secured Parties to the extent of any diminution in the value of the Prepetition Collateral (collectively, the "Adequate Protection Package"):

| Summary of Material Terms | | Location |
|---|---|---|
| **Amount of Cash Collateral to be Used:** [Fed. R. Bankr. P. 4001(b)(1)(B)(ii); S.D.N.Y. Bankr. L.R. 4001-2(a)(1) & (f)] | The Debtors seek to use Cash Collateral in the ordinary course of their business.[4] | Int. Ord. ¶¶ 1 & 3(b) |
| **Parties with Interest in Cash Collateral:** [Fed. R. Bankr. P. 4001(b)(1)(B)(i)] | The Prepetition Secured Parties. | Int. Ord. ¶ E |
| **Interim Use of Cash Collateral:** [Fed. R. Bankr. P. | The Debtors propose to use Cash Collateral, wherever such Cash Collateral may be located, to among other things, (a) maintain their operations and provide funding to affiliates (whether Debtors or non-Debtors) consistent with | Int. Ord. ¶ 1 |

---

[4]     Due to the Cash Collateral comprising primarily proceeds of Prepetition Collateral, it is unclear at this time how much of the Debtors' cash is Cash Collateral. Under the proposed Interim Cash Collateral Order, the Debtors are seeking authority to use all the Cash Collateral. The Debtors are not subject to a budget under the Interim Cash Collateral Order.

| Summary of Material Terms | | Location |
|---|---|---|
| 4001(b)(1)(B)(ii); S.D.N.Y. Bankr. L.R. 4001-2(a)(1) & (f)] | prepetition practices as set forth in the Debtors' first day motions to continue their cash management system and intercompany transactions with their foreign affiliates, each filed contemporaneously herewith, (b) pay certain prepetition obligations as further described in the Debtors' other "first day" motions filed substantially contemporaneously herewith and authorized pursuant to the "first day" orders approving the same and (c) pay disbursements for operating expenses and other general corporate purposes, <u>provided</u> that all uses of cash by the Debtors for the costs and expenses of administering the Chapter 11 Cases shall be deemed to be first from cash that is not Cash Collateral and thereafter from Cash Collateral.<br><br>The Debtors estimate that their disbursements during the period covered by the Interim Cash Collateral Order will be consistent with the disbursement forecasts provided in Schedule 12 of the First Day Declaration pursuant to Local Bankruptcy Rule 1007-2(b)(3). | |
| **Termination Date:** [Fed. R. Bankr. P. 4001(b)(1)(B)(iii); S.D.N.Y. Bankr. L.R. 4001-2(a)(10) & (c)(2)] | The Debtors ability to use Cash Collateral pursuant to the Interim Cash Collateral Order shall end on the earliest to occur of (x) entry by the Court of the Final DIP Order (which shall provide for the continued use of the Cash Collateral on the terms set forth therein), (y) sixty (60) days from the Petition Date, provided that such date of termination may be extended by the Debtors with the consent of the DIP Agent, which consent shall not be unreasonably withheld, or (z) five-business days following written notice to the Debtors after the occurrence and continuance of an "Event of Default" (as that term is defined in the Interim Cash Collateral Order) beyond any applicable grace period. Pursuant to the Final DIP Order, the Debtors shall continue to be allowed to use Cash Collateral. | Int. Ord. ¶ 8 |
| **Adequate Protection:** [Fed. R. Bankr. P. 4001(b)(1)(B)(iv) and (c)(1)(B)(ii); S.D.N.Y. Bankr. L.R. 4001-2(a)(4)] | The Debtors propose to provide as adequate protection to the Prepetition Secured Parties valid and perfected, security interests in, and liens (the "<u>Adequate Protection Liens</u>") to the extent of any diminution in value of the Prepetition Collateral as the result of the Debtors' use of Cash Collateral during the Chapter 11 Cases, on all of the right, title and interest of the Domestic Debtors in, to and under all present and after-acquired property of the Domestic Debtors of any nature whatsoever including, without limitation, all cash contained in any account of the Domestic Debtors, and the proceeds of all causes of action, other than (a) Avoidance Actions (as defined below) and proceeds of Avoidance Actions and (b) 35% of the outstanding voting shares of each new or existing foreign subsidiaries (collectively, with the proceeds and products of any and all of the foregoing, the "<u>Postpetition Collateral</u>"). | Int. Ord. ¶ 3 |
| **Priority of Adequate Protection Liens:** [Fed. R. Bankr. P. 4001(c)(1)(B)(ii); S.D.N.Y. Bankr. L.R. 4001-2(a)(4)] | Subject to the Carve Out and any liens granted for the benefit of the DIP Lenders and DIP Agent pursuant to the Final DIP Order, the Adequate Protection Liens shall comprise:<br><br>• a first priority perfected lien upon all of the Postpetition Collateral that is not otherwise encumbered by a validly perfected, enforceable, non-avoidable security interest or lien on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code;<br><br>• a first priority, senior, priming and perfected lien upon (a) that portion | Int. Ord. ¶ 3(a)(i) |

K&E 15009891.1

| | | |
| --- | --- | --- |
| | of the Postpetition Collateral that comprises the Prepetition Collateral and (b) Postpetition Collateral subject to a lien that is junior to the liens securing the Prepetition Secured Obligations; and<br><br>• a second priority, junior perfected lien upon all Postpetition Collateral (other than the portion described in the preceding clause), which is subject to a validly perfected lien as of the Petition Date, or a valid lien in existence on the Petition Date that is perfected subsequent to such date as permitted by section 546(b) of the Bankruptcy Code. | |
| **Carve Out:**<br>[Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(5) & (d)] | All liens, claims and interests granted pursuant to the DIP Facility, Interim Cash Collateral Order, Final DIP Order or any other related document as well as any claims or liens arising from any Prepetition Secured Obligation shall be subject in all respects to the Carve Out.<br>• The "Carve Out" shall mean the sum of (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (B) the costs of administrative expenses not to exceed $50,000 in the aggregate that are permitted to be incurred by any chapter 7 trustee pursuant to any order of this Court following any conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code and (C) at any time after the first Business Day following delivery of a Carve-Out Trigger Notice (as defined below), to the extent allowed at any time, whether before or after delivery of a Carve-Out Trigger Notice, whether by interim order, procedural order or otherwise, all unpaid fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors appointed in the Cases pursuant to section 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), the payment of all Professional Fees incurred by the Professional Persons at any time after the first Business Day following delivery of a Carve-Out Trigger Notice in an aggregate amount not exceeding $15,000,000 (the "Carve-Out Cap") (plus all unpaid Professional Fees allowed at any time by the Bankruptcy Court, whether before or after delivery of a Carve-Out Trigger Notice, whether by interim order, procedural order or otherwise, that were incurred by the Professional Persons on or prior to the first Business Day following the delivery of the Carve-Out Trigger Notice).<br><br>• The "Carve-Out Trigger Notice" is a written notice delivered by the DIP Agent to the Borrower, the United States Trustee, counsel for the Borrower and counsel for any statutory committee appointed in the Chapter 11 Cases stating that an event of default under the Interim Cash Collateral Order or, following entry of the Final DIP Order, the DIP Credit Agreement has occurred and is continuing and that the Carve-Out Cap is invoked, which notice may only be delivered following the occurrence and during the continuance of an event of | § 2.20(a)<br><br>Final DIP Ord. ¶ 3(a)<br><br>Int. Ord. ¶ 4 |

K&E 15009891.1

| Summary of Material Terms | Location |
|---|---|

default under the Interim Cash Collateral Order or, following entry of the Final DIP Order, the DIP Credit Agreement.

- The Carve Out shall not be available to pay any Professional Fees incurred in connection with the initiation or prosecution of any Prohibited Claims or the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Agent, the DIP Lenders, the Prepetition Secured Parties or the Prepetition Agent.

- The Carve Out shall not be reduced by the payment of Professional Fees incurred prior to the first Business Day following delivery of a Carve-Out Trigger Notice without regard to when such amounts are allowed by the Bankruptcy Court.

- Notwithstanding anything herein to the contrary, the Carve Out shall not be used to commence or prosecute any Prohibited Claim.

- Upon delivery of a Carve-Out Trigger Notice or the commencement of a liquidation, the Borrower shall deposit an amount equal to unpaid Professional Fees prior to making any distributions to creditors in a segregated account solely for payment of Professional Fees that are within the Carve Out.

| **507(b) Claim:** | The Domestic Debtors propose to grant a claim (the "507(b) Claim") to the Prepetition Secured Parties pursuant to sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code. | Int. Ord. ¶ 3(a)(ii) |
|---|---|---|

- The 507(b) Claim will have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject to the Carve Out and the terms of the Final DIP Order.

- The 507(b) Claim will constitute expenses of and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in these Chapter 11 Cases or, to the extent permitted by applicable law, any subsequent proceedings under the Bankruptcy Code, provided that the 507(b) Claim shall not be paid with the proceeds of Avoidance Actions.

- Subject to the Carve Out and the terms of the Final DIP Order, no cost or expense of administration under sections 105, 503(b) or 507(b) or otherwise, including those resulting from the conversion of these Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the 507(b) Claim of the Prepetition Secured Parties pursuant to the Adequate Protection Package.

| **Reporting Requirements:** | As part of the Adequate Protection Package, the Debtors are required to comply with certain periodic reporting requirements as provided in the Interim | Int. Ord. ¶ 3(b) |
|---|---|---|

K&E 15009891.1

| Summary of Material Terms | | Location |
|---|---|---|
| | Cash Collateral Order. Specifically, the Debtors must provide:<br><br>• no later than Tuesday of every calendar week, commencing July 14, 2009, a rolling 13-week cash flow projection of Lear Corporation and its subsidiaries in the form of the initial 13-week cash flow projection that has been mutually agreed upon by the Prepetition Agent and the Debtors | |
| **Adequate Protection Payments:**<br>[Fed. R. Bankr. P. 4001(b)(1)(B)(iv)] | The Debtors seek authority for the Domestic Debtors to pay or reimburse all reasonable accrued and unpaid prepetition fees, costs and charges incurred by the Prepetition Agent (including, without limitation, the administration fees payable to the Prepetition Agent under the Prepetition Credit Facility and the reasonable fees and out-of-pocket disbursements of counsel and any financial advisors or other third-party consultants to the Prepetition Agent), in each case, in connection with matters relating to the Prepetition Credit Facility, the Prepetition Secured Obligations, the monitoring of these Chapter 11 Cases or the enforcement and protection of the rights and interests of the Prepetition Agent and the Prepetition Lenders in these Chapter 11 Cases, provided that any party in interest retains the right to object to the reasonableness of any fees, costs and charges incurred by the Prepetition Agent.<br><br>Additionally, copies of any invoices for such fees, redacted as necessary to preserve the attorney-client privilege, shall be provided to counsel to the Committee and to the Office of the United States Trustee.<br><br>For the avoidance of doubt, any such Adequate Protection Payments shall not include any fees payable under Section 9.5(e) of the Prepetition Credit Agreement. | Int. Ord. ¶ 3(c) |
| **Stipulations of the Debtors:**<br>[Fed. R. Bankr. P. 4001(c)(1)(B)(iii) and (d)(1)(B)] | The Interim Cash Collateral Order contains certain stipulations by the Debtors, without prejudice to the rights of any other party (subject to certain limitations thereon contained in Paragraph 16 of the Interim Cash Collateral Order) with regard to their prepetition secured indebtedness.<br><br>• The Debtors acknowledge that Lear Corporation and the other applicable Prepetition Loan Parties were indebted to the Prepetition Lenders and Prepetition Agent on account of the Prepetition Secured Obligations, plus other applicable fees, costs and expenses of the Prepetition Lenders and the Prepetition Agent arising pursuant to the Prepetition Loan Documents.<br><br>• The Debtors further acknowledge and agree that the Prepetition Secured Obligations are secured (subject to certain limitations in Section 17.24 of the Prepetition Credit Agreement) by perfected, valid and enforceable first priority liens and security interests, and that such security interests have been properly filed or recorded so as to be perfected<br><br>• The Debtors also acknowledge and agree that certain cash of the applicable Prepetition Loan Parties and proceeds from certain other transactions constitute Prepetition Collateral as proceeds therefrom and is cash collateral for purposes of section 363(a) of the | Int. Ord. ¶¶ D & E |

| Summary of Material Terms | | Location |
|---|---|---|
| | Bankruptcy Code. | |
| **Binding Effect of the Debtors' Stipulations on Third Parties:** [Fed. R. Bankr. P. 4001(c)(1)(B)(viii) and (d)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(f)] | In conformity with Local Bankruptcy Rule 4001-2(f), the Interim Cash Collateral Order contains a provision permitting the Committee (as defined in the Interim Cash Collateral Order) 60 days after appointment of counsel to a Committee to investigate the validity, enforceability, priority or amount of claims stipulated in Paragraphs D and E in the Interim Cash Collateral Order and commence any proceedings related thereto.<br><br>If no such adversary proceeding or contested matter is commenced at the end of such period, the Prepetition Secured Obligations shall constitute allowed claims as further provided in Paragraph 16 of the Interim Cash Collateral Order.<br><br>If any such adversary proceeding or contested matter is timely commenced as of such date, the acknowledgements and agreements contained in Paragraphs D and E of the Interim Cash Collateral Order shall nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent that such acknowledgements and agreements were expressly challenged in such adversary proceeding or contested matter. | Int. Ord. ¶ 16 |
| **Limitation on Obligation to Fund Activities of Debtors and Committee:** [S.D.N.Y. Bankr. L.R. 4001-2(a)(9)] | The Cash Collateral or the Carve Out may not be used for payment or reimbursement of any fees, expenses, costs or disbursements of any professionals incurred in connection with the assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or contested matter seeking relief challenging the Prepetition Secured Obligations, invalidating, setting aside, avoiding, or subordinating in whole or in part the Prepetition Agent's liens and security interests granted pursuant to the Loan Documents or the Interim Cash Collateral Order, or asserting any other claims or causes of action against the Prepetition Agent or the Prepetition Lenders, <u>provided</u> that the Cash Collateral or the Carve Out may be used for investigation with regard to any of the foregoing subject to a limitation of $250,000.<br><br>Notwithstanding any provision in other "first day" orders entered by this Court authorizing the Debtors to make payments in respect of prepetition obligations, the provisions in the Interim Cash Collateral Order conditioning the payment of such amounts or limiting the amount of such payments are controlling. | Int. Ord. ¶¶ 5 & 15 |
| **Events of Default:** [S.D.N.Y. Bankr. L.R. 4001-2(a)(10) & (c)(2)] | The Debtors' ability to use Cash Collateral will cease five business days following written notice to the Debtors after the occurrence and continuance of any of the following events of default beyond any applicable grace period.<br><br>• Failure to make any payment as and when required by the Interim Cash Collateral Order or other failure to materially comply with the terms of the Interim Cash Collateral Order and such failure shall continue unremedied for more than two business days after notice thereof;<br><br>• Failure to comply with the reporting requirements and such failure shall continue unremedied for more than three business days after notice thereof;<br><br>• Failure to comply with any other covenant or agreement specified in | Int. Ord. ¶ 8 |

17

| Summary of Material Terms | Location |
|---|---|

the Interim Cash Collateral Order and such failure shall continue unremedied for more than five business days after notice thereof;

- Dismissal or chapter 7 conversion of the Chapter 11 Cases;

- Failure of the Ontario Superior Court, Commercial List, to enter within five business days of the Petition Date an order recognizing the commencement of the Chapter 11 Cases;

- A chapter 11 trustee with plenary powers, examiner with enlarged powers to operate Debtors' business is appointed; provided that appointment of a trustee or other fiduciary of any of the Debtors' estates for the limited purpose of investigating, commencing or prosecuting Avoidance Actions shall not constitute an event of default;

- An order shall be entered reversing, amending, supplementing, staying for a period in excess of three days, vacating or otherwise modifying the Interim Cash Collateral Order without the consent of the Prepetition Agent;

- A pleading shall be filed by any of the Debtors seeking, or otherwise consenting to, any of the matters set forth in Paragraph 8(d) or 8(e) of the Interim Cash Collateral Order [S.D.N.Y. Bankr. L.R. 4001-2(a)(10)(vi)];

- One or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Petition Date against any applicable Prepetition Loan Party involving in the aggregate a liability (excluding any amounts paid or covered by insurance as to which the relevant insurance company has not denied coverage) of $10,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 45 days from the entry thereof [S.D.N.Y. Bankr. L.R. 4001-2(a)(10)(ii)];

- Except in connection with entry of the Final DIP Order, without the prior written consent of the Prepetition Agent, the Debtors at any time during the Chapter 11 Cases grant (or seek authority from the Court to grant) liens in the Prepetition Collateral, the Postpetition Collateral or any portion thereof to any other parties pursuant to section 364 of the Bankruptcy Code, which liens are senior or on a parity with the liens of the Prepetition Agent or the Prepetition Lenders, unless the terms and conditions of any order granting such liens expressly provide that any unpaid obligations pursuant to the Adequate Protection Package are paid to the Prepetition Secured Parties concurrently with the entry of any such order [S.D.N.Y. Bankr. L.R. 4001-2(a)(10)(vi)]; and

- Except on the terms of the Interim Cash Collateral Order (other than in connection with the Final DIP Order), the Debtors at any time: (i) use the Cash Collateral; (ii) use the Postpetition Collateral; or (iii) apply to any court for an order authorizing the use of the Cash Collateral or

| Summary of Material Terms | | Location |
|---|---|---|
| | Postpetition Collateral. | |
| **Waiver/Modification of Automatic Stay** [Fed. R. Bankr. P. 4001(c)(1)(B)(iv) and (d)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(10) & (c)(1)] | Upon an event of default under the Interim Cash Collateral Order, the automatic stay shall be modified to allow: (a) the Debtors and the Administrative Agent to take all actions necessary to implement the Interim Cash Collateral Order; (b) all actions and transfers contemplated by the Interim Cash Collateral Order; and (c) consistent with the terms of the Interim Cash Collateral Order, following the termination of the Interim Cash Collateral Order pursuant to Paragraph 8 of the Interim Cash Collateral Order, to permit the Administrative Agent to pursue its rights and remedies as to the Prepetition Collateral and Postpetition Collateral in accordance with the Loan Documents and applicable law. | Int. Ord. ¶¶ 7 & 9 |
| | The Debtors or the committee may seek an emergency hearing following the Prepetition Agent's termination of the Debtors' use of Cash Collateral, to be held within the five (5) business day period following the occurrence of any event of default listed in Paragraph 8 of the Interim Cash Collateral Order after which the Prepetition Agent may give notice of the commencement of the applicable grace period, regarding the continued use of Cash Collateral. The automatic stay under section 362 of the Bankruptcy Code is deemed modified and vacated pursuant to the Interim Cash Collateral Order to the extent necessary to permit the Prepetition Agent and Prepetition Lenders to exercise their rights and remedies pursuant thereto. | |

### Concise Statement Relating to the Material Terms of the Proposed Postpetition Financing

23.      While the DIP Credit Agreement and the Final DIP Order should be referred to in their entirety, in accordance with Bankruptcy Rule 4001 (b)(1)(B) and (c)(1)(B) and Local Bankruptcy Rule 4001-2 (a)(ii), the salient terms of the DIP Credit Agreement and/or the Final DIP Order are summarized as follows:[5]

| Summary of Material Terms | | Location |
|---|---|---|
| **Borrower:** [Fed. R. Bankr. P. 4001(c)(1)(B)] | Lear Corporation ("Borrower"). | Preamble |
| **Guarantee and Interdebtor Claims:** [Fed. R. Bankr. P. | Each of the direct and indirect domestic Wholly Owned Subsidiaries of the Borrower signatory to the DIP Credit Agreement (such Wholly Owned Subsidiaries, the "Guarantors" and, collectively with the Borrower, the "Loan | Preamble |

---

5    This summary is qualified in its entirety by the provisions of the DIP Credit Agreement and the Final DIP Order. To the extent there are any conflicts between this summary and the DIP Credit Agreement, the terms of the DIP Credit Agreement shall govern. Moreover, to the extent there are any conflicts between the DIP Credit Agreement and the Final DIP Order, the terms of the Final DIP Order shall govern. [S.D.N.Y. Bankr. L.R. 4001-2(k)(6)]

| Summary of Material Terms | | Location |
|---|---|---|
| 4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(14) & (e)] | Parties"), each of which Guarantors (other than Lear ASC Corporation) is a debtor and a debtor in possession in the Chapter 11 Cases.<br><br>For the avoidance of doubt, no Canadian or other non-domestic Subsidiaries of the Borrower shall be Guarantors of any DIP Obligation. | |
| **DIP Agent:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B)] | JPMorgan Chase Bank, N.A. | Preamble |
| **DIP Arranger:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B)] | J.P. Morgan Securities Inc. and Citigroup Global Markets Inc. (each, an "Arranger"). | Preamble |
| **Type, Amount,<br>and Fund<br>Availability:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(1)] | Type and Amount of Facilities: _Term Loan_: an aggregate principal amount of $500 million will be available to the Borrower. | Preamble |
| **Maturity:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B)] | Maturity Date: The earliest of (a) the later of (i) the date that is 12 months from the initial closing (the "Closing Date") of the DIP Facility (the "Scheduled Maturity Date") or (ii) upon effectiveness of the Extension Option as described below, the date that is 15 months from the Closing Date, (b) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a confirmed plan of reorganization and (c) the acceleration of the Loans in accordance with the provisions of the DIP Credit Agreement.<br><br>Extension Option: The Debtors may give written notice within 30 days prior to the Scheduled Maturity Date of their intention to extend the DIP Facility by three months to the date that is 15 months from the Closing Date upon payment of a 1% fee and upon the condition that no Default or Event of Default under the DIP Facility is then continuing.<br><br>Termination of Commitments: Unless previously terminated, the Commitments shall terminate on the date that is 60 days after the date of execution and delivery of the DIP Credit Agreement if the Bankruptcy Court has not entered on or prior to such date the Final DIP Order in accordance with Paragraph 5(g); provided that such date may be extended by an additional 30 days if the DIP Agent consents to such extension (such consent not to be unreasonably withheld). | § 1.1<br><br>Final DIP<br>Ord. ¶ 12 |
| **Use of Funds:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(1)] | The proceeds of the DIP Facility shall be used (a) for working capital and other general corporate purposes of Lear Corporation and its Subsidiaries (including, without limitation, expenses incurred in administering the Chapter 11 Cases) and the payment of fees and expenses incurred in connection with entering into the DIP Credit Agreement and the transactions contemplated thereby, subject to the Final DIP Order and; (b) to make Adequate Protection Payments (as defined below) to, or for the benefit of, the Prepetition Agent. | § 4.15<br><br>Final DIP<br>Ord. ¶ 4 |

K&E 15009891.1

| Summary of Material Terms | | Location |
|---|---|---|
| **Adequacy of Budget:** [S.D.N.Y. Bankr. L.R. 4001-2(h)] | In accordance with Local Rule 4001-2(h), the Debtors have reason to believe that the requested authority to obtain postpetition financing under the DIP Facility, considering all available assets, is sufficient and adequate to pay all administrative expenses due or accruing during term of the DIP Facility. | |
| **506(c) Waiver:** [Fed. R. Bankr. P. 4001(c)(1)(B)(x)] | Except to the extent of the Carve Out, subject to entry of the Final DIP Order, no expenses of administration of the Chapter 11 Cases or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the collateral securing the DIP Obligations or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent or the Prepetition Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Secured Parties. | Final DIP Ord. ¶ 9 |
| **Affiliate Funding:** [S.D.N.Y. Bankr. L.R. 4001-2(a)(15)] | The Debtors intend to use proceeds from the DIP Facility to fund working capital and other general corporate expenses of their non-debtor Subsidiaries, subject to applicable limitations in the DIP Credit Agreement. | § 4.15 §7.7 Final DIP Ord. ¶ 4 |
| **Exit Facility:** [Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(1)] | Upon satisfaction of the Initial Conditions to Rollover (as defined below), the DIP Facility will be converted (the date of such conversion, the "Conversion Date") into a three-year senior secured first lien term loan facility (the "Exit Facility") in an aggregate principal amount of $500 million (or such lesser amount as is outstanding under the DIP Facility immediately prior to conversion into the Exit Facility), to reorganized Lear Corporation, as borrower, and guaranteed by reorganized Lear Corporation's direct and indirect domestic Wholly Owned Subsidiaries. The Debtors shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any breach by the DIP Lenders of their obligation to convert the DIP Facility into the Exit Facility, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy. | § 2.24 |
| **Initial Conditions to Rollover of the DIP Facility into Exit Facility:** | The DIP Facility will convert into the Exit Facility upon the satisfaction or waiver by the requisite parties of the conditions precedent set forth in Section 5 of the Exit Credit Agreement, which is attached to the DIP Credit Agreement as Exhibit I (the "Initial Conditions to Rollover"). | § 2.24 Exit Cr. Agrmt. § 5 |
| **Interest Rate:** [Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(3)] | DIP Facility:<br><br>• for ABR Loans, the ABR rate plus 9.0% per annum;<br><br>• for Eurodollar Loans, the Eurodollar Rate (with a floor of 3.5%) plus 10.0% per annum. | § 2.12(a) & (b) |
| **Default Rate:** [Fed. R. Bankr. P. | In the case of the Loans, a default rate will apply equal to the rate that would otherwise be applicable thereto plus 2%. | § 2.12(c) |

21

| Summary of Material Terms | | Location |
|---|---|---|
| 4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(10)] | In the case of any other DIP Obligation, the applicable default rate will be equal to the rate then applicable to ABR Loans plus 2%, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment). | |
| **Fees:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(3)] | DIP Facility:<br><br>• _Upfront Fee_: 5%, payable to the DIP Lenders from the loan proceeds in connection with the DIP Facility funding commitments.<br><br>• _Exit/Conversion Fee_: 1% on the principal amount of Loans that are continued as Exit Loans, payable upon substantial consummation (as defined in section 1101 of the Bankruptcy Code) of a confirmed chapter 11 plan.<br><br>• _Arrangement Fees_: The Debtors have agreed to provide certain arrangement fees to the arrangers pursuant to a fee letter. | § 2.6 |
| **Exit Facility Commitment Fee:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(3)] | On the effective date of a plan of reorganization under which the DIP Facility is converted into the Exit Facility (or an alternative exit facility acceptable to the DIP Lenders) (the "Plan Effective Date"), the Borrower agrees that reorganized Lear Corporation will, at reorganized Lear Corporation's sole election, (i) issue to the DIP Lenders warrants (the "Warrants") to purchase a number of shares of common stock of reorganized Lear Corporation with a value as of the Plan Effective Date equal to $25,000,000 (or, if less than all of the Loans under the DIP Facility are converted into the Exit Facility or any other exit facility, a percentage of $25,000,000 equal to the percentage of Loans so converted), with the Warrants to have the terms set forth on Exhibit G of the DIP Credit Agreement and other customary terms or (ii) pay in cash to each DIP Lender an amount equal to 5% of the principal amount of such DIP Lender's Loans that will be converted into the Exit Facility or any other exit facility. | § 2.7 |
| **Carve Out:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(5) & (d)] | As provided above in the _Concise Statement with Respect to the Use of Cash Collateral_, the DIP Facility provides for a Carve Out for certain Professional Fees. The provisions of the Carve Out in the Final DIP Order are identical to those in the Interim Cash Collateral Order (see Int. Ord. at ¶ 4) | § 2.20(a)<br><br>Final DIP Ord. ¶ 3(a) |
| **Liens and Superpriority:**<br>[Fed. R. Bankr. P.<br>4001(c)(1)(B)(i);<br>S.D.N.Y. Bankr. L.R.<br>4001-2(a)(4)] | The obligations of the Domestic Debtors under the DIP Facility will be superpriority administrative expense claims in each of the Domestic Debtors' Chapter 11 Cases and, subject in each instance to the Carve Out, will be secured by<br><br>• pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority Lien on all Collateral of the Domestic Debtors that is otherwise not encumbered by a valid perfected and non-avoidable Lien as of the Petition Date or a valid and perfected Lien in existence at the time of such date that is perfected subsequent to such date as permitted by | § 2.20(a)<br><br>Final DIP Ord. ¶ 7 |

| Summary of Material Terms | Location |
|---|---|

section 546(b) of the Bankruptcy Code, excluding avoidance actions but including the proceeds thereof, <u>provided</u> that liens on any capital stock of any foreign subsidiary directly owned by a Domestic Debtor shall be limited to 65% of the voting stock and 100% of the non-voting stock;

- pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all collateral that is subject to valid, perfected and non-avoidable Liens in existence on the Petition Date or valid Liens perfected (other than the Prepetition Collateral) (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code; and

- pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority priming Lien upon all Collateral (a) that is Prepetition Collateral, (b) that is subject to a Lien granted after the Petition Date to provide adequate protection in respect of the Prepetition Secured Obligations or (c) that is subject to a valid Lien in effect on the Petition Date that is junior to the Liens that secure the Prepetition Secured Obligations or a valid and perfected Lien in existence at the time of such date that is perfected subsequent to such date.

For the avoidance of doubt, no priming liens will be granted in property of any Debtor other than the Domestic Debtors.

| Summary of Material Terms | Location |
|---|---|
| **Subordination of Intercompany Debt:** [S.D.N.Y. Bankr. L.R. 4001-2(a)(14) & (e)] | Pursuant to Section 7.7(f) of the DIP Credit Agreement, the Loan Parties may make certain intercompany investments in the Group Members, including loans, extensions of credit or capital contributions, or purchases of Capital Stock, bonds, notes, loans, debentures or other debt securities of, or any assets constituting a business unit.<br><br>Specifically, (i) Lear Corporation and its Subsidiaries may invest in the Borrower or any Guarantor, (ii) any non-Loan Party Subsidiary may invest in any other non-Loan Party Subsidiary, (iii) any Loan Party may invest in any Foreign Subsidiary to fund in the ordinary course of business foreign operations and (iv) any Loan Party may invest in any non-Loan Party Subsidiary organized under the laws of a jurisdiction outside of North America or Europe as long as the aggregate cost of the investments in such non-Loan Party Subsidiaries does not exceed $100 million at any one time in the aggregate.<br><br>Pursuant to Section 7.2(b) of the DIP Credit Agreement, any Indebtedness incurred by a Loan Party to a non-Loan Party pursuant to these investments must be evidenced by a promissory note, substantially in the form of <u>Exhibit B</u> to the DIP Credit Agreement or otherwise in form and substance reasonably acceptable to the Administrative Agent (the "<u>Intercompany Subordinated Note</u>"), unless the jurisdiction governing the non-Loan Party would prohibit such Intercompany Subordinated Note. | § 7.2(b)<br><br>§ 7.7(f) |

K&E 15009891.1

| Summary of Material Terms | | Location |
|---|---|---|
| **Lien on Avoidance Action Proceeds:** [Fed. R. Bankr. P. 4001(c)(1)(B)(viii)] | Upon entry of the Final DIP Order, the Debtors propose to grant liens to the DIP Lenders on the proceeds of the Debtors' claims and causes of action (but not on the actual claims and causes of action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions"). | § 2.20(a)(ii)  Final DIP. Ord. ¶ 7(a) |
| **Reps and Warranties:** [Fed. R. Bankr. P. 4001(c)(1)(B)] | The DIP Credit Agreement contains certain representations and warranties made by the Loan Parties that are customary for financing arrangements of this nature. | § 4 |
| **Conditions to Closing of the DIP Facility:** [Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(2)] | The agreement of each DIP Lender to make the extension of credit requested to be made by it on the Closing Date is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of certain conditions precedent.  The conditions to closing contained in the DIP Credit Agreement are summarized below.  • **Delivery of DIP Credit Agreement.**  The parties listed on Schedule 1.1A of the DIP Credit Agreement, the DIP Agent and the Loan Parties must execute and deliver the DIP Credit Agreement.  • **Lien Searches.**  The DIP Agent must receive the results of lien searches that reveal no liens on any assets of the Loan Parties other than those permitted by Section 7.3 of the DIP Credit Agreement or discharged prior to the Closing Date pursuant to documentation reasonably satisfactory to the DIP Agent.  • **Fees.**  All fees and expenses for which invoices have been presented must be received by the DIP Lenders on or before the Closing Date, which amounts will be paid from proceeds of the DIP Facility.  • **Certificates.**  The DIP Agent must receive certain certificates confirming the incumbency of officers executing the Loan Documents, confirming authority for such execution, attaching certificates of incorporation for each Loan Party and confirming good standing for each Loan Party.  • **Representations and Warranties.**  Each of the representations and warranties (as described in Section 4 of the DIP Credit Agreement) must be true and correct in all material respects.  • **Pledged Stock.**  The DIP Agent must receive (i) certificates representing the shares of Capital Stock pledged pursuant to the Final DIP Order, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged pursuant to the Final DIP Order endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof, in each case of the foregoing, to the extent not previously delivered to the Prepetition Agent under the Prepetition Loan Documents. | § 5 |

24

| Summary of Material Terms | | Location |
|---|---|---|
| | • **Final DIP Order.** The DIP Agent must receive a copy of the Final DIP Order approving the relief requested in this Motion on terms substantially similar to the form of the Final DIP Order attached to the DIP Credit Agreement, entered with the consent or non-objection of a preponderance of the holders of Prepetition Secured Obligations. | |
| | • **First Day Motion/Order.** All "first day" motions and orders submitted to the Court must be in form and substance reasonably satisfactory to the DIP Agent. | |
| | • **Budget.** The Borrower must deliver to the DIP Lenders a consolidated budget on a quarterly basis for the 15-month period ending October 2, 2010, as well as an initial 13-week cash flow forecast, each accompanied by a certificate stating the budget was based on good faith estimates of management of the Borrower, and each as more fully detailed in Section 5(i) of the DIP Credit Agreement. | |
| | • **Borrowing Notice.** The Borrower must execute and deliver the Borrowing Notice to the DIP Agent. | |
| | • **No Default.** No Default or Event of Default may have occurred or be occurring on the Closing Date. | |
| | • **Legal Opinion.** The DIP Agent must receive an opinion, in form and substance reasonably satisfactory to the DIP Agent, of counsel to the Debtors. | |
| | • **"Know Your Customer" Information.** The DIP Agent must receive all documentation required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations. | |
| | • **Ratings.** The DIP Facility must receive a rating from S&P and Moodys. | |
| **Affirmative Covenants:** [Fed. R. Bankr. P. 4001(c)(1)(B)(vi); S.D.N.Y. Bankr. L.R. 4001-2(a)(1) & (a)(15)] | The DIP Credit Agreement contains certain affirmative covenants made by the Loan Parties that are customary for financing arrangements of this nature. | § 6 |
| **Negative Covenants:** [Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(1)] | The DIP Credit Agreement contains certain negative covenants made by the Loan Parties, including certain financial covenants as further described below, that are customary for financing arrangements of this nature. | § 7 |
| **Financial** | The DIP Credit Agreement imposes certain negative covenants on each Loan | § 7.1 |

| Summary of Material Terms | | Location |
|---|---|---|
| **Covenants:**<br>[Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(1)] | Party and its subsidiaries related to EBITDAR, liquidity and capital expenditures. These financial covenants are summarized below.<br><br>  &bull;  **EBITDAR Covenant.** No Loan Party may permit the Consolidated EBITDAR as of the last day of any fiscal quarter set forth below, commencing October 3, 2009, to be less than the amounts specified in the DIP Credit Agreement.<br><br>      &bull;  <u>October 3, 2009</u>: ($25 million)<br><br>      &bull;  <u>December 31, 2009</u>: $65 million<br><br>      &bull;  <u>April 3, 2010</u>: $100 million<br><br>      &bull;  <u>July 3, 2010</u>: $200 million<br><br>      &bull;  <u>October 2, 2010</u>: $315 million<br><br>  &bull;  **Liquidity Covenant.** No Loan Party may permit its level of Liquidity, as of the last day of any fiscal month, commencing August 1, 2009, to be less than the amounts specified in the DIP Credit Agreement.<br><br>      &bull;  <u>Aug. 1—Dec. 31, 2009</u>: $900 million<br><br>      &bull;  <u>Jan. 30—Oct. 2, 2010</u>: $700 million<br><br>  &bull;  **Capital Expenditures.** No Loan Party may permit the aggregate amount of Capital Expenditures made by the Loan Parties during any fiscal quarter, commencing October 3, 2009, to exceed the amounts specified in the DIP Credit Agreement.<br><br>      &bull;  <u>October 3, 2009</u>: $50 million<br><br>      &bull;  <u>December 31, 2009</u>: $100 million<br><br>      &bull;  <u>April 3, 2010</u>: $140 million<br><br>      &bull;  <u>July 3, 2010</u>: $180 million<br><br>      &bull;  <u>October 2, 2010</u>: $230 million | |
| **Mandatory Prepayments:**<br>[Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(13)] | The Borrower must repay certain of the DIP Obligations upon the occurrence of certain events or transactions.<br><br>  &bull;  **Issuance of Debt and Equity.** If any Group Member (defined as the Borrower and all its subsidiaries) issues Capital Stock or incurs Indebtedness (excluding certain equity issuance to Lear Corporation or its subsidiaries pursuant to Section 7.7 of the DIP Credit Agreement, as well as any indebtedness permitted by Section 7.2 of the DIP Credit Agreement), the Borrower must apply an amount equal to 100% of the Net Cash Proceeds of any such debt or equity issue toward repayment of the Loans.<br><br>  &bull;  **Asset Sale/Recovery Event** If a sale of assets yielding Net Cash Proceeds to any Group Member in excess of $1 million or a settlement or payment in respect of any property or casualty insurance claim or | § 2.9 |

| Summary of Material Terms | | Location |
|---|---|---|
| | condemnation relating to any asset of any Group Member in excess of $1 million occurs, subject to the Borrower's reinvestment right, the Borrower must apply an amount equal to 100% of the Net Cash Proceeds toward repayment of the Loans. | |
| **Limitation on Obligation to Fund Activities of Debtors and Committee:** [S.D.N.Y. Bankr. L.R. 4001-2(a)(9)] | No proceeds from the DIP Facility nor collateral securing the DIP Obligations nor Prepetition Collateral (including the Cash Collateral) or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Facility, the Prepetition Credit Facility or the liens or claims granted under the Final DIP Order, the DIP Credit Agreement or the Prepetition Loan Documents, (b) assert any claims and defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral or the collateral securing the DIP Facility in accordance with the DIP Documents, the Prepetition Loan Documents or the Final DIP Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders hereunder or under the DIP Documents or the Prepetition Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an order of this Court and (ii) permitted under the DIP Documents, provided that, notwithstanding anything to the contrary herein, no more than an aggregate of $250,000 of the Prepetition Collateral (including the Cash Collateral), DIP Loans under the DIP Agreement, the DIP Collateral or the Carve Out may be used by any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1103 of the Bankruptcy Code to investigate the validity, enforceability or priority of the Prepetition Secured Obligations or the liens on the Prepetition Collateral securing the Prepetition Secured Obligations, or investigate any Claims and Defenses or other causes action against the Prepetition Agent or the Prepetition Lenders. | Final DIP Ord. ¶ 18 |
| **Events of Default:** [Fed. R. Bankr. P. 4001(c)(1)(B); S.D.N.Y. Bankr. L.R. 4001-2(a)(10) & 4001-2(a)(11)] | If any of the following events summarized below shall occur and be continuing, the DIP Agent may, by notice to the Borrower, (i) terminate the commitments under the DIP Facility, (ii) declare the Loans due and payable, (iii) set-off amounts held as Cash Collateral or (iv) exercise any and all remedies under the DIP Credit Agreement, the Final DIP Order and applicable law.<br><br>• **Payment of Principal and Interest.** The Borrower fails to pay principal when due, or the Borrower fails to pay any interest within three Business Days of any interest payment due date, each with regard to the DIP Obligations.<br><br>• **Representations and Warranties.** Any representation or warranty made in the DIP Credit Agreement or any other Loan Document proves to be inaccurate in any material respect when made. | § 8 |

27

| Summary of Material Terms | Location |
|---|---|

- **Covenants.** The Borrower fails to maintain its existence, the Loan Parties fail to give notice of an Event of Default or any Loan Party breaches any negative covenant under Section 7 of the DIP Credit Agreement.

- **Group Member Cross-Defaults.** Any Group Member (other than certain immaterial subsidiaries) (i) defaults in making payment on principal of any postpetition debt the outstanding principal amount of which exceeds $10 million in the aggregate (other than the Borrower on the Loans and the Debtors on the Prepetition Secured Obligations), (ii) defaults on payments of interest on any such postpetition debt beyond the applicable grace period or (iii) defaults in observing or performing any other agreement relating to any such postpetition debt, or any other event occurs that causes any such postpetition debt to become due prior to its stated maturity.

- **Chapter 7 Conversion.** Any of the Chapter 11 Cases are dismissed or converted to a case under chapter 7 of the Bankruptcy Code or a trustee under chapter 11 of the Bankruptcy Code is appointed.

- **Additional Superpriority Liens and Claims.** The Court enters an order (i) granting an additional superpriority claim, other than the Carve Out, that is senior or pari passu with the liens granted to the DIP Lenders in the DIP Credit Agreement or Final DIP Order or the liens granted to the Prepetition Secured Parties in the Final DIP Order, (ii) vacating, staying for a period in excess of 10 days or otherwise amending, supplementing or modifying the Final DIP Order without the written consent of the DIP Agent and the Required Lenders or (iii) appointing an examiner with enlarged powers relating to the operation of the Loan Parties' businesses and such order is not reversed or vacated within 30 days after entry thereof.

- **Use of Cash Collateral.** (i) the Prepetition Secured Parties' Cash Collateral is used inconsistently with the Final DIP Order; or (ii) a court of competent jurisdiction enters an order terminating the use of the Prepetition Secured Parties' Cash Collateral.

- **Unauthorized payments.** Any Loan Party makes payments on prepetition obligations other than as permitted by the Final DIP Order or by the DIP Credit Agreement or DIP Agent or in accordance with "first day" relief.

- **Automatic Stay Relief.** The Court enters an order granting relief from the automatic stay to allow a third party to proceed against property of any Loan Party having an aggregate value in excess of $10 million. [S.D.N.Y. Bankr. L.R. 4001-2(a)(10)(ii)]

- **Loan Party Consent to the Foregoing.** Any Loan Party files a pleading consenting to chapter 7 conversion, additional superpriority liens, limitations on or misuse of Cash Collateral, unauthorized

| Summary of Material Terms | Location |
|---|---|

payments or relief from the automatic stay, as described above. [S.D.N.Y. Bankr. L.R. 4001-2(a)(10)(vi)]

- **ERISA Liability.** An ERISA Event occurs, a trustee is appointed by a United States district court to administer any Single Employer Plan, the PBGC institutes proceedings to terminate any Single Employer Plan, any Loan Party or respective ERISA Affiliates is notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability and such entity has no reasonable grounds to contest Withdrawal Liability, or any other event or condition shall occur or exist with respect to a Plan, such that in each event or condition above, each such event or condition, together with all other events or condition is reasonably expected to have a Material Adverse Effect.

- **Administrative Expense Claims.** Judgments or decrees in excess of $10 million required to be satisfied as an administrative expense claim are entered after the Petition Date against any Loan Party and not vacated, discharged, stayed or bonded pending appeal within 45 days of entry.

- **Invalidation of Superpriority Claims and Liens.** The Loan Parties commence or consent to any proceeding to invalidate, subordinate or challenge any superpriority claims or liens granted to secure the DIP Obligations, any relief under section 506(c) of the Bankruptcy Code with respect to any collateral securing the DIP Obligations, or the Borrower or any Subsidiary files a motion, pleading or proceeding reasonably expected to result in material impairment of rights or interest of the DIP Lenders.

- **Plan Fails to Satisfy DIP Obligations.** The Court confirms a plan of reorganization that does not provide for payment or assumption of the DIP Obligations on the Consummation Date or enters an order dismissing any of the Chapter 11 Cases that does not provide for payment of the DIP Obligations or any Debtors seek support for the same.

- **Effectiveness of Final DIP Order.** The Final DIP Order ceases to be in full force or effect, any Loan Party or affiliate asserts that the Final DIP Order will cease to be in full force or effect or any liens or superpriority claims granted by the Final DIP Order cease to be enforceable.

- **Change of Control.** Acquisition of direct or indirect ownership of Capital Stock representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of the Borrower or occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither nominated by the board of directors of the Borrower nor appointed by directors so nominated occurs. [S.D.N.Y. Bankr. L.R.

K&E 15009891.1

| Summary of Material Terms | Location |
|---|---|
| | 4001-2(a)(11)] | |

    • **Failure to File a Conforming Plan.**  The Debtors fail to file a plan that conforms substantially with the terms of the plan term sheet, to be attached as <u>Exhibit H</u> to the DIP Credit Agreement, or which pays the DIP Obligations in full (the "<u>Conforming Plan</u>") and an accompanying disclosure statement within 210 days of the Petition Date or at some later date as may be agreed to by the DIP Agent. [Fed. R. Bankr. P. 4001(c)(1)(B)(vi) and S.D.N.Y. Bankr. L.R. 4001-2(a)(10)(v)]

    • **Court Approval of Disclosure Statement.**  The Court does not enter an order approving a disclosure statement for a Conforming Plan within 275 days of the Petition Date (plus the number of days by which the Scheduled Maturity Date is extended pursuant to the Extension Option as permitted in Section 2.4(b) of the DIP Credit Agreement) or at some later date as may be agreed to by the DIP Agent. [Fed. R. Bankr. P. 4001(c)(1)(B)(vi)]

    • **Confirmation of Plan.**  The Court does not enter an order confirming a Conforming Plan within 335 days of the Petition Date (plus the number of days by which the Scheduled Maturity Date is extended pursuant to the Extension Option as permitted in Section 2.4(b) of the DIP Credit Agreement) or at some later date as may be agreed to by the DIP Agent. [Fed. R. Bankr. P. 4001(c)(1)(B)(vi)]

    • **Effective Date of Plan.**  The Conforming Plan does not become effective within 365 days of the Petition Date (plus the number of days by which the Scheduled Maturity Date is extended pursuant to the Extension Option as permitted in Section 2.4(b) of the DIP Credit Agreement) or at some later date as may be agreed to by the DIP Agent.

    • **Binding Provisions.**  Any material provision of the DIP Credit Agreement ceases to be valid and binding on the Debtors or the Debtors file a motion seeking, consenting to or asserting the invalidity of any such material provision.

| Summary of Material Terms | Location |
|---|---|
| **Binding of Estate to Validity of Secured Debt:** [Fed. R. Bankr. P. 4001(c)(1)(B)(iii); S.D.N.Y. Bankr. L.R. 4001-2(f)] | *Debtors' Stipulations.*  The Final DIP Order contains stipulations of the Debtors substantially similar to those contained in Paragraphs D and E of the Interim Cash Collateral Order acknowledging and agreeing that (a) the applicable Debtor Loan Parties are indebted to the Prepetition Lenders, (b) the Prepetition Secured Obligations are secured by perfected, valid and enforceable first priority liens and security interests (subject to permitted exceptions in the Prepetition Credit Agreement) granted by the applicable Debtor Loan Parties and (c) certain cash and proceeds of the Debtors is cash collateral for purposes of section 363(a) of the Bankruptcy Code. | Final DIP Ord. ¶¶ 3, 11 & 17 |
| | *Effect Of Stipulations On Third Parties.*  Likewise, the Final DIP Order contains provisions substantially similar to those in Paragraph 16 of the Interim Cash Collateral Order binding third parties to the above stipulations of | |

| Summary of Material Terms | | Location |
|---|---|---|
| | the Debtors and Debtor Loan Parties, as applicable, except that any official committee of unsecured creditors or any other party in interest may, within 60 days of the appointment of counsel to the committee, commence proceedings to challenge the validity, enforceability, priority or amount of the Prepetition Secured Obligations or assert other claims against the Prepetition Secured Parties. Additionally, the Final DIP Order provides that the Prepetition Secured Obligations will be deemed allowed claims and the liens on the Prepetition Collateral will be deemed legal, valid, binding first priority liens if no adversary proceeding is commenced during that time period. | |
| **Waiver/Modification of Automatic Stay:** [Fed. R. Bankr. P. 4001(c)(1)(B)(iv); S.D.N.Y. Bankr. L.R. 4001-2(a)(10) & (c)(2)] | Subject to five (5) business days' prior notice to the Debtors and certain other parties, the automatic stay is vacated to permit the exercise of remedies by the DIP Agent and the DIP Lenders. | Final DIP Ord. ¶ 8 |
| **Waiver/Modification of Applicable Laws:** [Fed. R. Bankr. P. 4001(c)(1)(B)(vii)] | The Final DIP Order when entered will be effective to create in favor of the DIP Lenders legal, valid, enforceable, and fully-perfected security interests in and liens on the Collateral. | Final DIP Ord. ¶ 3 |
| **Adequate Protection:** [Fed. R. Bankr. P. 4001(c)(1)(B)(ii); S.D.N.Y. Bankr. L.R. 4001-2(a)(8)] | As provided in the concise statement regarding use of Cash Collateral, above, the Debtors are providing the Adequate Protection Package to holders of liens on the Cash Collateral, whose liens are primed by the liens granted in the DIP Facility. [Int. Ord. ¶ 3] | Final DIP Ord. ¶ 13 |

## Use of Cash Collateral and Proposed Form of Adequate Protection

24.     A part of the cash, cash equivalents, and other amounts on deposit or maintained in the Debtors' bank accounts constitute proceeds that, to the extent subject to valid and perfected liens, are the Cash Collateral of the Prepetition Secured Parties, subject to the security interests of such parties under section 552(b) of the Bankruptcy Code. The Prepetition Secured Parties have consented to the Debtors' use of Cash Collateral in the ordinary course of business, subject to the Adequate Protection Liens and Adequate Protection Payments discussed below and certain other terms of the Interim Cash Collateral Order.

K&E 15009891.1

25.     Although the Debtors currently have substantial cash in their possession that is not subject to the prepetition interests of the Prepetition Secured Parties, to continue their operations, they require the use of their existing Cash Collateral.  Use of the Cash Collateral is particularly critical before the Debtors obtain authority to consummate the DIP Facility upon entry of the Final DIP Order.  Absent the Debtors' use of the Cash Collateral, the continued operation of the Debtors' businesses, even for a limited period of time, would not be possible, and serious and irreparable harm to the Debtors and their estates would occur.  Consequently, the use of Cash Collateral is critical to preserve and maintain the going concern value of the Debtors and will enhance the prospects for a successful reorganization of the Debtors under chapter 11 of the Bankruptcy Code.

26.     To the extent that their interests constitute valid and perfected security interests and liens as of the Petition Date, the Prepetition Secured Parties are entitled to adequate protection to the extent that there is any diminution in the value of the Prepetition Collateral from and after the Petition Date resulting from the Debtors' use thereof pursuant to sections 361 and 363(e) of the Bankruptcy Code.  Accordingly, and as further described above, the Debtors have agreed to provide the Prepetition Secured Parties with the Adequate Protection Package, in every instance subject to the Carve Out:

a.      *Fees, Expenses, and Interest*.  (i) payment by the Domestic Debtors of all accrued and unpaid fees and disbursements owing to the Prepetition Agent under the Prepetition Credit Facility and incurred prior to the Petition Date but unpaid as of the Petition Date and (ii) payment by the Domestic Debtors to the Prepetition Agent of all fees and expenses payable pursuant to the terms of the Prepetition Credit Facility, including without limitation, the reasonable fees and disbursements of counsel and financial advisors or other third-party consultants to the Prepetition Agent, but not including any fees payable under Section 9.5(e) of the Prepetition Credit Agreement; provided that any party in interest will retain the right to object to the reasonableness of any fees, costs and charges incurred by the Prepetition Secured Parties or the Prepetition Agent; provided further that copies of

invoices for such fees shall be provided to the counsel to the Committee and the Office of the United States Trustee (collectively, the "Adequate Protection Payments");

b.   *Superpriority Claim*.  The 507(b) Claim to the extent of any diminution in value of the Prepetition Collateral which is immediately junior to the superpriority claim granted in favor of the DIP Lenders pursuant to section 364(c)(1) of the Bankruptcy Code on account of the DIP Obligations, provided that the 507(b) Claim shall not be paid with the proceeds of Avoidance Actions;

c.   *Adequate Protection Liens*.  The Adequate Protection Liens to the extent of any diminution in value of the Prepetition Collateral as the result of the Debtors' use of Cash Collateral during the Chapter 11 Cases, on the Postpetition Collateral, as further provided above;

d.   *Financial Reporting*.   Delivery of copies of all financial reporting deliverables as provided in the Interim Cash Collateral Order.

## Proposed Postpetition Financing

**A.   The Debtors' Need for Postpetition Financing**

27.   The Debtors will require financing in addition to the use of Cash Collateral to fund their ongoing business operations and to pay the costs and expenses of administering the Chapter 11 Cases.  The relief requested in this Motion will enable the Debtors to accomplish their strategic restructuring goals.  Once the DIP Facility is approved, the Debtors' ability to minimize disruption to their businesses and instill confidence in their various creditor constituencies, including customers, suppliers, employees, vendors and service providers, will be substantially enhanced.   This will assure those constituencies of the Debtors' ability to seamlessly transition their business through chapter 11 and ultimately to reorganize in a successful and expedient manner.  Moreover, the successful balance sheet restructuring currently contemplated by the Debtors' proposed plan term sheet and plan support agreement, filed substantially contemporaneously herewith, depends on the Debtors' access to postpetition financing.

K&E 15009891.1

28.     Further, the proposed DIP Facility not only satisfies the Debtors' postpetition financing needs, but also ensures financing for the Debtors' businesses upon emergence from chapter 11 by converting into an Exit Facility upon confirmation of a Conforming Plan. Given current credit market conditions, the Exit Facility constitutes an especially valuable feature and will aid the Debtors substantially in achieving their restructuring goals.

29.     Access to the DIP Facility as provided herein is necessary to ensure the Debtors have access to sufficient liquidity to ultimately emerge successfully. The DIP Facility will provide the working capital necessary to allow the Debtors to, among other things, continue operating their businesses in the ordinary course, thereby preserving value for the benefit of all creditor constituencies.

30.     The availability of adequate postpetition financing and the promise of continued financing upon the Debtors' emergence from chapter 11 also will reassure the Debtors' suppliers and vendors that the Debtors will meet their payment obligations. Because of the demands inherent in the highly complex and competitive automotive supply industry, the Debtors rely on suppliers and vendors uniquely qualified to develop and deliver highly engineered and complex auto parts and to navigate the just-in-time logistics associated with the Debtors' operations and their customers' demands. However, as a result of declines in the performance of the automotive sector seen in the past year, as well as the attendant effects on the Debtors' businesses, the Debtors' trade vendors have attempted to impose tightened credit terms.

31.     Further, the Debtors' ability to obtain additional financing in a difficult market will demonstrate to the Debtors' customers that the Debtors will have adequate funding going forward to restructure their businesses on a going-concern basis. The Debtors believe that the DIP Facility will serve to assure customers that the Debtors maintain the financial resources

34

necessary to perform their obligations and undertake new business from their customers. Reassuring customers will further assist the Debtors in obtaining new vehicle programs both during the Chapter 11 Cases and after the Debtors' emergence from chapter 11.

**B.      The Debtors' Efforts To Obtain Postpetition Financing[6]**

32.     In December 2008, the Debtors retained the investment bank Miller Buckfire & Co. LLC ("Miller Buckfire") as their financial advisor to assist the Debtors with their evaluation of strategic alternatives. In the months prior to the Petition Date, the Debtors worked closely with their advisors to identify potential sources of postpetition financing.

33.     The Debtors and Miller Buckfire solicited indications of interest and entertained several unsolicited indications of interest with respect to potential postpetition financing from various parties, including, among others, certain Prepetition Lenders. In February and March 2009, the Debtors negotiated extensively with one particular potential lender that had demonstrated significant interest in providing the Debtors postpetition financing. However, the Debtors ultimately determined that the financing proposed by the potential lenders contained unfavorable terms that would not be conducive to the Debtors' restructuring goals.

34.     Miller Buckfire distributed solicitation materials and confidentiality agreements to sixteen financial institutions. The Debtors executed confidentiality agreements with and distributed diligence materials, including a confidential financing overview memorandum, to eight of the sixteen parties.

35.     The Debtors did not reach agreement with any potential postpetition lenders during this marketing process. Potential lenders expressed concern about the risks inherent in funding an automotive supplier in light of the uncertainty of current automotive markets.

---

[6]     Pursuant to Local Bankruptcy Rule 4001-2(b), this subsection describes the Debtors' efforts to obtain financing, the basis on which the Debtors determined that the proposed financing is on the best terms available and the material facts bearing on the issue of whether the credit is being extended in good faith.

K&E 15009891.1

Additionally, such lenders were unwilling to provide financing without priming liens and equally unwilling to engage in a priming fight with the Prepetition Secured Parties. As a result, it became clear that the financing proposals from third party lenders would be on less favorable terms than those provided by the Prepetition Secured Parties.

36. Throughout these marketing efforts, the Debtors continued discussions with a steering committee of Prepetition Secured Parties concerning proposed financing both inside and outside the context of a chapter 11 bankruptcy.[7] After extensive negotiations and consideration of numerous proposals—including a potential roll-up of certain prepetition obligations held by the Prepetition Secured Parties—the Debtors determined in their business judgment that the DIP Facility would best enable the Debtors to preserve the value of the Debtors' estates.

37. During the months of May and June 2009, the Debtors and the Prepetition Agent exchanged several iterations of term sheets for the DIP Facility. An initial draft of the DIP Credit Agreement was developed in early June, which, along with other loan documentation, the Debtors and the Prepetition Agent continued to negotiate and finalize up until the Petition Date. On July 1, 2009, the Debtors received confirmation that the DIP Agent had completed syndication of the DIP Facility. Accordingly, the Debtors and the DIP Agent finalized the DIP Loan Agreement and commenced the Chapter 11 Cases.

38. As further described below, the Debtors succeeded in negotiating for exit financing as part of the DIP Facility, allowing the Debtors to ensure an expeditious emergence

---

[7]     On March 17, 2009, the Prepetition Loan Parties and the Prepetition Agent executed an amendment to the Prepetition Credit Agreement and waiver, which waived, for a certain period of time, several events of default. Prior to expiration of this amendment and waiver, the Debtors obtained a second amendment and 45-day waiver of its default under the Prepetition Credit Agreement, which waiver would expire the earlier of June 30, 2009 or the date on which the Debtors made any payment on their outstanding senior unsecured bonds. These two amendments enabled the Debtors to carefully weigh all options and further negotiate favorable postpetition financing terms.

K&E 15009891.1

from chapter 11. Specifically, the DIP Facility, in addition to providing the Debtors with fresh capital, will convert dollar-for-dollar into the Exit Facility.

39. Moreover, the Debtors are not seeking approval of authority to access the DIP Facility until 25 days after the Petition Date. This will provide the Debtors with additional time to consider postpetition financing proposals on terms more favorable than those proposed in the DIP Facility.

**C.     Use of the DIP Financing**

40. The proceeds of the DIP Facility will be used: (a) for general working capital purposes not otherwise prohibited by the DIP Credit Agreement; (b) to fund costs of administration of the Chapter 11 Cases; (c) to pay all fees and expenses provided under the DIP Credit Agreement and authorized by the Court; and (d) for such other purposes as permitted under the DIP Credit Agreement.

**D.     Description of Liens and Claims**

41. Pursuant to the terms and conditions of the Final DIP Order and the DIP Credit Agreement, all DIP Obligations of the Domestic Debtors, in every instance subject to the Carve Out, shall be:

a.      entitled, pursuant to section 364(c)(1) of the Bankruptcy Code, to the DIP Superpriority Claim in respect of the Debtors' DIP Obligations, subject only to the Carve Out;

b.      collateralized, pursuant to section 364(c)(2) of the Bankruptcy Code, by a perfected, valid, enforceable and non-avoidable first priority lien upon, and security interest in, all of the present or after-acquired property of the Domestic Debtors not subject to valid, perfected, and non-avoidable liens existing at the time of filing, subject only to the Carve Out, but excluding, in all cases, thirty-five percent (35%) of the total outstanding voting Capital Stock of each new or existing Foreign Subsidiary;

c.      further collateralized, pursuant to section 364(c)(3) of the Bankruptcy Code, by a perfected junior lien on all present and after-acquired property of the Domestic Debtors that is otherwise subject to a valid and perfected

37

lien on the Petition Date (other than liens securing the Prepetition Secured Obligations and liens that are junior to the liens securing the Prepetition Secured Obligations) or a valid lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, subject only to the Carve Out; and

d.     further collateralized, pursuant to section 364(d)(1) of the Bankruptcy Code, by a perfected first priority (subject to permitted exceptions), senior priming lien on (x) all present and after-acquired property of the Domestic Debtors that is subject to a valid, perfected and enforceable lien on or after the Petition Date to secure the Prepetition Secured Obligations, (y) all present and after-acquired assets that are presently subject to liens that are junior to the liens that secure the Prepetition Secured Obligations (but subject to any liens, other than those securing the Prepetition Secured Obligations, to which the liens being primed hereby are subject) and (z) the liens granted after the Petition Date to provide adequate protection in respect of the Prepetition Secured Obligations, subject only to the Carve Out.

## Basis for Relief

## I.    The Debtors' Request To Use Cash Collateral and the Proposed Adequate Protection Is Appropriate

42.    Where, as here, a debtor proposes to use its prepetition lender's cash collateral, upon request of an entity that has an interest in such cash collateral, the court shall prohibit or condition such use as necessary to provide adequate protection of that interest to the entity whose interest is primed by postpetition liens.  See 11 U.S.C. § 363(e).  Additionally, a debtor may use cash collateral of a secured party if that secured party consents.  See 11 U.S.C. § 363(c)(2).

43.    What constitutes sufficient adequate protection is decided on a case-by-case basis. See In re Columbia Gas Sys., Inc., Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); In re Monroe Park, 17 B.R. 934 (D. Del. 1982) (concept of adequate protection requires a debtor to propose some form of relief that will preserve the secured creditor's interest in collateral pending the outcome of the bankruptcy proceedings); see also In re Martin, 761 F.2d

472 (8th Cir. 1985); <u>In re Mosello</u>, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); <u>In re Realty Southwest Assocs.</u>, 140 B.R. 360 (Bankr. S.D.N.Y. 1992).

44.     By requiring debtors to provide adequate protection to those creditors affected by debtors' use of creditors' cash collateral, the Bankruptcy Code seeks to shield a secured creditor from diminution in the value of its interest in the particular collateral during the period of its use. <u>See</u> <u>In re Continental Airlines, Inc.</u>, 146 B.R. 536, 539-40 (Bankr. D. Del. 1992) (secured creditor only entitled to adequate protection to the extent the collateral declined in value); <u>In re Pursuit Athletic Footwear, Inc.</u>, 193 B.R. 713, 716 (Bankr. D. Del. 1996) (if there is no diminution in the value of the secured creditor's collateral and the debtor can operate profitably postpetition, the secured creditor is adequately protected against the use of cash collateral); <u>see also</u> <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) ("The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the chapter 11 reorganization."); <u>In re Beker Indus. Corp.</u>, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); <u>In re Hubbard Power & Light</u>, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).

45.     When priming of liens is sought pursuant to section 364(d) of the Bankruptcy Code, courts also examine whether the prepetition secured creditors are being provided adequate protection for the value of their liens. <u>Beker</u>, 58 B.R. at 737; <u>In re Utah 7000</u>, 2008 WL 2654919 at *3 (Bankr. D. Utah July 3, 2008).  Adequate protection can come in various forms, including payment of adequate protection fees, payment of interest, granting of replacement liens, and administrative claims.  <u>In re Swedeland Dev. Co.</u> 16 F.3d 552, 564 (3d Cir. 1994).

46.     In addition to replacement liens and administrative claim status, the Bankruptcy Code permits the payment of adequate protection by granting creditors any relief that will result in the realization of the "indubitable equivalent" of such entity's interest in the property.

K&E 15009891.1

11 U.S.C. § 361(3).  While the Bankruptcy Code does not define "indubitable equivalent," courts view this provision as a "catch-all" for any other form of adequate protection.  See In re Timbers of Inwood Forest, Assocs. Ltd., 793 F.2d 1380, 1388 (5th Cir. 1988) (describing section 361(3) of the Bankruptcy Code as a "catch-all" provision).

47.       Courts have considered the preservation and enhancement of collateral to be a critical component of adequate protection.  In determining the sufficiency of adequate protection, courts in this district have considered "whether the value of the debtor's property will increase as a result of the" use of the postpetition financing.  495 Cent. Park, 136 B.R. at 631.  Thus, for purposes of determining the sufficiency of adequate protection, the Court should evaluate the difference between what the Prepetition Secured Parties' collateral would be worth with and without the DIP Facility.  See id. (priming loan approved because it would improve collateral's value, noting that "[t]his value will serve as adequate protection . . . .").  See also In re Ledgemere Land Corp., 125 B.R. 58, 62 (Bankr. D. Mass. 1991) (priming loan approved when "the chance of a decline in the value of the property is more than offset by the likelihood of enhancement in value due to the Debtor's construction and marketing plans"); In re Sky Valley, Inc., 100 B.R. 107, 114 (Bankr. N.D. Ga. 1988) ("an increase in the value of the collateral . . . resulting from superpriority financing could result in adequate protection." (citation omitted)), aff'd, 99 B.R. 117 (N.D. Ga. 1989).

48.       In In re Campbell Sod, Inc., 378 B.R. 647 (Bankr. D. Kan. 2007), the bankruptcy court permitted a priming lien pursuant to section 364(d) where use of the loan proceeds to purchase and develop sod crop was more likely to increase than decrease the value of the collateral, and the company was likely to fail without an infusion of capital.  In Campbell Sod, the court's approval of a priming lien depended in large part on testimony showing that the

priming loan would enable the debtor to stabilize and enhance the value of the prepetition lender's collateral. See id. at 650-51, 54.

49.     The Debtors are providing certain protections to the Prepetition Secured Parties in return for their consent to use Cash Collateral as well as for their consent to priming of their liens pursuant to the DIP Facility. Specifically, the Debtors propose to provide the Prepetition Secured Parties with the Adequate Protection Package, which comprises, among other things, four primary forms of adequate protection.

50.     *First*, the Domestic Debtors will provide the Prepetition Agent with the Adequate Protection Payments, consisting, as further described above, of certain accrued and unpaid fees and disbursements owing to the Prepetition Agent under the Prepetition Credit Facility and incurred prior to the Petition Date but unpaid as of the Petition Date. *Second*, the Debtors propose to grant the Prepetition Secured Parties, subject to the Carve Out and DIP Superpriority Claim (upon approval of the Final DIP Order), the 507(b) Claim against the Domestic Debtors to the extent of any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral. As provided above, the 507(b) Claim shall not paid with the proceeds of Avoidance Actions. *Third*, subject to the Carve Out, the Debtors propose to provide the Prepetition Secured Parties with the Adequate Protection Liens in and upon all Postpetition Collateral to the extent of any diminution in the value of the Prepetition Secured Parties' interest in the Prepetition Collateral. *Lastly*, in addition to the Adequate Protection Payments, the 507(b) Claim, and the Adequate Protection Liens, the Debtors propose to comply with certain reporting requirements. The Debtors believe that the proposed adequate protection for the Prepetition Secured Parties is necessary and appropriate to ensure that the Debtors can continue to use the Cash Collateral.

51.     In reliance upon such adequate protection, the Prepetition Secured Parties have consented to the Debtors' use of the Cash Collateral.  Accordingly, the Adequate Protection Package summarized herein and set forth in detail in the Interim Cash Collateral Order is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

## II.     Interim Approval of the Use of Cash Collateral Should be Approved

52.     The Court may grant interim relief in respect of a motion filed pursuant to section 363 and 364 of the Bankruptcy Code, such as this Motion, where such interim relief "is "necessary to avoid immediate and irreparable harm" to the estate pending a final hearing.  See Fed. R. Bankr. P. 4003 & 6003; see also S.D.N.Y. Bankr. L.R. 4001-2(g).  In this instance, it is essential that the Debtors immediately stabilize their operations and cash flow, which will maximize the potential for a successful reorganization.  Given the Debtors' liquidity needs, however, the foregoing will not be possible unless the Debtors have immediate access to the Prepetition Collateral, including the Cash Collateral.

53.     Absent authorization from the Court to use Cash Collateral on an interim basis pending the Final Hearing, the Debtors will be immediately and irreparably harmed.  As set forth above, the Debtors' ability to use Cash Collateral is critical to their ability to operate their businesses and preserve value.   Without immediate liquidity provided by the use of Cash Collateral, the Debtors operations likely will be disrupted.  Absent ability to use Cash Collateral, the Debtors likely will be unable to pay basic expenses, such as payroll and utilities, and will suffer a precipitous loss of value to the detriment of all parties in interest.  Serious and irreparable harm to the Debtors and their estates would occur, with disastrous consequences for the Debtors, their estates and creditors.

54. Accordingly, the Debtors are requesting authority to have immediate access to the Cash Collateral subject to the terms and conditions of the Interim Cash Collateral Order to (a) ensure that the Debtors have sufficient working capital to, among other things, pay their employees and vendors; (b) enable the Debtors to honor their prepetition obligations to various payments in accordance with any orders entered by the Court approving certain motions filed contemporaneously herewith; and (c) avoid the accrual of administrative expenses incurred in connection with the commencement of the Chapter 11 Cases.

55. Pursuant to Bankruptcy Rules 4001(b) and 6003 and Local Bankruptcy Rule 4001-2(g), the Debtors request that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtors to use the Cash Collateral of the Prepetition Secured Parties to (i) maintain and finance the ongoing operations of the Debtors, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule the Final Hearing on the relief requested herein.

56. In examining requests for interim relief under the Bankruptcy Rules, courts apply the same business judgment standard applicable to other business decisions. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 36 (Bankr. S.D.N.Y. 1990); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985). Under this standard, the Debtors' request for entry of the Interim Cash Collateral Order, in the time periods requested herein, is appropriate. The Debtors believe that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the use of cash collateral and the approval of the proposed adequate protection.

## III. The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code

57. Section 364(c) permits debtors to obtain postpetition secured financing if unsecured credit is unavailable. Moreover, a debtor in chapter 11 may obtain postpetition

financing on a priming lien basis if it is unable to obtain credit otherwise and it provides adequate protection to creditors whose liens the debtor intends to prime. <u>See</u> 11 U.S.C. § 364(d)(1)(A) & (B).

58. For the reasons discussed below, the Court should authorize the Debtors to access postpetition financing on a secured basis pursuant to sections 364(c) and 364(d)(1) of the Bankruptcy Code. The Debtors' ability to access postpetition financing will maximize the value of their estates because the reorganization process hinges upon their being able to access postpetition financing. Indeed, the DIP Facility contains numerous features favorable to the Debtors that will aid in their successful reorganization and future post-chapter 11 operations. Specifically, (a) the financing arrangements between the Debtors and the DIP Lenders provide for conversion of the DIP Facility into an Exit Facility upon the Debtors' emergence from chapter 11; (b) the DIP Credit Agreement permits the Debtors to continue utilizing their current cash management system; and (c) upon emergence, the DIP Lenders may receive warrants for stock in the reorganized Debtors,[8] meaning the DIP Lenders will likely have a financial incentive to cooperate in ensuring a successful reorganization of the Debtors' businesses.

## A. The Debtors Should Be Permitted to Obtain Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code

59. Pursuant to section 364(c), if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status, secured by a senior lien on unencumbered property, or secured by a junior lien on encumbered property. 11 U.S.C. § 364(c). <u>See</u> <u>Pearl-Phil GMT</u>

---

[8] As provided above, upon conversion of the DIP Facility into the Exit Facility, reorganized Lear Corporation will pay to the DIP Lenders a commitment fee by, at reorganized Lear Corporation's sole discretion, either issuing warrants to the DIP Lenders to purchase shares of reorganized Lear Corporation with a value as of the Plan Effective Date equal to $25 million (or, if less than all of the Loans under the DIP Facility are converted into the Exit Facility or any other exit facility, a percentage of $25,000,000 equal to the percentage of Loans so converted), or paying to the DIP Lenders cash in an amount equal to 5% of the principal amount of such DIP Lender's Loans that will be converted into the Exit Facility or any other exit facility.

(Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).

60.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source.  See, e.g., Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and holding that debtor made reasonable efforts to satisfy the standards of section 364(c) to obtain less onerous terms where debtor approached four lending institutions, was rejected by two and selected the least onerous financing option from the remaining two lenders); see also Bray v. Shenandoah Fed. Sav. & Loan Ass'n. (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986) ("The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable.").

61.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); see also In re Garland Corp., 6 B.R. 456, 461 (B.A.P. 1st Cir. 1980) (secured credit under section 364(c)(2) authorized, after notice and a hearing, upon showing that unsecured credit unobtainable); In re Stanley Hotel, Inc., 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); Ames, 115 B.R. at 37-39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

45

62.     As noted above, the Debtors, Miller Buckfire and the Debtors' other professional advisors met with and solicited offers from potential financiers over several months.  During this process, the Debtors were simply unable to obtain favorable postpetition financing in the form of unsecured credit, an administrative expense or credit secured by junior liens on the Debtors' assets.  Ultimately, the Prepetition Secured Parties provided the best proposal to allow the Debtors to undertake a successful reorganization.  The Debtors believe they could not obtain a debtor in possession facility of the size and on the terms as favorable as those proposed herein. Accordingly, the Debtors respectfully submit that their efforts to obtain postpetition financing satisfy the standard required under section 364(c) of the Bankruptcy Code.

63.     The DIP Facility will provide the Debtors' customers and vendors with additional assurance that the Debtors will maintain adequate liquidity during the Chapter 11 Cases to meet payroll, pay operating expenses and operate the business in a manner that maintains and enhances value for the benefit of all constituencies.

64.     Additionally, the DIP Facility ensures that the Debtors will not be required to devote additional effort and expense to negotiating and obtaining exit financing when the Chapter 11 Cases conclude.  Upon confirmation of a Conforming Plan, the DIP Facility converts into the Exit Facility.  This feature of the Debtors' proposed postpetition financing ensures that the Debtors will have an adequate source of liquidity to successfully continue business operations after they complete implementation of their contemplated balance sheet restructuring.

65.     In difficult economic times and historically tight credit markets, the Debtors have concluded that the funds provided by the DIP Facility will provide not only an appropriate cushion against unanticipated contingencies, but also will provide a necessary level of liquidity. This will ensure that the Debtors can continue to devote adequate funding to their capital and

labor intensive manufacturing and assembly operations, reassure their suppliers that payment for critical goods and services is forthcoming, demonstrate to customers the Debtors' continued viability as a going concern and stabilize the Debtors' businesses going forward.

**B.     The Debtors Should Be Permitted To Obtain Postpetition Financing Pursuant To Section 364(d)(1) of the Bankruptcy Code**

66.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property without consent from affected secured parties if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  <u>See</u> 11 U.S.C. § 364(d)(1).

67.     The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364(d)(1) should be whether the transaction would enhance the value of the Debtors' assets.   Courts advocate using a "holistic approach" to evaluate superpriority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens. <u>See</u> <u>In re Aqua Assocs.</u>, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

68.     In furtherance of this approach, courts consider a number of factors, including, without limitation:

> i.     whether alternative financing is available on any other basis (*e.g.*, whether any better offers, bids or timely proposals are before the court);

ii.    whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

iii.    whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

iv.    whether the proposed financing agreement was negotiated in good faith and at arm's-length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and its creditors.

v.    whether the proposed financing agreement adequately protects prepetition secured creditors; and

See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990); Bland v. Farmworker Creditors, 308 B.R. 109, 113-14 (S.D. Ga. 2003); In re Farmland Indus., Inc., 294 B.R. 855, 862-79 (Bankr. W.D. Mo. 2003), *cited in* Transcript of Record at 733:3-7, In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 5, 2009); In re Barbara K. Enters., Inc., Case No. 08-11474 (MG), 2008 WL 2439649, at *10 (Bankr. S.D.N.Y. June 16, 2008); see also 3 COLLIER ON BANKRUPTCY ¶ 364.04[1] (15th ed. rev. 2008).

69.    For the reasons set forth below, the Debtors satisfy these factors.

### 1.    The Debtors Could Not Obtain Alternative Financing on More Favorable Terms

70.    It is well-recognized in this jurisdiction and others that the appropriateness of a proposed postpetition financing facility must be considered in light of current market conditions. See, e.g., Transcript of Record at 734-35:24-1, In re Lyondell Chem. Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); In re Snowshoe Co. Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is unavailable).

K&E 15009891.1

71. Because of current economic conditions, it has been difficult to obtain debtor in possession financing. As described more fully above, the Debtors explored a variety of financing and investment possibilities that ultimately did not come to fruition. In addition, while the Debtors were in the process of negotiating the terms of the DIP Credit Agreement, the Debtors also attempted to identify other sources of postpetition financing to determine whether they could obtain such financing on better terms. Based on current capital market conditions, the Debtors determined that postpetition financing on an unsecured basis or on a junior priority basis to the Prepetition Secured Parties would not be attainable.

### 2. Entry Into the DIP Credit Agreement Is Necessary To Preserve the Assets of the Debtors' Estates During the Chapter 11 Cases

72. As debtors in possession, the Debtors have a fiduciary duty to protect and maximize their estates' assets. See In re Mushroom Transp. Co., Inc., 382 F.3d 325, 339 (3d Cir. 2004); Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery, 330 F.3d 548, 573 (3d Cir. 2003). The Debtors require access to the funds provided under the DIP Credit Agreement, which, if approved, will provide the Debtors with the working capital necessary to allow them to continue funding their day-to-day operations during the pendency of the Chapter 11 Cases.

73. All of the Debtors' major constituencies understand that failure to successfully implement and achieve the comprehensive balance sheet restructuring contemplated by the Debtors' plan of reorganization term sheet will endanger the Debtors' long-term competitiveness. Although the Debtors' compressed margins, coupled with the effects of current market conditions on the automotive industry and compounded by the ongoing economic downturn and weakened credit markets, have not resulted in an immediate risk of constrained liquidity, continued operations without additional financing may impose excessive liquidity

49

restraints on the Debtors. Additionally, the ability to obtain postpetition financing will serve to address any concerns that may arise among the Debtors' suppliers and customers in response to the filing of the Chapter 11 Cases.

74.     The Debtors' inability to access financing and thereby generate revenues to adequately support their business at this critical juncture could severely jeopardize their reorganization efforts. Approval and implementation of the DIP Credit Agreement, in contrast, will enable continued functioning of the Debtors' operations on a daily basis and preserve the going-concern value of the Debtors' estates for the benefit of all parties.

75.     As with most large businesses with billions of dollars in revenue, the Debtors project to have significant cash needs over the course of the Chapter 11 Cases. Access to the DIP Facility will allow the Debtors to, among other things, continue the operation of their businesses in an orderly manner, maintain business relationships with vendors, suppliers and customers, pay employees and satisfy other working capital and operational needs. Each of these basic business expenses is vital to preserving and maintaining the Debtors' going concern value. The inability to meet payments to vendors, pay employees and satisfy customers' desires for particular products would impair, if not destroy, the Debtors' prospects for reorganization. In short, without access to liquidity, the Debtors would eventually shut down their businesses to the detriment of all parties in interest in the Chapter 11 Cases.

76.     For these reasons, the Debtors submit that entry into the DIP Facility is in the best interests of the Debtors' creditors, is necessary to preserve the value of estate assets and is an exercise of the Debtors' sound and reasonable business judgment.

### 3.     The Terms of the DIP Credit Agreement Are the Best Available

77.     The DIP Credit Agreement was negotiated in good faith and at arm's-length among the parties, culminating in a carefully crafted agreement designed to maintain the

Debtors' business as a going-concern and preserve value for all parties in interest. Given the urgent needs of the Debtors to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Credit Agreement are the best available. Indeed, when viewed in its totality, the DIP Credit Agreement reflects the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and supported by fair consideration.

78.     Among the advantages the DIP Facility offers to the Debtors is the ability to convert the DIP Facility into the Exit Facility upon occurrence of the Initial Conditions to Rollover, discussed above. Essentially, once the Debtors obtain confirmation of a Conforming Plan, as well as fulfill any prior or contemporaneous transactions required under the plan of reorganization, the entire DIP Facility will convert into the Exit Facility. Thus, in negotiating and obtaining the DIP Facility, the Debtors have already cleared a major hurdle to exit from chapter 11. In the present credit markets where many companies are languishing in chapter 11 because they cannot obtain sufficient exit financing, this unique feature of the DIP Facility provides substantial flexibility for the Debtors and reduces the risks inherent in the chapter 11 process for the Debtors and all constituencies.

79.     Additionally, the DIP Facility is closely intertwined with the plan support agreements and the plan term sheet, filed contemporaneously with this Motion. Indeed, the plan support agreements, which have been agreed to and are binding upon the Prepetition Secured Parties and the ad hoc noteholders committee, may terminate if the DIP Facility is not approved by the Court within sixty days of the Petition Date. Thus, continued support by the Debtors' key creditor constituencies of the Debtors' restructuring goals is closely correlated with the Debtors' access to the DIP Facility.

K&E 15009891.1

80.     Moreover, because the DIP Lenders may receive warrants to purchase equity of the Debtors upon emergence from chapter 11, as summarized above, their interests in seeing value maximized and the Debtors' reorganized successfully are closely aligned with those of the Debtors and other creditor constituencies.  In the event there were a default under the DIP Credit Agreement, the Debtors are confident that the Prepetition Secured Parties' unique economic interests would drive them to support the Debtors' successful reorganization and work with the Debtors' management to consensually resolve a default, rather than pursuing more drastic remedies.  Further, because many of the DIP Lenders are existing participants in the Debtors' capital structure, they share restructuring goals similar to those of the Debtors and are invested in the success of the business, an important benefit of the proposed financing.  Finally, because the Final Hearing to approve the DIP Facility will not occur until approximately 25 days after the Petition Date, the DIP Facility effectively acts like a "stalking horse" bid in an auction, setting a public baseline and providing an additional market check on the DIP Facility.

**4.      The Debtors Have Exercised the Business Judgment Required to Justify Entering Into the DIP Credit Agreement**

81.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard.  See, e.g., Ames Dep't Stores, 115 B.R. at 38 (noting that financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment); Barbara K. Enters., 2008 WL 2439649 at *14 (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest").  Bankruptcy courts routinely accept a debtor's business judgment on many business decisions, including the decision to borrow money.  See, e.g., Group of Inst. Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions regarding

assumption or rejection of leases are left to the business judgment of the debtor); Simasko, 47 B.R. at 449 ("Business judgments should be left to the board room and not to the Court."). Further, one court has noted that "[m]ore exacting scrutiny [of the debtors' business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

82.     Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious, In re Curlew Valley Assocs., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981); see also In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor), and generally will not second-guess a debtor in possession's business decisions involving "a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code." Curlew Valley, 14 B.R. at 513-14 (footnotes omitted).

83.     To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" In re Dura Auto. Sys. Inc., No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting In re Exide Techs., Inc., 340 B.R. 222, 239 (Bankr. D. Del. 2006)); see also In re Lionel Corp., 722 F.2d 1063, 1070 (2d Cir. 1983) (acknowledging the use of the "articulated business justification" for the use of property under section 363 of the Bankruptcy Code). Once a debtor articulates a valid business justification, however, it is presumed that "in making a business decision the directors of a corporation acted

on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." In re Integrated Resources, Inc., 147 B.R. 650, 656 (S.D.N.Y. 1992) (quoting Smith v. Van Gorkom, 488 A.2d 858, 872 (Del. 1985)).

84.     Here, the Debtors have exercised sound business judgment in determining that the DIP Facility is appropriate, and have satisfied the legal prerequisites to obtain the proposed DIP Facility. The DIP Facility and DIP Credit Agreement were considered by the Debtors' management and subjected to scrutiny by experienced professionals before approval. The Debtors decision to agree to the DIP Facility is reasonable under the circumstances as, without the debtor in possession financing, the Debtors may continue to experience restrained liquidity. Moreover, the terms of the DIP Credit Agreement are fair and reasonable in light of current market conditions (particularly in the difficult markets for debtor in possession financing related to the automotive industry that exist currently) and are in the best interests of the Debtors' estates. Accordingly, the Debtors have demonstrated sound business judgment and should be granted authority to enter into the DIP Facility and borrow funds from the DIP Lenders on the terms described herein and take the other actions contemplated by the DIP Facility and as requested herein.

85.     In light of the distressed state of the automotive industry, the funds provided by the DIP Facility are essential to enable the Debtors to retain the confidence of their customers and suppliers and ensure the continued supply of goods and services they need to sustain their operations and maintain through the pendency of the Chapter 11 Cases. Indeed, failure to obtain approval of the DIP Facility will irreparably harm the going-concern value of their businesses, which, in turn, will adversely affect the potential for successfully emerging from chapter 11.

86.     Access to the DIP Facility will ensure that the Debtors can continue to adequately fund their operations, thereby preserving, and indeed, enhancing, enterprise value, which will ultimately increase the value of the estate and distribution to stakeholders upon consummation of a plan of reorganization.

87.     Accordingly, pursuant to section 364(c) and (d)(1), the Debtors respectfully submit that they should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lenders on the secured and administrative superpriority basis described herein.

**5.      The Adequate Protection Package Provided to the Prepetition Secured Parties Meets the Requirements of Section 364(d)(1)(B)**

88.     A debtor may obtain postpetition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, in addition to not being able to obtain credit otherwise, provides "adequate protection" to those parties whose liens are primed. 11 U.S.C. § 364(d)(1)(B).

89.     As discussed above, the Debtors have proposed to provide sufficient adequate protection with regard to their use of Prepetition Secured Parties' Cash Collateral under section 363(e).  They have also proposed to provide sufficient adequate protection as part of the DIP Facility to meet the standards for obtaining postpetition financing under section 364(d)(1)(B). Specifically, and as further described in connection with the Debtors' proposed use of Cash Collateral, the Debtors have agreed to pay all accrued and unpaid prepetition fees and disbursements owing to the Prepetition Agent under the Prepetition Credit Agreement.  Further, subject to the Carve Out and DIP Superpriority Claim, the Debtors propose to grant Prepetition Secured Parties the 507(b) Claim to the extent of any diminution in value of the Prepetition Secured Parties' collateral as a result of the Chapter 11 Cases, and in particular,

55

among other things, the imposition of the automatic stay. Additionally, the Debtors propose to grant the Adequate Protection Liens to the extent of any diminution in the value of the Prepetition Secured Parties' collateral, likewise subject to the Carve Out. Lastly, the Debtors have agreed to comply with certain reporting requirements.

90.     In reliance upon such adequate protection, the Prepetition Secured Parties have consented to priming of their liens. Accordingly, the Adequate Protection Package summarized herein and set forth in detail in the Final DIP Order is fair and reasonable and sufficient to satisfy the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

## IV.     The Debtors Should be Allowed to Pay the Fees Associated with the DIP Facility and the Exit Facility

91.     Courts routinely authorize debtors to pay fees related to debtor in possession financing facilities where the financing is beneficial to the estate in the Debtors' business judgment. See, e.g., In re Gen. Growth Properties Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); In re Aleris International Inc., Case No. 09-10478 (BLS) (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an upfront 3% facility fee for $125 million of debtor in possession financing); In re Dura Automotive Systems, Inc., Case No. 06-11202 (KJC) (Bankr. D. Del. Jan. 28, 2008) (authorizing debtors to pay 2.5% in fees related to refinancing and extending a debtor in possession financing facility); In re DJK Residential, Case No. 08-10375 (JMP) (Bankr. S.D.N.Y. February 29, 2008) (order authorizing debtors to enter into debtor in possession financing and pay a 3.0% fee); In re Delphi Corporation, et al., Case No. 05-44481 (RDD) (Bankr. S.D.N.Y. Nov. 16, 2007) (authorizing debtor to pay fees in order to extend a debtor in possession facility); In re Tower Automotive, Inc., et al., Case No. 05-10578 (ALG)

(Bankr. S.D.N.Y. Jan. 31, 2007) (same); see also In re Verasun Energy Corp., Case No. 08-12606 (BLS) (Bankr. D. Del. Nov. 28, 2008) (providing for an exit fee of 5.00% of the principal amount of the funded debtor in possession loans on a $196.54 million facility); In re Lyondell Chemical Co., Case No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3.00% of a $3.25 billion term loan portion of $8.0 billion in debtor in possession financing).

92.     The Facility Fee of 5.0% of all amounts actually funded under the DIP Facility, payable on the date of the applicable funding, the 1.0% Exit Fee of the total amount advanced under the DIP Facility, payable upon the substantial consummation of a plan of reorganization as defined in section 1101 of the Bankruptcy Code, (collectively, the "Fees") and the arrangement fees are justified under the Debtors' business judgment. When considered in the context of the financing provided by the proposed Exit Facility, the Fees are well within the range entered into in private lending situations and those approved by bankruptcy courts. Typically, the aggregate facility fees and exit fees approved in large chapter 11 cases equal or exceed 6%. See, e.g., In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. Apr. 29, 2009) (approving 3% initial fee and 3% exit fee on both term loan and non-roll-up portion of revolving facility, as well as 3% exit fee for roll-up portion of revolving facility loan).

93.     The Debtors are seeking approval of Fees for the DIP Facility in an amount equal to 5% of the principal amount of the DIP Facility as well as Fees for the Exit Facility in an amount equal to 1% of the principal amount of Loans that are continued as Exit Loans. In addition, the Debtors seek approval of certain arrangement fees for the arrangers. These Fees, in the aggregate, do not exceed, and are in some instances less than, the fee rates approved in prior cases. Additionally, the Fees are justified not only by the current conditions in credit markets, but also by the structure of the DIP Facility itself. As discussed above, the Exit Facility feature

K&E 15009891.1

of the Debtors' proposed postpetition financing will spare the Debtors the time and expense of seeking exit financing and will allow them to devote their and their advisors' attention to running their businesses and implementing a comprehensive balance sheet restructuring. The Fees are therefore more than justified in this instance.

94.     Further, the Fees were heavily negotiated between sophisticated parties advised by counsel. As a result, the Debtors believe that the Fees are reasonable in light of the amounts borrowed and the lending term. Therefore, the decision to enter into the DIP Facility and pay the Facility Fee satisfies the business judgment standard. See In re Lionel Corp., 722 F.2d at 1071.

## V.     Modification of the Automatic Stay is Warranted

95.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to:  (a) grant the liens and claims described herein; (b) perform such acts as the DIP Lenders may request in each of its reasonable discretion to assure the perfection and priority of the liens granted in the Final DIP Order and/or the Interim Cash Collateral Order; (c) permit the Debtors to incur all liabilities and obligations contemplated in the DIP Credit Agreement; (d) authorize the Debtors to deposit all cash, checks or other collections or proceeds from the Collateral received by the Debtors to be deposited in accordance with the requirements of the DIP Documents and to apply any amounts so deposited and other amounts paid to or received by the DIP Agent or the DIP Lenders, under the DIP Documents, in accordance with the requirements of the DIP Documents; (e) authorize and permit the DIP Agent and the DIP Lenders to exercise their remedies set forth in the Final DIP Order and the DIP Documents; and (f) authorize the Prepetition Agent to enforce its rights and remedies as to the Prepetition Collateral and Postpetition Collateral in accordance with the Prepetition Credit Agreement and related documents and applicable law.

K&E 15009891.1

96.     In addition, the Debtors request authority to permit modification of the automatic stay to permit Citibank, N.A. ("Citibank") to set off any cash deposits it is specifically holding as collateral for that certain Irrevocable Standby Letter of Credit No. 63663991, dated January 30, 2009 (the "Citibank LC") against any amounts paid by Citibank to the beneficiaries of the Citibank LC upon any postpetition draws thereon, subject to the terms of the Citibank LC. Citibank has agreed to return to the Debtors within three business days of such setoff the excess of any cash deposits that Citibank is holding as collateral for all letters of credit over the amount of collateral the Debtors are required to provide with respect to all outstanding letters of credit issued by Citibank at the Debtors' request with respect to the Citibank LC.

97.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.  See, e.g., In re General Growth Properties, Inc., Case No. 09-11977 (ALG) (Bankr. S.D.N.Y. May 14, 2009); In re Tronox Inc., Case No. 09-10156 (ALG) (Bankr. S.D.N.Y. Feb. 6, 2009); In re Chemtura Corp., Case No. 09-11233 (REG) (Bankr. S.D.N.Y. April 23, 2009); In re Wellman, Inc., Case No. 08-10595 (SMB) (Bankr. S.D.N.Y. Apr. 7, 2008); In re Musicland Holding Corp., Case No. 06-10064 (SMB) (Bankr. S.D.N.Y. Feb. 21, 2006); In re Muzak Holdings LLC, Case No. 09-10422 (KJC) (Bankr. D. Del. Mar. 12, 2009).

**Request for Final Hearing**

98.     Pursuant to Bankruptcy Rules 4001(b)(2) and (c)(2), the Debtors request that the Court set a date for the Final Hearing to consider that is as soon as practicable, but in no event later than twenty-five (25) days following the entry of the Interim Cash Collateral Order, and fix the time and date prior to the Final Hearing for parties to file objections to this Motion.

K&E 15009891.1

## Motion Practice

99.     This Motion includes citations to the applicable rules and statutory authorities upon which the relief requested herein is predicated, and a discussion of their application to this Motion.  Accordingly, the Debtors submit that this Motion satisfies Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York.

## Waiver of Bankruptcy Rule 6004(a) and 6004(h)

100.     To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 10-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## Application to Affiliate Entities

101.     The Debtors further request that the terms of this motion, as well as the terms of any orders requested by this motion and entered pursuant thereto, apply to any and all affiliates of the Debtors that have not yet filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code as of the Petition Date, but which subsequently file such a petition during the pendency of the Chapter 11 Cases.

## Notice

102.     The Debtors have provided notice of this Motion to:  (a) the Office of the United States Trustee for the Southern District of New York; (b) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d); (c) counsel to the agent for the Debtors' prepetition senior lenders and proposed postpetition secured lenders; (d) each trustee for each of the Debtors' notes; (e) counsel to the ad hoc committee of the Debtors' unsecured noteholders; (f) the Internal Revenue Service; and (g) the Securities and Exchange Commission.  In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

K&E 15009891.1

## **No Prior Request**

103.     No prior request for the relief sought in this Motion has been made to this or any

other court.

K&E 15009891.1

WHEREFORE, the Debtors respectfully request entry of an interim order, substantially in the form attached hereto as <u>Exhibit A</u>, granting the relief requested herein and granting such other and further relief as is just and proper.

New York, New York
Dated: July 7, 2009

/s/ *Marc Kieselstein*
James H.M. Sprayregen
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

- and -

Marc Kieselstein (*pro hac vice* pending)
Ryan Blaine Bennett (*pro hac vice* pending)
Paul Wierbicki (*pro hac vice* pending)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Proposed Counsel to the Debtors
and Debtors in Possession

## EXHIBIT A

## Interim Cash Collateral Order

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re:                                          :   Chapter 11
                                                :
LEAR CORPORATION, et al.,                        :   Case No. 09-[        ]
                                                :
            Debtors.                            :   Jointly Administered
                                                :
                                                :
-------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING THE USE OF
## LENDERS' CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION
## PURSUANT TO 11 U.S.C. §§ 361 AND 363

Upon the motion (the "Motion"),[1] dated as of [        ], 2009, of Lear

Corporation ("Lear") and certain of its direct and indirect subsidiaries, the above-captioned

debtors (each a "Debtor" and collectively, the "Debtors"), (a) seeking this Court's authorization,

pursuant to Section 363(c) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as

amended, the "Bankruptcy Code"), to use the Cash Collateral (as defined below) and, pursuant to

Sections 361 and 363 of the Bankruptcy Code, to provide adequate protection to the Lenders (as

defined below) with respect to any diminution in the value of the Lenders' interests in the

Prepetition Collateral (as defined below), including for the use of the Cash Collateral, the use,

sale, lease, depreciation, or other diminution in value of the Prepetition Collateral other than the

Cash Collateral, or the imposition of the automatic stay pursuant to Section 362(a) of the

Bankruptcy Code; and (b) seeking a preliminary hearing (the "Preliminary Hearing") on the

Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001(b) (this "Order")

---

[1]     To the extent capitalized terms are not defined herein, they shall have the meaning ascribed to them in the Motion.

authorizing the Debtors to use the Lenders' Cash Collateral; and due and sufficient notice of the Motion and the Preliminary Hearing under the circumstances having been given; and the Preliminary Hearing on the Motion having been held before this Court on [    ], 2009; and upon the entire record made by the Debtors at the Preliminary Hearing, and this Court having found good and sufficient cause appearing therefor,

**IT IS HEREBY STIPULATED AND AGREED BY AND AMONG THE DEBTORS, THE ADMINISTRATIVE AGENT AND THE LENDERS THAT**:

A.      On June 30, 2009 (the "<u>Petition Date</u>"), each of the Debtors filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York thereby commencing the above-captioned bankruptcy cases (collectively, these "<u>Chapter 11 Cases</u>").  The Debtors are continuing to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  No request has been made for the appointment of a trustee or examiner and no statutory committee of unsecured creditors (a "<u>Committee</u>") has yet been established in these Chapter 11 Cases.

B.      This Court has jurisdiction over these Chapter 11 Cases and the Motion pursuant to 28 U.S.C. § 157(b) and 1334.  Consideration of this Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2).

C.      Pursuant to the Amended and Restated Credit and Guarantee Agreement dated as of April 25, 2006 (as amended, supplemented or otherwise modified as of the Petition Date, the "<u>Credit Agreement</u>"), among Lear, Lear Canada, a general partnership organized under the laws of Ontario, Canada and a Debtor herein, certain of Lear's foreign subsidiaries party thereto, the several lenders party thereto (including as holders of secured swap obligations in connection with certain interest rate protection arrangements, collectively, the "<u>Lenders</u>"),

JPMorgan Chase Bank, N.A., as general administrative agent for the Lenders (in such capacity, the "Administrative Agent"), and the other agent banks party thereto, the Lenders made approximately $2.3 billion of loans and other financial accommodations to or for the benefit of Lear and the other Debtors.  In connection with the Credit Agreement, Lear and certain of the other Debtors (collectively, the "Debtor Loan Parties") entered into certain collateral and ancillary documentation, and certain hedge arrangements with the Lenders (such documentation as of the Petition Date, together with the Credit Agreement, the "Loan Documents").  All such loans, financial accommodations and other amounts owing by Lear and the other Debtor Loan Parties to the Administrative Agent and the Lenders in connection with the Loan Documents are hereinafter referred to the "Prepetition Obligations".

D.     Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and agree that, as of the Petition Date, Lear and the other applicable Debtor Loan Parties are truly and justly indebted to the Lenders and the Administrative Agent on account of the Prepetition Obligations as set forth in the Loan Documents, without defense, counterclaim or offset of any kind and are liable to the Lenders in respect of loans made by the Lenders to Lear pursuant to and to the extent set forth in the Credit Agreement and the other applicable Loan Documents in the aggregate principal amount of approximately $2.177 billion, plus additional amounts in respect of termination payments under certain hedge agreements with Lenders or their affiliates (to the extent such hedge agreements are terminated) that are secured ratably with the other Prepetition Obligations, plus approximately $73,200,000 on account of Lear's reimbursement obligations with respect to letters of credit issued pursuant to the Credit Agreement which remained outstanding as of the Petition Date, plus additional amounts in respect to accrued but

unpaid interest and all other fees, costs, and expenses of the Lenders and the Administrative Agent, in each case payable pursuant to the terms of the Loan Documents.

        E.      Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and agree that, pursuant to the Loan Documents, the Prepetition Obligations are secured (subject to the applicable limitation or secured amounts set forth in Section 17.24 of the Credit Agreement) by perfected, valid and enforceable first priority liens and security interests granted by Lear and the other applicable Debtor Loan Parties pursuant to and to the extent set forth in the applicable Loan Documents to the Administrative Agent for the ratable benefit of the Lenders, upon and in certain assets and property of the applicable Debtor Loan Parties, including without limitation, accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter-of-credit rights, certain commercial tort claims, pledged capital stock and other pledged interests of certain subsidiaries and other tangible and intangible personal property and the proceeds thereof (including the setoff rights described in the Loan Documents and arising by operation of law, but in each case not including any "Excluded Property" (as defined in the Credit Agreement), collectively the "Prepetition Collateral").  Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and agree that the Administrative Agent's liens and security interests in the Prepetition Collateral have been properly filed or recorded, as applicable, so as to be perfected in accordance with applicable law.  Without prejudice to the rights of any other party (but subject to the limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and agree that certain cash on hand of the applicable Debtor Loan Parties and amounts generated by the

collection of accounts receivable, sale of inventory or other dispositions of the Prepetition

Collateral constitute Prepetition Collateral as proceeds of the Prepetition Collateral and,

therefore, is cash collateral of the Lenders within the meaning of Section 363(a) of the

Bankruptcy Code (the "Cash Collateral").  The Administrative Agent does not consent to the use

by the Debtors of the Prepetition Collateral, including the Cash Collateral, except on the terms of

this Order (or other order that may be entered by the Bankruptcy Court with the Administrative

Agent's consent).  In addition, the Lenders are entitled, pursuant to Sections 361 and 363(e) of

the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral to the

extent required under the Bankruptcy Code for the diminution in value, including for the use of

the Cash Collateral, the use, sale, lease, depreciation, or other diminution in value of the

Prepetition Collateral other than the Cash Collateral, and the imposition of the automatic stay.

Based upon the foregoing stipulations, and upon the record made before this

Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS** that:

F.      Good cause has been shown for the entry of this Order.  The Debtors do

not have sufficient available sources of working capital and financing to carry on the operation

of their businesses without the use of the Cash Collateral.  Among other things, entry of this

Order will minimize disruption of the Debtors' businesses and operations and permit them to

make payroll and other operating expenses, maintain business relationships with their vendors

and retain customer and vendor confidence by demonstrating an ability to maintain normal

operations.  The use of the Cash Collateral is therefore of the utmost significance and importance

to the preservation and maintenance of the going concern value of the Debtors and their estates,

and will enhance the prospects for a successful reorganization of the Debtors under Chapter 11

of the Bankruptcy Code. The Cash Collateral is sufficient, however, to fund the Debtors'

business and these Chapter 11 Cases on an interim basis, pending entry of a DIP Financing Order

(as defined below).

G.    The Administrative Agent and the Debtors have negotiated at arms' length

and in good faith regarding the Debtors' use of Cash Collateral to fund the administration of the

Debtors' estates and continued operation of their businesses. The Administrative Agent and the

Lenders have agreed to permit the Debtors to use their Cash Collateral for the period through the

Termination Date (as defined below), all subject to the terms and conditions set forth herein,

including the protection afforded a party acting in "good faith" pursuant to Section 363(m) of the

Bankruptcy Code; provided, however that this Order and the terms, conditions, rights and

remedies set forth herein shall, as applicable, be superseded by, made subject to or terminate

upon entry of, an order by the Court substantially in the form attached to the Motion as Exhibit B

approving the debtor in possession financing facility described in the Motion (a "DIP Financing

Order").

H.    The Debtors represent that notice of the Preliminary Hearing and the relief

requested in the Motion has been given to (i) the Office of the United States Trustee for the

Southern District of New York, (ii) the entities listed on the Consolidated List of Creditors

Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (iii)

counsel to the Administrative Agent, (iv) counsel to the Debtors' proposed postpetition secured

lenders, (v) each trustee for each of the Debtors' notes, (vi) counsel to the ad hoc committee of

the Debtors' unsecured noteholders, (vii) the Internal Revenue Service, and (viii) the Securities

and Exchange Commission. Based on such representation, such notice of the Preliminary

Hearing was given in accordance with Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), and the local rules of this District.

        I.      Based on the record presented to the Court at the Preliminary Hearing, the terms of the Debtors' use of the Lenders' Cash Collateral appear to be fair and reasonable, and to reflect the Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties.

        J.      The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2). The permission granted herein to use the Lenders' Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors. This Court concludes that entry of this Order is in the best interest of the Debtors' estate and creditors.

        Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

        **IT IS HEREBY ORDERED** that:

        1.      The Motion is granted on an interim basis. The Debtors are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the Termination Date for working capital and general corporate purposes and costs and expenses related to these Chapter 11 Cases in accordance with the terms and conditions of this Order; <u>provided</u> that all uses of cash by the Debtors for the costs and expenses of administering these Cases shall be deemed to be first from cash that is not Cash Collateral and thereafter from Cash Collateral.

        2.      Except as otherwise provided herein, the Debtors shall maintain their pre-Petition Date cash management and accounts receivable collection system to the extent authorized by and subject to the terms of any order of this Court governing the Debtors' cash

management system.  This Order does not address the disposition of any Prepetition Collateral outside the ordinary course of business or the Debtors' use of the Cash Collateral resulting therefrom.

        3.      (a) As adequate protection for, and to the extent of, any diminution in the value of the Lenders' interest in the Prepetition Collateral resulting from (x) the use of the Cash Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease, depreciation, or other diminution in value of the Prepetition Collateral (other than the Cash Collateral) pursuant to Section 363(c) of the Bankruptcy Code and (z) the imposition of the automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the amount of any such diminution being referred to hereinafter as the "Adequate Protection Obligations"):

        (i)      the Administrative Agent and the Lenders are hereby granted (effective as of the Petition Date and without the necessity of the execution by the Debtors of mortgages, security agreements, control agreements, pledge agreements, financing statements or otherwise), valid and perfected, security interests in, and liens (the "Adequate Protection Liens") on all of the right, title and interest of the U.S. Debtors (the "Domestic Debtors") in, to and under all present and after-acquired property of the Domestic Debtors of any nature whatsoever including, without limitation, all cash contained in any account of the Domestic Debtors, and the proceeds of all causes of action, other than (a) causes of action (and proceeds thereof) arising under Sections 544, 545, 547, 548, 550 and 553 (collectively, the "Avoidance Actions") of the Bankruptcy Code and (b) 35% of the outstanding voting shares of each new or existing foreign subsidiary (collectively, with the proceeds and products of any and all of the foregoing, the "Postpetition Collateral").  Subject to the Carve Out (as defined below), said Adequate Protection Liens shall be (x) a first priority perfected lien upon all of the Postpetition Collateral that is not otherwise encumbered by a validly perfected, enforceable, non-avoidable security interest or lien on the Petition Date or a valid lien in existence on the Petition Date that is perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code, (y) a first priority, senior, priming and perfected lien upon (a) that portion of the Postpetition Collateral that is comprised of the Prepetition Collateral and (b) Postpetition Collateral subject to a lien that is junior to the liens securing the Prepetition Obligations and (z) a second priority, junior perfected lien upon all Postpetition Collateral (other than the portion described in the preceding clause (y)), which is subject to a validly perfected lien as of the Petition Date or a valid lien in existence on the Petition

Date that is perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code;

(ii)     subject to the Carve Out and the terms of a DIP Financing Order, a claim against the Domestic Debtors that constitutes expenses of administration under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "507(b) Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in these Chapter 11 Cases or, to the extent permitted by applicable law, any subsequent proceedings under the Bankruptcy Code provided that the507(b) Claims shall not be paid with the proceeds of Avoidance Actions.  Subject to the Carve Out and the terms of a DIP Financing Order, no cost or expense of administration under Sections 105, 503(b) or 507(b) or otherwise, including those resulting from the conversion of these Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the 507(b) Claims of the Lenders arising out of the Adequate Protection Obligations; and

(iii)     the Domestic Debtors are authorized and directed, promptly following entry of this order, to pay as further adequate protection an amount equal to all accrued and unpaid fees and disbursements owing to the Administrative Agent and the Issuing Lender under the Loan Documents and incurred prior to the Petition Date but unpaid as of the Petition Date provided that any such fees paid to the Issuing Lender shall not include any fees payable under section 9.5(e)(ii) of the Credit Agreement.

(b)  As further adequate protection hereunder, the Debtors shall provide the following reporting to the Administrative Agent (the "Reporting Requirements"): no later than Tuesday of every calendar week, commencing July 14, 2009, a rolling 13-week cash flow projection of Lear and its subsidiaries in the form of the initial 13-week cash flow projection that has been mutually agreed upon by the Administrative Agent and the Debtors (each, a "Cash Flow Forecast").  The Administrative Agent shall have reasonable access, upon notice during normal business hours, to the Debtors' business records and premises and to the Prepetition Collateral and the Postpetition Collateral to enable the Administrative Agent to (i) review, appraise, and evaluate the physical condition of the Prepetition Collateral or Postpetition

Collateral, (ii) inspect and review the financial records and all other records of the Debtors concerning the operation of the Debtors' business, and (iii) evaluate the Debtors' overall financial condition and all other records relating to the operations of the Debtors. The Debtors shall fully cooperate with the Administrative Agent regarding such reviews, evaluations, and inspections, and shall make members of their senior management and professionals reasonably available to the Administrative Agent and its professionals and consultants to conduct such reviews, evaluations and inspections, in each case subject to applicable confidentiality and privilege limitations. At its discretion, the Administrative Agent may request, and the Debtors agree to provide, periodic telephonic updates to the Administrative Agent and the Lenders concerning the operations, business affairs and financial condition of the Debtors, in each case subject to applicable confidentiality and privilege limitations.

(c) As additional adequate protection, the Domestic Debtors are authorized and directed, within 20 days of the submission of invoices therefor, to pay or reimburse all reasonable fees, costs and charges incurred by the Lenders and the Administrative Agent (including, without limitation, the administration fees payable to the Administrative Agent under the Credit Agreement and the reasonable fees and out-of-pocket disbursements of counsel and any financial advisors or other third-party consultants to the Administrative Agent), in each case, in connection with matters relating to the Credit Agreement, the Prepetition Obligations, the monitoring of these Chapter 11 Cases or the enforcement and protection of the rights and interests of the Administrative Agent and the Lenders in these Chapter 11 Cases. None of the fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval by this Court (but the Court shall resolve any dispute as to the reasonableness of any such fees, costs and expenses), and no recipient of any such payment shall be required to file any interim or

final fee application with respect thereto; provided, however, that copies of any such invoices, redacted as necessary to preserve the attorney-client privilege, shall be provided to counsel to the Committee and to the Office of the United States Trustee. Nothing contained herein shall be deemed to be a waiver by any party in interest of the right to object to the reasonableness of any fees, costs and charges incurred by the Lenders or the Administrative Agent.

(d)  Under the circumstances and based upon the Lenders' consent or non-objection, the adequate protection provided herein is reasonable and sufficient to protect the interests of the Lenders. Notwithstanding any other provision hereof, the grant of adequate protection to the Administrative Agent and the Lenders pursuant hereto is without prejudice to the right of the Administrative Agent to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.

4.  As used in this Order, "Carve Out" means shall mean the sum of (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (B) the costs of administrative expenses not to exceed $50,000 in the aggregate that are permitted to be incurred by any Chapter 7 trustee pursuant to any order of this Court following any conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; and (C) at any time after the first Business Day following delivery of a written notice delivered by the Administrative Agent to the Debtors, the United States Trustee, counsel for the Debtors and counsel for any statutory committee appointed in the Chapter 11 Cases stating that an Event of Default (as defined below) has occurred and is continuing and that the Carve Out Cap (as defined below) is

invoked, which notice may only be delivered following the occurrence and during the continuance of an Event of Default (a "Carve Out Trigger Notice"), to the extent allowed at any time, whether before or after delivery of a Carve Out Trigger Notice, whether by interim order, procedural order or otherwise, all unpaid fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), the payment of all Professional Fees incurred by the Professional Persons at any time after the first Business Day following delivery of a Carve Out Trigger Notice in an aggregate amount not exceeding $15,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed at any time by the Bankruptcy Court, whether before or after delivery of a Carve Out Trigger Notice, whether by interim order, procedural order or otherwise, that were incurred by the Professional Persons on or prior to the first Business Day following the delivery of the Carve Out Trigger Notice), provided that (x) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any Avoidance Actions or the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, in all cases to the extent against the Administrative Agent or the Lenders and (y) the Carve Out shall not be reduced by the payment of Professional Fees incurred prior to the first Business Day following delivery of a Carve Out Trigger Notice without regard to when such amounts are allowed by the Bankruptcy Court. Upon delivery of a Carve Out Trigger Notice or the commencement of a liquidation, the Debtors are directed to deposit an amount equal to the unpaid Professional Fees, including the Carve Out Cap, prior to making any distributions to creditors in a segregated account solely for payment of Professional Fees that are

within the Carve Out.  Nothing herein shall be construed as a waiver of the right of the

Administrative Agent or any Lender to object to the allowance of any Professional Fees and

Disbursements.

5.     Notwithstanding the foregoing, in no event shall the Cash Collateral or the

Carve Out be used for the payment or reimbursement of any fees, expenses, costs, or

disbursements of any of the professionals incurred in connection with the assertion or joinder in

any claim, counter-claim, action, proceeding, application, motion, objection, defense, or

contested matter, the purpose of which is to seek any order, judgment, determination, or similar

relief (a) challenging the Prepetition Obligations, invalidating, setting aside, avoiding, or

subordinating in whole or in part the Administrative Agent's liens and security interests granted

pursuant to the Loan Documents or this Order, or asserting any other claims or causes of action

against the Administrative Agent or the Lenders (but the Cash Collateral or the Carve Out may

be used for the investigation in connection therewith, subject to a limitation of $250,000), or (b)

preventing, hindering or delaying, whether directly or indirectly, the Administrative Agent's

enforcement or realization upon any Prepetition Collateral or Postpetition Collateral in

accordance with the terms of this Order.

6.     Except as expressly set forth in this Order, the Adequate Protection Liens

shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtors'

estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with

any other lien under Sections 363 and 364 of the Bankruptcy Code.  Subject to the Carve Out

and the terms of a DIP Financing Order, the Adequate Protection Liens shall be prior and senior

to all liens and encumbrances of all other secured creditors in and to such Postpetition Collateral

granted, or arising, after the Petition Date (including, without limitation, liens and security

interests, if any, granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors). The Adequate Protection Liens granted pursuant to this Order shall constitute valid, enforceable and duly perfected security interests and liens, and the Administrative Agent and the Lenders shall not be required to file or serve financing statements, notices of lien or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect such security interests and liens; and the failure by the Debtors to execute any documentation relating to the Adequate Protection Liens shall in no way affect the validity, enforceabililty, perfection or priority of such Adequate Protection Liens. If, however, the Administrative Agent, in its sole discretion, shall determine to file any such financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of such Adequate Protection Liens, the Debtors are directed to cooperate with and assist in such process, the stay imposed by Section 362(a) of the Bankruptcy Code is hereby lifted to allow the filing and recording of a certified copy of this Order or any such financing statements, notices of lien or similar instruments, and all such documents shall be deemed to have been filed or recorded at the time of and on the date of this Order.

7.    The automatic stay under Section 362 of the Bankruptcy Code is hereby vacated and modified to the extent necessary to permit (a) the Debtors and the Administrative Agent to take all actions necessary to implement this Order, (b) all actions and transfers contemplated herein, and (c) consistent with the terms of this Order, following the Termination Date, to permit the Administrative Agent to pursue its rights and remedies as to the Prepetition Collateral and Postpetition Collateral in accordance with the Loan Documents and applicable law.

8.      The Debtors' right to use the Cash Collateral pursuant to this Order shall

terminate (the date of any such termination, the "Termination Date") on the earliest to occur of

(x) entry by this Court of a DIP Financing Order (which shall provide for the continued use of

the Cash Collateral on the terms set forth therein), (y) sixty days after the Petition Date, with

such date extendable by thirty additional days with the Administrative Agent's consent, such

consent not be unreasonably withheld, or (z) five-business days following written notice to the

Debtors after the occurrence and continuance of any of the following events ("Events of

Default") beyond any applicable grace period:

   a. Failure of the Debtors to make any payment to the Administrative Agent or the
      Lenders as and when required by this Order or other failure to comply in any
      material respect with the terms of this Order and such failure shall continue
      unremedied for more than two business days after notice thereof;

   b. Failure of the Debtors to comply with the Reporting Requirements and such
      failure shall continue unremedied for more than three business days after notice
      thereof;

   c. Failure of the Debtors to comply with any other covenant or agreement specified
      in this Order (other than those described in clauses (a) and (b) above) and such
      failure shall continue unremedied for more than five business days after notice
      thereof;

   d. Any of these Chapter 11 Cases shall be dismissed or converted to a Chapter 7
      Case; the Ontario Superior Court, Commercial List, shall fail to enter within five
      business days after the Petition Date an order in the cases of Canadian Debtors
      under section 18.6 of the Companies' Creditors Arrangement Act recognizing the
      commencement of these Chapter 11 Cases; or a Chapter 11 Trustee with plenary
      powers, a responsible officer, or an examiner with enlarged powers relating to the
      operation of the businesses of the Debtors (powers beyond those set forth in
      Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of
      these Chapter 11 Cases; provided that the appointment by the Court of a trustee or
      other fiduciary of any of the Debtors' estates for the limited purpose of
      investigating, commencing or prosecuting Avoidance Actions on behalf of such
      Debtor's estate shall not constitute a default under this subparagraph;

   e. An order shall be entered reversing, amending, supplementing, staying for a
      period in excess of three days, vacating or otherwise modifying this Order without
      the consent of the Administrative Agent;

f. A pleading shall be filed by any of the Debtors seeking, or otherwise consenting to, any of the matters set forth in paragraphs (d) or (e) hereof;

g. One or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Petition Date against any Debtor Loan Party involving in the aggregate a liability (excluding any amounts paid or covered by insurance as to which the relevant insurance company has not denied coverage) of $10,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 45 days from the entry thereof;

h. Except in connection with entry of a DIP Financing Order, without the prior written consent of the Administrative Agent, the Debtors at any time during these Chapter 11 Cases grant (or seek authority from the Court to grant) liens in the Prepetition Collateral, the Postpetition Collateral or any portion thereof to any other parties pursuant to Section 364 of the Bankruptcy Code, which liens are senior or on a parity with the liens of the Administrative Agent or the Lenders, unless the terms and conditions of any order granting such liens expressly provide that any unpaid Adequate Protection Obligations are paid to the Lenders concurrently with the entry of any such order; and

i. Except on the terms of this Order (other than in connection with a DIP Financing Order), the Debtors at any time: (i) use the Cash Collateral; (ii) use the Postpetition Collateral; or (iii) apply to any court for an order authorizing the use of the Cash Collateral or Postpetition Collateral.

The Debtors shall promptly provide notice to the Administrative Agent (with a copy to counsel for the Committee and the United States Trustee) of the occurrence of any Event of Default.

9. Following notice by the Administrative Agent of an Event of Default and prior to a Termination Date, the Debtors or any other party of interest, including the Committee, shall be entitled to seek an emergency hearing to be held within such five (5) business day period regarding, among other things, the continued use of Cash Collateral. Unless the Court enters an order authorizing the Debtors to continue their use of Cash Collateral at such hearing, the Termination Date shall occur. Upon Termination Date, (i) the Adequate Protection Obligations shall become immediately due and payable, (ii) the Administrative Agent and each Lender may setoff amounts in any account of the Debtors maintained with the Administrative Agent or each Lender, respectively and (iii) the Administrative Agent and the Lenders may exercise the rights

and remedies available under the Loan Documents, this Order or applicable law, including, without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or Postpetition Collateral in order to collect the Adequate Protection Obligations. The automatic stay under Section 362 of the Bankruptcy Code is hereby deemed modified and vacated to the extent necessary to permit such actions. The actions described in clauses (ii) and (iii) above may be taken without further order of or application to the Court as the Administrative Agent or the Lenders shall, in their discretion, elect. The Administrative Agent and the Lenders shall be entitled to apply the payments or proceeds of the Prepetition Collateral in accordance with the provisions of the Loan Documents, and in no event shall the Administrative Agent or any of the Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Prepetition Collateral, Postpetition Collateral or otherwise. Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights, remedies, benefits and protections provided to the Administrative Agent and the Lenders under this Order shall survive the Termination Date except to the extent the Termination Date arises under clause (x) of the definition thereof. Notwithstanding the foregoing, the Administrative Agent and the Lenders shall not exercise the rights and remedies described in this paragraph 9 should the Termination Date occur by reason of entry of a DIP Financing Order by this Court.

10. Subject to entry of a DIP Financing Order, the provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered (a) confirming any plan of reorganization in these Chapter 11 Cases; (b) converting any of these Chapter 11 Cases to a Chapter 7 case; or (c) dismissing any of these Chapter 11 Cases. Subject to entry of a DIP Financing Order, if an order dismissing these Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in

accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the Adequate Protection Liens granted pursuant to this Order to the Administrative Agent and the Lenders shall continue in full force and effect, shall remain binding on all parties in interest notwithstanding such dismissal until the obligations secured thereby shall have been paid and satisfied in full and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the limited purposes of enforcing such Adequate Protection Liens.

11.     Subject to entry of a DIP Financing Order, if any or all of the provisions of this Order are hereafter modified (which shall not occur without the prior written agreement of the Administrative Agent), vacated, or stayed, such modification, vacation or stay shall not affect (a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the Administrative Agent or the Lenders before the effective date of such modification, vacation, or stay or (b) the validity or enforceability of the Adequate Protection Liens, or any priority or other protection authorized, created, or confirmed by this Order.  Notwithstanding any such modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the Debtors to the Administrative Agent or the Lenders before the effective date of such modification, vacation, or stay shall be governed in all respects by the original provisions of this Order, and the Administrative Agent and the Lenders shall be entitled to all the rights, remedies, privileges, and benefits granted herein with respect to all such indebtedness, obligations, or liabilities.

12.     No approval, agreement or consent requested of the Administrative Agent by the Debtors pursuant to the terms of this Order or otherwise shall be inferred from any action, inaction, or acquiescence of the Agent or the Lenders other than from a writing signed by the

Administrative Agent.  Nothing herein shall in any way affect the rights of the Administrative Agent or the Lenders as to any non-Debtor entity.

13.     Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the Administrative Agent or the Lenders may have against the Debtors or third parties, and without prejudice to the right of the Administrative Agent and the Lenders to seek relief from the automatic stay in effect pursuant to Bankruptcy Code Section 362, or any other relief in these Chapter 11 Cases, and the right of the Debtors or third parties to oppose any such relief.  The provisions of this Order shall be binding upon and inure to the benefit of the Administrative Agent, the Lenders, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.

14.     Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, the Administrative Agent and the Lenders are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Order, and each is entitled to the protection provided to such entities under Section 363(m) of the Bankruptcy Code.

15.     Notwithstanding any provision in other "first day" orders entered by this Court authorizing the Debtors to make payments in respect of prepetition obligations, the provisions in this Order conditioning the payment of such amounts or limiting the amount of such payments are controlling.

16.     As a result of the Debtors' review of the Loan Documents and the facts related thereto, the Debtors have made certain agreements and acknowledgments as set forth in paragraphs D and E above and shall have no right to file a complaint pursuant to Bankruptcy Rule 7001 or otherwise, or any other pleading asserting a claim or cause of action arising out of

or related to the Loan Documents or any transactions or course of conduct related thereto. The acknowledgments and agreements contained in paragraphs D and E hereof shall be binding upon the Debtors in all circumstances, and shall be binding upon all other parties in interest, including without limitation, a Committee, unless (a) a party in interest (including a Committee) has been granted standing to file and has properly filed an adversary proceeding or contested matter (subject to the limitations set forth in paragraph 5 hereof) challenging the validity, enforceability or priority of the Prepetition Obligations or the Administrative Agent's liens on the Prepetition Collateral in respect thereof, or otherwise asserting any claims or causes of action against the Administrative Agent or the Lenders on behalf of the Debtors' estates, no later than the date that is sixty (60) days after the date of the appointment of a Committee, and (b) this Court rules in favor of the plaintiff in any such timely and properly filed adversary proceeding or contested matter. If no such adversary proceeding or contested matter is commenced as of such date, the Prepetition Obligations shall constitute allowed claims, not subject to defense, counterclaim, offset of any kind, or subordination and otherwise unavoidable, for all purposes in these Chapter 11 Cases or any subsequent Chapter 7 cases, the Administrative Agent's liens on the Prepetition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, and the Administrative Agent, the Lenders, the Prepetition Obligations and the Administrative Agent's liens on the Prepetition Collateral shall not be subject to any other or further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto. If any such adversary proceeding or contested matter is timely commenced as of such date, the acknowledgements and agreements contained in paragraphs D and E shall nonetheless remain binding and preclusive (as provided in this paragraph) except to the extent that such

acknowledgements and agreements were expressly challenged in such adversary proceeding or contested matter.

17.     The automatic stay is hereby modified to authorize Citibank, N.A. ("Citibank") to set off any cash deposits it is specifically holding as collateral for that certain Irrevocable Standby Letter of Credit No. 63663991, dated Jan 30, 2009 and issued by Citibank at the request of the Debtors (the "Citibank LC"), against any amounts paid by Citibank to the beneficiaries of the Citibank LC upon postpetition draw of the Citibank LC, subject to the terms of the Citibank LC; provided, however, that Citibank agrees to return to the Debtors' estates, within three business days of such setoff, the excess of any cash deposits it is holding as collateral for the Citibank LC over the amount of collateral the Debtors are required to provide with respect to the Citibank LC.

18.     The findings of fact and conclusions of law contained herein constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to these proceedings by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

19.     The Debtors shall, on or before [          ], 2009, mail copies of a notice of the entry of this Order, together with a copy of this Order and a copy of the Motion, to the parties having been given notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for a Committee.  The notice of entry of this Order shall state that any party in interest objecting to the entry of a DIP Financing Order and/or the use of the Lenders' Cash Collateral pursuant thereto shall file written objections with the United States Bankruptcy Court Clerk for the Southern District of New York no later than 4:00 p.m. on [          ], 2009 and objections shall be served so that the same are received on or

before such date by: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York 10022, Attention: James H.M. Sprayregen, Esq. and Leonard Klingbaum, Esq. and Kirkland & Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attention: Marc Kieselstein, Esq. and Ryan Blaine Bennett, Esq., Attorneys for the Debtors, (b) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attention: Kenneth S. Ziman, Esq. and Elisha D. Graff, Esq., Attorneys for the Administrative Agent and (c) the Office of the United States Trustee, and a hearing to consider the relief requested in the Motion on a final basis shall be held on [          ], 2009 at [  ]:00 [ ]m.

Dated: [          ], 2009
      New York, New York

                                         _____

                                         Honorable _____
                                         United States Bankruptcy Judge

**EXHIBIT B**

**Form of Final DIP Order**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEAR CORPORATION, *et al.*, | ) Case No. 09-[____] (____) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

FINAL ORDER UNDER 11 U.S.C. §§ 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1) AND 364(e) AND BANKRUPTCY RULES. 2002, 4001 AND 9014 (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING, (II) AUTHORIZING THE DEBTORS TO USE CASH COLLATERAL AND (III) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED LENDERS

Upon the motion, dated [_____] [__], 2009 (the "Motion"), of Lear Corporation

("Lear") and certain of its subsidiaries, each as debtor and debtor-in-possession (collectively, the

"Debtors")[1] in the above-captioned cases (the "Chapter 11 Cases") commenced on June 30, 2009

(the "Petition Date") for a final order under sections 105, 361, 362, 363(c), 364(c)(1), 364(c)(2),

364(c)(3), 364(d)(1) and 364(e) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.

(as amended, the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of

Bankruptcy Procedure (as amended, the "Bankruptcy Rules") and the Local Bankruptcy Rules

for the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy

Court"), seeking:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' federal tax identification number (if any), include: Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear Corporation Canada Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC (4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings Corp. #50 (9055); Lear South Africa Limited (a

(I)     authorization for (a) Lear to obtain $500,000,000 postpetition financing (the "DIP Loans") on the terms and conditions set forth in this Order (this "Order") and the Credit and Guarantee Agreement (substantially in the form attached to the Motion as Exhibit A, and as hereafter amended, supplemented or otherwise modified from time to time, the "DIP Agreement"; [2] together with all agreements, documents and instruments delivered or executed in connection therewith, as hereafter amended, supplemented or otherwise modified from time to time, the "DIP Documents"), among Lear, the Guarantors (as defined below) and JPMorgan Chase Bank, N.A. ("JPMorgan"), as Administrative Agent (in such capacity, the "DIP Agent") for itself and a syndicate of other financial institutions (collectively, the "DIP Lenders"), and (b) the U.S. Debtors, other than Lear (collectively, the "Guarantors" and along with Lear, the "Domestic Debtors") along with Lear ASC Corporation, to guaranty on a secured basis Lear's obligations in respect of the DIP Loans;

(II)    authorization for the applicable Debtors to execute and deliver the DIP Agreement and the other DIP Documents and to perform such other and further acts as may be necessary or appropriate in connection therewith;

(III)   authorization for the Debtors to (a) use the Cash Collateral (as defined in paragraph 11 below) pursuant to section 363 of the Bankruptcy Code,

---

non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol Seating, LLC (4745).
    [2] Unless defined in this Order, capitalized terms are used herein as defined in the DIP Agreement.

and all other Prepetition Collateral (as defined in paragraph 3(b) below), and (b) provide adequate protection to the lenders (including their affiliates which entered into secured hedge agreements with the Debtors, collectively, the "Prepetition Lenders") under the Amended and Restated Credit and Guarantee Agreement, dated as of April 25, 2006 (as amended, supplemented or otherwise modified as of the Petition Date, the "Prepetition Credit Agreement"; and together with any security, pledge or guaranty agreements and all other documentation executed in connection with any of the foregoing, each as amended, supplemented or otherwise modified, in each case as of the Petition Date, the "Prepetition Loan Documents"), among Lear, Lear Canada, certain subsidiaries of Lear party thereto (together with Lear , collectively the "Debtor Loan Parties"), the Prepetition Lenders and JPMorgan, as administrative agent (in such capacity, the "Prepetition Agent") for the Prepetition Lenders;

(IV)    authorization for the DIP Agent to exercise remedies under the DIP Documents upon the occurrence and continuance of an Event of Default, including without limitation, upon the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code in respect of the Debtors' assets having a value in excess of $10,000,000;

(V)    authorization to grant liens to the DIP Lenders on the proceeds of the applicable Debtors' claims and causes of action (but not on the actual claims

and causes of action) arising under sections 544, 545, 547, 548, 549 and 550 of the Bankruptcy Code (collectively, the "Avoidance Actions");

(VI) the waiver by the Debtors of any right to seek to surcharge against the DIP Collateral (as defined in paragraph 7 below) pursuant to section 506(c) of the Bankruptcy Code;

(VII) to schedule, pursuant to Bankruptcy Rule 4001, a hearing (the "Hearing") for this Court to consider entry of this Order authorizing and approving on a final basis the relief requested in the Motion, including without limitation, for Lear on a final basis to borrow the full amount of the DIP Loans and to use the Cash Collateral and the other Prepetition Collateral.

This Court having held a hearing on [    ] [  ], 2009 to consider the Debtors' use of the Cash Collateral on an interim basis;

At the conclusion of such hearing, this Court having entered the Interim Order (I) Authorizing the Use of the Lenders' Cash Collateral and (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, dated [    ] [  ], 2009 (the "Cash Collateral Order") authorizing the Debtors to use the Cash Collateral during the period from the Petition Date through the date of entry of this Order, for general corporate purposes and costs and expenses relating to these Chapter 11 Cases in accordance with the terms and conditions thereof;

All objections to entry of this Order having been overruled, withdrawn or resolved pursuant to the terms of this Order;

The Hearing having been held by this Court on [_____] [__], 2009, and upon the record made by the Debtors at the Hearing, and after due deliberation and consideration and sufficient cause appearing therefor;

IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED, that:

1.      *Jurisdiction*.  This Court has core jurisdiction over the Chapter 11 Cases, this Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      *Notice*.  Notice of the Motion, the relief requested therein and the Hearing was served by the Debtors on (i) the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee"), (ii) the entities listed on the Consolidated List of Creditors Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (iii) counsel to the DIP Agent, (iv) counsel to the Prepetition Agent, (v) each trustee for each of the Debtors' notes, (vi) counsel to the ad hoc committee of the Debtors' unsecured noteholders, (vii) the Internal Revenue Service, and (viii) the Securities and Exchange Commission.  Under the circumstances, the notice given by the Debtors of the Motion, the relief requested therein and the Hearing constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and (c), the local rules of the Southern District of New York, and no further notice of the relief sought at the hearing is necessary or required.

3.      *Debtors' Stipulations*.  Without prejudice to the rights of any other party (but subject to the limitations thereon contained in paragraphs 17 and 18 below) the Debtors admit, stipulate, and agree that:

(a)     as of the Petition Date, Lear and the other applicable Debtor Loan Parties were liable to the Prepetition Lenders in respect of loans made by the Prepetition Lenders to Lear pursuant to and to the extent set forth in the applicable Prepetition Loan Documents in the aggregate principal amount of approximately $2.177 billion, plus additional amounts in respect of termination payments under certain hedge agreements with Prepetition Lenders or their affiliates (to the extent such hedge agreements are terminated) that are secured ratably with the other Prepetition Obligations, plus approximately $73,200,000 on account of Lear's reimbursement obligations with respect to letters of credit issued pursuant to the Prepetition Credit Agreement which remained outstanding as of the Petition Date, plus additional amounts in respect of accrued but unpaid interest, fees and other charges and all other fees, costs, and expenses of the Prepetition Lenders and the Prepetition Agent, in each case payable pursuant to and to the extent set forth in the applicable Prepetition Loan Documents (collectively, the "Prepetition Obligations");

(b)     the Prepetition Obligations are secured (subject to the applicable limitation or secured amounts set forth in Section 17.24 of the Prepetition Credit Agreement) by perfected, valid and enforceable first priority liens and security interests granted by Lear and the other applicable Debtor Loan Parties pursuant to and to the extent set forth in the applicable Prepetition Loan Documents to the Prepetition Agent for the ratable benefit of the Prepetition Lenders, upon and in certain assets and property of the applicable Debtor Loan Parties, including without limitation, accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, intellectual property, inventory, investment property, letter-of-credit

rights, certain commercial tort claims, pledged capital stock and other pledged interests of certain subsidiaries and other tangible and intangible personal property and the proceeds thereof (including the setoff rights described in the Prepetition Loan Documents and arising by operation of law, but in each case not including any "Excluded Property" (as defined in the Prepetition Credit Agreement), collectively the "Prepetition Collateral");

(c)     the liens and security interests in the Prepetition Collateral granted by the applicable Debtor Loan Parties to the Prepetition Agent to secure the Prepetition Obligations are (i) valid, binding, perfected, enforceable, first priority (subject to permitted exceptions under the Prepetition Credit Agreement) liens on and security interests in the Prepetition Collateral, (ii) not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (iii) subject and subordinate only to (A) after giving effect to this Order, the Carve Out (as defined in paragraph 6(b) below) and the liens and security interests granted to secure the DIP Loans and the Adequate Protection Obligations (as defined in paragraph 13 below), and (B) valid, perfected and unavoidable liens permitted under the Prepetition Loan Documents to the extent such permitted liens are senior to the liens securing the Prepetition Obligations; and

(d)     (i) no portion of the Prepetition Obligations is subject to avoidance, recharacterization, recovery or subordination pursuant to the Bankruptcy Code or applicable nonbankruptcy law and (ii) the Debtors do not have, and hereby forever release, any claims, counterclaims, causes of action, defenses or setoff rights, whether arising under the Bankruptcy Code or applicable nonbankruptcy law, against the Prepetition Agent, the Prepetition Lenders

and their respective affiliates, subsidiaries, agents, officers, directors, employees, attorneys and advisors;

4.     *Findings Regarding The DIP Financing.*

(a)     Good cause has been shown for the entry of this Order.

(b)     The Debtors require the DIP Loans and need to continue to use the Prepetition Collateral, including the Cash Collateral, in order to, among other things, permit the orderly continuation of their businesses, preserve the going concern value of the Loan Parties, make payroll and satisfy other working capital and general corporate purposes of the Loan Parties.   The Debtors' use of the Prepetition Collateral (including the Cash Collateral) is necessary to ensure that the Debtors have sufficient working capital and liquidity to preserve and maintain the going concern value of the Debtors' estates.

(c)     The Debtors are unable to obtain financing on more favorable terms from sources other than the DIP Lenders pursuant to, and for the purposes set forth in, the DIP Documents and are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense.   The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without granting the priming DIP Liens (as defined in paragraph 7 below) and the Superpriority Claims (as defined in paragraph 6(a) below), in each case on the terms and conditions set forth in this Order and the DIP Documents.

(d)     The terms of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) pursuant to this Order are fair and reasonable, reflect the Debtors'

exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(e)     The DIP Documents and the use of the Prepetition Collateral (including the Cash Collateral) have been the subject of extensive negotiations conducted in good faith and at arm's length among the Debtors, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, and all of the Debtors' obligations and indebtedness arising under or in connection with the DIP Loans, including without limitation, (i) all loans made to Lear pursuant to the DIP Agreement and the obligations of the other Domestic Debtors in respect of the guarantees of the DIP Loans and (ii) all other obligations of the Debtors under the DIP Documents and this Order owing to any DIP Lenders, including, without limitation, the Upfront Fee and the Exit Fee and the fee payable in cash or warrants pursuant to Section 2.7 of the DIP Agreement (the "Conversion Fee") (collectively, the "DIP Obligations"), shall be deemed to have been extended by the DIP Agent and the DIP Lenders in "good faith" as such term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Order or any provision hereof is vacated, reversed or modified on appeal or otherwise.

(f)     Consummation of the DIP Financing and the use of the Prepetition Collateral (including the Cash Collateral) in accordance with this Order and the DIP Documents are in the best interest of the Debtors' estates.

5. *Authorization Of The DIP Financing And The DIP Documents.*

(a)    The Debtors are hereby authorized to enter into and perform under the DIP Documents and, in the case of Lear, to borrow under the DIP Agreement an aggregate principal amount of $500,000,000 of the DIP Loans for working capital and other general corporate purposes of the Debtors and the Loan Parties, including without limitation, to pay interest, fees and expenses in connection with the DIP Financing.

(b)    In furtherance of the foregoing and without further approval of this Court, each Debtor is authorized to perform all acts and to execute and deliver all instruments and documents that the DIP Agent determines to be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents to the extent applicable, including without limitation:

(i)    the execution, delivery and performance of the DIP Documents;

(ii)    the execution, delivery and performance of the guarantees by the Domestic Debtors of the obligations of Lear;

(iii)    the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the DIP Documents, in each case in such form as the Debtors, the DIP Agent and the DIP Lenders may agree, and no further approval of this Court shall be required for amendments, waivers, consents or other modifications to and under the DIP Documents (and any fees paid in connection therewith) that do not materially and adversely affect the Debtors or which do not (A) shorten the maturity of the DIP Loans, (B) increase the Commitments or the rate of interest payable on the DIP Loans

under the DIP Agreement, or (C) change any Event of Default, add any covenants or amend the

covenants therein, in each case as applicable to the Debtors, in any such case to be materially

more restrictive; provided, however, that a copy of any such amendment, waiver, consent or

other modification shall be filed by the Debtors with this Court and served by the Debtors on the

U.S. Trustee and the Committee;

        (iv)     the non-refundable payment to the DIP Agent, J.P. Morgan

Securities Inc. (the "DIP Arranger") and the DIP Lenders, as the case may be, of the fees set

forth in the DIP Documents and those agreed to among the Debtors and the DIP Arranger;

        (v)     the non-refundable payment to each DIP Lender of the Upfront

Fee, the Exit Fee and the Conversion Fee, in each case paid as and to the extent set forth in the

DIP Documents and this Order; and

        (vi)     the performance of all other acts required under or in connection

with the DIP Documents.

        (c)     Upon execution and delivery of the DIP Documents, the DIP Documents

shall constitute valid and binding obligations of the Debtors as applicable, enforceable against

the applicable Debtors in accordance with the terms of this Order and the DIP Documents.  No

obligation, payment, transfer or grant of security by the applicable Debtors under the DIP

Documents or this Order shall be stayed, voidable, avoidable or recoverable under the

Bankruptcy Code or under any applicable nonbankruptcy law (including without limitation,

under sections 502(d), 548 or 549 of the Bankruptcy Code or under any applicable state Uniform

Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

6.    *Superpriority Claims.*

(a)    Except to the extent expressly set forth in this Order in respect of the Carve Out, pursuant to section 364(c)(1) of the Bankruptcy Code, all of the DIP Obligations shall constitute allowed senior administrative claims (the "<u>Superpriority Claims</u>") against the Domestic Debtors with priority over any and all administrative expenses, adequate protection claims and all other claims against the Domestic Debtors, now existing or hereafter arising, of any kind whatsoever, including without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment.

(b)    As used in this Order, "<u>Carve Out</u>" shall mean the sum of (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (B) the costs of administrative expenses not to exceed $50,000 in the aggregate that are permitted to be incurred by any Chapter 7 trustee pursuant to any order of this Court following any conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, and (C) at any time after the first Business Day following delivery of a written notice delivered by the Administrative Agent to the Debtors, the United States Trustee, counsel for the Debtors and counsel for any

statutory committee appointed in the Chapter 11 Cases stating that an Event of Default (as defined below) has occurred and is continuing and that the Carve Out Cap (as defined below) is invoked, which notice may only be delivered following the occurrence and during the continuance of an Event of Default (a "Carve Out Trigger Notice"), to the extent allowed at any time, whether before or after delivery of a Carve Out Trigger Notice, whether by interim order, procedural order or otherwise, all unpaid fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to Section 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), the payment of all Professional Fees incurred by the Professional Persons at any time after the first Business Day following delivery of a Carve Out Trigger Notice in an aggregate amount not exceeding $15,000,000 (the "Carve Out Cap") (plus all unpaid Professional Fees allowed at any time by the Bankruptcy Court, whether before or after delivery of a Carve Out Trigger Notice, whether by interim order, procedural order or otherwise, that were incurred by the Professional Persons on or prior to the first Business Day following the delivery of the Carve Out Trigger Notice), provided that (x) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any Avoidance Actions or the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation, in all cases to the extent against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders and (y) the Carve Out shall not be reduced by the payment of Professional Fees incurred prior to the first Business Day following delivery of a

Carve Out Trigger Notice without regard to when such amounts are allowed by the Bankruptcy Court. Upon delivery of a Carve Out Trigger Notice or the commencement of a liquidation, the Debtors are directed to deposit an amount equal to the unpaid Professional Fees, including the Carve Out Cap, prior to making any distributions to creditors in a segregated account solely for payment of Professional Fees that are within the Carve Out. Nothing herein shall be construed as a waiver of the right of the DIP Agent, any DIP Lender, the Prepetition Agent or any Prepetition Lender to object to the allowance of any Professional Fees and disbursements.

7.     *DIP Liens*. As security for the DIP Obligations, effective and perfected upon the date of this Order and without the necessity of the execution by the Domestic Debtors (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages or other similar documents, or the possession or control by the DIP Agent of any property, the following security interests and liens are hereby granted to the DIP Agent, for its own benefit and the benefit of the DIP Lenders (all property identified in clauses (a), (b) and (c) below, which to avoid any doubt, in any case shall exclude 35% of the total outstanding voting Capital Stock of any new or existing Foreign Subsidiary of any Domestic Debtor, being collectively referred to as the "DIP Collateral"), subject only to the Carve Out (all such liens and security interests granted to the DIP Agent, for its benefit and for the benefit of the DIP Lenders, pursuant to this Order, the "DIP Liens"):

(a)     First Lien On Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority lien on, and security interest in, all tangible and intangible prepetition and postpetition property of the

14

Domestic Debtors, whether existing on or as of the Petition Date or thereafter acquired, that is not subject to valid, perfected, non-avoidable and enforceable liens in existence on or as of the Petition Date (collectively, the "Unencumbered Property"), including without limitation, any and all unencumbered cash, accounts receivable, inventory, general intangibles, contracts, securities, chattel paper, owned real estate, real property leaseholds, fixtures, machinery, equipment, deposit accounts, patents, copyrights, trademarks, tradenames, rights under license agreements and other intellectual property, capital stock of the subsidiaries of Lear[3] and the proceeds of all of the foregoing, provided that, the Unencumbered Property shall not include the Avoidance Actions and any assets upon which security may not be lawfully granted, but Unencumbered Property shall include any proceeds or property recovered in respect of any Avoidance Actions.

(b)     Liens Junior To Certain Existing Liens.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected junior lien on, and security interest in all tangible and intangible prepetition and postpetition property of the Domestic Debtors (other than the property described in paragraph 7(c), as to which the DIP Liens will be as described in such clause), whether now existing or hereafter acquired, that is subject to valid, perfected and unavoidable liens in existence immediately prior to the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code, which

---

[3] With respect to the capital stock of any foreign subsidiaries directly owned by a Domestic Debtor such capital stock shall only include 65% of the voting stock and 100% of any non-voting stock.

security interests and liens in favor of the DIP Agent and the DIP Lenders shall be junior to such valid, perfected and unavoidable liens.

(c)     Liens Priming Prepetition Lenders' Liens.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a valid, binding, continuing, enforceable, fully-perfected first priority, senior priming lien on, and security interest in, all Prepetition Collateral and any collateral that is subject to a valid Lien in effect on the Petition Date that is junior to the Liens that secure the Prepetition Obligations, provided that, notwithstanding anything to the contrary contained herein or in the DIP Credit Agreement, no such priming liens shall be granted in property of any Debtor other than the Domestic Debtors.  The DIP Liens on the Prepetition Collateral shall be senior in all respects to the security interests in, and liens on, the Prepetition Collateral of the Prepetition Agent and the Prepetition Lenders (including, without limitation, the Adequate Protection Liens (as defined in paragraph 13(a) below)), but shall be junior to any valid, perfected and unavoidable security interests in and liens on the Prepetition Collateral that were senior to the liens of the Prepetition Agent and the Prepetition Lenders as of the Petition Date, including as permitted by section 546(b) of the Bankruptcy Code.

(d)     Liens Senior To Certain Other Liens.  The DIP Liens and the Adequate Protection Liens shall not be (i) subject or subordinate to (A) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or (B) any liens arising after the Petition Date or (ii) subordinated to or made *pari passu* with any other lien or security interest under sections 363 or 364 of the Bankruptcy Code or otherwise (except as set forth in paragraph 16(a) below).

16

8.     *Remedies After Event of Default.*  The automatic stay under section 362 of the Bankruptcy Code is vacated and modified to the extent necessary to permit the DIP Agent and the DIP Lenders to exercise, (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under the DIP Documents, other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, and (ii) upon the occurrence and during the continuance of an Event of Default, and the giving of five (5) business days' prior written notice to the Debtors (with a copy to counsel to the Committee and to the U.S. Trustee), all rights and remedies against the DIP Collateral provided for in the DIP Documents and this Order (including, without limitation, the right to setoff monies of the Debtors in accounts maintained with the DIP Agent or any DIP Lender).  In any hearing regarding any exercise of rights or remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing. In no event shall the DIP Agent, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral or any other collateral securing the DIP Obligations.  The DIP Agent's or any DIP Lender's delay or failure to exercise rights and remedies under the DIP Documents or this Order shall not constitute a waiver of the DIP Agent's or any DIP Lender's rights hereunder, thereunder or otherwise, unless any such waiver is pursuant to a written instrument executed in accordance with the terms of the DIP Agreement.

9.     *Limitation On Charging Expenses Against Collateral*.  Except to the extent of the Carve Out, no expenses of administration of the Chapter 11 Cases or any future proceeding that

may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral or the Prepetition Collateral, as the case may be, pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Agent, the Required Lenders (as defined in the DIP Agreement) or the Prepetition Agent, as the case may be, and no such consent shall be implied from any other action or inaction by the DIP Agent, the Required Lenders, the DIP Lenders, the Prepetition Agent, or the Prepetition Lenders.

10. *Payments Free and Clear.* Any and all payments or proceeds remitted to the DIP Agent on behalf of the DIP Lenders or the Prepetition Agent on behalf of the Prepetition Lenders pursuant to the provisions of this Order or any subsequent order of this Court shall be received free and clear of any claim, charge, assessment or other liability, except to the extent of the Carve Out.

11. *The Cash Collateral.* A portion of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the applicable Debtor Loan Parties in any account or accounts with any Prepetition Lender and any cash proceeds of the disposition of any Prepetition Collateral, constitute Prepetition Collateral as proceeds of the Prepetition Collateral and, therefore, is cash collateral of the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").

12. *Use Of Prepetition Collateral (including Cash Collateral).* The Debtors are hereby authorized to continue to use the Prepetition Collateral, including the Cash Collateral, during the period from the date of entry of this Order through and including the "Maturity Date"

under the DIP Agreement for working capital and general corporate purposes in accordance with the terms and conditions of this Order, <u>provided</u> that the Prepetition Lenders are granted adequate protection as hereinafter set forth. Pursuant to the Cash Collateral Order, this Court authorized the Debtors to use the Cash Collateral during the period from the Petition Date through the date of entry of this Order, for general corporate purposes and costs and expenses relating to these Chapter 11 Cases in accordance with the terms and conditions thereof.

13. *Adequate Protection*. The Prepetition Agent and the Prepetition Lenders are entitled, pursuant to sections 361, 363(c)(2) and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interests in the Prepetition Collateral, including the Cash Collateral, in an amount equal to the aggregate diminution in value of the Prepetition Collateral, including without limitation, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Cash Collateral and any other Prepetition Collateral, the priming of the Prepetition Agent's liens on the Prepetition Collateral by the DIP Liens, and the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (such diminution in value, the "<u>Adequate Protection Obligations</u>"). As adequate protection, the Prepetition Agent and the Prepetition Lenders are hereby granted the following:

(a) <u>Adequate Protection Liens</u>. As security for the payment of the Adequate Protection Obligations, the Prepetition Agent (for itself and for the benefit of the Prepetition Lenders) is hereby granted (effective and perfected as of the date of entry of the Cash Collateral Order and without the necessity of the execution by the Domestic Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid,

19

perfected replacement security interest in and lien on all of the Domestic Debtors' DIP Collateral (the "<u>Adequate Protection Liens</u>"), subject and subordinate only to (i) the DIP Liens, and (ii) the Carve Out.

(b)     <u>Section 507(b) Claim</u>.  The Adequate Protection Obligations shall constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code (the "<u>507(b) Claims</u>"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the Superpriority Claims granted in respect of the DIP Obligations <u>provided</u> that the 507(b) Claims shall not be paid with the proceeds of Avoidance Actions.  Except to the extent expressly set forth in this Order, the Prepetition Agent and the Prepetition Lenders shall not receive or retain any payments, property or other amounts in respect of the 507(b) Claims unless and until all DIP Obligations shall have indefeasibly been paid in full in cash, in addition and notwithstanding anything to the contrary contained herein, the Adequate Protection Obligations, notwithstanding their status as 507(b) Claims may be satisfied in a plan of reorganization confirmed in the Chapter 11 Cases in the manner set forth in such plan if holders of more than 66% (by value) of the Adequate Protection Obligations consent to such treatment.

(c)     <u>Fees, And Expenses</u>.  The applicable Debtors shall pay to the Prepetition Agent and the Issuing Lender all fees and expenses payable to the Prepetition Agent pursuant to the terms of the Prepetition Loan Documents, including without limitation, the reasonable fees

and disbursements of counsel and financial advisors or other third-party consultants to the Prepetition Agent provided that any such fees paid to the Issuing Lender shall not include any fees payable under section 9.5(e)(ii) of the Prepetition Credit Agreement.  None of the fees and expenses payable pursuant to this paragraph 13(c) shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto.  The Debtors shall pay the fees and expenses provided for in this paragraph 13(c) within 20 days after receipt of invoices therefor, and the Debtors shall promptly provide copies of such invoices to the Committee and the U.S. Trustee.

(d)  Information.  The Debtors shall promptly provide to the Prepetition Agent any written financial information or periodic reporting that is provided to, or required to be provided to, the DIP Agent or the DIP Lenders.

14.  *Reservation of Rights of Prepetition Lenders*.  Based upon the consent of the Prepetition Lenders, this Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Agent and the Prepetition Lenders. Notwithstanding any other provision hereof, the grant of adequate protection to the Prepetition Agent and the Prepetition Lenders pursuant hereto is without prejudice to the right of the Prepetition Agent to seek modification of the grant of adequate protection provided hereby so as to provide different or additional adequate protection, and without prejudice to the right of the Debtors or any other party in interest to contest any such modification.  Except as expressly provided herein, nothing contained in this Order (including without limitation, the authorization

to use any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to the Prepetition Agent or any Prepetition Lender.  The consent of the Prepetition Agent and the Prepetition Lenders to the priming of the Prepetition Agent's liens on the Prepetition Collateral by the DIP Liens (a) is limited to the DIP Financing and (b) does not constitute, and shall not be construed as constituting, an acknowledgement or stipulation by the Prepetition Agent or the Prepetition Lenders that, absent such consent, their interests in the Prepetition Collateral would be adequately protected pursuant to this Order.

       15.     *Perfection Of DIP Liens And Adequate Protection Liens.*

       (a)     The DIP Agent and the Prepetition Agent are hereby authorized, but not required, to file or record financing statements, intellectual property filings, mortgages, notices of lien or similar instruments in any jurisdiction, take possession of or control over, or take any other action in order to validate and perfect the DIP Liens and the Adequate Protection Liens granted to them hereunder, as applicable.  Whether or not the DIP Agent or the Prepetition Agent shall, in their respective sole discretion, choose to file such financing statements, intellectual property filings, mortgages, notices of lien or similar instruments, take possession of or control over, or otherwise confirm perfection of the DIP Liens and the Adequate Protection Liens, as the case may be, such DIP Liens and the Adequate Protection Liens shall be deemed valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination as of the date of entry of this Order, in the case of the DIP Liens, and as of the date of entry of the Cash Collateral Order, in the case of the Adequate Protection Liens.

(b)     A certified copy of this Order may, in the discretion of the DIP Agent or the Prepetition Agent, as the case may be, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Order for filing and recording.

(c)     The applicable Debtors shall execute and deliver to the DIP Agent and the Prepetition Agent, as the case may be, all such agreements, financing statements, instruments and other documents as the DIP Agent or the Prepetition Agent may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens, as the case may be.

(d)     Any provision of any lease or other license, contract or other agreement that requires (i) the consent or approval of one or more landlords or other parties or (ii) the payment of any fees or obligations to any governmental entity, in order for any Domestic Debtor to pledge, grant, sell, assign, or otherwise transfer any such leasehold interest, or the proceeds thereof, or other DIP Collateral related thereto, is hereby deemed to be inconsistent with the applicable provisions of the Bankruptcy Code.  Any such provision shall have no force and effect with respect to the granting of the DIP Liens or the Adequate Protection Liens on such leasehold interest or the proceeds of any assignment and/or sale thereof by any Domestic Debtor in favor of the DIP Lenders or the Prepetition Lenders in accordance with the terms of the DIP Documents or this Order.

16.     *Preservation Of Rights Granted Under The Order.*

(a)     No claim or lien having a priority senior to or *pari passu* with those granted by this Order to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders, shall be granted or allowed while any portion of the DIP Obligations (or any refinancing thereof), the Commitments or the Adequate Protection Obligations remain outstanding, and the DIP Liens and the Adequate Protection Liens shall not be subject or junior to any lien or security interest that is avoided and preserved for the benefit of the Debtors' estates under section 551 of the Bankruptcy Code or subordinated to or made *pari passu* with any other lien or security interest, whether under section 364(d) of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, the Debtors may, subject to the terms of the DIP Agreement, obtain letters of credit in an aggregate undrawn face amount not to exceed $250 million secured by liens on the DIP Collateral that are *pari passu* with those securing the DIP Obligations or by cash collateral.

(b)     Unless all DIP Obligations and Adequate Protection Obligations shall have been indefeasibly paid in full in cash, the Debtors shall not seek, and it shall constitute an Event of Default under the DIP Agreement and a termination of the right to use the Cash Collateral if any of the Debtors seeks, or if there is entered, (i) any modification of this Order without the prior written consent of the DIP Agent, the Required Lenders and the Prepetition Agent, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Agent, the Required Lenders or the Prepetition Agent, or (ii) an order converting or dismissing any of the Chapter 11 Cases.  If an order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall

provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that (A) the Superpriority Claims, the 507(b) Claims, the other administrative claims granted pursuant to this Order, the DIP Liens and the Adequate Protection Liens shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations and all Adequate Protection Obligations shall have been paid and satisfied in full (and that such Superpriority Claims, the 507(b) Claims, the other administrative claims granted pursuant to this Order, the DIP Liens and the Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest) and (B) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the claims, liens and security interests referred to in clause (A) above.

(c)     If any or all of the provisions of this Order are hereafter reversed, modified, vacated or stayed, such reversal, stay, modification or vacatur shall not affect (i) the validity, priority or enforceability of any DIP Obligations or the Adequate Protection Obligations incurred prior to the actual receipt of written notice by the DIP Agent or the Prepetition Agent, as applicable, of the effective date of such reversal, stay, modification or vacatur or (ii) the validity, priority or enforceability of the DIP liens or the Adequate Protection Liens.  Notwithstanding any such reversal, stay, modification or vacatur, any use of Cash Collateral, any DIP Obligations or any Adequate Protection Obligations incurred by the Debtors to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders, as the case may be, prior to the actual receipt of written notice by the DIP Agent and the Prepetition Agent of the effective date of such reversal, stay, modification or vacatur shall be governed in all respects by the original provisions

of this Order, and the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition

Lenders, shall be entitled to all of the rights, remedies, privileges and benefits granted in section

364(e) of the Bankruptcy Code, this Order and pursuant to the DIP Documents with respect to all

uses of Cash Collateral, all DIP Obligations and all Adequate Protection Obligations.

    (d)  Except as expressly provided in this Order or in the DIP Documents, the

DIP Liens, the Superpriority Claims, the Adequate Protection Liens, the 507(b) Claims and all

other rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the

Prepetition Lenders, granted by this Order and the DIP Documents shall survive, and shall not be

modified, impaired or discharged by (i) the entry of an order converting any of the Chapter 11

Cases to a case under chapter 7 of the Bankruptcy Code, dismissing any of the Chapter 11 Cases

or by any other act or omission, or (ii) the entry of an order confirming a plan of reorganization

in any of the Chapter 11 Cases and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the

Debtors have waived any discharge as to any remaining DIP Obligations or Adequate Protection

Obligations.  The terms and provisions of this Order and the DIP Documents shall continue in

the Chapter 11 Cases, in any successor cases if the Chapter 11 Cases cease to be jointly

administered, or in any superseding chapter 7 cases under the Bankruptcy Code, and the DIP

Liens, the Adequate Protection Liens, the DIP Obligations, the Superpriority Claims, the Section

507(b) Claims, the other administrative Claims granted pursuant to this Order, and all other

rights and remedies of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition

Lenders granted by this Order and the DIP Documents shall continue in full force and effect until

all DIP Obligations and all Adequate Protection Obligations are indefeasibly paid in full in cash,

except for any asserted and contingent DIP Obligations or Adequate Protection Obligations, as the case may be.

17.    *Effect Of Stipulations On Third Parties*.  The stipulations and admissions contained in this Order, including without limitation, in paragraphs 3 and 11 of this Order, shall be binding solely upon the Debtors and the other Debtor Loan Parties under all circumstances. The stipulations and admissions contained in this Order, including without limitation, in paragraphs 3 and 11 of this Order, shall be binding upon all other parties in interest, including without limitation, the Committee, unless (a) the Committee or any other party-in-interest with standing to do so has timely filed an adversary proceeding or contested matter (subject to the limitations contained herein, including without limitation, in paragraph 18) by no later than the date that is 60 days after the appointment of counsel to the Committee, (A) challenging the validity, enforceability, priority or extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations or (B) otherwise asserting or prosecuting any Avoidance Actions or any other claims, counterclaims or causes of action, objections, contests or defenses (collectively, the "Claims and Defenses") against the Prepetition Agent, any of the Prepetition Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors in connection with any matter related to the Prepetition Obligations or the Prepetition Collateral and (b) an order is entered and becomes final in favor of the plaintiff sustaining any such challenge or claim in any such timely filed adversary proceeding or contested matter, provided that, as to the Debtors and the other Debtor Loan Parties, all such Claims and Defenses are hereby irrevocably waived and relinquished as of

the Petition Date.  If no such adversary proceeding or contested matter is timely filed in respect of the Prepetition Obligations, (x) the Prepetition Obligations shall constitute allowed claims, not subject to counterclaim, setoff, subordination, recharacterization, defense or avoidance, for all purposes in the Chapter 11 Cases and any subsequent chapter 7 case, (y) the liens on the Prepetition Collateral securing the Prepetition Obligations shall be deemed to have been, as of the Petition Date, and to be, legal, valid, binding, perfected and of the priority specified in paragraph 3(b), not subject to defense, counterclaim, recharacterization, subordination or avoidance and (z) the Prepetition Obligations, the Prepetition Agent, the Prepetition Lenders, and the liens on the Prepetition Collateral granted to secure the Prepetition Obligations shall not be subject to any other or further challenge by the Committee or any other party-in-interest, and the Committee or such party-in-interest shall be enjoined from seeking to exercise the rights of the Debtors' estates, including without limitation, any successor thereto (including, without limitation, any estate representative or a chapter 7 or 11 trustee appointed or elected for any of the Debtors).  If any such adversary proceeding or contested matter is timely filed, the stipulations and admissions contained in paragraphs 3 and 11 of this Order shall nonetheless remain binding and preclusive (as provided in the second sentence of this paragraph) on the Committee and any other party-in-interest, except as to any such findings and admissions that were expressly and successfully challenged in such adversary proceeding or contested matter. Nothing in this Order vests or confers on any "Person" (as defined in the Bankruptcy Code), including the Committee, standing or authority to pursue any cause of action belonging to the Debtors or their estates, including without limitation, Claims and Defenses with respect to the

Prepetition Loan Documents, the Prepetition Obligations, or any liens granted by any Debtor to secure any of the foregoing.

18.     *Limitation On Use Of DIP Financing And DIP Collateral.*  The Debtors shall use the proceeds of the DIP Loans and the Prepetition Collateral (including the Cash Collateral) solely as provided in this Order and the DIP Documents.  Notwithstanding anything herein or in any other order of this Court to the contrary, no DIP Loans under the DIP Agreement, no DIP Collateral, no Prepetition Collateral (including the Cash Collateral) or the Carve Out may be used to (a) object, contest or raise any defense to, the validity, perfection, priority, extent or enforceability of any amount due under the DIP Documents, the Prepetition Loan Documents or the liens or claims granted under this Order, the DIP Documents or the Prepetition Loan Documents, (b) assert any Claims and Defenses or any other causes of action against the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, or their respective agents, affiliates, subsidiaries, directors, officers, representatives, attorneys or advisors, (c) prevent, hinder or otherwise delay the DIP Agent's or the Prepetition Agent's assertion, enforcement or realization on the Prepetition Collateral or the DIP Collateral in accordance with the DIP Documents, the Prepetition Loan Documents or this Order, (d) seek to modify any of the rights granted to the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders hereunder or under the DIP Documents or the Prepetition Loan Documents, in the case of each of the foregoing clauses (a) through (d), without such party's prior written consent or (e) pay any amount on account of any claims arising prior to the Petition Date unless such payments are (i) approved by an Order of this Court and (ii) permitted under the DIP Documents, <u>provided</u>

that, notwithstanding anything to the contrary herein, no more than an aggregate of $250,000 of the Prepetition Collateral (including the Cash Collateral), DIP Loans under the DIP Agreement, the DIP Collateral or the Carve Out may be used by the Committee to investigate the validity, enforceability or priority of the Prepetition Obligations or the liens on the Prepetition Collateral securing the Prepetition Obligations, or investigate any Claims and Defenses or other causes action against the Prepetition Agent or the Prepetition Lenders.

19.    *Insurance*.  To the extent the Prepetition Agent is listed as loss payee under any Debtor's insurance policies, the DIP Agent is also deemed to be the loss payee under such Debtor's insurance policies and shall act in that capacity and distribute any proceeds recovered or received in respect of any such insurance policies, <u>first</u>, to the payment in full of the DIP Obligations, and <u>second</u>, to the payment of the Prepetition Obligations.

20. *Master Proof of Claim.*

(a)     To facilitate the processing of claims, to ease the burden upon this Court and to reduce any unnecessary expense to the Debtors' estates, the Prepetition Agent is authorized to file a single master proof of claim in the Case of Lear on behalf of itself and the Prepetition Lenders on account of their claims arising under the Prepetition Loan Documents and hereunder against all Debtors (a "Master Proof of Claim"), and the Prepetition Agent shall not be required to file a verified statement pursuant to Rule 2019 of the Federal Rules of Bankruptcy Procedures in any of the Chapter 11 Cases; provided, nothing contained in this paragraph shall preclude a Prepetition Lender from filing a separate proof of claim for and on behalf of itself.

(b)     Upon filing of the Master Proof of Claim against Lear, the Prepetition Agent and each Prepetition Lender, and each of their respective successors and assigns, shall be deemed to have filed a proof of claim in the amount set forth opposite its name therein in respect of its claims against each of the Debtors arising under the Prepetition Loan Documents, and the Claims of the Prepetition Agent and each Prepetition Lender (and each of their respective successors and assigns), named in the Master Proof of Claim shall be allowed or disallowed as if each such entity had filed a separate proof of claim in each of the Chapter 11 Cases in the amount set forth in the Master Proof of Claim; provided that the Prepetition Agent may but shall not be required to amend the Master Proof of Claim from time to time to, among other things, reflect a change in the holders of the claims set forth therein or a reallocation among such holders of the claims asserted therein resulting from any transfer or any such claims.

(c)     The provisions set forth in paragraphs (a) and (b) above and the Master Proof of Claim are intended solely for the purpose of administrative convenience and, except to the extent set forth herein or therein, neither the provisions of this paragraph nor the Master Proof of Claim shall affect the substantive rights of the Debtors, the Committee, the Prepetition Agent, the Prepetition Lenders, or any other party in interest or their respective successors in interest, including without limitation, the right of each Prepetition Lender (or its successor in interest) to vote separately on any plan of reorganization proposed in the Chapter 11 Cases.

21.     *Order Governs*.  In the event of any inconsistency between the provisions of this Order and the DIP Documents, the provisions of this Order shall govern.  This Order supersedes the Cash Collateral Order.  To the extent not superseded hereby, in the event of any inconsistency between the Cash Collateral Order and this Order, the provisions of this Order shall govern.

22.     *Binding Effect; Successors And Assigns*.  The DIP Documents and the provisions of this Order, including all findings herein, shall be binding upon all parties-in-interest in the Chapter 11 Cases, including without limitation, the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders, the Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors) and shall inure to the benefit of the DIP Agent, the DIP Lenders, the Prepetition Agent, the Prepetition Lenders and the Debtors and their

respective successors and assigns, <u>provided</u> that, except to the extent expressly set forth in this Order, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Lenders shall have no obligation to permit the use of Cash Collateral or extend any financing to any chapter 7 trustee or similar responsible person appointed for the estates of the Debtors.

23. *Limitation of Liability.* In determining to make any loan under the DIP Agreement, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Order or the DIP Documents, the DIP Agent, the Prepetition Agent, the DIP Lenders and the Prepetition Lenders shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 <u>et</u> <u>seq.</u> as amended, or any similar federal or state statute). Furthermore, nothing in this Order or in the DIP Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders any liability for any claims arising from the pre-petition or post-petition activities of any of the Debtors and their affiliates (as defined in section 101(2) of the Bankruptcy Code).

24. *Effectiveness.* This Order shall constitute findings of fact and conclusions of law[4] and shall take effect immediately upon execution hereof, and there shall be no stay of execution of effectiveness of this Order.

---

[4] The findings of fact and conclusions of law contained herein constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to these proceedings by Bankruptcy Rule 9014. To the extent that any finding of act shall be determined to be a conclusion of law, it shall be so deemed and *vice versa*.

Dated: _____ ____, 2009
        New York, New York

_____
HONORABLE _____
UNITED STATES BANKRUPTCY JUDGE

# EXHIBIT C

## Form of DIP Credit Agreement

$500,000,000

CREDIT AND GUARANTEE AGREEMENT

among

LEAR CORPORATION,

a Debtor and Debtor-in-Possession, as Borrower

THE OTHER GUARANTORS NAMED HEREIN,

each (other than Lear ASC Corporation) a Debtor and Debtor-in-Possession,

The Several Lenders from Time to Time Parties Hereto,

and

JPMORGAN CHASE BANK, N.A.,

as Administrative Agent

Dated as of June 30, 2009

---

J. P. MORGAN SECURITIES INC.

and

CITIGROUP GLOBAL MARKETS INC.,

as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

Page

SECTION 1.  DEFINITIONS ....................................................................................................... 2
    1.1  Defined Terms ................................................................................................... 2
    1.2  Other Definitional Provisions ......................................................................... 18
SECTION 2.  AMOUNT AND TERMS OF LOANS ................................................................ 19
    2.1  Loans ................................................................................................................ 19
    2.2  Procedure for Borrowing ................................................................................. 19
    2.3  [Reserved] ........................................................................................................ 20
    2.4  Maturity and Repayment of Loans .................................................................. 20
    2.5  Termination of Commitments .......................................................................... 20
    2.6  Fees. .................................................................................................................. 20
    2.7  Exit Facility Commitment Fee ......................................................................... 20
    2.8  Optional Prepayments ...................................................................................... 21
    2.9  Mandatory Prepayments .................................................................................. 21
    2.10  Conversion and Continuation Options ........................................................... 21
    2.11  Limitations on Eurodollar Tranches .............................................................. 22
    2.12  Interest Rates and Payment Dates .................................................................. 22
    2.13  Computation of Interest and Fees .................................................................. 22
    2.14  Inability to Determine Interest Rate ............................................................... 23
    2.15  Pro Rata Treatment and Payments ................................................................. 23
    2.16  Requirements of Law ...................................................................................... 24
    2.17  Taxes ............................................................................................................... 25
    2.18  Indemnity ........................................................................................................ 27
    2.19  Change of Lending Office ............................................................................... 28
    2.20  Priority and Liens ........................................................................................... 28
    2.21  Payment of Obligations .................................................................................. 30
    2.22  No Discharge; Survival of Claims .................................................................. 30
    2.23  Conflicts .......................................................................................................... 30
    2.24  Conversion to Exit Facility ............................................................................ 30
SECTION 3.  [RESERVED] ...................................................................................................... 30
SECTION 4.  REPRESENTATIONS AND WARRANTIES ................................................... 30
    4.1  No Change. ....................................................................................................... 30
    4.2  Existence; Compliance with Law ..................................................................... 31
    4.3  Power; Authorization; Enforceable Obligations .............................................. 31
    4.4  No Legal Bar .................................................................................................... 31
    4.5  Litigation .......................................................................................................... 31
    4.6  No Default ........................................................................................................ 31
    4.7  Ownership of Property; Liens .......................................................................... 31
    4.8  Intellectual Property ........................................................................................ 31
    4.9  Taxes ................................................................................................................ 32
    4.10  Federal Regulations ....................................................................................... 32
    4.11  Labor Matters ................................................................................................. 32
    4.12  ERISA ............................................................................................................. 32
    4.13  Investment Company Act; Other Regulations ................................................ 32
    4.14  Subsidiaries .................................................................................................... 32
    4.15  Use of Proceeds .............................................................................................. 33

| | | |
|---|---|---|
| 4.16 | Environmental Matters | 33 |
| 4.17 | Accuracy of Information, etc | 34 |
| 4.18 | Financial Statements | 34 |
| 4.19 | Insurance | 34 |

SECTION 5.  CONDITIONS PRECEDENT .................................................................................. 34
SECTION 6.  AFFIRMATIVE COVENANTS ............................................................................... 37

| | | |
|---|---|---|
| 6.1 | Financial Statements | 37 |
| 6.2 | Certificates; Other Information | 38 |
| 6.3 | Payment of Obligations | 39 |
| 6.4 | Maintenance of Existence; Compliance | 40 |
| 6.5 | Maintenance of Property; Insurance | 40 |
| 6.6 | Inspection of Property; Books and Records; Discussions | 40 |
| 6.7 | Notices | 40 |
| 6.8 | Environmental Laws | 41 |
| 6.9 | Lender Conference Calls | 41 |
| 6.10 | Collateral; Further Assurances | 41 |

SECTION 7.  NEGATIVE COVENANTS ....................................................................................... 42

| | | |
|---|---|---|
| 7.1 | Financial Covenants | 42 |
| 7.2 | Indebtedness | 43 |
| 7.3 | Liens | 44 |
| 7.4 | Fundamental Changes | 47 |
| 7.5 | Disposition of Property | 47 |
| 7.6 | Restricted Payments | 48 |
| 7.7 | Investments | 48 |
| 7.8 | Transactions with Affiliates | 49 |
| 7.9 | Swap Agreements | 49 |
| 7.10 | Changes in Fiscal Periods | 50 |
| 7.11 | Negative Pledge Clauses | 50 |
| 7.12 | Clauses Restricting Subsidiary Distributions | 50 |
| 7.13 | Lines of Business | 50 |
| 7.14 | Use of Proceeds | 50 |
| 7.15 | Chapter 11 Claims | 51 |

SECTION 8.  EVENTS OF DEFAULT ........................................................................................... 51

| | | |
|---|---|---|
| 8.1 | Events of Default | 51 |

SECTION 9.  THE ADMINISTRATIVE AGENT .......................................................................... 54

| | | |
|---|---|---|
| 9.1 | Appointment | 54 |
| 9.2 | Delegation of Duties | 54 |
| 9.3 | Exculpatory Provisions | 55 |
| 9.4 | Reliance by Administrative Agent | 55 |
| 9.5 | Notice of Default | 55 |
| 9.6 | Non-Reliance on Administrative Agent and Other Lenders | 55 |
| 9.7 | Indemnification | 56 |
| 9.8 | Agent in Its Individual Capacity | 56 |
| 9.9 | Successor Administrative Agent | 56 |
| 9.10 | Execution of Loan Documents | 57 |

SECTION 10.  GUARANTEE ........................................................................................................... 57

| | | |
|---|---|---|
| 10.1 | Guarantee | 57 |
| 10.2 | Right of Contribution | 58 |
| 10.3 | No Subrogation | 58 |
| 10.4 | Amendments, etc. with respect to the Obligations | 58 |
| 10.5 | Guarantee Absolute and Unconditional | 59 |

|   | 10.6 | Reinstatement | 59 |
|---|------|---------------|----|
|   | 10.7 | Payments | 59 |
| SECTION 11. | | REMEDIES; APPLICATION OF PROCEEDS | 59 |
|   | 11.1 | Remedies; Obtaining the Collateral Upon Default | 59 |
|   | 11.2 | Remedies; Disposition of the Collateral | 60 |
|   | 11.3 | Application of Proceeds | 61 |
|   | 11.4 | WAIVER OF CLAIMS | 61 |
|   | 11.5 | Remedies Cumulative | 62 |
|   | 11.6 | Discontinuance of Proceedings | 62 |
| SECTION 12. | | MISCELLANEOUS | 62 |
|   | 12.1 | Amendments and Waivers | 62 |
|   | 12.2 | Notices | 64 |
|   | 12.3 | No Waiver; Cumulative Remedies | 65 |
|   | 12.4 | Survival of Representations and Warranties | 65 |
|   | 12.5 | Payment of Expenses and Taxes | 65 |
|   | 12.6 | Successors and Assigns; Participations and Assignments | 66 |
|   | 12.7 | Adjustments; Set-off | 69 |
|   | 12.8 | Counterparts | 70 |
|   | 12.9 | Severability | 70 |
|   | 12.10 | Integration | 70 |
|   | 12.11 | **GOVERNING LAW** | 70 |
|   | 12.12 | Submission To Jurisdiction; Waivers | 70 |
|   | 12.13 | Absence of Prejudice to the Prepetition Lenders with Respect to Matters Before the Bankruptcy Court | 71 |
|   | 12.14 | Specific Performance of Obligation to Convert into Exit Facility | 71 |
|   | 12.15 | Acknowledgements | 71 |
|   | 12.16 | Releases of Guarantees and Liens | 72 |
|   | 12.17 | Confidentiality | 72 |
|   | 12.18 | **WAIVERS OF JURY TRIAL** | 73 |
|   | 12.19 | Prepetition Credit Agreement Amendment; Adequate Protection | 73 |
|   | 12.20 | Effectiveness | 73 |

SCHEDULES:

1.1A    Commitments
4.14    Subsidiaries
7.2(d)  Existing Indebtedness
7.3(f)  Existing Liens

<u>EXHIBITS</u>:

A       Form of Final Order
B       Form of Intercompany Subordinated Note
C       Form of Assignment and Assumption
D       Form of Compliance Certificate
E       Form of Exemption Certificate
F       Form of Prepetition Credit Agreement Amendment
G       Warrant Term Sheet
H       Restructuring Term Sheet
I       Exit Credit Agreement

THIS DEBT IS ISSUED WITH ORIGINAL ISSUE DISCOUNT FOR PURPOSES OF SECTION 1271 ET SEQ. OF THE INTERNAL REVENUE CODE. A LENDER MAY OBTAIN THE ISSUE PRICE, AMOUNT OF ORIGINAL ISSUE DISCOUNT, ISSUE DATE AND YIELD TO MATURITY BY SUBMITTING A WRITTEN REQUEST FOR SUCH INFORMATION TO LEAR CORPORATION AT THE FOLLOWING ADDRESS: 21557 TELEGRAPH ROAD, SOUTHFIELD, MICHIGAN 48034, ATTENTION: SHARI L. BURGESS.

CREDIT AND GUARANTEE AGREEMENT (this "Agreement"), dated as of June 30, 2009, among (i) LEAR CORPORATION, a Delaware corporation (the "Borrower"), which is a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, and (ii) each of the direct and indirect domestic Wholly-Owned Subsidiaries of the Borrower signatory hereto (such Subsidiaries, the "Guarantors" and, the Guarantors (other than Lear ASC Corporation), together with the Borrower, the "Debtors" and each a "Debtor"), each of which Guarantors (other than Lear ASC Corporation) is a debtor and a debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the cases of the Debtors, each a "Case" and, collectively, the "Cases"), (iii) the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders"), and (iv) JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent").

INTRODUCTORY STATEMENT:

On June [ ], 2009 (the "Petition Date"), the Debtors filed voluntary petitions with the Bankruptcy Court (such term and other capitalized terms used in this Introductory Statement are as defined in this Introductory Statement or are being used with the meanings given to such terms in Section 1.1) initiating the Cases and have continued in the possession of their assets and in the management of their businesses pursuant to Bankruptcy Code Sections 1107 and 1108.

Pursuant to this Agreement and the Final Order, the Lenders are making available to the Borrower a $500,000,000 debtor-in-possession term loan facility (the "DIP Facility"), all of the Borrower's obligations with respect to which are guaranteed by the Guarantors.

The proceeds of the Loans will be used for working capital and other general corporate purposes of the Borrower and its Subsidiaries (including without limitation, for the payment of fees and expenses incurred in connection with entering into this Agreement and the transactions contemplated hereby), in all cases subject to the terms of this Agreement and the Final Order.

To provide guarantees for the repayment of the Loans and the payment of the other Obligations of the Loan Parties hereunder and under the other Loan Documents, the Debtors are providing to the Administrative Agent and the Lenders, pursuant to this Agreement and subject to the Final Order, the following (each as more fully described herein):

(a) a guarantee from each of the Guarantors of the due and punctual payment and performance of the Obligations of the Borrower;

(b) with respect to the Obligations of the Debtors, a Superpriority Claim entitled to the benefits of Bankruptcy Code Section 364(c)(1) in each of the Cases;

(c) pursuant to Bankruptcy Code Section 364(c)(2) a perfected first priority (subject to permitted exceptions) Lien on all present and after-acquired property of the Debtors not subject to a

Lien on the Petition Date, excluding, in all cases, thirty-five (35%) percent of the total outstanding voting Capital Stock of each new or existing Foreign Subsidiary;

(d)     pursuant to Bankruptcy Code Section 364(c)(3) a perfected junior Lien on all present and after-acquired property of the Debtors that is otherwise subject to a valid and perfected Lien on the Petition Date (other than Liens securing the Prepetition Obligations and Liens that are junior to the Liens securing the Prepetition Obligations) or a valid Lien perfected (but not granted) after the Petition Date to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code; and

(e)     pursuant to Bankruptcy Code Section 364(d)(1) a perfected first priority (subject to permitted exceptions), senior priming Lien on (x) all present and after-acquired property of the Debtors that is subject to a valid, perfected and enforceable Lien on or after the Petition Date to secure the Prepetition Obligations, (y) all present and after-acquired assets that are presently subject to Liens that are junior to the Liens that secure the Prepetition Obligations and (z) the Liens granted after the Petition Date to provide adequate protection in respect of the Prepetition Obligations.

All of the claims and the Liens granted hereunder and pursuant to the Final Order in the Cases to the Administrative Agent and the Lenders shall be subject to the Carve Out, but in each case only to the extent provided in the Final Order.

Accordingly, the parties hereto hereby agree as follows:

SECTION 1.  DEFINITIONS

1.1  Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate with a one-month Interest Period commencing on such day plus 1.0%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Administrative Agent":  JPMorgan Chase Bank, N.A., together with its affiliates, as the arranger of the Commitments and as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"Affiliate":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"Agent Indemnitees":  as defined in Section 9.7  .

"Agreement":  as defined in the preamble hereto.

"Applicable Margin":  a percentage per annum equal to (a) for ABR Loans, 9.0% and (b) for Eurodollar Loans, 10.0%.

"Approved Fund":  as defined in Section 12.6(b).

"Asset Sale":  any Disposition of property or series of related Dispositions of property (excluding any such Disposition permitted by Section 7.5(a) - (l)) that yields Net Cash Proceeds to any Group Member (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) in excess of $1,000,000.

"Assignee":  as defined in Section 12.6(b).

"Assignment and Assumption":  an Assignment and Assumption, substantially in the form of Exhibit C.

"Bankruptcy Code":  the Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. §§101 et seq.

"Bankruptcy Court":  the United States Bankruptcy Court for the Southern District of New York, or any other court having jurisdiction over the Cases from time to time.

"Benefited Lender":  as defined in Section 12.7(a).

"Board":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"Borrower":  as defined in the preamble hereto.

"Borrowing Date":  any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to make Loans hereunder.

"Borrowing Notice": as defined in Section 2.2.

"Budget":  as defined in Section 5(i).

"Business":  as defined in Section 4.16(b).

"Business Day":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, provided, that with respect to notices and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Canadian Court":  the Ontario Superior Court of Justice, Commercial List.

"Capital Expenditures":  for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance

sheet of such Person and its Subsidiaries, but excluding (i) such expenditures that are made with all or any portion of a Reinvestment Deferred Amount, (ii) capitalized interest and (iii) such expenditures for which such Person is reimbursed in cash by a third party (other than any Group Member).

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carve Out":  as defined in Section 2.20(a).

"Carve-Out Cap":  as defined in Section 2.20(a).

"Carve-Out Trigger Notice":  a written notice delivered by the Administrative Agent to the Borrower, the United States Trustee, counsel for the Borrower and counsel for any statutory committee appointed in the Cases stating that an Event of Default has occurred and is continuing and that the Carve-Out Cap is invoked, which notice may only be delivered following the occurrence and during the continuance of an Event of Default.

"Cases":  as defined in the preamble to this Agreement.

"Cash Collateral":  as defined in Section 363(a) of the Bankruptcy Code.

"Cash Equivalents":  (a) securities issued or unconditionally guaranteed or insured by the United States Government, the Canadian Government, Japan or any member of the European Union or any other government approved by the Administrative Agent (which approval shall not be unreasonably withheld), (b) securities issued or unconditionally guaranteed or insured by any state of the United States of America or province of Canada or any agency or instrumentality thereof having maturities of not more than twelve months from the date of acquisition and having one of the two highest ratings obtainable from either S&P or Moody's, (c) time deposits, certificates of deposit and bankers' acceptances having maturities of not more than twelve months from the date of acquisition, in each case with any Lender (or any affiliate of any thereof) or with any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, Japan, Canada or any member of the European Union or any U.S. branch of a foreign bank having at the date of acquisition capital and surplus of not less than $100,000,000, (d) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (a), (b) and (c) entered into with any bank meeting the qualifications specified in clause (c) above, (e) commercial paper issued by the parent corporation of any Lender and commercial paper rated, at the time of acquisition, at least "A-1" or the equivalent thereof by S&P or "P-1" or the equivalent thereof by Moody's and in either case maturing within twelve months after the date of acquisition, (e) deposits maintained with money market funds having total assets in excess of $300,000,000, (f) demand deposit accounts maintained in the ordinary course of business with banks or trust companies, (g) temporary deposits, of amounts received in the ordinary course of business pending disbursement of such amounts, in demand deposit accounts in banks outside the United States, (h) deposits in mutual funds which invest substantially all of their assets in preferred equities issued by

U.S. corporations rated at least "AA" (or the equivalent thereof) by S&P; provided, that notwithstanding the foregoing, Cash Equivalents shall, in any event, include all cash and cash equivalents as set forth in the Borrower's balance sheet prepared in accordance with GAAP, and (i) other investments requested by the Borrower and approved by the Administrative Agent.

"Cash Flow Forecast":  as defined in Section 6.2(f).

"CCAA Cases": the cases commenced by certain of the Canadian Subsidiaries of the Borrower in the Canadian Court under Section 18.6 of the Companies' Creditors Arrangement Act.

"Change of Control": (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Capital Stock representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of the Borrower; or (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated by the board of directors of the Borrower nor (ii) appointed by directors so nominated.

"Chinese Acceptance Notes": acceptance notes issued by Chinese banks in the ordinary course of business for the account of any direct or indirect Chinese Subsidiary of the Borrower or customers thereof to effect the current payment of goods and services in accordance with customary trade terms in China.

"Closing Date":  the date on which the conditions precedent set forth in Section 5.1 shall have been satisfied or waived and the funding of the Loans occurs.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all property of the Loan Parties, now owned or hereafter acquired, as more particularly described and referred to as "DIP Collateral" in the Final Order or in the Collateral Documents.

"Collateral Documents": collectively, any Mortgages, collateral assignments, security agreements, pledge agreements, security agreements granting Liens in Intellectual Property or other similar agreements delivered to the Administrative Agent and the Lenders pursuant to the Loan Documents to secure the Obligations (including pursuant to Section 2.20(b)).  The Collateral Documents shall supplement, and shall not limit, the grant of Collateral pursuant to the Final Order.

"Commitment": as to any Lender, the obligation of such Lender to make Loans to the Borrower in an aggregate principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1A.  The original aggregate amount of the Commitments is $500,000,000.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate":  a certificate of the Borrower duly executed by a Responsible Officer, on behalf of the Borrower, substantially in the form of Exhibit D.

"Conduit Lender":  any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.16, 2.17, 2.18 or 12.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Confirmation Order":  an order of the Bankruptcy Court confirming the Reorganization Plan.

"Conforming Plan":  (a) a Reorganization Plan proposed by the Debtors that incorporates the terms and conditions set forth in the Restructuring Term Sheet attached as Exhibit H and is consistent in all material respects with the Restructuring Term Sheet (as may be modified in accordance with the terms of that certain letter agreement dated as of June __, 2009 by and among the Borrower and certain of its Affiliates, JPMorgan Chase Bank, N.A. and the lender signatories thereto) or (b) a plan of reorganization proposed by the Debtors that provides for payment in full in cash of the Obligations.

"Consolidated EBITDA":  for any Test Period (and calculated without duplication), Consolidated Net Income for such period excluding (a) any extraordinary and non-recurring non-cash expenses, losses, income or gains as determined in accordance with GAAP, (b) charges, premiums and expenses associated with the discharge of pre-petition Indebtedness, (c) charges relating to FAS 106, (d) any non-cash income included, and any non-cash deductions made, in determining Consolidated Net Income for such period (other than any deductions which represent the accrual of or a reserve for the payment of cash charges in any future period), provided that cash payments made in any subsequent period in respect of any item for which any such non-cash deduction was excluded in a prior period shall be deemed to reduce Consolidated Net Income by such amount in such subsequent period, (e) stock compensation expense and non-cash equity linked expense, (f) deferred financing fees (and any write-offs thereof), (g) write-offs of goodwill, (h) an aggregate amount of up to $200,000,000 for fiscal year 2009 and $120,000,000 for any fiscal year thereafter (provided that up to $25,000,000 of such amount may be carried forward to the following fiscal year or carried back to the preceding fiscal year) in respect of restructuring, restructuring-related or other similar charges, (i) fees, costs, charges, commissions and expenses or other charges incurred during such period in connection with this Agreement, the Cases, the Reorganization Plan, the Exit Credit Agreement and the transactions contemplated by the foregoing, including the write-off of receivables of Chrysler, GM and their affiliates as a result of their respective bankruptcy filings, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization effected in connection with the winding up the Debtors prior to emergence, (j)  foreign exchange gains and losses and (k) any state or local taxes, plus, to the extent deducted in determining Consolidated Net Income, the sum of (A) Consolidated Interest Expense, (B) any expenses for taxes, (C) depreciation and amortization expense, (D) minority interests in income (or losses) of Subsidiaries and (E) net equity earnings (and losses) in Affiliates (excluding Subsidiaries).

"Consolidated Interest Expense":  for any Test Period, the amount which would, in conformity with GAAP, be set forth opposite the caption "interest expense" (or any like caption) on a consolidated income statement of the Borrower and its Subsidiaries for such period; provided, that

Consolidated Interest Expense for any period shall (a) exclude (i) any amortization or write-off of deferred financing fees during such period and (ii) premiums paid in connection with the discharge of Indebtedness and (b) include any interest income during such period.

"Consolidated Net Income":  for any Test Period, the consolidated net income (or deficit) of the Borrower and its Subsidiaries for such period (taken as a cumulative whole), determined in accordance with GAAP; provided that any provision for post-retirement medical benefits, to the extent such provision calculated under FAS 106 exceeds actual cash outlays calculated on the "pay as you go" basis, shall not to be taken into account.

"Consummation Date": the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of a Reorganization Plan that is confirmed pursuant to a Confirmation Order.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Debtors": as defined in the preamble.

"Default":  any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender" any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, unless such failure is the subject of a good faith dispute or subsequently cured (in which case such Lender shall cease to be a Defaulting Lender as of the date of such cure), (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless such failure is the subject of a good faith dispute or subsequently cured (in which case such Lender shall cease to be a Defaulting Lender as of the date of such cure), or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"DIP Facility": as defined in the Introductory Statement.

"Disclosure Statement":  the disclosure statement in respect of a Conforming Plan, in form and substance reasonably satisfactory to the Administrative Agent, to be distributed to certain holders of claims (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors.

"Disposition":  with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof.  The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Domestic Subsidiary":  any Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States.

"Effective Date":  the effective date of the Reorganization Plan.

"Enforcement Action": with respect to the Obligations, any demand for payment or acceleration thereof, the exercise of any rights and remedies with respect to any Collateral securing the

Obligations or the commencement or prosecution of enforcement of any of the rights and remedies hereunder or under any other Loan Documents, or applicable law, including without limitation the exercise of any rights of set-off or recoupment, and the exercise of any rights or remedies of a secured creditor under the Uniform Commercial Code of any applicable jurisdiction or under the Bankruptcy Code.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate": any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event": (a) any Reportable Event; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any failure by any Single Employer Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Single Employer Plan, whether or not waived; (d) a determination that any Single Employer Plan is, or is expected to be, in "at risk" status (within the meaning of Section 430 of the Code or Title IV of ERISA); (e) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Single Employer Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Single Employer Plan; (f) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Loan Party or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, or in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR01 page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period.  In the event that such rate does not appear on Reuters Screen LIBOR01 page (or otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be reasonably selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., New York City time, two

Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided, however, notwithstanding the foregoing, the Eurodollar Rate shall be the greater of (x) such rate determined pursuant to the foregoing formula and (y) 3.50% per annum.

"Eurodollar Tranche":  the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 8.1, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Exit Credit Agreement": the credit agreement for the "Roll-Over" Exit Facility of reorganized Lear Corporation, substantially in the form of Exhibit I hereto, with such amendments, modifications, supplements and changes permitted or agreed to pursuant to the terms hereof.

"Exit Facility": as defined and described in the Exit Credit Agreement.

"Exit Facility Documentation": the collective reference to the Exit Credit Agreement, collateral agreements, intercreditor agreement, mortgages and other security agreements, documents and instruments,  substantially consistent with the terms and conditions set forth in the Exit Credit Agreement, as reasonably determined by the Administrative Agent, and otherwise in form and substance reasonably satisfactory to the Administrative Agent and reorganized Lear Corporation.

"Exit Fee":  as defined in Section 2.6  (b).

"Extension Option":  as defined in Section 2.4(b).

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the  Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Final Order":  an order of the Bankruptcy Court entered in the Cases granting approval of, among other things, the transactions contemplated by this Agreement and the other Loan Documents and granting the Liens and Superiority Claims described in the Introductory Statement in favor of the

Administrative Agent and the Lenders, substantially in the form of Exhibit A hereto, or otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Required Lenders.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Funding Office":  the office of the Administrative Agent specified in Section 12.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time, except that for purposes of Section 7.1, GAAP shall be determined on the basis of such principles in effect on the date hereof and consistent with those used in the preparation of the most recent audited financial statements referred to in Section 12.1(a) of the Prepetition Credit Agreement.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members":  the collective reference to the Borrower and its Subsidiaries.

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantors":  as defined in the preamble hereto.

"Immaterial Subsidiary":  at any time, any Subsidiary of the Borrower which is not a Loan Party which has consolidated assets with a book value of $1,000,000 or less or which has consolidated revenues of $1,000,000 or less for the most recent period of four consecutive fiscal quarters.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services which would, in accordance with GAAP be shown on the liability side of the balance sheet, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of a default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person (contingent or otherwise) as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (f) above, (h) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, provided, if such Person has not assumed or become liable for such obligation, the amount of such Indebtedness shall be deemed to be the lesser of the fair market value of such property or the obligation being secured thereby and (i) for the purposes of Section 8.1(e) only, all obligations of such Person in respect of Swap Agreements, but excluding (i) trade and other accounts payables incurred in the ordinary course of such Person's business, (ii) accrued expenses and deferred compensation arrangements in the ordinary course, and (iii) advance payments in the ordinary course.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Initial Cash Flow Forecast": as defined in Section 5(i).

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, inventions, designs, patents, patent licenses, trademarks, tradenames, domain names and other source indicators, trademark licenses, technology, trade secrets, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Subordinated Note":  a promissory note, substantially in the form of Exhibit B or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"Interest Payment Date":  (a) as to any Eurodollar Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided that if any Interest Period for a Eurodollar Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; and (b) as to any ABR Loan, the last day of each calendar month and the Maturity Date.

"Interest Period":  as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of

conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

> (i)     if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

> (ii)    the Borrower may not select an Interest Period that would extend beyond the Scheduled Maturity Date or the extension thereof pursuant to the Extension Option; and

> (iii)   any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Investments": an advance, loan, extension of credit (by way of guaranty or otherwise, but excluding trade debt incurred in the ordinary course of business) or capital contribution to, or purchase any Capital Stock, bonds, notes, loans, debentures or other debt securities of, or any assets constituting a business unit of, or any other similar investment in, any Person. The amount of any Investment by any Person on any date of determination shall be the acquisition price of the gross assets acquired (including any liability assumed by such Person to the extent such liability would be reflected on a balance sheet prepared in accordance with GAAP) plus all additional capital contributions or purchase price paid in respect thereof, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment minus the amount of all cash returns of principal or capital thereon, cash dividends thereon and other cash returns on investment thereon or liabilities expressly assumed by another Person (other than a Group Member) in connection with the sale of such Investment. Whenever the term "outstanding" is used in this Agreement with reference to an Investment, it shall take into account the matters referred to in the preceding sentence.

"Lenders": as defined in the preamble hereto; provided, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Conduit Lender.

"Lien": any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any, priority or other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity": on any date of determination, the sum, without duplication, of (i) the cash and Cash Equivalents which are not subject to any Liens (other than (a) Liens in favor of the Administrative Agent, for the benefit of the Lenders, (b) Liens in favor of the Prepetition Agent, for the benefit of the Prepetition Secured Parties, (c) Liens permitted by Section 7.3(c)(ii) and (d) inchoate Liens arising by operating of law which are not the subject of enforcement actions) held by the Borrower and its Subsidiaries on such date, (ii) accounts receivable and inventory (in each case valued in accordance with GAAP) which are not subject to any Liens (other than (a) Liens in favor of the Administrative Agent, for the benefit of the Lenders, (b) Liens in favor of the Prepetition Agent, for the benefit of the Prepetition Secured Parties, and (c) inchoate Liens arising by operation of law which are not the subject of enforcement actions) held by the Borrower and its Subsidiaries on such date, less trade payables of the

Borrower and its Subsidiaries and (iii) the aggregate availability under any loan agreements or other lines of credit of the Borrower and its Subsidiaries on such date.

"Loan Documents":  this Agreement, the Notes, the Final Order, any Collateral Documents and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties":  the Borrower and the Guarantors.

"Loans": as defined in Section 2.1.

"Material Adverse Effect":  a material adverse effect on (a) the business, property, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole (other than (i) any events leading up to the filing of the Cases disclosed to the Lenders, (ii) the filing of the Cases and (iii) those events which customarily occur following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and other events ancillary thereto) or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent or the Lenders hereunder or thereunder.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Maturity Date":  the earliest of (a) the later of (i) the Scheduled Maturity Date or (ii) upon effectiveness of the Extension Option pursuant to Section 2.4(b), the date that is 15 months following the Closing Date, (b) the Consummation Date and (c) the acceleration of the Loans in accordance with the provisions hereof.

"Moody's":  Moody's Investors Service, Inc.

"Mortgages": collectively, any deeds of trust, trust deeds, hypothecs and mortgages creating and evidencing a Lien on any real property made by the Loan Parties in favor of or for the benefit of the Administrative Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Administrative Agent, in each case securing the Obligations.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of (i) attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien securing the Obligations) and other third-party fees and expenses actually incurred in connection therewith and (ii) Taxes and Other Taxes paid or reasonably estimated to be payable as a result of any Asset Sale or Recovery Event (after taking into account any available tax credits or deductions and any tax sharing arrangements) and (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-Excluded Taxes":  as defined in Section 2.17(a).

"Non-U.S. Lender":  as defined in Section 2.17(d).

"Notes":  the collective reference to any promissory note evidencing Loans.

"Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans) the Loans and all other obligations and liabilities of the Borrower and each Guarantor (or, in the case of Specified Letters of Credit, each Group Member on whose account such Specified Letter of Credit is issued and guarantee obligations of other Group Members in respect thereof) to the Administrative Agent or to any Lender (or, in the case of Specified Letters of Credit and Specified Swap Agreements, any affiliate of any Lender), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Letter of Credit (and related letter of credit applications), any Specified Swap Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, Guarantee Obligations, fees, indemnities, costs, expenses (including all reasonable fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, including any interest, additions to tax or penalties applicable thereto, whether disputed or not.

"Outstanding Amount": with respect to the Loans at any time, the aggregate principal amount thereof, after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Outstanding Percentage": as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the aggregate Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of the Loans then outstanding).

"Participant":  as defined in Section 12.6(c).

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the Introductory Statement.

"Plan":  at a particular time, any employee pension benefit plan (as defined in Section 3(2) of ERISA) in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan Effective Date": as defined in Section 2.7.

"Prepetition Agent": JPMorgan Chase Bank, N.A., in its capacity as general administrative agent for the Prepetition Lenders.

"Prepetition Credit Agreement": the Amended and Restated Credit and Guarantee Agreement, dated as of April 25, 2006, among the Borrower, the Foreign Subsidiary Borrowers party thereto, the Prepetition Lenders, the Prepetition Agent and the other agents party thereto, as amended, supplemented or otherwise modified as of the Petition Date.

"Prepetition Credit Agreement Amendment": an amendment to the Prepetition Credit Agreement substantially in the form of Exhibit F hereto.

"Prepetition Lenders": the several banks and other financial institutions and entities from time to time parties to the Prepetition Credit Agreement.

"Prepetition Loan Documents": the Prepetition Credit Agreement, the Securities Documents (as defined in the Prepetition Credit Agreement), the Notes (as defined in the Prepetition Credit Agreement) and any amendment, waiver, supplement or other modification to any of the foregoing.

"Prepetition Loans": the "Loans" as defined in the Prepetition Credit Agreement.

"Prepetition Obligations": all of the Debtors' obligations (including any Hedging Agreement Obligations (as defined in the Prepetition Credit Agreement) owed by any Debtor to any Prepetition Lender (or any Affiliate of such Prepetition Lender)) incurred under, pursuant to or in connection with the Prepetition Loan Documents.

"Prepetition Secured Parties": the Prepetition Agent, the Prepetition Lenders and any affiliate of a Prepetition Lender which holds Prepetition Obligations.

"Prime Rate": the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to debtors).

"Professional Fees": as defined in Section 2.20(a).

"Professional Persons": as defined in Section 2.20(a).

"Prohibited Claim": any action or objection with respect to (a) claims of the Prepetition Secured Parties against the Debtors or the Liens which secure the Prepetition Obligations, (b) the Superpriority Claims or Liens granted to the Administrative Agent and the Lenders pursuant to Sections 2.20(a) and (b), or (c) the Superpriority Claims or Liens granted to the Prepetition Secured Parties pursuant to Section 2.20(c).

"Prohibited Transaction": as defined in Section 406 of ERISA or Section 4975 of the Code.

"Projections": as defined in Section 6.2(c).

"Properties": as defined in Section 4.16(a).

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member in an amount in excess of $1,000,000.

"Register":  as defined in Section 12.6(b).

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member in connection therewith that are not applied to prepay the Loans pursuant to Section 2.9(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or Recovery Event in the business.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the businesses of the Borrower and its Subsidiaries.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a) the date occurring 180 days after such Reinvestment Event and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the businesses of the Borrower and its Subsidiaries with all or any portion of the relevant Reinvestment Deferred Amount.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reorganization Plan":  a plan of reorganization in the Borrower's Case.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, other than those events as to which the thirty day notice period is waived under PBGC regulations.

"Required Lenders":  at any time, Lenders having more than 50% of the Outstanding Amount; provided that the portion of the Outstanding Amount held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Requirement of Law":  as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  with respect to any Loan Party, the chief executive officer, the president, the chief financial officer, any vice president, the treasurer or the assistant treasurer of such Loan Party.

"Restricted Payments":  as defined in Section 7.6.

"S&P":  Standard & Poor's Ratings Services.

"Scheduled Maturity Date":  the first anniversary of the Closing Date.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Parties": collectively, the Administrative Agent, the Lenders, each issuer of a Specified Letter of Credit, the Persons entitled to indemnification under the Loan Documents and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.2.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Specified Jurisdiction":  any country, state or other jurisdictional subdivision outside North America or Europe.

"Specified Letters of Credit":  any letter of credit (a) issued for the account of any Group Member by any Lender or any affiliate of a Lender and (b) that has been designated by the relevant Lender and such Group Member, by written notice to the Administrative Agent prior to the issuance thereof, as a Specified Letter of Credit and with respect to which the Administrative Agent has confirmed to the relevant Lender sufficient availability pursuant to Section 7.2(i).  Such designation shall not create in favor of such Lender or affiliate of a Lender any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party hereunder or under any Collateral Document.

"Specified Swap Agreement":  any Swap Agreement (a) entered into by the Borrower or any Guarantor and any Person that is a Lender or an affiliate of a Lender at the time such Swap Agreement is entered into and (b) that has been designated by the relevant Lender and such Group Member, by written notice to the Administrative Agent prior to the effectiveness thereof, as a Specified Swap Agreement.  Such designation shall not create in favor of such Lender or affiliate of a Lender any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party hereunder or under any Collateral Document.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person (exclusive of any Affiliate in which such Person has a minority ownership interest).  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim":  a claim against any Debtor in any of the Cases which is an allowed administrative expense claim having priority over any or all administrative expenses, whether

now existing or hereafter arising, including of the kind specified in or arising under Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Taxes": all present or future taxes, duties, levies, imposts, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto, whether disputed or not.

"Test Period": on any date, the period beginning on July 5, 2009 and ending on such date (taken as one accounting period) in respect of which financial statements for each fiscal month, quarter or year in such period have been (or have been required to be) delivered pursuant to Section 6.1(a), (b) or (c), as applicable.

"Transferee":  any Assignee or Participant.

"Type":  as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"United States":  the United States of America.

"Upfront Fee": as defined in Section 2.6(a).

 "Warrant Share": a fraction, the numerator of which is the aggregate principal amount of Loans which are converted into the Exit Facility (or an alternative exit facility acceptable to the Lenders) and the denominator of which is the original principal amount of Loans made on the Closing Date.

"Warrants": as defined in Section 2.7.

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withdrawal Liability":  liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

1.2   Other Definitional Provisions. (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)      As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof (whether as a result of the Cases or otherwise) on

the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn by the Borrower or the Administrative Agent, as the case may be, or such provision amended in accordance herewith, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume or become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)     The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)     The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)     When determining whether a Default or Event of Default pursuant to Section 7.1 shall be in existence after giving pro forma effect to a certain event, the covenant levels to be used in making such determination shall be those in effect as of the last day of the most recent fiscal quarter (or, in the case of Section 7.1(b), the most recent month) of the Borrower for which financial reports are required to have been delivered pursuant to Section 6.1.

SECTION 2.   AMOUNT AND TERMS OF LOANS

2.1   Loans.  Subject to the terms and conditions set forth herein and in the Final Order, each Lender listed on Schedule 1.1A hereto severally agrees to make term loans (the "Loans") on the Closing Date in the full amount of such Lender's Commitment to the Borrower.  The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.10.

2.2   Procedure for Borrowing.  The Borrower shall give the Administrative Agent irrevocable notice (the "Borrowing Notice") (which notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, one Business Day prior to the anticipated Borrowing Date) requesting that the Lenders make the Loans and specifying the amount and Type of Loans to be borrowed, the requested Borrowing Date and in the case of Eurodollar Loans, the amount and length of the Interest Period therefor.  Upon receipt of the Borrowing Notice the Administrative Agent shall promptly notify each Lender thereof.  Not later than 12:00 Noon, New York City time, on the requested Borrowing Date each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loan to be made by such Lender.  The Administrative Agent shall credit the account of the Borrower on the books of such office of the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent by the Lenders in immediately available funds.

2.3    [Reserved].

2.4    Maturity and Repayment of Loans.  (a)  The Borrower shall repay all outstanding Loans on the Maturity Date.

(b)    The Borrower may extend the Scheduled Maturity Date to the date that is 15 months after the Closing Date (the "Extension Option") subject to satisfaction of the following conditions:

(i)    the Borrower shall provide prior written notice to the Administrative Agent at least 30 days prior to the Scheduled Maturity Date of its intention to exercise the Extension Option,

(ii)    the Borrower shall pay a fee to the Administrative Agent on or before the Scheduled Maturity Date, for the account of each Lender, equal to 1.0% of each Lender's pro rata share of the Outstanding Amount on the Scheduled Maturity Date, and

(iii)    no Default or Event of Default shall have occurred and be continuing as of the Scheduled Maturity Date.

2.5    Termination of Commitments.  Unless previously terminated, the Commitments shall terminate on the date that is 60 days after the date of execution and delivery of this Agreement if the Bankruptcy Court has not entered on or prior to such date the Final Order in accordance with Section 5(g); provided that such date may be extended by an additional 30 days if the Administrative Agent consents to such extension (such consent not to be unreasonably withheld).

2.6    Fees.  (a)  The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, an upfront fee (the "Upfront Fee") in an amount equal to 5.0% of the Commitment of such Lender, payable on the Closing Date.

(b)    The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, an exit fee (the "Exit Fee") in an amount equal to 1.0% of the principal amount of the Loans that are continued as Exit Loans (as defined in the Exit Credit Agreement) pursuant to Section 2.24 or exit loans under an alternative exit facility acceptable to the Lenders, such Exit Fee to be payable on the Consummation Date.

(c)    The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.

2.7    Exit Facility Commitment Fee.  On the effective date of a Reorganization Plan under which the DIP Facility is converted into the Exit Facility (or an alternative exit facility acceptable to the Lenders) (the "Plan Effective Date"), the Borrower agrees that reorganized Lear Corporation will pay to the Lenders a commitment fee, at reorganized Lear Corporation's sole election, by either (i) issuing to the Lenders warrants (the "Warrants") to purchase a number of shares of common stock of reorganized Lear Corporation with a value as of the Plan Effective Date equal to $25,000,000 (or, if less than all of the Loans under the DIP Facility are converted into an exit facility, the Warrant Share of $25,000,000), with the Warrants to have the terms set forth on Exhibit G and other customary terms or (ii) paying in cash to each Lender an amount equal to 5% of the principal amount of such Lender's Loans that will be converted into the Exit Facility or any other exit facility.

2.8  Optional Prepayments.  Subject to Section 2.6(b) and the provisos below, the Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 1:00 P.M., New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and one Business Day prior thereto, in the case of ABR Loans (provided that ABR Loans may be prepaid on the same Business Day if notice is received by the Administrative Agent no later than 12:00 P.M., New York City time), which notice shall specify the date and amount of prepayment and Type of the Loans being prepaid, as applicable; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.18.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof.  Partial optional prepayments of the Loans shall be ratable as among the Lenders thereof.

2.9  Mandatory Prepayments.  (a)  If any Capital Stock or Indebtedness shall be issued or incurred by any Group Member (excluding any Capital Stock issued to a Group Member in accordance with Section 7.7 and any Indebtedness permitted by Section 7.2) an amount equal to 100% of the Net Cash Proceeds thereof shall be applied by the Borrower on the date of receipt thereof by such Group Member toward the prepayment of the Loans as set forth in Section 2.9(c).

(b)  If on any date any Group Member shall receive Net Cash Proceeds from any Asset Sale or Recovery Event then, unless, a Reinvestment Notice shall have been timely delivered in respect thereof, an amount equal to 100% of such Net Cash Proceeds shall be applied by the Borrower no later than the end of the fiscal month in which such Net Cash Proceeds are received (or, if the aggregate amount of such Net Cash Proceeds is less than $15,000,000, no later than the end of the fiscal month following the fiscal month in which such Net Cash Proceeds are received) toward the prepayment of the Loans as set forth in Section 2.9(c); provided that, notwithstanding the foregoing, (i) the aggregate Net Cash Proceeds of Asset Sales that may be excluded from the foregoing prepayment requirement pursuant to Reinvestment Notices shall not exceed $25,000,000 in any fiscal year of the Borrower and (ii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Section 2.9(c).

(c)  Amounts to be applied in connection with prepayments made pursuant to this Section 2.9 shall be made ratably among the Lenders of the Loans.  The application of any prepayment made pursuant to this Section 2.9 shall be made, first, to ABR Loans and, second, to Eurodollar Loans.  Each prepayment of the Loans under Section 2.9 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid and, if a Eurodollar Loan is prepaid on any day other the last day of the Interest Period applicable thereto, the Borrower shall also pay amounts owing pursuant to Section 2.18.

2.10  Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date.  The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not

to permit such conversions. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuations, and provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR on the last day of such then expiring Interest Period. Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.11   Limitations on Eurodollar Tranches.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $500,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time.

2.12   Interest Rates and Payment Dates.  (a)  Subject to the provisions of Section 2.12(c), each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)     Subject to the provisions of Section 2.12(c), each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)     If any Event of Default shall have occurred and be continuing, on and after the date the Borrower receives notice from the Administrative Agent stating that interest is to accrue pursuant to this paragraph (c) or following acceleration of payment of the Loans, all outstanding Loans and other Obligations under the Loan Documents (whether or not overdue at such time) shall bear interest at a rate per annum equal to (i) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or and (ii) in the case of any other Obligation, the rate then applicable to ABR Loans plus 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.13   Computation of Interest and Fees.  (a)  Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed. The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate. Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective. The Administrative Agent shall

as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct and binding on the Borrower and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.12(a).

2.14     Inability to Determine Interest Rate.  If prior to the first day of any Interest Period:

(a)     the Administrative Agent shall have determined (which determination shall be presumptively correct and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)     the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-current Interest Period, to ABR Loans.  Until such notice has been withdrawn by the Administrative Agent (which the Administrative Agent shall do promptly after the circumstances giving rise to such event no longer exist), no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurodollar Loans.

2.15     Pro Rata Treatment and Payments.  (a) Except as otherwise provided herein, each payment by the Borrower on account of the Upfront Fee, the Exit Fee or any other fee payable to Lenders (which, for the avoidance of doubt, shall not include issuance of the Warrants) shall be made pro rata according to the respective Outstanding Percentages of the relevant Lenders entitled thereto.

(b)     Except as otherwise provided herein, each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made pro rata according to the respective Outstanding Percentages of the relevant Lenders entitled thereto.  Amounts prepaid on account of the Loans may not be reborrowed.

(c)     All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to the Lenders promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event

such payment shall be made on the immediately preceding Business Day. In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount. If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent. A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error. If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable thereto, within three Business Days after demand therefor from the Borrower.

(e)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount. If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate. Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.15(d), 2.15(e) or 9.7, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision of this Agreement), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

2.16   Requirements of Law. (a) If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case, made subsequent to the date hereof:

(i)     shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.17 and changes in the rate of tax on the overall net income of such Lender);

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the

account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)     shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, within 30 days after receipt of a reasonably detailed invoice therefor, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in each case, made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount reasonably deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)     A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.17   Taxes. (a)  All payments made by or on account of any Loan Party under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (including any interest, addition to tax or penalties applicable thereto), excluding income taxes and franchise taxes (imposed in lieu of net income taxes) and taxes imposed on or measured by the Administrative Agent's or any Lender's net profits if such tax is imposed as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or any Other Taxes are

required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder or under any other Loan Document, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that the Borrower shall not be required to increase any such amounts payable to the Administrative Agent or any Lender with respect to any Non-Excluded Taxes (i) that are attributable to the Administrative Agent's or such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section or (ii) that are United States withholding taxes imposed on amounts payable to the Administrative Agent or such Lender at the time the Administrative Agent or such Lender becomes a party to this Agreement, except to the extent that the Administrative Agent's or such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph (a).

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by any Loan Party, as promptly as reasonably possible thereafter such Loan Party shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, (i) a certified copy of an original official receipt received by such Loan Party showing payment thereof or (ii) if such Loan Party reasonably determines that it is unable to provide a certified copy of such receipt, a certificate as to the amount of such payment. If the relevant Loan Party fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent copies of the required receipts or other required documentary evidence, such Loan Party shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(d)     Each Lender (or Transferee) that is not a "United States Person" as defined in Section 7701(a)(30) of the Code (a "Non-U.S. Lender") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Administrative Agent and the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service ("IRS") Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party, Form W-8ECI or Form W-8IMY (accompanied by applicable underlying IRS forms), or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit E and two copies of the applicable Form W-8, or any subsequent versions thereof or successors thereto, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the expiration, obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower and the Administrative Agent (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(e)     A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower (or the Administrative Agent), such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, <u>provided</u> that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the commercial or legal position of such Lender.

(f)     Any Lender that is a United States person as defined in Section 7701(a)(30) of the Code shall deliver to the Borrower (with a copy to the Administrative Agent) a duly completed and signed IRS Form W-9 (or successor form) establishing that the Lender is organized under the laws of the United States and is not subject to backup withholding.

(g)     If the Administrative Agent or any Lender determines, in its sole discretion (exercised in good faith), that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.17 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); within 45 Business Days of the determination that the Borrower is entitled to such refund <u>provided</u>, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or to any other Person.

(h)     Each Lender shall indemnify the Administrative Agent, within 10 days after demand therefor, for the full amount of any Taxes attributable to such Lender that are payable or paid by the Administrative Agent, and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

(i)     The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.18   <u>Indemnity</u>.  The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement (other than by operation of Section 2.14), (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto.  Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such

prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market.  A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be presumptively correct in the absence of manifest error.  This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19  Change of Lending Office.  Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.16 or 2.17(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.16 or 2.17(a).

2.20  Priority and Liens.  (a)The Loan Parties hereby covenant, represent and warrant that, upon entry of the Final Order and subject to the terms thereof, the Obligations of the Loan Parties hereunder and under the other Loan Documents, (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute allowed Superpriority Claims, (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall be secured by a perfected first priority Lien on all Collateral that is otherwise not encumbered by a valid perfected and non-avoidable Lien as of the Petition Date or a valid and perfected Lien in existence at the time of such commencement that is perfected subsequent to such commencement as permitted by Section 546(b) of the Bankruptcy Code, excluding (x) 35% percent of the total outstanding voting Capital Stock of each new or existing Foreign Subsidiary and (y) avoidance actions but including the proceeds thereof, (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected junior Lien upon all Collateral that is subject to valid, perfected and non-avoidable Liens in existence on the Petition Date or valid Liens perfected (other than to secure the Prepetition Obligations) (but not granted) thereafter to the extent such post-Petition Date perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code, and (iv) pursuant to Section 364(d)(1) of the Bankruptcy Code, shall be secured by a perfected first priority priming Lien upon all Collateral (x) that is subject to a valid Lien or security interest in effect on the Petition Date to secure the Prepetition Obligations, (y) that is subject to a Lien granted after the Petition Date to provide adequate protection in respect of the Prepetition Obligations or (z) that is subject to a valid Lien in effect on the Petition Date that is junior to the Liens that secure the Prepetition Obligations, subject and subordinate in each case with respect to subclauses (i) through (iv) above, only to the Carve Out.  For purposes hereof, the "Carve Out" shall mean the sum of (A) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under section 1930(a) of title 28 of the United States Code, (B) the costs of administrative expenses not to exceed $50,000 in the aggregate that are permitted to be incurred by any Chapter 7 trustee pursuant to any order of the Bankruptcy Court following any conversion of any of the Cases pursuant to section 1112 of the Bankruptcy Code, and (C) at any time after the first Business Day following delivery of a Carve-Out Trigger Notice, to the extent allowed at any time, whether before or after delivery of a Carve-Out Trigger Notice, whether by interim order, procedural order or otherwise, all unpaid fees, costs and expenses (collectively, the "Professional Fees") incurred by persons or firms retained by the Debtors pursuant to Section 327, 328 or 363 of the Bankruptcy Code and any official committee of unsecured creditors appointed in the Cases pursuant to Section 1103 of the Bankruptcy Code (collectively, the "Professional Persons"), the payment of all Professional Fees incurred by the Professional Persons at any time after the first Business Day following

delivery of a Carve-Out Trigger Notice in an aggregate amount not exceeding $15,000,000 (the "Carve-Out Cap") (plus all unpaid Professional Fees allowed at any time by the Bankruptcy Court, whether before or after delivery of a Carve-Out Trigger Notice, whether by interim order, procedural order or otherwise, that were incurred by the Professional Persons on or prior to the first Business Day following the delivery of the Carve-Out Trigger Notice), provided that (x) the Carve Out shall not be available to pay any such Professional Fees incurred in connection with the initiation or prosecution of any Prohibited Claims or the initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the Administrative Agent, the Lenders, the Prepetition Lenders or the Prepetition Agent and (y) the Carve Out shall not be reduced by the payment of Professional Fees incurred prior to the first Business Day following delivery of a Carve-Out Trigger Notice without regard to when such amounts are allowed by the Bankruptcy Court. Notwithstanding anything herein to the contrary, the Carve Out shall not be used to commence or prosecute any Prohibited Claim. Upon delivery of a Carve-Out Trigger Notice or the commencement of a liquidation, the Borrower shall deposit the amount prior to making any distributions of the Carve Out in a segregated account solely for payment of Professional Fees that are within the Carve Out.

(b)     As to all Collateral, including without limitation, all cash, Cash Equivalents and real property the title to which is held by any Loan Party, or the possession of which is held by any Loan Party in the form of a leasehold interest, each Loan Party hereby assigns and conveys as security, grants a security interest in, hypothecates, mortgages, pledges and sets over unto the Administrative Agent all of the right, title and interest of the Borrower and such Guarantor in all of such Collateral, including without limitation, all cash, Cash Equivalents and owned real property and in all such leasehold interests, together in each case with all of the right, title and interest of the Borrower and such Guarantor in and to all buildings, improvements, and fixtures related thereto, any lease or sublease thereof, all general intangibles relating thereto and all proceeds thereof. The Borrower and each Guarantor acknowledges that, pursuant to and subject to the terms of the Final Order, the Liens granted in favor of the Administrative Agent (on behalf of the Lenders) in all of the Collateral shall be perfected without the recordation of any Uniform Commercial Code financing statements, notices of Lien or other instruments of mortgage or assignment. The Borrower and each Guarantor further agrees that (a) the Administrative Agent shall have the rights and remedies set forth in Section 11 and the Final Order in respect of the Collateral and (b) if requested by the Administrative Agent, the Borrower and each of the Guarantors shall enter into separate security agreements, pledge agreements and fee and leasehold mortgages with respect to such Collateral on terms reasonably satisfactory to the Administrative Agent.

(c)     Each Loan Party acknowledges and agrees that, subject to the terms of the Final Order, the Prepetition Secured Parties shall receive (a) as adequate protection for, and to the extent of, any diminution in the value of the Prepetition Secured Parties' respective interests in their collateral whether resulting from the imposition of the automatic stay, the priming described in Section 2.20(a) above, the use of the Prepetition Secured Parties' cash collateral or the use, sale, lease, depreciation, decline in market price or other diminution in value of the Prepetition Secured Parties' collateral (i) a Superpriority Claim under Section 507(b) of the Bankruptcy Code junior only the Carve Out and to the Superpriority Claim granted to the Administrative Agent and the Lenders; and (ii) a replacement Lien on the Collateral subject and subordinate to the Carve Out having a priority immediately junior to the priming and other Liens granted in favor of the Administrative Agent and the Lenders hereunder and under the other Loan Documents and the Final Order and to valid and perfected Liens which are senior (after giving effect to the Final Order) to the Liens granted to the Administrative Agent and the Lenders pursuant to the Final Order and (b) as further adequate protection, (i) the payment on a current basis of the reasonable fees and expenses (including, but not limited to, the reasonable fees and disbursements of counsel or financial advisors or third-party consultants incurred by the Prepetition Agent (including any unpaid prepetition fees and expenses) and (ii) financial and other reporting information in accordance with this Agreement.

2.21 <u>Payment of Obligations</u>. Upon the maturity (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, subject to the terms of the Final Order, the Lenders shall be entitled to immediate payment (whether in cash or pursuant to a refinancing pursuant to the terms of the Exit Credit Agreement) of such Obligations without further application to or order of the Bankruptcy Court.

2.22 <u>No Discharge; Survival of Claims</u>. The Borrower and each Guarantor agrees that to the extent its Obligations are not satisfied in full (including by conversion of the DIP Facility to the Exit Facility as described in Section 2.24), (a) its Obligations shall not be discharged by the entry of a Confirmation Order (and each Loan Party, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the Superpriority Claim granted to the Administrative Agent and the Lenders pursuant to the Final Order and described in Section 2.20 and the Liens granted to the Administrative Agent pursuant to the Final Order and described in Section 2.20 shall not be affected in any manner by the entry of a Confirmation Order.

2.23 <u>Conflicts</u>. To the extent of any conflict between the provisions of this Agreement and provisions contained in the Final Order, the provisions of the Final Order shall govern.

2.24 <u>Conversion to Exit Facility</u>. Upon the satisfaction or waiver by the requisite parties of the conditions precedent set forth in Section 5 of the Exit Credit Agreement, automatically and without any further consent or action required by the Administrative Agent, any Lender or any Loan Party, (i) the Borrower, in its capacity as reorganized Lear Corporation, and each Guarantor, in its capacity as a reorganized Debtor, to the extent such Person is required under the Exit Credit Agreement to continue to be a guarantor of the Exit Facility, shall assume all Obligations in respect of the Loans hereunder and all other monetary obligations in respect hereof, (ii) each outstanding Loan hereunder shall be continued as an Exit Loan (as defined in the Exit Credit Agreement) under the Exit Facility, (iii) each Lender hereunder shall be a Lender (as defined in the Exit Credit Agreement) under the Exit Facility, (iv) accrued and unpaid interest on the Loans shall be payable in cash on the Effective Date and (v) this Agreement and the Loan Documents shall be superseded and replaced by the Exit Facility Documentation. Each of the Loan Parties, the Administrative Agent and the Lenders shall take such actions and execute and deliver such agreements, instruments or other documents as the Administrative Agent may reasonably request to give effect to the provisions of this Section 2.24 and as are required to complete the Schedules to the Exit Facility Documentation; <u>provided</u>, <u>however</u>, that any such action by the Administrative Agent or any of the Lenders shall not be a condition precedent to the effectiveness of the provisions of this Section 2.24.

SECTION 3.   [RESERVED]

SECTION 4.   REPRESENTATIONS AND WARRANTIES

To induce the Administrative Agent and the Lenders to enter into this Agreement and the Lenders to make the Loans, each Loan Party hereby jointly and severally represents and warrants to the Administrative Agent and each Lender that:

4.1 <u>No Change.</u> Since the Petition Date, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect (it being agreed that solely for purposes of this Section 4.1 no change in automotive industry conditions or in banking, financial or capital markets on and after the Petition Date which does not disproportionately adversely affect the Borrower and its Subsidiaries, taken as a whole, shall have a Material Adverse Effect).

4.2  <u>Existence; Compliance with Law</u>.  Each Loan Party (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification and (d) is in compliance with all Requirements of Law.

4.3  <u>Power; Authorization; Enforceable Obligations</u>.  Upon entry by the Bankruptcy Court of the Final Order, each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.  Except for the entry by the Bankruptcy Court of the Final Order, no consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, and the Final Order has not been vacated, reversed or stayed, or modified or amended in a manner that would reasonably be expected to be adverse to the interests of the Required Lenders.  Upon entry by the Bankruptcy Court of the Final Order, each Loan Document has been duly executed and delivered on behalf of each Loan Party thereto.  Upon entry by the Bankruptcy Court of the Final Order, this Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party thereto, enforceable against each such Loan Party in accordance with its terms and the Final Order.

4.4  <u>No Legal Bar</u>.  The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Loan Party entered into after the Petition Date and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such post-petition Contractual Obligation (other than the Liens created by this Agreement and the Final Order).

4.5  <u>Litigation</u>.  Other than the Cases, no litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against any Loan Party or against any of their respective properties or revenues that could reasonably be expected to have a Material Adverse Effect.

4.6  <u>No Default</u>.  No Default or Event of Default has occurred and is continuing.

4.7  <u>Ownership of Property; Liens</u>.  Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party has title in fee simple to, or a valid leasehold interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property, except for minor defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes is subject to any Lien except as permitted by Section 7.3.

4.8  <u>Intellectual Property</u>.  Each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person against any Loan Party challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property of any Loan Party, nor does the Borrower know of any valid basis for any such claim.  To the knowledge of the Borrower, no use

by each Loan Party of any of its material Intellectual Property infringes on the rights of any Person in any material respect.

4.9    Taxes.  Each Loan Party has filed or caused to be filed all Federal and material state and other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any material assessments made against it or any of its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (except any such taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP (where GAAP requires such reserves) have been provided on the books of the relevant Loan Party); no tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

4.10    Federal Regulations.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board.  If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.11    Labor Matters.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Loan Party pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Loan Party on account of employee health and welfare insurance have been, in all material respects, paid or accrued as a liability on the books of the relevant Loan Party.

4.12    ERISA.  Except, in the aggregate, as could not reasonably be expected to result in a Material Adverse Effect, (i) each Loan Party and each of their respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the Code relating to Single Employer Plans and Multiemployer Plans and the regulations and published interpretations thereunder and (ii) no ERISA Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan.  Except, in the aggregate, as could not reasonably be expected to result in a Material Adverse Effect, the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits.

4.13    Investment Company Act; Other Regulations.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur the Indebtedness to be incurred hereunder.

4.14    Subsidiaries.  As of the Closing Date, (a) Schedule 4.14 sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and (b) there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options or similar equity

awards granted to current or former employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary, except as created by the Loan Documents and the Prepetition Loan Documents.

4.15 <u>Use of Proceeds</u>.  The proceeds of the Loans shall be used (a) for working capital and other general corporate purposes of the Group Members (including, without limitation, "Chapter 11 expenses" (or "administrative costs reflecting Chapter 11 expenses")) and the payment of fees and expenses incurred in connection with entering into this Agreement and the transactions contemplated hereby, subject to the Final Order; and (b) to make adequate protection payments to, or for the benefit of, the Prepetition Secured Parties in accordance with Section 2.20, the Final Order and the Budget.  The proceeds of the Loans shall not be used to purchase or carry margin stock.

4.16 <u>Environmental Matters</u>.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a) the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain, and to the knowledge of the Borrower, have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b) no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>"), nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

(c) Materials of Environmental Concern have not been transported or disposed of from the Properties during the last five years or, to the knowledge of the Borrower, any prior time in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties during the last five years or, to the knowledge of the Borrower, any prior time in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d) no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e) there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, during the past five years or, to the knowledge of the Borrower, any prior time, in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

(f) the Properties and all operations at the Properties are in compliance, and have in the last five years and, to the knowledge of the Borrower, any prior time, been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the

Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g)     no Group Member has assumed any liability by contract or, to the knowledge of the Borrower, operation of law, of any other Person under Environmental Laws.

4.17    <u>Accuracy of Information, etc</u>.  No factual statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent, the Lenders or the Bankruptcy Court, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents other than any projections or pro forma information, when taken as a whole, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances when made.  The projections and pro forma information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such projections as they relate to future events are subject to significant uncertainties, many of which are beyond the control of the Borrower and not to be viewed as fact and that actual results during the period or periods covered by such projections may differ from the projected results set forth therein by a material amount.

4.18    <u>Financial Statements</u>.  The (i) audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of December 31, 2008 and the related statements of income and cash flow for the fiscal year ending on such date and (ii) unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of April 4, 2009 and the related statements of income and cash flow for the fiscal quarter ending on such date, each as heretofore furnished to the Administrative Agent and the Lenders and certified by a Responsible Officer of the Borrower, are complete and correct in all material respects and fairly present the financial condition of the Borrower and its Subsidiaries on such date. All such financial statements, including the related schedules and notes thereto, have been prepared in conformity with GAAP applied on a consistent basis, and all liabilities, direct and contingent, of the Borrower on a consolidated basis with its Subsidiaries on such date required to be disclosed pursuant to GAAP are disclosed in such financial statements, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

4.19    <u>Insurance</u>.  All policies of insurance of any kind or nature owned by or issued to each Loan Party, including policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are (a) in full force and effect except to the extent commercially reasonably determined by the Borrower not to be necessary pursuant to clause (b) of this Section 4.19 or which is not material to the overall coverage and (b) are of a nature and provide such coverage as in the reasonable opinion of the Borrower, is sufficient and is customarily carried by companies of the size and character of the Loan Parties.

SECTION 5.   CONDITIONS PRECEDENT

The agreement of each Lender to make the extension of credit requested to be made by it on the Closing Date is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement.  The Administrative Agent shall have received this Agreement, executed and delivered by the Administrative Agent, the Borrower, each Guarantor and each Person listed on Schedule 1.1A.

(b)     Lien Searches.  The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions where any Loan Party is organized, and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 7.3 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(c)     Fees.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.  All such amounts will be paid with proceeds of Loans made on the Closing Date and will be reflected in the funding instructions given by the Borrower to the Administrative Agent on or before the Closing Date.

(d)     Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of a Responsible Officer of each Loan Party, dated the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent, as to the incumbency and signature of their respective officers executing each Loan Document to which it is a party, together with satisfactory evidence of the incumbency of such Responsible Officer, (ii) a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors (or the executive committee or other governing authority thereof) of each Loan Party authorizing the execution, delivery and performance of each Loan Document to be entered into on the Closing Date to which it is a party, (iii) a certificate of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, attaching the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party and (iv) a good standing certificate for each Loan Party from its jurisdiction of organization.

(e)     Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (provided that if any representation or warranty is by its terms qualified by materiality, such representation shall be true and correct in all respects) on and as of such date as if made on and as of such date.

(f)     Pledged Stock; Stock Powers; Pledged Notes.  The Administrative Agent shall have received (i) the certificates representing the shares of Capital Stock pledged pursuant to the Final Order, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged pursuant to the Final Order endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof, in each case of the foregoing, to the extent not previously delivered to the Prepetition Agent under the Prepetition Loan Documents.

(g)     Final Order.  The Administrative Agent shall have received a copy of the Final Order authorizing the Loan Documents and granting the Superpriority Claim status and Liens described in Section 2.20 and finding that the Lenders are extending credit to the Borrower in good faith within the meaning of Section 364(e) of the Bankruptcy Code, which Final Order shall (i) have been entered with the consent or non-objection of a preponderance (as determined by the Administrative Agent) of the Prepetition Obligations and on prior notice to such parties

(including without limitation, the Prepetition Secured Parties), (ii) be substantially consistent with Exhibit A (with such modifications as may be reasonably acceptable to the Administrative Agent), (iii) authorize extensions of credit in amounts not in excess of $500,000,000, (iv) authorize the use of Cash Collateral under the Prepetition Credit Agreement and provide for adequate protection in favor of the Prepetition Secured Parties as set forth in Section 2.20(c), (v) contain customary provisions regarding challenges to the prepetition claims and liens of the Prepetition Secured Parties and other matters, (vi) approve the payment by the Borrower of all fees owed under Section 2.6 and the issuance of additional consideration provided pursuant to Section 2.7, (vii) be in full force and effect and (viii) not have been stayed, reversed, vacated, rescinded, modified or amended in any respect and, if the Final Order is the subject of a pending appeal in any respect, none of the making of such extension of credit, the grant of Liens and Superpriority Claims pursuant to Section 2.20 or the performance by the Loan Parties of any of their respective obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(h)     First Day Motion/Orders.  All motions and orders submitted to the Bankruptcy Court on or about the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent.

(i)     Budget/Initial Cash Flow Forecast.  The Borrower shall have delivered to the Administrative Agent and the Lenders (i) a detailed consolidated budget, on a quarterly basis, for the 15-month period ending October 2, 2010 (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of such 15-month period, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto) (the "Budget"), and (ii) the initial 13-week cash flow forecast in form reasonably satisfactory to the Lenders (the "Initial Cash Flow Forecast") which, in each case, shall be accompanied by a certificate of the Borrower executed by a Responsible Officer, on behalf of the Borrower, stating that such budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made and that such Responsible Officer executing such certificate, on behalf of the Borrower (not in his or her individual capacity but solely as a Responsible Officer), has not had reason to believe that such Budget or Initial Cash Flow Forecast, as applicable, in light of such assumptions is incorrect or misleading in any material respect.

(j)     Borrowing Notice.  The Administrative Agent shall have received the Borrowing Notice, executed and delivered by the Borrower.

(k)     No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(l)     Legal Opinion of Counsel to the Borrower.  The Administrative Agent shall have received an opinion, in form and substance reasonably satisfactory to the Administrative Agent, of counsel to the Loan Parties.

(m)     Patriot Act and "Know Your Customer" Information.  The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA Patriot Act").

(n)    Ratings. The DIP Facility shall have received a rating from both S&P and Moody's.

For the purpose of determining compliance with the conditions specified in this Section 5, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

SECTION 6.    AFFIRMATIVE COVENANTS

Each Loan Party hereby jointly and severally agrees that, commencing on the Closing Date and so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each Loan Party shall and shall cause each of its Subsidiaries to:

6.1    Financial Statements.  Furnish to the Administrative Agent to be provided to each Lender:

(a)    as soon as available, but in any event not later than 120 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case, in comparative form the figures for the previous year, reported on without a qualification arising out of the scope of the audit or other material qualification or exception (other than a "going concern" exception or similar exception or qualification), by an independent certified public accountants of nationally recognized standing;

(b)    as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, commencing with the fiscal quarter ended in June 2009, the unaudited consolidated and consolidating (on the same basis as the Borrower prepared consolidating financial statements prior to the Petition Date) balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated and consolidating (on the same basis as the Borrower prepared consolidating financial statements prior to the Petition Date) statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case, in comparative form the figures for the previous year, certified by a Responsible Officer, on behalf of the Borrower, as being fairly stated in all material respects; and

(c)    as soon as available and in any event not later than 35 days after the end of each fiscal month, commencing with the fiscal month ended August 1, 2009, unaudited balance sheets of the Borrower on a consolidated and consolidating (on the same basis as the Borrower prepared consolidating financial statements prior to the Petition Date) basis with its Subsidiaries and the related statements of operations and the related statements of cash flows of the Borrower on a consolidated and consolidating (on the same basis as the Borrower prepared consolidating financial statements prior to the Petition Date) basis with its Subsidiaries, that shall be certified by a Responsible Officer, on behalf of the Borrower, to be complete and correct in all material respects and to present fairly, in accordance with GAAP, the financial position of the Borrower on a consolidated basis with its Subsidiaries as at the end of such period and the results of operations for such period, and for the elapsed portion of the year ended with the last day of such period.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except (i) as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein and (ii) with respect to unaudited statements, the absence of footnote disclosure and subject to year-end audit adjustments) consistently throughout the periods reflected therein and with prior periods.

6.2 <u>Certificates; Other Information</u>.  Furnish to the Administrative Agent which shall make such item available to each Lender (or, in the case of clause (j), to the relevant Lender):

(a)    [RESERVED];

(b)    concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of the Borrower stating that the Responsible Officer executing such certificate on behalf of the Borrower has no knowledge of any Default or Event of Default except as specified in such certificate, (ii) a Compliance Certificate containing all information and calculations necessary for determining compliance by each Loan Party with the provisions of this Agreement referred to therein, and (iii) in the case of quarterly or annual financial statements, to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2) a description of any Domestic Subsidiary acquired or created, including name and jurisdiction of organization, and (3) a description of any Person that has become a Loan Party, in each case since the date of the most recent report delivered pursuant to this clause (iii) (or, in the case of the first such report so delivered, since the Closing Date);

(c)    as soon as available, and in any event no later than 45 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto), and, as soon as available, significant revisions, if any, of such budget and projections with respect to such fiscal year (collectively, the "<u>Projections</u>"), which Projections shall in each case be accompanied by a certificate of the Borrower executed by a Responsible Officer, on behalf of the Borrower, stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer executing such certificate, on behalf of the Borrower, has no reason to believe that such Projections are incorrect or misleading in any material respect and that whether or not any such Projections are in fact achieved are subject to significant uncertainties and contingencies, many of which are not within the control of the Borrower, and that no assurance can be given that such Projections will be realized, and actual results may vary from the projected results and such variations may be material.

(d)    concurrently with the delivery of any financial statements pursuant to Section 6.1(a) or (b), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter;

(e)    within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(f)    no later than Tuesday of every calendar week, commencing the first Tuesday following the Closing Date, a rolling 13-week cash flow projection of the Borrower and its Subsidiaries substantially in the form of the Initial Cash Flow Forecast (each, a "<u>Cash Flow</u>

Forecast"), certified by a Responsible Officer of the Borrower as being prepared based upon good faith estimates and assumptions that are believed by such Responsible Officer to be reasonable at the time made and that such Responsible Officer is not aware of (x) any information contained in such cash flow forecast which is false or misleading in any material respect or (y) any omission of information which causes such cash flow forecast to be false or misleading in any material respect (it being understood that any such forecasts are estimates and that actual results may vary materially from such forecasts);

(g)     no later than the fifteenth Business Day of every fiscal month, commencing for fiscal month August, a certificate of a Responsible Officer of the Borrower containing all information and calculations necessary for determining compliance with Section 7.1(b) as of the close of business on the last day of the previous fiscal month;

(h)     to the Administrative Agent and counsel to the Administrative Agent, contemporaneously upon such filing or distribution, copies of all pleadings, motions, applications, judicial information, financial information and other documents to be filed by or on behalf of the Borrower or any of the Guarantors with the Bankruptcy Court or the United States Trustee in the Cases, or to be distributed by or on behalf of the Borrower or any of the Guarantors to any official committee appointed in the Cases (other than (a) pleadings, motions applications or other filings which would reasonably be expected to be immaterial to the Administrative Agent and the Lenders or (b) emergency pleadings, motions or other filings where, despite such Debtor's best efforts, such simultaneous notice is impracticable or (c) copies of pleadings and motions in connection with the DIP Facility or the Cash Collateral shall be delivered prior to such filing or distribution thereof) provided however, notwithstanding any of the foregoing to the contrary, the Loan Parties' obligation in this clause (h) shall be deemed satisfied if and to the extent any of such information and documents is publicly available;

(i)     to the Administrative Agent on behalf of each Required Lender promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(*l*) of ERISA that, following reasonable request of the Administrative Agent (which right to request shall be exercised no more than once during a 12-month period), any Loan Party or any ERISA Affiliate shall have promptly requested from the administrator or sponsor of a Multiemployer Plan with respect to such Multiemployer Plan; and

(j)     promptly, subject to applicable confidentiality agreements of the Group Members, such reasonably available additional financial and other information as any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.1, Section 6.2 or Section 6.7 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date received by the Administrative Agent. Each Lender shall be deemed to have received such documents on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial or governmental third-party website or whether sponsored by the Administrative Agent); provided, that the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and, at the request of the Administrative Agent, provide by electronic mail electronic versions (i.e., soft copies) of such documents.

6.3   Payment of Obligations.   Except in accordance with the Bankruptcy Code or by an applicable order of the Bankruptcy Court, pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, (i) all its post-petition material taxes and other

material obligations of whatever nature that constitute administrative expenses under Section 503(b) of the Bankruptcy Code in the Cases, except, so long as no material property (other than money for such obligation and the interest or penalty accruing thereon) of any Loan Party is in danger of being lost or forfeited as a result thereof, no such obligation need be paid if the amount or validity thereof is currently being contested in good faith by appropriate proceedings and any required reserves in conformity with GAAP with respect thereto have been provided on the books of the relevant Loan Party and (ii) all material obligations arising from Contractual Obligations entered into after the Petition Date or from Contractual Obligations entered into prior to the Petition Date and assumed and which are permitted to be paid post-petition by order of the Bankruptcy Court that has been entered with the consent of (or non-objection by) the Administrative Agent.

6.4 <u>Maintenance of Existence; Compliance</u>. (a)(i) Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) subject to the effect of the Cases, comply in all material respects with all Requirements of Law.

6.5 <u>Maintenance of Property; Insurance</u>. (a) Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted except as could not reasonably be expected to have a Material Adverse Effect and (b) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business.

6.6 <u>Inspection of Property; Books and Records; Discussions</u>. (a) Keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Administrative Agent or any Lender to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time upon reasonable notice and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and managerial employees of the Group Members and with their independent certified public accountants, <u>provided</u> that an officer of the Borrower shall be provided reasonable opportunity to participate in any such discussion with the accountants, <u>provided</u> <u>further</u> that that such inspections shall be coordinated through the Administrative Agent. The Administrative Agent and the Lenders agree to use reasonable efforts to coordinate and manage the exercise of their rights under this Section 6.6 so as to minimize the disruption to the business of the Borrower and its Subsidiaries resulting therefrom.

6.7 <u>Notices</u>. Promptly give notice to the Administrative Agent and each Lender of:

(a) the occurrence of any Default or Event of Default;

(b) any post-Petition Date litigation or proceeding affecting any Loan Party (i) in which the amount involved is $5,000,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(c) the occurrence of any ERISA Event that, alone or together with any other ERISA Event(s) that have occurred, could reasonably be expected to result in liability of any Loan Party or any of its ERISA Affiliates in an aggregate amount exceeding $5,000,000; and

(d)     any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Loan Party proposes to take with respect thereto.

6.8     Environmental Laws.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)     comply with, and take all commercially reasonable steps to ensure compliance by all tenants and subtenants, if any, with all applicable Environmental Laws, and obtain and comply with and maintain, and take all commercially reasonable steps to ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)     conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

6.9     Lender Conference Calls.  On a regular basis (but in any event no less frequently than monthly if and to the extent requested by the Administrative Agent) at such times as the Borrower and the Administrative Agent shall agree, host a conference call with the Administrative Agent and the Lenders to discuss the performance of the business, strategic alternatives and other issues as the Administrative Agent may reasonably request.

6.10     Collateral; Further Assurances.  Subject to the Final Order:

(a)     Execute and deliver, or cause to be executed and delivered, to the Administrative Agent such documents, agreements and instruments, and take or cause to be taken such further actions (including the filing and recording of financing statements and other documents and Mortgages) which may be required by law or which the Administrative Agent may, from time to time, reasonably request to carry out the terms and conditions of this Agreement and the other Loan Documents and to ensure perfection and priority of the Liens created or intended to be created by the Collateral Documents and the Final Order, all at the expense of the Loan Parties;

(b)     upon the request of the Administrative Agent (and subject to applicable legal and contractual restrictions), cause each of its wholly-owned Domestic Subsidiaries specified by the Administrative Agent to become a Guarantor, by executing a joinder agreement in a form specified by the Administrative Agent, and upon execution and delivery thereof, each such Person (i) shall automatically become a Guarantor hereunder and thereupon shall have all of the rights, benefits, duties, and obligations in such capacity under the Loan Documents and (ii) will grant Liens to the Administrative Agent in any property of such Loan Party which constitutes (or is a type which constitutes) Collateral; and

(c)     from after the date which is 30 days after the Closing Date (which period may be extended by the Administrative Agent from time to time in its sole discretion), maintain at all times substantially all of the cash and Cash Equivalents of the Loan Parties (other than cash and Cash Equivalents which are pledged to third parties to secure obligations of the Loan Parties) at an account or accounts with the Administrative Agent or any other financial institution that has entered into a control agreement in form and substance reasonably satisfactory to the Administrative Agent.

## SECTION 7.   NEGATIVE COVENANTS

Each Loan Party hereby jointly and severally agrees that, commencing on the Closing Date and so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, they shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

7.1   Financial Covenants.  (a)  Minimum Cumulative Consolidated EBITDA.  Permit the Consolidated EBITDA as at the last day of any Test Period ending on any date set forth below, to be less than the amount set forth below opposite such date:

| Date | Cumulative Consolidated EBITDA |
|---|---|
| October 3, 2009 | ($25,000,000) |
| December 31, 2009 | $65,000,000 |
| April 3, 2010 | $100,000,000 |
| July 3, 2010 | $200,000,000 |
| October 2, 2010 | $315,000,000 |

(b)      Minimum Liquidity.  Permit Liquidity, as of the last day of any fiscal month, commencing August 1, 2009, to be less than the amount set forth below opposite such date

| Date | Minimum Liquidity |
|---|---|
| August 1, 2009 | $900,000,000 |
| August 29, 2009 | $900,000,000 |
| October 3, 2009 | $900,000,000 |
| October 31, 2009 | $900,000,000 |
| November 28, 2009 | $900,000,000 |
| December 31, 2009 | $900,000,000 |
| January 30, 2010 | $700,000,000 |
| February 27, 2010 | $700,000,000 |
| April 3, 2010 | $700,000,000 |
| May 1, 2010 | $700,000,000 |
| May 29, 2010 | $700,000,000 |

| July 3, 2010 | $700,000,000 |
| July 31, 2010 | $700,000,000 |
| August 28, 2010 | $700,000,000 |
| October 2, 2010 | $700,000,000 |

(c)     <u>Limitation on Capital Expenditures</u>.  Permit the aggregate amount of Capital Expenditures made by the Loan Parties during any Test Period ending on any date set forth below to exceed the amount set forth opposite such date:

| **Date** | **Cumulative Capital Expenditure Amount** |
| --- | --- |
| October 3, 2009 | $50,000,000 |
| December 31, 2009 | $100,000,000 |
| April 3, 2010 | $140,000,000 |
| July 3, 2010 | $180,000,000 |
| October 2, 2010 | $230,000,000 |

7.2     <u>Indebtedness</u>.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)     Indebtedness of any Loan Party pursuant to any Loan Document;

(b)     intercompany Indebtedness incurred pursuant to any Investment permitted by Section 7.7(f) so long as any such Indebtedness owing by a Loan Party to any Person other than a Loan Party shall, in each case, be evidenced by an Intercompany Subordinated Note (other than, and solely to the extent that, such Intercompany Subordinated Note would be prohibited by any law or regulation of a jurisdiction where any such Person that is a Foreign Subsidiary is located or organized);

(c)     unsecured Guarantee Obligations incurred in the ordinary course of business by (i) the Borrower or any of its Subsidiaries of obligations of the Borrower or any Guarantor or (ii) any Subsidiary that is not  Loan Party of any obligations of a Subsidiary that is not a Loan Party;

(d)     Indebtedness outstanding on the Petition Date and listed on Schedule 7.2(d) and, except with respect to any such Indebtedness of Debtors, any refinancings, refundings, renewals or extensions thereof (without increasing, or shortening the maturity of, the principal amount thereof) (any such indebtedness, "<u>Refinancing Indebtedness</u>"); <u>provided</u> however that (i) to the extent such Refinancing Indebtedness refinances Indebtedness subordinated or <u>pari</u> <u>passu</u> to the Obligations, such Refinancing Indebtedness is subordinated or <u>pari</u> <u>passu</u> to the Obligations at least to the same extent as the Indebtedness being refunded or refinanced and (ii) the obligors in respect of such Refinancing Indebtedness (including in their capacities as primary obligor and guarantor) are the same as for the Indebtedness being refinanced;

(e)     Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(g) in an aggregate principal amount not to exceed $15,000,000 at any one time outstanding;

(f)     additional Indebtedness of the Borrower or any of its Subsidiaries in an aggregate principal amount not to exceed (x) with respect to the Loan Parties, $15,000,000 and (y) with respect to Subsidiaries that are not Loan Parties, $50,000,000, in each case, at any one time outstanding;

(g)     Indebtedness of the Borrower or any of its Subsidiaries incurred after the Petition Date in respect of workers' compensation claims, self-insurance obligations, performance, bid and surety bonds and completion guaranties, in each case in the ordinary course of business;

(h)     Indebtedness of the Borrower or any of its Subsidiaries incurred after the Petition Date arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is repaid within five Business Days;

(i)     letters of credit issued for the account of any Group Member (including Specified Letters of Credit), so long as (1) the sum of (i) the aggregate undrawn face amount thereof, (ii) any unreimbursed obligations in respect thereof and (iii) the aggregate amount of pledges and deposits made pursuant to Section 7.3(t) below does not exceed $250,000,000 at any time and (2) at any time no more than $25,000,000 of such letters of credit shall be issued by Persons other than Lenders or affiliates thereof;

(j)     obligations of Chinese Subsidiaries in respect of Chinese Acceptance Notes in the ordinary course of business;

(k)     Indebtedness of a joint venture (including a joint venture which is treated as a Subsidiary as a result of FASB Interpretation No. 46 issued by the Financial Accounting Standards Board) as long as such Indebtedness is non-recourse to the Borrower or any other Subsidiary of the Borrower in an aggregate principal amount not to exceed $50,000,000 at any time;

(l)     Indebtedness incurred by any Group Member other than a Loan Party pursuant to working capital lines of credit or any overdraft line or other cash management system in an aggregate outstanding principal amount for all such Group Members at the close of business on any day not to exceed $75,000,000;

(m)     Indebtedness under tax-favored or government-sponsored financing transactions; provided that (i) the terms of such transactions and the Group Members party thereto have been approved by the Administrative Agent, (ii) such Indebtedness is not senior in right of payment to the Obligations, (iii) any Lien arising pursuant to such transactions is subordinated to the Liens on the Collateral securing the Obligations and (iv) the aggregate principal amount of such Indebtedness shall not exceed $25,000,000 at any time.

7.3     Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)     Liens for taxes not yet due or that are being contested in good faith by appropriate proceedings, <u>provided</u> that adequate reserves with respect thereto (if required by GAAP) are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP (or, in the case of Foreign Subsidiaries, generally accepted accounting principles in effect from time to time in their respective jurisdiction of organization);

(b)     landlord's, carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier, construction or other like Liens in the ordinary course of business that are not overdue for a period of more than 45 days or that are being bonded or contested in good faith by appropriate proceedings;

(c)     (i) pledges or deposits made in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) Liens (A) of a collecting bank arising in the ordinary course of business under Section 4-210 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon or (B) in favor of a banking institution or financial intermediary, encumbering amounts credited to deposit or securities accounts (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds, utility payments and other obligations of a like nature incurred in the ordinary course of business;

(e)     zoning restrictions, survey exceptions and such matters as an accurate survey would disclose, mortgage rights, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     Liens in existence on the Petition Date and listed on Schedule 7.3(f) and, except with respect to Liens of Debtors, extensions, renewals and replacements of any such Liens so long as the principal amount of Indebtedness or other obligations secured thereby is not increased and so long as such Liens are not extended to any other property of the Borrower or any of its Subsidiaries;

(g)     Liens securing Indebtedness of the Borrower or any other Subsidiary incurred pursuant to Section 7.2(e) to finance the acquisition of fixed or capital assets; <u>provided</u> that (i) such Liens shall be created within 30 days of the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds thereof and (iii) the amount of Indebtedness secured thereby is not increased;

(h)     Liens created pursuant to this Agreement and the Final Order;

(i)     any interest or title of a lessor under any lease entered into by the Borrower or any other Subsidiary in the ordinary course of its business and covering only the assets so leased;

(j)     Liens with respect of leases, licenses, sublicenses or subleases granted to others not interfering in any material respect with the businesses of the Borrower or any of its Subsidiaries;

(k)     Liens with respect to operating leases not prohibited under this Agreement and entered into in the ordinary course of business;

(l)     Liens not otherwise permitted by this Section so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrower and all Subsidiaries) $5,000,000 at any one time;

(m)     Liens on the assets of a Foreign Subsidiary and its Subsidiaries securing obligations of such Persons that are not prohibited by Section 7.2 so long as the aggregate outstanding principal amount of the obligations for borrowed money secured thereby does not exceed (as to all Foreign Subsidiaries) $15,000,000 at any one time;

(n)     receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(o)     Liens on the assets of joint ventures and their Subsidiaries securing obligations of such Persons that are not prohibited by Section 7.2 so long as such Liens do not encumber any assets or property of the Borrower or its other Subsidiaries;

(p)     attachment, judgment or other similar Liens securing judgments or decrees not constituting an Event of Default under Section 8.1(l) or securing appeal or other surety bonds related to such judgments or decrees;

(q)     Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business;

(r)     statutory Liens and rights of offset arising in the ordinary course of business of the Borrower and its Subsidiaries;

(s)     Liens on assets of Foreign Subsidiaries securing Indebtedness of a Foreign Subsidiary permitted by Sections 7.2(f) and 7.2(k) and securing other obligations under the agreements governing or relating to such Indebtedness, so long as such Liens do not encumber the Capital Stock of the Borrower or any of its Subsidiaries;

(t)     pledges or deposits made to support any obligations of the Group Members (including cash collateral to secure obligations under letters of credit permitted pursuant to Section 7.2(i)) so long as (without duplication) the sum of (i) the aggregate undrawn face amount of letters of credit permitted pursuant to Section 7.2(i) above, (ii) any unreimbursed obligations in respect of letters of credit permitted pursuant to Section 7.2(i) above and (iii) the aggregate amount of such pledges and deposits does not exceed the limit set forth in Section 7.2(i);

(u)     Liens arising in connection with financing transactions permitted by Section 7.2(l), provided that such liens do not at any time encumber any property unless approved by the Administrative Agent and such Liens otherwise comply with Section 7.2(l);

(v)     the exchange or transfer within China of Chinese Acceptance Notes by Chinese Subsidiaries of the Borrower in the ordinary course of business; and

(w)     statutory Liens and Liens granted by any orders in any proceeding in connection with the CCAA Cases, in each case on any assets of any Canadian Subsidiaries of the Borrower.

7.4     <u>Fundamental Changes</u>.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)     any Subsidiary of the Borrower may be merged, consolidated with or into or transferred to the Borrower (<u>provided</u> that the Borrower shall be the continuing or surviving corporation) or with, into or to any Guarantor (<u>provided</u> that the Guarantor shall be the continuing or surviving corporation or simultaneously therewith, the continuing corporation shall become a Guarantor);

(b)     any Subsidiary of the Borrower that is not a Loan Party may be merged, consolidated, amalgamated, liquidated, wound-up, dissolved or all or substantially all of its property or business Disposed of with, into or to a Subsidiary that is not a Loan Party;

(c)     any Subsidiary of the Borrower may Dispose of any or all of its assets to the Borrower or any Guarantor (upon voluntary liquidation or otherwise); and

(d)     any Disposition otherwise permitted pursuant to Section 7.5 may be completed.

7.5     <u>Disposition of Property</u>.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person, except:

(a)     the Disposition of obsolete or worn out property or property no longer useful in the business of the Borrower and its Subsidiaries, in each case in the ordinary course of business;

(b)     the Disposition of inventory or Cash Equivalents in the ordinary course of business;

(c)     Dispositions permitted by Section 7.4(c), Restricted Payments permitted by Section 7.6 and Investments permitted by Section 7.7;

(d)     the Disposition or issuance of any Subsidiary's Capital Stock to the Borrower or any Guarantor;

(e)     the licensing and cross-licensing arrangements of technology or other intellectual property in the ordinary course of business;

(f)     the Disposition of any property or assets (i) to any Loan Party and (ii) by any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party;

(g)     transfers of property as a result of any Recovery Event;

(h)     leases, occupancy agreements and subleases of property in the ordinary course of business;

(i)     the Disposition by the Borrower and certain of its Subsidiaries of account receivables of General Motors Corporation, Chrysler LLC and their affiliates and customary

related property to special purpose vehicles established by General Motors Corporation and Chrysler LLC pursuant to the United States Department of the Treasury's Auto Supplier Support Programs;

(j)        the Disposition of receivables and customary related assets pursuant to factoring programs on customary market terms for such transactions and with respect to receivables of, and generated by, Group Members that are not Loan Parties;

(k)        the Disposition for fair market value of certain assets in Sweden related to the transfer of certain programs to a competitor as previously disclosed to the Administrative Agent;

(l)        the exchange or transfer within China of Chinese Acceptance Notes by Chinese Subsidiaries of the Borrower; and

(m)        the Disposition of other property (other than receivables and customary related assets) having a fair market value not to exceed $50,000,000 in the aggregate; provided that the Net Cash Proceeds thereof are applied to prepay the Loans to the extent required by Section 2.9(b).

7.6        Restricted Payments.  Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any Subsidiary of the Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any Subsidiary of the Borrower (collectively, "Restricted Payments"), except that (a) any Subsidiary may make Restricted Payments to any Loan Party, (b) any Subsidiary may make Restricted Payments to the Group Member that is its parent company so long as, in the case of any Restricted Payment made by a Loan Party, such parent company is also a Loan Party and (c) any Subsidiary may make Restricted Payments with respect to the Capital Stock of such Subsidiary, provided that each Group Member shareholder of such Subsidiary receives at least its ratable share thereof.

7.7        Investments.  Make any Investment except:

(a)        extensions of trade credit in the ordinary course of business;

(b)        Investments in Cash Equivalents;

(c)        Guarantee Obligations permitted by Section 7.2;

(d)        loans and advances to employees or directors of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses, provided that, in the case of the Loan Parties, the aggregate amount of such loans and advances shall not exceed $500,000 at any one time outstanding;

(e)        Investments in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries with the proceeds of any Reinvestment Deferred Amount;

(f)        intercompany Investments by (i) any Group Member in the Borrower or any Person that, prior to such investment, is a Guarantor, (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party, (iii) any Loan Party in a Foreign Subsidiary

to fund in the ordinary course of business foreign operations, (iv) by any Loan Party in any Subsidiary that is not a Loan Party, provided that the aggregate amount (valued at cost) of Investments under clause (iv) in Subsidiaries that are organized under the laws of a Specified Jurisdiction shall not exceed $100,000,000 at any one time outstanding in the aggregate plus, without duplication, all cash returns of principal or capital, cash dividends and other cash returns received by any Loan Party after the date hereof from any Subsidiary that is organized under the laws of a Specified Jurisdiction;

(g)     Investments consisting of Indebtedness permitted by Section 7.2;

(h)     prepaid expenses and lease, utility, workers, compensation, performance and other similar deposits made in the ordinary course of business;

(i)     Investments (including debt obligations) received in the ordinary course of business by the Borrower or any Subsidiary in connection with the bankruptcy or reorganization of suppliers and customers and in settlement or delinquent obligations of, and other disputes with, customers and suppliers arising out of the ordinary course of business;

(j)     Investments in existence on the Petition Date;

(k)     Investments in Greenfield Holdings, LLC and Integrated Manufacturing and Assembly L.L.C. to the extent that such Investments are made in the ordinary course of a Loan Party's business, for cash management purposes and not exceeding $25,000,000 at any one time outstanding plus, without duplication, all cash returns of principal or capital, cash dividends and other cash returns received by any Loan Party after the date hereof from Greenfield Holdings, LLC or Integrated Manufacturing and Assembly L.L.C.;

(l)     the Disposition or contribution by the Borrower and certain of its domestic Subsidiaries of certain metals and electronics assets to its existing Subsidiaries consistent with the restructuring plan including in the financial projections; and

(m)     in addition to Investments otherwise expressly permitted by this Section, Investments by the Borrower or any of its Subsidiaries in an aggregate amount not to exceed $75,000,000 at any one time outstanding.

7.8     Transactions with Affiliates.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than transactions among Group Members) unless such transaction is (a) otherwise permitted under this Agreement, or (b) in the ordinary course of business of the relevant Group Member, upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate.

7.9     Swap Agreements.  Enter into any Swap Agreement except (a) Swap Agreements entered into to hedge or mitigate risks to which any Group Member has actual exposure (other than those in respect of Capital Stock of any Person) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates  (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investments of any Group Member, provided that in each case such agreements are not entered into for speculative purposes.

7.10  Changes in Fiscal Periods.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

7.11  Negative Pledge Clauses.  Enter into or permit to exist or become effective any agreement that prohibits or limits the ability of any Group Member to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) the Final Order, this Agreement and the other Loan Documents, (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and proceeds thereof), (c) the Prepetition Loan Documents and any agreement existing as of the Petition Date which has been assumed or which remains effective after the Petition Date, (d) customary provisions in joint venture agreements and similar agreements that restrict the transfer of assets of, or equity interests in, joint ventures, and (e) licenses or sublicenses by the Borrower and its Subsidiaries of intellectual  property in the ordinary course of business (in which case, any prohibition or limitation shall only be effective against the intellectual property subject thereto).

7.12  Clauses Restricting Subsidiary Distributions.  Enter into or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Subsidiary of the Borrower, (b) make loans or advances to, or other Investments in, the Borrower or any other Subsidiary of the Borrower or (c) transfer any of its assets to the Borrower or any other Subsidiary of the Borrower, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents and the Prepetition Loan Documents, and any restrictions existing under or in connection with any other Indebtedness existing as of the Petition Date which has been assumed or which remains effective after the Petition Date, (ii) customary provisions in joint venture agreements and similar agreements that restrict the transfer of equity interests in joint ventures (which are not Subsidiaries of the Borrower) (in which case such restrictions shall relate only to assets of, or equity interests in, such joint venture), (iii) any restrictions regarding licenses or sublicenses by the Borrower and its Subsidiaries of intellectual property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property), (iv) customary restrictions and conditions contained in agreements relating to the sale of all or a substantial part of the capital stock or assets of any Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder, (v) with respect to restrictions described in clause (a) of this Section 7.12, restrictions contained in agreements governing Indebtedness permitted by Section 7.2(c) hereof and (vi) with respect to restrictions described in clause (c) of this Section 7.12, restrictions contained in agreements governing Indebtedness permitted by Section 7.2(e) hereof (as long as such restrictions apply to the property financed thereby) and (k) (as long as such restrictions apply only to the assets of the applicable joint venture).

7.13  Lines of Business.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

7.14  Use of Proceeds.  (a) Use the proceeds of the Loans for purposes other than those described in Section 4.15 or (b) use any portion of the Loans, the Collateral, the Carve Out or the Cash Collateral of the Prepetition Secured Parties to commence or prosecute any Prohibited Claim (provided that the restriction in the foregoing clause (b) does not apply to investigations of Prohibited Claims).

7.15    Chapter 11 Claims.  In the case of the Guarantors, incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien on any Collateral which is senior to, or pari passu with, the Obligations hereunder, in each case except for the Carve-Out.

## SECTION 8.   EVENTS OF DEFAULT

8.1    Events of Default.  If any of the following events shall occur and be continuing on or after the occurrence of the Closing Date:

(a)    the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within three Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)    any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)    any Loan Party shall default in the observance or performance of any agreement contained in clause (ii) of Section 6.4(a) (with respect to the Borrower only), Section 6.7(a) or Section 7 of this Agreement; or

(d)    any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 10 days after notice thereof from the Administrative Agent or the Required Lenders to the Borrower; or

(e)    any Group Member (other than an Immaterial Subsidiary) shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans and, in case of the Debtors, any pre-Petition Date Indebtedness) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such post-Petition Date Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to post-Petition Date Indebtedness the outstanding principal amount (or the termination value, as applicable) of which exceeds in the aggregate $10,000,000; or

(f)     any of the Cases shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or a trustee under Chapter 11 of the Bankruptcy Code shall be appointed in any of the Cases; or

(g)     (i) an order of the Bankruptcy Court shall be entered granting another Superpriority Claim (other than the Carve-Out) or Lien pari passu with or senior to that granted (x) to the Lenders and the Administrative Agent pursuant to this Agreement and the Final Order, or (y) to the Prepetition Secured Parties pursuant to the Final Order (other than the Carve Out); (ii) an order of the Bankruptcy Court shall be entered reversing, staying for a period in excess of ten (10) days, vacating or otherwise amending, supplementing or modifying the Final Order without the written consent of the Administrative Agent and the Required Lenders; (iii) the Prepetition Secured Parties' Cash Collateral shall be used in a manner inconsistent with the Final Order; (iv) an order of a court of competent jurisdiction shall be entered terminating the use of the Prepetition Secured Parties' Cash Collateral; or (v) an order of the Bankruptcy Court shall be entered under Section 1106(b) of the Bankruptcy Code in any of the Cases appointing an examiner having enlarged powers relating to the operation of the business of the Loan Parties (i.e., powers beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code) and such order shall not be reversed or vacated within 30 days after the entry thereof;

(h)     any Loan Party shall make any payments relating to pre-Petition Date obligations other than (i) as permitted under the Final Order, (ii) in accordance with, and to the extent authorized by, a "first day" order reasonably satisfactory to the Administrative Agent and (iii) as otherwise permitted under this Agreement or by the Administrative Agent, including pursuant to the Final Order and in connection with adequate protection payments described in Section 2.20(c); or

(i)     the entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any property of any Loan Party which has a value in excess of $10,000,000 in the aggregate; or

(j)     (i) the filing of any pleading by any Loan Party seeking, or otherwise consenting to, any of the matters set forth in paragraphs (f), (g), (h) or (i) above in this Section or (ii) any of the Debtors shall seek support for, or fail to contest in good faith any of the matters set forth in paragraphs (f), (g), (h) or (i) above in this Section; or

(k)     (i) an ERISA Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Single Employer Plan, (iii) the PBGC shall institute proceedings to terminate any Single Employer Plan(s); (iv) any Loan Party or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (v) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(l)     one or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Petition Date against any Loan Party involving in the aggregate a liability (excluding any amounts paid or covered by insurance as to which the relevant insurance company has not denied coverage) of $10,000,000 or more, and all such

judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 45 days from the entry thereof; or

(m)     (i) except as permitted under the Final Order, any proceeding shall be commenced by any Loan Party seeking, or otherwise consenting to, (x) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or (y) any relief under Section 506(c) of the Bankruptcy Code with respect to any Collateral or (ii) the Borrower or any Subsidiary shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; or

(n)     (i) the Bankruptcy Court shall confirm a plan in any of the Cases of the Debtors that does not provide for payment in full in cash of the Obligations (other than unasserted contingent obligations as long as such plan otherwise provides for payment of such obligations in a manner satisfactory to the Administrative Agent) on the Consummation Date or the assumption of the Obligations by the reorganized Debtors in accordance with Section 2.24, (ii) the Bankruptcy Court shall enter an order which dismisses any of the Cases of the Debtors and which does not provide for payment in full in cash of the Obligations (other than unasserted contingent obligations as long as such plan otherwise provides for payment of such obligations in a manner satisfactory to the Administrative Agent) or the assumption of the Obligations by the reorganized Debtors in accordance with Section 2.24 or (iii) any of the Debtors shall seek support for, or fail to contest in good faith to the filing or confirmation of, a plan or the entry of such an order described in clauses (i) or (ii) above; or

(o)     the Final Order shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Liens or Superpriority Claims created by the Final Order shall cease to be enforceable and of the same effect and priority purported to be created thereby other than by reason of the release thereof in accordance with the terms thereof; or

(p)     a Change of Control shall have occurred; or

(q)     the Debtors shall not have filed a Conforming Plan and the Disclosure Statement with the Bankruptcy Court on or before 210 days following the Petition Date, or such later date as may be agreed to by the Administrative Agent in its reasonable discretion; or

(r)     the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Required Lenders, approving the Disclosure Statement on or before 275 days (plus the number of days by which the Scheduled Maturity Date shall have been extended pursuant to the Extension Option) following the Petition Date, or such later date as may be agreed to by the Administrative Agent in its reasonable discretion; or

(s)     the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Required Lenders, confirming a Conforming Plan on or before 335 days (plus the number of days by which the Scheduled Maturity Date shall have been extended pursuant to the Extension Option) following the Petition Date, or such later date as may be agreed to by the Administrative Agent in its reasonable discretion; or

(t)     the Effective Date of a Conforming Plan shall not have occurred on or before 365 days (plus the number of days by which the Scheduled Maturity Date shall have been extended

pursuant to the Extension Option) following the Petition Date, or such later date as may be agreed to by the Administrative Agent in its reasonable discretion; or

(u)     any material provision of this Agreement shall cease to be valid and binding on the Debtors or any Debtor shall file a motion, pleading or proceeding seeking, consenting to or asserting the invalidity of any material provision of this Agreement;

then, and in any such event, the Administrative Agent may, and, at the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower (with a copy to the Prepetition Agent, counsel for any statutory committee appointed in the Cases and to the United States Trustee), take one or more of the following actions, at the same or different times (provided that with respect to clause (iii) below and the enforcement of Liens or other remedies with respect to the Collateral under clause (iv) below, the Administrative Agent shall provide the Borrower (with a copy to the Prepetition Agent, counsel for any statutory committee appointed in the Cases and to the United States Trustee) with five Business Days' written notice prior to taking the action contemplated thereby; provided, further, that upon receipt of the notice referred to in the immediately preceding clause, the Borrower may continue to make ordinary course and Carve-Out disbursements from the account referred to in clause (iii) below but may not withdraw or disburse any other amounts from such account) (in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition of any such action shall be whether, in fact, an Event of Default has occurred and is continuing):  (i) terminate forthwith the Commitments; (ii) declare the Loans then outstanding to be forthwith due and payable, whereupon the principal of the Loans, together with accrued interest thereon and any unpaid accrued fees and all other Obligations of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Loan Parties, anything contained herein or in any other Loan Document to the contrary notwithstanding; (iii) subject to the Final Order, set-off amounts held as cash collateral or in the accounts of the Loan Parties and apply such amounts to the Obligations of the Loan Parties hereunder and under the other Loan Documents in accordance with Section 11.3; and (iv) exercise any and all remedies under this Agreement, the Final Order, and applicable law available to the Administrative Agent and the Lenders.

## SECTION 9.   THE ADMINISTRATIVE AGENT

9.1   <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.   Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent.

9.2   <u>Delegation of Duties</u>.  The Administrative Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.  The exculpatory provisions of this Agreement and of the other Loan Documents shall apply to any such agent or attorney-in-fact and to their Related Parties (as defined below).

9.3   Exculpatory Provisions.  Neither the Administrative Agent nor any of its respective officers, directors, employees, agents, advisors, attorneys-in-fact, or affiliates shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Administrative Agent under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder.  The Administrative Agent shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4   Reliance by Administrative Agent.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, facsimile or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent.  The Administrative Agent may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent.  The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action.  The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5   Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless the Administrative Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that the Administrative Agent receives such a notice, the Administrative Agent shall give notice thereof to the Lenders.  The Administrative Agent shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Administrative Agent shall have received such directions, the Administrative Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as they shall deem advisable in the best interests of the Lenders.

9.6   Non-Reliance on Administrative Agent and Other Lenders.  Each Lender expressly acknowledges that neither the Administrative Agent nor any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates have made any representations or warranties to it and that no act by

the Administrative Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by the Administrative Agent to any Lender.  Each Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement.  Each Lender also represents that it will, independently and without reliance upon the Administrative Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

9.7    Indemnification.  The Lenders agree to indemnify the Administrative Agent and its officers, directors, employees, agents, affiliates, advisors, and controlling persons' (each, an "Agent Indemnitee") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Outstanding Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Outstanding Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind (including reasonable attorneys fees and expenses) whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct.  The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

9.8    Agent in Its Individual Capacity.  The Administrative Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though the Administrative Agent were not the Administrative Agent.  With respect to its Loans made or renewed by it, the Administrative Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not the Administrative Agent, and the terms "Lender" and "Lenders" shall include the Administrative Agent in its individual capacity.

9.9    Successor Administrative Agent.  The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and the Borrower.  If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the

Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans.  If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above.  After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 9 and of Section 12.5 shall continue to inure to its benefit.

9.10  <u>Execution of Loan Documents</u>.  The Lenders hereby empower and authorize the Administrative Agent, on behalf of the Lenders, to execute and deliver to the Loan Parties the other Loan Documents and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents.  Each Lender agrees that any action taken by the Administrative Agent or the Required Lenders (or any other instructing group of Lenders specified by this Agreement) in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Administrative Agent or the Required Lenders (or any other instructing group of Lenders specified by this Agreement) of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

SECTION 10.  GUARANTEE

10.1  <u>Guarantee</u>.

(a)  Each of the Guarantors hereby, jointly and severally, unconditionally and irrevocably, guarantees to the Administrative Agent, for the ratable benefit of the Lenders and their respective successors, indorsees, transferees and assigns permitted hereunder, the prompt and complete payment and performance by the Borrower (or, in the case of any Specified Letter of Credit, the relevant Group Member(s)) when due (whether at the stated maturity, by acceleration or otherwise) of the Obligations;

(b)  Anything herein or in any other Loan Document to the contrary notwithstanding, the maximum liability of each Guarantor under this Section 10.1 and under the other Loan Documents shall in no event exceed the amount which is permitted under applicable federal and state laws relating to the insolvency of debtors.

(c)  Each Guarantor agrees that the Obligations may at any time and from time to time exceed the amount of the liability of such Guarantor hereunder without impairing the guarantee contained in this Section 10 or affecting the rights and remedies of the Administrative Agent or any Lender hereunder.

(d)  The guarantee contained in this Section 10 shall remain in full force and effect until all the Obligations and the obligations of each Guarantor under the guarantee contained in this Section 10 shall have been satisfied by payment in full (other than unasserted contingent obligations) and the Commitments shall be terminated.

(e)  No payment made by the Borrower, any of the Guarantors, any other guarantor or any other Person or received or collected by the Administrative Agent or any Lender from the

Borrower, any of the Guarantors, any other guarantor or any other Person by virtue of any action or proceeding or any set-off or appropriation or application at any time or from time to time in reduction of or in payment of the Obligations shall be deemed to modify, reduce, release or otherwise affect the liability of any Guarantor hereunder which shall, notwithstanding any such payment (other than any payment made by such Guarantor in respect of the Obligations or any payment received or collected from such Guarantor in respect of the Obligations), remain liable for the Obligations up to the maximum liability of such Guarantor hereunder until the Obligations are paid in full (other than unasserted contingent obligations) and the Commitments are terminated.

10.2   <u>Right of Contribution</u>.  Each Guarantor hereby agrees that to the extent that a Guarantor shall have paid more than its proportionate share of any payment made hereunder, such Guarantor shall be entitled to seek and receive contribution from and against any other Guarantor hereunder which has not paid its proportionate share of such payment.  Each Guarantor's right of contribution shall be subject to the terms and conditions of Section 10.3.  The provisions of this Section 10.2 shall in no respect limit the obligations and liabilities of any Guarantor to the Administrative Agent and the Lenders, and each Guarantor shall remain liable to the Administrative Agent and the Lenders for the full amount guaranteed by such Guarantor hereunder.

10.3   <u>No Subrogation</u>.  Notwithstanding any payment made by any Guarantor hereunder or any set-off or application of funds of any Guarantor by the Administrative Agent or any Lender, no Guarantor shall be entitled to be subrogated to any of the rights of the Administrative Agent or any Lender against the Borrower or any other Guarantor or any collateral security or guarantee or right of offset held by the Administrative Agent or any Lender for the payment of the Obligations, nor shall any Guarantor seek or be entitled to seek any contribution or reimbursement from the Borrower or any other Guarantor in respect of payments made by such Guarantor hereunder, until all amounts owing to the Administrative Agent and the Lenders by the Borrower on account of the Obligations are paid in full.  If any amount shall be paid to any Guarantor on account of such subrogation rights at any time when all of the Obligations shall not have been paid in full, such amount shall be held by such Guarantor in trust for the Administrative Agent and the Lenders, segregated from other funds of such Guarantor, and shall, forthwith upon receipt by such Guarantor, be turned over to the Administrative Agent in the exact form received by such Guarantor (duly indorsed by such Guarantor to the Administrative Agent, if required), to be applied against the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement.

10.4   <u>Amendments, etc. with respect to the Obligations</u>.  Each Guarantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against any Guarantor and without notice to or further assent by any Guarantor, any demand for payment of any of the Obligations made by the Administrative Agent or any Lender may be rescinded by the Administrative Agent or such Lender and any of the Obligations continued, and the Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Administrative Agent or any Lender, and this Agreement and the other Loan Documents and any other documents executed and delivered in connection herewith or therewith may be amended, modified, supplemented or terminated, in whole or in part, as the Administrative Agent (or the Required Lenders or all Lenders, as the case may be) may deem advisable from time to time, and any collateral security, guarantee or right of offset at any time held by the Administrative Agent or any Lender for the payment of the Obligations may be sold, exchanged, waived, surrendered or released.  Neither the Administrative Agent nor any Lender shall have any obligation to protect, secure, perfect or insure any Lien at any time held by it as security for the Obligations or for the guarantee contained in this Section 10 or any property subject thereto.

10.5  <u>Guarantee Absolute and Unconditional</u>.  Each Guarantor waives any and all notice of the creation, renewal, extension or accrual of any of the Obligations and notice of or proof of reliance by the Administrative Agent or any Lender upon the guarantee contained in this Section 10 or acceptance of the guarantee contained in this Section 10; the Obligations, and any of them, shall conclusively be deemed to have been created, contracted or incurred, or renewed, extended, amended or waived, in reliance upon the guarantee contained in this Section 10; and all dealings between the Borrower and any of the Guarantors, on the one hand, and the Administrative Agent and the Lenders, on the other hand, likewise shall be conclusively presumed to have been had or consummated in reliance upon the guarantee contained in this Section 10.  Each Guarantor waives diligence, presentment, protest, demand for payment and notice of default or nonpayment to or upon the Borrower or any of the Guarantors with respect to the Obligations.  Each Guarantor understands and agrees that the guarantee contained in this Section 10 shall be construed as a continuing, absolute and unconditional guarantee of payment without regard to (a) the validity or enforceability of this Agreement or any other Loan Document, any of the Obligations or any other collateral security therefor or guarantee or right of offset with respect thereto at any time or from time to time held by the Administrative Agent or any Lender, (b) any defense, set-off or counterclaim (other than a defense of payment or performance) which may at any time be available to or be asserted by the Borrower or any other Person against the Administrative Agent or any Lender, or (c) any other circumstance whatsoever (with or without notice to or knowledge of the Borrower or such Guarantor) which constitutes, or might be construed to constitute, an equitable or legal discharge of the Borrower for the Obligations, or of such Guarantor under the guarantee contained in this Section 10, in bankruptcy or in any other instance.  When making any demand hereunder or otherwise pursuing its rights and remedies hereunder against any Guarantor, the Administrative Agent or any Lender may, but shall be under no obligation to, make a similar demand on or otherwise pursue such rights and remedies as it may have against the Borrower, any other Guarantor, or any other Person or against any collateral security or guarantee for the Obligations or any right of offset with respect thereto, and any failure by the Administrative Agent or any Lender to make any such demand, to pursue such other rights or remedies or to collect any payments from the Borrower, any other Guarantor, or any other Person or to realize upon any such collateral security or guarantee or to exercise any such right of offset, or any release of the Borrower, any other Guarantor, or any other Person or any such collateral security, guarantee or right of offset, shall not relieve any Guarantor of any obligation or liability hereunder, and shall not impair or affect the rights and remedies, whether express, implied or available as a matter of law, of the Administrative Agent or any Lender against any Guarantor.  For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

10.6  <u>Reinstatement</u>.  The guarantee contained in this Section 10 shall continue to be effective, or be reinstated, as the case may be, if at any time payment, or any part thereof, of any of the Obligations is rescinded or must otherwise be restored or returned by the Administrative Agent or any Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of any Loan Party, or upon or as a result of the appointment of a receiver, intervenor or conservator of, or trustee or similar officer for, any Loan Party or any substantial part of its property, or otherwise, all as though such payments had not been made.

10.7  <u>Payments</u>.  Each Guarantor hereby guarantees that payments hereunder will be paid to the Administrative Agent without set-off or counterclaim in Dollars at the Funding Office.

SECTION 11.  REMEDIES; APPLICATION OF PROCEEDS

11.1  <u>Remedies; Obtaining the Collateral Upon Default</u>.  Upon the occurrence and during the continuance of an Event of Default and with not fewer than 5 days' prior written notice by the Administrative Agent (or such longer time as may be required pursuant to the terms of the Final Order), to the extent any such action is not inconsistent with the Final Order or Section 8, the Administrative

Agent, in addition to any rights now or hereafter existing under applicable law, and without application to or order of the Bankruptcy Court, shall have all rights as a secured creditor under the Uniform Commercial Code in all relevant jurisdictions and may:

(a)        personally, or by agents or attorneys, immediately retake possession of the Collateral or any part thereof, from the Borrower, any Guarantor, or any other Person who then has possession of any part thereof with or without notice or process of law (but subject to any Requirements of Law), and for that purpose may enter upon the Borrower's or any Guarantor's premises where any of the Collateral is located and remove the same and use in connection with such removal any and all services, supplies, aids and other facilities of the Borrower, or such Guarantor;

(b)        instruct the obligor or obligors on any agreements, instrument or other obligation constituting the Collateral to make any payment required by the terms of such instrument or agreement directly to any Cash Collateral account;

(c)        sell, assign or otherwise liquidate, or direct any Loan Party to sell, assign or otherwise liquidate, any or all of the Collateral or any part thereof in accordance with Section 11.2, and take possession of the proceeds of any such sale, assignment or liquidation; and

(d)        take possession of the Collateral or any part thereof, by directing the Borrower and any Guarantor in writing to deliver the same to the Administrative Agent at any place or places designated by the Administrative Agent, in which event the Borrower and such Guarantor shall at its own expense:

(i)        forthwith cause the same to be moved to the place or places so designated by the Administrative Agent and there delivered to the Administrative Agent,

(ii)        store and keep any Collateral so delivered to the Administrative Agent at such place or places pending further action by the Administrative Agent as provided in Section 11.2, and

(iii)        while the Collateral shall be so stored and kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain them in good condition;

it being understood that the Borrower's and each Guarantor's obligation so to deliver the Collateral is of the essence of this Agreement and that, accordingly, upon application to the Bankruptcy Court, the Administrative Agent shall be entitled to a decree requiring specific performance by the Borrower or such Guarantor of such obligation.

11.2    Remedies; Disposition of the Collateral.  Upon the occurrence and during the continuance of an Event of Default and following not fewer than 5 days' prior notice by the Administrative Agent (or such longer time as may be required pursuant to the terms of the Final Order), and to the extent not inconsistent with the Final Order or Section 8, without application to or order of the Bankruptcy Court, any Collateral repossessed by the Administrative Agent under or pursuant to Section 11.1 or the Final Order or otherwise, and any other Collateral whether or not so repossessed by the Administrative Agent, may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the property to be sold, and in general in such manner, at such time or times, at such place or places and on commercially reasonable terms, in compliance with any Requirements of Law.  Any of the Collateral may be sold, leased or otherwise disposed of, in the condition in which the same existed when taken by the Administrative

Agent or after any overhaul or repair which the Administrative Agent shall determine to be commercially reasonable.  Any such disposition which shall be a private sale or other private proceeding permitted by applicable Requirements of Law shall be made upon not less than 10 days' written notice to the Borrower specifying the time at which such disposition is to be made and the intended sale price or other consideration therefor, and shall be subject, for the 10 days after the giving of such notice, to the right of the Borrower or any nominee of the Borrower to acquire the Collateral involved at a price or for such other consideration at least equal to the intended sale price or other consideration so specified.  Any such disposition which shall be a public sale permitted by applicable Requirements of Law shall be made upon not less than 10 days' written notice to the Borrower specifying the time and place of such sale and, in the absence of applicable Requirement of Law, shall be by public auction (which may, at the Administrative Agent's option, be subject to reserve), after publication of notice of such auction not less than 10 days prior thereto in USA Today and The Wall Street Journal, National Edition.  Subject to Section 11.4, to the extent permitted by any such Requirement of Law, the Administrative Agent on behalf of the Lenders or any Lender may bid for and become the purchaser of the Collateral or any item thereof, offered for sale in accordance with this Section 11.2 without accountability to the Borrower, any Guarantor or the Prepetition Secured Parties (except to the extent of surplus money received).  If, under mandatory Requirements of Law, the Administrative Agent shall be required to make disposition of the Collateral within a period of time which does not permit the giving of notice to the Borrower as hereinabove specified, the Administrative Agent need give the Borrower only such notice of disposition as shall be reasonably practicable.

       11.3  <u>Application of Proceeds</u>.  (a)  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, (i) if the Administrative Agent takes action under Section 8 upon the occurrence and during the continuance of an Event of Default, any payment by any Loan Party on account of principal of and interest on the Loans and any proceeds arising out of any realization (including after foreclosure) upon the Collateral shall be applied as follows:  <u>first</u>, to the payment of professional fees pursuant to the Carve Out, <u>second</u>, to the payment in full of all costs and out-of-pocket expenses (including without limitation, reasonable attorneys' fees and disbursements) paid or incurred by the Administrative Agent or any of the Lenders in connection with any such realization upon the Collateral, and, <u>third</u>, pro rata in accordance with each Lender's Outstanding Percentage, to the payment in full of the Loans and the Obligations (including any accrued and unpaid interest thereon, and any fees and other Obligations in respect thereof), and (ii) any payments or distributions of any kind or character, whether in cash, property or securities, made by any Loan Party or otherwise in a manner inconsistent with clause (i) of this Section 11.3(a) shall be held in trust and paid over or delivered to the Administrative Agent so that the priorities and requirements set forth in such clause (i) are satisfied.

       (b)      It is understood that the Loan Parties shall remain liable to the extent of any deficiency between the amount of the proceeds of the Collateral and the amount of the Obligations.

       11.4  <u>WAIVER OF CLAIMS</u>.  EXCEPT AS OTHERWISE PROVIDED IN THIS AGREEMENT, THE BORROWER AND THE GUARANTORS HEREBY WAIVE, TO THE EXTENT PERMITTED BY APPLICABLE LAW:

       (a)      NOTICE AND JUDICIAL HEARING IN CONNECTION WITH THE ADMINISTRATIVE AGENT'S TAKING POSSESSION OR THE ADMINISTRATIVE AGENT'S DISPOSITION OF ANY OF THE COLLATERAL, INCLUDING WITHOUT LIMITATION, ANY AND ALL PRIOR NOTICE AND HEARING FOR ANY PREJUDGMENT REMEDY OR REMEDIES AND ANY SUCH RIGHT WHICH THE BORROWER OR ANY GUARANTOR WOULD OTHERWISE HAVE UNDER ANY REQUIREMENT OF LAW;

(b)     ALL DAMAGES OCCASIONED BY SUCH TAKING OF POSSESSION EXCEPT ANY DAMAGES WHICH ARE THE DIRECT RESULT OF THE ADMINISTRATIVE AGENT'S OR ANY LENDER'S BAD FAITH, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT;

(c)     ALL OTHER REQUIREMENTS TO THE TIME, PLACE AND TERMS OF SALE OR OTHER REQUIREMENTS WITH RESPECT TO THE ENFORCEMENT OF THE ADMINISTRATIVE AGENT'S RIGHTS HEREUNDER; AND

(d)     ALL RIGHTS OF REDEMPTION, APPRAISEMENT, STAY, EXTENSION OR MORATORIUM NOW OR HEREAFTER IN FORCE UNDER ANY APPLICABLE LAW IN ORDER TO PREVENT OR DELAY THE ENFORCEMENT OF THIS AGREEMENT OR THE ABSOLUTE SALE OF THE COLLATERAL OR ANY PORTION THEREOF, AND EACH LOAN PARTY, FOR ITSELF AND ALL WHO MAY CLAIM UNDER IT, INSOFAR AS IT OR THEY NOW OR HEREAFTER LAWFULLY MAY, HEREBY WAIVES THE BENEFIT OF ALL SUCH LAWS.

11.5     Remedies Cumulative.  Each and every right, power and remedy hereby specifically given to the Administrative Agent and the Lenders shall be in addition to every other right, power and remedy specifically given under this Agreement, the Final Order or the other Loan Documents or now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by the Administrative Agent or any Lender.  All such rights, powers and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others. No delay or omission of the Administrative Agent or any Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein. In the event that the Administrative Agent shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit the Administrative Agent may recover reasonable expenses, including reasonable attorneys' fees, and the amounts thereof shall be included in such judgment.

11.6     Discontinuance of Proceedings.  In case the Administrative Agent shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to the Administrative Agent, then and in every such case the Borrower, the Administrative Agent and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the Liens granted under this Agreement and the Final Order, and all rights, remedies and powers of the Administrative Agent and the Lenders shall continue as if no such proceeding had been instituted.

SECTION 12.  MISCELLANEOUS

12.1     Amendments and Waivers.  (a)  Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 12.1.  The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in

any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders), (y) in connection with the waiver or extension of any mandatory prepayment hereunder, and (z) that any amendment or modification of defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 12.1 without the written consent of such Lender; (iii) reduce any percentage specified in the definition of Required Lenders or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, in each case without the written consent of all Lenders; (iv) amend, modify or waive any provision of Section 9 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent; (v) release all or substantially all of the Collateral securing the Obligations or release all or substantially all of the Guarantors from their obligations under this Agreement, in each case without the written consent of all Lenders; or (vi) amend, modify or waive Section 8.1(n) without the written consent of all Lenders. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(b)     The Borrower shall be permitted to replace any Lender that requests any payment under Section 2.16 or 2.17(a) or that does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders has been obtained), with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (iii) the Borrower shall be liable to such replaced Lender under Section 2.18 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (iv) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (v) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 12.6 (provided that the Borrower shall be obligated to pay the processing and recordation fee referred to therein) and (vi) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender. Any amendment supplement or modification hereof shall amend, supplement or modify the corresponding provision of the Exit Facility as may be agreed by the Administrative Agent and the Borrower without the consent of any other party.

(c)     Notwithstanding anything herein (including Section 12.1) to the contrary, the Loan Parties may (i) make any change to the Exit Facility with the consent of the Administrative Agent to the extent such change is not material or not adverse to the Lenders (or the lenders under the Exit Facility) (it being agreed that the Administrative Agent shall determine, in its reasonable discretion, whether such

change is material or adverse, as the case may be) and (ii) make any change to the Exit Facility with the consent of the Administrative Agent and the Required Lenders; <u>provided</u> that any change to the Exit Facility that would require the consent of affected lenders or all lenders under the Exit Credit Agreement in accordance with Section 10.1 of the Exit Credit Agreement had the Exit Credit Agreement become effective and superseded this Agreement pursuant to Section 2.24 of this Agreement shall require the consent of affected Lenders or all Lenders, as applicable.

       12.2  <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

The Borrower:

Lear Corporation
21557 Telegraph Road
Southfield, Michigan 48034
Attention: Shari L. Burgess
Telecopy:  (248) 447-1593
Telephone: (248) 447-1580
Email:  sburgess@lear.com


With copies to

Lear Corporation
21557 Telegraph Road
Southfield, Michigan 48034
Attention: Terrence B. Larkin
Telecopy: (248) 447-5126
Telephone: (248) 447-5123
Email: TLarkin@lear.com

With copies to (which shall not constitute a notice hereunder):

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
Telecopy: (212) 446-6460
Telephone: (212) 446-4792
Email: Leonard.Klingbaum@kirkland.com

Winston & Strawn LLP
35 West Wacker Drive
Chicago, IL 60601-9703
Telecopy: (312) 558-5989
Telephone: (312) 558-5700
Email: CBoehrer@winston.com

|                         |                                  |
|-------------------------|----------------------------------|
| Administrative Agent:   | JPMorgan Chase Bank, N.A.        |
|                         | Attention: Douglas Jenks         |
|                         | Telecopy: (212) 622-4557         |
|                         | Telephone: (212) 622-4521        |
|                         | Email:  douglas.jenks@chase.com  |

With copies to:

JPMorgan Chase Bank, N.A.
Attention: Goh Siew Tan
Telecopy: (212) 622-4556
Telephone: (212) 622-4575
Email:  gohsiew.tan@jpmorgan.com

1111 Fannin Street, Floor 10
Houston, TX 77002
Attention: Alice Telles
Telecopy: (713) 750-2938
Telephone: (713) 750-7941
Email:  alice.h.telles@jpmchase.com

provided that any notice, request or demand to or upon the Administrative Agent or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

12.3    No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of the Administrative Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

12.4    Survival of Representations and Warranties.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

12.5    Payment of Expenses and Taxes.  The Borrower agrees (a) to pay or reimburse the Administrative Agent for all its reasonable, out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby,

including the reasonable fees and disbursements of counsel and any financial advisor or third party consultants or appraisers to and of the Administrative Agent and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of amounts to be paid on the Closing Date) and from time to time thereafter on such other periodic basis as the Administrative Agent shall deem appropriate, (b) to pay or reimburse each Lender and the Administrative Agent for all its reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, including in connection with any work-out, restructuring, forbearance or other amendment providing relief to the Borrower, the other Loan Documents and any such other documents related thereto, including the reasonable fees and disbursements of counsel and any financial advisor or third party consultants or appraisers to the Administrative Agent and the reasonable fees and disbursements of counsel to the several Lenders; provided that, in the case of clauses (a) and (b), the Borrower shall not be obligated to so reimburse for more than one law firm (and, in addition to such law firm, any local counsel engaged in each relevant jurisdiction by such law firm) as counsel for the Lenders and the Administrative Agent, (c) to pay, indemnify, and hold each Lender and the Administrative Agent harmless from, any and all recording and filing fees, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents related thereto, and (d) to pay, indemnify, and hold each Lender and the Administrative Agent and their respective officers, directors, employees, affiliates, agents, advisors, trustees and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of any litigation, investigation or proceeding with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents and instruments referred to therein, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 12.5 shall be payable not later than 10 days after a reasonably detailed written demand therefor. Statements payable by the Borrower pursuant to this Section 12.5 shall be submitted to Shari Burgess (Telecopy No. (248) 447-1593; Telephone No. 248-447-1580; and Email: sburgess@lear.com), at the address of the Borrower set forth in Section 12.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 12.5 shall survive repayment of the Loans and all other amounts payable hereunder.

12.6  Successors and Assigns; Participations and Assignments. (a)  The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no

Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder to any Loan Party or any of its Affiliates.

(b)     (i)  Subject to the conditions set forth in paragraph (b)(ii) below and subject to paragraph (a)(iii) above, any Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent of the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an affiliate of a Lender or an Approved Fund; and

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments or, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents;

(B)     (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)     the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 12.6, "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)     Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.16, 2.17, 2.18 and 12.5). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 12.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     (i)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 12.1 and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.16, 2.17 and 2.18 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 12.7(b) as though it were a Lender, provided such Participant shall be subject to Section 12.7(a) as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.16, 2.17 or 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  Any Participant that is a Non-U.S. Lender shall not be entitled to the benefits of Section 2.17 unless such Participant complies with Section 2.17(d).

(iii)     In the event that any Lender sells a participation in a Loan, such Lender shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of all participants in the Loans held by it and the principal amount (and stated interest thereon) of the portion of the Loan which is the subject of the participation (the "Participation Register").  A Loan may be participated in whole or in part only by registration of

such participation on the Participation Register.  Any transfer of such participation may be effected only by the Registration of such transfer on the Participation Register.  The entries in the Participation Register shall be conclusive absent manifest error and such Lender shall treat such participants whose name is recorded in the Participation Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary. The Participation Register shall be available for inspection by the Administrative Agent at any reasonable time upon reasonable prior notice.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 12.6(b).  Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

12.7  Adjustments; Set-off.  (a)  Except to the extent that this Agreement, any other Loan Document or a court order expressly provides for payments to be allocated to a particular Lender or Lenders (including assignments made pursuant to Section 12.6), if any Lender (a "Benefited Lender") shall, at any time after the Loans and other amounts payable hereunder shall immediately become due and payable pursuant to Section 8, receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     Subject to (i) the Carve Out, (ii) the Final Order and (iii) after giving of the notice described in Section 8, notwithstanding the provisions of Section 362 of the Bankruptcy Code, in addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower or the Guarantors, any such notice being expressly waived by the Borrower and the Guarantors to the extent permitted by applicable law, upon any amount becoming due

and payable by the Borrower or the Guarantors hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final but not any trust or fiduciary account), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower or the Guarantors, as the case may be. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.

12.8    Counterparts. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof. A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

12.9    Severability. Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.10    Integration. This Agreement and the other Loan Documents represent the entire agreement of the Loan Parties, the Administrative Agent, and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent, or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

12.11    **GOVERNING LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

12.12    Submission To Jurisdiction; Waivers. (a) Each Loan Party hereby irrevocably and unconditionally:

(i)    submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the non-exclusive general jurisdiction of any State or Federal court of competent jurisdiction sitting in New York County, New York;

(ii)    consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

(iii)    agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of

mail), postage prepaid, to such Loan Party at its address set forth in Section 12.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(iv)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(v)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

(b)     Each of the Administrative Agent and each Lender hereby irrevocably and unconditionally (i) submits itself and its property in any legal action or proceeding arising as a result of a Debtor's enforcement of the provisions contained in Section 12.14, to the exclusive general jurisdiction of the Bankruptcy Court, (ii) consents to the actions referred to in Section 12.14 being brought in such court and waives any objection that it may have now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same, (iii) agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such party in care of the Administrative Agent at its address set forth in Section 12.2 or at such other address of which the Borrower shall have been notified pursuant thereto and (iv) agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction.

12.13   Absence of Prejudice to the Prepetition Lenders with Respect to Matters Before the Bankruptcy Court.  No Loan Party will without the express consent of the Administrative Agent (a) mention in any pleading or argument before the Bankruptcy Court in support of, or in any way relating to, a position that Bankruptcy Court authorization should be granted on the ground that such authorization is permitted by this Agreement (unless a Person opposing any such pleading or argument relies on this Agreement to assert or question the propriety of such) or (b) in any way attempt to support a position before the Bankruptcy Court based on the provisions of this Agreement. The rights of the parties to the Prepetition Credit Agreement are fully reserved and preserved.

12.14   Specific Performance of Obligation to Convert into Exit Facility.  It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach by the Administrative Agent or the Lenders of their obligations under Section 2.24 to convert the DIP Facility into the Exit Facility upon satisfaction of the applicable conditions precedent and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

12.15   Acknowledgements. Each Loan Party hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     neither the Administrative Agent nor any Lender has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent and Lenders, on one hand, and the Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

12.16   Releases of Guarantees and Liens.  (a) Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Administrative Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 12.1) to take any action requested by the Borrower having the effect of releasing, or subordinating any Lien on, any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 12.1 or (ii) under the circumstances described in paragraph (b) below.

(b)     At such time as the Loans and the other obligations under the Loan Documents shall have been paid in full, the Collateral shall be released from the Liens created by the Final Order, and all obligations related thereto (other than those expressly stated to survive such termination) of the Administrative Agent and each Loan Party shall terminate, all without delivery of any instrument or performance of any act by any Person.

12.17   Confidentiality.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee, (c) to its employees, officers, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates, provided that such Persons have been advised of the confidentiality provisions hereof and are subject thereto, (d) upon the request or demand of any Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with the Cases, any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

12.18 **WAIVERS OF JURY TRIAL.  THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

12.19  <u>Prepetition Credit Agreement Amendment; Adequate Protection</u>.  Each Lender that holds direct ownership in the loans under the Prepetition Credit Agreement shall, or in the case of a Lender that holds beneficial ownership in the loans under the Prepetition Credit Agreement through a participation, shall use commercially reasonable efforts to instruct its respective participant counterpart to: (a) to the extent not already a party thereto in such capacity, execute and deliver to the Borrower the Prepetition Credit Agreement Amendment and in any event by becoming a Lender shall be deemed to have agreed to said Prepetition Credit Agreement Amendment and (b) agree to the adequate protection provided for the Prepetition Credit Agreement in the Restructuring Term Sheet.

12.20  <u>Effectiveness</u>.  This Agreement shall become effective upon the execution and delivery of this Agreement by the Borrower, each Guarantor, the Administrative Agent and each Person listed on Schedule 1.1A, <u>provided</u> that the provisions of Sections 6, 7 and 8 shall not apply, and shall be of no force and effect, prior to the occurrence of the Closing Date.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

LEAR CORPORATION

By:_____

    Name:

    Title:

GUARANTORS:

[  ]

By:_____

    Name:

    Title:

[  ]

By: _____

    Name:

    Title:

[  ]

By: _____

    Name:

    Title:

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and as a Lender


By:_____
    Name:
    Title:

_____, as a Lender

By:_____
    Name:
    Title:

## Exhibit G to the DIP Credit Agreement

## Warrant Term Sheet

WARRANT TERM SHEET

| | |
|---|---|
| Exercise Price Per Warrant: | $0.01 |
| Expiration: | The earlier of (i) the seventh anniversary of issuance, (ii) the occurrence of a Reorganization Event (as defined below) and (iii) a secondary public offering of the Company's common stock (the "Expiration Date"). |
| Exercise Date: | Exercisable at any time prior to the Expiration Date. |
| Voting Rights: | None. |
| Anti-Dilution Provisions: | The Exercise Price Per Warrant and the number of shares of common stock issuable upon exercise of Warrants shall be subject to customary adjustment upon the occurrence of common stock splits and reverse common stock splits. |
| Registration Rights: | None. |
| Reorganization Event: | Except as provided in the next sentence, upon a Reorganization Event, each Warrant will be exercisable into the right to receive the kind and amount of consideration to which such holder would have been entitled as a result of such Reorganization Event had the Warrant been exercised immediately prior thereto. In the event of a Reorganization Event in which the only consideration payable to holders of common stock is cash, each Warrant shall be entitled to receive the cash consideration to which such holder would have been entitled as a result of such Reorganization Event, less the Exercise Price, had the Warrant been exercised immediately prior thereto. The Warrants shall expire and be cancelled following a Reorganization Event, subject to receipt of any consideration to which holders thereof are entitled as provided above. "Reorganization Event" shall mean any transaction in which reorganized Lear enters into a transaction constituting (i) a consolidation or merger in which its common stock is exchanged for securities of another entity, (ii) a reclassification of its common stock into securities other than common stock of reorganized Lear or (iii) any statutory exchange of the outstanding shares of reorganized Lear's common stock for securities of another entity. |
| Transferability: | Warrants will be freely transferable by holders thereof, subject to compliance with securities laws. |
| Successors: | All the covenants and provisions of the Warrant agreement by or for the benefit of reorganized Lear or the Warrant agent shall bind and inure to the benefit of their respective successors and assigns hereunder. |

**Exhibit I to the DIP Credit Agreement**

**Form of Exit Credit Agreement**

**FORM OF EXIT CREDIT AGREEMENT**

$500,000,000


CREDIT AGREEMENT

among

[REORGANIZED LEAR CORPORATION]


The Several Lenders from Time to Time Parties Hereto,

and

JPMORGAN CHASE BANK, N.A.,

as Administrative Agent and Collateral Agent


Dated as of [ _____ ], 20__

---


J. P. MORGAN SECURITIES INC.

and

CITIGROUP GLOBAL MARKETS INC.,

as Joint Lead Arrangers and Joint Bookrunners

# TABLE OF CONTENTS

SECTION 1. DEFINITIONS ........................................................................................................ 1
   1.1.  Defined Terms ............................................................................................................ 1
   1.2.  Other Definitional Provisions ................................................................................ 21

SECTION 2. AMOUNT AND TERMS OF LOANS ........................................................... 22
   2.1.  Loans........................................................................................................................ 22
   2.2.  Procedure for Conversion ..................................................................................... 22
   2.3.  [Reserved] ............................................................................................................... 22
   2.4.  Maturity and Repayment of Loans........................................................................ 22
   2.5.  [Reserved] ............................................................................................................... 22
   2.6.  Fees. .......................................................................................................................... 22
   2.7.  [Reserved] ............................................................................................................... 23
   2.8.  Optional Prepayments ........................................................................................... 23
   2.9.  Mandatory Prepayments ........................................................................................ 23
   2.10.  Conversion and Continuation Options ............................................................... 24
   2.11.  Limitations on Eurodollar Tranches .................................................................. 24
   2.12.  Interest Rates and Payment Dates ...................................................................... 24
   2.13.  Computation of Interest and Fees ....................................................................... 25
   2.14.  Inability to Determine Interest Rate ................................................................... 25
   2.15.  Pro Rata Treatment and Payments ..................................................................... 26
   2.16.  Requirements of Law ........................................................................................... 27
   2.17.  Taxes.................................................................................................................... 28
   2.18.  Indemnity ............................................................................................................. 30
   2.19.  Change of Lending Office ................................................................................... 30
   2.20.  Intercreditor Agreement ...................................................................................... 30

SECTION 3. [RESERVED] ...................................................................................................... 31

SECTION 4. REPRESENTATIONS AND WARRANTIES ............................................... 31
   4.1.  No Change ............................................................................................................... 31
   4.2.  Existence; Compliance with Law ......................................................................... 31
   4.3.  Power; Authorization; Enforceable Obligations ................................................ 31
   4.4.  No Legal Bar ........................................................................................................... 32
   4.5.  Litigation................................................................................................................. 32
   4.6.  No Default ............................................................................................................... 32
   4.7.  Ownership of Property; Liens ............................................................................... 32
   4.8.  Intellectual Property .............................................................................................. 32
   4.9.  Taxes ........................................................................................................................ 32
   4.10.  Federal Regulations ............................................................................................ 32
   4.11.  Labor Matters ...................................................................................................... 33
   4.12.  ERISA .................................................................................................................. 33
   4.13.  Investment Company Act; Other Regulations ................................................... 33
   4.14.  Subsidiaries ......................................................................................................... 33
   4.15.  Use of Proceeds................................................................................................... 33
   4.16.  Environmental Matters........................................................................................ 33

093331-1912-11912-Active.11694855.2        07/06/2009 6:47 PM

4.17. Accuracy of Information, etc ........................................................................... 34
4.18. Financial Statements ................................................................................... 34
4.19. Insurance ..................................................................................................... 35
4.20. Security Documents ..................................................................................... 35
4.21. Solvency ...................................................................................................... 36
4.22. Regulation H ............................................................................................... 36

SECTION 5. CONDITIONS PRECEDENT ..................................................................... 36

SECTION 6. AFFIRMATIVE COVENANTS .................................................................. 40
6.1. Financial Statements ................................................................................... 40
6.2. Certificates; Other Information ................................................................... 41
6.3. Payment of Obligations ............................................................................... 42
6.4. Maintenance of Existence; Compliance ...................................................... 42
6.5. Maintenance of Property; Insurance ........................................................... 42
6.6. Inspection of Property; Books and Records; Discussions............................ 42
6.7. Notices ......................................................................................................... 43
6.8. Environmental Laws .................................................................................... 43
6.9. Additional Collateral, etc. ........................................................................... 43
6.10. Post-Closing Matters ................................................................................... 45

SECTION 7. NEGATIVE COVENANTS ........................................................................ 45
7.1. Financial Covenants ..................................................................................... 45
7.2. Indebtedness ................................................................................................ 47
7.3. Liens ............................................................................................................. 49
7.4. Fundamental Changes .................................................................................. 52
7.5. Disposition of Property ................................................................................ 52
7.6. Restricted Payments ..................................................................................... 53
7.7. Investments .................................................................................................. 53
7.8. Transactions with Affiliates ......................................................................... 55
7.9. Swap Agreements ......................................................................................... 55
7.10. Changes in Fiscal Periods ............................................................................ 55
7.11. Negative Pledge Clauses .............................................................................. 55
7.12. Clauses Restricting Subsidiary Distributions ............................................. 55
7.13. Lines of Business ......................................................................................... 56
7.14. Use of Proceeds ........................................................................................... 56
7.15. Optional Payments and Modifications of Second Lien Term Loan Documents................. 56
7.16. Sale and Leasebacks .................................................................................... 56

SECTION 8. EVENTS OF DEFAULT .......................................................................... 56
8.1. Events of Default ......................................................................................... 56

SECTION 9. THE AGENTS ............................................................................................ 59
9.1. Appointment ................................................................................................ 59
9.2. Delegation of Duties .................................................................................... 59
9.3. Exculpatory Provisions ................................................................................ 59
9.4. Reliance by Agents ...................................................................................... 60
9.5. Notice of Default .......................................................................................... 60
9.6. Non-Reliance on Agents and Other Lenders ............................................... 60
9.7. Indemnification ............................................................................................ 61
9.8. Agent in Its Individual Capacity ................................................................. 61

9.9.   Successor Administrative Agent ........................................................... 61
9.10.  Execution of Loan Documents ............................................................ 61
9.11.  Collateral Agent .................................................................................. 62

SECTION 10. MISCELLANEOUS ............................................................................ 62
10.1.  Amendments and Waivers ................................................................... 62
10.2.  Notices ................................................................................................. 64
10.3.  No Waiver; Cumulative Remedies ..................................................... 65
10.4.  Survival of Representations and Warranties ....................................... 65
10.5.  Payment of Expenses and Taxes ......................................................... 65
10.6.  Successors and Assigns; Participations and Assignments ................. 66
10.7.  Adjustments; Set-off ........................................................................... 69
10.8.  Counterparts ......................................................................................... 70
10.9.  Severability ......................................................................................... 70
10.10. Integration ........................................................................................... 70
10.11. GOVERNING LAW ............................................................................ 70
10.12. Submission To Jurisdiction; Waivers ................................................. 70
10.13. Acknowledgements ............................................................................. 71
10.14. Releases of Guarantees and Liens ...................................................... 71
10.15. Confidentiality .................................................................................... 71
10.16. WAIVERS OF JURY TRIAL ............................................................. 72
10.17. USA Patriot Act .................................................................................. 72

SCHEDULES:

| 1.1A | Commitments |
| 1.1B | Mortgaged Property |
| 4.3 | Consents, Authorizations, Filings and Notices |
| 4.14 | Subsidiaries |
| 4.20(a) | UCC Filing Jurisdictions |
| 4.20(b) | Mortgage Filing Jurisdictions |
| 6.10 | Post-Closing Matters |
| 7.2(d) | Existing Indebtedness |
| 7.3(f) | Existing Liens |
| 7.7(j) | Existing Investments |

EXHIBITS:

| A | Form of Intercompany Subordinated Note |
| B | Form of Assignment and Assumption |
| C | Form of Compliance Certificate |
| D | Form of Guarantee and Collateral Agreement |
| E | Form of Intercreditor Agreement |
| F | Form of Mortgage |
| G | Form of Exemption Certificate |
| H | Form of Closing Certificate |
| I | Restructuring Term Sheet |

CREDIT AGREEMENT (this "Agreement"), dated as of [  ], 20__, among (i) [REORGANIZED LEAR CORPORATION], a Delaware corporation (the "Borrower"), (ii) the several banks and other financial institutions or entities from time to time parties to this Agreement (the "Lenders") and (iii) JPMORGAN CHASE BANK, N.A., as administrative agent (in such capacity, the "Administrative Agent") and as collateral agent for the Lenders (in such capacity the "Collateral Agent").

## INTRODUCTORY STATEMENT:

WHEREAS, on June __, 2009 (the "Petition Date"), the Borrower and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and continued in the possession of their property and in the management of their businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code;

WHEREAS, on _____ ___, 20___, the Bankruptcy Court entered the Confirmation Order confirming the Debtors' [_____ Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated _____ __, 20__ ] (as in effect on the date of confirmation thereof and as thereafter may be amended as provided in this Agreement, the "Plan of Reorganization"); and

WHEREAS, in connection with the confirmation and implementation of the Plan of Reorganization, the reorganized Debtors have requested the Lenders to make loans available to the reorganized Debtors to enable the reorganized Debtors to, among other things, consummate the transactions contemplated by the Plan of Reorganization and to pay related fees and expenses, and the Lenders have agreed, subject to the terms and conditions hereof, to enter into this Agreement.

Accordingly, the parties hereto hereby agree as follows:

## SECTION 1.   DEFINITIONS

1.1.   Defined Terms.  As used in this Agreement, the terms listed in this Section 1.1 shall have the respective meanings set forth in this Section 1.1.

"ABR":  for any day, a rate per annum (rounded upwards, if necessary, to the next 1/16 of 1%) equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Eurodollar Rate with a one-month Interest Period commencing on such day plus 1.0%. Any change in the ABR due to a change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate shall be effective as of the opening of business on the effective day of such change in the Prime Rate, the Federal Funds Effective Rate or such Eurodollar Rate, respectively.

"ABR Loans":  Loans the rate of interest applicable to which is based upon the ABR.

"Acquisition":  any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (a) the acquisition of all or a substantial portion of the assets of a Person, or of all or a substantial portion of any business or division of a Person, (b) the acquisition of in excess of 50% of the capital stock, partnership interests, membership interests or equity of any Person, or otherwise causing any Person to become a Subsidiary, or (c) a merger or consolidation or any other combination with another Person (other than a Person that is already a Subsidiary).

"<u>Administrative Agent</u>": JPMorgan Chase Bank, N.A., together with its affiliates, as the arranger of the Commitments and as the administrative agent for the Lenders under this Agreement and the other Loan Documents, together with any of its successors.

"<u>Affiliate</u>": as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"<u>Agent Indemnitees</u>": as defined in Section 9.7.

"<u>Agents</u>": the collective reference to the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>": as defined in the preamble hereto.

"<u>Applicable Margin</u>": a percentage per annum equal to (a) for ABR Loans, (i) prior to the date which is 18 calendar months after the Closing Date, 9.0%, (ii) for the next 12 months thereafter, 10.0% and (iii) thereafter, 11.0% and (b) for Eurodollar Loans, (i) prior to the date which is 18 calendar months after the Closing Date, 10.0%, (ii) for the next 12 months thereafter, 11.0% and (iii) thereafter, 12.0%.

"<u>Approved Fund</u>": as defined in Section 10.6(b).

"<u>Asset Sale</u>": any Disposition of property or series of related Dispositions of property excluding (i) any such Disposition permitted by Section 7.5(a) through (l), and (ii) any such Disposition that yields Net Cash Proceeds to any Group Member (valued at the initial principal amount thereof in the case of non-cash proceeds consisting of notes or other debt securities and valued at fair market value in the case of other non-cash proceeds) of $1,000,000 or less.

"<u>Assignee</u>": as defined in Section 10.6(b).

"<u>Assignment and Assumption</u>": an Assignment and Assumption, substantially in the form of Exhibit B.

"<u>Bankruptcy Code</u>": as defined in the recitals hereto.

"<u>Bankruptcy Court</u>": as defined in the recitals hereto.

"<u>Benefited Lender</u>": as defined in Section 10.7(a).

"<u>Board</u>": the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>": as defined in the preamble hereto.

"<u>Business</u>": as defined in Section 4.16(b).

"<u>Business Day</u>": a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close, <u>provided</u>, that with respect to notices

and determinations in connection with, and payments of principal and interest on, Eurodollar Loans, such day is also a day for trading by and between banks in Dollar deposits in the interbank eurodollar market.

"Canadian Court": the Ontario Superior Court of Justice, Commercial List.

"Canadian Debtors": the Borrower's Canadian Subsidiaries that are Debtors.

"Capital Expenditures": for any period, with respect to any Person, the aggregate of all expenditures by such Person and its Subsidiaries for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvements during such period) that should be capitalized under GAAP on a consolidated balance sheet of such Person and its Subsidiaries, but excluding (i) such expenditures that are made in connection with the purchase, replacement, substitution or restoration of assets to the extent of (A) insurance proceeds (or other similar recoveries) paid (or reasonably expected to be paid) on account of the loss of or damage to assets or (b) cash awards of compensation arising from (or reasonably expected to arise from) the taking by eminent domain or condemnation of assets, (ii) such expenditures that are made with all or any portion of a Reinvestment Deferred Amount, (iii) capitalized interest, (iv) such expenditures for which such Person is or reasonably expects to be reimbursed in cash by a third party (other than any Group Member), (v) such expenditures that are made with the proceeds of an Excluded Issuance and (vi) such expenditures that are made to fund the purchase price for assets acquired in Permitted Acquisitions.

"Capital Lease Obligations": as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock": any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Cases": the cases of the Debtors before the Bankruptcy Court.

"Cash Equivalents": (a) securities issued or unconditionally guaranteed or insured by the United States Government, the Canadian Government, Japan or any member of the European Union or any other government approved by the Administrative Agent (which approval shall not be unreasonably withheld), (b) securities issued or unconditionally guaranteed or insured by any state of the United States of America or province of Canada or any agency or instrumentality thereof having maturities of not more than twelve months from the date of acquisition and having one of the two highest ratings obtainable from either S&P or Moody's, (c) time deposits, certificates of deposit and bankers' acceptances having maturities of not more than twelve months from the date of acquisition, in each case with any Lender (or any affiliate of any thereof) or with any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, Japan, Canada or any member of the European Union or any U.S. branch of a foreign bank having at the date of acquisition capital and surplus of not less than $100,000,000, (d) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (a), (b) and (c) entered into with any bank meeting the qualifications specified in clause (c) above, (e) commercial paper issued by the parent corporation of any Lender and commercial paper rated, at the time of acquisition, at least "A-1" or the equivalent thereof by S&P or "P-1" or the equivalent thereof by Moody's and in either case maturing within twelve months

after the date of acquisition, (e) deposits maintained with money market funds having total assets in excess of $300,000,000, (f) demand deposit accounts maintained in the ordinary course of business with banks or trust companies, (g) temporary deposits, of amounts received in the ordinary course of business pending disbursement of such amounts, in demand deposit accounts in banks outside the United States, (h) deposits in mutual funds which invest substantially all of their assets in preferred equities issued by U.S. corporations rated at least "AA" (or the equivalent thereof) by S&P; provided, that notwithstanding the foregoing, Cash Equivalents shall, in any event, include all cash and cash equivalents as set forth in the Borrower's balance sheet prepared in accordance with GAAP, and (i) other investments requested by the Borrower and approved by the Administrative Agent.

"CCAA Cases": the cases commenced by the Canadian Debtors in the Canadian Court under Section 18.6 of the Companies' Creditors Arrangement Act.

"Change of Control": (a) the acquisition of ownership, directly or indirectly, beneficially or of record, by any Person or group (within the meaning of the Securities Exchange Act of 1934 and the rules of the Securities and Exchange Commission thereunder as in effect on the date hereof), of Capital Stock representing more than 35% of the aggregate ordinary voting power represented by the issued and outstanding Capital Stock of the Borrower; or (b) occupation of a majority of the seats (other than vacant seats) on the board of directors of the Borrower by Persons who were neither (i) nominated by the board of directors of the Borrower nor (ii) appointed by directors so nominated.

"Chinese Acceptance Notes": acceptance notes issued by Chinese banks in the ordinary course of business for the account of any direct or indirect Chinese Subsidiary of the Borrower or customers thereof to effect the current payment of goods and services in accordance with customary trade terms in China.

"Closing Date": the date on which the conditions precedent set forth in Section 5 shall have been satisfied or waived and the funding of the Loans occurs.

"Code": the Internal Revenue Code of 1986, as amended from time to time.

"Collateral": all property of the Loan Parties (other than Excluded Property), now owned or hereafter acquired upon which a Lien is purported to be created by any Security Document.

"Collateral Agent": as defined in the preamble hereto.

"Commitment": as to any Lender, the obligation of such Lender to convert Loans of the Borrower in an aggregate principal amount not to exceed the amount set forth under the heading "Commitment" opposite such Lender's name on Schedule 1.1A. The original aggregate amount of the Commitments is $[up to 500,000,000 as specified in the Conversion Notice].

"Commonly Controlled Entity": an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Compliance Certificate": a certificate of the Borrower duly executed by a Responsible Officer, on behalf of the Borrower, substantially in the form of Exhibit C.

"Conduit Lender": any special purpose corporation organized and administered by any Lender for the purpose of making Loans otherwise required to be made by such Lender and designated by such Lender in a written instrument; provided, that the designation by any Lender of a Conduit Lender

shall not relieve the designating Lender of any of its obligations to fund a Loan under this Agreement if, for any reason, its Conduit Lender fails to fund any such Loan, and the designating Lender (and not the Conduit Lender) shall have the sole right and responsibility to deliver all consents and waivers required or requested under this Agreement with respect to its Conduit Lender, and provided, further, that no Conduit Lender shall (a) be entitled to receive any greater amount pursuant to Section 2.16, 2.17, 2.18 or 10.5 than the designating Lender would have been entitled to receive in respect of the extensions of credit made by such Conduit Lender or (b) be deemed to have any Commitment.

"Confirmation Order": as defined in Section 5(h).

"Consolidated Assets":  at a particular date, all amounts which would be included under total assets on a consolidated balance sheet of the Borrower and its Subsidiaries as at such date, determined in accordance with GAAP.

"Consolidated Current Assets":  at any date, all amounts (other than cash and Cash Equivalents) that would, in conformity with GAAP, be set forth opposite the caption "total current assets" (or any like caption) on a consolidated balance sheet of Borrower and its Subsidiaries at such date.

"Consolidated Current Liabilities":  at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total current liabilities" (or any like caption) on a consolidated balance sheet of the Borrower and its Subsidiaries at such date, but excluding the current portion of any Funded Debt of the Borrower and its Subsidiaries.

"Consolidated EBITDA":  for any period (and calculated without duplication), Consolidated Net Income for such period excluding (a) any extraordinary and non-recurring non-cash expenses, losses, income or gains as determined in accordance with GAAP, (b) charges, premiums and expenses associated with the discharge of Indebtedness, (c) charges relating to FAS 106, (d) any non-cash income included, and any non-cash deductions made, in determining Consolidated Net Income for such period (other than any deductions which represent the accrual of or a reserve for the payment of cash charges in any future period), provided that cash payments made in any subsequent period in respect of any item for which any such non-cash deduction was excluded in a prior period shall be deemed to reduce Consolidated Net Income by such amount in such subsequent period, (e) stock compensation expense and non-cash equity linked expense, (f) deferred financing fees (and any write-offs thereof), (g) write-offs of goodwill, (h) an aggregate amount of up to (i) $200,000,000 for fiscal year 2009, and (ii) $150,000,000 for each fiscal year thereafter (provided that up to $25,000,000 of such amount may be carried forward to the following fiscal year or carried back to the preceding fiscal year) in respect of restructuring, restructuring-related or other similar charges, (i) fees, costs, charges, commissions and expenses or other charges incurred during such period in connection with this Agreement, the DIP Credit Agreement, the Cases, the Plan of Reorganization and the transactions contemplated by the foregoing, including the write-off of receivables of Chrysler, GM and their affiliates as a result of their respective bankruptcy filings, the termination or settlement of executory contracts, professional and accounting costs fees and expenses, management incentive, employee retention or similar plans (in each case to the extent such plan is approved by the Bankruptcy Court to the extent required), litigation costs and settlements, asset write-downs, income and gains recorded in connection with the corporate reorganization effected in connection with the winding up the Debtors prior to emergence, (j) foreign exchange gains and losses and (k) any state or local taxes, plus, to the extent deducted in determining Consolidated Net Income, the sum of (A) Consolidated Interest Expense, (B) any expenses for taxes, (C) depreciation and amortization expense, (D) minority interests in income (or losses) of Subsidiaries and (E) net equity earnings (and losses) in Affiliates (excluding Subsidiaries).  For purposes of calculating the ratios set forth in Section 7.1(a) and (b), Consolidated EBITDA for any fiscal period shall in any event include the Consolidated EBITDA for such fiscal period of any entity acquired by the Borrower or any of its Subsidiaries in a

Permitted Acquisition during such period. Notwithstanding the foregoing, for purposes of calculating Consolidated EBITDA for each of the four fiscal quarter periods ending December 31, 2009, March 31, 2010 and June 30, 2010, Consolidated EBITDA for such four fiscal quarter periods shall equal Consolidated EBITDA for the period commencing on October 1, 2009 and ending on December 31, 2009, April 3, 2010 and July 3, 2010, as applicable, multiplied by 4, 2 and 4/3, respectively.

"Consolidated Interest Expense":  for any period, the amount which would, in conformity with GAAP, be set forth opposite the caption "interest expense" (or any like caption) on a consolidated income statement of the Borrower and its Subsidiaries for such period and, to the extent not otherwise included in "interest expense", any other discounts and expenses comparable to or in the nature of interest under any Receivable Financing Transaction; provided, that Consolidated Interest Expense for any period shall (a) exclude (i) fees payable in respect of such period under Section 2.6, (ii) any amortization or write-off of deferred financing fees during such period, (iii) premiums paid in connection with the discharge of Indebtedness, (iv) any non-cash expense, and (v) interest payments made by the Debtors during the pendency of the Cases on pre-petition Indebtedness, and (b) include any interest income during such period.

"Consolidated Leverage Ratio": as at the last day of any period, the ratio of (a) Consolidated Total Debt on such day to (b) Consolidated EBITDA for such period.

"Consolidated Net Income":  for any period, the consolidated net income (or deficit) of the Borrower and its Subsidiaries for such period (taken as a cumulative whole), determined in accordance with GAAP; provided that any provision for post-retirement medical benefits, to the extent such provision calculated under FAS 106 exceeds actual cash outlays calculated on the "pay as you go" basis, shall not to be taken into account.

"Consolidated Revenues":  for any fiscal period, the consolidated revenues of the Borrower and its Subsidiaries for such period, determined in accordance with GAAP.

"Consolidated Total Tangible Assets": as of any date of determination thereof, the aggregate consolidated book value of the assets of the Borrower and its Subsidiaries (other than patents, patent rights, trademarks, trade names, franchises, copyrights, licenses, permits, goodwill and other similar intangible assets properly classified as such in accordance with GAAP) after all appropriate adjustments (including, without limitation, reserves for doubtful receivables, obsolescence, depreciation and amortization), all as set forth in the most recent consolidated balance sheet of the Borrower delivered pursuant to Section 6.1 on such date of determination, determined on a consolidated basis in accordance with GAAP.

"Consolidated Total Debt": at any date, the aggregate principal amount of all Indebtedness of the Borrower and its Subsidiaries at such date, determined on a consolidated basis, that would be required to be shown as debt on a balance sheet of the Borrower prepared in accordance with GAAP, but excluding Chinese Acceptance Notes and Earn-outs.

"Consolidated Working Capital":  at any date, the excess of Consolidated Current Assets on such date over Consolidated Current Liabilities on such date.

"Consummation Date": the date of substantial consummation (as defined in Section 1101 of the Bankruptcy Code) of the Plan of Reorganization.

"Contractual Obligation": as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Conversion Date": any Business Day specified by the Borrower as a date on which the Borrower requests the relevant Lenders to convert the loans under the DIP Credit Agreement to Loans hereunder.

"Conversion Notice": as defined in Section 2.2.

"Debtors": as defined in the preamble.

"Default": any of the events specified in Section 8.1, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Defaulting Lender" any Lender that (a) has failed to fund any portion of the Loans required to be funded by it hereunder within one (1) Business Day of the date required to be funded by it hereunder, unless such failure is the subject of a good faith dispute or subsequently cured (in which case such Lender shall cease to be a Defaulting Lender as of the date of such cure), (b) has otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within one (1) Business Day of the date when due, unless such failure is the subject of a good faith dispute or subsequently cured (in which case such Lender shall cease to be a Defaulting Lender as of the date of such cure), or (c) has been deemed insolvent or become the subject of a bankruptcy or insolvency proceeding.

"DIP Agent": JPMorgan Chase Bank, N.A. in its capacity as administrative agent for the lenders under the DIP Credit Agreement.

"DIP Credit Agreement": the Credit and Guarantee Agreement, dated as of _____ __, 2009 among the Borrower and certain of its Subsidiaries, the lenders from time to time party thereto, the DIP Agent and the other parties thereto, as amended, supplemented or otherwise modified prior to the date hereof.

"DIP Facility": the term loan facility made available under the DIP Credit Agreement.

"Disclosure Statement": the disclosure statement in respect of the Plan of Reorganization, in form and substance reasonably satisfactory to the Administrative Agent, distributed to certain holders of claims (as defined in Section 101(5) of the Bankruptcy Code) against the Debtors.

"Disposition": with respect to any property, any sale, lease, sale and leaseback, assignment, conveyance, transfer or other disposition thereof. The terms "Dispose" and "Disposed of" shall have correlative meanings.

"Dollars" and "$": dollars in lawful currency of the United States.

"Domestic Subsidiary": any Subsidiary of the Borrower organized under the laws of any jurisdiction within the United States.

"Earn-outs": with respect to any Person, obligations of such Person arising from a Permitted Acquisition which are payable to the seller based on the achievement of specified financial

results over time.  The amount of any Earn-outs at any time for the purpose of this Agreement shall be the amount earned and due to be paid at such time.

"ECF Percentage":  for any fiscal year (or, in the case of the first period, the portion of the fiscal year following the first anniversary of the Closing Date), 50% if the Consolidated Leverage Ratio exceeds 1.50 to 1.00 as of the last day of such fiscal year and 25% if the Consolidated Leverage Ratio is equal to or less than 1.50 to 1.00 as of the last day of such fiscal year.

"Effective Date":  the effective date of the Plan of Reorganization.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate": any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event": (a) any Reportable Event; (b) the existence with respect to any Plan of a non-exempt Prohibited Transaction; (c) any failure by any Single Employer Plan to satisfy the minimum funding standards (within the meaning of Sections 412 or 430 of the Code or Section 302 of ERISA) applicable to such Single Employer Plan, whether or not waived; (d) a determination that any Single Employer Plan is in "at risk" status (within the meaning of Section 430 of the Code or Title IV of ERISA); (e) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Single Employer Plan, including but not limited to the imposition of any Lien in favor of the PBGC or any Single Employer Plan; (f) the incurrence by any Loan Party or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by any Loan Party or any of its ERISA Affiliates of any notice, or the receipt by any Multiemployer Plan from a Loan Party or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, Insolvent, in Reorganization, or in endangered or critical status (within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"Eurocurrency Reserve Requirements":  for any day as applied to a Eurodollar Loan, the aggregate (without duplication) of the maximum rates (expressed as a decimal) of reserve requirements in effect on such day (including basic, supplemental, marginal and emergency reserves) under any regulations of the Board or other Governmental Authority having jurisdiction with respect thereto dealing with reserve requirements prescribed for eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board) maintained by a member bank of the Federal Reserve System.

"Eurodollar Base Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, the rate per annum determined on the basis of the rate for deposits in Dollars for a period equal to such Interest Period commencing on the first day of such Interest Period appearing on Reuters Screen LIBOR01 page as of 11:00 A.M., London time, two Business Days prior to the beginning of such Interest Period.  In the event that such rate does not appear on Reuters Screen LIBOR01 page (or

otherwise on such screen), the "Eurodollar Base Rate" shall be determined by reference to such other comparable publicly available service for displaying eurodollar rates as may be reasonably selected by the Administrative Agent or, in the absence of such availability, by reference to the rate at which the Administrative Agent is offered Dollar deposits at or about 11:00 A.M., New York City time, two Business Days prior to the beginning of such Interest Period in the interbank eurodollar market where its eurodollar and foreign currency and exchange operations are then being conducted for delivery on the first day of such Interest Period for the number of days comprised therein.

"Eurodollar Loans":  Loans the rate of interest applicable to which is based upon the Eurodollar Rate.

"Eurodollar Rate":  with respect to each day during each Interest Period pertaining to a Eurodollar Loan, a rate per annum determined for such day in accordance with the following formula (rounded upward to the nearest 1/100th of 1%):

$$\frac{\text{Eurodollar Base Rate}}{1.00 - \text{Eurocurrency Reserve Requirements}}$$

; provided, however, notwithstanding the foregoing, the Eurodollar Rate shall be the greater of (x) such rate determined pursuant to the foregoing formula and (y) 3.50% per annum.

"Eurodollar Tranche":  the collective reference to Eurodollar Loans the then current Interest Periods with respect to all of which begin on the same date and end on the same later date (whether or not such Loans shall originally have been made on the same day).

"Event of Default":  any of the events specified in Section 8.1, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Excess Cash Flow":  for any fiscal year of the Borrower (or shorter period beginning on the Closing Date through the end of the current fiscal year), the excess, if any, of (a) the sum, without duplication, of (i) Consolidated Net Income for such fiscal year (or period), (ii) the amount of all non-cash charges (including depreciation and amortization) deducted in arriving at such Consolidated Net Income, (iii) decreases in Consolidated Working Capital for such fiscal year (or period), and (iv) the aggregate net amount of non-cash loss on the Disposition of property by the Borrower and its Subsidiaries during such fiscal year (or period) (other than sales of inventory in the ordinary course of business), to the extent deducted in arriving at such Consolidated Net Income over (b) the sum, without duplication, of (i) the amount of all non-cash credits included in arriving at such Consolidated Net Income, (ii) the aggregate amount actually paid by the Borrower and its Subsidiaries in cash during such fiscal year (or period) on account of Capital Expenditures (excluding the principal amount of Indebtedness incurred in connection with such expenditures and any such expenditures financed with the proceeds of any Reinvestment Deferred Amount), (iii) the aggregate amount of all optional prepayments of the Loans during such fiscal year (or period), (iv) the aggregate amount of all regularly scheduled principal payments of Indebtedness (including the Loans) of the Borrower and its Subsidiaries made in cash during such fiscal year (or period) (other than in respect of any revolving credit facility to the extent there is not an equivalent permanent reduction in commitments thereunder), (v) increases in Consolidated Working Capital for such fiscal year (or period), (vi) the aggregate net amount of non-cash gain on the Disposition of property by the Borrower and its Subsidiaries during such fiscal year (or period) (other than sales of inventory in the ordinary course of business), (vii) minority interests in income and earnings of Affiliates for which the Borrower has not received cash distributions thereof, and (viii) all cash consideration paid with respect to Permitted Acquisitions (except to the extent funded with the proceeds of Excluded

Issuances or Indebtedness), including, without limitation, payments in respect of "earnouts" and similar payment obligations and seller notes, to the extent included in arriving at such Consolidated Net Income.

"Excess Cash Flow Application Date":  as defined in Section 2.9(c).

"Excluded Issuance":  any Capital Stock of the Borrower issued (a) to directors, employees or consultants of the Borrower or its Subsidiaries pursuant to compensation plans or arrangements approved by the Board, (b) upon the conversion or exercise of any Capital Stock of the Borrower outstanding on the date hereof or issued hereafter as part of an Excluded Issuance, (c) to a Group Member in accordance with Section 7.7, (d) to fund Capital Expenditures permitted under Section 7.1(c) and (e) to fund the payment of any consideration for a Permitted Acquisition in accordance with Section 7.7.

"Excluded Property":  (i) property owned by any Excluded Subsidiary or Foreign Subsidiary; (ii) receivables and customary related rights and assets subject to a Receivables Financing Transaction; (iii) any property to the extent that a grant of a security interest in such property pursuant to the Security Documents is prohibited by any Requirements of Law of a Governmental Authority, requires a consent not obtained of any Governmental Authority pursuant to such Requirement of Law or is prohibited by, or constitutes a breach or default under or results in the termination of or requires any consent not obtained under, any contract, license, agreement, instrument or other document evidencing or giving rise to such property or, in the case of any Investment, Pledged Stock or Pledged Note (as such terms are defined in the Security Documents), any applicable shareholder or similar agreement, except to the extent that such Requirement of Law or the term in such contract, license, agreement, instrument or other document or shareholder or similar agreement providing for such prohibition, breach, default or termination or requiring such consent is ineffective under applicable law; (iv) Vehicles (as defined in the Guarantee and Collateral Agreement) and title documents therefor; (v) any Capital Stock held by a Loan Party in a joint venture, so long as (x) not more than 50% of the aggregate Capital Stock of such joint venture is held by the Loan Parties in the aggregate and (y) such Capital Stock is not subject to a Lien in favor of any other Person; (vi) any property with respect to which the Administrative Agent determines that the cost or burden of subjecting such property to a Lien under the Security Documents is disproportionate to the value of the collateral security afforded thereby; (vii) real property owned by the Loan Parties having a fair market value of less than $1,000,000; (viii) interests in real property leased, subleased or licensed to any of the Loan Parties; and (ix) thirty-five percent (35%) of the total outstanding voting Capital Stock of each new and existing Foreign Subsidiary.

"Excluded Subsidiary": each Subsidiary of a Foreign Subsidiary and, with respect to any requirement to enter into any Security Document, any Special Purpose Subsidiary.

"Exit Fee": as defined in Section 2.6.

"Facility": the term loan facility made available to the Borrower pursuant to this Agreement.

"Federal Funds Effective Rate":  for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Foreign Subsidiary": any Subsidiary of the Borrower that is not a Domestic Subsidiary.

"Funded Debt": as to any Person, all Indebtedness of such Person that matures more than one year from the date of its creation or matures within one year from such date but is renewable or extendible, at the option of such Person, to a date more than one year from such date or arises under a revolving credit or similar agreement that obligates the lender or lenders to extend credit during a period of more than one year from such date, including all current maturities and current sinking fund payments in respect of such Indebtedness whether or not required to be paid within one year from the date of its creation or maturity and, in the case of the Borrower, Indebtedness in respect of the Loans.

"Funding Office": the office of the Administrative Agent specified in Section 10.2 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP": generally accepted accounting principles in the United States as in effect from time to time, except that for purposes of Section 7.1, GAAP shall be determined on the basis of such principles in effect on the date hereof and consistent with those used in the preparation of the most recent audited financial statements delivered pursuant to Section 6.1(a) of the DIP Credit Agreement.

"Governmental Authority": any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Group Members": the collective reference to the Borrower and its Subsidiaries.

"Guarantee and Collateral Agreement": the Guarantee and Collateral Agreement to be executed and delivered by the Borrower and each Guarantor, substantially in the form of Exhibit D.

"Guarantee Obligation": as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing Person that guarantees or in effect guarantees, or which is given to induce the creation of a separate obligation by another Person (including any bank under any letter of credit) that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Guarantor":  each Domestic Subsidiary of the Borrower other than Excluded Subsidiaries.

"Immaterial Subsidiary":  at any time, any Subsidiary of the Borrower which, based on the financial statements most recently delivered pursuant to Section 6.1(a) or (b), constituted less than 1% of Consolidated Assets or, for the twelve month period ended on the date of such financial statements, represented less than 1% of Consolidated Revenues, in each case determined using the equity method of accounting in accordance with GAAP.

"Indebtedness":  of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services, which would, in accordance with GAAP be shown on the liability side of the balance sheet, (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (f) above, (h) all obligations of the kind referred to in clauses (a) through (g) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation, provided, if such Person has not assumed or become liable for such obligation, the amount of such Indebtedness shall be deemed to be the lesser of the fair market value of such property or the obligation being secured thereby and (i) for the purposes of Section 8.1(e) only, all obligations of such Person in respect of Swap Agreements, but excluding (i) trade and other accounts payables incurred in the ordinary course of such Person's business, (ii) accrued expenses and deferred compensation arrangements in the ordinary course, and (iii) advance payments in the ordinary course.  The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Insolvency":  with respect to any Multiemployer Plan, the condition that such Plan is insolvent within the meaning of Section 4245 of ERISA.

"Insolvent":  pertaining to a condition of Insolvency.

"Intellectual Property":  the collective reference to all rights, priorities and privileges relating to intellectual property, whether arising under United States, multinational or foreign laws or otherwise, including copyrights, copyright licenses, inventions, designs, patents, patent licenses, trademarks, tradenames, domain names and other source indicators, trademark licenses, technology, trade secrets, know-how and processes, and all rights to sue at law or in equity for any infringement or other impairment thereof, including the right to receive all proceeds and damages therefrom.

"Intercompany Subordinated Note":  a promissory note, substantially in the form of Exhibit A or otherwise in form and substance reasonably acceptable to the Administrative Agent.

"Intercreditor Agreement":  the Intercreditor Agreement to be executed and delivered by the Administrative Agent, the Collateral Agent, the agent or trustee for the Second Lien Term Loans and

the Loan Parties, substantially in the form of Exhibit E, which form shall be reasonably satisfactory to the Required Lenders, as amended, modified and supplemented from time to time.

"Interest Coverage Ratio":  for any period, the ratio of (a) Consolidated EBITDA for such period to (b) Consolidated Interest Expense for such period.

"Interest Payment Date":  (a) as to any Eurodollar Loan, the last day of each Interest Period applicable to such Loan and the Maturity Date; provided that if any Interest Period for a Eurodollar Loan exceeds three months, the respective dates that fall every three months after the beginning of such Interest Period shall also be Interest Payment Dates; (b) as to any ABR Loan, the last day of each calendar quarter and the Maturity Date, (c) as to any Loan, the date of any repayment or prepayment made in respect thereof, and (d) as to any ABR Loan if an Event of Default is in existence, the last day of each calendar month.

"Interest Period":  as to any Eurodollar Loan, (a) initially, the period commencing on the borrowing or conversion date, as the case may be, with respect to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower in its notice of borrowing or notice of conversion, as the case may be, given with respect thereto; and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Eurodollar Loan and ending one, two, three or six months thereafter, as selected by the Borrower by irrevocable notice to the Administrative Agent not later than 11:00 A.M., New York City time, on the date that is three Business Days prior to the last day of the then current Interest Period with respect thereto; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)  if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)  the Borrower may not select an Interest Period that would extend beyond the Maturity Date; and

(iii)  any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of a calendar month.

"Investments":  an advance, loan, extension of credit (by way of guaranty or otherwise, but excluding trade debt incurred in the ordinary course of business) or capital contribution to, or purchase any Capital Stock, bonds, notes, loans, debentures or other debt securities of, or any assets constituting a business unit of, or any other similar investment in, any Person.  The amount of any Investment by any Person on any date of determination shall be the acquisition price of the gross assets acquired (including any liability assumed by such Person to the extent such liability would be reflected on a balance sheet prepared in accordance with GAAP) plus all additional capital contributions or purchase price paid in respect thereof, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment minus the amount of all cash returns of principal or capital thereon, cash dividends thereon and other cash returns on investment thereon or liabilities expressly assumed by another Person (other than a Group Member) in connection with the sale of such Investment.  Whenever the term "outstanding" is used in this Agreement with reference to an Investment, it shall take into account the matters referred to in the preceding sentence.

"Lenders":  as defined in the preamble hereto; provided, that unless the context otherwise requires, each reference herein to the Lenders shall be deemed to include any Conduit Lender.

"Lien":  any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any priority or other security agreement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Liquidity": on any date of determination, the sum, without duplication, of (i) the cash and Cash Equivalents which are not subject to any Liens (other than (a) Liens in favor of the Collateral Agent on behalf of the Secured Parties, (b) Liens permitted by Section 7.3(c)(ii) and (c) inchoate Liens arising by operating of law which are not the subject of enforcement actions) held by the Borrower and its Subsidiaries on such date, (ii) accounts receivable and inventory (in each case valued in accordance with GAAP) which are not subject to any Liens (other than (a) Liens in favor of the Collateral Agent on behalf of the Secured Parties and (b) inchoate Liens arising by operation of law which are not the subject of enforcement actions) held by the Borrower and its Subsidiaries on such date, less trade payables of the Borrower and its Subsidiaries on such date and (iii) the aggregate availability under any loan agreements or other lines of credit of the Borrower and its Subsidiaries on such date.

"Loan Documents":  this Agreement, the Security Documents, the Intercreditor Agreement, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Parties":  the Borrower and the Guarantors.

"Loans": as defined in Section 2.1.

"Material Adverse Effect":  a material adverse effect on (a) the business, property, operations or financial condition of the Borrower and its Subsidiaries, taken as a whole or (b) the validity or enforceability of this Agreement or any of the other Loan Documents or the rights or remedies of the Administrative Agent, the Collateral Agent or the Lenders hereunder or thereunder.

"Materials of Environmental Concern":  any gasoline or petroleum (including crude oil or any fraction thereof) or petroleum products or any hazardous or toxic substances, materials or wastes, defined or regulated as such in or under any Environmental Law, including asbestos, polychlorinated biphenyls and urea-formaldehyde insulation.

"Maturity Date":  the earlier of (a) the Scheduled Maturity Date and (b) the acceleration of the Loans in accordance with the provisions hereof.

"Moody's":  Moody's Investors Service, Inc.

"Mortgaged Property": as defined in Section 4.20(b).

"Mortgages": collectively, any deeds of trust, trust deeds, hypothecs and mortgages creating and evidencing a Lien on any real property made by the Loan Parties in favor of or for the benefit of the Collateral Agent on behalf of the Secured Parties in form and substance reasonably satisfactory to the Administrative Agent, in each case securing the Obligations, substantially in the form of Exhibit (with such non-substantive changes thereto as shall be required under the law of the jurisdiction in which such mortgage or deed of trust is to be recorded to provide for recordability and enforceability thereof and to include such provisions as are customarily contained in mortgages or deeds of trust in such jurisdiction).

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Cash Proceeds":  (a) in connection with any Asset Sale or any Recovery Event, the proceeds thereof in the form of cash and Cash Equivalents (including any such proceeds received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment receivable or otherwise, but only as and when received), net of (i) attorneys' fees, accountants' fees, investment banking fees, amounts required to be applied to the repayment of Indebtedness secured by a Lien expressly permitted hereunder on any asset that is the subject of such Asset Sale or Recovery Event (other than any Lien created pursuant to a Security Document) and other third-party fees and expenses actually incurred in connection therewith and (ii) Taxes and Other Taxes paid or reasonably estimated to be payable as a result of any Asset Sale or Recovery Event (after taking into account any available tax credits or deductions and any tax sharing arrangements), (b) in connection with any issuance or sale of Capital Stock or any incurrence of Indebtedness, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith, and (c) in connection with any Receivable Financing Transaction, the initial cash purchase price received by, or Indebtedness incurred by, any Loan Party thereunder (and any increase in the aggregate funded amount thereof) net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary fees and expenses actually incurred in connection therewith.

"Non-Excluded Taxes":  as defined in Section 2.17(a).

"Non-U.S. Lender":  as defined in Section 2.17(d).

"Notes":  the collective reference to any promissory note evidencing Loans.

"Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loans and interest accruing after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to a Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding) the Loans and all other obligations and liabilities of the Borrower and each Guarantor (or, in the case of Specified Letters of Credit, each Group Member on whose account such Specified Letter of Credit is issued and guarantee obligations of other Group Members in respect thereof) to the Administrative Agent or to any Lender (or, in the case of Specified Letters of Credit, Specified Swap Agreements and Specified Cash Management Agreements, any affiliate of any Lender), whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document, any Specified Letter of Credit (and related letter of credit applications), any Specified Swap Agreement, any Specified Cash Management Agreement or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, Guarantee Obligations, fees, indemnities, costs, expenses (including all reasonable fees, charges and disbursements of counsel to the Administrative Agent or to any Lender that are required to be paid by the Borrower pursuant hereto) or otherwise.

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document, including any interest, additions to tax or penalties applicable thereto, whether disputed or not.

"Outstanding Amount": with respect to the Loans at any time, the aggregate principal amount thereof, after giving effect to any borrowings and prepayments or repayments of Loans occurring on such date.

"Outstanding Percentage": as to any Lender at any time, the percentage which such Lender's Commitment then constitutes of the aggregate Commitments (or, at any time after the Closing Date, the percentage which the aggregate principal amount of such Lender's Loans then outstanding constitutes of the aggregate principal amount of the Loans then outstanding).

"Participant":  as defined in Section 10.6(c).

"Participation Register":  as defined in Section 10.6(c).

 "PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Acquisition":  any Acquisition by (i) the Borrower or any of its Subsidiaries of all or substantially all of the assets of a Person, or of all or substantially all of any business or division of a Person or (ii) the Borrower or any of its Subsidiaries of no less than 100% of the capital stock, partnership interests, membership interests or equity of any Person, in each case to the extent that:

> (a)      each of the conditions precedent set forth in Annex III shall have been satisfied in a manner reasonably satisfactory to the Administrative Agent;

> (b)      such Acquisition shall not be hostile and shall have been approved by the board of directors (or other similar body) and/or the stockholders or other equityholders of the Target; and

> (c)      no Default or Event of Default is in existence or would occur after giving effect to such Acquisition.

"Permitted Refinancing Indebtedness": as defined in Section 7.2(s).

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Petition Date":  as defined in the recitals hereto.

"Plan":  at a particular time, any employee pension benefit plan (as defined in Section 3(2) of ERISA) in respect of which a Loan Party or any ERISA Affiliate is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization"  as defined in the recitals hereto.

"Prime Rate":  the rate of interest per annum publicly announced from time to time by JPMorgan Chase Bank, N.A. as its prime rate in effect at its principal office in New York City (the Prime Rate not being intended to be the lowest rate of interest charged by JPMorgan Chase Bank, N.A. in connection with extensions of credit to debtors).

"Prohibited Transaction":  as defined in Section 406 of ERISA or Section 4975 of the Code.

"Pro Forma Balance Sheet": as defined in Section 4.18.

"Projections":  as defined in Section 6.2(c).

"Properties":  as defined in Section 4.16(a).

"Receivable Financing Transaction":  any transaction or series of transactions involving a sale for cash of accounts receivable, without recourse based upon the collectibility of the receivables sold, by the Borrower or any of its Subsidiaries to a Special Purpose Subsidiary and a subsequent sale or pledge of such accounts receivable (or an interest therein) by such Special Purpose Subsidiary, in each case without any guarantee by the Borrower or any of its Subsidiaries (other than the Special Purpose Subsidiary).

"Recovery Event":  any settlement of or payment in respect of any property or casualty insurance claim or any condemnation proceeding relating to any asset of any Group Member in an amount in excess of $1,000,000.

"Register":  as defined in Section 10.6(b).

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Reinvestment Deferred Amount":  with respect to any Reinvestment Event, the aggregate Net Cash Proceeds received by any Group Member in connection therewith that are not applied to prepay the Loans pursuant to Section 2.9(b) as a result of the delivery of a Reinvestment Notice.

"Reinvestment Event":  any Asset Sale or Recovery Event in respect of which the Borrower has delivered a Reinvestment Notice.

"Reinvestment Notice":  a written notice executed by a Responsible Officer stating that no Event of Default has occurred and is continuing and that the Borrower (directly or indirectly through a Subsidiary) intends and expects to use all or a specified portion of the Net Cash Proceeds of an Asset Sale or a Recovery Event in the business.

"Reinvestment Prepayment Amount":  with respect to any Reinvestment Event, the Reinvestment Deferred Amount relating thereto less any amount expended prior to the relevant Reinvestment Prepayment Date to acquire or repair assets useful in the businesses of the Borrower and its Subsidiaries.

"Reinvestment Prepayment Date":  with respect to any Reinvestment Event, the earlier of (a) the date occurring 360 days after such Reinvestment Event (provided that if on such 360th day, the applicable Reinvestment Prepayment Amount is contractually committed to acquire or repair assets useful in the businesses of the Borrower and its Subsidiaries, the Reinvestment Prepayment Date with respect to such amount shall be the earlier of (i) the date occurring 450 days after such Reinvestment Event, (ii) the date of termination of such commitment, and (iii) if such amount is not so expended, the first day following the date such amount was contractually committed to be expended) and (b) the date on which the Borrower shall have determined not to, or shall have otherwise ceased to, acquire or repair assets useful in the businesses of the Borrower and its Subsidiaries with all or any portion of the relevant Reinvestment Deferred Amount.

"Related Parties": as defined in Section 9.3.

"Reorganization": with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event": any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder, other than those events as to which the thirty day notice period is waived under PBGC regulations.

"Required Lenders": at any time, Lenders having more than 50% of the Outstanding Amount; provided that the portion of the Outstanding Amount held or deemed held by any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Requirement of Law": as to any Person, the Certificate of Incorporation and By-Laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer": with respect to any Loan Party, the chief executive officer, the president, the chief financial officer, any vice president, the treasurer or the assistant treasurer of such Loan Party.

"Restricted Payments": as defined in Section 7.6.

"Restructuring Term Sheet": the term sheet substantially in the form of Exhibit I (as such term sheet may be modified in accordance with the terms of that certain letter agreement dated as of June ___, 2009 by and among the Borrower and certain of its Affiliates, JPMorgan Chase Bank, N.A., and the lender signatories thereto).

"S&P": Standard & Poor's Ratings Services.

"Scheduled Maturity Date": the third anniversary of the Closing Date.

"SEC": the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Second Lien Agent": _____.

"Second Lien Term Loans": _____.

"Second Lien Term Loan Documents": _____.

"Secured Parties": collectively, the Administrative Agent, the Lenders, each provider under a Specified Cash Management Agreement, each issuer of a Specified Letter of Credit, each counterparty to a Specified Swap Agreement, the Persons entitled to indemnification under the Loan Documents and each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.2.

"Security Documents": the collective reference to the Guarantee and Collateral Agreement, the Mortgages and all other security documents hereafter delivered to the Administrative

Agent and the Collateral Agent granting a Lien on any property of any Person to secure the obligations and liabilities of any Loan Party under any Loan Document.

"<u>Seller Debt</u>":  unsecured debt owing to the seller in a Permitted Acquisition.

"<u>Single Employer Plan</u>":  any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"<u>Solvent</u>":  when used with respect to any Person, means that, as of any date of determination, (a) the amount of the "present fair saleable value" of the assets of such Person will, as of such date, exceed the amount of all "liabilities of such Person, contingent or otherwise", as of such date, as such quoted terms are determined in accordance with applicable federal and state laws governing determinations of the insolvency of debtors, (b) the present fair saleable value of the assets of such Person will, as of such date, be greater than the amount that will be required to pay the liability of such Person on its debts as such debts become absolute and matured, (c) such Person will not have, as of such date, an unreasonably small amount of capital with which to conduct its business, and (d) such Person will be able to pay its debts as they mature.  For purposes of this definition, (i) "debt" means liability on a "claim", and (ii) "claim" means any (x) right to payment, whether or not such a right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured or unmatured, disputed, undisputed, secured or unsecured.

"<u>Special Purpose Subsidiary</u>":  any Wholly Owned Subsidiary of the Borrower created by the Borrower for the sole purpose of facilitating a Receivable Financing Transaction; <u>provided</u>, that such Special Purpose Subsidiary shall cease to be a Special Purpose Subsidiary if at any time (a) such Special Purpose Subsidiary engages in any business other than Receivable Financing Transactions and activities directly related thereto or (b) the Borrower or any of its Subsidiaries (other than a Special Purpose Subsidiary) or any of their respective assets incur any liability, direct or indirect, contingent or otherwise, in respect of any obligation of a Special Purpose Subsidiary whether arising under or in connection with any Receivable Financing Transaction or otherwise (other than Standard Securitization Undertakings); <u>provided</u> <u>further</u>, however, that if the law of a jurisdiction in which the Borrower proposes to create a Special Purpose Subsidiary does not provide for the creation of a bankruptcy remote entity that is acceptable to the Borrower or requires the formation of one or more additional entities (whether or not Subsidiaries of the Borrower), such other type of entity may, upon the request of the Borrower and with the consent of the Administrative Agent (such consent not to be unreasonably withheld) serve as a "Special Purpose Subsidiary."

"<u>Specified Cash Management Agreement</u>":  any agreement providing for treasury, depositary or cash management services, including in connection with any automated clearing house transactions, controlled disbursements, return items, overdrafts, interstate depository network services or any similar transactions between the Borrower or any Guarantor and any Lender or affiliate thereof.

"<u>Specified Jurisdiction</u>":  any country, state or other jurisdictional subdivision outside North America or Europe.

"<u>Specified Letters of Credit</u>":  any letter of credit (a) issued for the account of any Group Member by any Lender or any affiliate of a Lender and (b) that has been designated by the relevant Lender and such Group Member, by written notice to the Administrative Agent prior to the issuance thereof, as a Specified Letter of Credit and with respect to which the Administrative Agent has confirmed to the relevant Lender sufficient availability pursuant to Section 7.2(i).  Such designation shall not create

in favor of such Lender or affiliate of a Lender any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party hereunder or under any Collateral Document.

"Specified Swap Agreement":  any Swap Agreement (a) entered into by the Borrower or any Guarantor and any Person that is a Lender or an affiliate of a Lender at the time such Swap Agreement is entered into and (b) that has been designated by the relevant Lender and such Group Member, by written notice to the Administrative Agent prior to the effectiveness thereof, as a Specified Swap Agreement.  Such designation shall not create in favor of such Lender or affiliate of a Lender any rights in connection with the management or release of any Collateral or of the obligations of any Loan Party hereunder or under any Collateral Document.

"Standard Securitization Undertakings":  representations, warranties, covenants and indemnities entered into by the Borrower or any Subsidiary thereof in connection with a Receivable Financing Transaction which are reasonably customary in an accounts receivable financing transaction.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person (exclusive of any Affiliate in which such Person has a minority ownership interest).  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Swap Agreement":  any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions.

"Target":  the Person, or business or substantially all of the assets of a Person or a division of a Person intended to be acquired in a Permitted Acquisition.

"Taxes": all present or future taxes, duties, levies, imposts, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto, whether disputed or not.

"3% Subsidiary":  at any time, any Subsidiary of the Borrower which, based on the financial statements most recently delivered pursuant to subsection 6.1(a) or (b), constituted at least 3% of Consolidated Assets or for the twelve month period ended on the date of such financial statements represented at least 3% of Consolidated Revenues, in each case determined using the equity method of accounting in accordance with GAAP.

"Title Insurance Company": as defined in Section 5(t)(ii).

"Transferee":  any Assignee or Participant.

"Type":  as to any Loan, its nature as an ABR Loan or a Eurodollar Loan.

"UCC":  the Uniform Commercial Code, as in effect from time to time in the State of New York or any other applicable jurisdiction.

"United States":  the United States of America.

"Wholly Owned Subsidiary":  as to any Person, any other Person all of the Capital Stock of which (other than directors' qualifying shares required by law) is owned by such Person directly and/or through other Wholly Owned Subsidiaries.

"Withdrawal Liability":  liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Title IV of ERISA.

1.2.  Other Definitional Provisions.  (a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)  As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms relating to any Group Member not defined in Section 1.1 and accounting terms partly defined in Section 1.1, to the extent not defined, shall have the respective meanings given to them under GAAP, as in effect from time to time; provided that, if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn by the Borrower or the Administrative Agent, as the case may be, or such provision amended in accordance herewith, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall be construed to mean incur, create, issue, assume or become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights, and (v) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)  The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)  When determining whether a Default or Event of Default pursuant to Section 7.1 shall be in existence after giving pro forma effect to a certain event, the covenant levels to be used in making such determination shall be those in effect as of the last day of the most recent fiscal quarter of the Borrower for which financial reports are required to have been delivered pursuant to Section 6.1.

## SECTION 2.   AMOUNT AND TERMS OF LOANS

2.1.   <u>Loans</u>.  Subject to the terms and conditions set forth herein, each Lender listed on Schedule 1.1A hereto has severally agreed to make term loans (the "<u>Loans</u>") on the Closing Date in the full amount of such Lender's Commitment to the Borrower.  The Loans may from time to time be Eurodollar Loans or ABR Loans, as determined by the Borrower and notified to the Administrative Agent in accordance with Sections 2.2 and 2.10.

2.2.   <u>Procedure for Conversion</u>.  The Borrower shall give the Administrative Agent irrevocable notice (the "<u>Conversion Notice</u>") (which notice must be received by the Administrative Agent prior to 12:00 Noon, New York City time, one Business Day prior to the anticipated Conversion Date) requesting that the Lenders convert the loans under the DIP Credit Agreement into the Loans hereunder and specifying the amount and Type of such Loans, the requested Conversion Date and in the case of Eurodollar Loans, the amount and length of the Interest Period therefor.  Upon receipt of the Conversion Notice the Administrative Agent shall promptly notify each Lender thereof.  On the requested Conversion Date, each Lender agrees to maintain outstanding its term loans made under the DIP Credit Agreement in the outstanding principal amounts as set forth on Schedule 1.1A as Loans hereunder.

2.3.   [Reserved].

2.4.   <u>Maturity and Repayment of Loans</u>.  The Loan of each Lender shall mature in eleven consecutive quarterly installments, commencing on the last day of the first full calendar quarter following the Closing Date, each of which shall be in an amount equal to such Lender's Outstanding Percentage multiplied by the amount set forth below opposite such installment, with a final installment on the third anniversary of the Closing Date (as such amounts may be adjusted to reflect any prepayments of the Loans):

| Payment Date | Principal Amount |
|---|---|
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
|  | $1,250,000 |
| Scheduled Maturity Date | $[486,250,000] |

2.5.   [Reserved].

2.6.   <u>Fees.</u>  (a)  The Borrower agrees to pay to the Administrative Agent, for the account of each Lender, an exit fee ("Exit Fee") equal to 2% of the principal amount of such Lender's Loans repaid on or after the second anniversary of the Closing Date, such fee to be payable on the date of such

repayment; *provided, however,* that if the outstanding principal balance of the Lenders' Loans are not repaid in full on or prior to the Scheduled Maturity Date, the Exit Fee on such outstanding principal balance shall be payable on the Scheduled Maturity Date rather than on the date of such repayment.

(b)     The Borrower agrees to pay to the Administrative Agent the fees in the amounts and on the dates as set forth in any fee agreements with the Administrative Agent and to perform any other obligations contained therein.

2.7.    [Reserved]

2.8.    Optional Prepayments.  Subject to Section 2.6(a) and the proviso below, the Borrower may at any time and from time to time prepay the Loans, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Administrative Agent no later than 1:00 P.M., New York City time, three Business Days prior thereto, in the case of Eurodollar Loans, and one Business Day prior thereto, in the case of ABR Loans (provided that ABR Loans may be prepaid on the same Business Day if notice is received by the Administrative Agent no later than 12:00 P.M., New York City time), which notice shall specify the date and amount of prepayment and Type of the Loans being prepaid, as applicable; provided, that if a Eurodollar Loan is prepaid on any day other than the last day of the Interest Period applicable thereto, the Borrower shall also pay any amounts owing pursuant to Section 2.18.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  Partial prepayments of Loans shall be in an aggregate principal amount of $1,000,000 or a whole multiple of $1,000,000 in excess thereof.  Partial optional prepayments of the Loans shall be ratable as among the Lenders thereof.

2.9.    Mandatory Prepayments.  (a)  If any Capital Stock or Indebtedness shall be issued or incurred by any Group Member (excluding any Excluded Issuance and any Indebtedness permitted by Section 7.2(a) through (s)) an amount equal to 50% of such Net Cash Proceeds in the case of Capital Stock and 100% of the Net Cash Proceeds in the case of Indebtedness shall be applied by the Borrower on the date of receipt thereof by such Group Member toward the prepayment of the Loans as set forth in Section 2.9(e).

(b)     If on any date any Group Member shall receive Net Cash Proceeds from any Asset Sale or Recovery Event then, unless a Reinvestment Notice shall have been timely delivered in respect thereof, an amount equal to 100% of such Net Cash Proceeds shall be applied by or on behalf of the Borrower no later than the end of the fiscal month in which such Net Cash Proceeds are received (or, if the aggregate amount of such Net Cash Proceeds is less than $15,000,000, no later than the end of the fiscal month following the fiscal month in which such Net Cash Proceeds are received) toward the prepayment of the Loans as set forth in Section 2.9(e); provided that notwithstanding the foregoing, (i) the aggregate Net Cash Proceeds of Asset Sales that may be excluded from the foregoing prepayment requirement pursuant to Reinvestment Notices shall not exceed $100,000,000 in any fiscal year of the Borrower and (ii) on each Reinvestment Prepayment Date, an amount equal to the Reinvestment Prepayment Amount with respect to the relevant Reinvestment Event shall be applied toward the prepayment of the Loans as set forth in Section 2.9(e).

(c)     If, for  (i) the period from the first anniversary of the Closing Date through the end of the then current fiscal year of the Borrower or (ii) any fiscal year of the Borrower thereafter, there shall be Excess Cash Flow, the Borrower shall, on the relevant Excess Cash Flow Application Date, apply the ECF Percentage of such Excess Cash Flow toward the prepayment of the Loans as set forth in Section 2.9(e).  Each such prepayment shall be made on a date (an "Excess Cash Flow Application Date") no later than five Business Days after the earlier of (i) the date on which the financial statements of the Borrower

referred to in Section 6.1(a), for the fiscal year with respect to which such prepayment is made, are required to be delivered to the Lenders and (ii) the date such financial statements are actually delivered.

(d)     Following the establishment of any Receivable Financing Transaction by the Borrower or any of its Domestic Subsidiaries, an amount equal to 100% of the Net Cash Proceeds thereof shall be promptly applied by or on behalf of the Borrower toward the prepayment of the Loans as set forth in Section 2.9(e).

(e)     Amounts to be applied in connection with prepayments made pursuant to this Section 2.9 shall be made ratably among the Lenders of the Loans.  The application of any prepayment made pursuant to this Section 2.9 shall be made, first, to ABR Loans and, second, to Eurodollar Loans. Each prepayment of the Loans under Section 2.9 shall be accompanied by accrued interest to the date of such prepayment on the amount prepaid, the Exit Fee owing pursuant to Section 2.6(a) (if applicable) and, if a Eurodollar Loan is prepaid on any day other the last day of the Interest Period applicable thereto, the Borrower shall also pay amounts owing pursuant to Section 2.18.

2.10.  Conversion and Continuation Options.  (a)  The Borrower may elect from time to time to convert Eurodollar Loans to ABR Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the Business Day preceding the proposed conversion date.  The Borrower may elect from time to time to convert ABR Loans to Eurodollar Loans by giving the Administrative Agent prior irrevocable notice of such election no later than 11:00 A.M., New York City time, on the third Business Day preceding the proposed conversion date (which notice shall specify the length of the initial Interest Period therefor), provided that no ABR Loan may be converted into a Eurodollar Loan when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such conversions.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

(b)     Any Eurodollar Loan may be continued as such upon the expiration of the then current Interest Period with respect thereto by the Borrower giving irrevocable notice to the Administrative Agent, in accordance with the applicable provisions of the term "Interest Period" set forth in Section 1.1, of the length of the next Interest Period to be applicable to such Loans, provided that no Eurodollar Loan may be continued as such when any Event of Default has occurred and is continuing and the Administrative Agent has or the Required Lenders have determined in its or their sole discretion not to permit such continuations, and provided, further, that if the Borrower shall fail to give any required notice as described above in this paragraph or if such continuation is not permitted pursuant to the preceding proviso such Loans shall be automatically converted to ABR on the last day of such then expiring Interest Period.  Upon receipt of any such notice the Administrative Agent shall promptly notify each relevant Lender thereof.

2.11.  Limitations on Eurodollar Tranches.  Notwithstanding anything to the contrary in this Agreement, all borrowings, conversions and continuations of Eurodollar Loans and all selections of Interest Periods shall be in such amounts and be made pursuant to such elections so that, (a) after giving effect thereto, the aggregate principal amount of the Eurodollar Loans comprising each Eurodollar Tranche shall be equal to $1,000,000 or a whole multiple of $500,000 in excess thereof and (b) no more than ten Eurodollar Tranches shall be outstanding at any one time.

2.12.  Interest Rates and Payment Dates.  (a)  Subject to the provisions of Section 2.12(c), each Eurodollar Loan shall bear interest for each day during each Interest Period with respect thereto at a rate per annum equal to the Eurodollar Rate determined for such day plus the Applicable Margin.

(b)     Subject to the provisions of Section 2.12(c), each ABR Loan shall bear interest at a rate per annum equal to the ABR plus the Applicable Margin.

(c)     If any Event of Default shall have occurred and be continuing, on and after the date the Borrower receives notice from the Administrative Agent stating that interest is to accrue pursuant to this paragraph (c) or following acceleration of payment of the Loans, all outstanding Loans and other Obligations under the Loan Documents (whether or not overdue at such time) shall bear interest at a rate per annum equal to (i) in the case of the Loans, the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2% or and (ii) in the case of any other Obligation, the rate then applicable to ABR Loans plus 2%, in each case, with respect to clauses (i) and (ii) above, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

(d)     Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (c) of this Section shall be payable from time to time on demand.

2.13.   Computation of Interest and Fees. (a) Interest and fees payable pursuant hereto shall be calculated on the basis of a 360-day year for the actual days elapsed, except that, with respect to ABR Loans the rate of interest on which is calculated on the basis of the Prime Rate, the interest thereon shall be calculated on the basis of a 365- (or 366-, as the case may be) day year for the actual days elapsed.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of each determination of a Eurodollar Rate.  Any change in the interest rate on a Loan resulting from a change in the ABR or the Eurocurrency Reserve Requirements shall become effective as of the opening of business on the day on which such change becomes effective.  The Administrative Agent shall as soon as practicable notify the Borrower and the relevant Lenders of the effective date and the amount of each such change in interest rate.

(b)     Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be presumptively correct and binding on the Borrower and the Lenders in the absence of manifest error.  The Administrative Agent shall, at the request of the Borrower, deliver to the Borrower a statement showing the quotations used by the Administrative Agent in determining any interest rate pursuant to Section 2.12(a).

2.14.   Inability to Determine Interest Rate.  If prior to the first day of any Interest Period:

(a)     the Administrative Agent shall have determined (which determination shall be presumptively correct and binding upon the Borrower) that, by reason of circumstances affecting the relevant market, adequate and reasonable means do not exist for ascertaining the Eurodollar Rate for such Interest Period, or

(b)     the Administrative Agent shall have received notice from the Required Lenders that the Eurodollar Rate determined or to be determined for such Interest Period will not adequately and fairly reflect the cost to such Lenders (as conclusively certified by such Lenders) of making or maintaining their affected Loans during such Interest Period,

the Administrative Agent shall give telecopy or telephonic notice thereof to the Borrower and the relevant Lenders as soon as practicable thereafter.  If such notice is given (x) any Eurodollar Loans requested to be made on the first day of such Interest Period shall be made as ABR Loans, (y) any Loans that were to have been converted on the first day of such Interest Period to Eurodollar Loans shall be continued as ABR Loans and (z) any outstanding Eurodollar Loans shall be converted, on the last day of the then-

current Interest Period, to ABR Loans.  Until such notice has been withdrawn by the Administrative Agent (which the Administrative Agent shall do promptly after the circumstances giving rise to such event no longer exist), no further Eurodollar Loans shall be made or continued as such, nor shall the Borrower have the right to convert Loans to Eurodollar Loans.

2.15.  <u>Pro Rata Treatment and Payments</u>.  (a)  Except as otherwise provided herein, each payment by the Borrower on account of the Exit Fee or any other fee payable to Lenders shall be made pro rata according to the respective Outstanding Percentages of the relevant Lenders entitled thereto.

(b)  Except as otherwise provided herein, each payment (including each prepayment) by the Borrower on account of principal of and interest on the Loans shall be made <u>pro rata</u> according to the respective Outstanding Percentages of the relevant Lenders entitled thereto.  The amount of each principal prepayment of the Loans shall be applied to reduce the then remaining installments of the Loans (i) as directed by the Borrower in the case of prepayments made pursuant to Section 2.8, (ii) in direct order of maturity to the next four installments then due and thereafter ratably based upon the respective then remaining principal amounts thereof in the case of prepayments made pursuant to Section 2.9(c) and (iii) ratably based upon the respective then remaining principal amounts thereof otherwise.  Amounts prepaid on account of the Loans may not be reborrowed.

(c)  All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Funding Office, in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to each relevant Lender promptly upon receipt in like funds as received.  If any payment hereunder (other than payments on the Eurodollar Loans) becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  If any payment on a Eurodollar Loan becomes due and payable on a day other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day unless the result of such extension would be to extend such payment into another calendar month, in which event such payment shall be made on the immediately preceding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding two sentences, interest thereon shall be payable at the then applicable rate during such extension.

(d)  Unless the Administrative Agent shall have been notified in writing by any Lender prior to a borrowing that such Lender will not make the amount that would constitute its share of such borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the date of borrowing therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon, at a rate equal to the greater of (i) the Federal Funds Effective Rate and (ii) a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this paragraph shall be conclusive in the absence of manifest error.  If such Lender's share of such borrowing is not made available to the Administrative Agent by such Lender within three Business Days after such date of borrowing, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable thereto, within three Business Days after demand therefor from the Borrower.

(e)     Unless the Administrative Agent shall have been notified in writing by the Borrower prior to the date of any payment due to be made by the Borrower hereunder that the Borrower will not make such payment to the Administrative Agent, the Administrative Agent may assume that the Borrower is making such payment, and the Administrative Agent may, but shall not be required to, in reliance upon such assumption, make available to the Lenders their respective pro rata shares of a corresponding amount.  If such payment is not made to the Administrative Agent by the Borrower within three Business Days after such due date, the Administrative Agent shall be entitled to recover, on demand, from each Lender to which any amount which was made available pursuant to the preceding sentence, such amount with interest thereon at the rate per annum equal to the daily average Federal Funds Effective Rate.  Nothing herein shall be deemed to limit the rights of the Administrative Agent or any Lender against the Borrower.

(f)     If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.15(d), 2.15(e) or 9.7, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision of this Agreement), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

2.16.  Requirements of Law.  (a)  If the adoption of or any change in any Requirement of Law or in the interpretation or application thereof or compliance by any Lender with any request or directive (whether or not having the force of law) from any central bank or other Governmental Authority, in each case, made subsequent to the date hereof:

(i)     shall subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Eurodollar Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Non-Excluded Taxes covered by Section 2.17 and changes in the rate of tax on the overall net income of such Lender);

(ii)     shall impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, deposits or other liabilities in or for the account of, advances, loans or other extensions of credit by, or any other acquisition of funds by, any office of such Lender that is not otherwise included in the determination of the Eurodollar Rate; or

(iii)     shall impose on such Lender any other condition;

and the result of any of the foregoing is to increase the cost to such Lender, by an amount that such Lender reasonably deems to be material, of making, converting into, continuing or maintaining Eurodollar Loans, or to reduce any amount receivable hereunder in respect thereof, then, in any such case, the Borrower shall promptly pay such Lender, within 30 days after receipt of a reasonably detailed invoice therefor, any additional amounts necessary to compensate such Lender for such increased cost or reduced amount receivable.  If any Lender becomes entitled to claim any additional amounts pursuant to this paragraph, it shall promptly notify the Borrower (with a copy to the Administrative Agent) of the event by reason of which it has become so entitled.

(b)     If any Lender shall have determined that the adoption of or any change in any Requirement of Law regarding capital adequacy or in the interpretation or application thereof or compliance by such Lender or any corporation controlling such Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any Governmental Authority, in each case, made subsequent to the date hereof shall have the effect of reducing the rate of return on such Lender's or such corporation's capital as a consequence of its obligations hereunder to a level below that

which such Lender or such corporation could have achieved but for such adoption, change or compliance (taking into consideration such Lender's or such corporation's policies with respect to capital adequacy) by an amount reasonably deemed by such Lender to be material, then from time to time, after submission by such Lender to the Borrower (with a copy to the Administrative Agent) of a written request therefor, the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such corporation for such reduction.

(c)     A certificate as to any additional amounts payable pursuant to this Section submitted by any Lender to the Borrower (with a copy to the Administrative Agent) shall be presumptively correct in the absence of manifest error.  Notwithstanding anything to the contrary in this Section, the Borrower shall not be required to compensate a Lender pursuant to this Section for any amounts incurred more than nine months prior to the date that such Lender notifies the Borrower of such Lender's intention to claim compensation therefor; provided that, if the circumstances giving rise to such claim have a retroactive effect, then such nine-month period shall be extended to include the period of such retroactive effect.  The obligations of the Borrower pursuant to this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.17.  Taxes.  (a)  All payments made by or on account of any Loan Party under this Agreement or any other Loan Document shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority (including any interest, addition to tax or penalties applicable thereto), excluding income taxes and franchise taxes (imposed in lieu of net income taxes) and taxes imposed on or measured by the Administrative Agent's or any Lender's net profits if such tax is imposed as a result of a present or former connection between the Administrative Agent or such Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Administrative Agent or such Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or any Other Taxes are required to be withheld from any amounts payable to the Administrative Agent or any Lender hereunder or under any other Loan Document, the amounts so payable to the Administrative Agent or such Lender shall be increased to the extent necessary to yield to the Administrative Agent or such Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement; provided, however, that the Borrower shall not be required to increase any such amounts payable to the Administrative Agent or any Lender with respect to any Non-Excluded Taxes (i) that are attributable to the Administrative Agent's or such Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section or (ii) that are United States withholding taxes imposed on amounts payable to the Administrative Agent or such Lender at the time the Administrative Agent or such Lender becomes a party to this Agreement, except to the extent that the Administrative Agent's or such Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph (a).

(b)     In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     Whenever any Non-Excluded Taxes or Other Taxes are payable by any Loan Party, as promptly as reasonably possible thereafter such Loan Party shall send to the Administrative Agent for its own account or for the account of the relevant Lender, as the case may be, (i) a certified copy of an original official receipt received by such Loan Party showing payment thereof or (ii) if such

Loan Party reasonably determines that it is unable to provide a certified copy of such receipt, a certificate as to the amount of such payment. If the relevant Loan Party fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Administrative Agent copies of the required receipts or other required documentary evidence, such Loan Party shall indemnify the Administrative Agent and the Lenders for any incremental taxes, interest or penalties that may become payable by the Administrative Agent or any Lender as a result of any such failure.

(d) Each Lender (or Transferee) that is not a "United States Person" as defined in Section 7701(a)(30) of the Code (a "<u>Non-U.S. Lender</u>") shall deliver to the Borrower and the Administrative Agent (or, in the case of a Participant, to the Administrative Agent and the Lender from which the related participation shall have been purchased) two copies of either U.S. Internal Revenue Service ("<u>IRS</u>") Form W-8BEN claiming eligibility for benefits of an income tax treaty to which the United States is a party, Form W-8ECI or Form W-8IMY (accompanied by applicable underlying IRS forms), or, in the case of a Non-U.S. Lender claiming exemption from U.S. federal withholding tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a statement substantially in the form of Exhibit G and two copies of the applicable Form W-8, or any subsequent versions thereof or successors thereto, in each case properly completed and duly executed by such Non-U.S. Lender claiming complete exemption from, or a reduced rate of, U.S. federal withholding tax on all payments by the Borrower under this Agreement and the other Loan Documents. Such forms shall be delivered by each Non-U.S. Lender on or before the date it becomes a party to this Agreement (or, in the case of any Participant, on or before the date such Participant purchases the related participation). In addition, each Non-U.S. Lender shall deliver such forms promptly upon the expiration, obsolescence or invalidity of any form previously delivered by such Non-U.S. Lender. Each Non-U.S. Lender shall promptly notify the Borrower and the Administrative Agent at any time it determines that it is no longer in a position to provide any previously delivered certificate to the Borrower and the Administrative Agent (or any other form of certification adopted by the U.S. taxing authorities for such purpose). Notwithstanding any other provision of this paragraph, a Non-U.S. Lender shall not be required to deliver any form pursuant to this paragraph that such Non-U.S. Lender is not legally able to deliver.

(e) A Lender that is entitled to an exemption from or reduction of non-U.S. withholding tax under the law of the jurisdiction in which the Borrower is located, or any treaty to which such jurisdiction is a party, with respect to payments under this Agreement shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower (or the Administrative Agent), such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate, <u>provided</u> that such Lender is legally entitled to complete, execute and deliver such documentation and in such Lender's reasonable judgment such completion, execution or submission would not materially prejudice the commercial or legal position of such Lender.

(f) Any Lender that is a United States person as defined in Section 7701(a)(30) of the Code shall deliver to the Borrower (with a copy to the Administrative Agent) a duly completed and signed IRS Form W-9 (or successor form) establishing that the Lender is organized under the laws of the United States and is not subject to backup withholding.

(g) If the Administrative Agent or any Lender determines, in its sole discretion (exercised in good faith), that it has received a refund of any Non-Excluded Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.17 with respect to the Non-Excluded Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender and without interest (other than any interest

paid by the relevant Governmental Authority with respect to such refund); within 45 Business Days of the determination that the Borrower is entitled to such refund <u>provided</u>, that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes which it deems confidential) to the Borrower or to any other Person.

(h)     Each Lender shall indemnify the Administrative Agent, within 10 days after demand therefor, for the full amount of any Taxes attributable to such Lender that are payable or paid by the Administrative Agent, and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.

(i)     The agreements in this Section shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.18.   <u>Indemnity</u>. The Borrower agrees to indemnify each Lender for, and to hold each Lender harmless from, any loss or expense that such Lender may sustain or incur as a consequence of (a) default by the Borrower in making a borrowing of, conversion into or continuation of Eurodollar Loans after the Borrower has given a notice requesting the same in accordance with the provisions of this Agreement (other than by operation of Section 2.14), (b) default by the Borrower in making any prepayment of or conversion from Eurodollar Loans after the Borrower has given a notice thereof in accordance with the provisions of this Agreement or (c) the making of a prepayment of Eurodollar Loans on a day that is not the last day of an Interest Period with respect thereto. Such indemnification may include an amount equal to the excess, if any, of (i) the amount of interest that would have accrued on the amount so prepaid, or not so borrowed, converted or continued, for the period from the date of such prepayment or of such failure to borrow, convert or continue to the last day of such Interest Period (or, in the case of a failure to borrow, convert or continue, the Interest Period that would have commenced on the date of such failure) in each case at the applicable rate of interest for such Loans provided for herein (excluding, however, the Applicable Margin included therein, if any) over (ii) the amount of interest (as reasonably determined by such Lender) that would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the interbank eurodollar market. A certificate as to any amounts payable pursuant to this Section submitted to the Borrower by any Lender shall be presumptively correct in the absence of manifest error. This covenant shall survive the termination of this Agreement and the payment of the Loans and all other amounts payable hereunder.

2.19.   <u>Change of Lending Office</u>. Each Lender agrees that, upon the occurrence of any event giving rise to the operation of Section 2.16 or 2.17(a) with respect to such Lender, it will, if requested by the Borrower, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any Loans affected by such event with the object of avoiding the consequences of such event; provided, that such designation is made on terms that, in the sole judgment of such Lender, cause such Lender and its lending office(s) to suffer no economic, legal or regulatory disadvantage, and provided, further, that nothing in this Section shall affect or postpone any of the obligations of the Borrower or the rights of any Lender pursuant to Section 2.16 or 2.17(a).

2.20.   <u>Intercreditor Agreement</u>. Each Lender hereby authorizes and directs the Administrative Agent and the Collateral Agent to enter into the Intercreditor Agreement on its behalf and hereby approves and agrees to be bound by the terms of the Intercreditor Agreement. Notwithstanding

anything to the contrary herein, in the case of any inconsistency between this Agreement and the Intercreditor Agreement, the Intercreditor Agreement shall govern. The Lenders acknowledge that the Second Lien Term Loans and related obligations are secured by the Collateral, subject to the Intercreditor Agreement.

SECTION 3.   [RESERVED]

SECTION 4.   REPRESENTATIONS AND WARRANTIES

To induce the Agents and the Lenders to enter into this Agreement and the Lenders to make the Loans, each Loan Party hereby jointly and severally represents and warrants to the Agents and each Lender that:

4.1.   No Change.  Since [_____, 20__]1, there has been no development or event that has had or could reasonably be expected to have a Material Adverse Effect (it being agreed that solely for purposes of this Section 4.1 no change in automotive industry conditions or in banking, financial or capital markets on and after such date which does not disproportionately adversely affect the Borrower and its Subsidiaries, taken as a whole, shall have a Material Adverse Effect).

4.2.   Existence; Compliance with Law.  Each Loan Party (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct the business in which it is currently engaged, (c) is duly qualified as a foreign corporation or other organization and in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification and (d) is in compliance with all Requirements of Law.

4.3.   Power; Authorization; Enforceable Obligations.  Upon entry by the Bankruptcy Court of the Confirmation Order, each Loan Party has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and, in the case of the Borrower, to obtain extensions of credit hereunder.  Each Loan Party has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and, in the case of the Borrower, to authorize the extensions of credit on the terms and conditions of this Agreement.  No consent or authorization of, filing with, notice to or other act by or in respect of, any Governmental Authority or any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents except (i) consents, authorizations, filings and notices described in Schedule 4.3, which consents, authorizations, filings and notices have been obtained or made and are in full force and effect and (ii) the filings referred to in Section 4.20.  Each Loan Document has been duly executed and delivered on behalf of each Loan Party thereto.  This Agreement constitutes, and each other Loan Document upon execution will constitute, a legal, valid and binding obligation of each Loan Party party thereto, enforceable against each such Loan Party in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

---

1 To be the later of (a) the Petition Date and (b) the date of the last audited financial statements delivered prior to the Closing Date.

4.4.  <u>No Legal Bar</u>.  The execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of any Loan Party and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Loan Documents and the Second Lien Term Loans).

4.5.  <u>Litigation</u>.  No litigation, investigation or proceeding of or before any arbitrator or Governmental Authority is pending or, to the knowledge of the Borrower, threatened by or against any Loan Party or against any of their respective properties or revenues (a) with respect to the Loan Documents or (b) that could reasonably be expected to have a Material Adverse Effect.

4.6.  <u>No Default</u>.  No Loan Party is in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect.  No Default or Event of Default has occurred and is continuing.

4.7.  <u>Ownership of Property; Liens</u>.  Except as could not reasonably be expected to have a Material Adverse Effect, each Loan Party has title in fee simple to, or a valid leasehold, subleasehold, license or other interest in, all its real property, and good title to, or a valid leasehold interest in, all its other property, and none of such property, except for minor encumbrances and defects in title that do not materially interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes is subject to any Lien except as permitted by Section 7.3.

4.8.  <u>Intellectual Property</u>.  Each Loan Party owns, or is licensed to use, all Intellectual Property necessary for the conduct of its business as currently conducted.  No material claim has been asserted and is pending by any Person against any Loan Party challenging or questioning the use of any Intellectual Property or the validity or effectiveness of any Intellectual Property of any Loan Party, nor does the Borrower know of any valid basis for any such claim.  To the knowledge of the Borrower, no use by each Loan Party of any of its material Intellectual Property infringes on the rights of any Person in any material respect.

4.9.  <u>Taxes</u>.  Each Loan Party has filed or caused to be filed all Federal and material state and other material tax returns that are required to be filed and has paid all taxes shown to be due and payable on said returns or on any material assessments made against it or any of its property and all other material taxes, fees or other charges imposed on it or any of its property by any Governmental Authority (except any such taxes the amount or validity of which are currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with GAAP (where GAAP requires such reserves) have been provided on the books of the relevant Loan Party); no tax Lien has been filed, and, to the knowledge of the Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

4.10.  <u>Federal Regulations</u>.  No part of the proceeds of any Loans, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board.  If requested by any Lender or the Administrative Agent, the Borrower will furnish to the Administrative Agent and each Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

4.11.  <u>Labor Matters</u>.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:  (a) there are no strikes or other labor disputes against any Loan Party pending or, to the knowledge of the Borrower, threatened; (b) hours worked by and payment made to employees of each Loan Party have not been in violation of the Fair Labor Standards Act or any other applicable Requirement of Law dealing with such matters; and (c) all payments due from any Loan Party on account of employee health and welfare insurance have been, in all material respects, paid or accrued as a liability on the books of the relevant Loan Party.

4.12.  <u>ERISA</u>.  Except, in the aggregate, as could not reasonably be expected to result in a Material Adverse Effect, (i) each Loan Party and each of their respective ERISA Affiliates is in compliance with the applicable provisions of ERISA and the Code relating to Single Employer Plans and Multiemployer Plans and the regulations and published interpretations thereunder and (ii) no ERISA Event has occurred during the five-year period prior to the date on which this representation is made or deemed made with respect to any Plan.  Except, in the aggregate, as could not reasonably be expected to result in a Material Adverse Effect, the present value of all accrued benefits under each Single Employer Plan (based on those assumptions used to fund such Plan) did not, as of the last annual valuation date prior to the date on which this representation is made or deemed made, exceed the value of the assets of such Plan allocable to such accrued benefits.

4.13.  <u>Investment Company Act; Other Regulations</u>.  No Loan Party is an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended.  No Loan Party is subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur the Indebtedness to be incurred hereunder.

4.14.  <u>Subsidiaries</u>.  As of the Closing Date, (a) Schedule 4.14 sets forth the name and jurisdiction of incorporation of each Subsidiary and, as to each such Subsidiary, the percentage of each class of Capital Stock owned by any Loan Party and (b) except as set forth on Schedule 4.14, there are no outstanding subscriptions, options, warrants, calls, rights or other agreements or commitments (other than stock options or similar equity awards granted to current or former employees or directors and directors' qualifying shares) of any nature relating to any Capital Stock of the Borrower or any Subsidiary.

4.15.  <u>Use of Proceeds</u>.  The proceeds of the Loans shall be used to replace and refinance the outstanding loans made under the DIP Credit Agreement.  The proceeds of the Loans shall not be used to purchase or carry margin stock.

4.16.  <u>Environmental Matters</u>.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)  the facilities and properties owned, leased or operated by any Group Member (the "<u>Properties</u>") do not contain, and to the knowledge of the Borrower, have not previously contained, any Materials of Environmental Concern in amounts or concentrations or under circumstances that constitute or constituted a violation of, or could give rise to liability under, any Environmental Law;

(b)  no Group Member has received or is aware of any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters or compliance with Environmental Laws with regard to any of the Properties or the business operated by any Group Member (the "<u>Business</u>"), nor does the Borrower have knowledge or reason to believe that any such notice will be received or is being threatened;

(c)    Materials of Environmental Concern have not been transported or disposed of from the Properties during the last five years or, to the knowledge of the Borrower, any prior time in violation of, or in a manner or to a location that could give rise to liability under, any Environmental Law, nor have any Materials of Environmental Concern been generated, treated, stored or disposed of at, on or under any of the Properties during the last five years or, to the knowledge of the Borrower, any prior time in violation of, or in a manner that could give rise to liability under, any applicable Environmental Law;

(d)    no judicial proceeding or governmental or administrative action is pending or, to the knowledge of the Borrower, threatened, under any Environmental Law to which any Group Member is or will be named as a party with respect to the Properties or the Business, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any Environmental Law with respect to the Properties or the Business;

(e)    there has been no release or threat of release of Materials of Environmental Concern at or from the Properties, or arising from or related to the operations of any Group Member in connection with the Properties or otherwise in connection with the Business, during the last five years or, to the knowledge of the Borrower, any prior time in violation of or in amounts or in a manner that could give rise to liability under Environmental Laws;

(f)    the Properties and all operations at the Properties are in compliance, and have in the last five years and, to the knowledge of the Borrower, at all prior times been in compliance, with all applicable Environmental Laws, and there is no contamination at, under or about the Properties or violation of any Environmental Law with respect to the Properties or the Business; and

(g)    no Group Member has assumed any liability by contract or, to the knowledge of the Borrower, operation of law, of any other Person under Environmental Laws.

4.17.  <u>Accuracy of Information, etc</u>.  No factual statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of any Loan Party to the Administrative Agent, the Lenders or the Bankruptcy Court, or any of them, for use in connection with the transactions contemplated by this Agreement or the other Loan Documents other than any projections or pro forma information, when taken as a whole, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of the circumstances when made.  The projections and pro forma information contained in the materials referenced above are based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, it being recognized by the Lenders that such projections as they relate to future events are subject to significant uncertainties, many of which are beyond the control of the Borrower and not to be viewed as fact and that actual results during the period or periods covered by such projections may differ from the projected results set forth therein by a material amount.

4.18.  <u>Financial Statements</u>.  (a) The unaudited pro forma consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at _____, 20__ (including the notes thereto) (the "<u>Pro Forma Balance Sheet</u>"), copies of which have heretofore been furnished to each Lender, has

been prepared giving effect (as if such events had occurred on such date) to (i) the occurrence of the Effective Date, (ii) the Second Lien Term Loans deemed made on the Closing Date, (iii) the Loans made on the Closing Date and the use of the proceeds thereof and (iv) the payment of fees and expenses in connection with the foregoing. The Pro Forma Balance Sheet has been prepared based on the best information available to the Borrower as of the date of delivery thereof, and presents fairly on a pro forma basis the estimated financial position of the Borrower and its consolidated Subsidiaries as at _____, 20__, assuming that the events specified in the preceding sentence had actually occurred at such date.

      (b)      [Reserved.]

      (c)      The (i) audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of December 31, [2009] and the related statements of income and cash flow for the fiscal year ending on such date and (ii) unaudited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as of [_____], 20__ and the related statements of income and cash flow for the fiscal quarter ending on such date, each as heretofore furnished to the Administrative Agent and the Lenders and certified by a Responsible Officer of the Borrower, are complete and correct in all material respects and fairly present the financial condition of the Borrower and its Subsidiaries on such date. All such financial statements, including the related schedules and notes thereto, have been prepared in conformity with GAAP applied on a consistent basis, and all liabilities, direct and contingent, of the Borrower on a consolidated basis with its Subsidiaries on such date required to be disclosed pursuant to GAAP are disclosed in such financial statements, subject to year-end audit adjustments and the absence of footnotes in the case of the statements referred to in clause (ii) above.

      4.19.  <u>Insurance</u>. All policies of insurance of any kind or nature owned by or issued to each Loan Party, including policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, property and liability insurance, are (a) in full force and effect except to the extent commercially reasonably determined by the Borrower not to be necessary pursuant to clause (b) of this Section 4.19 or which is not material to the overall coverage and (b) are of a nature and provide such coverage as in the reasonable opinion of the Borrower, is sufficient and is customarily carried by companies of the size and character of the Loan Parties.

      4.20.  <u>Security Documents</u>. (a) The Guarantee and Collateral Agreement is effective to create in favor of the Collateral Agent, for its benefit, for the benefit of the Administrative Agent and for the benefit of the Lenders, a legal, valid and enforceable security interest in the Collateral described therein and proceeds thereof. In the case of the Pledged Stock described in the Guarantee and Collateral Agreement, when stock certificates representing such Pledged Stock are delivered to the Collateral Agent (together with a properly completed and signed stock power or endorsement), and in the case of the other Collateral described in the Guarantee and Collateral Agreement, when financing statements and other filings specified on Schedule 4.20(a) in appropriate form are filed in the offices specified on Schedule 4.20(a) together with payment of any filing or recordation fees, or, with respect to after-acquired property, when the requirements set forth in Section 6.9 have been complied with, the Collateral Agent shall have a fully perfected Lien on, and security interest in, all right, title and interest of the Loan Parties in such Collateral and the proceeds thereof (except for registration of and application for Intellectual Property filed outside the United States) to the extent such Lien can be perfected by the filing of financing statements under the applicable UCC, as security for the Obligations (as defined in the Guarantee and Collateral Agreement), in each case prior and superior in right to any other Person (except, in the case of Collateral other than Pledged Stock, Liens permitted by Section 7.3, and in the case of the Collateral constituting Pledged Stock, inchoate Liens arising by operation of law), in each case, to the extent required by the Guarantee and Collateral Agreement.

(b)     Each of the Mortgages is effective to create in favor of the Collateral Agent, for its benefit, for the benefit of the Administrative Agent and for the benefit of the Lenders, a legal, valid and enforceable Lien on the Mortgaged Property described therein, and when the Mortgages are filed in the offices specified on Schedule 4.20(b), each such Mortgage shall constitute a Lien on, and security interest in, all right, title and interest of the Loan Parties in the subject Mortgaged Property, as security for the Obligations (as defined in the relevant Mortgage), in each case prior and superior in right to any other Person (except Liens permitted by Section 7.3). Part 1 of Schedule 1.1B lists, as of the Closing Date, each parcel of owned real property located in the United States and held by the Borrower or any of the Guarantors that has a fair market value, in the reasonable opinion of the Borrower, in excess of $1,000,000 (each, a "Mortgaged Property"). Part 2 of Schedule 1.1B lists, as of the Closing Date, (A) each parcel of owned real property located in the United States and held by the Borrower or any of the Guarantors which is not listed on Part 1 of Schedule 1.1B, and (B) each parcel of real property located in the United States and which is leased (as lessee) or subleased (as sublessee) by the Borrower or any of the Guarantors.

4.21.   Solvency.  After giving effect to the occurrence of the Effective Date and the incurrence of all Indebtedness and Obligations being incurred in connection herewith and therewith, the Borrower is Solvent.

4.22.   Regulation H.  Except as disclosed in Schedule 4.22, no Mortgage encumbers improved real property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards and in which flood insurance has been made available under the National Flood Insurance Act of 1968, as amended.

## SECTION 5.  CONDITIONS PRECEDENT

The agreement of each Lender to make the extension of credit requested to be made by it on the Closing Date is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     Credit Agreement.  The Administrative Agent shall have received (i) this Agreement, executed and delivered by the Borrower, (ii) the Guarantee and Collateral Agreement, executed and delivered by the Borrower and each Guarantor, and (iii) the Intercreditor Agreement, executed and delivered by the Administrative Agent, the Collateral Agent, the Second Lien Agent, the Borrower and each Guarantor.

(b)     Closing Certificate; Certified Certificate of Incorporation; Good Standing Certificates.  The Administrative Agent shall have received (i) a certificate of a Responsible Officer of each Loan Party, dated the Closing Date, in form and substance reasonably satisfactory to the Administrative Agent, as to the incumbency and signature of their respective officers executing each Loan Document to which it is a party, together with satisfactory evidence of the incumbency of such Responsible Officer, (ii) a copy of the resolutions, in form and substance reasonably satisfactory to the Administrative Agent, of the Board of Directors (or the executive committee or other governing authority thereof) of each Loan Party authorizing the execution, delivery and performance of each Loan Document to be entered into on the Closing Date to which it is a party, (iii) a certificate of the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, attaching the certificate of incorporation of each Loan Party that is a corporation certified by the relevant authority of the jurisdiction of organization of such Loan Party and (iv) a good standing certificate for each Loan Party from its jurisdiction of organization.

(c)     Representations and Warranties.  Each of the representations and warranties made by any Loan Party in or pursuant to the Loan Documents shall be true and correct in all material respects (provided that if any representation or warranty is by its terms qualified by materiality, such representation shall be true and correct in all respects) on and as of such date as if made on and as of such date.

(d)     Fees.  The Lenders and the Administrative Agent shall have received all fees required to be paid, and all expenses for which invoices have been presented (including the reasonable fees and expenses of legal counsel), on or before the Closing Date.

(e)     Legal Opinion of Counsel to the Borrower.  The Administrative Agent shall have received (i) an opinion, in form and substance reasonably satisfactory to the Administrative Agent, of counsel to the Borrower and its Subsidiaries and (ii) the legal opinion of local counsel in jurisdictions in which the Mortgages have been filed as may be reasonably requested by the Administrative Agent.

(f)     Compliance with DIP Credit Agreement.  The Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower in form and substance reasonably satisfactory to the Administrative Agent, certifying (i) no Default or Event of Default (as defined in the DIP Credit Agreement) exists under the DIP Credit Agreement immediately prior to the termination thereof and (ii) the Borrower is in compliance with the financial covenants set forth in Section 7.1 of the DIP Credit Agreement, immediately prior to the termination of the DIP Credit Agreement.

(g)     Pro Forma Liquidity.  After giving pro forma effect to the Plan of Reorganization and the borrowing of the Loans on the Closing Date (i) Liquidity of the Borrower and its Subsidiaries shall not be less than the minimum Liquidity required to be maintained pursuant to Section 7.1(b) of the DIP Credit Agreement as of the last day of the fiscal month in which the Closing Date occurs, and (ii) the aggregate principal amount of the Loans and the Second Lien Term Loans shall not exceed $1,100,000,000, and the Borrower shall have provided to the Administrative Agent reasonably satisfactory support for such calculations.

(h)     Confirmation Order.  The Bankruptcy Court shall have entered an order confirming the Plan of Reorganization, which order (the "Confirmation Order") (i) shall confirm a Plan of Reorganization that is consistent in all material respects with the Restructuring Term Sheet, (ii) shall authorize the Facility and (iii) shall be in full force and effect and shall not have been reversed or modified and shall not be stayed or subject to a motion to stay or subject to appeal or petition for review, rehearing or certiorari, and the period for appealing the confirmation order shall have elapsed. The Canadian Court shall have entered an order in the CCAA Cases recognizing and implementing the Confirmation Order with respect to the Canadian Debtors, which order (i) shall be consistent with the Confirmation Order except to the extent otherwise reasonably satisfactory to the Administrative Agent and (ii) shall be in full force and effect and shall not have been reversed or modified and shall not be stayed or subject to a motion to stay or subject to appeal or petition for review, rehearing or certiorari, and the period for appealing such order shall have elapsed.  The Effective Date shall have occurred (and all conditions precedent thereto as set forth therein shall have been satisfied (or shall be concurrently satisfied) or waived by the Required Lenders).

(i)    Repayment of DIP Facility.  The DIP Facility shall have been (i) repaid in full in cash and all commitments relating thereto shall have been terminated, and/or (ii) converted into Loans and/or Commitments to provide financing under the Facility, and all liens and security interests related thereto shall have been terminated, released or continued, as applicable (any combination of the actions specified in clauses (i) and (ii) shall be permitted).

(j)    Projections.  The Borrower shall have delivered projections through 2013 prepared in good faith on the basis of the assumptions stated therein.

(k)    Second Lien Term Loans.  (i) The Second Lien Term Loan Documents shall contain terms that conform to the Restructuring Term Sheet and are otherwise reasonably satisfactory to the Required Lenders, and (ii) the Administrative Agent shall have received reasonably satisfactory evidence that the conditions to the effectiveness of the Second Lien Term Loan Documents shall have been satisfied or waived in accordance with their terms.

(l)    Pro Forma Balance Sheet; Financial Statements.  The Lenders shall have received (i) the Pro Forma Balance Sheet, (ii) audited consolidated financial statements of the Borrower and its Subsidiaries for the most recently ended fiscal year and (iii) unaudited interim consolidated financial statements of the Borrower and its Subsidiaries for each fiscal quarter ended after the date of the latest applicable financial statements delivered pursuant to clause (i) of this paragraph as to which such financial statements are available.

(m)    Conversion Notice.  The Administrative Agent shall have received the Conversion Notice, executed and delivered by the Borrower.

(n)    No Default.  No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

(o)    Patriot Act and "Know Your Customer" Information.  The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "USA Patriot Act").

(p)    Ratings. The Borrower shall have used commercially reasonable efforts to obtain a rating for the Facility from both S&P and Moody's.

(q)    Insurance.  The Administrative Agent shall have received insurance certificates satisfying the requirements of Section ___ of the Guarantee and Collateral Agreement and Section ___ of the Mortgages.

(r)    Pledged Stock; Stock Powers; Pledged Notes.  The Collateral Agent shall have received (i) the certificates representing the shares of Capital Stock pledged pursuant to the Security Documents, together with an undated stock power for each such certificate executed in blank by a duly authorized officer of the pledgor thereof and (ii) each promissory note (if any) pledged to the Collateral Agent pursuant to the Security

Documents endorsed (without recourse) in blank (or accompanied by an executed transfer form in blank) by the pledgor thereof, in each case of the foregoing, to the extent not previously delivered to the DIP Agent under the DIP Credit Agreement.

(s)     Mortgages, etc.  (i)  The Administrative Agent shall have received a Mortgage with respect to each Mortgaged Property, executed and delivered by a duly authorized officer of each party thereto.

(ii)     If requested by the Administrative Agent, the Administrative Agent shall have received, and the title insurance company issuing the policy referred to in clause (iii) below (the "Title Insurance Company") shall have received, maps or plats of an as-built survey of the sites of the Mortgaged Properties certified to the Administrative Agent and the Title Insurance Company in a manner reasonably satisfactory to them, dated a date reasonably satisfactory to the Administrative Agent and the Title Insurance Company by an independent professional licensed land surveyor reasonably satisfactory to the Administrative Agent.

(iii)     The Administrative Agent shall have received in respect of each Mortgaged Property a binding pro forma mortgagee's title insurance policy (or policies) or marked-up unconditional commitment to issue such insurance, in each case in form and substance reasonably satisfactory to the Administrative Agent.  The Administrative Agent shall have received evidence reasonably satisfactory to it that all premiums in respect of each such policy, all charges for mortgage recording tax, and all related expenses, if any, have been paid.

(iv)     If requested by the Administrative Agent, the Administrative Agent shall have received (A) a policy of flood insurance that (1) covers any parcel of improved real property that is encumbered by any Mortgage and located in a special flood hazard area, (2) is written in an amount not less than the outstanding principal amount of the indebtedness secured by such Mortgage that is reasonably allocable to such real property, the fair market value of such real property as reasonable determined by Borrower or the maximum limit of coverage made available with respect to the particular type of property under the National Flood Insurance Act of 1968, as amended, whichever is less, and (3) has a term ending not later than the maturity of the Indebtedness secured by such Mortgage and (B) confirmation that the Borrower has received the notice required pursuant to Section 208(e)(3) of Regulation H of the Board with respect to any parcel of improved real property that is encumbered by any Mortgage and located in a special flood hazard area.

(v)     The Administrative Agent shall have received a copy of all recorded documents referred to, or listed as exceptions to title in, the title policy or policies referred to in clause (iii)) above.

(t)     Lien Searches.  The Administrative Agent shall have received the results of a recent lien search in each of the jurisdictions where any Loan Party is organized, and such search shall reveal no liens on any of the assets of the Loan Parties except for liens permitted by Section 7.3 or discharged on or prior to the Closing Date pursuant to documentation reasonably satisfactory to the Administrative Agent.

(u)     Filings, Registrations and Recordings.  Each document (including any Uniform Commercial Code financing statement) required by the Security Documents or

under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create in favor of the Collateral Agent, for its benefit, for the benefit of the Administrative Agent and for the ratable benefit of the Lenders, a perfected Lien (or in the case of the Mortgages, a valid Lien) on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted by Section 7.3), shall be in proper form to the satisfaction of the Collateral Agent for filing, registration or recordation.

For the purpose of determining compliance with the conditions specified in this Section 5, each Lender that has signed this Agreement shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Section 5 unless the Administrative Agent shall have received written notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

## SECTION 6.   AFFIRMATIVE COVENANTS

Each Loan Party hereby jointly and severally agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, each Loan Party shall and shall cause each of its Subsidiaries to:

6.1.   <u>Financial Statements</u>.  Furnish to the Administrative Agent to be provided to each Lender:

(a)      as soon as available, but in any event not later than 120 days after the end of each fiscal year of the Borrower, a copy of the audited consolidated balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such year and the related audited consolidated statements of income and of cash flows for such year, setting forth in each case, in comparative form the figures for the previous year, reported on without a qualification arising out of the scope of the audit or other material qualification or exception (other than a "going concern" exception or similar exception or qualification [for fiscal year 2009]), by independent certified public accountants of nationally recognized standing; and

(b)      as soon as available, but in any event not later than 60 days after the end of each of the first three quarterly periods of each fiscal year of the Borrower, commencing with the fiscal quarter ended _____ 20__, the unaudited consolidated and consolidating (on the same basis as the Borrower prepared consolidating financial statements prior to the Closing Date) balance sheet of the Borrower and its consolidated Subsidiaries as at the end of such quarter and the related unaudited consolidated and consolidating (on the same basis as the Borrower prepared consolidating financial statements prior to the Closing Date) statements of income and of cash flows for such quarter and the portion of the fiscal year through the end of such quarter, setting forth in each case, in comparative form the figures for the previous year, certified by a Responsible Officer, on behalf of the Borrower, as being fairly stated in all material respects.

All such financial statements shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP applied (except (i) as approved by such accountants or officer, as the case may be, and disclosed in reasonable detail therein and (ii) with respect to unaudited statements, the absence of footnote disclosure and subject to year-end audit adjustments) consistently throughout the periods reflected therein and with prior periods.

6.2.  Certificates; Other Information.  Furnish to the Administrative Agent which shall make such item available to each Lender (or, in the case of clause (f), to the relevant Lender):

(a)     [Reserved];

(b)     concurrently with the delivery of any financial statements pursuant to Section 6.1, (i) a certificate of the Borrower stating that the Responsible Officer executing such certificate on behalf of the Borrower has no knowledge of any Default or Event of Default except as specified in such certificate, (ii) a Compliance Certificate containing all information and calculations necessary for determining compliance by each Loan Party with the provisions of this Agreement referred to therein, including calculations in reasonable detail with respect to compliance with Section 7.1, and (iii) in the case of quarterly or annual financial statements, to the extent not previously disclosed to the Administrative Agent, (1) a description of any change in the jurisdiction of organization of any Loan Party, (2 a description of any Domestic Subsidiary acquired or created, including name and jurisdiction of organization, and (3) a description of any Person that has become a Loan Party, in each case since the date of the most recent report delivered pursuant to this clause (iii) (or, in the case of the first such report so delivered, since the Closing Date);

(c)     as soon as available, and in any event no later than 45 days after the end of each fiscal year of the Borrower, a detailed consolidated budget for the following fiscal year (including a projected consolidated balance sheet of the Borrower and its Subsidiaries as of the end of the following fiscal year, the related consolidated statements of projected cash flow and projected income and a description of the underlying assumptions applicable thereto), and, as soon as available, significant revisions, if any, of such budget and projections with respect to such fiscal year (collectively, the "Projections"), which Projections shall in each case be accompanied by a certificate of the Borrower executed by a Responsible Officer, on behalf of the Borrower, stating that such Projections are based on reasonable estimates, information and assumptions and that such Responsible Officer executing such certificate, on behalf of the Borrower, has no reason to believe that such Projections are incorrect or misleading in any material respect, and that whether or not any such Projections are in fact achieved are subject to significant uncertainties and contingencies, many of which are not within the control of the Borrower, and that no assurance can be given that such Projections will be realized, and actual results may vary from the projected results and such variations may be material;

(d)     concurrently with the delivery of any financial statements pursuant to Section 6.1(a) or (b), a narrative discussion and analysis of the financial condition and results of operations of the Borrower and its Subsidiaries for such fiscal quarter and for the period from the beginning of the then current fiscal year to the end of such fiscal quarter;

(e)     within five days after the same are filed, copies of all financial statements and reports that the Borrower may make to, or file with, the SEC;

(f)     to the Administrative Agent on behalf of each Required Lender promptly following receipt thereof, copies of any documents described in Sections 101(k) or 101(l) of ERISA that, following reasonable request of the Administrative Agent (which right to request shall be exercised no more than once during a 12-month period), any Loan Party

or any ERISA Affiliate shall have promptly requested from the administrator or sponsor of a Multiemployer Plan with respect to such Multiemployer Plan; and

(g)     promptly, subject to applicable confidentiality agreements of the Group Members, such reasonably available additional financial and other information as any Lender through the Administrative Agent may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.1, Section 6.2 or Section 6.7 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date received by the Administrative Agent.  Each Lender shall be deemed to have received such documents on the date on which such documents are posted on the Borrower's behalf on IntraLinks/IntraAgency or another relevant website, if any, to which each Lender and the Administrative Agent have access (whether a commercial or governmental third-party website or whether sponsored by the Administrative Agent); provided, that the Borrower shall notify (which may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents and, at the request of the Administrative Agent, provide by electronic mail electronic versions (i.e., soft copies) of such documents.

6.3.     Payment of Obligations.  Pay, discharge or otherwise satisfy at or before maturity or before they become delinquent, as the case may be, all its material obligations in respect of taxes, assessments and governmental charges or levies of whatever nature, except where the amount or validity thereof is currently being contested in good faith by appropriate proceedings and reserves in conformity with GAAP with respect thereto have been provided on the books of the Borrower and its Subsidiaries.

6.4.     Maintenance of Existence; Compliance.  (a)(i)  Preserve, renew and keep in full force and effect its organizational existence and (ii) take all reasonable action to maintain all rights, privileges and franchises necessary or desirable in the normal conduct of its business, except, in each case, as otherwise permitted by Section 7.4 and except, in the case of clause (ii) above, to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; and (b) comply in all material respects with all Requirements of Law.

6.5.     Maintenance of Property; Insurance.  (a)  Keep all property useful and necessary in its business in good working order and condition, ordinary wear and tear excepted except as could not reasonably be expected to have a Material Adverse Effect and (b) maintain with financially sound and reputable insurance companies insurance on all its property in at least such amounts and against at least such risks (but including in any event public liability, product liability and business interruption) as are usually insured against in the same general area by companies engaged in the same or a similar business.

6.6.     Inspection of Property; Books and Records; Discussions.  (a)  Keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities and (b) permit representatives of the Agents or any Lender (subject to reasonable confidentiality agreements) to visit and inspect any of its properties and examine and make abstracts from any of its books and records at any reasonable time upon reasonable notice and as often as may reasonably be desired and to discuss the business, operations, properties and financial and other condition of the Group Members with officers and managerial employees of the Group Members and with their independent certified public accountants, provided that an officer of the Borrower shall be provided reasonable opportunity to participate in any such discussion with the accountants; provided further that such inspections shall be coordinated through the Administrative Agent so that in the absence of an Event of Default, not more than one such inspection shall occur in any calendar year.  The Agents and the Lenders agree to use reasonable efforts to coordinate and manage the exercise of their rights under this Section 6.6 so as to minimize the disruption to the business of the Borrower and its Subsidiaries resulting therefrom.

6.7.   Notices.  Promptly give notice to the Administrative Agent and each Lender of:

(a)      the occurrence of any Default or Event of Default;

(b)      any litigation or proceeding affecting any Loan Party (i) in which the amount involved is $10,000,000 or more and not covered by insurance, (ii) in which injunctive or similar relief is sought or (iii) which relates to any Loan Document;

(c)      the occurrence of any ERISA Event that, alone or together with any other ERISA Event(s) that have occurred, could reasonably be expected to result in liability of any Loan Party  or any of its ERISA Affiliates in an aggregate amount exceeding $10,000,000; and

(d)      any development or event that has had or could reasonably be expected to have a Material Adverse Effect.

Each notice pursuant to this Section 6.7 shall be accompanied by a statement of a Responsible Officer setting forth details of the occurrence referred to therein and stating what action the relevant Loan Party proposes to take with respect thereto.

6.8.   Environmental Laws.  Except as, in the aggregate, could not reasonably be expected to have a Material Adverse Effect:

(a)      comply with, and take all commercially reasonable steps to ensure compliance by all tenants and subtenants, if any, with, all applicable Environmental Laws, and obtain and comply with and maintain, and take all commercially reasonable steps to ensure that all tenants and subtenants obtain and comply with and maintain, any and all licenses, approvals, notifications, registrations or permits required by applicable Environmental Laws.

(b)      conduct and complete all investigations, studies, sampling and testing, and all remedial, removal and other actions required under Environmental Laws and promptly comply with all lawful orders and directives of all Governmental Authorities regarding Environmental Laws.

6.9.   Additional Collateral, etc.  (a)  With respect to any property acquired after the Closing Date by any Loan Parties (other than (x) any property described in paragraph (b) below and (y) any property constituting Excluded Property) as to which the Collateral Agent, for the benefit of the Secured Parties, does not have a perfected Lien, promptly (i) execute and deliver to the Administrative Agent such amendments to the Security Documents or such other documents as the Administrative Agent deems necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a security interest in such property and (ii) take all actions necessary or advisable to grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected first priority security interest under the laws of the United States in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Documents or by law or as may be requested by the Administrative Agent.

(b)      (i)      As soon as possible (and in no event later than 45 days after the delivery of any financial statements under subsection 6.1(a) or (b), for any fiscal period, in the case of Subsidiaries referred to in the following clause (A) which period may be extended by the Administrative Agent from time to time in its discretion), cause (A) all of the Capital Stock (other than Excluded Property) owned

directly or indirectly by the Borrower of each of the Borrower's direct or indirect Domestic Subsidiaries (other than any Excluded Subsidiary or Immaterial Subsidiary) to be pledged to the Collateral Agent, pursuant to an amendment to the Security Documents reasonably requested by the Administrative Agent, (B) if requested by the Administrative Agent, cause all of the Capital Stock (other than Excluded Property) owned directly or indirectly by the Borrower of any of the Borrower's direct or indirect Domestic Subsidiaries (other than any Excluded Subsidiary and whether or not such Domestic Subsidiary is an Immaterial Subsidiary) to be pledged to the Collateral Agent pursuant to an amendment to the Security Documents reasonably requested by the Administrative Agent, (C) 65% of the voting Capital Stock and all non-voting Capital Stock (other than Excluded Property) of each of the Borrower's or any of its Domestic Subsidiaries' direct Foreign Subsidiaries which are not Immaterial Subsidiaries (or such lesser amount as may be owned by the Borrower and its Domestic Subsidiaries), to be pledged to the Collateral Agent pursuant to the Security Documents, for the ratable benefit of the Secured Parties, pursuant to an amendment to the Security Documents reasonably requested by the Administrative Agent and (D) the Administrative Agent to receive legal opinions of counsel to the Borrower acceptable to the Administrative Agent covering such matters in respect of such pledges as the Administrative Agent shall reasonably request.

        (ii)      Notwithstanding the foregoing, cause the Capital Stock of any Special Purpose Subsidiary or Subsidiary of the Borrower which acts as a purchaser of receivables for a receivables securitization program of the Borrower and its Domestic Subsidiaries to be pledged as Collateral pursuant to the Security Documents.

        (c)      As soon as possible, cause (i) each of the Borrower's direct or indirect Domestic Subsidiaries (other than an Excluded Subsidiary or an Immaterial Subsidiary (provided that all Immaterial Subsidiaries excluded from the requirements under this clause (c) shall not at any time contribute in the aggregate more than 5% of Consolidated Assets or more than 5% of Consolidated Revenues) or a joint venture in which not more than 85% of the aggregate Capital Stock of such joint venture is held by the Loan Parties in the aggregate) to become a Guarantor by executing and delivering a joinder or assumption agreement to the Guarantee and Collateral Agreement in a form reasonably requested by the Administrative Agent if such Subsidiary is not then a Guarantor and (ii) opinions of counsel to the Borrower, in form and substance reasonably satisfactory to the Administrative Agent, covering such matters in respect of the Guarantee and Collateral Agreement as the Administrative Agent shall reasonably request to be delivered to the Administrative Agent.

        (d)      With respect to any fee interest in any real property having a fair market value (together with improvements thereof) of at least $1,000,000 acquired after the Closing Date by any Loan Party (other than any such real property subject to a Lien expressly permitted by Section 7.3(g)), as soon as reasonably possible and in any event within 30 days after such acquisition (i) execute and deliver a Mortgage, in favor of the Collateral Agent, for its benefit, for the benefit of the Administrative Agent and for the benefit of the Lenders, covering such real property, creating a Lien on such real property prior and superior in right to all other Liens on such real property (except Liens permitted by Section 7.3), (ii) if requested by the Administrative Agent, provide the Collateral Agent, for its benefit, for the benefit of the Administrative Agent and for the benefit of the Lenders with (x) a binding pro forma mortgagee's title insurance policy or marked-up unconditional commitment to issue such insurance covering such real property in an amount equal to the purchase price of such real property (or such lesser amount as shall be reasonably specified by the Administrative Agent) as well as a current map or plat of an as-built survey thereof, together with a surveyor's certificate and (y) any consents or estoppels reasonably deemed necessary by the Administrative Agent in connection with such Mortgage, each of the foregoing in form and substance reasonably satisfactory to the Administrative Agent and (iii) if requested by the Administrative Agent, deliver to the Agents legal opinions relating to the matters described above, which

opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Administrative Agent.

6.10.  Post-Closing Matters.  (a) Maintain at all times substantially all of the cash and Cash Equivalents of the Loan Parties (other than cash and Cash Equivalents which are pledged to third parties to secure obligations of the Loan Parties) at an account or accounts with the Administrative Agent or any other financial institution that has entered into a control agreement in form and substance reasonably satisfactory to the Administrative Agent; provided, that (i) the Loan Parties may maintain accounts with financial institutions other than the Administrative Agent and not subject to control agreements consisting of (A) payroll accounts, which accounts shall at no time contain more cash than is necessary to meet the periodic payroll obligations of the Borrower and its Subsidiaries, (B) accounts with balances up to $10,000,000 in the aggregate, (C) trust accounts, so long as such trust accounts only contain funds of third parties and (D) accounts, if any, maintained in connection with employee benefit plans, so long as such accounts contain only funds required to be maintained by such employee benefit plans.

(b)  [Cause the post-closing matters identified on Schedule 6.10 to be completed on or before the date which is ___ days after the Closing Date (which period may be extended by the Administrative Agent from time to time in its discretion)].

SECTION 7.  NEGATIVE COVENANTS

Each Loan Party hereby jointly and severally agrees that, so long as any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, they shall not, and shall not permit any of its Subsidiaries to, directly or indirectly:

7.1.  Financial Covenants.

(a)  Consolidated Leverage Ratio.  Permit, on the last day of any fiscal quarter beginning with the first fiscal quarter end date following the Closing Date, the Consolidated Leverage Ratio for the four consecutive fiscal quarters of the Borrower ending with such fiscal quarter end date to exceed the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter | Consolidated Leverage Ratio |
|---|---|
| Q4 2009 | 7.50 |
| Q1 2010 | 7.50 |
| Q2 2010 | 6.00 |
| Q3 2010 | 4.75 |
| Q4 2010 | 3.50 |
| Q1 2011 | 2.75 |
| Q2 2011 | 2.50 |

| | |
|---|---|
| Q3 2011 | 2.25 |
| Q4 2011 and each fiscal quarter thereafter | 2.00 |

(b)    Interest Coverage.  Permit, on the last day of any fiscal quarter beginning with the first fiscal quarter end date following the Closing Date, the Interest Coverage Ratio for the four consecutive fiscal quarters of the Borrower ending with such fiscal quarter end date to be less than the amount set forth opposite such fiscal quarter below:

| Fiscal Quarter | Interest Coverage Ratio |
|---|---|
| Q4 2009 | 1.25 |
| Q1 2010 | 1.25 |
| Q2 2010 | 1.50 |
| Q3 2010 | 1.75 |
| Q4 2010 | 2.50 |
| Q1 2011 and each fiscal quarter thereafter | 3.00 |

(c)    Capital Expenditures.  Permit the aggregate amount of Capital Expenditures made by the Loan Parties during any fiscal year set forth below to exceed the amount set forth opposite such fiscal year:

| Fiscal Year | Maximum Capital Expenditure Amount ($) |
|---|---|
| 2010 | 200,000,000 |
| 2011 | 215,000,000 |
| Each fiscal year thereafter | 250,000,000 |

; provided, that (a) up to 100% of any such amount referred to above, if not expended in the fiscal year for which it is permitted, may be carried over for expenditure in the next succeeding fiscal year and (b) Capital Expenditures made pursuant to this Section during any fiscal year shall be deemed made, first, in respect of amounts permitted for such fiscal year as provided above and, second, in respect of amounts carried over from the prior fiscal year pursuant to clause (a) above.

7.2.  <u>Indebtedness</u>.  Create, issue, incur, assume, become liable in respect of or suffer to exist any Indebtedness, except:

(a)  Indebtedness of any Loan Party pursuant to any Loan Document;

(b)  intercompany Indebtedness incurred pursuant to any Investment permitted by Section 7.7(f) so long as any such Indebtedness owing by a Loan Party to any Person other than a Loan Party shall, in each case, be evidenced by an Intercompany Subordinated Note (other than, and solely to the extent that, such Intercompany Subordinated Note would be prohibited by any law or regulation of a jurisdiction where any such Person that is a Foreign Subsidiary is located or organized);

(c)  unsecured Guarantee Obligations incurred in the ordinary course of business by (i) the Borrower or any of its Subsidiaries of obligations of the Borrower or any Guarantor or (ii) any Subsidiary that is not  Loan Party of any obligations of a Subsidiary that is not a Loan Party;

(d)  Indebtedness outstanding on the Closing Date (after giving effect to the occurrence of the Effective Date) and listed on Schedule 7.2(d);

(e)  Indebtedness (including, without limitation, Capital Lease Obligations) secured by Liens permitted by Section 7.3(g) in an aggregate principal amount not to exceed $50,000,000 at any one time outstanding;

(f)  additional Indebtedness of the Borrower or any of its Subsidiaries in an aggregate principal amount not to exceed (x) with respect to the Loan Parties, $35,000,000 and (y) with respect to Subsidiaries that are not Loan Parties, $150,000,000, in each case, at any one time outstanding;

(g)  Indebtedness of the Borrower or any of its Subsidiaries in respect of workers' compensation claims, self-insurance obligations, performance, bid and surety bonds and completion guaranties, in each case in the ordinary course of business;

(h)  Indebtedness of the Borrower or any of its Subsidiaries arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently drawn by the Borrower or such Subsidiary in the ordinary course of business against insufficient funds, so long as such Indebtedness is repaid within five Business Days;

(i)  letters of credit issued for the account of any Group Member (including Specified Letters of Credit), so long as the sum of (i) the aggregate undrawn face amount thereof, (ii) any unreimbursed obligations in respect thereof and (iii) the aggregate amount of pledges and deposits made pursuant to Section 7.3(t) below does not exceed $225,000,000 at any time;

(j)  obligations of Chinese Subsidiaries in respect of Chinese Acceptance Notes in the ordinary course of business;

(k)  Indebtedness of a joint venture (including a joint venture which is treated as a Subsidiary as a result of FASB Interpretation No. 46 issued by the Financial Accounting Standards Board) as long as such Indebtedness is non-recourse to the

Borrower or any other Subsidiary of the Borrower in an aggregate principal amount not to exceed $150,000,000 at any time;

(l)     Indebtedness incurred by any Group Member other than a Loan Party pursuant to working capital lines of credit or any overdraft line or other cash management system in an aggregate outstanding principal amount for all such Group Members at the close of business on any day not to exceed $150,000,000;

(m)     (i) Indebtedness of the Borrower in respect of the Second Lien Term Loan Agreement in an aggregate principal amount not to exceed $600,000,000, plus (x) interest thereon that is paid-in-kind and (y) any additional amount permitted under the Intercreditor Agreement, and (ii) Guarantee Obligations of any Guarantor in respect of such Indebtedness;

(n)     Indebtedness under tax-favored or government-sponsored financing transactions; provided that (i) the terms of such transactions and the Group Members party thereto have been approved by the Administrative Agent, (ii) such Indebtedness is not senior in right of payment to the Obligations, (iii) any Lien on Collateral arising pursuant to such transactions is subordinated to the Liens on the Collateral securing the Obligations and (iv) the aggregate principal amount of such Indebtedness shall not exceed $75,000,000 at any time;

(o)     Indebtedness incurred by any Group Member in order to finance Permitted Acquisitions;

(p)     Seller Debt and Earn-outs incurred in connection with Permitted Acquisitions; provided, that such Seller Debt or Earn-outs shall be subordinated and/or restricted in a manner reasonably satisfactory to the Administrative Agent at the time they are contemplated to be incurred;

(q)     Indebtedness of a Subsidiary of the Borrower acquired pursuant to a Permitted Acquisition (or Indebtedness assumed at the time of a Permitted Acquisition of an asset securing such Indebtedness); provided that (i) such Indebtedness was not incurred in connection with, or in anticipation or contemplation of, such Permitted Acquisition, and (ii) such Indebtedness does not constitute debt for borrowed money, it being understood and agreed that Capitalized Lease Obligations and purchase money Indebtedness shall not constitute debt for borrowed money for purposes of this subclause (ii);

(r)     contingent obligations with respect to customary indemnification obligations in favor of sellers in connection with Acquisitions permitted under Section 7.7 and purchasers in connection with Dispositions permitted under Section 7.5;

(s)     provided that no Event of Default shall have occurred and be continuing or would occur as a consequence thereof, Indebtedness which serves to refund, replace, extend repurchase, redeem or refinance any Indebtedness permitted under paragraphs (d), (e), (f), (o) or (q) above, or any Indebtedness issued to so refund, replace, extend, repurchase or refinance such Indebtedness, including, in each case, additional Indebtedness incurred to pay premiums (including tender premiums), defeasance costs and fees and expenses in connection therewith (collectively, the "Permitted Refinancing Indebtedness") at or prior to its respective maturity; provided, however, that:

(i)        the weighted average life to maturity of such Permitted Refinancing Indebtedness shall not be shorter than the weighted average life to maturity of such refinanced Indebtedness at the time of such refunding or refinancing;

(ii)        to the extent such Permitted Refinancing Indebtedness refinances Indebtedness subordinated or _pari passu_ to the Obligations, such Permitted Refinancing Indebtedness is subordinated or _pari passu_ to the Obligations at least to the same extent as the Indebtedness being refunded or refinanced;

(iii)        such Permitted Refinancing Indebtedness shall not be in a principal amount in excess of the principal amount of, premium, if any, accrued interest on, and related fees and expenses of, the Indebtedness being refunded, replaced, extended, repurchased, redeemed or refinanced (including any premium, expenses, costs and fees incurred in connection with such refund, replacement or refinancing);

(iv)        the obligors in respect of such Permitted Refinancing Indebtedness (including in their capacities as primary obligor and guarantor) are the same as for the Indebtedness being refinanced; and

(v)        any Liens securing such Permitted Refinancing Indebtedness are not extended to any property which does not secure the Indebtedness being refinanced; and

(t)        unsecured Indebtedness and unsecured Guarantee Obligations of any Loan Party in respect of such unsecured Indebtedness so long as the Net Cash Proceeds thereof are applied to prepay the Loans in accordance with Section 2.9(a).

7.3.   Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, whether now owned or hereafter acquired, except:

(a)        Liens for taxes not yet due or that are being contested in good faith by appropriate proceedings, provided that adequate reserves with respect thereto (if required by GAAP) are maintained on the books of the Borrower or its Subsidiaries, as the case may be, in conformity with GAAP (or, in the case of Foreign Subsidiaries, generally accepted accounting principles in effect from time to time in their respective jurisdiction of organization);

(b)        landlord's carriers', warehousemen's, mechanics', materialmen's, repairmen's, supplier, construction or other like Liens in the ordinary course of business that are not overdue for a period of more than 45 days or that are being bonded or contested in good faith by appropriate proceedings;

(c)        (i) pledges or deposits made in connection with workers' compensation, unemployment insurance and other social security legislation, and (ii) Liens (A) of a collecting bank arising in the ordinary course of business under Section 4-210 of the Uniform Commercial Code in effect in the relevant jurisdiction covering only the items being collected upon or (B) in favor of a banking institution or financial intermediary, encumbering amounts credited to deposit or securities accounts (including the right of set-off) arising in the ordinary course of business in connection with the maintenance of such accounts;

(d)     deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds, utility payments and other obligations of a like nature incurred in the ordinary course of business;

(e)     zoning restrictions, survey exceptions and such matters as an accurate survey would disclose, mortgage rights, easements, rights-of-way, restrictions and other similar encumbrances incurred in the ordinary course of business that, in the aggregate, are not substantial in amount and that do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower or any of its Subsidiaries;

(f)     Liens in existence on the Closing Date (after giving effect to the occurrence of the Effective Date) and listed on Schedule 7.3(f) and extensions, renewals and replacements of any such Liens so long as the principal amount of Indebtedness or other obligations secured thereby is not increased and so long as such Liens are not extended to any other property of the Borrower or any of its Subsidiaries;

(g)     Liens securing Indebtedness of the Borrower or any other Subsidiary incurred pursuant to Section 7.2(e) to finance the acquisition of fixed or capital assets; provided that (i) such Liens shall be created within 30 days of the acquisition of such fixed or capital assets, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and proceeds thereof and (iii) the amount of Indebtedness secured thereby is not increased and extensions, renewals and replacements of any such Liens so long as the principal amount of Indebtedness or other obligations secured thereby is not increased and so long as such Liens are not extended to any other property of the Borrower or any of its Subsidiaries;

(h)     Liens created pursuant to the Loan Documents;

(i)     any interest or title of a lessor under any lease entered into by the Borrower or any other Subsidiary in the ordinary course of its business and covering only the assets so leased;

(j)     Liens with respect of leases, licenses, sublicenses or subleases granted to others not interfering in any material respect with the businesses of the Borrower or any of its Subsidiaries;

(k)     Liens with respect to operating leases not prohibited under this Agreement and entered into in the ordinary course of business;

(l)     Liens not otherwise permitted by this Section so long as neither (i) the aggregate outstanding principal amount of the obligations secured thereby nor (ii) the aggregate fair market value (determined as of the date such Lien is incurred) of the assets subject thereto exceeds (as to the Borrower and all Subsidiaries) $35,000,000 at any one time;

(m)     Liens on the assets of a Foreign Subsidiary and its Subsidiaries securing obligations of such Persons that are not prohibited by Section 7.2 so long as the aggregate outstanding principal amount of the obligations for borrowed money secured thereby does not exceed (as to all Foreign Subsidiaries) $75,000,000 at any one time;

(n)      receipt of progress payments and advances from customers in the ordinary course of business to the extent same creates a Lien on the related inventory and proceeds thereof;

(o)      Liens on the assets of joint ventures and their Subsidiaries securing obligations of such Persons that are not prohibited by Section 7.2 so long as such Liens do not encumber any assets or property of the Borrower or its other Subsidiaries;

(p)      attachment, judgment or other similar Liens securing judgments or decrees not constituting an Event of Default under Section 8.1(h) or securing appeal or other surety bonds related to such judgments or decrees;

(q)      Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business;

(r)      statutory Liens and rights of offset arising in the ordinary course of business of the Borrower and its Subsidiaries;

(s)      Liens on assets of Foreign Subsidiaries securing Indebtedness of a Foreign Subsidiary permitted by Sections 7.2(f) and 7.2(k) and securing other obligations under the agreements governing or relating to such Indebtedness, so long as such Liens do not encumber the Capital Stock of the Borrower or any of its Subsidiaries;

(t)      pledges or deposits made to support any obligations of the Group Members (including cash collateral to secure obligations under letters of credit permitted pursuant to Section 7.2(i)) so long as (without duplication) the sum of (i) the aggregate undrawn face amount of letters of credit permitted pursuant to Section 7.2(i) above, (ii) any unreimbursed obligations in respect of letters of credit permitted pursuant to Section 7.2(i) above and (iii) the aggregate amount of such pledges and deposits does not exceed the limit set forth in Section 7.2(i);

(u)      Liens arising in connection with financing transactions permitted by Section 7.2(n), provided that such liens do not at any time encumber any property unless approved by the Administrative Agent and such Liens otherwise comply with Section 7.2(n);

(v)      Liens on the Collateral (or any portion thereof) securing the obligations under the Second Lien Term Loan Documents; _provided_ that such Liens are subordinated pursuant to the Intercreditor Agreement;

(w)      Liens on property or assets acquired pursuant to a Permitted Acquisition, or on property or assets of a Subsidiary of the Borrower in existence at the time such Subsidiary is acquired pursuant to a Permitted Acquisition; provided that (i) any Indebtedness that is secured by such Liens is permitted to exist under Section 7.2(q), and (ii) such Liens are not incurred in connection with, or in contemplation or anticipation of, such Permitted Acquisition and do not attach to any other asset of the Borrower or any of its Subsidiaries and extensions, renewals and replacements of any such Liens so long as the principal amount of Indebtedness or other obligations secured thereby is not increased and so long as such Liens are not extended to any other property of the Borrower or any of its Subsidiaries;

(x)     statutory Liens and Liens granted by any orders in any proceeding in connection with the CCAA Cases, in each case on any assets of any Canadian Subsidiary of the Borrower;

(y)     Liens on receivables and customary related assets subject to a Receivable Financing Transaction; and

(z)     the exchange or transfer within China of Chinese Acceptance Notes by Chinese Subsidiaries of the Borrower in the ordinary course of business.

7.4.    <u>Fundamental Changes</u>.  Enter into any merger, consolidation or amalgamation, or liquidate, wind up or dissolve itself (or suffer any liquidation or dissolution), or Dispose of all or substantially all of its property or business, except that:

(a)     any Subsidiary of the Borrower may be merged, consolidated with or into or transferred to the Borrower (<u>provided</u> that the Borrower shall be the continuing or surviving corporation) or with, into or to any Guarantor (<u>provided</u> that the Guarantor shall be the continuing or surviving corporation or simultaneously therewith, the continuing corporation shall become a Guarantor);

(b)     any Subsidiary of the Borrower that is not a Loan Party may be merged, consolidated, amalgamated, liquidated, wound-up, dissolved or all or substantially all of its property or business Disposed of with, into or to a Subsidiary that is not a Loan Party;

(c)     any Subsidiary of the Borrower may Dispose of any or all of its assets to the Borrower or any Guarantor (upon voluntary liquidation or otherwise);

(d)     any Disposition otherwise permitted pursuant to Section 7.5 may be completed; and

(e)     any Permitted Acquisition otherwise permitted pursuant to Section 7.7 may be completed.

7.5.    <u>Disposition of Property</u>.  Dispose of any of its property, whether now owned or hereafter acquired, or, in the case of any Subsidiary, issue or sell any shares of such Subsidiary's Capital Stock to any Person, except:

(a)     the Disposition of obsolete or worn out property or property no longer useful in the business of the Borrower and its Subsidiaries, in each case in the ordinary course of business;

(b)      the Disposition of inventory or Cash Equivalents in the ordinary course of business;

(c)     Dispositions permitted by Section 7.4(c), Restricted Payments permitted by Section 7.6 and Investments permitted by Section 7.7;

(d)     the Disposition or issuance of any Subsidiary's Capital Stock to the Borrower or any Guarantor;

(e)     the licensing and cross-licensing arrangements of technology or other intellectual property in the ordinary course of business;

(f)     the Disposition of any property or assets (i) to any Loan Party and (ii) by any Subsidiary that is not a Loan Party to any other Subsidiary that is not a Loan Party;

(g)     transfers of property as a result of any Recovery Event;

(h)     leases, occupancy agreements and subleases of property in the ordinary course of business;

(i)     the Disposition by the Borrower and certain of its Subsidiaries of account receivables of General Motors Corporation, Chrysler LLC and their affiliates and customary related property to special purpose vehicles established by General Motors Corporation and Chrysler LLC pursuant to the United States Department of the Treasury's Auto Supplier Support Programs;

(j)     the Disposition of receivables and customary related assets (i) in connection with a Receivables Financing Transaction or (ii) pursuant to factoring programs on customary market terms for such transactions and with respect to receivables of, and generated by, Group Members that are not Loan Parties;

(k)     the Disposition for fair market value of certain assets in Sweden related to the transfer of certain programs to a competitor as previously disclosed to the Administrative Agent;

(l)     the exchange or transfer within China of Chinese Acceptance Notes by Chinese Subsidiaries of the Borrower; and

(m)     the Disposition of other property (other than receivables and customary related assets) having a fair market value not to exceed 5% of Consolidated Total Tangible Assets in the aggregate during any fiscal year of the Borrower; provided that the Net Cash Proceeds thereof are applied to prepay the Loans to the extent required by Section 2.9(b).

7.6.    <u>Restricted Payments</u>.  Declare or pay any dividend (other than dividends payable solely in common stock of the Person making such dividend) on, or make any payment on account of, or set apart assets for a sinking or other analogous fund for, the purchase, redemption, defeasance, retirement or other acquisition of, any Capital Stock of the Borrower or any Subsidiary of the Borrower, whether now or hereafter outstanding, or make any other distribution in respect thereof, either directly or indirectly, whether in cash or property or in obligations of the Borrower or any Subsidiary of the Borrower (collectively, "Restricted Payments"), except that (a) any Subsidiary may make Restricted Payments to any Loan Party, (b) any Subsidiary may make Restricted Payments to the Group Member that is its parent company so long as, in the case of any Restricted Payment made by a Loan Party, such parent company is also a Loan Party, and (c) any Subsidiary may make Restricted Payments with respect to the Capital Stock of such Subsidiary, provided that each Group Member shareholder of such Subsidiary receives at least its ratable share thereof. Notwithstanding the foregoing, the cashless exercise of stock options granted pursuant to any employee benefit plan shall not be construed as a Restricted Payment.

7.7.    <u>Investments</u>.  Make any Investment except:

(a)　　extensions of trade credit in the ordinary course of business;

(b)　　Investments in Cash Equivalents;

(c)　　Guarantee Obligations permitted by Section 7.2;

(d)　　loans and advances to employees or directors of any Group Member in the ordinary course of business (including for travel, entertainment and relocation expenses);

(e)　　Investments in the business of the Borrower and its Subsidiaries made by the Borrower or any of its Subsidiaries with the proceeds of any Reinvestment Deferred Amount;

(f)　　intercompany Investments by (i) any Group Member in the Borrower or any Person that, prior to such investment, is a Guarantor, (ii) by any Subsidiary that is not a Loan Party in any other Subsidiary that is not a Loan Party, (iii) by any Loan Party in a Foreign Subsidiary to fund in the ordinary course of business foreign operations and (iv) by any Loan Party in any Subsidiary that is not a Loan Party, provided that the aggregate amount of Investments under clause (iv) in Subsidiaries that are organized under the laws of a Specified Jurisdiction shall not exceed $200,000,000 at any one time outstanding in the aggregate plus, without duplication, all cash returns of principal or capital, cash dividends and other cash returns received by any Loan Party after the date hereof from any Subsidiary that is organized under the laws of a Specified Jurisdiction;

(g)　　Investments consisting of Indebtedness permitted by Section 7.2;

(h)　　prepaid expenses and lease, utility, workers, compensation, performance and other similar deposits made in the ordinary course of business;

(i)　　Investments (including debt obligations) received in the ordinary course of business by the Borrower or any Subsidiary in connection with the bankruptcy or reorganization of suppliers and customers and in settlement or delinquent obligations of, and other disputes with, customers and suppliers arising out of the ordinary course of business;

(j)　　Investments in existence on the Closing Date;

(k)　　Investments in Greenfield Holdings, LLC and Integrated Manufacturing and Assembly L.L.C. to the extent that such Investments are made in the ordinary course of a Loan Party's business, for cash management purposes and not exceeding $50,000,000 at any one time outstanding plus, without duplication, all cash returns of principal or capital, cash dividends and other cash returns received by any Loan Party after the date hereof from Greenfield Holdings, LLC or Integrated Manufacturing and Assembly L.L.C.;

(l)　　the Disposition or contribution by the Borrower and certain of its domestic Subsidiaries of certain metals and electronics assets to its existing Subsidiaries consistent with the restructuring plan including in the financial projections; and

(m)　　Swap Agreements permitted by Section 7.9;

(n)     Investments in Special Purpose Subsidiaries arising or made under Receivable Financing Transactions;

(o)     Permitted Acquisitions; and

(p)     in addition to Investments otherwise expressly permitted by this Section, Investments by the Borrower or any of its Subsidiaries in an aggregate amount not to exceed $200,000,000 at any one time outstanding.

7.8.    <u>Transactions with Affiliates</u>.  Enter into any transaction, including any purchase, sale, lease or exchange of property, the rendering of any service or the payment of any management, advisory or similar fees, with any Affiliate (other than transactions among Group Members) unless such transaction (a) is otherwise permitted under this Agreement, (b) is in the ordinary course of business of the relevant Group's Member, upon fair and reasonable terms no less favorable to the relevant Group Member than it would obtain in a comparable arm's length transaction with a Person that is not an Affiliate; or (c) involves any Lender or Agent (or their Affiliates) in its capacity as Lender or Agent under this Agreement.

7.9.    <u>Swap Agreements</u>.  Enter into any Swap Agreement except (a) Swap Agreements entered into to hedge or mitigate risks to which any Group Member has actual exposure (other than those in respect of Capital Stock of any Person) and (b) Swap Agreements entered into in order to effectively cap, collar or exchange interest rates  (from fixed to floating rates, from one floating rate to another floating rate or otherwise) with respect to any interest-bearing liability or investments of any Group Member, provided that in each case such agreements are not entered into for speculative purposes.

7.10.    <u>Changes in Fiscal Periods</u>.  Permit the fiscal year of the Borrower to end on a day other than December 31 or change the Borrower's method of determining fiscal quarters.

7.11.    <u>Negative Pledge Clauses</u>.  Enter into or permit to exist or become effective any agreement that prohibits or limits (other than a dollar limit, provided that such dollar limit is sufficient in amount to allow at all times the Liens to secure the obligations under the Loan Documents in full) the ability of any Loan Party to create, incur, assume or suffer to exist any Lien upon any of its property or revenues, whether now owned or hereafter acquired, to secure its obligations under the Loan Documents to which it is a party other than (a) this Agreement and the other Loan Documents, (b) any agreements governing any purchase money Liens or Capital Lease Obligations otherwise permitted hereby (in which case, any prohibition or limitation shall only be effective against the assets financed thereby and proceeds thereof), (c) the Second Lien Term Loan Documents, any agreement governing any Indebtedness existing as of the Closing Date and any agreement governing any Permitted Refinancing Indebtedness of such Indebtedness existing as of the Closing Date (provided that the prohibition or limitation contained therein is no less favorable to the Lenders than that which exists in the agreement governing such Indebtedness as of the Closing Date), (d) customary provisions in joint venture agreements and similar agreements that restrict the transfer of assets of, or equity interests in, joint ventures, (e) customary provisions in any agreements governing any Receivable Financing Transaction (in which case, any prohibition or limitation shall only be effective against the assets conveyed thereunder) and (f) licenses or sublicenses by the Borrower and its Subsidiaries of intellectual  property in the ordinary course of business (in which case, any prohibition or limitation shall only be effective against the intellectual property subject thereto).

7.12.    <u>Clauses Restricting Subsidiary Distributions</u>.  Enter into or permit to exist or become effective any consensual encumbrance or restriction on the ability of any Subsidiary of the Borrower to (a) make Restricted Payments in respect of any Capital Stock of such Subsidiary held by, or pay any Indebtedness owed to, the Borrower or any other Loan Party, (b) make loans or advances to, or

other Investments in, the Borrower or any other Loan Party or (c) transfer any of its assets to the Borrower or any other Loan Party, except for such encumbrances or restrictions existing under or by reason of (i) any restrictions existing under the Loan Documents, the Second Lien Term Loan Documents, any agreement governing any Indebtedness existing as of the Closing Date and any agreement governing any Permitted Refinancing Indebtedness of such Indebtedness existing as of the Closing Date (provided that the prohibition or limitation contained therein is no less favorable to the Lenders than that which exists in the agreement governing such Indebtedness as of the Closing Date), (ii) customary provisions in joint venture agreements and similar agreements that restrict the transfer of equity interests in joint ventures (which are not Subsidiaries of the Borrower) (in which case such restrictions shall relate only to assets of, or equity interests in, such joint venture), (iii) any restrictions regarding licenses or sublicenses by the Borrower and its Subsidiaries of intellectual  property in the ordinary course of business (in which case such restriction shall relate only to such intellectual property); (iv) customary restrictions and conditions contained in agreements relating to the sale of all or a substantial part of the capital stock or assets of any Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary to be sold and such sale is permitted hereunder, (v) with respect to restrictions described in clause (a) of this Section 7.12, restrictions contained in agreements governing Indebtedness permitted by Section 7.2(c) hereof; and (vi) with respect to restrictions described in clause (c) of this Section 7.12, restrictions contained in agreements governing Indebtedness permitted by Section 7.2(e) (as long as such restrictions apply to the property financed thereby) and (k) hereof (as long as such restrictions apply only to the assets of the applicable joint venture).

7.13.   Lines of Business.  Enter into any business, either directly or through any Subsidiary, except for those businesses in which the Borrower and its Subsidiaries are engaged on the date of this Agreement or that are reasonably related thereto.

7.14.   Use of Proceeds.  Use the proceeds of the Loans for purposes other than those described in Section 4.15.

7.15.   Optional Payments and Modifications of Second Lien Term Loan Documents. Except to the extent permitted by the Intercreditor Agreement, (a) make or offer to make any payment, prepayment, repurchase or redemption of or otherwise defease or segregate funds with respect to the Second Lien Term Loans other than scheduled payments of interest; or (b) amend, modify, waive or otherwise change, or consent or agree to any amendment, modification, waiver or other change to, any of the terms of the Second Lien Term Loan Documents (other than any such amendment, modification, waiver or other change that would extend the maturity or reduce the amount of any payment of principal thereof or reduce the rate or extend any date for payment of interest thereon and is not otherwise materially adverse to the Lenders).

7.16.   Sale and Leasebacks.  Enter into any arrangement with any Person providing for the leasing by any Loan Party of real or personal property that has been or is to be sold or transferred by such Loan Party to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or rental obligations of such Loan Party unless the Net Cash Proceeds received by such Loan Party have been used to make a prepayment of the Loans pursuant to Section 2.9(b) above.

## SECTION 8.   EVENTS OF DEFAULT

8.1.   Events of Default.  If any of the following events shall occur and be continuing:

(a)     the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan, or any other amount payable hereunder or under any other Loan Document, within three Business Days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)     any representation or warranty made or deemed made by any Loan Party herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)     any Loan Party shall default in the observance or performance of any agreement contained in clause (i) of Section 6.4(a) (with respect to the Borrower only), Section 6.7(a) or Section 7 of this Agreement or Section _____ and _____ of the Guarantee and Collateral Agreement; or

(d)     any Loan Party shall default in the observance or performance of any other agreement contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of 30 days after notice thereof from the Administrative Agent or the Required Lenders to the Borrower; or

(e)     any Group Member (other than an Immaterial Subsidiary) shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loans) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; provided, that a default, event or condition described in clause (i), (ii) or (iii) of this paragraph (e) shall not at any time constitute an Event of Default unless, at such time, one or more defaults, events or conditions of the type described in clauses (i), (ii) and (iii) of this paragraph (e) shall have occurred and be continuing with respect to Indebtedness the outstanding principal amount (or the termination value, as applicable) of which exceeds in the aggregate $35,000,000; or

(f)     (i) the Borrower or any of its Subsidiaries (other than 3% Subsidiaries) shall commence any case, proceeding or other action (A) under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding up, liquidation, dissolution, composition or other relief with respect to it or its debts, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets; or

(ii) there shall be commenced against the Borrower or any of its Subsidiaries (other than 3% Subsidiaries) any case, proceeding or other action of a nature referred to in clause (i) above that (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed or undischarged for a period of 60 days; or (iii) there shall be commenced against the Borrower or any of its Subsidiaries (other than 3% Subsidiaries) any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets that results in the entry of an order for any such relief that shall not have been vacated, discharged, or stayed or bonded pending appeal within 60 days from the entry thereof; or (iv) the Board of Directors of the Borrower shall authorize any action set forth in clause (i) above; or (v) the Borrower or any of its Subsidiaries (other than 3% Subsidiaries) shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due; or (vi) or the Borrower or any of its Subsidiaries (other than 3% Subsidiaries) shall make a general assignment for the benefit of its creditors; provided that all 3% Subsidiaries that are subject to any of the proceedings or actions described in clauses (i) through (vi) of this paragraph (f) shall not at any time contribute in the aggregate more than 5% of Consolidated Assets or more than 5% of Consolidated Revenues; or

(g)     (i) an ERISA Event shall have occurred; (ii) a trustee shall be appointed by a United States district court to administer any Single Employer Plan, (iii) the PBGC shall institute proceedings to terminate any Single Employer Plan(s); (iv) any Loan Party or any of their respective ERISA Affiliates shall have been notified by the sponsor of a Multiemployer Plan that it has incurred or will be assessed Withdrawal Liability to such Multiemployer Plan and such entity does not have reasonable grounds for contesting such Withdrawal Liability or is not contesting such Withdrawal Liability in a timely and appropriate manner; or (v) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (v) above, such event or condition, together with all other such events or conditions, if any, could reasonably be expected to have a Material Adverse Effect; or

(h)     one or more judgments or decrees shall be entered against any Group Member involving in the aggregate a liability (excluding any amounts paid or covered by insurance as to which the relevant insurance company has not denied coverage) of $35,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 60 days from the entry thereof; or

(i)     any of the Loan Documents shall cease, for any reason, to be in full force and effect, or any Loan Party or any Affiliate of any Loan Party shall so assert, or any Liens created by any Loan Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby other than by reason of the release thereof in accordance with the terms of the Loan Documents; or

(j)     a Change of Control shall have occurred; or

(k)     the Intercreditor Agreement shall cease, for any reason, to be in full force and effect or the Liens securing the obligations under the Second Lien Term Loan Agreement shall cease, for any reason, to be validly subordinated to the Liens securing the Obligations, or any Loan Party or any Affiliate of any Loan Party shall assert any of the foregoing;

then, and in any such event, (A) if such event is an Event of Default specified in clause (i) or (ii) of paragraph (f) above with respect to the Borrower, automatically the Commitments shall immediately terminate and the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents (including, without limitation, all amounts to be paid pursuant to Section 2.6(a)) shall immediately become due and payable, and (B) if such event is any other Event of Default, either or both of the following actions may be taken: (i) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower declare the Commitments to be terminated forthwith, whereupon the Commitments shall immediately terminate; and (ii) with the consent of the Required Lenders, the Administrative Agent may, or upon the request of the Required Lenders, the Administrative Agent shall, by notice to the Borrower, declare the Loans (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable. Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.

## SECTION 9.  THE AGENTS

9.1.  <u>Appointment</u>.  Each Lender hereby irrevocably designates and appoints the Administrative Agent as the agent and the Collateral Agent as the collateral agent of such Lender under this Agreement and the other Loan Documents, and each such Lender irrevocably authorizes each of the Administrative Agent and the Collateral Agent, in its capacity as such, to take such action on its behalf under the provisions of this Agreement and the other Loan Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent and Collateral Agent, as applicable, by the terms of this Agreement and the other Loan Documents, together with such other powers as are reasonably incidental thereto.   Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent and the Collateral Agent shall not have any duties or responsibilities, except those expressly set forth herein, or any fiduciary relationship with any Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Loan Document or otherwise exist against the Administrative Agent or the Collateral Agent, as applicable.

9.2.  <u>Delegation of Duties</u>.  Each of the Administrative Agent and the Collateral Agent may execute any of its duties under this Agreement and the other Loan Documents by or through agents or attorneys-in-fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  Neither Agent shall be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.  The exculpatory provisions of this Agreement and of the other Loan Documents shall apply to any such agent or attorney-in-fact and to their Related Parties (as defined below).

9.3.  <u>Exculpatory Provisions</u>.  Neither any Agent nor any of its officers, directors, employees, agents, advisors, attorneys-in-fact, controlling persons or affiliates (collectively, the "Related Parties") shall be (i) liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Loan Document (except to the extent that any of the foregoing are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from its or such Person's own gross negligence or willful misconduct) or (ii) responsible in any manner to any of the Lenders for any recitals, statements, representations or warranties made by any Loan Party or any officer thereof contained in this Agreement or any other Loan Document or in any certificate, report, statement or other document referred to or provided for in, or received by the Agents under or in connection with, this Agreement or any other Loan Document or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Loan Document or for any

failure of any Loan Party a party thereto to perform its obligations hereunder or thereunder. The Agents shall not be under any obligation to any Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Loan Document, or to inspect the properties, books or records of any Loan Party.

9.4. <u>Reliance by Agents</u>. The Agents and their Related Parties shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, facsimile or email message, statement, order or other document or conversation believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including counsel to the Borrower), independent accountants and other experts selected by the Agents. The Agents and their Related Parties may deem and treat the payee of any Note as the owner thereof for all purposes unless a written notice of assignment, negotiation or transfer thereof shall have been filed with the Administrative Agent. The Agents and their Related Parties shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless it shall first receive such advice or concurrence of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement) as it deems appropriate or it shall first be indemnified to its satisfaction by the Lenders against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Agents and their Related Parties shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Loan Documents in accordance with a request of the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement), and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lenders and all future holders of the Loans.

9.5. <u>Notice of Default</u>. No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received notice from a Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default". In the event that an Agent receives such a notice, such Agent shall give notice thereof to the Lenders. The Agents shall take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders (or, if so specified by this Agreement, all Lenders or any other instructing group of Lenders specified by this Agreement); provided that unless and until the Agents shall have received such directions, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as they shall deem advisable in the best interests of the Lenders.

9.6. <u>Non-Reliance on Agents and Other Lenders</u>. Each Lender expressly acknowledges that neither the Agents nor any of their Related Parties have made any representations or warranties to it and that no act by the any Agent hereafter taken, including any review of the affairs of a Loan Party or any affiliate of a Loan Party, shall be deemed to constitute any representation or warranty by any Agent to any Lender. Each Lender represents to the Agents that it has, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates and made its own decision to make its Loans hereunder and enter into this Agreement. Each Lender also represents that it will, independently and without reliance upon any Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Loan Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Loan Parties and their affiliates. Except for notices, reports and other documents expressly required to be furnished to the

Lenders by the Agents hereunder, the Agents shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of any Loan Party or any affiliate of a Loan Party that may come into the possession of the Agents or any of its officers, directors, employees, agents, advisors, attorneys-in-fact or affiliates.

9.7. <u>Indemnification</u>. The Lenders agree to indemnify each Agent and its Related Parties (each, an "Agent Indemnitee") (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), ratably according to their respective Outstanding Percentages in effect on the date on which indemnification is sought under this Section (or, if indemnification is sought after the date upon which the Commitments shall have terminated and the Loans shall have been paid in full, ratably in accordance with such Outstanding Percentages immediately prior to such date), from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind (including reasonable attorneys fees and expenses) whatsoever that may at any time (whether before or after the payment of the Loans) be imposed on, incurred by or asserted against such Agent Indemnitee in any way relating to or arising out of, the Commitments, this Agreement, any of the other Loan Documents or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Agent Indemnitee under or in connection with any of the foregoing; provided that no Lender shall be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from such Agent Indemnitee's gross negligence or willful misconduct. The agreements in this Section shall survive the payment of the Loans and all other amounts payable hereunder.

9.8. <u>Agent in Its Individual Capacity</u>. Each Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with any Loan Party as though such Agent were not an Agent. With respect to its Loans made or renewed by it, each Agent shall have the same rights and powers under this Agreement and the other Loan Documents as any Lender and may exercise the same as though it were not an Agent, and the terms "Lender" and "Lenders" shall include each Agent in its individual capacity.

9.9. <u>Successor Administrative Agent</u>. The Administrative Agent may resign as Administrative Agent upon 10 days' notice to the Lenders and the Borrower. If the Administrative Agent shall resign as Administrative Agent under this Agreement and the other Loan Documents, then the Required Lenders shall appoint from among the Lenders a successor agent for the Lenders, whereupon such successor agent shall succeed to the rights, powers and duties of the Administrative Agent, and the term "Administrative Agent" shall mean such successor agent effective upon such appointment and approval, and the former Administrative Agent's rights, powers and duties as Administrative Agent shall be terminated, without any other or further act or deed on the part of such former Administrative Agent or any of the parties to this Agreement or any holders of the Loans. If no successor agent has accepted appointment as Administrative Agent by the date that is 10 days following a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nevertheless thereupon become effective, and the Lenders shall assume and perform all of the duties of the Administrative Agent hereunder until such time, if any, as the Required Lenders appoint a successor agent as provided for above. After any retiring Administrative Agent's resignation as Administrative Agent, the provisions of this Section 9 and of Section 10.5 shall continue to inure to its benefit. The Administrative Agent may in its discretion resign as Collateral Agent at any time it resigns as Administrative Agent.

9.10. <u>Execution of Loan Documents</u>. The Lenders hereby empower and authorize the Agents, on behalf of the Lenders, to execute and deliver to the Loan Parties the other Loan Documents

and all related agreements, certificates, documents, or instruments as shall be necessary or appropriate to effect the purposes of the Loan Documents. Each Lender agrees that any action taken by the Agents or the Required Lenders (or any other instructing group of Lenders specified by this Agreement) in accordance with the terms of this Agreement or the other Loan Documents, and the exercise by the Agents or the Required Lenders (or any other instructing group of Lenders specified by this Agreement) of their respective powers set forth therein or herein, together with such other powers that are reasonably incidental thereto, shall be binding upon all of the Lenders.

9.11. <u>Collateral Agent</u>. (a) The provisions of Section 9 that apply to the Administrative Agent shall apply, mutatis mutandis, to the Collateral Agent and to any successor Collateral Agent, as applicable; provided that, notwithstanding anything herein to the contrary, the Collateral Agent shall have the right to appoint a successor to itself as Collateral Agent and without the consent of any Lender.

(b)      The Collateral Agent is authorized on behalf of all the Lenders, without the necessity of any notice to or further consent from the Lenders, from time to time to take any action with respect to any Collateral or the Loan Documents which may be necessary to perfect and maintain a perfected security interest in and Liens upon the Collateral granted pursuant to the Loan Documents. Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder or under any of the other Loan Documents, the Collateral Agent shall not have any duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, trades or other matters relative to any Collateral, whether or not the Collateral Agent is deemed to have knowledge of such matters, or as to taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral (including the filing of UCC Financing and Continuation Statements). The Collateral Agent shall be deemed to have exercised appropriate and due care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which other collateral agents accord similar property.

(c)      Each of the Administrative Agent and the Collateral Agent, in its capacity as an agent under the Intercreditor Agreement, shall be entitled to all right, privileges, protections, immunities, benefits and indemnities provided to the Administrative Agent under this Section 9.

SECTION 10.   MISCELLANEOUS

10.1. <u>Amendments and Waivers</u>. (a) Neither this Agreement, any other Loan Document, nor any terms hereof or thereof may be amended, supplemented or modified except in accordance with the provisions of this Section 10.1. The Required Lenders and each Loan Party party to the relevant Loan Document may, or, with the written consent of the Required Lenders, the Administrative Agent and each Loan Party party to the relevant Loan Document may, from time to time, (a) enter into written amendments, supplements or modifications hereto and to the other Loan Documents for the purpose of adding any provisions to this Agreement or the other Loan Documents or changing in any manner the rights of the Lenders or of the Loan Parties hereunder or thereunder or (b) waive, on such terms and conditions as the Required Lenders or the Administrative Agent, as the case may be, may specify in such instrument, any of the requirements of this Agreement or the other Loan Documents or any Default or Event of Default and its consequences; provided, however, that no such waiver and no such amendment, supplement or modification shall (i) forgive the principal amount or extend the final scheduled date of maturity of any Loan, extend the scheduled date of any principal amortization payment in respect of any Loan, reduce the stated rate of any interest or fee payable hereunder (except (x) in connection with the waiver of applicability of any post-default increase in interest rates (which waiver shall be effective with the consent of the Required Lenders), (y) in connection with the waiver or extension of any mandatory prepayment hereunder, and (z) that any amendment or modification of

defined terms used in the financial covenants in this Agreement shall not constitute a reduction in the rate of interest or fees for purposes of this clause (i)) or extend the scheduled date of any payment thereof, or increase the amount or extend the expiration date of any Lender's Commitment, in each case without the written consent of each Lender directly affected thereby; (ii) eliminate or reduce the voting rights of any Lender under this Section 10.1 without the written consent of such Lender; (iii) reduce any percentage specified in the definition of Required Lenders or consent to the assignment or transfer by the Borrower of any of its rights and obligations under this Agreement and the other Loan Documents, in each case without the written consent of all Lenders; (iv) amend, modify or waive any provision of Section 9 or any other provision of any Loan Document that affects the Administrative Agent without the written consent of the Administrative Agent; or (v) release all or substantially all of the Collateral securing the Obligations or release all or substantially all of the Guarantors from their obligations under the Guarantee and Collateral Agreement, in each case without the consent of each Lender. Any such waiver and any such amendment, supplement or modification shall apply equally to each of the Lenders and shall be binding upon the Loan Parties, the Lenders, the Administrative Agent and all future holders of the Loans. In the case of any waiver, the Loan Parties, the Lenders and the Administrative Agent shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

(b)     Notwithstanding the foregoing, the Administrative Agent may amend or supplement the Intercreditor Agreement and the Security Documents without the consent of any Lender or the Required Lenders (but with the consent of the Borrower to the extent required under the Intercreditor Agreement and the Security Documents) to cure any ambiguity, defect or inconsistency in the Intercreditor Agreement or the Security Documents.

(c)     The Borrower shall be permitted to replace any Lender that requests any payment under Section 2.16 or 2.17(a) or that does not consent to any proposed amendment, supplement, modification, consent or waiver of any provision of this Agreement or any other Loan Document that requires the consent of each of the Lenders or each of the Lenders affected thereby (so long as the consent of the Required Lenders has been obtained), with a replacement financial institution; provided that (i) such replacement does not conflict with any Requirement of Law, (ii) the replacement financial institution shall purchase, at par, all Loans and other amounts owing to such replaced Lender on or prior to the date of replacement, (iii) the Borrower shall be liable to such replaced Lender under Section 2.18 if any Eurodollar Loan owing to such replaced Lender shall be purchased other than on the last day of the Interest Period relating thereto, (iv) the replacement financial institution shall be reasonably satisfactory to the Administrative Agent, (v) the replaced Lender shall be obligated to make such replacement in accordance with the provisions of Section 10.6 (provided that the Borrower shall be obligated to pay the processing and recordation fee referred to therein) and (vi) any such replacement shall not be deemed to be a waiver of any rights that the Borrower, the Administrative Agent or any other Lender shall have against the replaced Lender.

(d)     In addition, notwithstanding the foregoing, this Agreement may be amended with the written consent of the Administrative Agent, the Borrower and the Lenders providing the relevant Replacement Term Loans (as defined below) to permit the refinancing of all or a portion of the Loans outstanding hereunder ("Refinanced Terms Loans") with a replacement term loan tranche hereunder which shall be Loans hereunder ("Replacement Term Loans"); provided that (i) the aggregate principal amount of such Replacement Term Loans shall not exceed the aggregate principal amount of such Refinanced Term Loans, (ii) the weighted average life to maturity of such Replacement Term Loans shall not be shorter than the weighted average life to maturity of such Refinanced Term Loans at the time of such refinancing and (iii) all other terms applicable to such Replacement Term Loans shall be substantially identical to, or less favorable to the Lenders providing, such Replacement Term Loans than,

those applicable to such Refinanced Term Loans, except to the extent necessary to provide for covenants and other terms applicable to any period after the latest final maturity of any Loans in effect immediately prior to such refinancing.

        10.2.  <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by telecopy), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of telecopy notice, when received, addressed as follows in the case of the Borrower and the Administrative Agent, and as set forth in an administrative questionnaire delivered to the Administrative Agent in the case of the Lenders, or to such other address as may be hereafter notified by the respective parties hereto:

|                                          |                                              |
| ---------------------------------------- | -------------------------------------------- |
| The Borrower:                            | Lear Corporation                             |
|                                          | 21557 Telegraph Road                         |
|                                          | Southfield, Michigan 48034                   |
|                                          | Attention: Shari L. Burgess                  |
|                                          | Telecopy:  (248) 447-1593                    |
|                                          | Telephone: (248) 447-1580                    |
|                                          | Email:  sburgess@lear.com                    |
|                                          |                                              |
|                                          | With copies to:                              |
|                                          |                                              |
|                                          | Lear Corporation                             |
|                                          | 21557 Telegraph Road                         |
|                                          | Southfield, Michigan 48034                   |
|                                          | Attention: Terrence B. Larkin                |
|                                          | Telecopy: (248) 447-5126                     |
|                                          | Telephone: (248) 447-5123                    |
|                                          | Email: TLarkin@lear.com                      |
|                                          |                                              |
|                                          | With copies to (which shall not constitute a notice hereunder): |
|                                          |                                              |
|                                          | Kirkland & Ellis LLP                         |
|                                          | 601 Lexington Avenue                         |
|                                          | New York, NY 10022                           |
|                                          | Telecopy: (212) 446-6460                     |
|                                          | Telephone: (212) 446-4792                    |
|                                          | Email: Leonard.Klingbaum@kirkland.com        |
|                                          |                                              |
|                                          | Winston & Strawn LLP                         |
|                                          | 35 West Wacker Drive                         |
|                                          | Chicago, IL 60601-9703                       |
|                                          | Telecopy: (312) 558-5989                     |
|                                          | Telephone: (312) 558-5700                    |
|                                          | Email: CBoehrer@winston.com                  |
|                                          |                                              |
| Administrative Agent or Collateral Agent: | JPMorgan Chase Bank, N.A.                    |
|                                          |                                              |
|                                          | Attention: Douglas Jenks                     |

Telecopy: (212) 622-4557
Telephone: (212) 622-4521
Email: douglas.jenks@chase.com

With copies to:

JPMorgan Chase Bank, N.A.
Attention: Goh Siew Tan
Telecopy: (212) 622-4556
Telephone: (212) 622-4575
Email: gohsiew.tan@jpmorgan.com

1111 Fannin Street, Floor 10
Houston, TX 77002
Attention: Alice Telles
Telecopy: (713) 750-2938
Telephone: (713) 750-7941
Email: alice.h.telles@jpmchase.com

provided that any notice, request or demand to or upon the Agents or the Lenders shall not be effective until received.

Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices pursuant to Section 2 unless otherwise agreed by the Administrative Agent and the applicable Lender. The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

10.3. No Waiver; Cumulative Remedies. No failure to exercise and no delay in exercising, on the part of the Administrative Agent, the Collateral Agent or any Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

10.4. Survival of Representations and Warranties. All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loans and other extensions of credit hereunder.

10.5. Payment of Expenses and Taxes. The Borrower agrees (a) to pay or reimburse each Agent for all its reasonable, out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement, the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of counsel and any financial advisor or third party consultants or appraisers to and each Agent and filing and recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower prior to the Closing Date (in the case of

amounts to be paid on the Closing Date) and from time to time thereafter on such other periodic basis as each Agent shall deem appropriate, (b) to pay or reimburse each Lender and each Agent for all its reasonable out-of-pocket costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, including in connection with any work-out, restructuring, forbearance or other amendment providing relief to the Borrower, the other Loan Documents and any such other documents related thereto, including the reasonable fees and disbursements of counsel and any financial advisor or third party consultants or appraisers to each Agent and the reasonable fees and disbursements of counsel to the several Lenders; provided that, in the case of clauses (a) and (b), the Borrower shall not be obligated to so reimburse for more than one law firm (and, in addition to such law firm, any local counsel engaged in each relevant jurisdiction by such law firm) as counsel for the Lenders and the Agents, (c) to pay, indemnify, and hold each Lender and each Agent harmless from, any and all recording and filing fees, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents related thereto, and (d) to pay, indemnify, and hold each Lender and each Agent and their respective officers, directors, employees, affiliates, agents, advisors, trustees and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever arising out of any litigation, investigation or proceeding with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents and instruments referred to therein, including any of the foregoing relating to the use of proceeds of the Loans or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of any Group Member or any of the Properties and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against any Loan Party under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 10.5 shall be payable not later than 10 days after a reasonably detailed written demand therefor. Statements payable by the Borrower pursuant to this Section 10.5 shall be submitted to Shari Burgess (Telecopy No. (248) 447-1593; Telephone No. 248-447-1580; and Email: sburgess@lear.com), at the address of the Borrower set forth in Section 10.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Administrative Agent. The agreements in this Section 10.5 shall survive repayment of the Loans and all other amounts payable hereunder.

      10.6.  <u>Successors and Assigns; Participations and Assignments</u>. (a) The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder to any Loan Party or any of its Affiliates.

(b)    (i)  Subject to the conditions set forth in paragraph (b)(ii) below and subject to paragraph (a)(iii) above, any Lender may assign to one or more Eligible Assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans at the time owing to it) with the prior written consent of the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment of all or any portion of a Loan to a Lender, an affiliate of a Lender or an Approved Fund; and

(ii)    Assignments shall be subject to the following additional conditions:

(A)    except in the case of an assignment to a Lender, an affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning Lender's Commitments, the amount of the Commitments or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 unless the Administrative Agent otherwise consents;

(B)    (1) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500 and (2) the assigning Lender shall have paid in full any amounts owing by it to the Administrative Agent; and

(C)    the Assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an administrative questionnaire in which the Assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

For the purposes of this Section 10.6, "Eligible Assignee" means (a) a commercial bank, financial institution, financial company, fund or insurance company that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course or (b) any other Person that is not a competitor of the Borrower or any of its Subsidiaries or an affiliate of any such competitor; and "Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an affiliate of a Lender or (c) an entity or an affiliate of an entity that administers or manages a Lender.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) below, from and after the effective date specified in each Assignment and Assumption the Assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.16, 2.17, 2.18 and 10.5).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 10.6 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with and to the extent permitted by paragraph (c) of this Section.

(iv)     The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Assignee, the Assignee's completed administrative questionnaire (unless the Assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)     (i)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver that (1) requires the consent of each Lender directly affected thereby pursuant to the proviso to the second sentence of Section 10.1 and (2) directly affects such Participant.  Subject to paragraph (c)(ii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.16, 2.17 and 2.18 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 10.7(b) as though it were a Lender, provided such Participant shall be subject to Section 10.7(a) as though it were a Lender.

(ii)     A Participant shall not be entitled to receive any greater payment under Section 2.16, 2.17 or 2.18 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  Any Participant that is a Non-U.S. Lender shall not be entitled to the benefits of Section 2.17 unless such Participant complies with Section 2.17(d).

(iii)     In the event that any Lender sells a participation in a Loan, such Lender shall, acting solely for this purpose as an agent of the Borrower, maintain a register on which it enters the name and address of all participants in the Loans held by it and the principal amount (and stated interest thereon) of the portion of the Loan which is the subject of the participation (the "Participation Register").  A Loan may be participated in whole or in part only by registration of

such participation on the Participation Register.  Any transfer of such participation may be effected only by the Registration of such transfer on the Participation Register.  The entries in the Participation Register shall be conclusive absent manifest error and such Lender shall treat such participants whose name is recorded in the Participation Register as the owner of such participation for all purposes of this Agreement, notwithstanding any notice to the contrary. The Participation Register shall be available for inspection by the Administrative Agent at any reasonable time upon reasonable prior notice.

(d)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or Assignee for such Lender as a party hereto.

(e)     The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring Notes to facilitate transactions of the type described in paragraph (d) above.

(f)     Notwithstanding the foregoing, any Conduit Lender may assign any or all of the Loans it may have funded hereunder to its designating Lender without the consent of the Borrower or the Administrative Agent and without regard to the limitations set forth in Section 10.6(b) (but with regard to the requirements set forth in Section 10.6(b)(iv)).  Each of the Borrower, each Lender and the Administrative Agent hereby confirms that it will not institute against a Conduit Lender or join any other Person in instituting against a Conduit Lender any bankruptcy, reorganization, arrangement, insolvency or liquidation proceeding under any state bankruptcy or similar law, for one year and one day after the payment in full of the latest maturing commercial paper note issued by such Conduit Lender; provided, however, that each Lender designating any Conduit Lender hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such Conduit Lender during such period of forbearance.

10.7.     Adjustments; Set-off.  (a)  Except to the extent that this Agreement, any other Loan Document or a court order expressly provides for payments to be allocated to a particular Lender or Lenders (including assignments made pursuant to Section 10.6), if any Lender (a "Benefited Lender") shall, at any time after the Loans and other amounts payable hereunder shall immediately become due and payable pursuant to Section 8, receive any payment of all or part of the Obligations owing to it, or receive any collateral in respect thereof (whether voluntarily or involuntarily, by set-off, or otherwise), in a greater proportion than any such payment to or collateral received by any other Lender, if any, in respect of the Obligations owing to such other Lender, such Benefited Lender shall purchase for cash from the other Lenders a participating interest in such portion of the Obligations owing to each such other Lender, or shall provide such other Lenders with the benefits of any such collateral, as shall be necessary to cause such Benefited Lender to share the excess payment or benefits of such collateral ratably with each of the Lenders; provided, however, that if all or any portion of such excess payment or benefits is thereafter recovered from such Benefited Lender, such purchase shall be rescinded, and the purchase price and benefits returned, to the extent of such recovery, but without interest.

(b)     In addition to any rights and remedies of the Lenders provided by law, each Lender shall have the right, without prior notice to the Borrower or the Guarantors, any such notice being expressly waived by the Borrower and the Guarantors to the extent permitted by applicable law, upon any Obligations becoming due and payable by the Borrower or the Guarantors hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such

Obligations any and all deposits (general or special, time or demand, provisional or final but not any trust or fiduciary account), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by such Lender or any branch or agency thereof to or for the credit or the account of the Borrower or the Guarantors, as the case may be. Each Lender agrees promptly to notify the Borrower and the Administrative Agent after any such setoff and application made by such Lender, <u>provided</u> that the failure to give such notice shall not affect the validity of such setoff and application.

        10.8.  <u>Counterparts</u>.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by email or facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Administrative Agent.

        10.9.  <u>Severability</u>.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

        10.10.  <u>Integration</u>.  This Agreement and the other Loan Documents represent the entire agreement of the Loan Parties, the Administrative Agent, the Collateral Agent and the Lenders with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Administrative Agent, the Collateral Agent, or any Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

        10.11.  <u>GOVERNING LAW</u>.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK.

        10.12.  <u>Submission To Jurisdiction; Waivers</u>.  Each Loan Party hereby irrevocably and unconditionally:

        (a)     submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of (i) any State or Federal court of competent jurisdiction sitting in New York County, New York; and (ii) appellate courts from any thereof;

        (b)     consents that any such action or proceeding may be brought in such courts and waives any objection that it may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agrees not to plead or claim the same;

        (c)     agrees that service of process in any such action or proceeding may be effected by mailing a copy thereof by registered or certified mail (or any substantially similar form of mail), postage prepaid, to such Loan Party at its address set forth in Section 10.2 or at such other address of which the Administrative Agent shall have been notified pursuant thereto;

(d)     agrees that nothing herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(e)     waives, to the maximum extent not prohibited by law, any right it may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

10.13.   Acknowledgements.  Each Loan Party hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     none of the Administrative Agent, the Collateral Agent nor any Lender has any fiduciary relationship with or duty to any Loan Party arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between Administrative Agent, the Collateral Agent and Lenders, on one hand, and the Loan Parties, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Lenders or among the Loan Parties and the Lenders.

10.14.   Releases of Guarantees and Liens.  (a)Notwithstanding anything to the contrary contained herein or in any other Loan Document, each of the Administrative Agent and the Collateral Agent is hereby irrevocably authorized by each Lender (without requirement of notice to or consent of any Lender except as expressly required by Section 10.1) to take any action requested by the Borrower having the effect of releasing, or subordinating any Lien on, any Collateral or guarantee obligations (i) to the extent necessary to permit consummation of any transaction not prohibited by any Loan Document or that has been consented to in accordance with Section 10.1 or (ii) under the circumstances described in paragraph (b) below.

(b)     At such time as the Loans and the other obligations under the Loan Documents (other than obligations under or in respect of Specified Letters of Credit and Specified Swap Agreements and any contingent indemnification obligations) shall have been paid in full, the Collateral shall be released from the Liens created by the Loan Documents, and all obligations related thereto (other than those expressly stated to survive such termination) of the Administrative Agent, the Collateral Agent and each Loan Party shall terminate, all without delivery of any instrument or performance of any act by any Person.

10.15.   Confidentiality.  Each of the Administrative Agent and each Lender agrees to keep confidential all non-public information provided to it by any Loan Party, the Administrative Agent or any Lender pursuant to or in connection with this Agreement that is designated by the provider thereof as confidential; provided that nothing herein shall prevent the Administrative Agent or any Lender from disclosing any such information (a) to the Administrative Agent, any other Lender or any affiliate thereof, (b) subject to an agreement to comply with the provisions of this Section, to any actual or prospective Transferee or any direct or indirect counterparty to any Swap Agreement (or any professional advisors to such counterparty), (c) to its employees, officers, directors, agents, attorneys, accountants and other professional advisors or those of any of its affiliates, provided that such Persons have been advised of the confidentiality provisions hereof and are subject thereto, (d) upon the request or demand of any

Governmental Authority, (e) in response to any order of any court or other Governmental Authority or as may otherwise be required pursuant to any Requirement of Law, (f) if requested or required to do so in connection with any litigation or similar proceeding, (g) that has been publicly disclosed, (h) to the National Association of Insurance Commissioners or any similar organization or any nationally recognized rating agency that requires access to information about a Lender's investment portfolio in connection with ratings issued with respect to such Lender, or (i) in connection with the exercise of any remedy hereunder or under any other Loan Document.

Each Lender acknowledges that information furnished to it pursuant to this Agreement or the other Loan Documents may include material non-public information concerning the Borrower and its Affiliates and their related parties or their respective securities, and confirms that it has developed compliance procedures regarding the use of material non-public information and that it will handle such material non-public information in accordance with those procedures and applicable law, including Federal and state securities laws.

All information, including requests for waivers and amendments, furnished by the Borrower or the Administrative Agent pursuant to, or in the course of administering, this Agreement or the other Loan Documents will be syndicate-level information, which may contain material non-public information about the Borrower and its Affiliates and their related parties or their respective securities. Accordingly, each Lender represents to the Borrower and the Administrative Agent that it has identified in its administrative questionnaire a credit contact who may receive information that may contain material non-public information in accordance with its compliance procedures and applicable law, including Federal and state securities laws.

10.16. <u>WAIVERS OF JURY TRIAL</u>. THE BORROWER, THE ADMINISTRATIVE AGENT AND THE LENDERS HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.

10.17. <u>USA Patriot Act</u>. Each Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow such Lender to identify the Borrower in accordance with the Patriot Act.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

[REORGANIZED LEAR CORPORATION]

By:_____
    Name:
    Title:

JPMORGAN CHASE BANK, N.A.,
as Administrative Agent and Collateral Agent and as a
Lender


By:_____
    Name:
    Title:

_____, as a Lender


By:_____
    Name:
    Title:

**Annex III**

**Conditions Precedent to Permitted Acquisitions**

(1)     the Administrative Agent shall receive not less than ten Business Days' prior written notice of such Acquisition, which notice shall include a reasonably detailed description of the proposed terms of such Acquisition and identify the anticipated closing date thereof;

(2)     concurrently with such Acquisition, the Borrower shall comply, and shall cause the Target to the extent applicable to comply, with the provisions of Section 6.9 of the Credit Agreement;

(3)     after giving effect to such Acquisition and the incurrence of any Indebtedness in connection therewith, (a) no Default or Event of Default shall exist, and (b) the Borrower shall be in compliance on a pro forma basis with the covenants set forth in Section 7.1 recomputed for the most recently ended fiscal quarter of the Borrower for which information is available regarding the business being acquired;

(4)     all material consents necessary for such Acquisition have been acquired and such Acquisition shall have been approved by the applicable Target's board of directors or similar governing body;

(5)     the applicable Target shall be engaged in substantially the same type of business as the Borrower and its Subsidiaries or a reasonable extension thereof;

(6)     the aggregate consideration (including all (i) cash and other property (other than common stock of the Borrower), (ii) Earn-Outs, (iii) Seller Debt and (iv) any other Indebtedness that is assumed or acquired by the Borrower of any of its Subsidiaries in connection with the Acquisition) paid in connection with all Acquisitions shall not exceed $400,000,000.