## EXHIBIT A

**Joint Plan of Reorganization**

SOLICITATION VERSION

James H.M. Sprayregen
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York  10022
Telephone:        (212) 446-4800
Facsimile:        (212) 446-4900

- and -

Marc Kieselstein
Ryan Blaine Bennett
Paul Wierbicki
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois  60654
Telephone:        (312) 862-2000
Facsimile:        (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| LEAR CORPORATION, et al.,[1] | ) | Case No. 09-14326 (ALG) |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

---

**DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

---

**Dated:  September 18, 2009**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' federal tax identification number (if any), include:  Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear Corporation Canada Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC (4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings Corp. #50 (9055); Lear South Africa Limited (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol Seating, LLC (4745).  The location of the Debtors' corporate headquarters and the service address for all of the Debtors is:  21557 Telegraph Road, Southfield, Michigan 48033.

## TABLE OF CONTENTS

**Page**

ARTICLE I. DEFINED TERMS AND RULES OF INTERPRETATION ................................................................1
    A.    Rules of Interpretation ................................................................1
    B.    Defined Terms ................................................................1

ARTICLE II. ADMINISTRATIVE, DIP FACILITY AND PRIORITY CLAIMS ................................................15
    A.    Administrative Claims ................................................................15
    B.    DIP Facility Claims ................................................................15
    C.    Priority Tax Claims ................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ....................................16
    A.    Classification of Claims ................................................................16
    B.    Treatment of Claims and Interests Against Group A Debtors ................................16
    C.    Treatment of Claims and Interests Against Group B Debtors ................................19
    D.    Intercompany Claims ................................................................21
    E.    Special Provision Governing Unimpaired Claims ................................................................21
    F.    Acceptance or Rejection of the Plan ................................................................21
    G.    Nonconsensual Confirmation ................................................................21

ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN ................................................................21
    A.    Substantive Consolidation ................................................................21
    B.    Corporate Existence ................................................................22
    C.    Vesting of Assets in the Reorganized Debtors ................................................................22
    D.    Indemnification Provisions in Organizational Documents ................................................................23
    E.    Cancellation of Agreements, Unsecured Notes and Equity Interests ................................23
    F.    Reorganized Company Equity Interests ................................................................23
    G.    Section 1145 Exemption ................................................................24
    H.    Exit Financing ................................................................24
    I.    New Term Loans ................................................................25
    J.    Restructuring Transactions ................................................................25
    K.    Corporate Action ................................................................25
    L.    Post-Effective Date Governance ................................................................25
    M.    Effectuating Documents; Further Transactions ................................................................25
    N.    Exemption from Certain Transfer Taxes and Recording Fees ................................................................26
    O.    Board Representation ................................................................26
    P.    Senior Management ................................................................26
    Q.    Key Management Incentive Plan and Management Equity Plan ................................................................26
    R.    Preservation of Rights of Action ................................................................26

ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................................27
    A.    Assumption and Rejection of Executory Contracts and Unexpired Leases ................................27
    B.    Cure of Defaults for Assumed Executory Contracts and Unexpired Leases ................................27
    C.    Claims Based on Rejection of Executory Contracts and Unexpired Leases ................................28
    D.    Assumption of Directors and Officers Insurance Policies ................................................................28
    E.    Reservation of Rights ................................................................29
    F.    Nonoccurrence of Effective Date ................................................................29
    G.    Compensation and Benefit Programs ................................................................29
    H.    Collective Bargaining Agreements ................................................................30
    I.    Workers' Compensation Programs ................................................................30

ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS ................................................................30
    A.    Distributions on Account of Claims and Interests Allowed As of the Effective Date ................................30
    B.    Distributions on Account of Claims and Interests Allowed After the Effective Date ................................30

K&E 1544985910

C.     Delivery of Distributions .................................................................................31
D.     Claims Paid or Payable by Third Parties...........................................................33
E.     Allocation Between Principal and Accrued Interest ..........................................33
F.     Minimum Distribution .......................................................................................33

ARTICLE VII. PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT AND
UNLIQUIDATED CLAIMS OR EQUITY INTERESTS .......................................................33
A.     Allowance of Claims and Interests....................................................................33
B.     Claims and Interests Administration Responsibilities.......................................33
C.     Estimation of Claims and Interests....................................................................33
D.     Disallowance of Claims or Interests ..................................................................34
E.     Amendments to Claims ......................................................................................34

ARTICLE VIII. CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE................34
A.     Conditions Precedent to Confirmation ..............................................................34
B.     Conditions Precedent to the Effective Date ......................................................35
C.     Waiver of Conditions .........................................................................................35
D.     Non-Occurrence of Conditions ..........................................................................35

ARTICLE IX. RELEASE, INJUNCTIVE AND RELATED PROVISIONS ...........................................35
A.     Discharge of Claims and Termination of Interests............................................35
B.     Subordinated Claims ..........................................................................................35
C.     Compromise and Settlement of Claims, Interests, and Controversies ..............36
D.     **Debtor Release**................................................................................................36
E.     **Third Party Release** .......................................................................................37
F.     **Exculpation**....................................................................................................37
G.     Indemnification ..................................................................................................38
H.     **Injunction**......................................................................................................38
I.     Setoffs ................................................................................................................39
J.     Release of Liens .................................................................................................39

ARTICLE X. ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS ...........................39
A.     Professional Claims............................................................................................39
B.     Other Administrative Claims .............................................................................40

ARTICLE XI. RETENTION OF JURISDICTION ...............................................................................40

ARTICLE XII. MISCELLANEOUS PROVISIONS ..............................................................................42
A.     Immediate Binding Effect..................................................................................42
B.     Additional Documents .......................................................................................42
C.     Payment of Statutory Fees ................................................................................42
D.     Modification of Plan ..........................................................................................42
E.     Revocation of Plan .............................................................................................43
F.     Reservation of Rights.........................................................................................43
G.     Successors and Assigns......................................................................................43
H.     Service of Documents ........................................................................................43
I.     Term of Injunctions or Stays.............................................................................44
J.     Entire Agreement ...............................................................................................44
K.     Governing Law ..................................................................................................44
L.     Exhibits ..............................................................................................................44
M.     Nonseverability of Plan Provisions upon Confirmation....................................45
N.     Closing of Chapter 11 Cases .............................................................................45
O.     Conflicts.............................................................................................................45
P.     Dissolution of Committee ..................................................................................45
Q.     Fees ....................................................................................................................45
R.     Special Rule Concerning the Debtors' Qualified Pension Plans ........................45

K&E 1544985910

S.      ACE Companies................................................................................................................46
T.      Section 1125(e) Good Faith Compliance ........................................................................46
U.      Further Assurances............................................................................................................46
V.      No Stay of Confirmation Order........................................................................................46
W.      Aid and Recognition .........................................................................................................47

K&E 1544985910

## DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

Lear Corporation and the other Debtors in the above-captioned chapter 11 cases propose the following joint plan of reorganization for the resolution of outstanding creditor claims against, and equity interests in, the Debtors pursuant to title 11 of the United States Code, 11 U.S.C. §§ 101-1532. Capitalized terms used in the Plan and not otherwise defined have the meanings ascribed to such terms in Article I.B of the Plan.

Reference is made to the Disclosure Statement, Filed contemporaneously with the Plan, for a discussion of the Debtors' history, businesses, assets, results of operations, and projections of future operations, as well as a summary and description of the Plan and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

## ARTICLE I.

## DEFINED TERMS AND RULES OF INTERPRETATION

A.    *Rules of Interpretation*

1.    For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words ''herein,'' "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed hereby.

B.    *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

1.    "*2013 and 2016 Indenture*" means that certain Indenture dated as of November 24, 2006, among Lear Corporation, as issuer, certain Affiliates of Lear Corporation, as guarantors, and the 2013 and 2016 Notes Trustee, as amended, supplemented or otherwise modified from time to time through the Petition Date.

2.    "*2013 and 2016 Notes*" means the unsecured 8.5% senior notes due 2013 and/or the unsecured 8.75% senior notes due 2016 issued pursuant to the 2013 and 2016 Indenture.

3.    "*2013 and 2016 Notes Trustee*" means The Bank of New York Mellon Trust Company, National Association, or its successor.

K&E 1544985910

4.        "*2014 Indenture*" means that certain Indenture dated as of August 3, 2004, among Lear Corporation, as issuer, certain Affiliates of Lear Corporation, as guarantors, and the 2014 Notes Trustee, as amended, supplemented or otherwise modified from time to time through the Petition Date.

5.        "*2014 Notes*" means the unsecured 5.75% senior notes due 2014 issued pursuant to the 2014 Indenture.

6.        "*2014 Notes Trustee*" means The Bank of New York Mellon Trust Company, National Association, as successor in interest to BNY Midwest Trust Company, N.A., or its successor.

7.        "*Accrued Professional Compensation*" means, at any date, all accrued fees and reimbursable expenses (including success fees) for services rendered by all Retained Professionals in the Chapter 11 Cases through and including such date, to the extent that such fees and expenses have not been previously paid and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent that there is a Final Order denying some or all of a Retained Professional's fees or expenses, such denied amounts shall no longer be considered Accrued Professional Compensation.

8.        "*ACE Companies*" means, collectively, ACE American Insurance Company, ACE Property and Casualty Insurance Company, Indemnity Insurance Company of North America, Insurance Company of North America, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, ACE INA Insurance and ESIS, Inc. and each of their respective affiliates or other companies issuing policies or entering into agreements to, with or providing coverage to one or more of the Debtors.

9.        "*ACE Insurance Program*" means those insurance policies and all agreements, documents or instruments relating thereto including, without limitation, claims servicing agreements, that have been issued or entered into by or at the request of the ACE Companies (or any of them) to, with or providing coverage to one or more of the Debtors.

10.        "*ACE-Related Cure*" means cure of defaults under the ACE Insurance Program, if any, related to assumption of the ACE Insurance Program.

11.        "*Adequate Protection Claims*" means rights to adequate protection arising under the DIP Order.

12.        "*Administrative Claim*" means a Claim (other than the Adequate Protection Claims and DIP Facility Claims) that has been timely filed, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Accrued Professional Compensation (to the extent Allowed by the Bankruptcy Court); and (c) all fees and charges assessed against the Estates under chapter 123 of title 28 United States Code, 28 U.S.C. §§ 1911-1930.

13.        "*Affiliate*" has the meaning set forth at section 101(2) of the Bankruptcy Code.

14.        "*Allowed*" means with respect to Claims:  (a) any Claim, proof of which is timely Filed by the applicable Claims Bar Date (or that by the Bankruptcy Code or Final Order is not or shall not be required to be Filed); (b) any Claim that is listed in the Schedules as of the Effective Date as not disputed, not contingent, and not unliquidated, and for which no Proof of Claim has been timely Filed; or (c) any Claim allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; provided, however, that with respect to any Claim described in clauses (a) or (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to any such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court or such an objection is so interposed and the Claim shall have been Allowed by a Final Order; provided further, however, that the Claims described in clauses (a), (b) and (c) above shall not include any Claim on account of a right, option, warrant, right to convert, or other right to purchase an Equity Interest.  Except as otherwise specified in the Plan or an order of the Bankruptcy Court or with respect to Priority Tax Claims, the amount of an Allowed Claim shall not include interest on such Claim from and after the Petition Date.  Any Claim that has been or is hereafter listed in the Schedules as disputed,

K&E 1544985910

contingent, or unliquidated, and for which no Proof of Claim has been timely Filed, is not considered Allowed and shall be expunged without further action and without any further notice to or action, order, or approval of the Bankruptcy Court.   For the avoidance of doubt, the Prepetition Credit Agreement Secured Claims and the Prepetition Credit Agreement Deficiency Claims shall be deemed Allowed in the amounts of the Prepetition Credit Agreement Secured Claims and the Prepetition Credit Agreement Deficiency Claims, respectively.

15.      "*Amended and Restated Bylaws*" means the bylaws of Reorganized Lear Corporation substantially in the form of those attached to the Plan Supplement.

16.      "*Amended and Restated Certificate of Incorporation*" means the certificate of incorporation of Reorganized Lear Corporation substantially in the form of that attached to the Plan Supplement.

17.      "*Avoidance Actions*" means any and all actual or potential claims or causes of action to avoid a transfer of property or an obligation incurred by the Debtors pursuant to sections 544, 547, 548, 550 and 551 of the Bankruptcy Code.

18.      "*Ballot*" means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

19.      "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

20.      "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

21.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, 28 U.S.C. § 2075, as applicable to the Chapter 11 Cases, and the general, local and chambers rules of the Bankruptcy Court.

22.      "*Baseline Liquidity Benefit*" means a cumulative benefit to the Debtors' liquidity of $134 million, arising on account of the Debtors' forecasted improvement in terms with their trade vendors from December 31, 2009 to September 30, 2010.

23.      "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

24.      "*Canadian Debtors*" means Lear Canada, Lear Canada Investments Ltd. and Lear Corporation Canada Ltd.

25.      "*Canadian Information Officer*" means RSM Richter Inc., as information officer in the Canadian Proceedings, which provides the Ontario Superior Court of Justice (Commercial List) with updates on material activities in the Chapter 11 Cases.

26.      "*Canadian Proceedings*" means those proceedings commenced when the Canadian Debtors filed for creditor protection under the *Companies' Creditors Arrangement Act*, as amended, in the Ontario Superior Court of Justice (Commercial List) on the Petition Date, administered under commercial court file number CV-09-00008269-00CL.

27.      "*Canadian Recognition Order*" means an order in the Canadian Proceedings recognizing and giving full effect to the Plan.

28.      "*Cash*" means legal tender of the United States of America or the equivalent thereof, including, without limitation, bank deposits, checks and Cash Equivalents.

29.      "*Cash Equivalents*" mean (a) securities issued or unconditionally guaranteed or insured by the United States Government, the Canadian Government, Japan or any member of the European Union or any other government approved by the Exit Facility Agent (which approval shall not be unreasonably withheld), (b) securities

K&E 1544985910

issued or unconditionally guaranteed or insured by any state of the United States of America or province of Canada or any agency or instrumentality thereof having maturities of not more than twelve months from the date of acquisition and having one of the two highest ratings obtainable from either S&P or Moody's, (c) time deposits, certificates of deposit and bankers' acceptances having maturities of not more than twelve months from the date of acquisition, in each case with any of the Exit Facility Lenders (or any affiliate of any thereof) or with any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, Japan, Canada or any member of the European Union or any U.S. branch of a foreign bank having at the date of acquisition capital and surplus of not less than $100,000,000, (d) repurchase obligations with a term of not more than seven days for underlying securities of the types described in clauses (a), (b) and (c) entered into with any bank meeting the qualifications specified in clause (c) above, (e) commercial paper issued by the parent corporation of any Exit Facility Lender and commercial paper rated, at the time of acquisition, at least "A-1" or the equivalent thereof by S&P or "P-1" or the equivalent thereof by Moody's and in either case maturing within twelve months after the date of acquisition, (e) deposits maintained with money market funds having total assets in excess of $300,000,000, (f) demand deposit accounts maintained in the ordinary course of business with banks or trust companies, (g) temporary deposits, of amounts received in the ordinary course of business pending disbursement of such amounts, in demand deposit accounts in banks outside the United States, (h) deposits in mutual funds which invest substantially all of their assets in preferred equities issued by U.S. corporations rated at least "AA" (or the equivalent thereof) by S&P; provided, that notwithstanding the foregoing, Cash Equivalents shall, in any event, include all Cash and cash equivalents as set forth in Reorganized Lear Corporation's balance sheet prepared in accordance with GAAP, and (i) other investments requested by Reorganized Lear Corporation and approved by the Exit Facility Agent.

30.     "*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including, but not limited to, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code, including Avoidance Actions and all such matters set forth in Article IV.C and Article IV.R) of any of the Debtors, the Debtors-in-Possession, and/or the Estates (including, but not limited to, those actions set forth in the Plan Supplement), whether known or unknown, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, that are or may be pending on the Effective Date or instituted by the Reorganized Debtors after the Effective Date against any entity, based in law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted as of the date of entry of the Confirmation Order.

31.     "*Certificate*" means any instrument evidencing a Claim or an Interest.

32.     "*Certificate of Designation*" means the Certificate of Designation of the Series A Preferred Stock, the form of which is set forth in the Plan Supplement.

33.     "*Chairman, President and Chief Executive Officer*" means Robert E. Rossiter.

34.     "*Chapter 11 Cases*" means (a) when used with reference to a particular Debtor, the chapter 11 case Filed for that Debtor under chapter 11 of the Bankruptcy Code in the Bankruptcy Court and (b) when used with reference to all Debtors, the jointly administered chapter 11 cases for all of the Debtors.

35.     "*Claim*" means any claim against a Debtor as defined in section 101(5) of the Bankruptcy Code.

36.     "*Claims Bar Date*" means, as applicable, (a) October 2, 2009 at 5:00 p.m. prevailing Eastern Time or (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for Filing such Claim.

37.     "*Claims Register*" means the official register of Claims and Interests maintained by the Notice, Claims and Solicitation Agent.

38.     "*Class*" means a category of holders of Claims or Equity Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

K&E 1544985910

39.      "*Class 5A Claim*" means a Claim that is classified in Class 5A.

40.      "*Commission*" means the United States Securities and Exchange Commission.

41.      "*Committee*" means the official committee of unsecured creditors of the Debtors appointed by the United States Trustee in the Chapter 11 Cases on July 14, 2009, pursuant to section 1102 of the Bankruptcy Code.

42.      "*Compensation and Benefit Claims*" means any and all Claims arising on account of, or relating to, the Compensation and Benefits Programs assumed pursuant to Article V.G hereof (including, but not limited to, Claims relating to the Debtors' supplemental employee retirement program).

43.      "*Compensation and Benefits Programs*" means all employment and severance agreements and policies, and all compensation and benefit plans, policies, and programs of the Debtors, and all amendments and modifications thereto, applicable to the Debtors' employees, former employees, retirees and non-employee directors and the employees, former employees and retirees of their subsidiaries, including, without limitation, all savings plans, retirement plans, health care plans, disability plans, severance benefit agreements and plans, incentive plans, deferred compensation plans and life, accidental death and dismemberment insurance plans, including the Employee-Related Programs and the Employment Agreements.

44.      "*Confirmation*" means the entry of the Confirmation Order by the Bankruptcy Court on the docket of the Chapter 11 Cases.

45.      "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

46.      "*Confirmation Hearing*" means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

47.      "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

48.      "*Contract/Lease Schedule Date*" means September 11, 2009, the latest date by which the Debtors shall file their list of Executory Contracts and Unexpired Leases to be rejected filed pursuant to the Plan Supplement.

49.      "*Convenience Claims*" means (a) any general unsecured Claim against the Group A Debtors (other than Unsecured Note Claims and Prepetition Credit Agreement Deficiency Claims) that otherwise would be a Class 5A Claim, but, with respect to each such Claim the aggregate amount of such Claim is equal to or less than $10,000 or (b) any Class 5A Claim in excess of $10,000, which the Holder thereof, pursuant to such Holder's Ballot or such other election accepted by the Debtors, elects to have reduced to the amount of $10,000 or less and to be treated as a Convenience Claim.

50.      "*Cure*" means the payment of Cash by the applicable Debtors, or the distribution of other property (as the applicable Debtors and the counterparty to the Executory Contract or Unexpired Lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an Executory Contract or Unexpired Lease of the Debtors and (b) permit the Debtors to assume such Executory Contract or Unexpired Lease under sections 365 and 1123 of the Bankruptcy Code.

51.      "*Cure Bar Date*" means the deadline for filing requests for payment of Cure, which shall be the later of: (a) thirty (30) days after the Effective Date or (b) thirty (30) days after the assumption of the applicable Executory Contract or Unexpired Lease, unless otherwise ordered by the Bankruptcy Court or agreed to by the Debtors and the counterparty to the applicable Executory Contract or Unexpired Lease.

52.      "*Debtor*" means one of the Debtors, in its individual capacity as a debtor and debtor-in-possession in the Chapter 11 Cases.

K&E 1544985910

53.     "*Debtor Releasees*" means, collectively, (a) all current and former officers, directors, members, managers, and employees of the Debtors; and (b) all attorneys, financial advisors, advisors, accountants, investment bankers, investment advisors, actuaries, professionals and affiliates of the Debtors, their subsidiaries, and each of their respective predecessors and successors in interest, and all of their respective current and former members (including *ex officio* members), managers, officers, directors, employees, partners, attorneys, financial advisors, accountants, managed funds, investment bankers, investment advisors, actuaries, professionals and affiliates, each in their respective capacities as such.

54.     "*Debtors*" means, collectively, the Group A Debtors and the Group B Debtors.

55.     "*Debtors-in-Possession*" means, collectively, the Group A Debtors and the Group B Debtors as debtors in possession in the Chapter 11 Cases.

56.     "*DIP Agent*" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent under the DIP Facility.

57.     "*DIP Facility*" means that certain $500,000,000 Credit and Guarantee Agreement, dated as of August 4, 2009, among Lear Corporation, as borrower, the Guarantors (as defined therein), the DIP Agent and the DIP Lenders, as may be amended, modified, ratified, extended, renewed, restated or replaced.

58.     "*DIP Facility Claims*" means any secured Claim held by the DIP Lenders and/or the DIP Agent arising under or related to the DIP Facility and the other Loan Documents (as defined therein).

59.     "*DIP Facility Warrants*" means the warrants to acquire New Common Stock, if any, issued to the DIP Lenders pursuant to Article II.B, the terms of which are set forth in the DIP Facility Warrant Agreement.

60.     "*DIP Facility Warrant Agreement*" means that certain agreement providing for, among other things, the issuance of the DIP Facility Warrants, if any, pursuant to Article II.B to the Holders of DIP Facility Claims, which shall be in the form and substance as set forth in the Plan Supplement.

61.     "*DIP Lenders*" means, collectively, the Lenders (as defined in the DIP Facility) party to the DIP Facility from time to time.

62.     "*DIP Order*" means the order entered by the Bankruptcy Court on August 4, 2009 authorizing and approving the DIP Facility.

63.     "*Disclosure Statement*" means the disclosure statement for the Plan, including, without limitation, all exhibits and schedules thereto, as amended, supplemented or modified from time to time, that is prepared and distributed in accordance with sections 1125, 1126(b) and 1145 of the Bankruptcy Code, Bankruptcy Rule 3018 and other applicable law.

64.     "*Disputed Claim*" means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

65.     "*Distribution Agent*" means the Entity or Entities chosen by the Reorganized Debtors to make or to facilitate distributions pursuant to the Plan, including the Reorganized Debtors or any Third Party Distribution Agent.

66.     "*DTC*" means Depository Trust Company.

67.     "*Effective Date*" means the date selected by the Debtors that is a Business Day after the entry of the Confirmation Order on which: (a) no stay of the Confirmation Order is in effect; and (b) all conditions specified in Article VIII.B have been (i) satisfied or (ii) waived pursuant to Article VIII.C.

68.     "*Employee-Related Programs*" means those certain employee-related programs listed in the Plan Supplement.

69.     "*Employment Agreements*" means the employment agreements attached to the Plan Supplement.

70.     "*Entity*" means an entity as defined in section 101(15) of the Bankruptcy Code.

71.     "*Equity Interest*" means any issued, unissued, authorized or outstanding shares of common stock, preferred stock or other instrument evidencing an ownership interest in a Debtor, whether or not transferable, together with any warrants, equity-based awards or contractual rights to purchase or acquire such equity interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date, including Section 510(b) Equity-Related Claims; provided, however, that Equity Interest does not include any Intercompany Interest.

72.     "*Estate*" means, as to each Debtor, the estate created for such Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

73.     "*Excess Cash Paydown*" means in the event Reorganized Lear Corporation has Minimum Liquidity determined on a normalized basis in excess of $1.0 billion as of the Effective Date, Reorganized Lear Corporation shall, to the extent of such excess and without penalty or premium:  (a) first, redeem the Series A Preferred Stock in an aggregate stated value of up to $50.0 million; (b) second, prepay the New Term Loans in an aggregate principal amount of up to $50.0 million; and (c) thereafter, prepay the loans under the Exit Facility.

74.     "*Exculpated Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the Debtor Releasees; (d) the Indenture Trustees; (e) the Third Party Releasees; (f) the Canadian Information Officer; (g) the Committee and the members thereof (in their capacities as such); and (h) all of the current and former members (including *ex officio* members), officers, directors, managers, employees, partners, attorneys, financial advisors, accountants, investment bankers, investment advisors, actuaries, professionals, agents, affiliates and representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such).

75.     "*Executory Contract*" means a contract or lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

76.     "*Exit Facility*" means the Exit Financing Agreement to be executed as of the Effective Date, including any agreements, amendments, supplements or documents related thereto.

77.     "*Exit Facility Agent*" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent, or any other financial institution designated as "agent," under the Exit Financing Agreement.

78.     "*Exit Facility Lenders*" means, collectively, the lenders party to the Exit Financing Agreement from time to time.

79.     "*Exit Financing Agreement*" means an agreement on account of (a) the three-year senior secured first lien term facility in an aggregate principal amount of up to $500 million between the DIP Lenders, Reorganized Lear Corporation, as borrower, and Reorganized Lear Corporation's wholly owned domestic direct and indirect subsidiaries, as guarantors, substantially similar to the agreement attached as Exhibit I to the DIP Facility, or (b) an alternative exit-financing facility provided that the DIP Facility is paid in full in Cash upon the Effective Date; provided that the aggregate amount of loans under the Exit Financing Agreement is subject to prepayment on account of the Excess Cash Paydown.

80.     "*File*," "*Filed*" or "*Filing*" means file, filed or filing with the Bankruptcy Court in the Chapter 11 Cases, or in the case of a Proof of Claim, to file with the Notice, Claims and Solicitation Agent.

81.     "*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument or rehearing has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought or has otherwise been dismissed with prejudice.

K&E 1544985910

82.    "*GAAP*" means generally accepted accounting principles in the United States as in effect from time to time.

83.    "*General Unsecured Claims*" means:  (a) general unsecured Claims (i) directly relating to and arising solely from the receipt of goods and services by the Group B Debtors arising with and held by Persons with whom the Group B Debtors are conducting, and will continue to conduct, business as of the Petition Date, (ii) under Executory Contracts and Unexpired Leases rejected by the Group B Debtors or (iii) arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlements entered by, a Group B Debtor related thereto; and (b) all Compensation and Benefit Claims against any Group B Debtor; <u>provided</u> that General Unsecured Claims shall not include Administrative Claims, Subordinated Claims or Intercompany Claims.

84.    "*Group A Debtors*" means, collectively, Lear Corporation, Lear Canada, Lear Automotive Dearborn, Inc., Lear Corporation (Germany) Ltd., Lear Corporation EEDS and Interiors, Lear Operations Corporation and Lear Seating Holdings Corp. #50.

85.    "*Group B Debtors*" means, collectively, Lear #50 Holdings, LLC, Lear Argentine Holdings Corporation #2, Lear Automotive Manufacturing, LLC, Lear Canada Investments Ltd., Lear Corporation Canada Ltd., Lear Corporation Global Development, Inc., Lear EEDS Holdings, LLC, Lear European Operations Corporation, Lear Holdings, LLC, Lear Investments Company, LLC, Lear Mexican Holdings Corporation, Lear Mexican Holdings, LLC, Lear Mexican Seating Corporation, Lear South Africa Limited, Lear South American Holdings Corporation, Lear Trim L.P. and Renosol Seating, LLC.

86.    "*Holder*" means an Entity holding a Claim or Interest.

87.    "*Impaired*" means any Claim or Interest in an Impaired Class.

88.    "*Impaired Class*" means an impaired Class within the meaning of section 1124 of the Bankruptcy Code.

89.    "**Indemnification*" means the indemnification provision set forth in Article IX.G.

90.    "*Indemnification Obligation*" means a Debtor's obligation under an Executory Contract, assumed in the Chapter 11 Cases, or otherwise to indemnify directors, officers, employees or agents of such Debtor who served in such capacity at any time, with respect to or based upon any act or omission taken or omitted in any of such capacities, or for or on behalf of any Debtor, pursuant to and to the maximum extent provided by the Debtor's respective certificates of incorporation, certificates of formation, bylaws, similar corporate documents, and applicable law, as in effect as of the Effective Date.

91.    "*Indentures*" means, collectively, the 2013 and 2016 Indenture, the Zero-Coupon Indenture and the 2014 Indenture.

92.    "*Indenture Trustees*" means, collectively, the 2013 and 2016 Notes Trustee, the Zero-Coupon Notes Trustee and the 2014 Notes Trustee.

93.    "*Indenture Trustees' Fees*" means the reasonable and documented fees, disbursements, advances and expenses (including professional fees and expenses) of the Indenture Trustees under the indentures governing the 2013 and 2016 Notes, the Zero-Coupon Notes and the 2014 Notes.

94.    "*Intercompany Claims*" means, collectively, any Claim held by a Debtor against another Debtor or any Claim held by an Affiliate of a Debtor against a Debtor.

95.    "*Intercompany Interest*" means an Equity Interest in a Debtor held by another Debtor or an Equity Interest in a Debtor held by an Affiliate of a Debtor.  For the avoidance of doubt, an Intercompany Interest excludes any Equity Interest in Lear Corporation.

96.    "*Interests*" means, collectively, Equity Interests and Intercompany Interests.

K&E 1544985910

97.    "*Interim Compensation Order*" means an order of the Bankruptcy Court allowing Retained Professionals to seek interim compensation in accordance with the procedures approved therein, as the same may be modified by a Bankruptcy Court order approving the retention of a specific Retained Professional or otherwise.

98.    "*Key Management Incentive Plan*" means the key management incentive plan approved by the Bankruptcy Court, the terms of which are described in the Disclosure Statement.

99.    "*Lender Plan Support Agreement*" means that plan support agreement dated July 6, 2009, between the Debtors and certain of the Holders of Prepetition Credit Agreement Secured Claims, as amended from time to time in accordance with the terms thereof.

100.    "*Lien*" means a lien as defined in section 101(37) of the Bankruptcy Code.

101.    "*Local Bankruptcy Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

102.    "*Management Equity Plan*" means the management equity plan for the benefit of certain continuing employees of the Reorganized Debtors and non-management members of the New Board, the terms of which are described in the Disclosure Statement.

103.    "*Minimum Liquidity*" means, as of the Effective Date, Cash and Cash Equivalents, *plus* availability under working capital facilities, if any, *plus* the Working Capital Adjustment, *less* any Accrued Professional Compensation, Administrative Claims and other costs associated with the Chapter 11 Cases not paid prior to the Effective Date, and cash financing costs to the extent not previously paid; provided, that at least $800 million of such aggregate amount must consist of Cash and Cash Equivalents; provided, further, that the Minimum Liquidity as of the Effective Date must be calculated on or prior to the date that is 30 days after the Effective Date and shall be determined on a basis substantially consistent with the projections of liquidity of the Debtors provided to the Prepetition Administrative Agent and the Noteholder Steering Committee prior to the Petition Date.

104.    "*Moody's*" means Moody's Investors Service, Inc.

105.    "*New Board*" means the board of directors of Reorganized Lear Corporation.

106.    "*New Common Stock*" means newly-issued shares of common stock of Reorganized Lear Corporation.

107.    "*New Term Loans*" means the $600 million of new term loans to be issued as of the Effective Date under the New Term Loans Agreement, which are subject to prepayment on account of the Excess Cash Paydown.

108.    "*New Term Loans Agreement*" means that $600 million second lien term loan agreement among Reorganized Lear Corporation, as borrower, Reorganized Lear Corporation's domestic direct and indirect subsidiaries, as guarantors, and the Holders of Prepetition Credit Agreement Secured Claims, substantially in the form of the agreement set forth in the Plan Supplement.

109.    "*Non-Released Parties*" means those Entities that are not Debtor Releasees or Third Party Releasees.

110.    "*Noteholder Plan Support Agreement*" means that plan support agreement dated July 6, 2009, between the Debtors and certain of the Holders of Unsecured Note Claims, as amended from time to time in accordance with the terms thereof.

111.    "*Noteholder Steering Committee*" means that certain steering committee of noteholders holding Unsecured Note Claims represented by the Noteholder Steering Committee Advisors.

112.    "*Noteholder Steering Committee Advisors*" means Stroock & Stroock & Lavan, LLP, as counsel to the Noteholder Steering Committee, Moelis & Co., LLC, as financial advisor to the Noteholder Steering Committee and Goodmans, LLP as Canadian counsel to the Noteholder Steering Committee.

K&E 1544985910

113.    "*Notice, Claims and Solicitation Agent*" means Kurtzman Carson Consultants LLC, located at 2335 Alaska Avenue, El Segundo, California 90245, (888) 249-2792, retained as the Debtors' notice, claims and solicitation agent.

114.    "*Other General Unsecured Claims*" means any unsecured Claim, other than Unsecured Ongoing Operations Claims, Convenience Claims or Subordinated Claims, against one or more of the Group A Debtors including, but not limited to (a) the Unsecured Note Claims, (b) the Prepetition Credit Agreement Deficiency Claims, (c) Claims arising from the rejection of Unexpired Leases and Executory Contracts to which a Group A Debtor is a party, and (d) Claims arising from any litigation or other court, administrative or regulatory proceeding, including, without limitation, damages or judgments entered against, or settlements entered into by, a Group A Debtor related thereto.

115.    "*Other General Unsecured Claims Distribution*" means the Pro Rata distribution to the Holders of Other General Unsecured Claims consisting of the following:

(a)    all shares of the New Common Stock issued as of the Effective Date that remain after giving effect to the distribution of the New Common Stock pursuant to the Prepetition Credit Agreement Secured Claims Distribution (subject to dilution from the Series A Preferred Stock, the Warrants and the Management Equity Plan); and

(b)    Other General Unsecured Claims Warrants representing 15% of Reorganized Lear Corporation's fully-diluted New Common Stock as of the Effective Date (subject to dilution from the Management Equity Plan).

116.    "*Other General Unsecured Claims Warrant Agreement*" means that certain agreement providing for, among other things, the issuance of the Other General Unsecured Claims Warrants to the Holders of Other General Unsecured Claims, which shall be in the form and substance as set forth in the Plan Supplement.

117.    "*Other General Unsecured Claims Warrants*" means the warrants to acquire New Common Stock issued to the Holders of Other General Unsecured Claims, the terms of which are set forth in the Other General Unsecured Claims Warrant Agreement.

118.    "*Other Priority Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

119.    "*Other Secured Claim*" means any Secured Claim against the Debtors not specifically described herein; *provided*, *however*, that Other Secured Claims shall not include DIP Facility Claims.

120.    "*Person*" means any individual, corporation, partnership, joint venture, association, limited liability company, joint stock company, trust, unincorporated organization, government or agency or political subdivision thereof or any other Entity.

121.    "*Petition Date*" means July 7, 2009.

122.    "*Plan*" means this joint plan of reorganization under chapter 11 of the Bankruptcy Code, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules or the terms hereof, as the case may be, and the Plan Supplement, which is incorporated herein by reference, including, without limitation, all exhibits and schedules hereto and thereto.

123.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to be filed on the Plan Supplement Filing Date, as amended, modified or supplemented from time to time in accordance with the terms hereof and in accordance with the Bankruptcy Code and the Bankruptcy Rules, comprising, without limitation, the following documents: (a) the form of the New Term Loans Agreement; (b) the form of the Exit Financing Agreement; (c) the form of the DIP Facility Warrant Agreement; (d) the form of the Other General Unsecured Claims Warrant Agreement; (e) the form of Certificate of Designation; (f) the list of the Employee-Related Programs; (g) copies of the Employment Agreements; (h) the list of Executory Contracts and

K&E 1544985910

Unexpired Leases to be rejected; (i) the list of Compensation and Benefits Programs to be rejected; (j) the Registration Rights Agreement; (k) the Amended and Restated Certificate of Incorporation; (l) the Amended and Restated Bylaws; (m) a schedule of the Causes of action to be retained by the Reorganized Debtors; and (n) the identity of the members of the New Board; provided that notwithstanding anything to the contrary herein or otherwise, the list of Executory Contracts and Unexpired Leases to be rejected shall be filed on or before the Contract/Lease Schedule Date and shall not be modified after the Contract/Lease Schedule Date.

124. "*Plan Supplement Filing Date*" means the date that is ten (10) Business Days prior to the Voting Deadline.

125. "*Plan Support Agreements*" means, collectively, the Noteholder Plan Support Agreement and the Lender Plan Support Agreement.

126. "*Plan Term Sheet*" means that certain *Restructuring Term Sheet* attached as <u>Exhibit 1</u> to each of the Plan Support Agreements.

127. "*Prepetition Administrative Agent*" means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement.

128. "*Prepetition Credit Agreement*" means that certain Amended and Restated Credit and Guarantee Agreement dated as of April 25, 2006, among Lear Corporation, certain of its subsidiaries, the Prepetition Administrative Agent and other lenders party thereto, as amended.

129. "*Prepetition Credit Agreement Claims*" means, collectively, the Prepetition Credit Agreement Secured Claims and the Prepetition Credit Agreement Deficiency Claims.

130. "*Prepetition Credit Agreement Deficiency Claims*" means the unsecured Claims arising out of the Prepetition Credit Agreement in an aggregate Allowed amount equal to $737 million.

131. "*Prepetition Credit Agreement Lenders*" means the lenders under the Prepetition Credit Agreement, as of the Petition Date, including holders of Swap Claims.

132. "*Prepetition Credit Agreement Secured Claims*" means secured Claims arising out of the Prepetition Credit Agreement, including the Swap Claims, in an aggregate Allowed amount equal to $1.6 billion.

133. "*Prepetition Credit Agreement Secured Claims Distribution*" means the distribution to the Holders of Prepetition Credit Agreement Secured Claims consisting of the following:

(a) the New Term Loans;

(b) all shares of the Series A Preferred Stock; and

(c) 35.5% of the New Common Stock issued and outstanding on the Effective Date (subject to dilution from the Series A Preferred Stock, the Other General Unsecured Claims Warrants and the Management Equity Plan).

134. "*Priority Tax Claim*" means a Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

135. "*Professional Compensation and Reimbursement Claim*" means a Claim by a Retained Professional seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

136. "*Professional Fee Escrow Account*" means an interest-bearing account in an amount equal to the Professional Fee Reserve Amount funded and maintained by the Reorganized Debtors on and after the Effective Date solely for the purpose of paying all Allowed and unpaid fees and expenses of Retained Professionals in the Chapter 11 Cases.

K&E 1544985910

137.    "*Professional Fee Reserve Amount*" means the aggregate Accrued Professional Compensation through the Effective Date as estimated by the Retained Professionals in accordance with Article X.A.4 hereof.

138.    "*Proof of Claim*" means a proof of Claim Filed against any Debtor in the Chapter 11 Cases.

139.    "*Pro Rata*" means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class, or the proportion of a particular recovery that a Class is entitled to share with other Classes entitled to the same recovery under the Plan.

140.    "*Registration Rights Agreement*" means a registration rights agreement substantially in the form set forth in the Plan Supplement obligating Reorganized Lear Corporation to register for resale certain shares of New Common Stock under the Securities Act in accordance with the terms set forth in such agreement.

141.    "*Releasing Parties*" means, collectively, the Prepetition Administrative Agent, the Prepetition Credit Agreement Lenders, the Indenture Trustees, the DIP Agent, the DIP Lenders, the Canadian Information Officer, the Committee and members thereof, the Noteholder Steering Committee, Holders of Unsecured Note Claims that voted to accept the Plan, the non-Debtor parties to the Plan Support Agreements and all Holders of Claims or Equity Interests except any Holder of a Claim or Equity Interest: (a) that voted to reject the Plan; (b) that did not vote to accept the Plan but that timely elected on such Holder's Ballot to not participate in the Third Party Release set forth in Article IX.E hereof; or (c) that is in a Class that is deemed to reject the Plan.

142.    "*Reorganized Debtors*" means the Debtors, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

143.    "*Reorganized Lear Corporation*" means Lear Corporation, as reorganized pursuant to and under the Plan, or any successor thereto, by merger, consolidation, or otherwise, on or after the Effective Date.

144.    "*Representatives*" means, with regard to an Entity, current and former officers, directors, members (including *ex officio* members), managers, employees, partners, advisors, attorneys, professionals, accountants, investment bankers, investment advisors, actuaries, Affiliates, financial advisors, consultants, agents and other representatives of each of the foregoing Entities (whether current or former, in each case in his, her or its capacity as such).

145.    "*Requisite Participating Lenders*" means those Prepetition Credit Agreement Lenders that are parties to the Lender Plan Support Agreement and that hold more than $66^2/_3\%$ of the dollar amount of the Prepetition Credit Agreement Claims held by such Prepetition Credit Agreement Lenders.

146.    "*Requisite Participating Noteholders*" means those Holders of Unsecured Noteholder Claims that are parties to the Noteholder Plan Support Agreement and that hold more than $66^2/_3\%$ of the dollar amount of the Unsecured Noteholder Claims held by such Holders of Unsecured Noteholder Claims.

147.    "*Retained Professional*" means an Entity: (a) employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327 and 1103 of the Bankruptcy Code and to be compensated for services rendered prior to the Effective Date, pursuant to sections 327, 328, 329, 330 and 331 of the Bankruptcy Code; or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

148.    "*S&P*" means Standard & Poor's Ratings Services.

149.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

150.    "*Section 510(b) Claims*" means, collectively, the Section 510(b) Equity-Related Claims and the Section 510(b) Note-Related Claims.

K&E 1544985910

151.    "*Section 510(b) Equity-Related Claims*" means any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to any Equity Interest, which shall include, without limitation, any Claim arising from the rescission of a purchase or sale of any Equity Interest, any claim for damages arising from the purchase or sale of any Equity Interest, or any claim for reimbursement, contribution or indemnification for such Claim.

152.    "*Section 510(b) Note-Related Claims*" means any Claim of the type described in and subject to subordination pursuant to section 510(b) of the Bankruptcy Code relating to any of the Unsecured Notes, which shall include, without limitation, any Claim arising from the rescission of a purchase or sale of any of the Unsecured Notes, any claim for damages arising from the purchase or sale of any of the Unsecured Notes, or any claim for reimbursement, contribution or indemnification for such Claim.

153.    "*Secured Claims*" means, with respect to any Claim against any Debtor, other than Prepetition Credit Agreement Secured Claims, that portion, which, pursuant to section 506 of the Bankruptcy Code is (a) secured by a valid, perfected, and enforceable security interest, Lien, mortgage or other encumbrance, that is not subject to avoidance under applicable bankruptcy or nonbankruptcy law, in or upon any right, title or interest of a Debtor in and to property of the relevant Estate, to the extent of the value of the Holder's interest in such property as of the relevant determination date or (b) Allowed as such pursuant to the terms of the Plan (subject to the occurrence of the Effective Date).

154.    "*Securities*" means any instruments that qualify under section 2(a)(1) of the Securities Act, including the Unsecured Notes; provided that, for the avoidance of doubt, the Unsecured Notes shall be canceled pursuant to Article IV.E and shall not be reissued.

155.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a-77aa, as now in effect or hereafter amended, or any similar federal, state or local law.

156.    "*Series A Preferred Stock*" means Reorganized Lear Corporation's Series A Preferred Stock with a stated value of $500 million as of the Effective Date (subject to adjustment on account of the Excess Cash Paydown), the terms of which are set forth in the Certificate of Designation.

157.    "*Servicer*" means an indenture trustee, agent, servicer or other authorized representative of Holders of Claims or Interests recognized by the Debtors.

158.    "*Stock and Warrant Reserve*" means the New Common Stock and Other General Unsecured Claims Warrants held in reserve pursuant to Article VI.B.3 and in amount to be determined by the Debtors, in consultation with the Committee, the Noteholder Steering Committee and the Prepetition Administrative Agent prior to the Effective Date.

159.    "*Subordinated Claim*" means any Claim that (a) is a Section 510(b) Note-Related Claim or (b) by order of the Bankruptcy Court or any other court of competent jurisdiction is equitably subordinated to all general unsecured claims pursuant to section 510(c) of the Bankruptcy Code or otherwise.

160.    "*Swap Claims*" means those secured Claims arising from hedging arrangements under, or in connection with, the Prepetition Secured Credit Agreement with certain of the Prepetition Credit Agreement Lenders or their Affiliates.

161.    "*Terms Reduction*" means an estimate of the reduction in terms with the Debtors' trade vendors as of the Effective Date that shall be prepared in good faith by the Debtors or Reorganized Debtors, as applicable, on a basis consistent with the March LRP Model (May Update) as modified by the DIP sizing analysis of June 11, 2009 and updated as reflected in Exhibit F to the Disclosure Statement and delivered to the Prepetition Administrative Agent and the Noteholder Steering Committee by no later than 30 days after the Effective Date.

162.    "*Third Party Distribution Agent*" means DTC or any other Entity or Entities chosen by the Debtors or the Reorganized Debtors, as applicable, in consultation with the DIP Agent, the Noteholder Steering Committee and the Committee, to make or facilitate distributions under the Plan.

K&E 1544985910

163.    "*Third Party Releasees*" means, collectively: (a) the Prepetition Credit Agreement Lenders; (b) the Prepetition Administrative Agent; (c) the DIP Agent; (d) the DIP Lenders; (e) Holders of Unsecured Note Claims that voted to accept the Plan; (f) the non-Debtor parties to the Plan Support Agreements; (g) the Committee and the members thereof (in their capacities as such); (h) the Indenture Trustees; (i) the Canadian Information Officer; (j) the Noteholder Steering Committee; and (k) all attorneys, financial advisors, advisors, accountants, investment bankers, investment advisors, actuaries, professionals, current and former members (including ex officio members), officers, directors, employees, partners, and affiliates of each of the foregoing, each of the foregoing in their respective capacities as such.

164.    "*Trigger Price*" means, for purposes of exercise of the Other General Unsecured Claims Warrants, $2.155 billion divided by the total number of diluted shares of New Common Stock as of the Effective Date treating $500 million of Series A Preferred Stock on an as-converted basis and accounting for the shares of New Common Stock issuable upon the exercise of the Other General Unsecured Claim Warrants.  The Trigger Price shall be determined without giving pro forma effect to any Excess Cash Paydown and will be based upon $1.145 billion of debt and $500 million of Series A Preferred Stock.  Assuming 45 million of diluted shares of New Common Stock as of the Effective Date (based upon the shares of New Common Stock issued under the Plan and treating $500 million of the Series A Preferred Stock on an as-converted basis), Other General Unsecured Claims Warrants for approximately 7.94 million shares would issued and the Trigger Price would be $40.71 per share.

165.    "*Unclaimed Distribution*" means any distribution under the Plan on account of an Allowed Claim or Interest to a Holder that has not:  (a) accepted a particular distribution or, in the case of distributions made by check, negotiated such check; (b) given notice to the Reorganized Debtors of an intent to accept a particular distribution; (c) responded to the Debtors' or Reorganized Debtors' requests for information necessary to facilitate a particular distribution; or (d) taken any other action necessary to facilitate such distribution.

166.    "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

167.    "*Unimpaired*" means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

168.    "*Unsecured Note Claims*" means any Claim of a Holder arising under the Unsecured Notes and/or the Indentures in an aggregate Allowed amount equal to $1.3 billion (plus accrued and unpaid interest as of the Petition Date).

169.    "*Unsecured Notes*" means, collectively, the 2013 and 2016 Notes, the 2014 Notes and the Zero-Coupon Notes.

170.    "*Unsecured Ongoing Operations Claims*" means (a) all general unsecured Claims directly relating to and arising solely from the receipt of goods or services by the Group A Debtors arising with and held by Persons with whom the Group A Debtors are conducting, and will continue to conduct, business as of the Petition Dates and (b) all Compensation and Benefit Claims against any Group A Debtor; provided that Unsecured Ongoing Operations Claims shall not include Administrative Claims, Convenience Claims or Subordinated Claims.

171.    "*Voting Deadline*" means 5:00 p.m., prevailing Eastern Time, on October 26, 2009.

172.    "*Warrants*" means, collectively, the DIP Facility Warrants and the Other General Unsecured Claims Warrants.

173.    "*Warrant Share*" means a fraction, the numerator of which is the aggregate principal amount of DIP Facility Claims which are converted into the Exit Facility and the denominator of which is $500 million.

174.    "*Warrant Agreements*" means, collectively, the DIP Facility Warrant Agreement and the Other General Unsecured Claims Warrant Agreement.

14

175.    "*Working Capital Adjustment*" means a negative adjustment equal to the product of: (a) $403 million less the amount of any actual Terms Reduction that has occurred on or prior to the Effective Date; multiplied by (b) 0.50.

176.    "*Zero-Coupon Indenture*" means that certain Indenture dated as of February 20, 2002, among Lear Corporation, as issuer, certain Affiliates of Lear Corporation, as guarantors, and the Zero-Coupon Notes Trustee, as amended, supplemented or otherwise modified from time to time through the Petition Date.

177.    "*Zero-Coupon Notes*" means the unsecured zero-coupon convertible senior notes due 2022 issued pursuant to the Zero-Coupon Indenture.

178.    "*Zero-Coupon Notes Trustee*" means The Bank of New York Mellon Trust Company, National Association, or its successor.

## ARTICLE II.

## ADMINISTRATIVE, DIP FACILITY AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Facility Claims and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *Administrative Claims*

Subject to the provisions of sections 327, 330(a) and 331 of the Bankruptcy Code, except to the extent that a Holder of an Allowed Administrative Claim and the applicable Debtors agree to less favorable treatment to such Holder, each Holder of an Allowed Administrative Claim will be paid the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due or as soon as reasonably practicable thereafter; (b) if an Administrative Claim is Allowed after the Effective Date, on the date such Administrative Claim is Allowed or as soon as reasonably practicable thereafter or, if not then due, when such Allowed Administrative Claim is due; (c) at such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Reorganized Debtors, as the case may be; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided that, Allowed Administrative Claims that arise in the ordinary course of the Debtors' business shall be paid in full in Cash in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to, such transactions; provided, further, that Allowed Administrative Claims do not include Claims filed after the applicable deadline set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court).

B.    *DIP Facility Claims*

Notwithstanding anything to the contrary herein, and subject to the terms of the DIP Facility, in full and final satisfaction, settlement, release and discharge of and in exchange for release of all DIP Facility Claims, on the Effective Date, the DIP Facility Claims shall convert into the Exit Facility or be paid off in full and in Cash. In the event the DIP Facility Claims convert into the Exit Facility, Reorganized Lear Corporation shall pay to the Exit Facility Agent, for the account of each DIP Lender, a fee, at Reorganized Lear Corporation's sole election, of either (i) DIP Facility Warrants issued Pro Rata in the name of each DIP Lender (or its designee) as soon as reasonably practicable following the Effective Date to purchase a number of shares of New Common Stock with an aggregate stated value as of the Effective Date equal to $25 million (or, if less than all of the DIP Facility Claims convert into the Exit Facility, the Warrant Share of $25 million) or (ii) Cash on the Effective Date in an amount equal to 5% of the principal amount of each such DIP Lender's DIP Facility Claims that convert into the Exit Facility.

C.    *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment or has been paid by any applicable Debtor prior to the Effective Date, in full and final satisfaction, settlement, release, and discharge of and in exchange for release of each Allowed Priority Tax Claim, each Holder of such Allowed

K&E 1544985910

Priority Tax Claim shall receive on account of such Claim, in accordance with section 1129(a)(9)(C) of the Bankruptcy Code, regular installment payments in Cash over a period ending not later than five years after the Petition Date of a total value, as of the Effective Date, equal to the Allowed amount of such Claim, which total value shall include simple interest to accrue on any outstanding balance of such Allowed Priority Tax Claim starting on the Effective Date at the rate of interest determined under applicable non-bankruptcy law pursuant to section 511 of the Bankruptcy Code.

## ARTICLE III.

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims*

Pursuant to Article IV.A hereof, the Plan provides for the substantive consolidation of the Group A Debtors' Estates into one Estate and the Group B Debtors' Estates into one Estate. The following tables classify Claims and Interests with respect to the Group A Debtors' Estates and the Group B Debtors' Estates, except DIP Facility Claims, Administrative Claims and Priority Tax Claims, for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code. The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class. A Claim or Interest is classified in a particular Class only to the extent that any such Claim or Interest is an Allowed Claim in that Class and has not been paid, released, settled or otherwise satisfied prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests Against Group A Debtors**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1A | Other Priority Claims Against a Group A Debtor | Unimpaired | Deemed to Accept |
| 2A | Other Secured Claims Against a Group A Debtor | Unimpaired | Deemed to Accept |
| 3A | Prepetition Credit Agreement Secured Claims | Impaired | Entitled to Vote |
| 4A | Unsecured Ongoing Operations Claims | Unimpaired | Deemed to Accept |
| 5A | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6A | Convenience Claims | Impaired | Entitled to Vote |
| 7A | Subordinated Claims | Impaired | Deemed to Reject |
| 8A-1 | Equity Interests in Lear Corporation | Impaired | Deemed to Reject |
| 8A-2 | Intercompany Interests in Group A Debtors | Unimpaired | Deemed to Accept |

**Summary of Classification and Treatment of Claims and Interests Against Group B Debtors**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1B | Other Priority Claims Against a Group B Debtor | Unimpaired | Deemed to Accept |
| 2B | Other Secured Claims Against a Group B Debtor | Unimpaired | Deemed to Accept |
| 3B | General Unsecured Claims | Unimpaired | Deemed to Accept |
| 4B | Intercompany Interests in Group B Debtors | Unimpaired | Deemed to Accept |

B.    *Treatment of Claims and Interests Against Group A Debtors*

1.    <u>*Class 1A—Other Priority Claims*</u>

(a)    *Classification*: Class 1A consists of all Other Priority Claims that may exist against the Group A Debtors.

(b)    *Treatment*: Except to the extent that a Holder of an Other Priority Claim against the Group A Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Priority Claim against the Group A Debtors, each Holder of such Allowed Other Priority Claim shall be

16

paid in full in Cash on the later of the Effective Date or the date on which such Other Priority Claim against the Group A Debtors becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; provided that subject to Bankruptcy Court approval, priority wage claims against the Group A Debtors may be paid in full in the ordinary course of business.

(c)     *Voting*: Class 1A is Unimpaired, and Holders of Class 1A Other Priority Claims against the Group A Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 1A Other Priority Claims are not entitled to vote to accept or reject the Plan.

2.     *Class 2A—Other Secured Claims*

(a)     *Classification*: Class 2A consists of all Other Secured Claims that may exist against the Group A Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Other Secured Claim against the Group A Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim against the Group A Debtors, each Holder of an Allowed Other Secured Claim, at the sole option of the Group A Debtors shall (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

(c)     *Voting*: Class 2A is Unimpaired, and Holders of Class 2A Other Secured Claims against the Group A Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 2A Other Secured Claims are not entitled to vote to accept or reject the Plan.

3.     *Class 3A—Prepetition Credit Agreement Secured Claims*

(a)     *Classification*:  Class 3A consists of Prepetition Credit Agreement Secured Claims that may exist against the Group A Debtors.

(b)     *Treatment*: Except to the extent that a Holder of a Prepetition Credit Agreement Secured Claim against the Group A Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Prepetition Credit Agreement Secured Claim against the Group A Debtors, each Holder of a Prepetition Credit Agreement Secured Claim shall receive its Pro Rata share of the Prepetition Credit Agreement Secured Claims Distribution. The Adequate Protection Claims of the Holders of Prepetition Credit Agreement Secured Claims shall be deemed satisfied in full by payments made pursuant to the DIP Order.  Any replacement or other Liens created under the DIP Order shall terminate and shall have no further force and effect as of the Effective Date.

(c)     *Voting*: Class 3A is Impaired and Holders of Class 3A Prepetition Credit Agreement Secured Claims against the Group A Debtors are entitled to vote to accept or reject the Plan.

4.     *Class 4A—Unsecured Ongoing Operations Claims*

(a)     *Classification*: Class 4A consists of Unsecured Ongoing Operations Claims that may exist against the Group A Debtors.  Notwithstanding anything to the contrary in the Plan

K&E 1544985910

or otherwise, all Compensation and Benefit Claims against the Group A Debtors are classified as Class 4A Unsecured Ongoing Operations Claims.

(b)     *Treatment*:  Except to the extent that a Holder of an Unsecured Ongoing Operations Claim against the Group A Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Unsecured Ongoing Operations Claim against the Group A Debtors, each Holder of an Unsecured Ongoing Operations Claim: (i) that is due and payable as of the Effective Date shall be paid in full in Cash or receive such other treatment as to render such Holder Unimpaired on the Effective Date or as soon as reasonably practicable thereafter; (ii) that is not due and payable as of the Effective Date shall be paid in full in Cash thereafter (X) in the ordinary course of business in accordance with the terms of any agreement that governs such Allowed Unsecured Ongoing Operations Claim or (Y) in accordance with the course of practice between the Group A Debtors and such Holder with respect to such Allowed Unsecured Ongoing Operations Claim.   Holders of Allowed Unsecured Ongoing Operations Claims who received any payment from the Group A Debtors during the Chapter 11 Cases pursuant to any order of the Bankruptcy Court shall not be excluded from receiving distributions under this Plan on account of such Claims unless such Claims were fully satisfied by any prior payments from the Group A Debtors.  The Group A Debtors reserve all rights to challenge the legal basis and amount of any asserted Unsecured Ongoing Operations Claim, and each such Holder reserves all rights and defenses with respect to any such challenge.

(c)     *Voting*:  Class 4A is Unimpaired, and Holders of Class 4A Unsecured Ongoing Operations Claims against the Group A Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 4A Unsecured Ongoing Operations Claims are not entitled to vote to accept or reject the Plan.

5.    *Class 5A—Other General Unsecured Claims*

(a)     *Classification*: Class 5A consists of Other General Unsecured Claims that may exist against the Group A Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of an Other General Unsecured Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other General Unsecured Claim, each Holder of an Other General Unsecured Claim shall receive its Pro Rata share of the Other General Unsecured Claims Distribution.

(c)     *Voting*: Class 5A is Impaired and Holders of Class 5A Other General Unsecured Claims against the Group A Debtors are entitled to vote to accept or reject the Plan.

6.    *Class 6A—Convenience Claims*

(a)     *Classification*: Class 6A consists of Convenience Claims that may exist against the Group A Debtors.

(b)     *Treatment*:  Except to the extent that a Holder of a Convenience Claim agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Convenience Claim, each Holder of a Convenience Claim shall be paid an amount equal to 25% of such Claim in Cash on the later of the Effective Date or the date such Claim becomes an Allowed Convenience Claim, or as soon as reasonably practicable thereafter.

(c)     *Voting*: Class 6A is Impaired and Holders of Class 6A Allowed Convenience Claims are entitled to vote to accept or reject the Plan.

K&E 1544985910

7.     _Class 7A—Subordinated Claims_

    (a)     *Classification*: Class 7A consists of all Subordinated Claims.

    (b)     *Treatment*:  Holders of Subordinated Claims will not receive any distribution on account of such Claims, and Subordinated Claims shall be discharged, cancelled, released and extinguished as of the Effective Date.

    (c)     *Voting*:  Class 7A is Impaired, and Holders of Class 7A Subordinated Claims are not entitled to receive or retain any property under the Plan on account of Subordinated Claims.  Therefore, Holders of Class 7A Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 7A Subordinated Claims are not entitled to vote to accept or reject the Plan.

8.     _Class 8A-1—Equity Interests in Lear Corporation_

    (a)     *Classification*: Class 8A-1 consists of all Equity Interests in Lear Corporation.

    (b)     *Treatment*:  Holders of Equity Interests in Lear Corporation will not receive any distribution on account of such Claims, and Equity Interests in Lear Corporation shall be discharged, cancelled, released and extinguished as of the Effective Date.

    (c)     *Voting*:  Class 8A-1 is Impaired, and Holders of Class 8A-1 Equity Interests in Lear Corporation are not entitled to receive or retain any property under the Plan on account of Equity Interests in Lear Corporation.  Therefore, Holders of Class 8A-1 Equity Interests in Lear Corporation are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code, and Holders of Class 8A-1 Equity Interests in Lear Corporation are not entitled to vote to accept or reject the Plan.

9.     _Class 8A-2—Intercompany Interests in Group A Debtors_

    (a)     *Classification*: Class 8A-2 consists of all Intercompany Interests in Group A Debtors.

    (b)     *Treatment*:  Holders of Intercompany Interests in Group A Debtors shall continue to be held by the Reorganized Debtors holding such Intercompany Interests as of the Petition Date.

    (c)     *Voting*:  Class 8A-2 is Unimpaired, and Holders of Class 8A-2 Intercompany Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Class 8A-2 Intercompany Interests are not entitled to vote to accept or reject the Plan.

C.     *Treatment of Claims and Interests Against Group B Debtors*

    1.     _Class 1B—Other Priority Claims_

        (a)     *Classification*: Class 1B consists of all Other Priority Claims that may exist against the Group B Debtors.

        (b)     *Treatment*:  Except to the extent that a Holder of an Other Priority Claim against the Group B Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Priority Claim against the Group B Debtors, each Holder of such Allowed Other Priority Claim shall be paid in full in Cash on the later of the Effective Date or the date on which such Other Priority Claim against the Group B Debtors becomes an Allowed Other Priority Claim or as soon as reasonably practicable thereafter; <u>provided</u> that subject to Bankruptcy Court approval, priority wage claims against the Group B Debtors may be paid in full in the ordinary course of business.

K&E 1544985910

(c) *Voting*: Class 1B is Unimpaired, and Holders of Class 1B Other Priority Claims against the Group B Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 1B Other Priority Claims are not entitled to vote to accept or reject the Plan.

2. <u>*Class 2B—Other Secured Claims*</u>

(a) *Classification*: Class 2B consists of all Other Secured Claims that may exist against the Group B Debtors.

(b) *Treatment*: Except to the extent that a Holder of an Other Secured Claim against the Group B Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each Other Secured Claim against the Group B Debtors, each Holder of an Allowed Other Secured Claim, at the sole option of the Group B Debtors shall (i) be paid in full in Cash, (ii) receive the collateral securing its Allowed Other Secured Claim, plus post-petition interest to the extent required under section 506(b) of the Bankruptcy Code, or (iii) receive other treatment rendering such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code, in each case on the later of the Effective Date and the date such Secured Claim becomes an Allowed Other Secured Claim, or as soon as reasonably practicable thereafter.

(c) *Voting*: Class 2B is Unimpaired, and Holders of Class 2B Other Secured Claims against the Group B Debtors are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 2B Other Secured Claims are not entitled to vote to accept or reject the Plan.

3. <u>*Class 3B—General Unsecured Claims*</u>

(a) *Classification*: Class 3B consists of General Unsecured Claims that may exist against the Group B Debtors. Notwithstanding anything to the contrary in the Plan or otherwise, all Compensation and Benefit Claims against the Group B Debtors are classified as Class 3B General Unsecured Claims.

(b) *Treatment*: Except to the extent that a Holder of a General Unsecured Claim against the Group B Debtors agrees to a less favorable treatment for such Holder, in exchange for full and final satisfaction, settlement, release and discharge of each General Unsecured Claim, each Holder of a General Unsecured Claim against the Group B Debtors shall, at the sole option of the Group B Debtors, (i) be paid in the ordinary course of the Group B Debtors' business as such Claims become due and payable, (ii) be paid consistent with prior dealing and business practices with the Group B Debtors or (iii) be reinstated and rendered Unimpaired in accordance with Section 1124 of the Bankruptcy Code.

(c) *Voting*: Class 3B is Unimpaired, and Holders of Class 3B General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, Holders of Class 3B General Unsecured Claims are not entitled to vote to accept or reject the Plan.

4. <u>*Class 4B—Intercompany Interests in Group B Debtors*</u>

(a) *Classification*: Class 4B consists of all Holders of Intercompany Interests in the Group B Debtors.

(b) *Treatment*: Holders of Intercompany Interests in the Group B Debtors shall continue to be held by the Reorganized Debtors holding such Intercompany Interests as of the Petition Date.

20

(c)    *Voting*:  Class 4B is Unimpaired, and Holders of Class 4B Intercompany Interests are
conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the
Bankruptcy Code.  Therefore, Holders of Class 4B Intercompany Interests are not entitled
to vote to accept or reject the Plan.

D.    *Intercompany Claims*

Notwithstanding anything herein to the contrary, Holders of Intercompany Claims shall not be eligible to
receive any distribution on account of such Claim as of the Effective Date.  Reorganized Lear Corporation may, or
may cause each applicable Debtor to, in Reorganized Lear Corporation's sole discretion, reinstate or compromise, as
the case may be, Intercompany Claims.

E.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the
Reorganized Debtors' rights in respect of any Unimpaired Claim, including, but not limited to, all rights in respect
of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

F.    *Acceptance or Rejection of the Plan*

1.    *Presumed Acceptance of Plan*:  Classes 1A, 2A, 4A, 8A-2, 1B, 2B, 3B and 4B are Unimpaired
under the Plan and are, therefore, presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy
Code.  Therefore, such Classes are not entitled to vote on the Plan and the vote of such Holders of Claims shall not
be solicited.

2.    *Voting Classes*:  Each Holder of an Allowed Claim in each of Classes 3A, 5A and 6A shall be
entitled to vote to accept or reject the Plan.

3.    *Presumed Rejection of the Plan*:  Classes 7A and 8A-1 are Impaired and Holders of Class 7A
Subordinated Claims or Class 8A-1 Interests shall receive no distributions under the Plan on account of their Claims
or Interests and are therefore, presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy
Code.  Therefore, Holders of Class 7A Subordinated Claims or Class 8A-1 Interests are not entitled to vote on the
Plan and the vote of such Holders shall not be solicited.

4.    *Acceptance by Impaired Classes of Claims*:  Pursuant to section 1126(c) of the Bankruptcy Code
and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has
accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the
Allowed Claims in such Class actually voting have voted to accept the Plan.

5.    *Controversy Concerning Impairment*:  If a controversy arises as to whether any Claims, or any
Class of Claims, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on
or before the Confirmation Date.

G.    *Nonconsensual Confirmation*

Except as otherwise specifically provided in the Plan, if any Impaired Class shall not accept the Plan by the
requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend
the Plan (subject to the Plan Support Agreements and conditions to the Effective Date set forth below) or undertake
to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.

## ARTICLE IV.

## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Substantive Consolidation*

The Plan shall serve as a motion by the Debtors seeking entry of an order substantively consolidating all of
the Estates of the Group A Debtors into a single consolidated Estate and all of the Estates of the Group B Debtors

K&E 1544985910

into a separate, single consolidated Estate for all purposes, including voting, Confirmation and distribution pursuant to the Plan.

If substantive consolidation of the Group A Debtors' Estates and the Group B Debtors' Estates, as applicable, is ordered, then on and after the Effective Date, all assets and liabilities of the Group A Debtors and the Group B Debtors, as applicable, shall be treated as though they were merged into one Estate of the Group A Debtors and one Estate of the Group B Debtors, as applicable, for all purposes, including voting, Confirmation and distribution pursuant to the Plan, and all guarantees by any Group A Debtor and Group B Debtor, as applicable, of the obligations of any other Group A Debtor or Group B Debtor, as applicable, shall be eliminated so that any Claim and any guarantee thereof by any other Group A Debtor or Group B Debtor, as applicable, as well as any joint and several liability of any Group A Debtor or Group B Debtor, as applicable, with respect to any other Group A Debtor or Group B Debtor, as applicable, shall be treated as one collective obligation of the Group A Debtors or the Group B Debtors, as applicable.  Substantive consolidation shall not affect the legal and organizational structure of the Reorganized Debtors or their separate corporate existences or any prepetition or postpetition guarantees, Liens, or security interests that are required to be maintained under the Bankruptcy Code, under the Plan, or, in connection with contracts or leases that were assumed or entered into during the Chapter 11 Cases.  Any alleged defaults under any applicable agreement with the Debtors, the Reorganized Debtors, or the Affiliates arising from substantive consolidation under the Plan shall be deemed cured as of the Effective Date.

In the event that the Bankruptcy Court does not order substantive consolidation of the Group A Debtors' Estates and the Group B Debtors' Estates, as applicable, then except as specifically set forth in the Plan: (1) nothing in the Plan or the Disclosure Statement shall constitute or be deemed to constitute an admission that one of the Group A Debtors or the Group B Debtors, as applicable, is subject to or liable for any Claim against any other Group A Debtor or Group B Debtor, as applicable; (2) Claims against multiple Debtors shall be treated as separate Claims with respect to each Debtor's Estate for all purposes (including distributions and voting), and such Claims shall be administered as provided in the Plan; (3) the Debtors shall not, nor shall they be required to, resolicit votes with respect to the Plan, nor will the failure of the Bankruptcy Court to approve substantive consolidation of the Group A Debtors' Estates and the Group B Debtors' Estates, as applicable, alter the distributions set forth in the Plan; and (4) the Debtors may file a plan of reorganization for each Debtor and the confirmation requirements of section 1129 of the Bankruptcy Code must be satisfied separately with respect to each Debtor; provided that, a Holder's (a) vote to accept or reject the Plan; (b) presumed acceptance of the Plan pursuant to section 1126(f) of the Bankruptcy Code; or (c) deemed rejection of the Plan pursuant to section 1126(g) may be deemed a vote to accept or reject any plan described in clause (4) hereof to the extent that any such plan does not provide such Holder with less favorable treatment than such Holder would have received if the Bankruptcy Court had ordered substantive consolidation as set forth herein.  The Debtors' inability to confirm any such plan or the Debtors' election to withdraw any such plan shall not impair the confirmation of any other plan described in clause (4) hereof or the consummation of any such plan.

B.    *Corporate Existence*

Except as otherwise provided in the Plan, each Debtor shall continue to exist after the Effective Date as a separate corporate Entity, limited liability company, partnership or other form, as the case may be, with all the powers of a corporation, limited liability company, partnership or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective certificate of incorporation and bylaws (or other formation documents) in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws (or other formation documents) are amended by the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be pursuant to the Plan and require no further action or approval.

C.    *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan or any agreement, instrument, or other document incorporated herein, on the Effective Date, all property in each Estate, all Causes of Action, and any property acquired by any of the Debtors pursuant to the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire or dispose of property and compromise or

settle any Claims, Interests or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

D.    *Indemnification Provisions in Organizational Documents*

As of the Effective Date, each Debtor's bylaws shall provide for the indemnification, defense, reimbursement, exculpation, and/or limitation of liability of, and advancement of fees and expenses to, directors, officers, employees or agents who were directors, officers, employees or agents of such Debtor, at any time prior to the Effective Date at least to the same extent as the bylaws of each of the respective Debtors on the Petition Date, against any claims or causes of action whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, and none of the Reorganized Debtors shall amend and/or restate its certificate of incorporation or bylaws before or after the Effective Date to terminate or materially adversely affect any of the Reorganized Debtors' obligations or such directors', officers', employees' or agents' rights.

E.    *Cancellation of Agreements, Unsecured Notes and Equity Interests*

1.    On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, and other documents evidencing the Unsecured Notes and Equity Interests in Lear Corporation shall be canceled and of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto shall be discharged.

2.    On the Effective Date, except to the extent otherwise provided herein, any Indentures relating to any of the foregoing shall be deemed to be canceled, as permitted by section 1123(a)(5)(F) of the Bankruptcy Code, and the obligations of the Debtors thereunder shall be discharged; <u>provided</u> that, the Unsecured Notes and the Indentures shall continue in effect to (a) allow Holders of the Unsecured Claims to receive distributions provided for hereunder; (b) preserve the right of the Indenture Trustees to the reimbursement of the Indenture Trustees' Fees; and (c) preserve the Indenture Trustees' right to indemnification from the Debtors pursuant to the terms of the Indentures. Notwithstanding the foregoing, the charging liens held by the Indenture Trustees against distributions to holders of Unsecured Notes shall be deemed released only upon payment of the Indenture Trustees' fees.

3.    As of the Effective Date, the transfer register or ledger maintained by Indenture Trustees for the Unsecured Notes shall be closed, and there shall be no further changes in the record holders of any Unsecured Notes.

4.    As of the Effective Date, except to the extent otherwise provided herein, the Prepetition Credit Agreement shall be deemed to be cancelled, and the obligations of the Debtors thereunder shall be discharged; <u>provided</u> that, the Prepetition Credit Agreement shall continue in effect solely for the purpose to: (a) allow Holders of the Prepetition Credit Agreement Claims to receive the distributions provided for hereunder; (b) allow the Prepetition Administrative Agent to receive distributions from the Debtors and to make further distributions to the Holders of Prepetition Credit Agreement Claims on account of such Claims, as set forth in Article VI.C.2 of the Plan; and (c) preserve the Prepetition Administrative Agent's right to indemnification from the Debtors pursuant and subject to the terms of the Prepetition Credit Agreement in respect of any claim or cause of action asserted against the Prepetition Administrative Agent by a Person or Entity that is not party to the Prepetition Credit Agreement; <u>provided</u> that any claim or right to payment on account of such indemnification shall be an unsecured claim and shall not be secured in any of the assets of the Debtors, the Reorganized Debtors or their affiliates.

F.    *Reorganized Company Equity Interests*

Reorganized Lear Corporation's equity interests shall consist of New Common Stock, Series A Preferred Stock and Warrants. On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtors shall issue or reserve for issuance all Securities to be issued pursuant to the terms of the Plan and the Amended and Restated Certificate of Incorporation, without need for any further corporate or shareholder action.

1.    <u>New Common Stock</u>. Shares of New Common Stock shall be issued to (a) Holders of Allowed Prepetition Credit Agreement Secured Claims, (b) Holders of Allowed Other General Unsecured Claims, (c) holders

K&E 1544985910

of the Series A Preferred Stock upon conversion of such Securities, (d) holders of Warrants upon exercise of such Warrants, and (e) holders of equity-based awards issued under the Management Equity Plan.

Following the Effective Date, Reorganized Lear Corporation shall as soon as reasonably practicable file with the Commission a registration statement for the New Common Stock on Form 8-A or Form 10 (as determined in the Debtors' reasonable discretion) under the Securities Exchange Act of 1934. Following the Effective Date, Reorganized Lear Corporation shall use reasonable best efforts to list the New Common Stock on the NASDAQ or The New York Stock Exchange as soon as reasonably practicable.

2.     Series A Preferred Stock.  Shares of Series A Preferred Stock shall be issued to Holders of Allowed Prepetition Credit Agreement Secured Claims.  The Series A Preferred Stock will not be publicly listed. Shares of Series A Preferred Stock are subject to redemption on account of the Excess Cash Paydown.

3.     Other General Unsecured Claims Warrants.  Other General Unsecured Claims Warrants shall be issued to Holders of Allowed Other General Secured Claims.  As set forth in the Plan Term Sheet, Other General Unsecured Claims Warrants may be exercised at a price of $0.01 per warrant at any time during the period (a) commencing on the Business Day following a period of 30 consecutive trading days during which the market price per share of New Common Stock on at least 20 of the trading days within such period is equal to or greater than the Trigger Price;[2] and (b) ending on the fifth anniversary of the Effective Date.  The Trigger Price will be determined without giving pro forma effect to any Excess Cash Paydown.  Assuming 45 million diluted shares of New Common Stock as of the Effective Date, based on the shares of New Common Stock issued under the Plan and treating $500 million of Series A Preferred Stock on an as-converted basis, Other General Unsecured Claims Warrants for approximately 7.94 million shares would be issued, and the Trigger Price would be $40.71 per share.

4.     DIP Facility Warrants.  DIP Facility Warrants may be issued to the DIP Lenders, if applicable pursuant to Article II.B.

5.     Registration Rights.  Holders of New Common Stock shall be entitled to registration rights pursuant to the Registration Rights Agreement.

G.     *Section 1145 Exemption*

Pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any Securities pursuant to the Plan and any and all settlement agreements incorporated herein shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act to the maximum extent permitted thereunder and any other applicable law requiring registration prior to the offering, issuance, distribution or sale of Securities. In addition, except as otherwise provided in the Plan, under section 1145 of the Bankruptcy Code, any Securities contemplated by the Plan and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act, and compliance with any rules and regulations of the Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) applicable regulatory approval.

H.     *Exit Financing*

On the Effective Date, the Reorganized Debtors will consummate the Exit Facility.  In accordance with the Exit Financing Agreement, the Reorganized Debtors will use proceeds of the Exit Financing Agreement to pay or refinance the DIP Facility Claims.  Reorganized Lear Corporation shall make payments of principal and interest in accordance with the terms and conditions of the Exit Financing Agreement; provided that the loans under the Exit Facility are subject to prepayment on account of the Excess Cash Paydown.

---

[2]    In the event the New Common Stock is not traded at the New York Stock Exchange or other public securities exchange, the market price will be determined at the price at which the last trade took place.

K&E 1544985910

From and after the Effective Date, the Reorganized Debtors, subject to any applicable limitations set forth in any post-Effective Date financing, shall have the right and authority without further order of the Bankruptcy Court to raise additional capital and obtain additional financing as the boards of directors of the applicable Reorganized Debtors deem appropriate.

I.      *New Term Loans.*

On the Effective Date, Reorganized Lear Corporation will issue the New Term Loans.  The New Term Loans will be guaranteed by Reorganized Lear Corporation's domestic direct and indirect subsidiaries pursuant to the New Term Loans Agreement and, further, are subject to prepayment on account of the Excess Cash Paydown. On or before the Effective Date, the Reorganized Debtors and each Holder of an Allowed Prepetition Credit Agreement Secured Claim shall execute the New Term Loans Agreement.

J.      *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including:  (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtors determine are necessary or appropriate.

K.      *Corporate Action*

Each of the matters provided for by the Plan involving the corporate structure of the Debtors or corporate, financing or related actions to be taken by or required of the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Interests, directors of the Debtors or any other Entity. Without limiting the foregoing, such actions will include:  the adoption and (as applicable) filing of the Amended and Restated Certificate of Incorporation, the Certificate of Designation and the Amended and Restated Bylaws; the appointment of officers and (as applicable) directors for the Reorganized Debtors; the issuance of the New Term Loans, the New Common Stock, the Series A Preferred Stock and the Warrants, the execution and delivery of the Exit Facility (as applicable), the New Term Loans Agreement, the Warrant Agreements, the Registration Rights Agreement, and all related documents and instruments (as applicable), and the adoption and implementation of the Key Management Incentive Plan and the Management Equity Plan.

L.      *Post-Effective Date Governance*

The Reorganized Debtors shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.  Without limiting the generality of the foregoing, as of the Effective Date, Reorganized Lear Corporation shall be governed by the Amended and Restated Certificate of Incorporation and the Amended and Restated Bylaws.

M.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtors, and the officers and members of the boards of directors or managers, as applicable, thereof, are authorized to and may issue, execute, deliver, file or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

K&E 1544985910

N.    *Exemption from Certain Transfer Taxes and Recording Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from a Debtor to a Reorganized Debtor or to any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, Securities, or other interest in the Debtors or the Reorganized Debtors; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

O.    *Board Representation*

The New Board shall consist of Reorganized Lear Corporation's Chairman, President and Chief Executive Officer and eight (8) other directors.  The New Board shall meet the criteria set forth in the New York Stock Exchange or NASDAQ, as applicable, listing requirements.  The members of the New Board, excluding the Chairman, President and Chief Executive Officer, shall be appointed as follows: (1) five directors shall be appointed by the Prepetition Administrative Agent in consultation with the Prepetition Credit Agreement Lenders party to the Lender Plan Support Agreement and with the assistance of a nationally recognized executive search firm to be retained by the Prepetition Administrative Agent at the expense of the Debtors; and (2) three directors shall be appointed by the Noteholder Steering Committee in consultation with the other Holders of Unsecured Note Claims that are parties to the Noteholder Plan Support Agreement and the Committee and with the assistance of a nationally recognized executive search firm to be retained by the Noteholder Steering Committee at the expense of the Debtors.  The Plan Supplement will list the members of the New Board identified as of the date of filing thereof; New Board members identified thereafter and prior to the start of the Confirmation Hearing will be identified at the Confirmation Hearing.  Subject to the Amended and Restated Bylaws relating to the filling of vacancies, if any, on the New Board, the members of the New Board as constituted on the Effective Date will continue to serve at least until the first annual meeting of stockholders after the Effective Date.  Starting at such first annual meeting of stockholders, the board of directors of Reorganized Lear Corporation shall be elected pursuant to the terms of the Amended and Restated Bylaws.

P.    *Senior Management*

The senior management of the Reorganized Debtors shall be the same senior management that existed for the Debtors as of the Effective Date.  The Reorganized Debtors shall provide the senior management with Cash and bonus compensation and benefits consistent with (but not less economically favorable than) such senior management's respective Employment Agreements and arrangements in effect as of the Petition Date.

Q.    *Key Management Incentive Plan and Management Equity Plan*

Reorganized Lear Corporation shall have adopted the Key Management Incentive Plan and the Management Equity Plan on or before the Effective Date.

R.    *Preservation of Rights of Action*

Except for Avoidance Actions and the actions released by the Debtors pursuant to Article IX.D below, and in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including, but not limited to, any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; provided, however that, notwithstanding anything to the

K&E 1544985910

contrary in the Plan or otherwise, the Debtors specifically waive the right to bring any Avoidance Actions.  **No Person may rely on the absence of a specific reference in the Plan, the Plan Supplement or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or Reorganized Debtors, as applicable, will not pursue any and all available Causes of Action against them.  The Debtors or Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan.**  Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of *res judicata*, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or the Effective Date.

Further, except for the actions released by the Debtors pursuant to Article IX.D and Avoidance Actions, the Reorganized Debtors reserve and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan.  In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Person shall vest in the applicable Reorganized Debtor, as the case may be.  The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without the consent or approval of any third party.

## ARTICLE V.

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

**Subject to the provisions herein, each of the Debtors' Executory Contracts and Unexpired Leases shall be deemed assumed as of the Effective Date unless such Executory Contract or Unexpired Lease: (1) was assumed or rejected previously by the Debtors; (2) is identified on the list of Executory Contracts and Unexpired Leases to be rejected filed pursuant to the Plan Supplement, which such list shall be filed on or before September 11, 2009 and shall not be modified by the Debtors after September 11, 2009; (3) is the subject of a separate motion or notice to reject filed by the Debtors on or before September 11, 2009; <u>provided</u> that the Debtors shall not file any separate motions or notices to reject Executory Contracts or Unexpired Leases after September 11, 2009 if the Plan is still pending or has been consummated; or (4) previously expired or terminated pursuant to its own terms.**

Except as expressly provided otherwise, the Plan shall give effect to any subordination rights as required by section 510(a) of the Bankruptcy Code.

Entry of the Confirmation Order by the Bankruptcy Court shall constitute an order approving the assumptions or rejections of such Executory Contracts and Unexpired Leases as set forth in the Plan, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Unless otherwise indicated, all assumptions or rejections of such Executory Contracts and Unexpired Leases in the Plan are effective as of the Effective Date.  Each such Executory Contract and Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order, and not assigned to a third party prior to the Effective Date, shall revest in and be fully enforceable by the applicable contracting Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.  Notwithstanding anything to the contrary in the Plan, the Debtors or Reorganized Debtors, as applicable, reserve the right to alter, amend, modify or supplement the Executory Contracts and Unexpired Leases identified in the Plan Supplement prior to the Confirmation Date.

B.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any provisions or terms of the Debtors' Executory Contracts or Unexpired Leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by an agreed-upon waiver of Cure.  Except with respect to Executory Contracts or Unexpired Leases in which the Debtors and the applicable

27

counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure must be Filed with the Notice, Claims and Solicitation Agent on or before the Cure Bar Date. The Cure Bar Date shall not apply to any franchise or Executory Contract with a state or local franchise authority. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or further notice to or action, order, or approval of the Bankruptcy Court, and any Claim for Cure shall be deemed fully satisfied, released, and discharged, notwithstanding anything included in the Schedules or in any Proof of Claim to the contrary; provided, however, that nothing shall prevent the applicable Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtors also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

If the Debtors or Reorganized Debtors, as applicable, object to any request for Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the applicable Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the applicable Debtor or Reorganized Debtor, and the counterparty to the Executory Contract or Unexpired Lease. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption. The Debtors or Reorganized Debtors, as applicable, reserve the right, either to reject or nullify the assumption of any Executory Contract or Unexpired Lease no later than thirty days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise, except any Executory Contract with a state or local franchise authority, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption.

C.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any Proofs of Claim asserting Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases pursuant to the Plan or otherwise must be Filed by Holders of such Claims with the Notice, Claims and Solicitation Agent no later than thirty days after the later of (1) the Effective Date or (2) the effective date of rejection for such Holders to be entitled to receive distributions under the Plan on account of such Claims; provided that any such Claims must be filed by no later than the Claims Bar Date for the Holder of such Claim to be entitled to vote on the Plan. Any Holder of a Proof of Claim arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases that does not timely File such Proof of Claim shall not (a) be treated as a creditor with respect to such Claim, (b) be permitted to vote to accept or reject the Plan or (c) participate in any distribution in the Chapter 11 Cases on account of such Claim, and such Claim shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules or a Proof of Claim to the contrary.

D.      *Assumption of Directors and Officers Insurance Policies*

As of the Effective Date, the Reorganized Debtors shall be deemed to have assumed all of the Debtors' unexpired directors' and officers' liability insurance policies and fiduciary policies pursuant to section 365(a) of the Bankruptcy Code. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Reorganized Debtors' foregoing assumption of each of the unexpired directors' and officers' liability insurance policies and fiduciary policies. Notwithstanding anything to the contrary contained in the Plan, confirmation of the Plan shall not discharge, impair or otherwise modify any indemnity obligations assumed by the foregoing assumption of the unexpired directors' and officers' liability insurance policies and fiduciary policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.

In addition, after the Effective Date, none of the Reorganized Debtors shall terminate or otherwise reduce the coverage under any directors' and officers' insurance policies and fiduciary policies (including any "tail policy") in effect on the Petition Date, with respect to conduct occurring prior thereto, and all directors and officers of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such directors and officers remain in such positions after the Effective Date.

E.      *Reservation of Rights*

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder.  If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

F.      *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any consensual request to extend the deadline for assuming or rejecting unexpired leases pursuant to section 365(d)(4) of the Bankruptcy Code.

G.      *Compensation and Benefit Programs*

Subject to the provisions of the Plan, all Compensation and Benefits Programs shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for:

(a)     all employee equity or equity-based incentive plans, and any provisions set forth in the Compensation and Benefits Program that provide for rights to acquire Equity Interests in Lear Corporation;

(b)     Compensation and Benefits Programs listed in the Plan Supplement as executory contracts to be rejected;

(c)     Compensation and Benefits Programs that have previously been rejected; and

(d)     Compensation and Benefits Programs that, as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject, or have been specifically waived by the beneficiaries of any employee benefit plan or contract.

Any assumption of Compensation and Benefits Programs pursuant to this Article V.G shall not be deemed to trigger any applicable change of control, immediate vesting, termination, or similar provisions therein (unless a Compensation and Benefits Program counterparty timely objects to the assumption contemplated by this Article V.G, in which case any such Compensation and Benefits Program shall be deemed rejected as of immediately prior to the Petition Date).  No counterparty shall have rights under a Compensation and Benefits Program assumed pursuant to this Article V.G other than those applicable immediately prior to such assumption.  Consistent with the Plan Support Agreements and the term sheet attached thereto and notwithstanding anything to the contrary in the Plan or otherwise, any and all Compensation and Benefit Claims (including, but not limited to, Claims relating to the Debtors' supplemental employee retirement program) are Unimpaired and entitled to full payment.

Notwithstanding anything to the contrary in this Article V.G or otherwise, (a) the Reorganized Debtors' obligations, if any, to pay all "retiree benefits" (as that term is defined in section 1114(a) of the Bankruptcy Code) shall continue and (b) all of the Debtors' qualified pension plans shall continue.

K&E 1544985910

H.      *Collective Bargaining Agreements*

All unexpired collective bargaining agreements (including any modification thereto) shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code, except for collective bargaining agreements: (1) specifically rejected or assigned pursuant to an order of the Bankruptcy Court; (2) as of the entry of the Confirmation Order, are the subject of pending rejection procedures or a motion to reject; or (3) as of the entry of the Confirmation Order, are the subject of pending settlement proceedings or a motion to authorize a settlement; provided that notwithstanding anything to the contrary herein or otherwise, all of the Debtors' collective bargaining agreements with the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America and any related local unions (a) shall be treated as Executory Contracts under the Plan and deemed assumed on the Effective Date pursuant to the provisions of sections 365 and 1123 of the Bankruptcy Code and (b) shall not be modified by the Debtors pursuant to sections 1113 or 1114 of the Bankruptcy Code.

I.      *Workers' Compensation Programs*

As of the Effective Date, except as set forth in the Plan Supplement, the Debtors and the Reorganized Debtors shall continue to honor their obligations under: (1) all applicable workers' compensation laws in states in which the Reorganized Debtors operate; and (2) the Debtors' written contracts, agreements, agreements of indemnity, self-insurer workers' compensation bonds, policies, programs, and plans for workers' compensation and workers' compensation insurance; provided, however, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable non-bankruptcy law with respect to any such contracts, agreements, policies, programs, and plans; provided, further, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state law.

**ARTICLE VI.**

**PROVISIONS GOVERNING DISTRIBUTIONS**

A.      *Distributions on Account of Claims and Interests Allowed As of the Effective Date*

Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties and subject to the establishment of the Stock and Warrant Reserve, distributions under the Plan on account of Allowed Claims and Interests on or before the Effective Date shall be made in accordance with Article II, Article III.B, Article III.C and Article IV; provided, however, that Allowed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors prior to the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business or industry practice; provided, further, that the New Common Stock to be issued under the Plan shall be deemed issued as of the Effective Date regardless of the date on which the New Common Stock is actually dated, authenticated or distributed.

B.      *Distributions on Account of Claims and Interests Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims. Except as otherwise provided in the Plan, a Final Order or as agreed to by the relevant parties and subject to the establishment of the Stock and Warrant Reserve, distributions under the Plan on account of Disputed Claims that become Allowed after the Effective Date shall be made as soon as reasonably practicable after the Disputed Claim becomes an Allowed Claim; provided, however, that (a) Disputed Administrative Claims with respect to liabilities incurred by the Debtors in the ordinary course of business during the Chapter 11 Cases or assumed by the Debtors on or before the Effective Date that become Allowed after the Effective Date shall be paid or performed in the ordinary course of business in accordance with the terms and conditions of any controlling agreements, course of dealing, course of business, or industry practice and (b) Disputed Priority Tax Claims that become Allowed Priority Tax Claims after the Effective Date, unless otherwise agreed, shall be paid in accordance with Article II.C.

2.      Special Rules for Distributions to Holders of Disputed Claims. Notwithstanding any provision otherwise in the Plan and except as otherwise agreed by the relevant parties: (a) no partial payments and no partial

K&E 1544985910

distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim (except to the extent such Allowed Claim is expressly Allowed pursuant to the Plan) unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order and the Claims have been Allowed.

3.    <u>Reserve of New Common Stock and Other General Unsecured Claims Warrants</u>.  On the Effective Date, the Reorganized Debtors shall withhold and maintain in reserve shares of New Common Stock and Other General Unsecured Claims Warrants as the Stock and Warrant Reserve to pay Holders of Disputed Claims that are Other General Unsecured Claims that become Allowed Claims pursuant to the terms of the Plan.  The amount of New Common Stock and Other General Unsecured Claims Warrants withheld as a part of the Stock and Warrant Reserve for the benefit of a Holder of a Disputed Other General Unsecured Claim shall be equal to the lesser of: (a) (i) if no estimation is made by the Bankruptcy Court pursuant to Article VII.C herein, the number of shares of New Common Stock and Other General Unsecured Claims Warrants necessary to satisfy the Other General Unsecured Claim Distribution required to be made pursuant to the Plan based on the asserted amount of the Disputed Claim or, if the Claim is denominated as contingent or unliquidated as of the Voting Deadline or such other date as designated in an order of the Bankruptcy Court, the amount that the Debtors elect to withhold on account of such Claim in the Stock and Warrant Reserve or (ii) the number of shares of New Common Stock and Other General Unsecured Claims Warrants necessary to satisfy the Other General Unsecured Claim Distribution required to be made pursuant to the Plan for such Disputed Claim based on an amount as estimated by pursuant to Article VII.C and set forth in an order of the Bankruptcy Court for purposes of allowance and distributions; and (b) the number of shares of New Common Stock and Other General Unsecured Claims Warrants necessary to satisfy the Other General Unsecured Claim Distribution required to be made pursuant to the Plan based on an amount as may be agreed upon by the Holder of such Disputed Claim and the Reorganized Debtors.  As Disputed Claims are Allowed, the Distribution Agent shall distribute, in accordance with the terms of the Plan, New Common Stock and Other General Unsecured Claims Warrants to Holders of Other General Unsecured Claims, and the Stock and Warrant Reserve shall be adjusted accordingly.  Any Stock and Warrant Reserve remaining following the distributions in accordance with this Article VI.B.3 shall be cancelled.

C.    *Delivery of Distributions*

1.    <u>Record Date for Distributions</u>.  On the Effective Date, the Claims Register shall be closed and the Distribution Agent shall be authorized to recognize only those record Holders listed on the Claims Register as of the close of business on the Effective Date.  Notwithstanding the foregoing, if a Claim or Interest, other than one based on a publicly-traded certificate, is transferred twenty or fewer days before the Effective Date, the Distribution Agent shall make distributions to the transferee only to the extent practical and in any event only if the relevant transfer form contains an unconditional and explicit certification and waiver of any objection to the transfer by the transferor.

2.    <u>Distribution Agent</u>.  The Distribution Agent shall make all distributions required under the Plan, except that distributions to Holders of Allowed Claims and Interests governed by a separate agreement and administered by a Servicer may be deposited by the Debtors with the appropriate Servicer, at which time such distributions shall be deemed complete, and the Servicer shall deliver such distributions in accordance with the Plan and the terms of the governing agreement; <u>provided</u> that, the New Common Stock and Warrants to be issued in accordance with the Plan shall be transferred to DTC or another Third Party Distribution Agent on behalf of each applicable recipient to be distributed to Holders; <u>provided</u> that, distributions to Holders of Allowed Prepetition Credit Agreement Claims shall be made to the Prepetition Administrative Agent, for further distributions on a Pro Rata basis to such Holders, or, if directed by the Prepetition Administrative Agent, shall be delivered to the Distribution Agent for distribution to such Holders; <u>provided</u>, <u>further</u>, that distributions on a Pro Rata basis as provided under the Plan with respect to the Unsecured Notes Claims shall be made by (a) the Indenture Trustee or (b) with consent of the Indenture Trustee, through the facilities of the DTC or, if applicable, a Third Party Distribution Agent.  Each Distribution Agent will serve without bond and any Distribution Agent may employ or contract with other Entities to assist in or make the distributions required under the Plan.  The duties of any Third Party Distribution Agent shall be set forth in the applicable agreement retaining such Third Party Distribution Agent.

3.    <u>Delivery of Distributions in General</u>.    Except as otherwise provided in the Plan, and notwithstanding any authority to the contrary, distributions to Holders of Allowed Claims and Interests shall be

made to Holders of record as of the Effective Date by the Distribution Agent or a Servicer, as appropriate: (a) in accordance with Federal Rule of Civil Procedure 4, as modified and made applicable by Bankruptcy Rule 7004; (b) to the signatory set forth on any of the Proofs of Claim or Interest Filed by such Holder or other representative identified therein (or at the last known addresses of such Holder if no Proof of Claim or Interest is Filed or if the Debtors have been notified in writing of a change of address); (c) at the addresses set forth in any written notices of address changes delivered to the Distribution Agent after the date of any related Proof of Claim or Interest; (d) at the addresses reflected in the Schedules if no Proof of Claim or Interest has been Filed and the Distribution Agent has not received a written notice of a change of address; or (e) on any counsel that has appeared in the Chapter 11 Cases on the Holder's behalf. The Debtors, the Reorganized Debtors, and the Distribution Agent, as applicable, shall not incur any liability whatsoever on account of any distributions under the Plan except for gross negligence or willful misconduct.

4.    Compliance Matters.    In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on them by any governmental unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support, and other spousal awards, liens, and encumbrances.

5.    Undeliverable Distributions.    If any distribution to a Holder of an Allowed Claim or Interest is returned to a Distribution Agent as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently due missed distributions shall be made to such Holder as soon as reasonably practicable thereafter. Undeliverable distributions shall remain in the possession of the Reorganized Debtors until such time as a distribution becomes deliverable, or such distribution reverts to the Reorganized Debtors and shall not be supplemented with any interest, dividends or other accruals of any kind.

6.    Reversion.    Any distribution under the Plan that is an Unclaimed Distribution for a period of six (6) months after distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and such Unclaimed Distribution shall revest in the Reorganized Debtors. Upon such revesting, the Claim or Interest of any Holder or its successors with respect to such property shall be cancelled, discharged, and forever barred notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary. The provisions of the Plan regarding undeliverable distributions and Unclaimed Distributions shall apply with equal force to distributions that are issued by the Debtors, made pursuant to any indenture or Certificate (but only with respect to the distribution by the Servicer to Holders that are entitled to be recognized under the relevant indenture or Certificate and not with respect to Entities to whom those recognized Holders distribute), notwithstanding any provision in such indenture or Certificate to the contrary and notwithstanding any otherwise applicable federal or state escheat, abandoned or unclaimed property law.

7.    Manner of Payment Pursuant to the Plan.    Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Reorganized Debtors by check or by wire transfer. Checks issued by the Distribution Agent or applicable Servicer on account of Allowed Claims and Interests shall be null and void if not negotiated within ninety (90) days after issuance, but may be requested to be reissued until the distribution revests in the Reorganized Debtors.

8.    Surrender of Cancelled Instruments or Securities.    On the Effective Date or as soon as reasonably practicable thereafter, each Holder of a Certificate shall be deemed to have surrendered such Certificate to the Distribution Agent or a Servicer (to the extent the relevant Claim or Interest is governed by an agreement and administered by a Servicer). Such surrendered Certificate shall be cancelled solely with respect to the Debtors, and such cancellation shall not alter the obligations or rights of any non-Debtor third parties vis-à-vis one another with respect to such Certificate. Notwithstanding anything to the contrary herein, this paragraph shall not apply to Certificates evidencing Claims that are rendered Unimpaired under the Plan.

K&E 1544985910

D.      *Claims Paid or Payable by Third Parties*

        <u>Claims Paid by Third Parties</u>.  The Notice, Claims and Solicitation Agent shall reduce in full a Claim, and such Claim shall be disallowed without a Claims objection having to be Filed and without any further notice to or action, order or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or Reorganized Debtor.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or a Reorganized Debtor on account of such Claim, such Holder shall, within two weeks of receipt thereof, repay or return the distribution to the applicable Reorganized Debtor, to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate in effect on the Petition Date on such amount owed for each Business Day after the two-week grace period specified above until the amount is repaid.

E.      *Allocation Between Principal and Accrued Interest*

        Except as otherwise provided in the Plan, the aggregate consideration paid to Holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claim (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

F.      *Minimum Distribution*

        Any other provision of the Plan notwithstanding, the Distribution Agent will not be required to make distributions of Cash less than $50 in value or of New Common Stock or Warrants less than $50 in value, and each such Claim to which this limitation applies shall be discharged pursuant to Article IX.A, and its Holder forever barred pursuant to Article IX.H from asserting that Claim against the Reorganized Debtors or their property.

**ARTICLE VII.**

**PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT
AND UNLIQUIDATED CLAIMS OR EQUITY INTERESTS**

A.      *Allowance of Claims and Interests*

        Except as expressly provided herein or in any order entered in the Chapter 11 Cases prior to the Effective Date, including the Confirmation Order, no Claim or Interest shall be deemed Allowed unless and until such Claim or Interest is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order, including the Confirmation Order, in the Chapter 11 Cases allowing such Claim.  Prior to and following the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had with respect to any Claim or Interest immediately prior to the Effective Date.

B.      *Claims and Interests Administration Responsibilities*

        Except as otherwise specifically provided in the Plan, the Debtors, prior to the Effective Date, and the Reorganized Debtors, after the Effective Date, shall have the sole authority:  (1) to File, withdraw or litigate to judgment, objections to Claims or Interests; (2) to settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court.

C.      *Estimation of Claims and Interests*

        Before or after the Effective Date, the Debtors or Reorganized Debtors, as applicable, may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim or Interest that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or Interest or whether the Bankruptcy Court has ruled on any such objection,

K&E 1544985910

and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection. Notwithstanding any provision otherwise in the Plan, a Claim or Interest that has been expunged from the Claims Register, but that either is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Interest, that estimated amount shall constitute a maximum limitation on such Claim or Interest for all purposes under the Plan (including for purposes of distributions), and the relevant Reorganized Debtor may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim or Interest.

D.      *Disallowance of Claims or Interests*

Any Claims or Interests held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549 or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims and Interests may not receive any distributions on account of such Claims and Interests until such time as such Causes of Action against that Entity have been settled or an order of the Bankruptcy Court with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Reorganized Debtors. All Claims Filed on account of an Indemnification Obligation to a director, officer or employee shall be deemed satisfied and expunged from the Claims Register as of the Effective Date to the extent such Indemnification Obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan.

E.      *Amendments to Claims*

Except as expressly provided herein or in any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim shall be deemed Allowed unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code or the Bankruptcy Court has entered a Final Order (including the Confirmation Order) in the Chapter 11 Cases allowing such Claim. Except as expressly provided in the Plan or any order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), the Reorganized Debtors will have and shall retain after the Effective Date any and all rights and defenses that the Debtors had with respect to any Claim as of the Petition Date. All Claims of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed disallowed as of the Effective Date unless and until such Entity pays in full the amount that it owes such Debtor or Reorganized Debtor, as the case may be.

## ARTICLE VIII.

## CONDITIONS PRECEDENT TO CONFIRMATION AND THE EFFECTIVE DATE

A.      *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that all provisions set forth below shall have occurred, unless waived in accordance with the terms of the Plan Support Agreements:

1.  the Plan Support Agreements shall be in full force and effect and shall not have been terminated;

2.  the Disclosure Statement shall have been approved by the Bankruptcy Court;

3.  the Prepetition Administrative Agent and the Noteholder Steering Committee shall be reasonably satisfied with all material tax matters and positions relating to the Debtors and the Reorganized Debtors;

4.  the Plan, including any amendments, modifications or supplements thereto, shall be in form and substance reasonably satisfactory to the requisite Prepetition Credit Agreement Lenders party to the Lender Support Agreement and the requisite Holders of Unsecured Notes party to the Noteholder Support Agreement, in each case subject to and in accordance with the terms of the respective Plan Support Agreements; and

K&E 1544985910

5.    the Bankruptcy Court shall have entered the Confirmation Order, which order shall be in form and substance reasonably satisfactory to the Debtors, the Requisite Participating Lenders and the Requisite Participating Noteholders.

B.    *Conditions Precedent to the Effective Date*

The following are conditions precedent to the Effective Date that must be satisfied or waived in accordance with the Plan Support Agreements:

1.    contemporaneous effectiveness of the Exit Facility; provided that, with respect to an alternative exit financing facility the DIP Facility shall be repaid in Cash in full on the Effective Date; and

2.    there shall have been no modification or stay of the Confirmation Order or entry of other court order prohibiting transactions contemplated by the Plan from being consummated.

C.    *Waiver of Conditions*

The conditions precedent to the Effective Date may be waived in accordance with the terms and conditions set forth in the Plan Support Agreements, in each case without notice to or order of the Bankruptcy Court.

D.    *Non-Occurrence of Conditions*

If the Effective Date does not occur, the Debtors may determine, upon notice to the Bankruptcy Court, that the Plan is null and void in all respects, and nothing contained in the Plan, the Confirmation Order or the Disclosure Statement shall: (1) constitute a waiver or release of any Cause of Action or Claim; (2) constitute an admission, acknowledgment, offer or undertaking in any respect by any party, including the Debtors; or (3) otherwise prejudice in any manner the rights of any party, including the Debtors.

## ARTICLE IX.

## RELEASE, INJUNCTIVE AND RELATED PROVISIONS

A.    *Discharge of Claims and Termination of Interests*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release, and discharge, effective as of the Effective Date, of all Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in, the Debtors, the Reorganized Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not:  (1) a Proof of Claim or Interest based upon such Claim, debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such Claim, debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the Holder of such a Claim or Interest has accepted the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

B.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable

K&E 1544985910

subordination relating thereto. Subject to the requirements of section 1129(b) of the Bankruptcy Code (as applicable), no Holder of a Section 510(b) Claim or Subordinated Claim shall receive any distribution on account of such Section 510(b) Claim or Subordinated Claim, and all Section 510(b) Claims and Subordinated Claims shall be extinguished.

C.      *Compromise and Settlement of Claims, Interests, and Controversies*

        Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim may have with respect to any Allowed Claim or Interest, or any distribution to be made on account of such Allowed Claim or Interest. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019(a), without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtors may compromise and settle Claims against them and Causes of Action against other Entities.

D.      ***Debtor Release***

        **NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE (SUCH THAT THE REORGANIZED DEBTORS WILL NOT RECEIVE ANY CLAIM OR CAUSE OF ACTION RELEASED HEREUNDER), FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY EACH OF THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES, THE ADEQUACY OF WHICH IS HEREBY CONFIRMED, INCLUDING: (1) THE DISCHARGE OF DEBT AND ALL OTHER GOOD AND VALUABLE CONSIDERATION PAID PURSUANT HERETO; AND (2) THE SERVICES OF THE DEBTORS' PRESENT AND FORMER OFFICERS, DIRECTORS, MANAGERS, AND ADVISORS IN FACILITATING THE EXPEDITIOUS IMPLEMENTATION OF THE RESTRUCTURING CONTEMPLATED HEREBY, EACH OF THE DEBTORS DISCHARGE AND RELEASE AND SHALL BE DEEMED TO HAVE PROVIDED A FULL DISCHARGE AND RELEASE TO EACH DEBTOR RELEASEE AND TO EACH THIRD PARTY RELEASEE (AND EACH SUCH DEBTOR RELEASEE AND THIRD PARTY RELEASEE SO RELEASED SHALL BE DEEMED FULLY RELEASED AND DISCHARGED BY THE DEBTORS) AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE THAT ANY OF THE DEBTORS OR THE REORGANIZED DEBTORS WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT IN THEIR OWN RIGHT (WHETHER INDIVIDUALLY OR COLLECTIVELY) OR THAT ANY HOLDER OF A CLAIM OR AN EQUITY INTEREST OR OTHER ENTITY WOULD HAVE BEEN LEGALLY ENTITLED TO ASSERT ON BEHALF OF ANY OF THE DEBTORS OR ANY OF THEIR ESTATES; PROVIDED, HOWEVER, THAT THE FOREGOING "DEBTOR RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION OF ANY DEBTOR: (1) ARISING UNDER THE EXIT FACILITY, THE NEW TERM LOANS OR THE WARRANT AGREEMENTS; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS. NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CAUSES OF ACTION THAT THE DEBTORS OR THE REORGANIZED DEBTORS HAVE OR MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.**

        **ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE DEBTOR RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S**

36

FINDING THAT THE DEBTOR RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE DEBTOR RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE DEBTORS OR THE REORGANIZED DEBTORS ASSERTING ANY CLAIM OR CAUSE OF ACTION RELEASED PURSUANT TO THE DEBTOR RELEASE.

E.     *Third Party Release*

       NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ON THE EFFECTIVE DATE AND EFFECTIVE AS OF THE EFFECTIVE DATE, THE RELEASING PARTIES (REGARDLESS OF WHETHER A RELEASING PARTY IS A THIRD PARTY RELEASEE) SHALL PROVIDE A FULL DISCHARGE AND RELEASE (AND EACH ENTITY SO RELEASED SHALL BE DEEMED RELEASED BY THE RELEASING PARTIES) TO THE THIRD PARTY RELEASEES AND THE DEBTOR RELEASEES AND THEIR RESPECTIVE PROPERTY FROM ANY AND ALL CAUSES OF ACTION, WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, LIQUIDATED OR UNLIQUIDATED, CONTINGENT OR NON-CONTINGENT, EXISTING AS OF THE EFFECTIVE DATE IN LAW, AT EQUITY, WHETHER FOR TORT, FRAUD, CONTRACT, VIOLATIONS OF FEDERAL OR STATE SECURITIES LAWS OR OTHERWISE, ARISING FROM OR RELATED IN ANY WAY TO THE DEBTORS, INCLUDING THOSE IN ANY WAY RELATED TO THE CHAPTER 11 CASES OR THE PLAN; PROVIDED, HOWEVER, THAT THE FOREGOING "THIRD PARTY RELEASE" SHALL NOT OPERATE TO WAIVE OR RELEASE ANY CAUSES OF ACTION OF ANY RELEASING PARTY: (1) ARISING UNDER THE EXIT FACILITY OR THE NEW TERM LOANS; OR (2) EXPRESSLY SET FORTH IN AND PRESERVED BY THE PLAN, THE PLAN SUPPLEMENT, OR RELATED DOCUMENTS.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, THE PLAN DOES NOT RELEASE ANY CLAIMS OR CAUSES OF ACTION THAT THE RELEASING PARTIES, THE DEBTORS OR THE REORGANIZED DEBTORS MAY HAVE NOW OR IN THE FUTURE AGAINST THE NON-RELEASED PARTIES.

       ENTRY OF THE CONFIRMATION ORDER SHALL CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL, PURSUANT TO BANKRUPTCY RULE 9019, OF THE THIRD PARTY RELEASE, WHICH INCLUDES BY REFERENCE EACH OF THE RELATED PROVISIONS AND DEFINITIONS CONTAINED HEREIN, AND, FURTHER, SHALL CONSTITUTE THE BANKRUPTCY COURT'S FINDING THAT THE THIRD PARTY RELEASE IS: (1) IN EXCHANGE FOR THE GOOD AND VALUABLE CONSIDERATION PROVIDED BY THE DEBTOR RELEASEES AND THE THIRD PARTY RELEASEES; (2) A GOOD FAITH SETTLEMENT AND COMPROMISE OF THE CLAIMS RELEASED BY THE THIRD PARTY RELEASE; (3) IN THE BEST INTERESTS OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS; (4) FAIR, EQUITABLE AND REASONABLE; (5) GIVEN AND MADE AFTER DUE NOTICE AND OPPORTUNITY FOR HEARING; AND (6) A BAR TO ANY OF THE RELEASING PARTIES ASSERTING ANY CLAIM RELEASED PURSUANT TO THE THIRD PARTY RELEASE.

F.     *Exculpation*

       NONE OF THE EXCULPATED PARTIES SHALL HAVE, NOR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH, OR RELATED TO FORMULATING, NEGOTIATING, PREPARING, DISSEMINATING, IMPLEMENTING, ADMINISTERING, CONFIRMING, OR EFFECTING THE PLAN OR ANY CONTRACT, INSTRUMENT, RELEASE OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO IN CONNECTION WITH THE PLAN OR ANY OTHER PREPETITION OR POSTPETITION ACT TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR IN CONTEMPLATION OF THE RESTRUCTURING OF THE DEBTORS; PROVIDED, HOWEVER, THAT THE FOREGOING "EXCULPATION" SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT RESULTS FROM ANY SUCH ACT OR OMISSION THAT IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED GROSS NEGLIGENCE OR WILLFUL MISCONDUCT;

K&E 1544985910

**PROVIDED, FURTHER, THAT EACH EXCULPATED PARTY SHALL BE ENTITLED TO RELY UPON THE ADVICE OF COUNSEL CONCERNING HIS, HER OR ITS DUTIES PURSUANT TO, OR IN CONNECTION WITH, THE PLAN OR ANY OTHER RELATED DOCUMENT, INSTRUMENT, OR AGREEMENT.**

G.    *Indemnification*

On and from the Effective Date, and except as prohibited by applicable law, the Reorganized Debtors shall assume all indemnification obligations currently in place, whether in the bylaws, certificates of incorporation (or other formation documents), board resolutions, employment contracts or other agreements for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors and such current and former directors', officers', managers', and employees' respective Affiliates (collectively, the "*Indemnified Parties*").  Without limiting the foregoing and except as prohibited by applicable law, the Debtors shall indemnify and hold harmless, except as provided in the Plan Supplement, each of the Indemnified Parties for all costs, expenses, loss, damage or liability incurred by any such Indemnified Party arising from or related in any way to any and all Causes of Action whether known or unknown, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, including any claims or causes of action, whether direct or derivative, liquidated or unliquidated, fixed or contingent, disputed or undisputed, matured or unmatured, known or unknown, foreseen or unforeseen, asserted or unasserted, based in whole or in part upon any act or omission, transaction or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including those arising from or related in any way to: (1) any action or omission of any such Indemnified Party with respect to any indebtedness of or any Equity Interest in the Debtors (including any action or omission of any such Indemnified Party with respect to the acquisition, holding, voting or disposition of any such investment); (2) any action or omission of any such Indemnified Party in such Indemnified Party's capacity as an officer, director, member, employee, partner or agent of, or advisor to any Debtor; (3) any disclosure made or not made by any Indemnified Party to any current or former Holder of any such indebtedness of or any such Equity Interest in the Debtors; (4) any consideration paid to any such Indemnified Party by any of the Debtors in respect of any services provided by any such Indemnified Party to any Debtor; and (5) any action taken or not taken in connection with the Chapter 11 Cases or the Plan.  In the event that any such Indemnified Party becomes involved in any action, proceeding or investigation brought by or against any Indemnified Party, as a result of matters to which the foregoing "Indemnification" may relate, the Reorganized Debtors shall promptly reimburse any such Indemnified Party for its reasonable and documented legal and other expenses (including the cost of any investigation and preparation) incurred in connection therewith as such expenses are incurred and after a request for indemnification is made in writing, with reasonable documentation in support thereof; provided, however, that, notwithstanding anything herein to the contrary, the Debtors shall not indemnify any of the Non-Released Parties, whether for any matter to which this Article IX.G pertains or otherwise.

H.    ***Injunction***

**Except as otherwise provided in the Plan or the Confirmation Order, all Entities who have held, hold or may hold Claims, Equity Interests, Causes of Action or liabilities that: (1) have been discharged pursuant to Article IX.A hereof; (2) have been released pursuant to Article IX.D hereof; (3) have been released pursuant to Article IX.E hereof; or (4) are subject to exculpation pursuant to Article IX.F hereof (but only to the extent of the exculpation provided in Article IX.F), are permanently enjoined and precluded, from and after the Effective Date, from: (A) commencing or continuing in any manner any action or other proceeding of any kind against any Entity so released, discharged, or exculpated (including the Reorganized Debtors) (or the property or estate of any Entity, directly or indirectly, so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Equity Interests, causes of action or liabilities; (B) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against any Entity so released, discharged, or exculpated (including the Reorganized Debtors) (or the property or estate of any Entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Equity Interests, causes of action, or liabilities; (C) creating, perfecting or enforcing any lien, claim, or encumbrance of any kind against any Entity so released, discharged, or exculpated (including the Reorganized Debtors) (or the property or estate of any Entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims,**

K&E 1544985910

Equity Interests, causes of action, or liabilities; (D) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from any Entity so released, discharged, or exculpated (including the Reorganized Debtors) (or the property or estate of any Entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Equity Interests, causes of action or liabilities unless such Holder has Filed a motion requesting the right to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in a Proof of Claim or Interest or otherwise that such Holder asserts, has or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise; and (E) commencing or continuing in any manner any action or other proceeding of any kind against any Entity so released, discharged, or exculpated (including the Reorganized Debtors) (or the property or estate of any Entity so released, discharged, or exculpated) on account of or in connection with or with respect to any such released, discharged, or exculpated Claims, Equity Interests, causes of action, or liabilities released or settled pursuant to the Plan; provided, however, that nothing contained herein shall preclude an Entity from obtaining benefits directly and expressly provided to such Entity pursuant to the terms of the Plan; provided, further, that nothing contained herein shall be construed to prevent any Entity from defending against Claims objections or collection actions whether by asserting a right of setoff or otherwise to the extent permitted by law.

I.      *Setoffs*

Except as otherwise provided herein, each Reorganized Debtor pursuant to the Bankruptcy Code (including section 553 of the Bankruptcy Code), applicable bankruptcy or non-bankruptcy law, or as may be agreed to by the Holder of a Claim or Interest, may set off against any Allowed Claim (other than DIP Facility Claims or Prepetition Credit Agreement Secured Claims) or Interest and the distributions to be made pursuant to the Plan on account of such Allowed Claim or Interest (before any distribution is made on account of such Allowed Claim or Interest), any Claims, rights, and Causes of Action of any nature that such Debtor or Reorganized Debtor, as applicable, may hold against the Holder of such Allowed Claim or Interest, to the extent such Claims, rights, or Causes of Action against such Holder have not been otherwise compromised or settled on or prior to the Effective Date (whether pursuant to the Plan or otherwise); provided, however, that neither the failure to effect such a setoff nor the allowance of any Claim or Interest pursuant to the Plan shall constitute a waiver or release by such Reorganized Debtor of any such Claims, rights, and Causes of Action that such Reorganized Debtor may possess against such Holder.

J.      *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim and the Prepetition Credit Agreement Secured Claims, satisfaction in full of the portion of the Secured Claim and the Prepetition Credit Agreement Secured Claims that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

## ARTICLE X.

## ALLOWANCE AND PAYMENT OF CERTAIN ADMINISTRATIVE CLAIMS

A.      *Professional Claims*

1.      Final Fee Applications.  All final requests for Professional Compensation and Reimbursement Claims shall be Filed no later than 45 days after the Effective Date.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior Bankruptcy Court orders, the Allowed amounts of such Professional Compensation and Reimbursement Claims shall be determined by the Bankruptcy Court.

2.      Payment of Interim Amounts.  Except as otherwise provided in the Plan, Retained Professionals shall be paid pursuant to the Interim Compensation Order.

3.        Professional Fee Escrow Account.  On the Effective Date, the Reorganized Debtors shall fund the Professional Fee Escrow Account with Cash equal to the aggregate Professional Fee Reserve Amount for all Retained Professionals.  The Professional Fee Escrow Account shall be maintained in trust for the Retained Professionals with respect to whom fees or expenses have been held back pursuant to the Interim Compensation Order.  The remaining amount of Professional Compensation and Reimbursement Claims owing to the Retained Professionals shall be paid in Cash to such Retained Professionals by the Reorganized Debtors from the Professional Fee Escrow Account, without interest or other earnings therefrom, when such Claims are Allowed by a Bankruptcy Court order.  When all Professional Compensation and Reimbursement Claims have been paid in full, amounts remaining in the Professional Fee Escrow Account, if any, shall be paid to the Reorganized Debtors.

4.        Professional Fee Reserve Amount.  To receive payment for unbilled fees and expenses incurred through the Effective Date, the Retained Professionals shall estimate their Accrued Professional Compensation prior to and as of the Effective Date and shall deliver such estimate to the Debtors on or before the Effective Date.  If a Retained Professional does not provide such estimate, the Reorganized Debtors may estimate the unbilled fees and expenses of such Retained Professional; provided, however, that such estimate shall not be considered an admission or limitation with respect to the fees and expenses of such Retained Professional.  The total amount so estimated as of the Effective Date shall comprise the Professional Fee Reserve Amount.

5.        Post-Effective Date Fees and Expenses.  Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall pay in Cash the reasonable legal fees and expenses incurred by that Reorganized Debtor after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  Upon the Effective Date, any requirement that Retained Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and each Reorganized Debtor may employ and pay any Retained Professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

6.        Substantial Contribution Compensation and Expenses.  Except as otherwise specifically provided in the Plan, any Entity that requests compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code must File an application and serve such application on counsel for the Debtors or Reorganized Debtors, as applicable, by no later than 30 days after the Effective Date and as otherwise  required by the Bankruptcy Court, the Bankruptcy Code, and the Bankruptcy Rules.

B.    *Other Administrative Claims*

All requests for payment of an Administrative Claim must be Filed with the Notice, Claims and Solicitation Agent and served upon counsel to the Debtors or Reorganized Debtors, as applicable.  The Reorganized Debtors may settle and pay any Administrative Claim in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.  In the event that any party with standing objects to an Administrative Claim, the Bankruptcy Court shall determine the Allowed amount of such Administrative Claim.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

## ARTICLE XI.

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.        Allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims or Interests;

K&E 1544985910

2.      Decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Retained Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      Resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Cure or Claims arising therefrom, including Cure or Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      Ensure that distributions to Holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

5.      Adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

6.      Adjudicate, decide or resolve any and all matters related to Causes of Action;

7.      Adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      Enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

9.      Enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

10.     Resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

11.     Issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with enforcement of the Plan;

12.     Resolve any cases, controversies, suits, disputes or Causes of Action with respect to the releases, injunctions, and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

13.     Resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid;

14.     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

15.     Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

16.     Enter an order or final decree concluding or closing the Chapter 11 Cases;

17.     Adjudicate any and all disputes arising from or relating to distributions under the Plan;

K&E 1544985910

18.    Consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

19.    Determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

20.    Hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan (other than any dispute arising after the Effective Date under, or directly with respect to, the Exit Facility, which such disputes shall be adjudicated in accordance with the terms of the Exit Facility);

21.    Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

22.    Hear and determine all disputes involving the existence, nature, or scope of the Debtors' discharge, including any dispute relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

23.    Enforce all orders previously entered by the Bankruptcy Court; and

24.    Hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.

## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all Holders of Claims or Interests (irrespective of whether Holders of such Claims or Interests are deemed to have accepted the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan or herein, each Entity acquiring property under the Plan and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.

B.    *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or Reorganized Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Payment of Statutory Fees*

All fees payable pursuant to section 1930(a) of the Judicial Code, as determined by the Bankruptcy Court at a hearing pursuant to section 1128 of the Bankruptcy Code, shall be paid for each quarter (including any fraction thereof) until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.

D.    *Modification of Plan*

Subject to the limitations contained in the Plan and the Plan Support Agreements, and in accordance with the Plan Support Agreements: (1) the Debtors reserve the right, in accordance with the Bankruptcy Code and the

K&E 1544985910

Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; and (2) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as the case may be, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

E.    *Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if entry of the Confirmation Order or the Effective Date does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

F.    *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the Holders of Claims or Interests prior to the Effective Date.

G.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries or guardian, if any, of each Entity.

H.    *Service of Documents*

After the Effective Date, any pleading, notice, or other document required by the Plan to be served on or delivered to the Reorganized Debtors shall be served on:

| Debtors | Counsel to Debtors |
|---|---|
| Lear Corporation<br>21557 Telegraph Road<br>Southfield, Michigan 48033<br>Attn: Terrence B. Larkin, Senior Vice President, General Counsel and Corporate Secretary | Kirkland & Ellis LLP<br>300 North LaSalle<br>Chicago, Illinois 60654<br>Attn: James H.M. Sprayregen, Marc Kieselstein and Ryan Blaine Bennett |
| **Counsel to the Noteholders Committee** | **United States Trustee** |
| Stroock & Stroock & Lavan<br>1080 Maiden Lane<br>New York, New York 10038<br>Attn.: Kristopher Hansen and Sayan Bhattacharyya | Office of the United States Trustee<br>for the Southern District of New York<br>33 Whitehall Street, 21st Floor<br>New York, New York 10004<br>Attn.: Paul K. Schwartzberg, Esq. |
| **Counsel to the Agent for the Debtors' Prepetition and Postpetition Lenders** | **Counsel to the Committee** |
| Simpson Thacher & Bartlett LLP<br>425 Lexington Avenue<br>New York, New York 10017<br>Attn.: Ken Ziman and Elisha Graff | Lowenstein Sandler<br>65 Livingston Avenue<br>Roseland, New Jersey 07068<br>Attn.: Sharon L. Levine |

43

After the Effective Date, the Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, they must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed requests.

In accordance with Bankruptcy Rules 2002 and 3020(c), within ten (10) Business Days of the date of entry of the Confirmation Order, the Debtors shall serve the Notice of Confirmation by United States mail, first class postage prepaid, by hand, or by overnight courier service to all parties served with the Confirmation Hearing Notice; provided, however, that no notice or service of any kind shall be required to be mailed or made upon any Entity to whom the Debtors mailed a Confirmation Hearing Notice, but received such notice returned marked "undeliverable as addressed," "moved, left no forwarding address" or "forwarding order expired," or similar reason, unless the Debtors have been informed in writing by such Entity, or are otherwise aware, of that Entity's new address. To supplement the notice described in the preceding sentence, within twenty days of the date of the Confirmation Order the Debtors shall publish the Notice of Confirmation once in *The Wall Street Journal* (National Edition).  Mailing and publication of the Notice of Confirmation in the time and manner set forth in the this paragraph shall be good and sufficient notice under the particular circumstances and in accordance with the requirements of Bankruptcy Rules 2002 and 3020(c), and no further notice is necessary.

I.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

J.      *Entire Agreement*

On the Effective Date, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

K.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control), and corporate governance matters; provided, however, that corporate governance matters relating to Debtors or Reorganized Debtors, as applicable, not incorporated in New York shall be governed by the laws of the state of incorporation of the applicable Debtor or Reorganized Debtor, as applicable.

L.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan.  Except as otherwise provided in the Plan, such exhibits and documents included in the Plan Supplement shall be Filed with the Bankruptcy Court on or before the Plan Supplement Filing Date or the Solicitation Date, as applicable.  After the exhibits and documents are Filed, copies of such exhibits and documents shall have been available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' private website at http://www.kccllc.net/lear or the Bankruptcy Court's website at www.nysb.uscourts.gov.  To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

K&E 1544985910

M.      *Nonseverability of Plan Provisions upon Confirmation*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted.    Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors, the Prepetition Administrative Agent, the Committee and the Noteholder Steering Committee; and (3) nonseverable and mutually dependent.

N.      *Closing of Chapter 11 Cases*

The Reorganized Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

O.      *Conflicts*

Except as set forth in the Plan, to the extent that any provision of the Disclosure Statement, the Plan Supplement, or any other order (other than the Confirmation Order) referenced in the Plan (or any exhibits, appendices, supplements, or amendments to any of the foregoing), conflict with or are in any way inconsistent with any provision of the Plan, the Plan shall govern and control

P.      *Dissolution of Committee*

On the Effective Date, the Committee shall dissolve, and the members thereof shall be released and discharged from all rights and duties arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that after the entry of the Confirmation Order, the Committee's functions shall be restricted to, and the Committee shall not be heard on any issue except, obtaining a Final Order of the Bankruptcy Court authorizing or approving Accrued Professional Compensation of its Retained Professionals.

Q.      *Fees*

The Debtors shall pay within five Business Days of the Effective Date the reasonable fees and documented out-of-pocket expenses of the Noteholder Steering Committee Advisors, in full in Cash without the need for the Noteholder Steering Committee Advisors to File retention applications or fee applications with the Bankruptcy Court unless otherwise required by applicable bankruptcy law or by order of the Bankruptcy Court.

The Debtors shall pay within five Business Days of the Effective Date the reasonable fees and documented out-of-pocket expenses of the Indenture Trustees due as of the Effective Date for the period covering up to and including the Effective Date, including the reasonable fees and documented out-of-pocket expenses of Covington & Burling LLP as counsel to the Indenture Trustees due as of the Effective Date for the period covering up to and including the Effective Date, without the need of these parties to File fee applications with the Bankruptcy Court unless otherwise required by applicable bankruptcy law or by order of the Bankruptcy Court; <u>provided</u> that, the Indenture Trustees and their counsel shall provide the Debtors with the invoices for which they seek payment on or before the Effective Date.

The Debtors shall also pay on the Effective Date or as soon as reasonably practicable thereafter the reasonable fees and documented out-of-pocket fees incurred by the members of the Committee.

R.      *Special Rule Concerning the Debtors' Qualified Pension Plans*

Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, neither the Plan nor the Confirmation Order will release, discharge or exculpate the Debtors, the Reorganized Debtors or any third party

from any debt owed to the Debtors' qualified pension plans or the Pension Benefit Guaranty Corporation under the Employee Retirement Income Security Act of 1974 or the Internal Revenue Code or enjoin or prevent the qualified pension plans and the Pension Benefit Guaranty Corporation from collecting any such liability from a liable party.

S.    *ACE Companies*

Notwithstanding anything to the contrary in the Disclosure Statement, Plan, any exhibit to the Plan, any other Plan document or the Confirmation Order (including, without limitation, any other provision that purports to be preemptory or supervening), (i) the Debtors and the Reorganized Debtors: (a) shall assume the ACE Insurance Program on the Effective Date and (b) shall cure the ACE-Related Cure in accordance with Article V.B of the Plan; provided, however, that Reorganized Debtors shall remain liable for any Claim under the ACE Insurance Program that becomes liquidated, or is due and owing, after the time of assumption (regardless of when the underlying cause of action and/or claim arose) and shall pay such Claim in the ordinary course of business; (ii) as of the Effective Date, the Reorganized Debtors are bound by the terms of the ACE Insurance Program and shall be liable for all of the Debtors' obligations and liabilities, whether now existing or hereafter arising, under the ACE Insurance Program including, without limitation, the ACE-Related Cure and the duty to continue to provide collateral and security as required by the ACE Insurance Program; (iii) except as otherwise provided in part (i) hereof regarding the ACE-Related Cure, the Claims of ACE Companies pursuant to the ACE Insurance Program arising after the Petition Date shall be Administrative Claims that (a) are Allowed; provided, however, that nothing limits the ability of any applicable Debtor or Reorganized Debtor to contest any such Administrative Claim on any basis provided for under the ACE Insurance Program, applicable law or any other valid grounds and (b) the ACE Companies' Administrative Claims that are not contested, shall be due and payable in the ordinary course of business by the Debtors (or after the Effective Date, by the Reorganized Debtors) pursuant to the ACE Insurance Program, and the ACE Companies shall not be required to file or serve a request for payment of such Administrative Claims and shall not be subject to any bar date or similar deadline; and (iv) nothing in the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening), (a) shall in any way operate to, or have the effect of, impairing ACE Companies' legal, equitable or contractual rights and defenses with respect to the ACE Insurance Program, in any respect, including without limitation, the ACE Companies' rights of recoupment, setoff, rescission, contribution and subrogation and the rights of ACE Companies to contest and/or litigate with any party (including, without limitation, the Debtors and Reorganized Debtors) the existence, primacy and/or scope of available coverage under any alleged applicable policy; (b) alters the rights and obligations of the ACE Companies, the Debtors (or after the Effective Date, the Reorganized Debtors) under the ACE Insurance Program and applicable non-bankruptcy law; or (c) discharges, releases or relieves the Debtors (or after the Effective Date, the Reorganized Debtors) from any obligations or liabilities due and owing to the ACE Companies under the ACE Insurance Program; provided that, notwithstanding anything to the contrary herein or otherwise, to the extent the Debtors' obligations to any third party are released, relieved or discharged under the Plan or otherwise, the Debtors shall not maintain any liability on account of such obligations to any party other than to the ACE Companies with respect to the Debtors' obligations under the ACE Insurance Program.

T.    *Section 1125(e) Good Faith Compliance*

The Debtors, Reorganized Debtors, the Committee, Canadian Information Officer, and each of their respective Representatives, shall be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

U.    *Further Assurances*

The Debtors, Reorganized Debtors, all Holders of Claims receiving distributions hereunder and all other parties-in-interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

V.    *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rule 3020(e) and 7062.

K&E 1544985910

W.        *Aid and Recognition*

The Debtors or Reorganized Debtors, as the case may be, shall, as needed to effect the terms hereof, request the aid and recognition of any court or judicial, regulatory or administrative body in any province or territory of Canada or any other nation or state.

*[remainder of page intentionally blank]*

Respectfully submitted, as of the date first set forth above,

**LEAR CORPORATION (on behalf of itself and all other Debtors)**

By:    */s/ Matthew J. Simoncini*
Name:    Matthew J. Simoncini
Title:    Senior Vice President and Chief Financial Officer of Lear Corporation

## EXHIBIT B

**Form of Letter to Holders in Each of the Voting Classes**

On September 18, 2009, Lear Corporation and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession (collectively, the "Debtors") filed:    (a) the *Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") and (b) the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as amended from time to time, the "Plan")[1]  On September 18, 2009, the Bankruptcy Court entered the *Order:  (A) Approving the Disclosure Statement; (B) Approving Certain Dates Related to Confirmation of the Plan; (C) Approving Certain Voting Procedures and the Form of Certain Documents to be Distributed in Connection with the Solicitation of the Plan; and (D) Approving Proposed Voting and General Tabulation Procedures* (the "Disclosure Statement Order"), which, among other things, approved certain procedures (the "Solicitation Procedures") with respect to the solicitation of votes to accept or reject the Plan.

**You have received this letter and the enclosed materials because you are entitled to vote on the Plan.**

The enclosed materials constitute the Debtors' "Solicitation Package" and consist of the following:

a.    the Disclosure Statement Order (with the Solicitation Procedures, which shall be attached as Exhibit 1 thereto);

b.    the approved form of the Disclosure Statement (together with the Plan) in paper format with an appropriate form of Ballot and/or Master Ballot and voting instructions with respect thereto, if applicable (with a pre-addressed, postage prepaid return envelope);

c.    this cover letter and a letter from the official committee of unsecured creditors in support of the Plan;

d.    the notice of the Confirmation Hearing; and

e.    such other materials as the Bankruptcy Court may direct.

---

[1]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan or the Disclosure Statement, as applicable.

The Board of Directors of Lear Corporation, the parent company to each of Lear #50 Holdings, LLC, Lear Argentine Holdings Corporation #2, Lear Automotive Dearborn, Inc., Lear Automotive Manufacturing, LLC, Lear Canada, Lear Canada Investments Ltd., Lear Corporation (Germany) Ltd., Lear Corporation Canada Ltd., Lear Corporation EEDS and Interiors, Lear Corporation Global Development, Inc., Lear EEDS Holdings, LLC, Lear European Operations Corporation, Lear Holdings, LLC, Lear Investments Company, LLC, Lear Mexican Holdings Corporation, Lear Mexican Holdings, LLC, Lear Mexican Seating Corporation, Lear Operations Corporation, Lear Seating Holdings Corp. #50, Lear South Africa Limited, Lear South American Holdings Corporation, Lear Trim L.P. and Renosol Seating, LLC, each of which is a Debtor in the chapter 11 cases, has approved the filing and solicitation of the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of the Holders of Claims against and Interests in each of the Debtors. Moreover, the Debtors believe that any alternative other than Confirmation of the Plan could result in extensive delays and increased administrative expenses, thereby resulting in smaller distributions on account of Claims and Interests.

The Plan Supplement will be filed no later than ten business days prior to the Voting Deadline.

**THE DEBTORS, THEREFORE, RECOMMEND THAT ALL ENTITIES ENTITLED TO VOTE SUBMIT A TIMELY BALLOT VOTING TO ACCEPT THE PLAN.**

**The materials in the Solicitation Package are intended to be self-explanatory. If you have any questions, however, please feel free to contact the Debtors' Notice, Claims and Solicitation Agent:  by (a) calling the Debtors' restructuring hotline at (866) 927-7093 within the U.S. or Canada or, outside of the U.S. or Canada, calling (310) 751-2659; (b) visiting the Debtors' restructuring website at:  http://www.kccllc.net/lear;  and/or (c) writing to Lear Corporation, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.  You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at:  http://www.nysb.uscourts.gov.**

## EXHIBIT C

**Signed Disclosure Statement Order**

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| | ) |
| In re: | ) Chapter 11 |
| | ) |
| LEAR CORPORATION, et al., [1] | ) Case No. 09-14326 (ALG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

**ORDER:  (A) APPROVING THE DISCLOSURE STATEMENT;
(B) APPROVING CERTAIN DATES RELATED TO CONFIRMATION
OF THE PLAN; (C) APPROVING CERTAIN VOTING PROCEDURES
AND THE FORM OF CERTAIN DOCUMENTS TO BE DISTRIBUTED IN
CONNECTION WITH THE SOLICITATION OF THE PLAN; AND (D) APPROVING
PROPOSED VOTING AND GENERAL TABULATION PROCEDURES**

Upon the motion (the "Motion") of the above-captioned debtors (collectively, the

"Debtors") for the entry of an order (this "Order"):  (a) approving the *Disclosure Statement for*

*Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code*

(as amended from time to time, the "Disclosure Statement"); (b) approving certain dates related

to confirmation of the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11*

*of the Bankruptcy Code* (as amended from time to time, the "Plan");[2] (c) approving certain

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' federal tax
identification number (if any), include:  Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear
Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive
Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Debtor that does
not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear
Corporation Canada Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number);
Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS
Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear
Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC
(4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings
Corp. #50 (9055); Lear South Africa Limited (a non-U.S. Debtor that does not maintain a U.S. Federal tax
identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol
Seating, LLC (4745).  The location of the Debtors' corporate headquarters and the service address for all of the
Debtors is:  21557 Telegraph Road, Southfield, Michigan 48033.

[2]    Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion, the
Disclosure Statement or the Plan, as applicable.

voting procedures and the form of certain documents to be distributed in connection with the solicitation of the Plan; and (d) approving proposed voting and general tabulation procedures [Docket No. 368] and the *Notice of Revised Proposed Disclosure Statement Order and Related Exhibits* [Docket No. 598] (the "Notice"); it appearing that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; the Bankruptcy Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334; consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157 (b); venue being proper before this court pursuant to 28 U.S.C. §§ 1408 and 1409; notice of the Motion having been adequate and appropriate under the circumstances; and after due deliberation and sufficient cause appearing therefor, it is hereby ORDERED that:

1.      The Motion is granted as set forth herein.

2.      The Plan Confirmation Schedule is approved as set forth herein.

3.      The form of the Disclosure Statement Hearing notice, substantially in the form attached to the Motion as Exhibit J, **as amended on the record of the hearing on September 18, 2009,** is hereby approved.

4.      The Debtors have provided adequate notice of the time fixed for filing objections and the hearing to consider approval of the Disclosure Statement in accordance with Bankruptcy Rules 2002 and 3017 and Local Bankruptcy Rules 2002-1 and 3017-1(a).

5.      Any objections to approval of the Disclosure Statement that were not withdrawn or resolved at or prior to the hearing to consider approval of the Disclosure Statement are overruled.

6.      The Disclosure Statement complies with all aspects of section 1125 of the Bankruptcy Code and is hereby approved as containing adequate information (as defined by section 1125(a) of the Bankruptcy Code).

7.      September 14, 2009, 5:00 p.m. prevailing Eastern Time, shall be the Voting Record Date for determining:  (a) the Holders of Claims and Interests (including "holders of bonds, debentures, notes and other securities") that are entitled to receive the Solicitation Package pursuant to the Solicitation Procedures; (b) the Holders of Claims and Interests entitled to vote to accept the Plan; and (c) whether Claims and Interests have been properly transferred or assigned to an assignee, including the requirements that:  (i) the transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e); and (ii) such transfer is reflected on the Claims Register on or before the Voting Record Date.

8.      The Disclosure Statement, the Plan and the Ballots and Master Ballot provide Holders of Claims and Interests and other parties in interest with sufficient notice regarding the release, exculpation, and injunction provisions contained in the Plan in compliance with Bankruptcy Rule 3016(c).

9.      The Solicitation Procedures attached hereto as <u>Exhibit 1</u> and incorporated by reference herein, are hereby approved in their entirety, provided that the Debtors reserve the right to amend or supplement the Solicitation Procedures to better facilitate the solicitation process.

10.      The procedures for distribution of the Solicitation Packages set forth in the Motion (and including any revisions made thereto, as reflected in the Notice) and the Solicitation Procedures satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules, and the Debtors shall distribute or cause to be distributed Solicitation Packages to all Entities entitled to vote to accept or reject the Plan.

11.     The form of the Confirmation Hearing Notice, substantially in the form attached
to the Motion as <u>Exhibit B</u> (and including any revisions made thereto, as reflected in the Notice),
complies with the requirements of Bankruptcy Rules 2002(b), 2002(d) and 3017(d) and is hereby
approved.

12.     The Debtors shall publish the Confirmation Hearing Notice (in a format modified
for publication) in the *Wall Street Journal*, *USA Today*, *Globe and Mail (National Edition)* and
the *Detroit Free Press* on a date no fewer than 15 calendar days prior to the Voting Deadline.

13.     The Debtors' letter to the Voting Classes, substantially in the form attached to the
Motion as <u>Exhibit C</u> (and including any revisions made thereto, as reflected in the Notice), is
hereby approved.

14.     The Ballots and Master Ballot, substantially in the forms attached to the Motion
as <u>Exhibit D</u> and <u>Exhibit E</u> (and including any revisions made thereto, as reflected in the Notice),
respectively, are hereby approved.

15.     The form of the voting instructions, substantially in the form attached to the
Ballots and the Master Ballot on <u>Exhibits D</u> and <u>Exhibit E</u> to the Motion (and including any
revisions made thereto, as reflected in the Notice), respectively, are hereby approved.

16.     All votes to accept or reject the Plan must be cast by using the appropriate Ballot
or the Master Ballot.

17.     All Ballots and Master Ballots must be properly executed, completed, and
delivered according to their applicable voting instructions by:  (a) first class mail, in the return
envelope provided with each Ballot or Master Ballot; (b) overnight courier; or (c) personal
delivery, so that the Ballots and Master Ballots are actually received by the Notice, Claims and

Solicitation Agent no later than the Voting Deadline at the return address set forth in the applicable Ballot or Master Ballot.

18.    The Non-Voting Status Notice-Deemed to Accept, substantially in the form attached to the Motion as <u>Exhibit F</u> (and including any revisions made thereto, as reflected in the Notice), is hereby approved.

19.    The Non-Voting Status Notice-Deemed to Reject, substantially in the form attached to the Motion as <u>Exhibit G</u> (and including any revisions made thereto, as reflected in the Notice), is hereby approved.

20.    The form of the Notice to Contract and Lease Counterparties, substantially in the form attached to the Motion as <u>Exhibit H</u> (and including any revisions made thereto, as reflected in the Notice), is hereby approved.

21.    Ballots and/or Master Ballots and copies of the Plan and Disclosure Statement need not be provided to the Holders of Claims who are in Unimpaired Classes or who are unclassified under the Plan and are, therefore, deemed to accept the Plan.

22.    The form of the Disputed Claim Notice, substantially in the form attached to the Motion as <u>Exhibit I</u> (and including any revisions made thereto, as reflected in the Notice), is hereby approved.

23.    The Debtors shall be excused from mailing Solicitation Packages to those Entities to whom the Debtors mailed a notice regarding the Disclosure Statement Hearing and received a notice from the United States Postal Service or other carrier that such notice was undeliverable unless such Entity provides the Debtors, through the Notice, Claims and Solicitation Agent, an accurate address not less than ten calendar days prior to the Solicitation Date.  If an Entity has

changed its mailing address after the Petition Date, the burden is on such Entity, not the Debtors, to advise the Debtors and the Notice, Claims and Solicitation Agent of the new address.

24.     In the event that substantive consolidation is not authorized, the Debtors shall not be required to resolicit votes with respect to the Plan.

25.     The Voting Deadline shall be 5:00 p.m. prevailing Eastern Time on October 26, 2009.

26.     The Plan Objection Deadline shall be 4:00 p.m. prevailing Eastern Time on October 26, 2009.

27.     Any objections to the Plan must be filed by the Plan Objection Deadline and must:  (a) be in writing; (b) conform to the Bankruptcy Rules and the Local Bankruptcy Rules; (c) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such Entity; (d) state with particularity the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection; and (e) be filed, contemporaneously with a proof of service, with the Court and served so that it is actually received by the notice parties identified in the Confirmation Hearing Notice no later than the Plan Objection Deadline.

28.     The Confirmation Hearing shall commence on November 5, 2009 at 10:00 a.m. prevailing Eastern Time, which hearing may be continued from time to time by the Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Court and served on (a) all entities that have filed a request for service of filings in the chapter 11 cases pursuant to Bankruptcy Rule 2002 and (b) other parties entitled to notice.

29.     The terms of this Order shall be binding upon the Debtors, all Holders of Claims

and Interests, and any trustees appointed under chapter 7 or chapter 11 of the Bankruptcy Code

relating to the Debtors and all other parties in interest.

30.     All time periods set forth in this Order shall be calculated in accordance with

Bankruptcy Rule 9006(a).

31.     The Debtors are authorized to take all actions necessary to effectuate the relief

granted pursuant to this Order in accordance with the Motion.

32.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062,

9014 or otherwise, the terms and conditions of this Order shall be immediately effective and

enforceable upon its entry.

33.     The Court retains jurisdiction with respect to all matters arising from or related to

the implementation of this Order.

New York, New York
Dated:  September 18, 2009

                                                    _/s/ Allan L. Gropper_____
                                                    United States Bankruptcy Judge

# EXHIBIT 1

**Revised Solicitation Procedures**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEAR CORPORATION, et al., [1] | ) Case No. 09-14326 (ALG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

## SOLICITATION PROCEDURES

On September __, 2009, Lear Corporation and certain of its subsidiaries and affiliates, as debtors and debtors-in-possession (the "Debtors") filed: (a) the *Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"); (b) the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (as amended from time to time, the "Plan"); and (c) the *Debtors' Motion for Entry of an Order: (a) Approving the Disclosure Statement; (b) Approving Certain Dates Related to Confirmation of the Plan; (c) Approving Certain Voting Procedures and the Form of Certain Documents to be Distributed in Connection with Solicitation of the Plan; and (d) Approving Proposed Voting and General Tabulation Procedures* [Docket No. 368 (the "Motion"). On the date of the order to which these Solicitation Procedures are attached, the Bankruptcy Court entered an order approving the Motion and the Solicitation Procedures set forth herein (the "Disclosure Statement Order").[2]

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' federal tax identification number (if any), include: Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear Corporation Canada Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC (4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings Corp. #50 (9055); Lear South Africa Limited (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol Seating, LLC (4745). The location of the Debtors' corporate headquarters and the service address for all of the Debtors is: 21557 Telegraph Road, Southfield, Michigan 48033.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion, the Plan or the Disclosure Statement, as applicable. A copy of the Motion, the Disclosure Statement, and the Plan may be obtained: (a) from the Notice, Claims and Solicitation Agent (i) free of charge at its website at www.kccllc.net/lear, (ii) by writing to Kurtzman Carson Consultants LLC, Attn: Lear Corporation Balloting Center, 2335 Alaska Avenue, El Segundo, California 90245, (iii) by calling (866) 927-7093 within the U.S. or Canada or, outside of the U.S. or Canada, calling (310) 751-2659 or (iv) by emailing KCC_Lear@kccllc.com; or (b) for a fee via PACER at https://ecf.nysb.uscourts.gov.

# Definitions

a. **"Ballot"** means the ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

b. **"Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the chapter 11 cases.

c. **"Beneficial Holder"** means a beneficial owner of publicly-traded Securities whose Claims have not been satisfied prior to the Voting Record Date pursuant to Bankruptcy Court order or otherwise, as reflected in the records maintained by the Nominees holding through the DTC or other relevant security depository and/or the applicable indenture trustee, as of the Voting Record Date.

d. **"Confirmation Hearing"** means the hearing conducted by the Bankruptcy Court pursuant to section 1128(a) of the Bankruptcy Code to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time and which currently is scheduled for November 5, 2009 at 10:00 a.m. (prevailing Eastern Time).

e. **"Confirmation Hearing Notice"** means that certain notice of the Confirmation Hearing approved by the Bankruptcy Court in the Disclosure Statement Order.

f. **"Disclosure Statement"** means the Debtors' Disclosure Statement approved by the Bankruptcy Court in the Disclosure Statement Order.

g. **"Disclosure Statement Order"** means the Order: (a) Approving the Disclosure Statement; (b) Approving Certain Dates Related to Confirmation of the Plan; (c) Approving Certain Voting Procedures and the Form of Certain Documents to be Distributed in Connection with Solicitation of the Plan; and (d) Approving Proposed Voting and General Tabulation Procedures.

h. **"General Tabulation Procedures"** means the Procedures set forth herein for the purposes of tabulating votes to accept or reject the Plan.

i. **"Master Ballot"** means the master ballots accompanying the Disclosure Statement upon which certain Holders of Impaired Claims entitled to vote shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process, and which must be actually received on or before the Voting Deadline.

j.      **"Nominee"** means a bank, broker or other nominee in whose name Securities are transferred by agreement between such nominee and the Beneficial Holder.

k.      **"Non-Voting Status Notice-Deemed to Accept"** means the notice of non-voting status that the Holders of Claims in Classes 1A, 2A, 4A, 8A-2, 1B, 2B, 3B and 4B who are deemed to accept the Plan will receive in lieu of a Ballot or Master Ballot.

l.      **"Non-Voting Status Notice-Deemed to Reject"** means the notice the Holders of Claims or Interests in Classes 7A and 8A-1 who are deemed to reject the Plan will receive in lieu of a Ballot or Master Ballot.

m.      **"Notice, Claims and Solicitation Agent"** means Kurtzman Carson Consultants LLC, retained as the Debtors' notice, claims and solicitation agent.

n.      **"Plan"** means the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, as may be amended from time to time.

o.      **"Plan Objection Deadline"** means **October 26, 2009 at 4:00 p.m. (prevailing Eastern Time)**, the date set by the Bankruptcy Court as the deadline to file and serve objections to the Plan.

p.      **"Prepetition Administrative Agent"** means JPMorgan Chase Bank, N.A. in its capacity as administrative agent and collateral agent under the Prepetition Credit Agreement.

q.      **"Prepetition Credit Agreement Lenders"** means the lenders under the Prepetition Credit Agreement, including holders of Swap Claims

r.      **"Resolution Event"** has the meaning set forth in section D.6. of the Solicitation Procedures.

s.      **"Solicitation Package"** consists of the documents set forth in section C.1. of the Solicitation Procedures.

t.      **"Solicitation Procedures"** means the procedures set forth herein.

u.      "**Unsecured Notes**" means, collectively, the 2013 and 2016 Notes, the 2014 Notes and the Zero-Coupon Notes.

v.      **"Voting Deadline"** means **October 26, 2009 at 5:00 p.m. (prevailing Eastern Time)**, the date set by the Bankruptcy Court as the deadline for receipt of Ballots and Master Ballots by the Notice, Claims and Solicitation Agent.

w.      **"Voting Record Date"** has the meaning set forth in section A of the Solicitation Procedures.

## Solicitation Procedures

**A.    The Voting Record Date**

The Bankruptcy Court has approved September 14, 2009, as the record date (the "Voting Record Date") for purposes of determining, among other things, which Holders of Claims or Interests are entitled to vote on the Plan.

**B.    The Voting Deadline**

The Bankruptcy Court has approved October 26, 2009 at 5:00 p.m. (prevailing Eastern Time) as the deadline for the delivery of Ballots and Master Ballots voting to accept or reject the Plan (the "Voting Deadline").  To be counted as votes to accept or reject the Plan, all Ballots and Master Ballots, as applicable, must be properly executed, completed, and delivered by using the return envelope provided or by delivery by:  (a) first class mail; (b) overnight courier; or (c) personal delivery, so that they are actually received no later than the Voting Deadline by the Notice, Claims and Solicitation Agent.  The Ballots and Master Ballots will clearly indicate the appropriate return address (or, in the case of the Beneficial Holders of the Debtors' Unsecured Notes who hold their position through a Nominee, such Beneficial Holders will be instructed to comply with the return instructions provided by the Nominee).  Ballots returnable to the Notice, Claims and Solicitation Agent should be sent to:  Kurtzman Carson Consultants LLC, Attn: Lear Corporation Balloting Center, 2335 Alaska Avenue, El Segundo, California 90245.

**C.    Solicitation Procedures**

1.    **The Solicitation Package**:  The Solicitation Package shall contain copies of the following:

      a.    either (i) the Disclosure Statement Order (with the Solicitation Procedures, which shall be attached as Exhibit 1 thereto) and the approved form of the Disclosure Statement (together with the Plan) in paper format with an appropriate form of Ballot and/or Master Ballot and voting instructions with respect thereto, if applicable (with a pre-addressed, postage prepaid return envelope); or (ii) a Non-Voting Status Notice;

      b.    to the extent a Holder of any Claim or Interest receives the materials set forth in clause (a)(i) above, such Holder also shall receive (i) a letter from the Debtors, substantially in the form attached as Exhibit C hereto, urging the Holders in each Class, entitled to vote on the Plan to vote to accept the Plan, (ii) a letter from the official committee of unsecured creditors in support of the Plan and (iii) if applicable, a letter in form and substance, acceptable to the Debtors in their discretion, from the Debtors' other significant constituents urging the Holders in each class entitled to vote on the Plan to vote to accept the Plan;

      c.    the Confirmation Hearing Notice; and

     d.     such other materials as the Bankruptcy Court may direct.

2.    **Distribution of the Solicitation Packages**:  The Solicitation Package shall be served on the following Entities:

    a.    Holders of Claims or Interests for which a Proof of Claim or Interest has been timely-Filed, as reflected on the Claims Register as of the Voting Record Date; provided, however, that Holders of Claims and Interests to which an objection is pending at least 15 days prior to the Confirmation Hearing shall not be entitled to vote unless such Holders become eligible to vote through a Resolution Event in accordance with section D.6 herein;

    b.    All Entities listed in the Debtors' Schedules[3] shall receive a Solicitation Package with the exception of those Claims and Interests that are scheduled as contingent, unliquidated, disputed, or any combination thereof (excluding such scheduled Claims and Interests that have been superseded by a timely-Filed Proof of Claim); provided, however, that Holders of Claims and Interests that are scheduled as contingent, unliquidated or disputed for which the applicable claims bar date for such Holder or Beneficial Holder has not passed shall receive Solicitation Packages;

    c.    Holders whose Claims or Interests arise pursuant to an agreement or settlement with the Debtors, as reflected in a document Filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim or Interest has been Filed;

    d.    Prepetition Credit Agreement Lenders who are Holders of Class 3A Prepetition Credit Agreement Secured Claims and/or Class 5A Other General Unsecured Claims as of the Voting Record Date, based upon the records of the Prepetition Administrative Agent, as provided to the Notice, Claims and Solicitation Agent; and

    e.    with respect to any Beneficial Holder who holds its position through a Nominee, to the applicable Nominee, as reflected in the relevant records as of the Voting Record Date.

---

[3]  "*Schedules*" are, collectively, the schedules of assets and liabilities, schedules of executory contracts and unexpired leases and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified or supplemented from time to time.

The Debtors shall make every reasonable effort to ensure that Holders and/or Beneficial Holders of more than one Claim in a single Voting Class receive no more than one Solicitation Package on account of such Claims.

3.    **Distribution of Materials**:  The following Entities shall be served the Disclosure Statement Order, the Disclosure Statement and all exhibits to the Disclosure Statement, including the Plan:  (a) the Office of the United States Trustee for the Southern District of New York; (b) counsel to the official committee of unsecured creditors appointed in the chapter 11 cases; (c) counsel to the agent for the Debtors' prepetition senior lenders and proposed postpetition secured lenders; (d) each trustee for each of the Debtors' notes; (e) counsel to the ad hoc committee of the Debtors' unsecured noteholders; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission; (h) the attorneys general for each of the States in which the Debtors conduct their operations; (i) the Environmental Protection Agency; (j) the Pension Benefit Guaranty Corporation; and (k) all those persons and entities that have formally requested notice, pursuant to Bankruptcy Rule 2002 and the Local Bankruptcy Rules.

4.    **Publication of Confirmation Hearing Notice**:  The Debtors shall, following the Disclosure Statement Hearing, publish the Solicitation Notice, which will contain, among other things, the Plan Objection Deadline, the Voting Deadline and the date that the Confirmation Hearing is first scheduled, in the *Wall Street Journal*, *USA Today*, *Globe and Mail (National Edition)* and the *Detroit Free Press* to provide notification to those Entities that may not receive notice by mail, on a date no fewer than 15 calendar days prior to the Voting Deadline.

## D.    Voting and General Tabulation Procedures

1.    **Who May Vote**:  Only the following Holders of Claims in Voting Classes are entitled to vote:

    a.    Holders of Claims for which Proofs of Claim or Interest have been timely-Filed, as reflected on the Claims Register as of the Voting Record Date; provided, however, that certain Holders of Claims subject to a pending objection shall not be entitled to vote unless they become eligible to vote through a Resolution Event, as set forth in more detail in section D.6. herein;

    b.    Holders of Claims that are listed in the Debtors' Schedules, with the exception of those Claims that are scheduled as contingent, unliquidated or disputed (excluding such scheduled Claims and Interests that have been superseded by a timely-Filed Proof of Claim or Interest); provided, however, that Holders of Claims and Interests that are scheduled as contingent, unliquidated, or disputed for which the applicable claims bar date has not passed may vote;

    c.    Holders whose Claims arise pursuant to an agreement or settlement with the Debtors, as reflected in a document Filed with the Bankruptcy Court, in an order of the Bankruptcy Court, or in a document executed by the

Debtors pursuant to authority granted by the Bankruptcy Court, in each case regardless of whether a Proof of Claim or Interest has been Filed;

d.    The assignee of any transferred or assigned Claim or Interest, only if:  (i) transfer or assignment has been fully effectuated pursuant to the procedures dictated by Bankruptcy Rule 3001(e); and (ii) such transfer is reflected on the Claims Register on or before the Voting Record Date;

e.    Prepetition Credit Agreement Lenders who are Holders of Class 3A Prepetition Credit Agreement Secured Claims and/or Class 5A Other General Unsecured Claims as of the Voting Record Date, based upon the records of the Prepetition Administrative Agent, as provided to the Notice, Claims and Solicitation Agent pursuant to the Solicitation Procedures; and

f.    the applicable Nominee, as reflected in the relevant records as of the Voting Record Date.

2.    **Establishing Claim and Interest Amounts**:  In tabulating votes, the following hierarchy will be used to determine the amount of the Claim or Interest associated with each vote:

a.    the amount of the Claim settled and/or agreed upon by the Debtors, as reflected in a court pleading, stipulation, agreement or other document Filed with the Bankruptcy Court, in an order of the Bankruptcy Court or in a document executed by the Debtors pursuant to authority granted by the Bankruptcy Court;

b.    the amount of the Claim Allowed (temporarily or otherwise) pursuant to a Resolution Event in accordance with the Solicitation Procedures;

c.    the amount of the Claim contained in a Proof of Claim that has been timely Filed by the applicable claims bar date (or deemed timely Filed by the Bankruptcy Court under applicable law) except for any amounts in such Proofs of Claim asserted on account of any interest accrued after the Petition Date; provided that Ballots cast by Holders whose Claims are not listed in the Schedules, but that timely File a Proof of Claim in an unliquidated or unknown amount that are not the subject of an objection, will count for satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as Ballots for Claims in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of section 1126(c) of the Bankruptcy Code; provided, further, that to the extent the amount of the Claim contained in the Proof of Claim is different from the amount of the Claim set forth in a document Filed with the Bankruptcy Court as referenced in the Solicitation Procedures, the amount of the Claim in the document Filed with the Bankruptcy Court will supersede the amount of the Claim set forth on the respective Proof of Claim;

d.      the amount of the Claim listed in the Schedules; provided, that such Claim is not listed in the Schedules as contingent, unliquidated or disputed, or any combination thereof, and has not been paid; and

e.      in the absence of any of the foregoing, zero.

The amount of the Claim established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim or Interest.  Moreover, any amounts filled in on Ballots by the Debtors through the Notice, Claims and Solicitation Agent are not binding for any purpose, including for purposes of voting and distribution.

3.      **General Ballot Tabulation**:   The following voting procedures and standard assumptions will be used in tabulating Ballots and Master Ballots:

a.      except as otherwise provided herein or unless waived by the Debtors or permitted by order of the Bankruptcy Court, unless the Ballot or Master Ballot being furnished is timely submitted on or prior to the Voting Deadline, the Debtors shall reject such Ballot or Master Ballot as invalid and, therefore, decline to count it in connection with Confirmation;

b.      the Notice, Claims and Solicitation Agent will date and time-stamp all Ballots and Master Ballots when received.   The Notice, Claims and Solicitation Agent shall retain all original Ballots and Master Ballots and an electronic copy of the same for a period of six years after the Effective Date of the Plan, unless otherwise ordered by the Bankruptcy Court;

c.      an original executed Ballot or Master Ballot is required to be submitted by the Entity submitting such Ballot or Master Ballot.  Delivery of a Ballot or Master Ballot to the Notice, Claims and Solicitation Agent by facsimile, email or any other electronic means shall not be valid;

d.      pursuant to Local Bankruptcy Rule 3018-1(a), the Debtors shall File the Voting Report with the Bankruptcy Court no later than five calendar days prior to the Confirmation Hearing.  The Voting Report shall, among other things, delineate every irregular Ballot and Master Ballot including, without limitation, those Ballots and Master Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or necessary information, received via facsimile or electronic mail, or damaged.  The Voting Report shall indicate the Debtors' intentions with regard to such irregular Ballots and Master Ballots;

e.      the method of delivery of Ballots or Master Ballots to the Notice, Claims and Solicitation Agent is at the election and risk of each Holder of a Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Notice, Claims and Solicitation Agent actually receives the originally executed Ballot or Master Ballot;

f.    no Ballot or Master Ballot should be sent to any of the Debtors, the Debtors' agents (other than the Notice, Claims and Solicitation Agent), any indenture trustee (unless specifically instructed to do so), or the Debtors' financial or legal advisors and if so sent will not be counted;

g.    if multiple Ballots or Master Ballots are received from the same Holder of a Claim or Interest with respect to the same Claim or Interest prior to the Voting Deadline, the latest-dated valid Ballot or Master Ballot received prior to the Voting Deadline will supersede and revoke any prior dated Ballot or Master Ballot;

h.    Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any such votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, if a Holder has multiple Claims within the same Class, the Debtors may, in their discretion, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes;

i.    a person signing a Ballot or a Master Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity must indicate such capacity when signing and, if required or requested by the applicable Nominee or its agent, the Notice, Claims and Solicitation Agent, the Debtors or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Holder or Beneficial Holder;

j.    the Debtors, subject to contrary order of the Bankruptcy Court, may waive any defects or irregularities as to any particular Ballot or Master Ballot at any time, either before or after the close of voting, and any such waivers shall be documented in the Voting Report;

k.    neither the Debtors, nor any other Entity, will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots and Master Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification;

l.    unless waived by the Debtors, subject to contrary order of the Bankruptcy Court, any defects or irregularities in connection with deliveries of Ballots and Master Ballots must be cured prior to the Voting Deadline or such Ballots and Master Ballots will not be counted;

m.    in the event a designation for lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim or Interest will be counted for purposes of

determining whether the Plan has been accepted and/or rejected by such Claim or Interest;

n.      subject to any contrary order of the Bankruptcy Court, the Debtors reserve the right to reject any and all Ballots and Master Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; provided, however, that any such rejections shall be documented in the Voting Report;

o.      if a Claim or Interest has been estimated or otherwise Allowed for voting purposes by an order of the Bankruptcy Court pursuant to Bankruptcy Rule 3018(a), such Claim or Interest shall be temporarily Allowed in the amount so estimated or Allowed by the Bankruptcy Court for voting purposes only and not for purposes of allowance or distribution;

p.      if an objection to a Claim is Filed, such Claim shall be treated in accordance with the procedures set forth herein; and

q.      the following Ballots and Master Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (a) any Ballot or Master Ballot that is illegible or contains insufficient information to permit the identification of the Holder of the Claim; (b) any Ballot or Master Ballot cast by a Party that does not hold a Claim in a Class that is entitled to vote on the Plan; (c) any unsigned Ballot or Master Ballot; (d) any Ballot or Master Ballot not marked to accept or reject the Plan or any Ballot marked both to accept and reject the Plan; or (e) any Ballot or Master Ballot submitted by any Entity not entitled to vote pursuant to the Solicitation Procedures.

4.      **The Master Ballot Voting Procedures**:  The following additional procedures, as well as the procedures set forth in section D.3. herein, shall apply to Claims of Beneficial Holders who hold their position through a Nominee:

a.      September 14, 2009, is the Voting Record Date for determining the identity of Beneficial Holders eligible to vote on the Plan;

b.      the Notice, Claims and Solicitation Agent shall distribute or cause to be distributed the appropriate number of copies of Ballots to each Beneficial Holder holding a Claim as of the Voting Record Date, including Nominees identified by the Notice, Claims and Solicitation Agent as Entities through which Beneficial Holders hold their Claims relating to Securities;

c.      any Nominee that is a Holder of record with respect to Unsecured Notes shall vote on behalf of Beneficial Holders of such Unsecured Notes by: (i) immediately distributing the Solicitation Package, including Ballots, it receives from the Notice, Claims and Solicitation Agent to all such Beneficial Holders; (ii) providing such Beneficial Holders with a return

address to send Ballots; (iii) promptly collecting Ballots from such Beneficial Holders that cast votes on the Plan; (iv) compiling and validating the votes and other relevant information of all such Beneficial Holders on the Master Ballot; and (v) transmitting the Master Ballot to the Notice, Claims and Solicitation Agent by the Voting Deadline;

d.      any Beneficial Holder holding Unsecured Notes as a record Holder in its own name shall vote on the Plan by completing and signing a Ballot and returning it directly to the Notice, Claims and Solicitation Agent on or before the Voting Deadline;

e.      any indenture trustee (unless otherwise empowered to do so) will not be entitled to vote on behalf of Beneficial Holders; rather, each such Beneficial Holder must submit his or her own Ballot in accordance with the Beneficial Holder voting procedures;

f.      any Beneficial Holder holding Unsecured Notes in "street name" through a Nominee must vote on the Plan through such Nominee by completing and signing the Ballot and returning such Ballot to the appropriate Nominee as promptly as possible and in sufficient time to allow such Nominee to process the Ballot and return the Master Ballot to the Notice, Claims and Solicitation Agent prior to the Voting Deadline.    Any Beneficial Holder holding Unsecured Notes in "street name" that submits a Ballot to the Debtors, the Debtors' agents, or the Debtors' financial or legal advisors will not have such Ballot counted for purposes of accepting or rejecting the Plan;

g.      any Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Notice, Claims and Solicitation Agent a Master Ballot that reflects the vote of such Beneficial Holders by the Voting Deadline or otherwise validates the Ballot in a manner acceptable to the Notice, Claims and Solicitation Agent.    Nominees shall retain all Ballots returned by Beneficial Holders for a period of one year after the Effective Date of the Plan;

h.      if a Beneficial Holder holds Unsecured Notes through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Ballot and each such Beneficial Holder should execute a separate Ballot for each block of Senior Notes that it holds through any Nominee and must return each such Ballot to the appropriate Nominee; and

i.      if a Beneficial Holder holds a portion of its Unsecured Notes through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in section D.3. herein to vote the portion held in its own name and the

procedures described in the rest of this section D.4. to vote the portion
held by the Nominee(s).

5.      **The Master Ballot Tabulation Procedures**:  These rules will apply with respect
to the tabulation of Master Ballots and Ballots cast by Nominees and Beneficial Holders:

  a.      votes cast by Beneficial Holders through Nominees will be applied to the
applicable positions held by such Nominees in Class 5A, as of the Voting
Record Date, as evidenced by the applicable records.  Votes submitted by
a Nominee, whether pursuant to a Master Ballot or prevalidated Ballot,
will not be counted in excess of the amount of such Securities held by
such Nominee as of the Voting Record Date;

  b.      if conflicting votes or "over-votes" are submitted by a Nominee, whether
pursuant to a Master Ballot or prevalidated Ballot, the Debtors will use
reasonable efforts to reconcile discrepancies with the Nominees;

  c.      if over-votes on a Master Ballot or prevalidated Ballot are not reconciled
prior to the preparation of the vote certification, the Debtors shall apply
the votes to accept and to reject the Plan in the same proportion as the
votes to accept and to reject the Plan submitted on the Master Ballot or
prevalidated Ballot that contained the overvote, but only to the extent of
the Nominee's position in Class 5A;

  d.      for purposes of tabulating votes, each Nominee or Beneficial Holder will
be deemed to have voted the principal amount of its Claims in Class 5A,
although any principal amounts may be adjusted by the Notice, Claims
and Solicitation Agent to reflect the amount of the Claim actually voted,
including prepetition interest; and

  e.      a single Nominee may complete and deliver to the Notice, Claims and
Solicitation Agent multiple Master Ballots.  Votes reflected on multiple
Master Ballots will be counted, except to the extent that they are
duplicative of other Master Ballots.  If two or more Master Ballots are
inconsistent, the last-dated valid Master Ballot received prior to the Voting
Deadline will, to the extent of such inconsistency, supersede and revoke
any prior dated Master Ballot.

6.      **Temporary Allowance of Claims for Voting Purposes:**    If a Holder or
Beneficial Holder of a Claim is subject to a pending objection on or after the Voting Record
Date, the Holder or Beneficial Holder of such Claim cannot vote unless one or more of the
following events have taken place within a reasonable time prior to the Confirmation Hearing
(each, a "<u>Resolution Event</u>"):

  a.      an order of the Bankruptcy Court is entered allowing such Claim
pursuant to section 502(b) of the Bankruptcy Code, after notice
and a hearing;

b.      a motion is filed with the Bankruptcy Court requesting that such Claim be temporarily allowed for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

c.      a stipulation or other agreement is executed between the Holder or Beneficial Holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount;

d.      a stipulation or other agreement is executed between the Holder or Beneficial Holder of such Claim and the Debtors temporarily allowing the Holder or Beneficial Holder of such Claim to vote its Claim in an agreed upon amount; or

e.      the pending objection to such Claim is voluntarily withdrawn by the Debtors.

No later than two business days after a Resolution Event, the Notice, Claims and Solicitation Agent shall distribute a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant Holder or Beneficial Holder of such temporarily allowed Claim that has been allowed for voting purposes only (or for other purposes as set forth in an applicable order of the Bankruptcy Court) by such Resolution Event, which must be returned according to the instructions on the Ballot by no later than the Voting Deadline.

If the Holder of a Claim receives a Solicitation Package and the Debtors object to such Claim after the Voting Record Date, but at least 15 days prior to the Confirmation Hearing, the Debtors' notice of objection will inform such Holder of the rules applicable to Claims and Interests subject to a pending objection and the procedures for temporary allowance for voting purposes. Furthermore, if the Holder of a Claim receives a Solicitation Package and the Debtors object to such Claim less than 15 days prior to the Confirmation Hearing, the Holder's Claim shall be deemed temporarily allowed for voting purposes only without further action by the Holder of such Claim and without further order of the Bankruptcy Court.

7.      **Forms of Notices to Unimpaired Classes**: Certain Holders of Claims that are not entitled to vote because they are unimpaired or are otherwise deemed to accept the Plan under section 1126(f) of the Bankruptcy Code, will receive only the Confirmation Hearing Notice and the Non-Voting Status Notice–Deemed to Accept. The Non-Voting Status Notice–Deemed to Accept, substantially in the form attached to the Motion as <u>Exhibit F</u>, will instruct the Holders how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots and Master Ballots).

8.      **Forms of Notices to Impaired Classes**: Certain Holders of Interests that are not entitled to vote because they are Impaired, or are otherwise deemed to reject the Plan under section 1126(g) of the Bankruptcy Code, will receive only the Confirmation Hearing Notice and the Non-Voting Status Notice–Deemed to Reject. The Non-Voting Status Notice–Deemed to Reject, substantially in the form attached to the Motion as <u>Exhibit G</u>, will instruct the Holders how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots and Master Ballots).

**E.**      **Release, Exculpation and Injunction Language in the Plan**

THE RELEASE, EXCULPATION, AND INJUNCTION LANGUAGE IN ARTICLE IX OF THE PLAN WILL BE INCLUDED IN THE DISCLOSURE STATEMENT AND FURTHER NOTICE IS PROVIDED WITH RESPECT TO SUCH PROVISIONS IN THE CONFIRMATION HEARING NOTICE.

**F.**      **Amendments to the Plan and the Solicitation Procedures**

THE DEBTORS EXPRESSLY RESERVE THE RIGHT TO AMEND FROM TIME TO TIME THE TERMS OF THE PLAN IN ACCORDANCE WITH THE TERMS THEREOF (SUBJECT TO COMPLIANCE WITH THE REQUIREMENTS OF SECTION 1127 OF THE BANKRUPTCY CODE AND THE TERMS OF THE PLAN REGARDING MODIFICATION).

THE DEBTORS EXPRESSLY RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THE SOLICITATION PROCEDURES TO BETTER FACILITATE THE SOLICITATION PROCESS.

# **EXHIBIT D-1**

## **Lender Plan Support Agreement**

LEAR CORPORATION
21557 Telegraph Road
Southfield, Michigan 48033

July 6, 2009

To the Holders of Lender Claims
Referred to Below

Ladies and Gentlemen:

       This letter agreement (the "Agreement") sets forth certain terms and conditions pursuant to which Lear Corporation ("Lear") and certain of its domestic and Canadian subsidiaries (together with Lear, collectively the "Debtors") will propose their jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the support of the lenders (the "Lenders") party to that certain Amended and Restated Credit and Guarantee Agreement dated as of April 25, 2006 (as amended, modified or otherwise supplemented from time to time, the "Credit Agreement"), among Lear, certain of its subsidiaries party thereto, the Lenders, JPMorgan Chase Bank, N.A., as general administrative agent thereunder (in such capacity, the "Administrative Agent"), and the other parties signatory thereto.

       Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Restructuring Term Sheet (as defined below).

       The parties hereto hereby agree as follows:

1.      Proposed Plan of Reorganization

       Each of the Debtors proposes to commence voluntary, pre-arranged cases (collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") to be jointly administered. Certain Canadian subsidiary Debtors (the "Canadian Debtors") propose to commence parallel cases under section 18.6 of the Companies' Creditors Arrangement Act (the "CCAA Cases") in the Ontario Superior Courts Commercial List (the "Canadian Court"), in which such Canadian Debtors will seek relief consistent with the relief sought by the Debtors in the Chapter 11 Cases. As part of the Chapter 11 Cases, the Debtors intend to file a disclosure statement and related Plan, which will provide for, among other things, certain distributions on account of the claims of the Lenders under the Credit Agreement (the "Lender Claims").

2.      Representations and Warranties of the Participating Lenders

       Each Lender identified as a holder of Lender Claims on the signature pages hereto (such Lenders, the "Participating Lenders") represents and warrants to the Debtors that, as of the date hereof:

       (a)     Such Participating Lender (i) either (A) is the sole beneficial owner of the principal amount of Lender Claims set forth below under its signature hereto, or (B) has sole

investment or voting discretion with respect to the principal amount of Lender Claims set forth below under its signature and has the power and authority to bind the beneficial owner(s) of such Lender Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Lender Claims and to dispose of, exchange, assign and transfer such Lender Claims. For the purposes of this Agreement, "Participating Lenders" shall not include a holder of Lender Claims signatory hereto in its capacity or to the extent of its holdings as a public-side broker or market maker of Lender Claims or any other claim against or security in the Debtors.

(b)    Such Participating Lender has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Lender Claims that are subject to this Agreement that are inconsistent with the representations and warranties of such Participating Lender herein or would render such Participating Lender otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)    Such Participating Lender (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

3.    <u>Support for a Qualified Plan</u>

Subject to the terms and conditions hereof and for so long this Agreement has not been terminated as provided herein, and except as otherwise specifically requested in writing by Lear, each Participating Lender shall (and, in the case of the following clauses (a), (b), (c), (d) and (e), shall cause each of its affiliates, subsidiaries, representatives, agents and employees to) (a) (i) vote its Lender Claims to accept any Plan proposed by the Debtors incorporating the terms and conditions set forth on the term sheet annexed hereto as Exhibit 1, which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 9 hereof, the "<u>Restructuring Term Sheet</u>"), consistent in all material respects with this Agreement and the Restructuring Term Sheet, and in form and substance reasonably satisfactory to the Debtors (a "<u>Qualified Plan</u>") by delivering its duly executed and completed ballot accepting such Qualified Plan on a timely basis following commencement of the solicitation of acceptances of such Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and (ii) not change or withdraw such vote (or cause or direct such vote to be changed or withdrawn), (b) support, and take all reasonable actions necessary or reasonably requested by the Debtors to facilitate, the solicitation, confirmation and consummation of a Qualified Plan and the transactions contemplated thereby, (c) not object to, or vote any of its Lender Claims to reject, a Qualified Plan or otherwise take any action or commence any proceeding to oppose or to seek any modification of a Qualified Plan, the related disclosure statement, in form and substance reasonably satisfactory to the Debtors and consistent in all material respects with this Agreement

2

and the Restructuring Term Sheet (the "Disclosure Statement"), or any other reorganization documents filed by any of the Debtors in connection with the Chapter 11 Cases and the confirmation of a Qualified Plan, (d) not directly or indirectly seek, solicit, support, encourage, vote its Lender Claims for, consent to, encourage, or participate in any discussions regarding or the negotiation or formulation of (i) any plan of reorganization, proposal, offer, dissolution, winding up, liquidation, reorganization, merger, consolidation, business combination, joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an "Alternative Proposal") other than a Qualified Plan or (ii) any other action that is inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation, or consummation of, a Qualified Plan, and (e) support customary release provisions contained in any Qualified Plan in favor of the Debtors and its agents, including their respective officers, directors and employees.

Each Participating Lender agrees to permit disclosure in the Disclosure Statement and any filings by the Debtors with the Securities and Exchange Commission and any other regulatory agency to which the Debtors may be subject of the contents of this Agreement, including, but not limited to, the aggregate Lender Claims held by all Lenders; provided that (i) the Debtors shall provide a draft of such disclosure to the Administrative Agent (on behalf of the Participating Lenders) and a reasonable amount of time to review such draft prior to such disclosure being made and (ii) the Debtors shall not disclose the amount of any individual Lender Claim, except as otherwise required by applicable law.

4.    Transfer of Lender Claims

Each Participating Lender agrees that so long as this Agreement has not been terminated in accordance with its terms it shall not directly or indirectly (a) grant any proxies to any person in connection with its Lender Claims to vote on the Plan, or (b) sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in ("Transfer") any Lender Claims, except in accordance with the terms of the Credit Agreement and to a party that agrees in writing to be subject to the terms and conditions of this Agreement as a "Participating Lender", which writing shall be in form and substance reasonably satisfactory to the Administrative Agent and the Debtors. Each Participating Lender agrees to notify the Debtors in writing before the close of two (2) business days after such Transfer of its Lender Claims and to provide the Debtors with a signed agreement of the transferee agreeing to be subject to the terms and conditions of this Agreement before the close of two (2) business days after such Transfer. Any Transfer of any Lender Claim that does not comply with the foregoing shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude any Lender from acquiring additional Lender Claims or any other interests in any Debtors; provided, however, that any such additional Lender Claims or other interests in such Debtor shall, upon acquisition, automatically be deemed to be subject to all the terms of this Agreement.

5.    The Debtors' Covenants

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, to the

3

extent not inconsistent with the fiduciary obligations of any of the Debtors or any of their respective subsidiaries under applicable law, use their commercially reasonable efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Administrative Agent and the Debtors and consistent in all material respects with this Agreement and the Restructuring Term Sheet; and

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein.

6.    Termination of Obligations

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Lear and Participating Lenders holding more than 66 2/3% of the Lender Claims bound under this Agreement (the "Requisite Participating Lenders");

(ii)    on the date that is five (5) business days following the occurrence of any of the events listed below (each, a "Termination Event"), unless such Termination Event is waived by the Requisite Participating Lenders within such five (5) business day period:

(A) the Chapter 11 Cases shall not have been filed by July 9, 2009 (or such later date as may be agreed by Lear and the Requisite Participating Lenders);

(B) a Qualified Plan and the Disclosure Statement shall not have been filed within 60 days after the filing date of the Chapter 11 Cases (the "Petition Date") (or such later date as may be agreed by Lear and the Requisite Participating Lenders);

(C) the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Administrative Agent, approving the adequacy of the Disclosure Statement within 150 days after the Petition Date (or such later date as may be agreed by Lear and the Requisite Participating Lenders);

(D) the Bankruptcy Court shall not have entered the Confirmation Order within 270 days after the Petition Date (or such later date as may be agreed by Lear and the Requisite Participating Lenders);

4

(E) a Qualified Plan shall not have been consummated within 300 days after the Petition Date (or such later date as may be agreed by Lear and the Requisite Participating Lenders);

(F) the Debtors shall (1) materially breach the Debtors' covenants set forth in Section 5 above, (2) publicly announce their intention not to pursue a Qualified Plan, or (3) propose, accept or file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(G)(1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases, or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(H) the Chapter 11 Case of any Debtor that is a obligor or guarantor under the Credit Agreement is involuntarily dismissed;

(I) the Bankruptcy Court does not enter, within 10 days after the Petition Date, an order governing the use by the Debtors of the Lenders' cash collateral and granting adequate protection to the Lenders, substantially in the form annexed hereto as Exhibit 2;

(J) the Bankruptcy Court does not enter, within 60 days after the Petition Date, a debtor in possession financing order, in form and substance reasonably satisfactory to the Administrative Agent and approving the DIP Facility (as defined in the Restructuring Term Sheet);

(K) an event of default shall have occurred and be continuing under the Debtors' debtor in possession financing facility and the obligations under such facility shall have been accelerated and declared due and payable;

(L) a "Termination Event" shall have occurred under the Noteholder Plan Support Agreement (as defined in the Restructuring Term Sheet); or

(M)    there shall have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally);

provided that the Administrative Agent shall promptly provide notice of any Termination Event to Lear (it being understood that failure to provide such notice shall not constitute a waiver of such Termination Event); or

5

(iii)    upon delivery of written notice of termination to the Administrative Agent by Lear following any material breach of any of the Participating Lenders' representations, warranties, covenants or agreements set forth in this Agreement.

(b)    Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination. Upon the occurrence of any termination of this Agreement, any and all votes delivered by a Participating Lender prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors.

7.    Specific Performance

It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

8.    Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Lenders (and their respective advisors), with respect to the subject matter hereof.

9.    Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement or the Restructuring Term Sheet shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Requisite Participating Lenders, provided, however, (a) the written consent of each Participating Lender shall be required for any amendment, modification, waiver or other supplement of this Agreement that (i) amends or modifies in any way the definition of Conflicted Lender (as defined below)as used in this Agreement or (ii) amends or modifies in any way the definition of Requisite Participating Lenders as used in this Agreement, (b) the written consent of Participating Lenders holding at least 66 2/3% of the aggregate Lender Claims or, if the Participating Lenders hold in the aggregate less than such percentage of the aggregate Lender Claims, then the written consent of each Participating Lender, shall be required for any amendment, modification, waiver or other supplement of this Agreement that effects a material change to the treatment of the Class 3A- Prepetition Credit Agreement Secured Claims or the Class 5A – Other Unsecured Claims (each as defined in the Restructuring Term Sheet) from that reflected in the Restructuring Term Sheet as of the date hereof, and (c) a Conflicted Lender shall

6

have no vote on any matter herein and its Lender Claims will not count for any purposes in calculating Requisite Participating Lenders.

"Conflicted Lender" shall be any Lender that, as of any date of determination, (a) objects in any respect to any of the relief requested by the Debtors in their motion for approval of the DIP Facility filed with the Bankruptcy Court or (b) holds nominal unsecured senior notes claims against the Debtors that (determined on a percentage basis of the total unsecured senior notes claims against the Debtors) exceed 50% of its nominal Lender Claims (determined on a percentage basis of the total Lender Claims of all Lenders). By way of example with respect to clause (b) in the immediately preceding sentence, if a Lender held 30% of the aggregate Lender Claims, it would be a Conflicted Lender if it held more than 15% of the aggregate unsecured senior notes claims against the Debtors.

For the purposes hereof, immaterial changes to the Restructuring Term Sheet shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Administrative Agent.

10.    Independent Analysis

Each Participating Lender hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

11.    Governing Law

This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York. By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and submits itself to the nonexclusive jurisdiction of each such court, generally and unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the foregoing consent to jurisdiction in either a state or federal court of competent jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases, each of the parties hereto hereby agrees that, if the petitions have been filed and the Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of or in connection with this Agreement.

12.    Effective Date

Upon delivery of its duly executed counterpart signature page, each Participating Lender shall be bound to the terms of this Agreement, and this Agreement shall become effective as between the Debtors and such Participating Lender (the "Effective Date"); provided, that if as of the commencement of the Chapter 11 Cases, the Debtors have not received (a) signature pages to this Agreement from Lenders holding more than 50% of the aggregate amount of Lender

7

Claims and (b) signatures to the Noteholder Plan Support Agreement from holders of Unsecured Note Claims (as defined in the Restructuring Term Sheet) holding more than 50% of the aggregate amount of Unsecured Notes Claims, this Agreement shall become null and void.

Upon the Effective Date, the Restructuring Term Sheet shall be deemed effective for the purposes of this Agreement and thereafter the terms and conditions therein may only be amended, modified, waived or otherwise supplemented as set forth in Section 9 above.

13.    Third-Party Beneficiary

This Agreement is intended for the benefit of the parties hereto and no other person shall have any rights hereunder.

14.    Counterparts

This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. Execution copies of this agreement may be delivered by facsimile or otherwise, which shall be deemed to be an original for the purposes of this paragraph.

15.    Headings

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

16.    Acknowledgment

This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Lenders will not be solicited until the Lenders have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

17.    Settlement Discussions

This Agreement and the Restructuring Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

18.    No Waiver of Participation and Preservation of Rights

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Lenders to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence

8

in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

**LEAR CORPORATION (on behalf of itself and all other Debtors)**

By: _____

Name: Terrence B. Larkin

Title: Senior Vice President, General Counsel and Corporate Secretary

AGREED BY EACH OF THE FOLLOWING
LENDERS

[Signature Page Plan Support Agreement]

## JPMORGAN CHASE BANK, N.A.

Claims under the Credit Agreement:

Notwithstanding anything to the contrary in this Agreement, this Agreement does not apply to the Credit Trading Group of JPMorgan Chase Bank, N.A., provided, however, that the full amount of the Lender Claims set forth on this signature page to this Agreement is subject at all times and in all respects to the support and transfer provisions of this Agreement and, subject to the terms and conditions of Section 4 of this Agreement, the amount set forth on this signature page shall not be reduced in any respect by invocation or application of any of the foregoing or any other provisions of this Agreement or otherwise.

Authorized Signatory:

By: _Douglas A. Jenks_
Name: _Douglas A. Jenks_
Title: _Managing Director_

Acknowledged by Lear Corporation:

By: _____
Name:
Title:

[Signature Page Plan Support Agreement]

**JPMORGAN CHASE BANK, N.A.**

Claims under the Credit Agreement:

Notwithstanding anything to the contrary in this Agreement, this Agreement does not apply to the Credit Trading Group of JPMorgan Chase Bank, N.A., provided, however, that the full amount of the Lender Claims set forth on this signature page to this Agreement is subject at all times and in all respects to the support and transfer provisions of this Agreement and, subject to the terms and conditions of Section 4 of this Agreement, the amount set forth on this signature page shall not be reduced in any respect by invocation or application of any of the foregoing or any other provisions of this Agreement or otherwise.

Authorized Signatory:

By:_____
Name:
Title:

Acknowledged by Lear Corporation:

By:
Name: Robert E. Rossiter
Title: CEO & President

[Signature Page Plan Support Agreement]

JUL 06 2009 14:54 FR BANK OF AMERICA    312 974 8811 TO 912124552502    P.02

**Bank of America, N.A.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name: Chas McDonell
Title: Senior Vice President

[Signature Page Plan Support Agreement]

**Bank of America, N.A., successor by merger to Merrill Lynch Bank USA**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name: Chas McDonell

Title: Senior Vice President

[Signature Page Plan Support Agreement]

**DEUTSCHE BANK AG – NEW YORK BRANCH**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:    **Valerie Shapiro**
Title:    **Vice President**

By: _____
Name:
Title:    VINCENT D'AMORE
         DIRECTOR

[Signature Page Plan Support Agreement]

DEUTSCHE BANK AG LONDON BRANCH

Claims under the Credit Agreement:

Authorized Signatory:

Deutsche Bank AG London Branch

By: _____
Name:    Edward Schaffer
Title:    Vice President

By: _____
Name:    Deirdre D. Cesario
Title:    Assistant Vice President

[Signature Page Plan Support Agreement]

**THE ROYAL BANK OF SCOTLAND PLC**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name: Frank Guerra

Title: Managing Director

**Icahn Partners LP**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_

Name: Keith Cozza

Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**Icahn Partners Master Fund II L.P.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_
Name: Keith Cozza
Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**Icahn Partners Master Fund III L.P.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_

Name: Keith Cozza

Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**Icahn Partners Master Fund LP**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_

Name: Keith Cozza
Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**CITIBANK, N.A.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Wayne _____
Name: Wayne Beckmann
Title: Managing Director – Citibank, N.A.
     Global Autos and Industrials Department
     388 Greenwich Street / 34th Fl
     Ph. 212-816-5566 / Fax: 646-291-1691

[Signature Page Plan Support Agreement]

**Baltic Funding LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Stacy Lai_
Name: Stacy Lai

Title: Assistant Vice President

[Signature Page Plan Support Agreement]

Sankaty Advisors, LLC as Collateral
Manager for AVERY POINT CLO,
LTD., as Term Lender

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:
Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

Sankaty Advisors, LLC as Collateral
Manager for Castle Hill I -
INGOTS, Ltd.. as Term Lender

Claims under the Credit Agreement:

Authorized Signatory:

By:

Name:

Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

Chatham Light ℃CLO, Ltd
By: Sankaty Advisors, LLC
as Collateral Manager

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name:

Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

Katonah III, Ltd. by Sankaty
Advisors LLC as Sub-Advisors

Claims under the Credit Agreement:

Authorized Signatory:

By:

Name:

Title:

**Alan K. Halfenger**
**Chief Compliance Officer**
**Assistant Secretary**

[Signature Page Plan Support Agreement]

Katonah IV, Ltd. by Sankaty
Advisors, LLC as Sub-Advisors

Claims under the Credit Agreement:

Authorized Signatory:

By:

Name:

Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

Sankaty Advisors, LLC as Collateral
Manager for Loan Funding XI LLC,
As Term Lender

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:
Title:

**Alan K. Halfenger**
**Chief Compliance Officer**
**Assistant Secretary**

[Signature Page Plan Support Agreement]

Sankaty Advisors, LLC as Collateral
Manager for Race Point CLO,
Limited, as Term Lender

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:
Title:

**Alan K. Halfenger**
**Chief Compliance Officer**
**Assistant Secretary**

[Signature Page Plan Support Agreement]

Sankaty Advisors, LLC as Collateral
Manager for Race Point II CLO,
Limited, as Term Lender

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name:

Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

Sankaty Advisors, LLC as Collateral
Manager for Race Point III CLO,
Limited, as Term Lender

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:
Title:

       **Alan K. Halfenger**
       **Chief Compliance Officer**
       **Assistant Secretary**

[Signature Page Plan Support Agreement]

Race Point IV CLO, Ltd
By: Sankaty Advisors, LLC
   as Collateral Manager

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:
Title:

**Alan K. Halfenger**
**Chief Compliance Officer**
**Assistant Secretary**

[Signature Page Plan Support Agreement]

Sankaty High Yield Partners II, L.P.

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name:

Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

Sankaty High Yield Partners III, L.P.

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name:

Title:

Alan K. Halfenger
Chief Compliance Officer
Assistant Secretary

[Signature Page Plan Support Agreement]

SSS Funding II
By: Sankaty Advisors, LLC
as Collateral Manager


Claims under the Credit Agreement:


Authorized Signatory:

By:
Name:
Title:
     Alan K. Halfenger
     Chief Compliance Officer
     Assistant Secretary


[Signature Page Plan Support Agreement]

MORGAN STANLEY SENIOR FUNDING, INC

JPMORGAN CHASE BANK, N.A.

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:
Title:

**Ian J. Sandler**
**Authorized Signatory**

[Signature Page Plan Support Agreement]

**Oregon Public Employees Retirement Fund**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**KKR Financial CLO 2005-1, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**KKR Financial CLO 2005-2, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**KKR Financial CLO 2006-1, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**KKR Financial CLO 2007-1, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**KKR Financial CLO 2007-A, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**KKR Financial CLO 2009-1, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name:  Sarah E. Brucks
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

ESSEX PARK CDO LTD.
By: Blackstone Debt Advisors L.P.
as Collateral Manager

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Dean Criares
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**INWOOD PARK CDO LTD.**
**By: Blackstone Debt Advisors L.P.**
**as Collateral Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: Dean Criares
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**LAFAYETTE SQUARE CDO LTD.**
**By: Blackstone Debt Advisors L.P.**
**as Collateral Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Dean Criares
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**LOAN FUNDING VI LLC,**
**for itself or as agent for Corporate Loan Funding VI LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Dean Criares
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**PROSPECT PARK CDO LTD.**
**By: Blackstone Debt Advisors L.P.**
**as Collateral Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: Dean Criares
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**UNION SQUARE CDO LTD.**
**By: Blackstone Debt Advisors L.P.**
**as Collateral Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Dean Criares
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**THE BANK OF NOVA SCOTIA**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: James Forward
Title: Managing Director

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

DRYDEN IX-SENIOR LOAN FUND 2005
By:  Prudential Investment Management, Inc., as Collateral
Manager

By:
    Name:
    Title:

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Dryden V – Leveraged Loan CDO 2003
By:  Prudential Investment Management, Inc., as Collateral
Manager

By:
Name:
Title:

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]


Claims under the Credit Agreement:


Authorized Signatory:


Dryden VIII – Leveraged Loan CDO 2005
By:  Prudential Investment Management, Inc., as Collateral
Manager

By:
Name:
Title:

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Dryden VII – Leveraged Loan CDO 2004
By:  Prudential Investment Management, Inc., as Collateral
Manager

By: _____

Name:
Title:

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Dryden XI – Leveraged Loan CDO 2006
By: Prudential Investment Management, Inc., as Collateral
Manager

By:
Name:
Title:

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

Authorized Signatory:

Dryden XVIII Leveraged Loan 2007 Ltd.
By:  Prudential Investment Management
as Collateral Manager

By: _____
Name:
Title:

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:


Authorized Signatory:


Dryden XVI – Leveraged Loan CDO 2006
By: Prudential Investment Management, Inc., as Collateral
Manager

By:
Name:
Title:

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Dryden XXI Leveraged Loan CDO LLC
By: Prudential Investment Management, Inc., as Collateral
Manager

By:
    Name:
    Title:

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory

Loan Funding V, LLC, for itself or as agent for Corporate
Loan Funding V LLC
By:  Prudential Investment Management, Inc., as Portfolio
Manager

By:
Name:
Title:

[OTHER PARTICIPATING LENDERS]


Claims under the Credit Agreement:


Authorized Signatory:


The Prudential Series Fund – High Yield
Bond Portfolio
By:  Prudential Investment Management
as investment advisor


By: _____
    Name:
    Title:


[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Dryden High Yield Fund, Inc.
By: Prudential Investment Management
as investment advisor

By: _____
Name:
Title:

**Bank of Tokyo – Mitsubishi UFJ Trust Company**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: David Noda
Title:   Vice President and Manager

[Signature Page Plan Support Agreement]

**SUNTRUST BANK**

Balance of Loans under Credit Agreement:

Authorized Signatory:

By: _Amanda Parks_
Name: Amanda Parks
Title: SVP

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**OAK HILL CREDIT PARTNERS II,
LIMITED**, as a Lender

By: Oak Hill CLO Management II, LLC
As Investment Manager

By: _____
Name: Scott D. Krase
Title:   Authorized Person

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

**GMAM GROUP PENSION TRUST I**

By: STATE STREET BANK AND TRUST
       COMPANY, solely as Trustee

By:     _____
Name:   Timothy North
Title:  Officer

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

OAK HILL CREDIT OPPORTUNITIES
FINANCING, LTD., as a Lender

By:
Name:  Scott D. Krase
Title:   Authorized Person

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**OAK HILL CREDIT PARTNERS III
LIMITED**, as a Lender

By: Oak Hill CLO Management III, LLC
As Investment Manager

By:_____
Name: Scott D. Krase
Title:   Authorized Person

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**OAK HILL CREDIT PARTNERS IV, LIMITED**, as a Lender

By: Oak Hill CLO Management IV, LLC
As Investment Manager

By: _____
Name: Scott D. Krase
Title:   Authorized Person

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**OAK HILL CREDIT PARTNERS V,
LIMITED**, as a Lender

By: Oak Hill Advisors, L.P.
As Portfolio Manager

By: _____
Name: Scott D. Krase
Title:   Authorized Person

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**OHA PARK AVENUE CLO I, LTD.**, as
a Lender

By: Oak Hill Advisors, L.P.
As Investment Manager

By: _____
Name: Scott D. Krase
Title:  Authorized Person

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:


Stichting Bedrijfstakpensioenfonds
Voor de Metalektro, as a Lender

By: Oak Hill Advisors, L.P.
As Investment Manager

By: _____
Name: Scott D. Krase
Title:   Authorized Person

The Hartford Mutual Funds, Inc., on behalf of The Hartford High
Yield Fund
        By: Hartford Investment Management
        Company, Its Sub-advisor

Claims under the Credit Agreement:


Authorized Signatory:

By:_____

Name:

Title:     Francesco Ossino
        Senior Vice President

[Signature Page Plan Support Agreement]

The Hartford Mutual Funds, Inc., on behalf of
The Hartford Income Fund
By Hartford Investment Management Company,
its Subadvisor

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:
Title:    Francesco Ossino
          Senior Vice President

[Signature Page Plan Support Agreement]

The Hartford Mutual Funds, Inc., on behalf of
The Hartford Floating Rate Fund
        By Hartford Investment Management
        Company, its Sub-advisor


Claims under the Credit Agreement:


Authorized Signatory:


By: _____
Name:
Title:    Francesco Ossino
            Senior Vice President

The Hartford Mutual Funds, Inc., on behalf of
The Hartford Total Return Bond Fund
By Hartford Investment Management Company,
its Subadvisor

Claims under the Credit Agreement:


Authorized Signatory:


By:_____

Name:

Title:    Francesco Ossino
          Senior Vice President


[Signature Page Plan Support Agreement]

Hartford Series Fund, Inc., on behalf of Hartford High
Yield HLS Fund
      By: Hartford Investment Management
      Company, Its Sub-advisor

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name:

Title:      Francesco Ossino
      Senior Vice President

[Signature Page Plan Support Agreement]

**Hartford Series Fund, Inc., on behalf of
Hartford Total Return Bond HLS Fund
By Hartford Investment Management Company,
its Subadvisor**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:
Title:         Francesco Ossino
               Senior Vice President

[Signature Page Plan Support Agreement]

The Investment and Administrative Committee of
The Walt Disney Company Sponsored Qualified Benefit Plans
and Key Employees Deferred Compensation and Retirement Plan
By:  Hartford Investment Management Company
        Its Investment Manager


Claims under the Credit Agreement:


Authorized Signatory:


By: _____
Name:
Title:
        Francesco Ossino
        Senior Vice President


[Signature Page Plan Support Agreement]

**Hartford Institutional Trust, on behalf of its Floating Rate
Bank Loan Series**
> **By: Hartford Investment Management Company,
> its Investment Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name: _____

Title:  Francesco Ossino
        Senior Vice President

[Signature Page Plan Support Agreement]

**State Board of Administration of Florida**
    **By: Hartford Investment Management Company,**
        **its Investment Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name:

Title:         Francesco Ossino
               Senior Vice President

[Signature Page Plan Support Agreement]

Hartford Life and Accident Insurance Company
By:  Hartford Investment Management Company
     Its Agent and Attorney-in-Fact


Claims under the Credit Agreement:


Authorized Signatory:

By:_____

Name:

Title:    Francesco Ossino
          Senior Vice President

[Signature Page Plan Support Agreement]

The Hartford Mutual Funds, Inc., on behalf of
The Hartford Strategic Income Fund
By:  Hartford Investment Management Company
     Its Investment Manager

Claims under the Credit Agreement:

Authorized Signatory:

By:  _____

Name:

Title:

          Francesco Ossino
          Senior Vice President

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

ARES ENHANCED LOAN INVESTMENT STRATEGY IR LTD.

By:    ARES ENHANCED LOAN MANAGEMENT IR, L.P., as Portfolio Manager

By:    Ares Enhanced Loan IR GP, LLC, as its General Partner

By:    Ares Management LLC, as its Manager

By:    _____
       Name:
       Title:    SETH J. BRUFSKY
                 AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

ARES ENHANCED LOAN INVESTMENT STRATEGY IR-B LTD.

By:    ARES ENHANCED LOAN MANAGEMENT IR-B, L.P., as Portfolio Manager

By:    Ares Enhanced Loan IR-B GP, LLC, as its General Partner

By:    Ares Management LLC, as its Manager

By:    _____
       Name:
       Title:
                SETH J. BRUFSKY
            AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Ares IX CLO Ltd.

By:    Ares CLO Management IX, L.P.,
       Investment Manager

By:    Ares CLO GP IX, LLC,
       Its General Partner

By:    Ares Management LLC,
       Its Managing Member

By:    _____
Name:
Title:     SETH J. BRUFSKY
           AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

    Ares VII CLO Ltd.

    By:    Ares CLO Management VII, L.P.,
              Investment Manager

    By:    Ares CLO GP VII, LLC,
              Its General Partner

By:    _____
Name:
Title:      SETH J. BRUFSKY
        AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Ares VIII CLO Ltd.

By:    Ares CLO Management VIII, L.P.,
       Investment Manager

By:    Ares CLO GP VIII, LLC,
       Its General Partner

By:
Name:
Title:    SETH J. BRUFSKY
        AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

Authorized Signatory:

Ares VIR CLO Ltd.

By:    Ares CLO Management VIR, L.P.,
        Investment Manager

By:    Ares CLO GP VIR, LLC,
        Its General Partner

By:    _____
Name:
Title:    SETH J. BRUFSKY
        AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

> Ares VR CLO Ltd.
>
> By:    Ares CLO Management VR, L.P.,
>        Investment Manager
>
> By:    Ares CLO GP VR, LLC,
>        Its General Partner
>
> By:    _____
> Name:
> Title:
>           SETH J. BRUFSKY
>         AUTHORIZED SIGNATOR

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Ares X CLO Ltd.

By:     Ares CLO Management X, L.P.,
        Investment Manager

By:     Ares CLO GP X, LLC,
        Its General Partner

By:     _____
Name:
Title:      SETH J. BRUFSKY
        AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

ARES XI CLO Ltd.

By: ARES CLO MANAGEMENT XI, L.P.

By: ARES CLO GP XI, LLC, ITS GENERAL PARTNER

By: ARES MANAGEMENT LLC, ITS MANAGER

By: _____
Name:
Title:
       SETH J. BRUFSKY
      AUTHORIZED SIGNATORY

**[Signature Page Plan Support Agreement]**

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

Global Loan Opportunity Fund B.V.

By:  Ares Management Limited, its Portfolio Manager

By: _____
Name:
Title:

SETH J. BRUFSKY
AUTHORIZED SIGNATORY

[Signature Page Plan Support Agreement]

**OAKTREE CAPITAL MANAGEMENT, L.P.,**
**on behalf of certain funds and accounts**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:
Title:      **Desmund Shirazi**
            **Managing Director**

By: _____
Name:      **Sheldon M. Stone**
Title:      **Principal**

[Signature Page Plan Support Agreement]

**GOLDMAN SACHS LENDING PARTNERS, LLC.**

Claims under the Credit Agreement:


Authorized Signatory:


By:
Name:
Title:            Andrew Caditz
                  Authorized Signatory

|Signature Page Plan Support Agreement|

06/29/2009  10:47    +0000000000                                           PAGE  02/02

**Bank of China, New York Branch**

Claims under the Credit Agreement:

Authorized Signatory:

By _____
Name: William Warren Smith
Title:  Chief Lending Officer

[Signature Page Plan Support Agreement]

**THE BANK OF NEW YORK MELLON**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:    EDWARD J. DeSALVIO
Title:       VICE PRESIDENT

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

**Carlyle Credit Partners Financing I CLO-A, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Linda Pace
Title:   Managing Director

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

**Carlyle Credit Partners Financing I CLO-B, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Linda Pace
Title:   Managing Director

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

**Carlyle High Yield Partners 2008-1, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Linda Pace
Title:  Managing Director

**[OTHER PARTICIPATING LENDERS]**

**Carlyle High Yield Partners IV, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Linda Pace
Title:   Managing Director

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

**<u>Carlyle High Yield Partners IX, Ltd.</u>**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name: Linda Pace

Title:   Managing Director

**[OTHER PARTICIPATING LENDERS]**

**Carlyle High Yield Partners VI, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name: Linda Pace
Title:   Managing Director

**[OTHER PARTICIPATING LENDERS]**

**Carlyle High Yield Partners VII, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____

Name: Linda Pace
Title:   Managing Director

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

**Carlyle High Yield Partners VIII, Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Linda Pace
Title:   Managing Director

[OTHER PARTICIPATING LENDERS]

**<u>Carlyle High Yield Partners X, Ltd.</u>**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Linda Pace
Title:   Managing Director

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

Authorized Signatory:

**BLACK DIAMOND CLO 2006-1(CAYMAN), Ltd.**
**By: Black Diamond CLO 2006-1 Adviser, L.L.C.**
**As Its Collateral Manager**

By: _____
Name: Stephen H. Deckoff
Title:   Managing Principal

[Signature Page Plan Support Agreement]

**CONTINENTAL CASUALTY COMPANY**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:
Title:          Lynne Gugenheim
          Senior Vice President and Deputy General Counsel

Approved by
Law Dept.
By: _____
Date: _____

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**STYX PARTNERS, L.P.**

By: Styx Associates LLC,
   its General Partner

By: _____
Name: Kevin Genda
Title: Senior Managing Director

**Icahn Fund Sub 1 Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_
Name: Keith Cozza
Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**Icahn Fund Sub 2 Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_
Name: Keith Cozza
Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**Icahn Fund Sub 3 Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_
Name: Keith Cozza
Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**Icahn Fund Sub 4 Ltd.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Keith Cozza_
Name: Keith Cozza
Title: Chief Compliance Officer

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

By:
Name: Chi-Fo Huang
Title:

Platinum Grove Contingent Capital Master Fund Ltd.

[Signature Page Plan Support Agreement]

**KINGSLAND II, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: Kingsland Capital Management, LLC
as Manager

By: _____
Name:  Vincent Siino
Title:   Authorized Officer

[Signature Page Plan Support Agreement]

**KINGSLAND III, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: Kingsland Capital Management, LLC
as Manager

By: _____
Name: Vincent Siino
Title:   Authorized Officer

[Signature Page Plan Support Agreement]

**KINGSLAND IV, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: Kingsland Capital Management, LLC
as Manager

By: _____
Name: Vincent Siino
Title:   Authorized Officer

[Signature Page Plan Support Agreement]

**COMERICA BANK**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Sarah R. West_

Name: Sarah R. West

Title:   Vice President

**ST. JAMES RIVER CLO, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Bradley K. Bryan_
Name: Bradley K. Bryan
Title: Senior Vice President

**CLEAR LAKE CLO, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Bradley K. Bryan_
Name: Bradley K. Bryan
Title: Senior Vice President

**SUMMIT LAKE CLO, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Bradley K. Bryan_
Name: Bradley K. Bryan
Title: Senior Vice President

[Signature Page Plan Support Agreement]

**VICTORIA FALLS CLO, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Bradley K. Bryan_
Name: Bradley K. Bryan
Title: Senior Vice President

**DIAMOND LAKE CLO, LTD.**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Bradley K. Bryan_
Name: Bradley K. Bryan
Title: Senior Vice President

**CFIP Master Fund, Ltd.**
**By: Chicago Fundamental Investment**
**Partners, LLC, its Investment Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name:  Steven J. Novatney
Title:  General Counsel & CCO

[Signature Page Plan Support Agreement]

**CHGO Loan Funding Ltd.**
**By: Chicago Fundamental Investment**
**Partners, LLC, as Collateral Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By: _Steven J. Novatney_
Name: Steven J. Novatney
Title:  General Counsel & CCO

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

Authorized Signatory:

Taconic Capital Partners 1.5 L.P.

By: Taconic Capital Advisors, LP, as Investment Advisor

By:_____
Name:
Title:    Jon Jachman
         Principal

[Signature Page Plan Support Agreement]

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

Authorized Signatory:

Taconic Opportunity Fund L.P.

By: Taconic Capital Advisors, LP, as Investment Advisor

By: _____
Name: Jon Jachman
Title: Principal

[Signature Page Plan Support Agreement]

06/29/2009 13:58 FAX  949 720 6361          PIMCO LEGAL                            ☑ 005/006

Claims under the Credit Agreement:

**Fairway Loan Funding Company**
By:     Pacific Investment Management Company LLC,
        as its Investment Advisor

By: _____
        Arthur Y.D. Ong
        Executive Vice President

[Signature Page Plan Support Agreement]

694

Claims under the Credit Agreement:

**Loan Funding III (Delaware) LLC**
By:    Pacific Investment Management Company LLC,
      as its Investment Advisor

By: _____
      Arthur Y.D. Ong
      Executive Vice President

[Signature Page Plan Support Agreement]

2010

Claims under the Credit Agreement:

**Mayport CLO Ltd.**
By:    Pacific Investment Management Company LLC,
as its Investment Advisor

By: _____
        Arthur Y.D. Ong
        Executive Vice President

[Signature Page Plan Support Agreement]

6895

06/29/2009 13:58 FAX  949 720 6361          PIMCO LEGAL                    004/006

Claims under the Credit Agreement:

**Southport CLO, Limited**
By:      Pacific Investment Management Company LLC,
         as its Investment Advisor

By: _____
         Arthur Y.D. Ong
         Executive Vice President

[Signature Page Plan Support Agreement]

2012

06/29/2009 13:58 FAX 949 720 6361          PIMCO LEGAL                    002/006

Claims under the Credit Agreement:

**Waveland – INGOTS, LTD.**
By:     Pacific Investment Management Company LLC,
        as its Investment Advisor

By: _Arthur Y.D. Ong_
        Arthur Y.D. Ong
        Executive Vice President

[Signature Page Plan Support Agreement]

*2006*

**COLUMBUS PARK CDO LTD.**
**By: GSO / Blackstone Debt Funds Management LLC**
**as Collateral Manager**

Claims under the Credit Agreement:

Authorized Signatory:

By:_____
Name: Daniel H. Smith
Title:   Authorized Signatory

[Signature Page Plan Support Agreement]

**RIVERSIDE PARK CLO LTD.**
**By: GSO / Blackstone Debt Funds Management LLC**
**as Collateral Manager**

Claims under the Credit Agreement:


Authorized Signatory:

By: _____
Name: Daniel H. Smith
Title:   Authorized Signatory


[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Fraser Sullivan CLO I Ltd.

Claims under the Credit Agreement:


Authorized Signatory:

By: Fraser Sullivan Investment Management, LLC, as

Collateral Manager

By: _____

Name: Tighe P. Sullivan
Title:   Managing Partner

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Fraser Sullivan CLO II Ltd.

Claims under the Credit Agreement:


Authorized Signatory:

By: Fraser Sullivan Investment Management, LLC, as

Collateral Manager

By: _____

Name: Tighe P. Sullivan

Title:   Managing Partner

[Signature Page Plan Support Agreement]

GULF STREAM-COMPASS CLO 2005-II, LTD
By:  Gulf Stream Asset Management LLC
As Collateral Manager

GULF STREAM-SEXTANT CLO 2006-I, LTD
By:  Gulf Stream Asset Management LLC
As Collateral Manager

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: Barry R. Love
Title:  Chief Credit Officer

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

**GENERAL ELECTRIC PENSION TRUST**, as a
Lender

By:    GE Asset Management Inc., as Collateral Manager

By: _____
Name: John Flynn
Title: Authorized Signatory

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

**NAVIGATOR CDO 2003, LTD.**, as a Lender

By:    GE Asset Management Inc., as Collateral Manager

By: _____

Name: John Flynn

Title: Authorized Signatory

[OTHER PARTICIPATING LENDERS]

Claims under the Credit Agreement:

**NAVIGATOR CDO 2004, LTD.**, as a Lender

By:    GE Asset Management Inc., as Collateral Manager

By: _____
Name: John Campos
Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

**NAVIGATOR CDO 2005, LTD.**, as a Lender

By:    GE Asset Management Inc., as Collateral Manager

By: _____

Name: John Flynn

Title:  Authorized Signatory

[Signature Page Plan Support Agreement]

**Zodiac Fund – Morgan Stanley US
Senior Loan Fund**
By: Morgan Stanley Investment Management Inc. as
Investment Manager

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name:
Title:    **WILLIAM A. HOUSEY JR.**

**Executive Director**

[Signature Page Plan Support Agreement]

**Nuveen Floating Rate Income Opportunity Fund**

**By: Symphony Asset Management, LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: James Kim
Title: Associate Portfolio Manager

[Signature Page Plan Support Agreement]

**Symphony CLO I**

**By: Symphony Asset Management, LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
Name: James Kim
Title: Associate Portfolio Manager

[Signature Page Plan Support Agreement]

**Symphony CLO II**

**By: Symphony Asset Management, LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name: James Kim

Title: Associate Portfolio Manager

[Signature Page Plan Support Agreement]

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

WhiteHorse I, Ltd
        By: WhiteHorse Capital Partners, L.P.
        As Collateral Manager

WhiteHorse IV, Ltd
        By: WhiteHorse Capital Partners, L.P.
        As Collateral Manager

WhiteHorse Capital Partners, L.P.
        By WhiteRock Asset Advisors, LLC
        As General Partner

Authorized Signatory:

Name: Ethan Underwood
Title: Portfolio Manager

**Aladdin Capital LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By:

Name:  James Bragg

Title:   Director

**Investment CBNA Loan Funding LLC**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name:    Andrew Valko

Title:    **ATTORNEY-IN-FACT**

[Signature Page Plan Support Agreement]

*Hillmark Funding Ltd By:*
*Hillmark Capital Management, L.P.*
*as Collateral Manager as a lender*

**[OTHER PARTICIPATING LENDERS]**

Claims under the Credit Agreement:

Authorized Signatory:

By: _____

Name: *Hillel Weinberger*

Title: *Chairman*

Golden Knight II CLO, Ltd.

Claims under the Credit Agreement:

Authorized Signatory:

By: _____
PORTFOLIO MANAGER

Name:
Title:

[Signature Page Plan Support Agreement]

Lord Abbett Investment Trust – Lord Abbett Floating Rate Fund

Claims under the Credit Agreement:

Authorized Signatory:

_Elizabeth Mace_
**PORTFOLIO MANAGER**

By:
Name:
Title:

[Signature Page Plan Support Agreement]

## **EXHIBIT 1**

**Restructuring Term Sheet**

*(please see attached)*

## LEAR CORPORATION

### JOINT PLAN OF REORGANIZATION TERM SHEET

### (Exhibit 1 to the Plan Support Agreement)

THIS TERM SHEET DESCRIBES A PROPOSED RESTRUCTURING (THE "**RESTRUCTURING**") FOR LEAR CORPORATION ("**LEAR**") AND CERTAIN OF ITS DOMESTIC AND CANADIAN SUBSIDIARIES PURSUANT TO A JOINT PLAN OF REORGANIZATION (THE "**PLAN OF REORGANIZATION**") WHICH WOULD BE FILED BY THE DEBTORS (AS DEFINED BELOW) IN CONNECTION WITH A CONTEMPLATED CHAPTER 11 FILING IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "**BANKRUPTCY COURT**").

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF LEAR OR ITS SUBSIDIARIES. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the commencement of the Debtors' chapter 11 cases, (a) certain of the Prepetition Credit Agreement Lenders listed therein and the Debtors will have executed a Plan Support Agreement (the "**Lender Plan Support Agreement**") pursuant to which the Debtors agree to pursue and implement a Plan of Reorganization consistent in form and substance in all material respects with this Term Sheet and (b) certain of the holders of the Unsecured Note Claims (as defined herein) listed therein, including those noteholders constituting a steering committee of noteholders (the "**Noteholder Steering Committee**"), and the Debtors will have executed a Plan Support Agreement (the "**Noteholder Plan Support Agreement**," and together with the Lender Plan Support Agreement, the "**Plan Support Agreements**") pursuant to which the Debtors agree to pursue and implement a Plan of Reorganization consistent in form and substance in all material respects with this Term Sheet. This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the Plan of Reorganization and the related definitive documentation governing the Restructuring. |
| | In conjunction with the Restructuring, a group of Prepetition Credit Agreement Lenders has agreed to provide a debtor-in-possession financing facility (such facility, the "**DIP Facility**") which, upon satisfaction of certain conditions, will convert into the Exit Facility (as defined below) upon the Debtors' exit from chapter 11. A detailed description of the DIP Facility, including pricing terms, conditions and covenants, is set forth in the debtor in possession financing credit agreement agreed to by the Debtors and the Prepetition Credit Agreement Lenders party thereto |

| | |
|---|---|
| | attached hereto as <u>Annex 1</u> (the "**DIP Credit Agreement**"). |
| **Debt to be Repaid/ Restructured** | Indebtedness to be treated under the Plan of Reorganization will include:<br><br>(i) approximately $2.3 billion outstanding (together with the Swap Claims referred to below, the "**Prepetition Credit Agreement Obligations**") under that certain Amended and Restated Credit Agreement dated as of April 25, 2006 (the "**Prepetition Credit Agreement**") among Lear, certain of its subsidiaries, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "**Prepetition Administrative Agent**") and the lenders party thereto (including as holders of termination claims under certain hedging arrangements (the "**Swap Claims**"), the "**Prepetition Credit Agreement Lenders**"); and<br><br>(ii) approximately $1.3 billion aggregate principal amount of senior unsecured notes (plus accrued and unpaid interest) (the "**Unsecured Note Claims**"), comprised of (a) the unsecured 8.50% senior notes due 2013 and the unsecured 8.75% senior notes due 2016 issued pursuant to that certain Indenture dated as of November 24, 2006, among Lear, certain subsidiary guarantors and The Bank of New York Trust Company, N.A. as Trustee, (b) the unsecured 5.75% senior notes due 2014 issued pursuant to that certain Indenture dated as of August 3, 2004 among Lear, certain subsidiary guarantors and BNY Midwest Trust Company as Trustee, and (c) the unsecured zero-coupon convertible senior notes due 2022 issued pursuant to that certain Indenture dated as of February 20, 2002, among Lear, certain subsidiary guarantors and The Bank of New York Trust Company, N.A. as Trustee. |
| **Securities to be Issued under the Plan of Reorganization** | **Debt.**   The (i) $500 million first lien term loan Exit Facility described in the exit credit agreement attached hereto as <u>Annex 2</u> (the "**Exit Facility**") and (ii) $600 million second lien term loan with the terms and conditions set forth on Exhibit 1 (the "**New Term Loans**").<br><br>**Preferred Stock.**   Reorganized Lear shall issue up to $500 million in Series A Preferred Stock (the "**Series A Preferred Stock**") with the terms and conditions set forth on Exhibit 2.<br><br>**New Common Stock.**   Subject to the right of the stockholders to amend the certificate of incorporation, reorganized Lear ("<u>Reorganized Lear</u>") shall issue a single class of common stock (the "**New Common Stock**") on the effective date of the Plan of Reorganization (the "**Effective Date**"), which stock shall be deemed fully paid and non-assessable.<br><br>**Management Equity Plan.** There shall be allocated sufficient shares of New Common Stock to provide a Management Equity Plan (as defined below) with a reserve for equity awards of New Common Stock, as provided in Exhibit 4 hereto.<br><br>**Warrants:**<br>(A).   To the extent the Exit Facility fee is not paid in cash, Reorganized |

509265-0024-02208-Active.11681162.15

| | |
|---|---|
| | Lear will issue warrants to purchase shares of New Common Stock with an Effective Date value of up to $25 million, all as set forth in the DIP Facility, and representing a percentage of the New Common Stock, as reflected on Exhibit 7 hereto.<br>(B).  Reorganized Lear shall issue warrants to holders of Class 5A Claims, with such warrants to have the terms and conditions set forth in Exhibit 3 hereto. |
| **Proposed Filing Entities** | Lear expects that voluntary chapter 11 cases will be commenced by Lear and certain of its domestic and Canadian subsidiaries (the "**Debtors**"). For purposes of the Plan of Reorganization, the Debtors will be further classified into Group A Debtors, consisting of those Debtors liable for Prepetition Credit Agreement Obligations, the Swap Claims and the Unsecured Note Claims (the "**Group A Debtors**") and the Group B Debtors[1], consisting of all Debtors who are not Group A Debtors (the "**Group B Debtors**"). |
| **CLASSIFICATION AND TREATMENT OF CLAIMS** | |
| **Unclassified Claims** | |
| **DIP Facility Claims** | The DIP Facility shall, on the Effective Date, be repaid by the Exit Facility or paid in full in cash.  In addition, Reorganized Lear will issue Warrants to the lenders under the DIP Facility on the Effective Date to the extent required under the terms of the DIP Facility.<br><br>Not classified; non-voting. |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) (to the extent not already paid during the chapter 11 cases), of the Bankruptcy Code,  shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtors.<br><br>Not classified; non-voting. |
| **Priority Tax Claims** | Priority tax claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>Not classified; non-voting. |
| **Intercompany Claims** | There shall be no distributions on account of Intercompany Claims. Notwithstanding the foregoing, Lear, in its sole discretion, may (or may cause each applicable Debtor to), reinstate or compromise, as the case may |

---

[1] To the extent required, the Plan of Reorganization could be structured to incorporate separate plans of reorganization for each Debtor, with each such plan reflecting substantive treatment of claims consistent with the terms hereof.

3

| | be, intercompany claims between and among the Debtors and their subsidiaries. |
|---|---|
| | **Classified Claims and Interests**<br>**Group A Debtors** |
| **Class 1A—Other Priority Claims** | All claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims against the Group A Debtors, shall be paid in full in cash on the later of the Effective Date or the allowance of the claim; *provided*, that, subject to Bankruptcy Court approval, priority wage claims against the Group A Debtors may be paid in full in the ordinary course of business.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 2A—Other Secured Claims** | Each holder of an Other Secured Claim against the Group A Debtors shall receive the following treatment, at the option of the Group A Debtors: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) other treatment rendering such claim unimpaired.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 3A—Prepetition Credit Agreement Secured Claims** | For purposes of the Plan of Reorganization and in settlement and compromise of all issues relating to the amount of the secured portion of the Prepetition Credit Agreement Obligations, the Prepetition Credit Agreement Lenders will have allowed secured claims against the Group A Debtors in an aggregate amount equal to $1.6 billion[2] (the "**Prepetition Credit Agreement Secured Claims**"). Each holder of a Prepetition Credit Agreement Secured Claim shall receive its pro rata share of: (i) $600 million of New Term Loans; (ii) $500 million in Series A Preferred Stock to be convertible into a percentage of the New Common Stock, as provided in Exhibit 7 hereto; and (iii) a percentage of the New Common Stock, as provided in Exhibit 7 hereto. To the extent Reorganized Lear has Minimum Liquidity (as defined below) determined on a normalized basis consistent with the financial analysis provided to the Prepetition Administrative Agent and the advisors to the Noteholder Steering Committee by Lear, in excess of $1.0 billion on the Effective Date, the amount of such excess shall be utilized to prepay, without premium or penalty, first, the Series A Preferred Stock, in an aggregate stated value of up to $50 million, then the New Term Loans, in an aggregate principal amount of up to $50 million, and thereafter, the Exit Facility; *provided further* that any payments of the New Term Loans made with the Debtors' excess cash within the first 30 days after the Effective Date shall not be subject to any prepayment penalty or premium.<br><br>"Minimum Liquidity" shall mean cash and cash equivalents, plus availability under working capital facilities, if any, plus a working capital |

---

[2] Inclusive of the Swap Claims.

509265-0024-02208-Active.11681162.15

| | |
|---|---|
| | adjustment to be agreed upon the Debtors, the Prepetition Administrative Agent and the Noteholder Steering Committee, less any accrued but unpaid professional fees and other chapter 11 costs not paid prior to the Effective Date, and cash financing costs to the extent not previously paid; *provided*, that at least $800 million of such aggregate amount consists of cash and cash equivalents; and *provided, further* that Minimum Liquidity shall be determined on or prior to the date that is 30 days after the Effective Date.<br><br>Impaired - entitled to vote. |
| **Class 4A—Unsecured Ongoing Operations Claims** | "**Unsecured Ongoing Operations Claims**" shall consist of all general unsecured claims relating to the provision of goods or services to the Group A Debtors arising with, or held by, persons or entities with whom the Debtors are conducting business as of the date of commencement of the Debtors' chapter 11 cases, but excluding any claims arising from the rejection by the Debtors of any contracts and leases and all other Class 5A or 6A Claims.  Each holder of an Unsecured Ongoing Operations Claim that is due and payable on or before the Effective Date shall be paid in full (in cash) on the Effective Date on account of such claim or otherwise receive such treatment as to render such holder unimpaired.  An allowed Unsecured Ongoing Operations Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement that governs such allowed Unsecured Ongoing Operations Claim or (ii) in accordance with the course of practice between the Group A Debtors and such holder with respect to such allowed Unsecured Ongoing Operations Claim. Holders of Unsecured Ongoing Operations Claims who received payment(s) from the Group A Debtors during the chapter 11 cases pursuant to any Bankruptcy Court order shall not be excluded from receiving distributions under the Plan of Reorganization on account of such claims unless such claims were fully satisfied by any prior payments from the Group A Debtors.  The Group A Debtors shall reserve all rights to challenge the legal basis and amount of any Unsecured Ongoing Operations Claim.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 5A—Other Unsecured Claims**[3] | "Other General Unsecured Claims" against the Group A Debtors shall consist of all general unsecured claims against the Group A Debtors that are not otherwise classified in Class 4A or 6A, including without limitation, (i) the Unsecured Note Claims, (ii) the Prepetition Credit Agreement Lenders' unsecured deficiency claim in the amount of approximately $737 million (the "**Prepetition Credit Agreement Deficiency Claims**"), (iii) claims arising upon rejection of leases and executory contracts to which a Group A Debtor is party; (iv) claims relating to the provision of goods or |

---

[3] Includes Unsecured Note Claims, the Prepetition Credit Agreement Deficiency Claims and all other claims against the Group A Debtors that are not a/an (a) Administrative Claim, (b) Priority Tax Claim, (c) Convenience Claim, (d) Other Secured Claim, (e) Prepetition Credit Agreement Secured Claim, (f) Priority Wage Claim, (g) Intercompany Claim, (h) Unsecured Ongoing Operations Claim or (i) Convenience Claim, but excludes Class 1A Claims and other employee-related claims otherwise provided for in this Term Sheet.

5

| | |
|---|---|
| | services to the Group A Debtors that are not classified as Administrative Claims or Class 4A or 6A Claims and (v) claims arising from litigation damages entered against the Group A Debtors (collectively, the "**Other General Unsecured Claims**").<br><br>Each holder of an allowed General Unsecured Claim against a Group A Debtor shall receive its pro rata share of (i) a percentage of the New Common Stock, as provided in Exhibit 7 hereto, that remains after giving effect to the distribution of New Common Stock to holders of Class 3A Claims and subject to dilution from the Series A Preferred Stock, the Warrants and the Management Equity Plan; and (ii) Warrants representing 15% of Reorganized Lear's outstanding New Common Stock, with the terms and conditions set forth in Exhibit 3 hereto.<br><br>Impaired – entitled to vote. |
| **Class 6A—Convenience Claims** | Subject to Bankruptcy Court approval, claims below a threshold to be agreed between the Debtors, the Noteholder Steering Committee and the Prepetition Administrative Agent against the Group A Debtors shall be paid an amount equal to 25% of such claim in cash on the later of the Effective Date or the allowance of the claim.<br><br>Impaired – entitled to vote. |
| **Class 7A—Existing Equity and 510(b) Claims** | <u>Class 7A-1</u>—Equity interest in Lear<br>Holders of the existing equity in Lear shall receive no recovery. Class 7A-1 interests include the common stock of Lear and options, warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), including without limitation, any claim against the Debtors that is subordinated pursuant to section 510(b) of the Bankruptcy Code, which shall include any claim arising from the recission of a purchase or sale of any equity interest, any claim for damages arising from the purchase or sale of any equity interest, or any claim for reimbursement, contribution or indemnification for such claim.<br><br>Impaired; not entitled to vote - deemed to reject.<br><br><u>Class 7A-2</u>—Existing equity interest in Debtor subsidiaries of Lear<br>All equity interests of Lear's Group A Debtor subsidiaries shall continue to be held by Lear and the subsidiaries of Lear holding such equity interests prior to the commencement of the Cases.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Classified Claims and Interests**<br>**Group B Debtors** | |
| **Class 1B—Other Priority Claims** | All claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims against the Group B Debtors, shall be paid in full in cash on the later of the Effective Date or the allowance of the claim; *provided*, that, subject to Bankruptcy Court |

509265-0024-02208-Active.11681162.15

| | approval, priority wage claims against the Group B Debtors may be paid in full in the ordinary course of business.<br><br>Unimpaired; not entitled to vote – deemed to accept |
|---|---|
| **Class 2B—Other Secured Claims** | Each holder of an Other Secured Claim against the Group B Debtors shall receive the following treatment, at the option of the Group B Debtors: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) other treatment rendering such claim unimpaired.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 3B—Unsecured Claims[4]** | All general unsecured claims of the Group B Debtors' creditors set forth or otherwise described in the disclosure statement, including claims under contracts and unexpired leases assumed by the Group B Debtors under the Plan of Reorganization and trade payables owed by any Group B Debtor or non-debtor subsidiary of Lear to any third party creditor, but excluding the Intercompany Claims, will be paid in the ordinary course as such claims become due. The Group B Debtors shall reserve all rights to challenge the legal basis and amount of any general unsecured claims.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 4B—Existing Equity** | All equity interests of Lear's Group B Debtor subsidiaries shall continue to be held by Lear and the subsidiaries of Lear holding such equity interests prior to the commencement of the Cases.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **GENERAL PROVISIONS** | |
| **Management Equity Plan** | On the Effective Date, Lear shall implement the Management Equity Plan (the "**Management Equity Plan**") for the benefit of certain continuing employees of the Debtors and non-management members of the Board (as defined below). The Management Equity Plan shall have the terms set forth on Exhibit 4 hereto. |
| **Employment Agreements/Other Incentive Plans** | The Plan of Reorganization shall provide for the adoption or assumption, as applicable, of the agreements between the Debtors and those executive officers of the Debtors who are parties to employment agreements with the Debtors as of the Petition Date (as defined below), which agreements shall (i) provide severance benefits to such executive officers equal to the severance benefits such executive officers are entitled to receive under their prepetition employment agreements with the Debtors and (ii) be in the form provided to the Prepetition Administrative Agent and the Noteholder Steering Committee by Lear. To the extent assumed, and as applicable, any such prepetition agreement shall be amended to eliminate provisions therein providing for the issuance of equity interests in Lear, with such |

---

[4] Includes all other claims against the Group B Debtors that are not a/an (a) Administrative Claim, (b) Priority Tax Claim, (c) Other Secured Claim, (d) Priority Wage Claim, or (e) Intercompany Claim.

509265-0024-02208-Active.11681162.15

|  | interests being treated as Class 7A-1 equity interest as set forth above.

The Plan of Reorganization shall provide for the adoption or assumption of the key management incentive plan, the valued employees plan and the remaining non-equity obligations under the outside director compensation plan, the long term stock incentive plan, and the management stock purchase plan, substantially consistent with the summaries provided to the Prepetition Administrative Agent and the Noteholder Steering Committee prior to the Petition Date (as defined below); provided that all incentive plan provisions covering insiders are approved by the Bankruptcy Court. Unless otherwise rejected or terminated by the Debtors in their sole discretion on or before confirmation of the Plan of Reorganization, the Plan of Reorganization shall provide that the reorganized Debtors shall assume or reinstate all employee and retiree health, welfare and qualified and non-qualified pension plans. The restructuring contemplated by this Term Sheet will not constitute a "change in control" or "change of control" (as those terms are defined in the respective plans to be assumed). The key management incentive plan shall have the terms set forth in Exhibit 5 hereto.

After the Effective Date, Reorganized Lear shall continue or enter into any benefit, compensation, incentive or similar plans and agreements as approved by the Board.

For purposes of clarity, a list of the U.S. plans and their treatment under the Plan of Reorganization is attached as Exhibit 6 hereto. |
|---|---|
| **Cancellation of Instruments, Certificates and Other Documents** | On the Effective Date, except to the extent otherwise provided above, all instruments, certificates and other documents evidencing debt or equity interests in Lear or the other Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged. |
| **Executory Contracts and Unexpired Leases** | Executory contracts and unexpired leases shall be assumed or rejected, as the case may be, in the Debtors' discretion, in the Plan of Reorganization to the extent that any such executory contracts and unexpired leases have not been assumed or rejected by the Debtors in their discretion during the pendency of the chapter 11 reorganization. |
| **Ad Hoc Committee Advisor Fees** | The Debtors shall pay the reasonable fees and expenses of the Ad Hoc Committee Advisors (as defined in the Noteholder Support Agreement) as set forth in the Noteholder Plan Support Agreement, incurred in connection with the Debtors' chapter 11 cases without the need for any application to the Bankruptcy Court unless other required by applicable bankruptcy law or any order of the Bankruptcy Court. |
| **Retention of Jurisdiction** | The Bankruptcy Court shall retain jurisdiction for customary matters. |

8

| **CORPORATE GOVERNANCE/CHARTER PROVISIONS/CAPITAL STOCK/REPORTING COMPANY/1145 EXEMPTION** | |
|---|---|
| **Board of Directors of Lear** | Reorganized Lear shall have a nine-person board of directors (the "**Board**"), which shall consist of eight directors and Reorganized Lear's Chairman & Chief Executive Officer.  Of the eight directors: (a) no fewer than five shall be appointed by the Prepetition Administrative Agent in consultation with the Prepetition Credit Agreement Lenders party to the Plan Support Agreement and with the assistance of a nationally recognized executive search firm to be retained by the Prepetition Administrative Agent (at the expense of the Debtors); and (b) three members shall be appointed by the Noteholder Steering Committee in consultation with the other holders of Unsecured Note Claims who are parties to the Noteholder Plan Support Agreement and the creditors' committee in the Debtors' chapter 11 cases.  Current directors will be included among the candidates to be considered for the new Board. <br><br> All directors of the Board shall meet the criteria set forth in the NYSE or Nasdaq, as applicable, listing requirements. |
| **Charter; Bylaws** | The charter and bylaws of each of the Debtors shall have been restated in a manner reasonably satisfactory to the Prepetition Administrative Agent and the Noteholder Steering Committee and consistent with section 1123(a)(6) of the Bankruptcy Code. |
| **Company as a Public Reporting Company** | For certain purposes, including requiring Lear to become a public reporting company under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Plan of Reorganization shall require Lear as promptly as practicable following the Effective Date to file with the SEC a registration statement on Form 10 under the Exchange Act registering all securities issued under the Plan of Reorganization under the Exchange Act (the "**Form 10**"), and Lear shall use reasonable best efforts to have such registration statement declared effective by the SEC as promptly as reasonably practicable. <br><br> The Plan of Reorganization shall provide for Lear to use its reasonable best efforts to obtain a listing for the New Common Stock on NYSE or Nasdaq as soon as reasonably practicable following the effectiveness of the Form 10 (e.g., after listing requirements are satisfied). <br><br> Demand registration rights with respect to the Series A Preferred Stock and the New Common Stock to be discussed based upon the anticipated composition of holders of Series A Preferred Stock and New Common Stock on and after the Effective Date. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan of Reorganization will be exempt from SEC registration under section 1145 of the Bankruptcy Code. |
| **Debtor Releases** | Full release, to the maximum extent permitted by law, by Debtors and their estates in favor of lenders under the DIP Facilities, the Prepetition Administrative Agent, the Prepetition Credit Agreement Lenders, holders |

9

|  | of Unsecured Note Claims and current and former officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals) of the Debtors and such lenders, noteholders and investors from any claims and causes of action based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the chapter 11 cases, the Plan of Reorganization and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan of Reorganization (other than claims based on gross negligence or willful misconduct) arising on or prior to the Effective Date. |
|---|---|
| **Releases Among Released Parties** | Plan shall provide that each of the parties released by the Debtors shall release each other and the Debtors for pre-Effective Date matters based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the chapter 11 cases, the Plan of Reorganization and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan of Reorganization. |
| **Indemnification/ Exculpation** | Customary indemnification and exculpation provisions. |
| **Discharge** | Customary discharge provisions. |
| **Injunction** | Customary injunction provisions. |
| **Indemnification of Prepetition Officers and Directors** | Under the Plan of Reorganization, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements or employment contracts) for the current and former directors, officers, employees, attorneys, accountants, investment bankers and other professionals of the Debtors shall be assumed and irrevocable and shall survive the effectiveness of the Plan of Reorganization. |
| **Tax Issues** | The terms of the Plan of Reorganization and the restructuring contemplated by this Term Sheet shall be structured to preserve favorable tax attributes of the Debtors to the extent practicable. The Debtors shall consult with the advisors to the Prepetition Administrative Agent and the advisors to the Noteholder Steering Committee on tax issues and matters of tax structure relating to the Plan of Reorganization and the restructuring contemplated by this Term Sheet. |
| **PLAN IMPLEMENTATION AND PROPOSED REORGANIZATION SCHEDULE** | |
| **Plan Support Agreement** | Prior to the commencement of the Debtors' chapter 11 cases, the Prepetition Credit Agreement Lenders and the Debtors shall execute and deliver the Lender Plan Support Agreement, and certain holders of the Unsecured Notes and the Debtors shall execute and deliver the Noteholder Plan Support Agreement. |
| **Timeline** | (i)   The Plan of Reorganization and related disclosure statement shall be filed within 60 days of the filing date of these chapter 11 cases (the "**Petition Date**"); |
|  | (ii)   The Debtors shall obtain an order, in form and substance reasonably satisfactory to the Requisite Participating Lenders (as |

|  |  | defined in the Lender Plan Support Agreement) and the Requisite Participating Noteholders (as defined in the Noteholder Plan Support Agreement), approving the adequacy of the disclosure statement no later than 150 days after the Petition Date; |
|  | (iii) | The Debtors shall obtain entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to the Requisite Participating Lenders and the Requisite Participating Noteholders, confirming the Plan of Reorganization no later than 270 days after the Petition Date; and |
|  | (iv) | The Debtors shall cause the Effective Date of the Plan of Reorganization to occur no later than 300 days after the Petition Date. |
| **Conditions Precedent to Plan Confirmation** | (i) | The Plan Support Agreements shall be in full force and effect and shall not have been terminated; |
|  | (ii) | The disclosure statement shall have been approved; |
|  | (iii) | The Prepetition Administrative Agent and the Noteholder Steering Committee shall be reasonably satisfied with all material tax matters and positions relating to the Debtors and the reorganized Debtors; |
|  | (iv) | Except as provided in this Term Sheet, including Exhibit 5 and Exhibit 6 hereof, all employment arrangements of senior management for the post-Effective Date period shall be reasonably satisfactory to the Prepetition Administrative Agent and the Noteholder Steering Committee; |
|  | (v) | The Plan of Reorganization, including any amendments, modifications or supplements thereto, and all documentation contemplated by this Term Sheet or the Plan of Reorganization, shall be in form and substance reasonably satisfactory to the Requisite Participating Lenders and the Requisite Participating Noteholders; |
|  | (vi) | There shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); and |
|  | (vii) | The Bankruptcy Court shall have entered an order confirming the Plan of Reorganization, which order shall be in form and substance reasonably satisfactory to the Debtors and the Requisite Participating Lenders and the Requisite Participating Noteholders. |
| **Conditions Precedent to Plan Consummation** | (i) | Contemporaneous effectiveness of the Exit Facility or an alternative exit financing facility provided that with respect to such alternative exit financing facility the DIP Facility shall be repaid in cash in full on the Effective Date; and |
|  | (ii) | No modification or stay of confirmation order or entry of other court order prohibiting Plan of Reorganization transactions from |

509265-0024-02208-Active.11681162.15

| | being consummated. |
|---|---|

509265-0024-02208-Active.11681162.15

Exhibit 1

## TERMS OF NEW TERM LOANS

| | |
|---|---|
| Borrower: | Reorganized Lear. |
| Guarantors: | Reorganized Lear's domestic subsidiaries which guarantee the Exit Facility. |
| Principal: | $600 million. |
| Maturity: | 3 years from the Effective Date |
| Interest Rate: | For the first 18-month period commencing with the consummation of the Plan of Reorganization (the "**Initial Period**"), L+550 bps with a LIBOR floor of 3.5%; for the 12-month period commencing after the Initial Period, L+650 bps with a LIBOR floor of 3.5%; and thereafter through maturity, L+750 bps with a LIBOR floor of 3.5%.<br><br>Interest rate margin will be further increased by 1.00% per annum on interest paid in PIK. |
| Call Premium: | Call premium of 2% of the principal amount of any voluntary prepayment under, or refinancing of, the New Term Loans after the second anniversary of the Effective Date, payable at the time of prepayment/ refinancing. |
| Financial Covenants: | Financial covenants to piggyback off of covenants in the Exit Facility, but to be set off of wider cushions; debt-incurrence covenant TBD. |
| Collateral: | The obligations under the New Term Loans will be secured on a silent second priority basis by a perfected security interest in the Collateral under the Exit Facility.  Silent second priority security interest in the Collateral, payment subordination, lien priority, relative rights and other creditors' rights issues in respect of the New Term Loans and the Exit Facility (and any debt refinancing or replacing such debt) to be set forth in a customary intercreditor agreement, in a form reasonably satisfactory to the parties. |

Exhibit 2

TERMS OF SERIES A PARTICIPATING PREFERRED STOCK

| Issuer: | Reorganized Lear. |
|---|---|
| Initial Face Amount: | Up to $500 million (the "**Stated Value**"), which shall be distributed pro rata to the holders of the Prepetition Credit Agreement Secured Claim in satisfaction and discharge of claims thereunder on a dollar for dollar basis. |
| Liquidation Preference: | The greater of (i) the initial Stated Value plus any accrued but unpaid dividends as of the relevant determination date (such aggregate amount, as of such date, the "**Accrued Value**"), and (ii) the amount that would then be received upon the liquidation, dissolution, or winding up of Reorganized Lear by a holder of the number of shares of New Common Stock issuable upon conversion of the Series A Preferred Stock (and assuming all of the Series A Preferred Stock were so converted) held by such holder (the "**Liquidation Value**"). |
| Dividends: | The Series A Preferred Stock shall not bear any mandatory dividends. No dividend shall be declared on the Series A Preferred Stock unless so authorized by a vote of at least six out of the eight non-management directors of Reorganized Lear.<br><br>The holders of Series A Preferred Stock will participate in any dividends or distributions declared on New Common Stock (other than a dividend payable solely in additional shares of New Common Stock, which is addressed under the anti-dilution protections below) based on the number of shares of New Common Stock into which Series A Preferred Stock is convertible as of the applicable record date for such New Common Stock dividend or distribution.<br><br>Reorganized Lear may not declare dividends on or repurchase any junior securities (including New Common Stock) unless dividends on Series A Preferred Stock, if any, have been paid in full in cash through the most recent dividend payment date. |
| Mandatory Redemption: | Upon liquidation of Reorganized Lear.<br><br>If Reorganized Lear enters into a transaction constituting a consolidation or merger, a reclassification of its New Common Stock into securities other than New Common Stock or any statutory exchange of the outstanding shares of New Common Stock for securities of another entity (each, a "**Reorganization Event**"), each share of Series A Preferred Stock outstanding immediately prior to such Reorganization Event will remain outstanding but will become convertible, at the option of the holder, into the kind of securities, cash |

| | and other property receivable in such Reorganization Event by a holder of the number of shares of New Common Stock into which each share of Series A Preferred Stock would then be convertible. In the event of a sale of all or substantially all of the assets of Reorganized Lear, proper provision shall be made such that the holders of the Series A Preferred Stock shall receive an equivalent security in the entity acquiring such assets. |
|---|---|
| Optional Redemption: | Subject to any applicable contractual restrictions, at the option of Reorganized Lear, at any time or from time to time, in whole or in part, at a redemption price, payable in cash, equal to the greater of (i) the Accrued Value and (ii) the Liquidation Value. |
| Mandatory Conversion Date: | Three (3) years following the Effective Date, provided that the Mandatory Conversion Date shall also mean any earlier date after the first anniversary of the Effective Date, if for 20 trading days within any period of 30 consecutive trading days, the closing price of the New Common Stock exceeds 135% of the then-applicable conversion price for the Series A Preferred Stock. The initial conversion price shall be equal to the per share Plan of Reorganization value of New Common Stock as of the Effective Date. |
| Optional Conversion: | Each share of Series A Preferred Stock may be converted at the option of the holder at any time into a number of shares of New Common Stock equal to the Accrued Value as of the conversion date (including any increase in Stated Value as a result of dividend payments that are paid in-kind) divided by the then applicable conversion price. The initial conversion price shall be equal to the per share Plan of Reorganization value of New Common Stock as of the Effective Date. |
| Anti-Dilution: | The conversion price will be subject to proportional adjustment for any stock split, stock recombination, or stock dividend (other than the pay in-kind dividends to holders of the Series A Preferred Stock) or any distribution of rights, options, warrants or any distribution of shares of capital stock, evidences of indebtedness or other property or assets by Reorganized Lear or any of its subsidiaries in which the holders of Series A Preferred Stock do not participate on a pro rata as converted basis. |
| Ranking: | Senior to all other capital stock of Reorganized Lear with respect to dividends and liquidation. |
| Voting: | Series A Preferred Stock will vote together with the New Common Stock on all matters and not as a separate class, on an as-converted basis. Notwithstanding the foregoing, the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock, voting as a separate class, is required to: |

| | | |
|---|---|---|
| | | (a) amend Reorganized Lear's certificate of incorporation in a way that would alter, modify or change the rights, designations or preferences of the holders of Series A Preferred Stock;<br><br>(b) authorize or issue any other capital stock that will be senior to Series A Preferred Stock; and<br><br>(c) increase or decrease the authorized number of shares of Series A Preferred Stock. |
| | Registration Rights: | Registration rights for the Series A Preferred Stock to be discussed based on size of issue and composition of holders of Series A Preferred Stock. |
| | Transferability: | Freely transferable. |

Exhibit 3

## TERMS OF WARRANTS FOR CLASS 5A CLAIMS

| | |
|---|---|
| Warrants | The Warrants will entitle the holders thereof to acquire shares of New Common Stock representing 15% of the New Common Stock, on a fully-diluted basis, as of the Effective Date (but subject to dilution for awards under the Management Equity Plan). |
| Exercise Price per Warrant: | Exercisable at any time during the Exercise Period at a price equal to $.01 per Warrant.<br><br>"Exercise Period" means the period (a) commencing on the business day following a period of 30 consecutive trading days during which the closing price of the New Common Stock on at least 20 of the trading days within such period implies a total distributable value of the Company equal to or greater than $3.3 billion and (b) ending on the Expiration Date. |
| Expiration: | The fifth anniversary of the Effective Date (the "Expiration Date"). |
| Exercise Date: | Exercisable at any time, during the Exercise Period. |
| Voting Rights: | None. |
| Anti-Dilution Provisions: | The Exercise Price per Warrant and the number of shares of common stock issuable upon exercise of the Warrants shall be subject to customary adjustment upon the occurrence of common stock splits and reverse common stock splits. |
| Reorganization Event: | Except as provided in the next sentence, upon a Reorganization Event that is consummated during the Exercise Period, each Warrant will be exercisable into the right to receive the kind and amount of consideration to which such holder would have been entitled as a result of such Reorganization Event had the Warrant been exercised immediately prior thereto. In the event of a Reorganization Event consummated during the Exercise Period in which the only consideration payable to holders of New Common Stock is cash, each Warrant shall be entitled to receive the cash consideration to which such holder would have been entitled as a result of such Reorganization Event, less the Exercise Price, had the Warrant been exercised immediately prior thereto. The Warrants shall expire and be cancelled following a Reorganization Event, subject to receipt of any consideration to which holders thereof are entitled as provided above. A "Reorganization Event" shall mean any transaction in which Reorganized Lear enters into a transaction constituting (i) a consolidation or merger in which its New Common Stock is exchanged for securities of another entity, (ii) a reclassification of its New Common Stock into securities other than New Common Stock or (iii) any statutory exchange of the outstanding shares of New Common Stock for securities of another entity. |
| Transferability: | The Warrants will not be subject to any contractual restrictions on transfer other than such as are necessary to ensure compliance with U.S. federal and state securities laws. Reorganized Lear will undertake to file a registration statement covering the Warrants and the New Common Stock underlying the Warrants and to maintain the effectiveness of the registration statement. |

Exhibit 4

TERMS OF MANAGEMENT EQUITY PLAN

| | |
|---|---|
| Number of Shares | Equivalent to up to 10% of the New Common Stock. |
| Types of Awards | Initial awards of restricted stock granted as set forth in the section entitled "Grants" herein.  Future awards, excluding the awards described herein, to be determined by the Board of Reorganized Lear, and may include, without limitation, restricted stock, restricted stock units, performance shares, performance units, stock appreciation rights, stock options, etc. |
| Pricing | Awards (other than restricted stock and restricted stock units) will have an exercise price per share equal to the fair market value on the date of grant. |
| Grants | Upon emergence, restricted stock grants equal to 2.7% of the New Common Stock, on a fully-diluted basis after giving effect to all securities exercisable or convertible into New Common Stock.<br><br>Future awards will be granted at such time(s) as the Board of Reorganized Lear shall determine. |
| Participants | Participation in the determination of the Board, provided that participation for emergence grants limited to 150 to 200 employees determined as follows:<br><br>(a) E3 and higher (approximately 100 participants), including the participants listed on Schedule A hereto in the percentage of the total award on emergence, as set forth next to such participant's title therein; and<br><br>(b) 50-100 additional participants based on performance, position criticality and other relevant factors. |
| Vesting | Emergence grants shall vest in three equal annual installments on each of the first three anniversaries of the Effective Date. Vesting of emergence grants for a particular employee shall be accelerated, in full, in the event of termination of employment of such employee by Lear without Cause or by such employee with Good Reason.<br><br>Future awards, excluding the emergence awards described herein, shall be subject to such vesting schedules and in such form as determined by the Board. |
| Expiration of Awards | Earlier of (i) ten years after grant, (ii) 30 days after termination of employment other than for death, disability or cause, (iii) one year after termination of employment by death or disability or (iv) immediately upon termination for cause. |

Schedule A

**Top 29 Executives**

| Band ($000) | Title | # of EEs | % of Total Emergence Grant Per Individual EE |
|---|---|---|---|
| Insider | CEO | 1 | 18.25% |
| Insider | Division President | 1 | 4.73% |
| Insider | Division President | 1 | 4.73% |
| Insider | CFO | 1 | 4.73% |
| Insider | SVP, General Counsel | 1 | 4.73% |
| E1 | | 2 | 1.69% |
| E2 | | 22 | 0.92% |

**Other 171 Participants**

| Band ($000) | Title | # of EEs | % of Total Emergence Grant Per Individual EE |
|---|---|---|---|
| E2 | | 2 | 0.92% |
| E3 | | 67 | 0.38% |
| 6 | | 102 | 0.11% |

Exhibit 5

## TERMS OF KEY MANAGEMENT INCENTIVE PLAN

| Participants | 29 senior executives |
|---|---|
| Performance measures and weightings | Filing a Plan of Reorganization conforming to the Term Sheet or any other plan that the Board determines, in the exercise of its fiduciary duties, is in the best interests of the Debtors (such plans, a "Satisfactory Plan"), within 60 days after filing the petition: 25% of award opportunity<br><br>Emergence within 300 days from filing the petition: 50% of award opportunity<br><br>Quarterly opportunity for Adjusted Operating Earnings results: 25% of award opportunity (6.25% per quarter) |
| Award opportunity | Market competitive award opportunities set based on position responsibilities, criticality, business impact and other factors<br><br>Specified as a dollar amount which is equal to the market-based multiple of salary times an executive's current base salary<br><br>Award opportunity for filing a Satisfactory Plan and Emergence are binary. For the Adjusted Operating Earnings award opportunity, payouts can range up to 140% of target for the particular quarter based on actual results (8.75% per quarter) |
| Payout timing | Within 10 days following the occurrence of the event or, for the Adjusted Operating Earnings award opportunity, within 30 days of completion of the quarter<br><br>If emergence is during a quarter, the Adjusted Operating Earnings opportunity will be prorated assuming target performance<br><br>For the CEO, payout of all earned amounts will be as follows:<br>   o  Upon emergence: 50%<br>   o  1 year anniversary from emergence: 50% |

Exhibit 6

<u>TREATMENT OF U.S. BENEFIT PLANS</u>

1.    <u>Plans to be Assumed/Adopted</u>
- Outside Directors Compensation Plan (interest accounts totaling approximately $346,000)
- Valued Employee Plan
- Key Management Incentive Plan
- Long-Term Stock Incentive Plan (cash dividend portion totaling approximately $375,000)
- Management Stock Purchase Plan (notional cash accounts totaling approximately $160,000)
- Qualified Plans (including 401(k) and pension plans)
- Welfare Plans (including Estate Preservation Plan)
- Executive Supplemental Savings Plan
- PSP Excess Plan
- Supplemental Employee Retirement Program (Pension Equalization Program and pension portion of Executive Supplemental Savings Plan)
- Severance Policy

2.    <u>Plans Not to be Assumed</u>
- Annual Incentive Compensation Plan
- Key Employee Recognition Plan
- Long-Term Incentive Plan (equity portion and performance awards)
- Management Stock Purchase Plan (equity portion)
- Outside Directors Compensation Plan (equity portion)

Exhibit 7

| | % of Fully Diluted Common Equity |
|---|---|
| Series A Preferred Stock for Prepetition Credit Agreement Secured Claims[1] | 26.2% |
| New Common Stock for Prepetition Credit Agreement Secured Claims[1] | 26.2% |
| DIP Facility Warrants[1] | 1.3% |
| Prepetition Credit Agreement Deficiency Claims[2] | 16.4% |
| Unsecured Notes Claim[2] | 29.9% |
| TOTAL | 100.0% |

(1) Subject to dilution from warrants representing 15% of Reorganized Lear's outstanding New Common Stock as set forth in Exhibit 3 and Management Equity Plan.
(2) Subject to dilution from warrants representing 15% of Reorganized Lear's outstanding New Common Stock as set forth in Exhibit 3, Management Equity Plan, and Other General Unsecured Claims not included above.

**ANNEX 1**[1]

---

[1]    A copy of the DIP Credit Agreement has been filed with the Bankruptcy Court as <u>Exhibit C</u> of the Debtors' motion for authority, among other things, to obtain postpetition financing and use cash collateral [Docket No. 11].

**ANNEX 2**[2]

_____

[2]    A copy of the Exit Facility is attached as <u>Exhibit I</u> to the DIP Credit Agreement, which has been filed as <u>Exhibit C</u> of the Debtors' motion for authority, among other things, to obtain postpetition financing and use cash collateral [Docket No. 11].

## EXHIBIT 2

**Form of Order Governing Use of Cash Collateral and Granting Adequate Protection**

*(please see attached)*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

In re:                                    :  Chapter 11
                                          :
LEAR CORPORATION, et al.,                 :  Case No. 09-[      ]
                                          :
              Debtors.                    :  Jointly Administered
                                          :
                                          :
                                          :
-----------------------------------------------------------------x

## INTERIM ORDER (I) AUTHORIZING THE USE OF
## LENDERS' CASH COLLATERAL AND (II) GRANTING ADEQUATE PROTECTION
## PURSUANT TO 11 U.S.C. §§ 361 AND 363

Upon the motion (the "Motion"),[1] dated as of [          ], 2009, of Lear

Corporation ("Lear") and certain of its direct and indirect subsidiaries, the above-captioned

debtors (each a "Debtor" and collectively, the "Debtors"), (a) seeking this Court's authorization,

pursuant to Section 363(c) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (as

amended, the "Bankruptcy Code"), to use the Cash Collateral (as defined below) and, pursuant to

Sections 361 and 363 of the Bankruptcy Code, to provide adequate protection to the Lenders (as

defined below) with respect to any diminution in the value of the Lenders' interests in the

Prepetition Collateral (as defined below), including for the use of the Cash Collateral, the use,

sale, lease, depreciation, or other diminution in value of the Prepetition Collateral other than the

Cash Collateral, or the imposition of the automatic stay pursuant to Section 362(a) of the

Bankruptcy Code; and (b) seeking a preliminary hearing (the "Preliminary Hearing") on the

Motion to consider entry of an interim order pursuant to Bankruptcy Rule 4001(b) (this "Order")

---

[1]    To the extent capitalized terms are not defined herein, they shall have the meaning ascribed to them in the Motion.

authorizing the Debtors to use the Lenders' Cash Collateral; and due and sufficient notice of the

Motion and the Preliminary Hearing under the circumstances having been given; and the

Preliminary Hearing on the Motion having been held before this Court on [        ], 2009; and

upon the entire record made by the Debtors at the Preliminary Hearing, and this Court having

found good and sufficient cause appearing therefor,

**IT IS HEREBY STIPULATED AND AGREED BY AND AMONG THE
DEBTORS, THE ADMINISTRATIVE AGENT AND THE LENDERS THAT:**

A.    On June 30, 2009 (the "Petition Date"), each of the Debtors filed a

voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States

Bankruptcy Court for the Southern District of New York thereby commencing the above-

captioned bankruptcy cases (collectively, these "Chapter 11 Cases"). The Debtors are continuing

to operate their businesses and manage their properties as debtors-in-possession pursuant to

Sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the

appointment of a trustee or examiner and no statutory committee of unsecured creditors (a

"Committee") has yet been established in these Chapter 11 Cases.

B.    This Court has jurisdiction over these Chapter 11 Cases and the Motion

pursuant to 28 U.S.C. § 157(b) and 1334. Consideration of this Motion constitutes a core

proceeding as defined in 28 U.S.C. § 157(b)(2).

C.    Pursuant to the Amended and Restated Credit and Guarantee Agreement

dated as of April 25, 2006 (as amended, supplemented or otherwise modified as of the Petition

Date, the "Credit Agreement"), among Lear, Lear Canada, a general partnership organized under

the laws of Ontario, Canada and a Debtor herein, certain of Lear's foreign subsidiaries party

thereto, the several lenders party thereto (including as holders of secured swap obligations in

connection with certain interest rate protection arrangements, collectively, the "Lenders"),

JPMorgan Chase Bank, N.A., as general administrative agent for the Lenders (in such capacity,

the "Administrative Agent"), and the other agent banks party thereto, the Lenders made

approximately $2.3 billion of loans and other financial accommodations to or for the benefit of

Lear and the other Debtors.  In connection with the Credit Agreement, Lear and certain of the

other Debtors (collectively, the "Debtor Loan Parties") entered into certain collateral and

ancillary documentation, and certain hedge arrangements with the Lenders (such documentation

as of the Petition Date, together with the Credit Agreement, the "Loan Documents").  All such

loans, financial accommodations and other amounts owing by Lear and the other Debtor Loan

Parties to the Administrative Agent and the Lenders in connection with the Loan Documents are

hereinafter referred to the "Prepetition Obligations".

D.    Without prejudice to the rights of any other party (but subject to the

limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and

agree that, as of the Petition Date, Lear and the other applicable Debtor Loan Parties are truly

and justly indebted to the Lenders and the Administrative Agent on account of the Prepetition

Obligations as set forth in the Loan Documents, without defense, counterclaim or offset of any

kind and are liable to the Lenders in respect of loans made by the Lenders to Lear pursuant to

and to the extent set forth in the Credit Agreement and the other applicable Loan Documents in

the aggregate principal amount of approximately $2.177 billion, plus additional amounts in

respect of termination payments under certain hedge agreements with Lenders or their affiliates

(to the extent such hedge agreements are terminated) that are secured ratably with the other

Prepetition Obligations, plus approximately $73,200,000 on account of Lear's reimbursement

obligations with respect to letters of credit issued pursuant to the Credit Agreement which

remained outstanding as of the Petition Date, plus additional amounts in respect to accrued but

unpaid interest and all other fees, costs, and expenses of the Lenders and the Administrative

Agent, in each case payable pursuant to the terms of the Loan Documents.

      E.    Without prejudice to the rights of any other party (but subject to the

limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and

agree that, pursuant to the Loan Documents, the Prepetition Obligations are secured (subject to

the applicable limitation or secured amounts set forth in Section 17.24 of the Credit Agreement)

by perfected, valid and enforceable first priority liens and security interests granted by Lear and

the other applicable Debtor Loan Parties pursuant to and to the extent set forth in the applicable

Loan Documents to the Administrative Agent for the ratable benefit of the Lenders, upon and in

certain assets and property of the applicable Debtor Loan Parties, including without limitation,

accounts, chattel paper, deposit accounts, documents, equipment, general intangibles,

instruments, intellectual property, inventory, investment property, letter-of-credit rights, certain

commercial tort claims, pledged capital stock and other pledged interests of certain subsidiaries

and other tangible and intangible personal property and the proceeds thereof (including the setoff

rights described in the Loan Documents and arising by operation of law, but in each case not

including any "Excluded Property" (as defined in the Credit Agreement), collectively the

"Prepetition Collateral").  Without prejudice to the rights of any other party (but subject to the

limitations thereon described below in decretal paragraph 16), the Debtors acknowledge and

agree that the Administrative Agent's liens and security interests in the Prepetition Collateral

have been properly filed or recorded, as applicable, so as to be perfected in accordance with

applicable law.  Without prejudice to the rights of any other party (but subject to the limitations

thereon described below in decretal paragraph 16), the Debtors acknowledge and agree that

certain cash on hand of the applicable Debtor Loan Parties and amounts generated by the

collection of accounts receivable, sale of inventory or other dispositions of the Prepetition

Collateral constitute Prepetition Collateral as proceeds of the Prepetition Collateral and,

therefore, is cash collateral of the Lenders within the meaning of Section 363(a) of the

Bankruptcy Code (the "Cash Collateral"). The Administrative Agent does not consent to the use

by the Debtors of the Prepetition Collateral, including the Cash Collateral, except on the terms of

this Order (or other order that may be entered by the Bankruptcy Court with the Administrative

Agent's consent). In addition, the Lenders are entitled, pursuant to Sections 361 and 363(e) of

the Bankruptcy Code, to adequate protection of their interest in the Prepetition Collateral to the

extent required under the Bankruptcy Code for the diminution in value, including for the use of

the Cash Collateral, the use, sale, lease, depreciation, or other diminution in value of the

Prepetition Collateral other than the Cash Collateral, and the imposition of the automatic stay.

Based upon the foregoing stipulations, and upon the record made before this

Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS** that:

F.        Good cause has been shown for the entry of this Order. The Debtors do

not have sufficient available sources of working capital and financing to carry on the operation

of their businesses without the use of the Cash Collateral. Among other things, entry of this

Order will minimize disruption of the Debtors' businesses and operations and permit them to

make payroll and other operating expenses, maintain business relationships with their vendors

and retain customer and vendor confidence by demonstrating an ability to maintain normal

operations. The use of the Cash Collateral is therefore of the utmost significance and importance

to the preservation and maintenance of the going concern value of the Debtors and their estates,

and will enhance the prospects for a successful reorganization of the Debtors under Chapter 11

of the Bankruptcy Code. The Cash Collateral is sufficient, however, to fund the Debtors'

business and these Chapter 11 Cases on an interim basis, pending entry of a DIP Financing Order

(as defined below).

      G.    The Administrative Agent and the Debtors have negotiated at arms' length

and in good faith regarding the Debtors' use of Cash Collateral to fund the administration of the

Debtors' estates and continued operation of their businesses. The Administrative Agent and the

Lenders have agreed to permit the Debtors to use their Cash Collateral for the period through the

Termination Date (as defined below), all subject to the terms and conditions set forth herein,

including the protection afforded a party acting in "good faith" pursuant to Section 363(m) of the

Bankruptcy Code; provided, however that this Order and the terms, conditions, rights and

remedies set forth herein shall, as applicable, be superseded by, made subject to or terminate

upon entry of, an order by the Court substantially in the form attached to the Motion as Exhibit B

approving the debtor in possession financing facility described in the Motion (a "DIP Financing

Order").

      H.    The Debtors represent that notice of the Preliminary Hearing and the relief

requested in the Motion has been given to (i) the Office of the United States Trustee for the

Southern District of New York, (ii) the entities listed on the Consolidated List of Creditors

Holding the 50 Largest Unsecured Claims filed pursuant to Bankruptcy Rule 1007(d), (iii)

counsel to the Administrative Agent, (iv) counsel to the Debtors' proposed postpetition secured

lenders, (v) each trustee for each of the Debtors' notes, (vi) counsel to the ad hoc committee of

the Debtors' unsecured noteholders, (vii) the Internal Revenue Service, and (viii) the Securities

and Exchange Commission. Based on such representation, such notice of the Preliminary

Hearing was given in accordance with Sections 102(1) and 363 of the Bankruptcy Code, Bankruptcy Rules 2002 and 4001(b), and the local rules of this District.

I.       Based on the record presented to the Court at the Preliminary Hearing, the terms of the Debtors' use of the Lenders' Cash Collateral appear to be fair and reasonable, and to reflect the Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties.

J.       The Debtors have requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(b)(2).  The permission granted herein to use the Lenders' Cash Collateral is necessary to avoid immediate and irreparable harm to the Debtors.  This Court concludes that entry of this Order is in the best interest of the Debtors' estate and creditors.

Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Preliminary Hearing, and good and sufficient cause appearing therefor;

**IT IS HEREBY ORDERED** that:

1.       The Motion is granted on an interim basis.  The Debtors are hereby authorized to use the Cash Collateral during the period from the Petition Date through and including the Termination Date for working capital and general corporate purposes and costs and expenses related to these Chapter 11 Cases in accordance with the terms and conditions of this Order; provided that all uses of cash by the Debtors for the costs and expenses of administering these Cases shall be deemed to be first from cash that is not Cash Collateral and thereafter from Cash Collateral.

2.       Except as otherwise provided herein, the Debtors shall maintain their pre-Petition Date cash management and accounts receivable collection system to the extent authorized by and subject to the terms of any order of this Court governing the Debtors' cash

management system.  This Order does not address the disposition of any Prepetition Collateral

outside the ordinary course of business or the Debtors' use of the Cash Collateral resulting

therefrom.

3.        (a) As adequate protection for, and to the extent of, any diminution in the

value of the Lenders' interest in the Prepetition Collateral resulting from (x) the use of the Cash

Collateral pursuant to Section 363(c) of the Bankruptcy Code, (y) the use, sale, lease,

depreciation, or other diminution in value of the Prepetition Collateral (other than the Cash

Collateral) pursuant to Section 363(c) of the Bankruptcy Code and (z) the imposition of the

automatic stay pursuant to Section 362(a) of the Bankruptcy Code (the amount of any such

diminution being referred to hereinafter as the "Adequate Protection Obligations"):

> (i)        the Administrative Agent and the Lenders are hereby granted (effective as
> of the Petition Date and without the necessity of the execution by the Debtors of
> mortgages, security agreements, control agreements, pledge agreements,
> financing statements or otherwise), valid and perfected, security interests in, and
> liens (the "Adequate Protection Liens") on all of the right, title and interest of the
> U.S. Debtors (the "Domestic Debtors") in, to and under all present and after-
> acquired property of the Domestic Debtors of any nature whatsoever including,
> without limitation, all cash contained in any account of the Domestic Debtors, and
> the proceeds of all causes of action, other than (a) causes of action (and proceeds
> thereof) arising under Sections 544, 545, 547, 548, 550 and 553 (collectively, the
> "Avoidance Actions") of the Bankruptcy Code and (b) 35% of the outstanding
> voting shares of each new or existing foreign subsidiary (collectively, with the
> proceeds and products of any and all of the foregoing, the "Postpetition
> Collateral").  Subject to the Carve Out (as defined below), said Adequate
> Protection Liens shall be (x) a first priority perfected lien upon all of the
> Postpetition Collateral that is not otherwise encumbered by a validly perfected,
> enforceable, non-avoidable security interest or lien on the Petition Date or a valid
> lien in existence on the Petition Date that is perfected subsequent to such date as
> permitted by Section 546(b) of the Bankruptcy Code, (y) a first priority, senior,
> priming and perfected lien upon (a) that portion of the Postpetition Collateral that
> is comprised of the Prepetition Collateral and (b) Postpetition Collateral subject to
> a lien that is junior to the liens securing the Prepetition Obligations and (z) a
> second priority, junior perfected lien upon all Postpetition Collateral (other than
> the portion described in the preceding clause (y)), which is subject to a validly
> perfected lien as of the Petition Date or a valid lien in existence on the Petition

Date that is perfected subsequent to such date as permitted by Section 546(b) of the Bankruptcy Code;

(ii)    subject to the Carve Out and the terms of a DIP Financing Order, a claim against the Domestic Debtors that constitutes expenses of administration under Sections 503(b)(1), 507(a) and 507(b) of the Bankruptcy Code (the "507(b) Claims") with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code including, without limitation, Sections 105, 326, 328, 330, 331 and 726 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtors, and any successor trustee or any creditor, in these Chapter 11 Cases or, to the extent permitted by applicable law, any subsequent proceedings under the Bankruptcy Code provided that the 507(b) Claims shall not be paid with the proceeds of Avoidance Actions.  Subject to the Carve Out and the terms of a DIP Financing Order, no cost or expense of administration under Sections 105, 503(b) or 507(b) or otherwise, including those resulting from the conversion of these Chapter 11 Cases pursuant to Section 1112 of the Bankruptcy Code, shall be senior to, or pari passu with, the 507(b) Claims of the Lenders arising out of the Adequate Protection Obligations; and

(iii)    the Domestic Debtors are authorized and directed, promptly following entry of this order, to pay as further adequate protection an amount equal to all accrued and unpaid fees and disbursements owing to the Administrative Agent and the Issuing Lender under the Loan Documents and incurred prior to the Petition Date but unpaid as of the Petition Date provided that any such fees paid to the Issuing Lender shall not include any fees payable under section 9.5(e)(ii) of the Credit Agreement.

(b)  As further adequate protection hereunder, the Debtors shall provide the following reporting to the Administrative Agent (the "Reporting Requirements"): no later than Tuesday of every calendar week, commencing July 14, 2009, a rolling 13-week cash flow projection of Lear and its subsidiaries in the form of the initial 13-week cash flow projection that has been mutually agreed upon by the Administrative Agent and the Debtors (each, a "Cash Flow Forecast").  The Administrative Agent shall have reasonable access, upon notice during normal business hours, to the Debtors' business records and premises and to the Prepetition Collateral and the Postpetition Collateral to enable the Administrative Agent to (i) review, appraise, and evaluate the physical condition of the Prepetition Collateral or Postpetition

Collateral, (ii) inspect and review the financial records and all other records of the Debtors

concerning the operation of the Debtors' business, and (iii) evaluate the Debtors' overall

financial condition and all other records relating to the operations of the Debtors. The Debtors

shall fully cooperate with the Administrative Agent regarding such reviews, evaluations, and

inspections, and shall make members of their senior management and professionals reasonably

available to the Administrative Agent and its professionals and consultants to conduct such

reviews, evaluations and inspections, in each case subject to applicable confidentiality and

privilege limitations. At its discretion, the Administrative Agent may request, and the Debtors

agree to provide, periodic telephonic updates to the Administrative Agent and the Lenders

concerning the operations, business affairs and financial condition of the Debtors, in each case

subject to applicable confidentiality and privilege limitations.

(c)    As additional adequate protection, the Domestic Debtors are authorized and

directed, within 20 days of the submission of invoices therefor, to pay or reimburse all

reasonable fees, costs and charges incurred by the Lenders and the Administrative Agent

(including, without limitation, the administration fees payable to the Administrative Agent under

the Credit Agreement and the reasonable fees and out-of-pocket disbursements of counsel and

any financial advisors or other third-party consultants to the Administrative Agent), in each case,

in connection with matters relating to the Credit Agreement, the Prepetition Obligations, the

monitoring of these Chapter 11 Cases or the enforcement and protection of the rights and

interests of the Administrative Agent and the Lenders in these Chapter 11 Cases. None of the

fees, costs and expenses payable pursuant to this paragraph shall be subject to separate approval

by this Court (but the Court shall resolve any dispute as to the reasonableness of any such fees,

costs and expenses), and no recipient of any such payment shall be required to file any interim or

final fee application with respect thereto; provided, however, that copies of any such invoices,

redacted as necessary to preserve the attorney-client privilege, shall be provided to counsel to the

Committee and to the Office of the United States Trustee.  Nothing contained herein shall be

deemed to be a waiver by any party in interest of the right to object to the reasonableness of any

fees, costs and charges incurred by the Lenders or the Administrative Agent.

(d)  Under the circumstances and based upon the Lenders' consent or non-

objection, the adequate protection provided herein is reasonable and sufficient to protect the

interests of the Lenders.  Notwithstanding any other provision hereof, the grant of adequate

protection to the Administrative Agent and the Lenders pursuant hereto is without prejudice to

the right of the Administrative Agent to seek modification of the grant of adequate protection

provided hereby so as to provide different or additional adequate protection and without

prejudice to the right of the Debtors or any other party in interest to contest any such

modification.

4.    As used in this Order, "Carve Out" means shall mean the sum of (A) all

fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United

States Trustee under section 1930(a) of title 28 of the United States Code, (B) the costs of

administrative expenses not to exceed $50,000 in the aggregate that are permitted to be incurred

by any Chapter 7 trustee pursuant to any order of this Court following any conversion of any of

the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code; and (C) at any time after

the first Business Day following delivery of a written notice delivered by the Administrative

Agent to the Debtors, the United States Trustee, counsel for the Debtors and counsel for any

statutory committee appointed in the Chapter 11 Cases stating that an Event of Default (as

defined below) has occurred and is continuing and that the Carve Out Cap (as defined below) is

invoked, which notice may only be delivered following the occurrence and during the

continuance of an Event of Default (a "Carve Out Trigger Notice"), to the extent allowed at any

time, whether before or after delivery of a Carve Out Trigger Notice, whether by interim order,

procedural order or otherwise, all unpaid fees, costs and expenses (collectively, the "Professional

Fees") incurred by persons or firms retained by the Debtors pursuant to Section 327, 328 or 363

of the Bankruptcy Code and any official committee of unsecured creditors appointed in the

Chapter 11 Cases pursuant to Section 1103 of the Bankruptcy Code (collectively, the

"Professional Persons"), the payment of all Professional Fees incurred by the Professional

Persons at any time after the first Business Day following delivery of a Carve Out Trigger Notice

in an aggregate amount not exceeding $15,000,000 (the "Carve Out Cap") (plus all unpaid

Professional Fees allowed at any time by the Bankruptcy Court, whether before or after delivery

of a Carve Out Trigger Notice, whether by interim order, procedural order or otherwise, that

were incurred by the Professional Persons on or prior to the first Business Day following the

delivery of the Carve Out Trigger Notice), provided that (x) the Carve Out shall not be available

to pay any such Professional Fees incurred in connection with the initiation or prosecution of any

Avoidance Actions or the initiation or prosecution of any claims, causes of action, adversary

proceedings or other litigation, in all cases to the extent against the Administrative Agent or the

Lenders and (y) the Carve Out shall not be reduced by the payment of Professional Fees incurred

prior to the first Business Day following delivery of a Carve Out Trigger Notice without regard

to when such amounts are allowed by the Bankruptcy Court.  Upon delivery of a Carve Out

Trigger Notice or the commencement of a liquidation, the Debtors are directed to deposit an

amount equal to the unpaid Professional Fees, including the Carve Out Cap, prior to making any

distributions to creditors in a segregated account solely for payment of Professional Fees that are

within the Carve Out. Nothing herein shall be construed as a waiver of the right of the
Administrative Agent or any Lender to object to the allowance of any Professional Fees and
Disbursements.

5.    Notwithstanding the foregoing, in no event shall the Cash Collateral or the
Carve Out be used for the payment or reimbursement of any fees, expenses, costs, or
disbursements of any of the professionals incurred in connection with the assertion or joinder in
any claim, counter-claim, action, proceeding, application, motion, objection, defense, or
contested matter, the purpose of which is to seek any order, judgment, determination, or similar
relief (a) challenging the Prepetition Obligations, invalidating, setting aside, avoiding, or
subordinating in whole or in part the Administrative Agent's liens and security interests granted
pursuant to the Loan Documents or this Order, or asserting any other claims or causes of action
against the Administrative Agent or the Lenders (but the Cash Collateral or the Carve Out may
be used for the investigation in connection therewith, subject to a limitation of $250,000), or (b)
preventing, hindering or delaying, whether directly or indirectly, the Administrative Agent's
enforcement or realization upon any Prepetition Collateral or Postpetition Collateral in
accordance with the terms of this Order.

6.    Except as expressly set forth in this Order, the Adequate Protection Liens
shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtors'
estates under Section 551 of the Bankruptcy Code or (ii) subordinated to or made pari passu with
any other lien under Sections 363 and 364 of the Bankruptcy Code. Subject to the Carve Out
and the terms of a DIP Financing Order, the Adequate Protection Liens shall be prior and senior
to all liens and encumbrances of all other secured creditors in and to such Postpetition Collateral
granted, or arising, after the Petition Date (including, without limitation, liens and security

interests, if any, granted in favor of any federal, state, municipal or other governmental unit,

commission, board or court for any liability of the Debtors).  The Adequate Protection Liens

granted pursuant to this Order shall constitute valid, enforceable and duly perfected security

interests and liens, and the Administrative Agent and the Lenders shall not be required to file or

serve financing statements, notices of lien or similar instruments which otherwise may be

required under federal or state law in any jurisdiction, or take any action, including taking

possession, to validate and perfect such security interests and liens; and the failure by the

Debtors to execute any documentation relating to the Adequate Protection Liens shall in no way

affect the validity, enforceabililty, perfection or priority of such Adequate Protection Liens.  If,

however, the Administrative Agent, in its sole discretion, shall determine to file any such

financing statements, notices of lien or similar instruments, or to otherwise confirm perfection of

such Adequate Protection Liens, the Debtors are directed to cooperate with and assist in such

process, the stay imposed by Section 362(a) of the Bankruptcy Code is hereby lifted to allow the

filing and recording of a certified copy of this Order or any such financing statements, notices of

lien or similar instruments, and all such documents shall be deemed to have been filed or

recorded at the time of and on the date of this Order.

       7.      The automatic stay under Section 362 of the Bankruptcy Code is hereby

vacated and modified to the extent necessary to permit (a) the Debtors and the Administrative

Agent to take all actions necessary to implement this Order, (b) all actions and transfers

contemplated herein, and (c) consistent with the terms of this Order, following the Termination

Date, to permit the Administrative Agent to pursue its rights and remedies as to the Prepetition

Collateral and Postpetition Collateral in accordance with the Loan Documents and applicable

law.

8.    The Debtors' right to use the Cash Collateral pursuant to this Order shall terminate (the date of any such termination, the "Termination Date") on the earliest to occur of (x) entry by this Court of a DIP Financing Order (which shall provide for the continued use of the Cash Collateral on the terms set forth therein), (y) sixty days after the Petition Date, with such date extendable by thirty additional days with the Administrative Agent's consent, such consent not be unreasonably withheld, or (z) five-business days following written notice to the Debtors after the occurrence and continuance of any of the following events ("Events of Default") beyond any applicable grace period:

a.    Failure of the Debtors to make any payment to the Administrative Agent or the Lenders as and when required by this Order or other failure to comply in any material respect with the terms of this Order and such failure shall continue unremedied for more than two business days after notice thereof;

b.    Failure of the Debtors to comply with the Reporting Requirements and such failure shall continue unremedied for more than three business days after notice thereof;

c.    Failure of the Debtors to comply with any other covenant or agreement specified in this Order (other than those described in clauses (a) and (b) above) and such failure shall continue unremedied for more than five business days after notice thereof;

d.    Any of these Chapter 11 Cases shall be dismissed or converted to a Chapter 7 Case; the Ontario Superior Court, Commercial List, shall fail to enter within five business days after the Petition Date an order in the cases of Canadian Debtors under section 18.6 of the Companies' Creditors Arrangement Act recognizing the commencement of these Chapter 11 Cases; or a Chapter 11 Trustee with plenary powers, a responsible officer, or an examiner with enlarged powers relating to the operation of the businesses of the Debtors (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of these Chapter 11 Cases; provided that the appointment by the Court of a trustee or other fiduciary of any of the Debtors' estates for the limited purpose of investigating, commencing or prosecuting Avoidance Actions on behalf of such Debtor's estate shall not constitute a default under this subparagraph;

e.    An order shall be entered reversing, amending, supplementing, staying for a period in excess of three days, vacating or otherwise modifying this Order without the consent of the Administrative Agent;

    f.    A pleading shall be filed by any of the Debtors seeking, or otherwise consenting to, any of the matters set forth in paragraphs (d) or (e) hereof;

    g.    One or more judgments or decrees required to be satisfied as an administrative expense claim shall be entered after the Petition Date against any Debtor Loan Party involving in the aggregate a liability (excluding any amounts paid or covered by insurance as to which the relevant insurance company has not denied coverage) of $10,000,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 45 days from the entry thereof;

    h.    Except in connection with entry of a DIP Financing Order, without the prior written consent of the Administrative Agent, the Debtors at any time during these Chapter 11 Cases grant (or seek authority from the Court to grant) liens in the Prepetition Collateral, the Postpetition Collateral or any portion thereof to any other parties pursuant to Section 364 of the Bankruptcy Code, which liens are senior or on a parity with the liens of the Administrative Agent or the Lenders, unless the terms and conditions of any order granting such liens expressly provide that any unpaid Adequate Protection Obligations are paid to the Lenders concurrently with the entry of any such order; and

    i.    Except on the terms of this Order (other than in connection with a DIP Financing Order), the Debtors at any time: (i) use the Cash Collateral; (ii) use the Postpetition Collateral; or (iii) apply to any court for an order authorizing the use of the Cash Collateral or Postpetition Collateral.

The Debtors shall promptly provide notice to the Administrative Agent (with a copy to counsel for the Committee and the United States Trustee) of the occurrence of any Event of Default.

        9.    Following notice by the Administrative Agent of an Event of Default and prior to a Termination Date, the Debtors or any other party of interest, including the Committee, shall be entitled to seek an emergency hearing to be held within such five (5) business day period regarding, among other things, the continued use of Cash Collateral.  Unless the Court enters an order authorizing the Debtors to continue their use of Cash Collateral at such hearing, the Termination Date shall occur.  Upon Termination Date, (i) the Adequate Protection Obligations shall become immediately due and payable, (ii) the Administrative Agent and each Lender may setoff amounts in any account of the Debtors maintained with the Administrative Agent or each Lender, respectively and (iii) the Administrative Agent and the Lenders may exercise the rights

and remedies available under the Loan Documents, this Order or applicable law, including,

without limitation, foreclosing upon and selling all or a portion of the Prepetition Collateral or

Postpetition Collateral in order to collect the Adequate Protection Obligations.  The automatic

stay under Section 362 of the Bankruptcy Code is hereby deemed modified and vacated to the

extent necessary to permit such actions.  The actions described in clauses (ii) and (iii) above may

be taken without further order of or application to the Court as the Administrative Agent or the

Lenders shall, in their discretion, elect.  The Administrative Agent and the Lenders shall be

entitled to apply the payments or proceeds of the Prepetition Collateral in accordance with the

provisions of the Loan Documents, and in no event shall the Administrative Agent or any of the

Lenders be subject to the equitable doctrine of "marshaling" or any other similar doctrine with

respect to any of the Prepetition Collateral, Postpetition Collateral or otherwise.

Notwithstanding the occurrence of the Termination Date or anything herein, all of the rights,

remedies, benefits and protections provided to the Administrative Agent and the Lenders under

this Order shall survive the Termination Date except to the extent the Termination Date arises

under clause (x) of the definition thereof.  Notwithstanding the foregoing, the Administrative

Agent and the Lenders shall not exercise the rights and remedies described in this paragraph 9

should the Termination Date occur by reason of entry of a DIP Financing Order by this Court.

        10.      Subject to entry of a DIP Financing Order, the provisions of this Order and

any actions taken pursuant hereto shall survive entry of any order which may be entered (a)

confirming any plan of reorganization in these Chapter 11 Cases; (b) converting any of these

Chapter 11 Cases to a Chapter 7 case; or (c) dismissing any of these Chapter 11 Cases.  Subject

to entry of a DIP Financing Order, if an order dismissing these Chapter 11 Cases under Section

1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in

accordance with Sections 105 and 349 of the Bankruptcy Code) that (a) the Adequate Protection

Liens granted pursuant to this Order to the Administrative Agent and the Lenders shall continue

in full force and effect, shall remain binding on all parties in interest notwithstanding such

dismissal until the obligations secured thereby shall have been paid and satisfied in full and (b)

this Court shall retain jurisdiction, notwithstanding such dismissal, for the limited purposes of

enforcing such Adequate Protection Liens.

11.    Subject to entry of a DIP Financing Order, if any or all of the provisions of

this Order are hereafter modified (which shall not occur without the prior written agreement of

the Administrative Agent), vacated, or stayed, such modification, vacation or stay shall not affect

(a) the validity of any obligation, indebtedness or liability incurred by the Debtors to the

Administrative Agent or the Lenders before the effective date of such modification, vacation, or

stay or (b) the validity or enforceability of the Adequate Protection Liens, or any priority or other

protection authorized, created, or confirmed by this Order.  Notwithstanding any such

modification, vacation, or stay, any indebtedness, obligations, or liabilities incurred by the

Debtors to the Administrative Agent or the Lenders before the effective date of such

modification, vacation, or stay shall be governed in all respects by the original provisions of this

Order, and the Administrative Agent and the Lenders shall be entitled to all the rights, remedies,

privileges, and benefits granted herein with respect to all such indebtedness, obligations, or

liabilities.

12.    No approval, agreement or consent requested of the Administrative Agent

by the Debtors pursuant to the terms of this Order or otherwise shall be inferred from any action,

inaction, or acquiescence of the Agent or the Lenders other than from a writing signed by the

Administrative Agent. Nothing herein shall in any way affect the rights of the Administrative Agent or the Lenders as to any non-Debtor entity.

13.     Entry of this Order shall be without prejudice to any and all rights, remedies, claims and causes of action which the Administrative Agent or the Lenders may have against the Debtors or third parties, and without prejudice to the right of the Administrative Agent and the Lenders to seek relief from the automatic stay in effect pursuant to Bankruptcy Code Section 362, or any other relief in these Chapter 11 Cases, and the right of the Debtors or third parties to oppose any such relief. The provisions of this Order shall be binding upon and inure to the benefit of the Administrative Agent, the Lenders, the Debtors, and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in these Chapter 11 Cases as a legal representative of the Debtors or the Debtors' estates.

14.     Pursuant to Sections 105, 361 and 363 of the Bankruptcy Code, the Administrative Agent and the Lenders are hereby found to be entities that have acted in "good faith" in connection with the negotiation and entry of this Order, and each is entitled to the protection provided to such entities under Section 363(m) of the Bankruptcy Code.

15.     Notwithstanding any provision in other "first day" orders entered by this Court authorizing the Debtors to make payments in respect of prepetition obligations, the provisions in this Order conditioning the payment of such amounts or limiting the amount of such payments are controlling.

16.     As a result of the Debtors' review of the Loan Documents and the facts related thereto, the Debtors have made certain agreements and acknowledgments as set forth in paragraphs D and E above and shall have no right to file a complaint pursuant to Bankruptcy Rule 7001 or otherwise, or any other pleading asserting a claim or cause of action arising out of

or related to the Loan Documents or any transactions or course of conduct related thereto.  The

acknowledgments and agreements contained in paragraphs D and E hereof shall be binding upon

the Debtors in all circumstances, and shall be binding upon all other parties in interest, including

without limitation, a Committee, unless (a) a party in interest (including a Committee) has been

granted standing to file and has properly filed an adversary proceeding or contested matter

(subject to the limitations set forth in paragraph 5 hereof) challenging the validity, enforceability

or priority of the Prepetition Obligations or the Administrative Agent's liens on the Prepetition

Collateral in respect thereof, or otherwise asserting any claims or causes of action against the

Administrative Agent or the Lenders on behalf of the Debtors' estates, no later than the date that

is sixty (60) days after the date of the appointment of a Committee, and (b) this Court rules in

favor of the plaintiff in any such timely and properly filed adversary proceeding or contested

matter.  If no such adversary proceeding or contested matter is commenced as of such date, the

Prepetition Obligations shall constitute allowed claims, not subject to defense, counterclaim,

offset of any kind, or subordination and otherwise unavoidable, for all purposes in these Chapter

11 Cases or any subsequent Chapter 7 cases, the Administrative Agent's liens on the Prepetition

Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim,

offset of any kind, subordination and otherwise unavoidable, and the Administrative Agent, the

Lenders, the Prepetition Obligations and the Administrative Agent's liens on the Prepetition

Collateral shall not be subject to any other or further challenge by any party in interest seeking to

exercise the rights of the Debtors' estates, including without limitation, any successor thereto.  If

any such adversary proceeding or contested matter is timely commenced as of such date, the

acknowledgements and agreements contained in paragraphs D and E shall nonetheless remain

binding and preclusive (as provided in this paragraph) except to the extent that such

acknowledgements and agreements were expressly challenged in such adversary proceeding or contested matter.

17.    The automatic stay is hereby modified to authorize Citibank, N.A. ("Citibank") to set off any cash deposits it is specifically holding as collateral for that certain Irrevocable Standby Letter of Credit No. 63663991, dated Jan 30, 2009 and issued by Citibank at the request of the Debtors (the "Citibank LC"), against any amounts paid by Citibank to the beneficiaries of the Citibank LC upon postpetition draw of the Citibank LC, subject to the terms of the Citibank LC; provided, however, that Citibank agrees to return to the Debtors' estates, within three business days of such setoff, the excess of any cash deposits it is holding as collateral for the Citibank LC over the amount of collateral the Debtors are required to provide with respect to the Citibank LC.

18.    The findings of fact and conclusions of law contained herein constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to these proceedings by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law it shall be so deemed and vice versa.

19.    The Debtors shall, on or before [        ], 2009, mail copies of a notice of the entry of this Order, together with a copy of this Order and a copy of the Motion, to the parties having been given notice of the Preliminary Hearing, to any party which has filed prior to such date a request for notices with this Court and to counsel for a Committee.  The notice of entry of this Order shall state that any party in interest objecting to the entry of a DIP Financing Order and/or the use of the Lenders' Cash Collateral pursuant thereto shall file written objections with the United States Bankruptcy Court Clerk for the Southern District of New York no later than 4:00 p.m. on [        ], 2009 and objections shall be served so that the same are received on or

before such date by: (a) Kirkland & Ellis LLP, 601 Lexington Avenue, New York, New York

10022, Attention:  James H.M. Sprayregen, Esq. and Leonard Klingbaum, Esq. and Kirkland &

Ellis LLP, 300 North LaSalle, Chicago, Illinois 60654, Attention:  Marc Kieselstein, Esq. and

Ryan Blaine Bennett, Esq., Attorneys for the Debtors, (b)  Simpson Thacher & Bartlett LLP, 425

Lexington Avenue, New York, New York 10017, Attention:  Kenneth S. Ziman, Esq. and Elisha

D. Graff, Esq., Attorneys for the Administrative Agent and (c) the Office of the United States

Trustee, and a hearing to consider the relief requested in the Motion on a final basis shall be held

on [            ], 2009 at [  ]:00 [ ]m.

Dated: [            ], 2009
       New York, New York


_____

Honorable _____
United States Bankruptcy Judge

## **EXHIBIT D-2**

**Noteholder Plan Support Agreement**

**EXECUTION VERSION**

LEAR CORPORATION
21557 Telegraph Road
Southfield, Michigan 48033

July 6, 2009

To the Holders of Noteholder Claims
Referred to Below

Ladies and Gentlemen:

This letter agreement (the "Agreement") sets forth certain terms and
conditions pursuant to which Lear Corporation ("Lear") and certain of its domestic and
Canadian subsidiaries (together with Lear, collectively the "Debtors") will propose their
jointly filed chapter 11 plan of reorganization (a "Plan") on a consensual basis with the
support of certain of the holders (the "Noteholders") of (i) 8.50% senior notes due 2013,
(ii) 5.75% senior notes due 2014, (iii) 8.75% senior notes due 2016, and/or (iv) zero-
coupon convertible senior notes due 2022 (collectively, the "Notes") issued by Lear.

Capitalized terms not defined herein shall have the meaning ascribed to
such terms in the Restructuring Term Sheet (as defined below).

The parties hereto hereby agree as follows:

1.    Proposed Plan of Reorganization

Each of the Debtors proposes to commence voluntary, pre-arranged cases
(collectively, the "Chapter 11 Cases") under chapter 11 of title 11 of the United States
Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern
District of New York (the "Bankruptcy Court") to be jointly administered. Certain
Canadian subsidiary Debtors (the "Canadian Debtors") propose to commence parallel
cases under section 18.6 of the Companies' Creditors Arrangement Act (the "CCAA
Cases") in the Ontario Superior Courts Commercial List (the "Canadian Court"), in
which such Canadian Debtors will seek relief consistent with the relief sought by the
Debtors in the Chapter 11 Cases. As part of the Chapter 11 Cases, the Debtors intend to
file a disclosure statement and related Plan, which will provide for, among other things,
certain distributions on account of the claims of the Noteholders under the Notes
(together with all related claims, rights and causes of action arising out of or in
connection with or otherwise relating to such Notes, the "Noteholder Claims").

2.    Representations and Warranties of the Participating Noteholders

Each Noteholder identified as a holder of Noteholder Claims on the
signature pages hereto (such Noteholders, the "Participating Noteholders") (for the
avoidance of doubt if the Noteholder is specified on the relevant signature as a particular
group or business within an entity, "Participating Noteholder" shall mean such group or

business and shall not mean the entity or its affiliates, or any other desk or business thereof, or any third party funds advised thereby) represents and warrants to the Debtors that, as of the date hereof:

(a)    Such Participating Noteholder (i) either (A) is the beneficial owner of the principal amount of Notes set forth below under its signature hereto, or (B) has investment or voting discretion (other than ordinary course pledges and/or swaps) with respect to the principal amount of Notes set forth below under its signature and has the power and authority to bind the beneficial owner(s) of such Notes and Noteholder Claims to the terms of this Agreement and (ii) has full power and authority to act on behalf of, vote and consent to matters concerning such Notes and Noteholder Claims and to dispose of, exchange, assign and transfer such Notes and Noteholder Claims.

(b)    Such Participating Noteholder has made no prior assignment, sale, participation, grant, conveyance, or other transfer of, and has not entered into any other agreement to assign, sell, participate, grant, convey or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any Notes or Noteholder Claims that are subject to this Agreement (other than ordinary course pledges and/or swaps) that are inconsistent with the representations and warranties of such Participating Noteholder herein or would render such Participating Noteholder otherwise unable to comply with this Agreement and perform its obligations hereunder.

(c)    Such Participating Noteholder (i) has such knowledge and experience in financial and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision, and has conducted an independent review and analysis of the business and affairs of the Debtors that it considers sufficient and reasonable for purposes of entering into this Agreement and (ii) is an "accredited investor" (as defined by Rule 501 of the Securities Act of 1933, as amended).

For the purposes of this Agreement, "Participating Noteholders" shall not include a holder of Notes or Noteholder Claims signatory hereto in its capacity or to the extent of its holdings as a public-side broker, dealer or market maker of Notes or Noteholder Claims or any other claim against or security in the Debtors.

3.    Support for a Qualified Plan

Subject to the terms and conditions hereof and for so long this Agreement has not been terminated as provided herein, each Participating Noteholder shall, with respect to the Noteholder Claims that it beneficially owns or has investment or voting discretion with respect to at such time, (a) (i) vote its Noteholder Claims to accept any Plan proposed by the Debtors incorporating the terms and conditions set forth on the term sheet annexed hereto as Exhibit 1, which term sheet is expressly incorporated by reference herein and made a part of this Agreement as if fully set forth herein (as such term sheet may be modified in accordance with Section 10 hereof, the "Restructuring

2

Term Sheet"), materially consistent in all respects with this Agreement and the
Restructuring Term Sheet, and in form and substance reasonably satisfactory to the
Debtors and the Requisite Participating Noteholders (as defined below) (a "Qualified
Plan") by delivering its duly executed and completed ballot accepting such Qualified Plan
on a timely basis following commencement of the solicitation of acceptances of such
Qualified Plan in accordance with sections 1125 and 1126 of the Bankruptcy Code and
(ii) not change or withdraw such vote (or cause or direct such vote to be changed or
withdrawn) (subject to the provisions of Section 6(b) hereof); (b) support the
confirmation and consummation of a Qualified Plan and the transactions contemplated
thereby, (c) not object to, or vote any of its Noteholder Claims to reject, a Qualified Plan
or otherwise take any action or commence any proceeding to oppose or to seek any
modification of a Qualified Plan, the related disclosure statement, in form and substance
reasonably satisfactory to the Debtors and the Requisite Participating Noteholders and
materially consistent in all respects with this Agreement and the Restructuring Term
Sheet (the "Disclosure Statement"), or any other reorganization documents filed by any
of the Debtors in connection with the Chapter 11 Cases and the confirmation of a
Qualified Plan that, in each case, are materially consistent in all respects with this
Agreement and the Qualified Plan, and (d) not directly or indirectly seek, solicit, support,
encourage, vote its Noteholder Claims for, or consent to, encourage, or participate in any
negotiations regarding, (i) any plan of reorganization, proposal, offer, dissolution,
winding up, liquidation, reorganization, merger, consolidation, business combination,
joint venture, partnership, sale of assets or restructuring for any of the Debtors (each, an
"Alternative Proposal") other than a Qualified Plan or (ii) any other action that is
inconsistent with, or that would delay or obstruct the proposal, solicitation, confirmation,
or consummation of, a Qualified Plan.

Provided, however, unless expressly limited herein, nothing contained
herein shall limit: (i) the ability of a Participating Noteholder to consult with other
Participating Noteholders or the Debtors; (ii) the rights of a Participating Noteholder
under any applicable bankruptcy, insolvency, foreclosure or similar proceeding,
including, without limitation, appearing as a party in interest in any matter to be
adjudicated to appear and be heard, concerning any matter arising in the Chapter 11
Cases or the CCAA Cases so long as such consultation or appearance is not inconsistent
with the Participating Noteholder's obligations hereunder and the terms of the Qualified
Plan; (iii) the ability of a Participating Noteholder to sell or enter into any transactions in
connection with the Notes or any other claims against or interests in the Debtors, subject
to Section 4 hereof; or (iv) the rights of any Participating Noteholder under the indentures
governing the Notes or constitute a waiver or amendment of any provision of the
indentures governing the Notes.

The Noteholders party to this Agreement shall support the DIP Facility (as
defined in the Restructuring Term Sheet).

3

4.    <u>Transfer of Noteholder Claims</u>

Each Participating Noteholder agrees that so long as this Agreement has not been terminated in accordance with its terms it shall not directly or indirectly sell, pledge, hypothecate or otherwise transfer or dispose of, or grant, issue or sell any option, right to acquire, voting, participation or other interest in ("<u>Transfer</u>") any Noteholder Claims, except to a party that (i) is a Participating Noteholder or (ii) agrees in writing to be subject to the terms and conditions of this Agreement as a "Participating Noteholder", by executing the Joinder attached hereto as Exhibit A by three business days following such transfer, a copy of which shall be provided to both Stroock & Stroock & Lavan LLP as counsel to the Ad Hoc Group ("<u>Stroock</u>", and together with Moelis & Company, as financial advisors to the Ad Hoc Group and Canadian counsel to the Ad Hoc Group, the "<u>Ad Hoc Group Advisors</u>") and Kirkland & Ellis LLP as counsel to the Debtors. Any Transfer of any Noteholder Claim that does not comply with the foregoing shall be deemed void *ab initio*. This Agreement shall in no way be construed to preclude any Noteholder from acquiring additional Noteholder Claims or any other interests in any Debtors; provided, however, that any such additional Noteholder Claims or other interests in such Debtor shall, upon acquisition, automatically be deemed to be subject to all the terms of this Agreement; except to the extent that such additional Notes and Noteholder Claims are acquired by a Qualified Marketmaker in accordance with the following proviso.

Provided, however, that the foregoing shall not limit transactions by any Qualified Marketmaker (as defined below) in respect of Notes and Noteholder Claims not otherwise subject to this Agreement (as identified on the signature pages hereto or acquired pursuant to the last sentence of the immediately preceding paragraph and not subject to the exception in such sentence, which such exception does not in any way apply to Notes or Noteholder Claims transferred or delivered in any manner to or from a Qualified Marketmaker that were at the time of transfer subject to this Agreement) (i) conducted in the ordinary course of its broker/dealer, market maker or flow trading business, and (ii) not entered into with a view towards establishing and holding directionally biased positions (including without limitation engaging in arbitrage positions with respect to Notes) for the proprietary account of such Qualified Marketmaker, whether in a proprietary trading unit or otherwise. For the avoidance of doubt, the accumulation of an inventory of Notes by a Qualified Market Maker in the ordinary course of its broker/dealer, market maker or flow trading business shall not be deemed to be establishing or holding a directionally biased position for purposes of clause (ii) of the immediately preceding sentence. Notwithstanding anything to the contrary in this paragraph or otherwise, to the extent any Notes or Noteholder Claims that are subject to this Agreement (as identified on the signature pages hereto or acquired pursuant to the last sentence of the immediately preceding paragraph and not subject to the exception in such sentence, which such exception does not in any way apply to Notes or Noteholder Claims transferred or delivered in any manner to or from a Qualified Marketmaker that were at the time of transfer subject to this Agreement) are sold,

4

purchased or otherwise transferred to or from any Qualified Marketmaker, any such Noteholder Claim shall at all times and in all respects remain subject to this Agreement.

Notwithstanding anything to the contrary in the immediately preceding two paragraphs, the definition of Participating Noteholders herein, or otherwise, the full amount of the Noteholders Claims set forth on each Noteholder's signature page to this Agreement is subject at all times and in all respects to the provisions of this Agreement, and each such amount shall not be reduced in any respect by invocation or application of the preceding two paragraphs of this Agreement, the definition of Participating Noteholders herein, or any other provisions of this Agreement or otherwise.

"Qualified Marketmaker" means an entity that (i) holds itself out to the public as standing ready in the ordinary course of its business to purchase from and sell Notes to or on behalf of customers (or to enter with customers into long and short positions in derivative contracts that reference Notes), in its capacity as a dealer or market maker in such Notes, (ii) in fact regularly makes a two-way market in such Notes or regularly engages in flow trading with or on behalf of customers, and (iii) consistently has filed its U.S. federal income tax returns on the basis that such business constituted a securities dealer business within the scope of section 475(a) of the Internal Revenue Code of 1986, as amended. An entity that is under common control with or controlled by a Qualified Marketmaker shall be considered a Qualified Marketmaker to the extent it satisfies conditions (i) and (ii) of the preceding sentence.

5.    The Debtors' Covenants

As long as a Termination Event (as defined below) has not occurred, or has occurred but has been duly waived in accordance with the terms hereof, the Debtors shall, subject to Section 23 herein, use their reasonable best efforts to:

(a)    file the Disclosure Statement and prosecute its approval by the Bankruptcy Court within the time frame set forth herein;

(b)    obtain from the Bankruptcy Court an order confirming a Qualified Plan (the "Confirmation Order") within the time frame set forth herein, which Confirmation Order shall be in form and substance reasonably satisfactory to the Requisite Participating Noteholders and the Debtors and materially consistent in all respects with this Agreement and the Restructuring Term Sheet;

(c)    effectuate and consummate a Qualified Plan within the timeframe set forth herein; and

(d)    continue payment of the fees and expenses of the Ad Hoc Group Advisors upon the terms of the engagement letters executed by the Company and each professional, subject to modification as reasonably acceptable to Stroock, Moelis and the Ad Hoc Steering Committee and pursuant to applicable bankruptcy law, including but not

5

limited to supporting an application by the Ad Hoc Group for reimbursement of fees and expenses of the Ad Hoc Group Advisors under section 503(b) of the Bankruptcy Code and payment of such fees and expenses pursuant to the Qualified Plan under section 1129(a)(4) of the Bankruptcy Code.

6.    <u>Termination of Obligations</u>

(a)    This Agreement shall terminate and all obligations of the parties hereto shall immediately terminate and be of no further force and effect as follows:

(i)    by the mutual written consent of Lear and Participating Noteholders holding more than 66 2/3% of the Noteholder Claims bound under this Agreement held by Participating Noteholders who are not then in breach of their obligations under this Agreement (the "<u>Requisite Participating Noteholders</u>");

(ii)    upon two (2) business days prior written notice of termination delivered to Lear by the Requisite Participating Noteholders following the occurrence of any of the events listed below (each, a "<u>Termination Event</u>"), unless waived in accordance with <u>Section 10</u> hereof:

(A) the Chapter 11 Cases shall not have been filed by July 9, 2009 (or such later date as may be agreed by Lear and the Requisite Participating Noteholders);

(B) a Qualified Plan and the Disclosure Statement shall not have been filed within 60 days after the filing date of the Chapter 11 Cases (the "<u>Petition Date</u>") (or such later date as may be agreed by Lear and the Requisite Participating Noteholders);

(C) the Bankruptcy Court shall not have entered an order, in form and substance reasonably satisfactory to the Requisite Participating Noteholders, approving the adequacy of the Disclosure Statement within 150 days after the Petition Date (or such later date as may be agreed by Lear and the Requisite Participating Noteholders);

(D) the Bankruptcy Court shall not have entered the Confirmation Order within 270 days after the Petition Date (or such later date as may be agreed by Lear and the Requisite Participating Noteholders);

(E) a Qualified Plan shall not have been consummated within 300 days after the Petition Date (or such later date as may be agreed by Lear and the Requisite Participating Noteholders);

(F) the Debtors shall have materially breached their covenants, representations, warranties or obligations under this Agreement;

6

(G) the Debtors (1) withdraw or revoke the Qualified Plan or publicly announce their intention not to pursue the Qualified Plan or (2) propose, accept or file a motion with the Bankruptcy Court seeking approval of an Alternative Proposal;

(H) (1) an examiner with expanded powers or a trustee shall have been appointed in any of the Chapter 11 Cases or (2) any of the Chapter 11 Cases shall have been converted to cases under Chapter 7;

(I) the Chapter 11 Case of any Debtor that is an obligor or guarantor under any indenture governing the Notes is involuntarily dismissed;

(J) the CCAA Cases shall have been converted to Canadian bankruptcy proceedings or the CCAA Cases shall have been involuntarily dismissed by the Canadian Court;

(K) the Qualified Plan is modified or replaced such that it (or any such replacement) at any time is not in whole or in part consistent in any material respect with the Restructuring Term Sheet;

(L) the termination of, or occurrence of an event of default (as defined in the applicable agreement) under, any order or agreement permitting the use of cash collateral or to provide post-petition debtor-in-possession financing or exit financing to the Debtors which shall not have been cured within any applicable grace periods or waived pursuant to the terms of the agreement governing such facility; or

(M)      there shall have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); or

(N) a "Termination Event" shall have occurred under the Lender Plan Support Agreement (as defined in the Restructuring Term Sheet).

(iii)      upon delivery of written notice of termination to the Participating Noteholders by Lear following any material breach of any of the Participating Noteholders' representations, warranties, covenants, obligations or agreements set forth in this Agreement.

(b)      Upon termination of this Agreement in accordance with the terms herein, this Agreement shall forthwith become void and of no further force or effect, each party hereto shall be released from its commitments, undertakings and agreements under or related to this Agreement, and there shall be no liability or obligation on the part of any party hereto; provided, however, that in no event shall any such termination relieve a party hereto from liability from its breach or non-performance of its obligations

7

hereunder prior to the date of such termination.  Upon the occurrence of any termination of this Agreement, any and all votes delivered by a Participating Noteholder prior to such termination shall be deemed, for all purposes, to be null and void from the first instance and shall not be considered or otherwise used in any manner by the Debtors.  If this Agreement has been terminated at a time when permission of the Bankruptcy Court shall be required for the Participating Noteholder to change or withdraw (or cause to change or withdraw) its vote to accept the Plan, the Debtors shall not oppose any attempt by the Participating Noteholder to change or withdraw (or cause to change or withdraw) such vote at such time unless the Debtors dispute the effectiveness of termination of this Agreement.  The Participating Noteholders shall have no liability to the Debtors or to each other in respect of any termination of this Agreement following the occurrence of a Termination Event.

7.    Good Faith Cooperation; Further Assurances; Acknowledgment

The parties hereto shall cooperate and negotiate with each other in good faith and shall coordinate their activities (to the extent practicable and subject to the terms hereof) in respect of (a) all material matters relating to their rights in respect of the Debtors or otherwise in connection with their relationship with the Debtors, (b) all material matters concerning the implementation of the Qualified Plan, including the definitive documents implementing and achieving the Qualified Plan (including the order of the Bankruptcy Court order of the Bankruptcy Court confirming the Qualified Plan, the order of the Canadian Court recognizing the order confirming the Qualified Plan and other related documents, each of which are more specifically described in the Restructuring Term Sheet (the "Definitive Documents")) and (c) the pursuit and support of the restructuring transaction contemplated herein.  Furthermore, subject to the terms hereof, each of the parties shall take such action as may be reasonably necessary, in their discretion, to carry out the purposes and intent of this Agreement, including making and filing any required regulatory filings.  The Company agrees to provide drafts of all Definitive Documents to the Ad Hoc Group Advisors and shall afford them a reasonable opportunity to comment on such documents and disclosures.  The consent or approval of the Requisite Participating Noteholders to the Definitive Documents, or any other documents provided for under this Agreement, may be communicated to the Debtors by Stroock.

8.    Specific Performance

It is understood and agreed by the parties that money damages would not be a sufficient remedy for any breach of this Agreement by any party and each non-breaching party shall be entitled to seek specific performance and injunctive or other equitable relief, including attorneys fees and costs, as a remedy of any such breach, and each party agrees to waive any requirement for the securing or posting of a bond in connection with such remedy, in addition to any other remedy to which such non-breaching party may be entitled, at law or in equity.

8

9.  Prior Negotiations

This Agreement supersedes all prior negotiations, and documents reflecting such prior negotiations, between and among the Debtors and the Noteholders (and their respective advisors), with respect to the subject matter hereof.

10.  Amendments

No amendment, modification, waiver or other supplement of the terms of this Agreement or the Restructuring Term Sheet shall be valid unless such amendment, modification, waiver or other supplement is in writing and has been signed by the Debtors and the Requisite Participating Noteholders, provided, however, (a) the written consent of each Participating Noteholder shall be required for any amendment, modification, waiver or other supplement of this Section 10 or the definition of Requisite Participating Noteholders as used in this Agreement, and (b) the written consent of Participating Noteholders holding at least 66 2/3% of the aggregate Noteholder Claims or, if the Participating Noteholders hold in the aggregate less than such percentage of the aggregate Noteholder Claims, then the written consent of each Participating Noteholder, shall be required for any amendment, modification, waiver or other supplement of this Agreement that effects a material change to the treatment of the Class 5A – Other Unsecured Claims (as defined in the Restructuring Term Sheet) from that reflected in the Restructuring Term Sheet as of the date hereof.

For the purposes hereof, immaterial changes to the Restructuring Term Sheet shall not constitute a modification or amendment thereof or of this Agreement and may be made by the Debtors and the Ad Hoc Group Advisors.

11.  Independent Analysis

Each Participating Noteholder hereby confirms that it has made its own decision to execute this Agreement based upon its own independent assessment of documents and information available to it, as it deemed appropriate.

12.  Governing Law

This Agreement and all matters arising out of or related to this Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York without regard to conflicts of laws (other than Section 5-1401 of the General Obligations Laws of the State of New York). By its execution and delivery of this Agreement, each of the parties hereto hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may be brought in either a state or federal court of competent jurisdiction in the State of New York. By execution and delivery of this Agreement, each of the parties hereto hereby irrevocably accepts and

9

submits itself to the exclusive jurisdiction of each such court, generally and
unconditionally, with respect to any such action, suit or proceeding. Notwithstanding the
foregoing consent to jurisdiction in either a state or federal court of competent
jurisdiction in the State of New York, upon the commencement of the Chapter 11 Cases,
each of the parties hereto hereby agrees that, if the petitions have been filed and the
Chapter 11 Cases are pending, the Bankruptcy Court shall have exclusive jurisdiction of
all matters arising out of or in connection with this Agreement.

13.    Effective Date

This Agreement shall become effective when counterparts hereof have
been duly executed and delivered by the Debtors and Participating Noteholders holding
more than 50% of all Noteholder Claims (the "Effective Date"); provided, however, that
signature pages executed by Participating Noteholders shall be delivered to (a) other
Participating Noteholders in a redacted form that removes such Participating
Noteholders' holdings of the Notes and (b) the Debtors and advisors to the Participating
Noteholders in an unredacted form; provided, further, that if as of the commencement of
the Chapter 11 Cases, the Debtors have not received (a) signature pages to this
Agreement from Noteholders holding more than 50% of the aggregate amount of
Noteholder Claims and (b) signatures to the Lender Plan Support Agreement from
Prepetition Credit Agreement Lenders (as defined in the Restructuring Term Sheet)
holding more than 50% of the aggregate amount of the claims under the Prepetition
Credit Agreement (as defined in the Restructuring Term Sheet), this Agreement shall
become null and void.

Upon the Effective Date, the Restructuring Term Sheet shall be deemed
effective for the purposes of this Agreement and thereafter the terms and conditions
therein may only be amended, modified, waived or otherwise supplemented as set forth
in Section 10 above.

14.    Third-Party Beneficiary

This Agreement is intended for the benefit of the parties hereto and no
other person shall have any rights hereunder.

15.    Counterparts

This Agreement may be executed in several counterparts, each of which
shall be deemed to be an original, and all of which together shall be deemed to be one
and the same agreement. Execution copies of this agreement may be delivered by
facsimile or otherwise, which shall be deemed to be an original for the purposes of this
paragraph.

10

16.   Headings

The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement.

17.   Acknowledgment

This Agreement is not and shall not be deemed to be a solicitation of consents to the Plan. The acceptance of the Noteholders will not be solicited until the Noteholders have received the Disclosure Statement and related ballot, as approved by the Bankruptcy Court.

18.   Settlement Discussions

This Agreement and the Restructuring Term Sheet are part of a proposed settlement of matters that could otherwise be the subject of litigation amount the parties hereto. Nothing herein shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, this Agreement and all negotiations relating thereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

19.   No Waiver of Participation and Preservation of Rights

Except as provided in this Agreement, nothing herein is intended to, does or shall be deemed in any manner to waive, limit, impair or restrict the ability of each of the Noteholders to protect and preserve its rights, remedies and interests, including, but not limited to, its claims against any of the Debtors, any liens or security interests it may have in any assets of any of the Debtors, or its full participation in the Chapter 11 Cases. Without limiting the foregoing sentence in any way, if this Agreement is terminated in accordance with its terms for any reason, the parties hereto each fully reserve any and all of their respective rights, remedies and interests, subject to Section 6(b) in the case of any claim for breach of Agreement arising prior to termination.

20.   Successors and Assigns; Severability; Several Obligations.

This Agreement is intended to bind and inure to the benefit of the parties and their respective successors, assigns, heirs, executors, administrators and representatives. The invalidity or unenforceability at any time of any provision hereof shall not affect or diminish in any way the continuing validity and enforceability of the remaining provisions hereof. The agreements, representations and obligations of the Participating Noteholders under this Agreement are, in all respects, several and not joint.

21.   Relationship Among Parties.

It is understood and agreed that no Participating Noteholder has any duty of trust or confidence in any form with any other Participating Noteholder, and, except as

11

provided in this Agreement, there are no commitments among or between them.  In this regard, it is understood and agreed that any Participating Noteholder may trade in the Notes or other debt or equity securities of the Debtors without the consent of the Debtors or any other Participating Noteholder, subject to applicable securities laws and the terms of this Agreement; provided further that no Participating Noteholder shall have any responsibility for any such trading by any other entity by virtue of this Agreement.  No prior history, pattern or practice of sharing confidences among or between the Participating Noteholders shall in any way affect or negate this understanding and agreement.

22.    Disclosure; Publicity.

(a) Not later than two business days after commencement of the Chapter 11 Cases, subject to the provisions set forth in Section 22(b) hereof, the Debtors shall either file with the Securities and Exchange Commission a Report on Form 8-K or disseminate a press release disclosing the existence of this Agreement and the terms hereof (including the schedules and exhibits hereto), with such redactions as may be requested by any Participating Noteholder's counsel solely with respect to maintaining the confidentiality of the items identified in Section 22(b) hereof, except as otherwise required by law.  In the event that the Debtors fail, in the reasonable judgment of a Participating Noteholder, to make the foregoing disclosures in compliance with the terms specified herein, any such Participating Noteholder may publicly disclose the foregoing, including, without limitation, this Agreement and all of its exhibits and schedules (subject to the redactions called for by Section 13 hereof), and the Company hereby waives any claims against the Consenting Holders arising as a result of such disclosure by a Consenting Holder; provided that such disclosure fully complies with this Agreement and any other applicable agreement among the parties.

(b) The Debtors will submit drafts to the Ad Hoc Group Advisors of any press releases and public documents that constitute disclosure of the existence or terms of this Agreement or any amendment to the terms of this Agreement at least one (1) business day prior to making any such disclosure, and shall afford them a reasonable opportunity to comment on such documents and disclosures.  Except as required by law or otherwise permitted under the terms of any other agreement between the Debtors and any Participating Noteholder, no party or its advisors shall (i) use the name of any Participating Noteholder in any public manner or (ii) disclose to any person (including, for the avoidance of doubt, any other Participating Noteholder), other than advisors to the Debtors, the principal amount or percentage of any Notes or any other securities of the Debtors held by any Participating Noteholder, in each case, without such Participating Noteholder's prior written consent; provided, however, that (i) if such disclosure is required by law or regulation, the disclosing party shall use reasonable best efforts to afford the relevant Participating Noteholder a reasonable opportunity to review and comment in advance of such disclosure and shall take all reasonable measures to limit such disclosure and (ii) the foregoing shall not prohibit the disclosure of the aggregate

12

percentage or aggregate principal amount of Notes held by all the Participating Noteholders collectively.

23.    Fiduciary Duties.

Notwithstanding anything to the contrary herein, nothing in this Agreement shall require (a) the Debtors or any directors or officers of the Debtors (in such person's capacity as a director or officer of the Debtors) to take any action, or to refrain from taking any action, to the extent required to comply with its or their fiduciary obligations under applicable law, or (b) any Participating Noteholder or representative of a Participating Noteholder that is a member of a statutory committee established in the Chapter 11 Cases to take any action, or to refrain from taking any action, in such person's capacity as a statutory committee member to the extent required to comply with fiduciary obligations applicable under the Bankruptcy Code; provided however, that nothing in this Agreement shall be construed as requiring any Participating Noteholder to serve on any statutory committee in the Chapter 11 Case.  Nothing herein will limit or affect, or give rise to any liability, to the extent required for the discharge of the fiduciary obligations described in this Section 23.

13

NY 72178171v7

IN WITNESS WHEREOF, the parties hereto have caused this Agreement
to be executed and delivered by their respective duly authorized officers, solely in their
respective capacity as officers of the undersigned and not in any other capacity, as of the
date first set forth above.

**LEAR CORPORATION** (on behalf of
itself and all other Debtors)

By: _____

Name: Matthew Simoncini

Title: SVP & CFO

AGREED BY EACH OF THE FOLLOWING
NOTEHOLDERS

[CONSENTING HOLDER]

By: _DAN·EL ALLEN_____

Name: _____

Title: _Senior Portfolio Manager_

Notice Address:

_C/o Anchorage Advisors, LLC_
_610 Broadway, 6th FL_
_New York, NY 10012_

Fax: _212-432-4601_

Attention: _General Counsel_

[Signature Pages to Lock-Up Agreement]

**GOLDMAN, SACHS & CO.**
**solely for its New York High Yield Distressed Investing Desk**


By: _____

Name: _Joshu Slatky_____

Title: _Managing Director_____


Notice Address:

_____

_____

_____

Fax: _____

Attention: _____


[Signature Pages to Lock-Up Agreement]

**AVENUE INVESTMENTS, LP**

By: _____

Name: _Sonia Gardner_____

Title: _President & Managing Partner___

Notice Address:

535 Madison Avenue, 14th Fl.

New York, NY 10022

_____

Fax: _212-878-3565_____

Attention: ___Michael Bayles_____

[Signature Pages to Lock-Up Agreement]

**AVENUE – CDP GLOBAL OPPORTUNITIES FUND, L.P., (US)**

By: _____

Name: ____Sonia Gardner_____

Title: ___President & Managing Partner___

Notice Address:

535 Madison Avenue, 14th Fl.

New York, NY 10022

_____

Fax:   212-878-3565

Attention:      Michael Bayles

[Signature Pages to Lock-Up Agreement]

AVENUE SPECIAL SITUATIONS FUND IV, L.P.

By:

Name:    Sonia Gardner

Title:    President & Managing Partner

Notice Address:

535 Madison Avenue, 14th Fl.

New York, NY 10022

Fax:    212-878-3565

Attention:    Michael Bayles

[Signature Pages to Lock-Up Agreement]

**AVENUE SS FUND V, L.P. (W/O REM CAP)**

By: _____

Name: _Sonia Gardner_

Title: _President & Managing Partner_

Notice Address:

535 Madison Avenue, 14th Fl.

New York, NY 10022

_____

Fax:   212-878-3565

Attention: ____Michael Bayles

[Signature Pages to Lock-Up Agreement]

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be executed as of the date first written above.

**BARCLAYS BANK PLC**

**For and on behalf of the Special Situations Group**

By: _Roderick Bryce_

Name: Roderick Bryce

Title:   Vice President

Notice Address:

Barclays Bank PLC

1620 26th Street, Suite 2000N

Santa Monica, CA 90404

Fax: 310 828 5747

Attention: Eitan Melamed

**BARCLAYS CAPITAL INC.**

**For and on behalf of the Credit Trading Group**

By: _____

Name: <u>Rene Canezin</u>

Title: <u>Managing Director</u>

<u>Notice Address:</u>

<u>Barclays Capital Inc.</u>

<u>745 Seventh Avenue</u>

<u>New York, NY  10019</u>

Fax: <u>212-520-9348</u>

Attention: <u>Sarah Thompson</u>
       <u>Timothy Bass</u>

[Signature Pages to Lock-Up Agreement]

**BGF US Dollar High Yield Bond Fund**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Celfin Capital S.A. Adm. General de Fondos para Ultra Fondo de Inversion**

By:  _____

Name:  AnnMarie Smith

Title:  Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**BAV RBI Renten US HY I**

By: _____

Name: AnnMarie Smith

Title:    Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

RB-UI-FONDS-HYBO

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**PPL Services Corporation – High Yield Portfolio**

By: _____

Name: Ann Marie Smith

Title: Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**PNC Pension High Yield Portolio**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Oregon Public Employees Retirement System Portfolio**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**NTCA High Yield Portfolio**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Nebraska Investment Council Defined Benefit Pension Plans Account**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**NEXCOM High Yield**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**Missouri State Employees' Retirement System**

By: _____

Name: AnnMarie Smith

Title: Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BGF Global High Yield Bond Fund**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**MET Investors Series Trust - BlackRock High Yield Portfolio**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Lockheed Martin High Yield Portfolio**

By: _____

Name:  AnnMarie Smith

Title:   Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**LGT Multi Manager Bond High Yield**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Iowa Public Employees' Retirement System**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

BlackRock Corporate High Yield Fund V, Inc.

By: _____

Name: AnnMarie Smith

Title:    Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock High Income Shares**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory

<u>Notice Address</u>:

<u>BlackRock</u>

<u>40 East 52nd Street</u>

<u>New York, NY  10022</u>

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Global Investment Series: Income Strategies Portfolio**

By:

Name: AnnMarie Smith

Title:    Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Employees' Retirement Fund of the City of Dallas**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**BlackRock Diversified Income Strategies Fund, Inc.**

By: _____

Name:   AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

BlackRock Debt Strategies Fund, Inc.

By: _____

Name:  AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**DIRECTORS GUILD OF AMERICA-PRODUCER SUPPLEMENTAL PENSION PLAN**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

<u>Notice Address:</u>

<u>BlackRock</u>

<u>40 East 52nd Street</u>

<u>New York, NY  10022</u>

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**DIRECTORS GUILD OF AMERICA-PRODUCER BASIC PENSION PLAN**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Corporate High Yield Fund III, Inc.**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Corporate High Yield Fund, Inc.**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**Coutts US Dollar High Yield Bond Programme**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**California State Teachers' Retirement System**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Blue Shield of California Group**

By: _____

Name: Ann Marie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY 10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Asset Allocation Portfolio (Fixed Income)**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock High Yield Bond Portfolio**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock High Income Fund**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Income Opportunity Trust**

By: _____

Name:  AnnMarie Smith

Title:    Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Limited Duration Income Trust**

By: _____

Name:  AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Floating Rate Income Trust**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

BlackRock Strategic Bond Trust

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Core Bond Trust**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock High Yield Trust**

By: _____

Name:  AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Managed Account Series: High Income Portfolio**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Arkansas Teacher Retirement System Core PLUS Portfolio**

By: _____

Name: AnnMarie Smith

Title: Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY 10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

BlackRock Senior High Income Fund, Inc.

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**Tempest Reinsurance Company Limited-High Yield**

By:  _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**INA Pool High Yield**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**ACE Bermuda Insurance Ltd. (ACE Bermuda)-High Yield**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**ACE American Insurance Company - High Yield**

By: _____

Name: AnnMarie Smith

Title: Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY 10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock Corporate High Yield Fund VI, Inc.**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**BlackRock High Income V.I. Fund of BlackRock Variable Series Funds, Inc.**

By: _____

Name:  AnnMarie Smith

Title:  Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

**R3 Capital Partners Master, L.P.**

By: _____

Name: AnnMarie Smith

Title:  Authorized Signatory


Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor


[Signature Pages to Lock-Up Agreement]

**BlackRock High Income Portfolio of BlackRock Series Fund, Inc.**

By: _____

Name: AnnMarie Smith

Title:   Authorized Signatory

Notice Address:

BlackRock

40 East 52nd Street

New York, NY  10022

email: brian.woo@blackrock.com

Attention: Brian Woo 4th Floor

[Signature Pages to Lock-Up Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

LEAR CORPORATION

By:_____

Name:

Title:

- ACE American Insurance Company - High Yield
- ACE Bermuda Insurance Ltd. (ACE Bermuda)- High Yield
- INA Pool High Yield
- Tempest Reinsurance Company Limited-High Yield
- BlackRock Senior High Income Fund, Inc.
- Arkansas Teacher Retirement System Core PLUS Portfolio
- Managed Account Series: High Income Portfolio
- BlackRock Floating Rate Income Trust
- BlackRock Strategic Bond Trust
- BlackRock Core Bond Trust
- BlackRock High Yield Trust
- BlackRock Limited Duration Income Trust
- BlackRock Income Opportunity Trust
- BlackRock High Income Fund
- BlackRock High Yield Bond Portfolio
- BlackRock Asset Allocation Portfolio (Fixed Income)
- Blue Shield of California Group
- BlackRock High Income Portfolio of BlackRock Series Fund, Inc.

- BlackRock High Income V.I. Fund of BlackRock Variable Series Funds, Inc.

- California State Teachers' Retirement System
- Coutts US Dollar High Yield Bond Programme
- BlackRock Corporate High Yield Fund, Inc.
- BlackRock Corporate High Yield Fund III, Inc.
- DIRECTORS GUILD OF AMERICA-PRODUCER BASIC PENSION PLAN
- DIRECTORS GUILD OF AMERICA-PRODUCER SUPPLEMENTAL PENSION PLAN
- BlackRock Debt Strategies Fund, Inc.
- BlackRock Diversified Income Strategies Fund, Inc.
- BGF Global High Yield Bond Fund
- Employees' Retirement Fund of the City of Dallas
- BlackRock Global Investment Series: Income Strategies Portfolio

- BlackRock High Income Shares
- BlackRock Corporate High Yield Fund VI, Inc.
- BlackRock Corporate High Yield Fund V, Inc.
- Iowa Public Employees' Retirement System

- LGT Multi Manager Bond High Yield
- Lockheed Martin High Yield Portfolio
- R3 Capital Partners Master, L.P.
- MET Investors Series Trust - BlackRock High Yield Portfolio

- Missouri State Employees' Retirement System

- NEXCOM High Yield
- Nebraska Investment Council Defined Benefit Pension Plans Account
- NTCA High Yield Portfolio
- Oregon Public Employees Retirement System Portfolio
- PNC Pension High Yield Portfolio
- PPL Services Corporation - High Yield Portfolio
- RB-UI-FONDS-HYBO
- BAV RBI Renten US HY I
- Celfin Capital S.A. Adm. General de Fondos para Ultra Fondo de Inversion

- BGF US Dollar High Yield Bond Fund

By: _____

Name: AnnMarie Smith
Title: Authorized Signatory on behalf of
BlackRock Financial Management, Inc.,
as Investment Advisor

AGREED BY EACH OF THE FOLLOWING
NOTEHOLDERS

**CQS DIRECTIONAL OPPORTUNITIES MASTER FUND LIMITED**

By: _____

Name: _____Gary Trehlou_____

Title: _____Authorised Signatory_____

Notice Address:

C/- CQS (UK) LLP

33 Chester Street

London SW1X 7BL

Fax: +44 (0)20 7201 1156

Attention: Legal Department

**D. E. SHAW OCULUS PORTFOLIOS, L.L.C.**

By:  _____

Name:  ~~Brandon Baer~~

Title:  Authorized Signatory

Notice Address:

D. E. SHAW OCULUS PORTFOLIOS, L.L.C.

120 West 45th Street

39th Floor

New York, NY 10036

Fax: 212-845-1628

Attention: Maureen Knoblauch

[Signature Pages to Lock-Up Agreement]

**MACKAY SHIELDS LLC**, as investment adviser or subadvisor for certain clients

By: _Lucille Protas_

Name: Lucille Protas

Title:   Chief Operating Officer

Notice Address:

MacKay Shields LLC
9 West 57th Street
New York, NY 10019

Fax: 212-754-9187

Attention: J. Matthew Philo

[Signature Pages to Lock-Up Agreement]

**OAKTREE CAPITAL MANAGEMENT, L.P.,**
as investment manager of various funds and accounts

By:
Name: Martin Boskovich
Title: Vice President, Legal

By:
Name:
Title: Desmund Shirazi
Managing Director

<u>Notice Address</u>:

333 South Grand Avenue
Los Angeles, California 90071
Fax: 213-830-6490
Attention: Desmund Shirazi

[Signature Pages to Lock-Up Agreement]

**PAULSON & CO. INC.**

By: _Michael Waldorf_

Name: _Michael Waldorf_

Title: _Senior Counsel_

<u>Notice Address</u>:

1251 Avenue of the Americas, 50th Floor

New York, NY 10020

Fax: 212-977-9505

Attention: Stuart Merzer

[Signature Pages to Lock-Up Agreement]

Aberdeen High Grade Bond
Papaver Inc.
Stichting Pensioenfonds voor Huisartsen
Stichting Pensioenfonds Medische Specialisten
UMASS Foundation Fund 2
UMASS Core Plus Composite
White Mountains Acct 193 Fund aka Symetra Life Insurance Company


By:  Pioneer Institutional Asset Management, Inc.
     As investment advisor to each Noteholder above

By:  _____
     Name: Margaret C. Begley
     Title:  Assistant Secretary and
             Associate General Counsel


Notice Address:

c/o Pioneer Investment Management, Inc.
Pioneer Institutional Asset Management, Inc.
60 State Street
Boston MA 02109
Fax: (617)528-6845
Attention: Keith Hogan


[Signature Pages to Lock-Up Agreement]

AGREED BY EACH OF THE FOLLOWING
NOTEHOLDERS:

Pioneer Bond Fund
Pioneer Funds Austria – Global High Yield Bond
Pioneer Diversified High Income Trust
Pioneer Funds – US High Yield (LUX)
Pioneer Global High Yield Fund
Pioneer High Income Trust
Pioneer High Yield Fund
ING Pioneer High Yield Portfolio
Pioneer Institutional Solutions – Credit Opportunities
Pioneer Funds – Global High Yield (LUX)
Pioneer Funds – Strategic Income (LUX)
Pioneer Funds – US Dollar Aggregate Bond (LUX)
PIONEER FUNDUSZ OBLIGACJI DOLAROWYCH FIO
PIONEER FUNDUSZ OBLIGACJI DOLAROWYCH PLUS FIO
Pioneer Strategic Income Fund
Met Investors Series Trust – Pioneer Strategic Income Fund
Pioneer Bond VCT Portfolio
Pioneer High Yield VCT Portfolio
Pioneer Strategic Income VCT Portfolio

Pioneer Investment Management, Inc.,
As investment advisor to each Noteholder above

By: _____
      Name: Margaret C. Begley
      Title:  Assistant Secretary and
                 Associate General Counsel

[Signature Pages to Lock-Up Agreement]

P. SCHOENFELD ASSET MANAGEMENT LP

By P. SCHOENFELD ASSET MANAGEMENT GP LLC,

Its General Partner

By: _____

Name: John K. Robinson

Title:   Authorized Officer

Notice Address:

P. Schoenfeld Asset Management LP

1350 Avenue of the Americas

New York, NY 10019

Fax: 212-649-9540

Attention: Kim Egert (kegert@psam.com)

[Signature Pages to Lock-Up Agreement]

Sun Life Assurance Company of Canada

By: _____        By: _____

Name:  Evan Moskovit                Name:  Michael S. McSherry
Title:   Senior Managing Director    Title:   Assistant Vice President
                                              and Senior Counsel

Notice Address:

General Counsel
Sun Life Assurance Company of Canada
One Sun Life Executive Park, SC 2335
Wellesley, MA  02481
Fax:  781-237-0707

Attention: Evan S. Moskovit
        e-mail: evan.moskovit@suncapadv.com

with a copy to:  Michael S. McSherry
        e-mail: Michael.McSherry@sunlife.com

Sun Life Insurance and Annuity Company of New York

By: _____          By: _____

Name: Evan Moskovit                   Name: Michael S. McSherry
Title:  Senior Managing Director      Title:  Assistant Vice President
                                              and Senior Counsel

Notice Address:

General Counsel
Sun Life Assurance Company of Canada
One Sun Life Executive Park, SC 2335
Wellesley, MA  02481
Fax:  781-237-0707

Attention: Evan S. Moskovit
           e-mail: evan.moskovit@suncapadv.com

with a copy to:  Michael S. McSherry
                 e-mail: Michael.McSherry@sunlife.com

Sun Life Hong Kong Limited

By: _____

Name: Evan Moskovit
Title: Senior Managing Director

By: _____

Name: Michael S. McSherry
Title: Assistant Vice President
and Senior Counsel

Notice Address:

General Counsel
Sun Life Assurance Company of Canada
One Sun Life Executive Park, SC 2335
Wellesley, MA 02481
Fax: 781-237-0707

Attention: Evan S. Moskovit
e-mail: evan.moskovit@suncapadv.com

with a copy to: Michael S. McSherry
e-mail: Michael.McSherry@sunlife.com

Sun Life Assurance Company of Canada (U.S.)

By: _____     By: _____

Name: Evan Moskovit               Name: Michael S. McSherry
Title:   Senior Managing Director Title:   Assistant Vice President
                                           and Senior Counsel

Notice Address:

General Counsel
Sun Life Assurance Company of Canada
One Sun Life Executive Park, SC 2335
Wellesley, MA 02481
Fax: 781-237-0707

Attention: Evan S. Moskovit
        e-mail: evan.moskovit@suncapadv.com

with a copy to: Michael S. McSherry
        e-mail: Michael.McSherry@sunlife.com

[CONSENTING HOLDER]

By: _Gregory Kocik:_

Name: _Cef_____    TD Asset Management

Title: _Managing Director_

Notice Address:

_161 Bay Street, 33rd Floor_

_Toronto, Ontario_

_Canada    M5J2T2_

Fax: _416-982-4296_

Attention: _Greg Kocik_

[Signature Pages to Lock-Up Agreement]

YORK CAPITAL MANAGEMENT, L.P.

By: Dinan Management, LLC, its general partner

By: _____
    Name: Adam J. Semler
    Title:  Chief Financial Officer

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**YORK INVESTMENT LIMITED**

By: York Offshore Holdings, Ltd., its
investment manager

By: _____
    Name: Adam J. Semler
    Title:  Director

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**YORK SELECT, L.P.**

By: York Select Domestic Holdings, LLC, its
general partner

By: _____
    Name: Adam J. Semler
    Title:  Chief Financial Officer

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**YORK CREDIT OPPORTUNITIES FUND, L.P.**

By: York Credit Opportunities Domestic Holdings, LLC, its general partner

By: _____
    Name: Adam J. Semler
    Title: CFO

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**YORK SELECT UNIT TRUST**

By: York Select Offshore Holdings, LLC, its
investment manager

By: _____
     Name: Adam J. Semler
     Title:  Chief Financial Officer

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**YORK GLOBAL VALUE PARTNERS, L.P.**

By: York Global Value Holdings, LLC, its
general partner

By: _____

    Name: Adam J. Semler

    Title: CFO

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**PERMAL YORK LTD.**

By: JGD Management Corp., its investment
manager

By: _____
    Name: Adam J. Semler
    Title:  CFO

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

**YORK CREDIT OPPORTUNITIES UNIT TRUST**

By: York Credit Opportunities Offshore Holdings, LLC, its investment manager

By: _____
    Name: Adam J. Semler
    Title:  CFO

Notice Address:

c/o York Capital Management

767 Fifth Avenue, 17th Floor

New York, NY 10153

Fax: 212-300-1302

Attention: Adam J. Semler

[Signature Pages to Lock-Up Agreement]

## EXHIBIT A

## JOINDER

This Joinder to the Restructuring & Lockup Agreement, dated as of July 1, 2009, by and among Lear Corporation and the Participating Noteholders signatory thereto (the "Agreement"), is executed and delivered by [_____] (the "Joining Party") as of [_____], 2009. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

        1.      Agreement to be Bound. The Joining Party hereby agrees to be bound by all of the terms of the Agreement, attached to this Joinder as Annex I (as the same may be hereafter amended, restated or otherwise modified from time to time). The Joining Party shall hereafter be deemed to be a "Participating Noteholder" and a party for all purposes under the Agreement.

        2.      Representations and Warranties. With respect to the aggregate principal amount of Notes set forth below its name on the signature page hereof and all related claims, rights and causes of action arising out of or in connection with or otherwise relating to such Notes, the Joining Party hereby makes the representations and warranties of the Participating Noteholders set forth in the Agreement to each other party to the Agreement.

        3.      Governing Law. This Joinder shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflicts of law provisions which would require the application of the law of any other jurisdiction.

* * * * *

[THE REMAINDER OF THIS PAGE IS
INTENTIONALLY LEFT BLANK]

A-1

IN WITNESS WHEREOF, the Joining Party has caused this Joinder to be
executed as of the date first written above.

**[CONSENTING HOLDER]**

By: _____

Name: _____

Title: _____

| Principal Amount of Notes Held | |
|---|---|
| **Security** | **Amount** |
| 8.5% Senior Notes due 2013 | |
| 5.75% Senior Notes due 2014 | |
| 8.75% Senior Notes due 2016 | |
| Zero Coupon Senior Notes due 2022 | |

<u>Notice Address</u>:

_____

_____

_____

Fax: _____

Attention: _____

With a copy to:

_____

_____

_____

A-2

Fax: _____

Attention: _____

Acknowledged:

**LEAR CORPORATION**

By:        _____

Name:    _____

Title:     _____

A-3

## EXHIBIT 1

**Restructuring Term Sheet**

*(please see attached)*

## LEAR CORPORATION

## JOINT PLAN OF REORGANIZATION TERM SHEET

### (Exhibit 1 to the Plan Support Agreement)

THIS TERM SHEET DESCRIBES A PROPOSED RESTRUCTURING (THE "RESTRUCTURING") FOR LEAR CORPORATION ("LEAR") AND CERTAIN OF ITS DOMESTIC AND CANADIAN SUBSIDIARIES PURSUANT TO A JOINT PLAN OF REORGANIZATION (THE "PLAN OF REORGANIZATION") WHICH WOULD BE FILED BY THE DEBTORS (AS DEFINED BELOW) IN CONNECTION WITH A CONTEMPLATED CHAPTER 11 FILING IN THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF NEW YORK (THE "BANKRUPTCY COURT").

THIS TERM SHEET IS NOT AN OFFER OR A SOLICITATION WITH RESPECT TO ANY SECURITIES OF LEAR OR ITS SUBSIDIARIES. ANY SUCH OFFER OR SOLICITATION SHALL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

| OVERVIEW | |
|---|---|
| **Restructuring Summary** | Prior to the commencement of the Debtors' chapter 11 cases, (a) certain of the Prepetition Credit Agreement Lenders listed therein and the Debtors will have executed a Plan Support Agreement (the "**Lender Plan Support Agreement**") pursuant to which the Debtors agree to pursue and implement a Plan of Reorganization consistent in form and substance in all material respects with this Term Sheet and (b) certain of the holders of the Unsecured Note Claims (as defined herein) listed therein, including those noteholders constituting a steering committee of noteholders (the "**Noteholder Steering Committee**"), and the Debtors will have executed a Plan Support Agreement (the "**Noteholder Plan Support Agreement**," and together with the Lender Plan Support Agreement, the "**Plan Support Agreements**") pursuant to which the Debtors agree to pursue and implement a Plan of Reorganization consistent in form and substance in all material respects with this Term Sheet. This Term Sheet does not include a description of all of the terms, conditions and other provisions that are to be contained in the Plan of Reorganization and the related definitive documentation governing the Restructuring. |
| | In conjunction with the Restructuring, a group of Prepetition Credit Agreement Lenders has agreed to provide a debtor-in-possession financing facility (such facility, the "**DIP Facility**") which, upon satisfaction of certain conditions, will convert into the Exit Facility (as defined below) upon the Debtors' exit from chapter 11. A detailed description of the DIP Facility, including pricing terms, conditions and covenants, is set forth in the debtor in possession financing credit agreement agreed to by the Debtors and the Prepetition Credit Agreement Lenders party thereto |

| | attached hereto as <u>Annex 1</u> (the "**DIP Credit Agreement**"). |
|---|---|
| **Debt to be Repaid/ Restructured** | Indebtedness to be treated under the Plan of Reorganization will include:<br><br>(i) approximately $2.3 billion outstanding (together with the Swap Claims referred to below, the "<u>**Prepetition Credit Agreement Obligations**</u>") under that certain Amended and Restated Credit Agreement dated as of April 25, 2006 (the "<u>**Prepetition Credit Agreement**</u>") among Lear, certain of its subsidiaries, JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacity, the "<u>**Prepetition Administrative Agent**</u>") and the lenders party thereto (including as holders of termination claims under certain hedging arrangements (the "<u>**Swap Claims**</u>"), the "<u>**Prepetition Credit Agreement Lenders**</u>"); and<br><br>(ii) approximately $1.3 billion aggregate principal amount of senior unsecured notes (plus accrued and unpaid interest) (the "<u>**Unsecured Note Claims**</u>"), comprised of (a) the unsecured 8.50% senior notes due 2013 and the unsecured 8.75% senior notes due 2016 issued pursuant to that certain Indenture dated as of November 24, 2006, among Lear, certain subsidiary guarantors and The Bank of New York Trust Company, N.A. as Trustee, (b) the unsecured 5.75% senior notes due 2014 issued pursuant to that certain Indenture dated as of August 3, 2004 among Lear, certain subsidiary guarantors and BNY Midwest Trust Company as Trustee, and (c) the unsecured zero-coupon convertible senior notes due 2022 issued pursuant to that certain Indenture dated as of February 20, 2002, among Lear, certain subsidiary guarantors and The Bank of New York Trust Company, N.A. as Trustee. |
| **Securities to be Issued under the Plan of Reorganization** | **Debt.** The (i) $500 million first lien term loan Exit Facility described in the exit credit agreement attached hereto as <u>Annex 2</u> (the "<u>**Exit Facility**</u>") and (ii) $600 million second lien term loan with the terms and conditions set forth on Exhibit 1 (the "<u>**New Term Loans**</u>").<br><br>**Preferred Stock.** Reorganized Lear shall issue up to $500 million in Series A Preferred Stock (the "<u>**Series A Preferred Stock**</u>") with the terms and conditions set forth on Exhibit 2.<br><br>**New Common Stock.** Subject to the right of the stockholders to amend the certificate of incorporation, reorganized Lear ("<u>**Reorganized Lear**</u>") shall issue a single class of common stock (the "<u>**New Common Stock**</u>") on the effective date of the Plan of Reorganization (the "<u>**Effective Date**</u>"), which stock shall be deemed fully paid and non-assessable.<br><br>**Management Equity Plan.** There shall be allocated sufficient shares of New Common Stock to provide a Management Equity Plan (as defined below) with a reserve for equity awards of New Common Stock, as provided in Exhibit 4 hereto.<br><br>**Warrants:**<br>(A). To the extent the Exit Facility fee is not paid in cash, Reorganized |

|  | Lear will issue warrants to purchase shares of New Common Stock with an Effective Date value of up to $25 million, all as set forth in the DIP Facility, and representing a percentage of the New Common Stock, as reflected on Exhibit 7 hereto.<br>(B).  Reorganized Lear shall issue warrants to holders of Class 5A Claims, with such warrants to have the terms and conditions set forth in Exhibit 3 hereto. |
| --- | --- |
| **Proposed Filing Entities** | Lear expects that voluntary chapter 11 cases will be commenced by Lear and certain of its domestic and Canadian subsidiaries (the "<u>Debtors</u>"). For purposes of the Plan of Reorganization, the Debtors will be further classified into Group A Debtors, consisting of those Debtors liable for Prepetition Credit Agreement Obligations, the Swap Claims and the Unsecured Note Claims (the "<u>Group A Debtors</u>") and the Group B Debtors[1], consisting of all Debtors who are not Group A Debtors (the "<u>Group B Debtors</u>"). |

## CLASSIFICATION AND TREATMENT OF CLAIMS

### Unclassified Claims

| **DIP Facility Claims** | The DIP Facility shall, on the Effective Date, be repaid by the Exit Facility or paid in full in cash.  In addition, Reorganized Lear will issue Warrants to the lenders under the DIP Facility on the Effective Date to the extent required under the terms of the DIP Facility.<br><br>Not classified; non-voting. |
| --- | --- |
| **Administrative Claims** | Each holder of an allowed administrative claim, including claims of the type described in section 503(b)(9) (to the extent not already paid during the chapter 11 cases), of the Bankruptcy Code,  shall receive payment in full (in cash) of the unpaid portion of its allowed administrative claim on the Effective Date or as soon thereafter as practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of such claim and the Debtors.<br><br>Not classified; non-voting. |
| **Priority Tax Claims** | Priority tax claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code.<br><br>Not classified; non-voting. |
| **Intercompany Claims** | There shall be no distributions on account of Intercompany Claims. Notwithstanding the foregoing, Lear, in its sole discretion, may (or may cause each applicable Debtor to), reinstate or compromise, as the case may |

---

[1] To the extent required, the Plan of Reorganization could be structured to incorporate separate plans of reorganization for each Debtor, with each such plan reflecting substantive treatment of claims consistent with the terms hereof.

3

| | be, intercompany claims between and among the Debtors and their subsidiaries. |
|---|---|
| | **Classified Claims and Interests**<br>**Group A Debtors** |
| **Class 1A—Other Priority Claims** | All claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims against the Group A Debtors, shall be paid in full in cash on the later of the Effective Date or the allowance of the claim; *provided*, that, subject to Bankruptcy Court approval, priority wage claims against the Group A Debtors may be paid in full in the ordinary course of business.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 2A—Other Secured Claims** | Each holder of an Other Secured Claim against the Group A Debtors shall receive the following treatment, at the option of the Group A Debtors: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) other treatment rendering such claim unimpaired.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 3A—Prepetition Credit Agreement Secured Claims** | For purposes of the Plan of Reorganization and in settlement and compromise of all issues relating to the amount of the secured portion of the Prepetition Credit Agreement Obligations, the Prepetition Credit Agreement Lenders will have allowed secured claims against the Group A Debtors in an aggregate amount equal to $1.6 billion[2] (the "**Prepetition Credit Agreement Secured Claims**"). Each holder of a Prepetition Credit Agreement Secured Claim shall receive its pro rata share of: (i) $600 million of New Term Loans; (ii) $500 million in Series A Preferred Stock to be convertible into a percentage of the New Common Stock, as provided in Exhibit 7 hereto; and (iii) a percentage of the New Common Stock, as provided in Exhibit 7 hereto. To the extent Reorganized Lear has Minimum Liquidity (as defined below) determined on a normalized basis consistent with the financial analysis provided to the Prepetition Administrative Agent and the advisors to the Noteholder Steering Committee by Lear, in excess of $1.0 billion on the Effective Date, the amount of such excess shall be utilized to prepay, without premium or penalty, first, the Series A Preferred Stock, in an aggregate stated value of up to $50 million, then the New Term Loans, in an aggregate principal amount of up to $50 million, and thereafter, the Exit Facility; *provided further* that any payments of the New Term Loans made with the Debtors' excess cash within the first 30 days after the Effective Date shall not be subject to any prepayment penalty or premium.<br><br>"Minimum Liquidity" shall mean cash and cash equivalents, plus availability under working capital facilities, if any, plus a working capital |

---

[2] Inclusive of the Swap Claims.

| | |
|---|---|
| | adjustment to be agreed upon the Debtors, the Prepetition Administrative Agent and the Noteholder Steering Committee, less any accrued but unpaid professional fees and other chapter 11 costs not paid prior to the Effective Date, and cash financing costs to the extent not previously paid; *provided*, that at least $800 million of such aggregate amount consists of cash and cash equivalents; and *provided, further* that Minimum Liquidity shall be determined on or prior to the date that is 30 days after the Effective Date.<br><br>Impaired - entitled to vote. |
| **Class 4A—Unsecured Ongoing Operations Claims** | "**Unsecured Ongoing Operations Claims**" shall consist of all general unsecured claims relating to the provision of goods or services to the Group A Debtors arising with, or held by, persons or entities with whom the Debtors are conducting business as of the date of commencement of the Debtors' chapter 11 cases, but excluding any claims arising from the rejection by the Debtors of any contracts and leases and all other Class 5A or 6A Claims. Each holder of an Unsecured Ongoing Operations Claim that is due and payable on or before the Effective Date shall be paid in full (in cash) on the Effective Date on account of such claim or otherwise receive such treatment as to render such holder unimpaired. An allowed Unsecured Ongoing Operations Claim that is not due and payable on or before the Effective Date shall be paid thereafter (i) in the ordinary course of business in accordance with the terms of any agreement that governs such allowed Unsecured Ongoing Operations Claim or (ii) in accordance with the course of practice between the Group A Debtors and such holder with respect to such allowed Unsecured Ongoing Operations Claim. Holders of Unsecured Ongoing Operations Claims who received payment(s) from the Group A Debtors during the chapter 11 cases pursuant to any Bankruptcy Court order shall not be excluded from receiving distributions under the Plan of Reorganization on account of such claims unless such claims were fully satisfied by any prior payments from the Group A Debtors. The Group A Debtors shall reserve all rights to challenge the legal basis and amount of any Unsecured Ongoing Operations Claim.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 5A—Other Unsecured Claims**[3] | "Other General Unsecured Claims" against the Group A Debtors shall consist of all general unsecured claims against the Group A Debtors that are not otherwise classified in Class 4A or 6A, including without limitation, (i) the Unsecured Note Claims, (ii) the Prepetition Credit Agreement Lenders' unsecured deficiency claim in the amount of approximately $737 million (the "**Prepetition Credit Agreement Deficiency Claims**"), (iii) claims arising upon rejection of leases and executory contracts to which a Group A Debtor is party; (iv) claims relating to the provision of goods or |

---

[3] Includes Unsecured Note Claims, the Prepetition Credit Agreement Deficiency Claims and all other claims against the Group A Debtors that are not a/an (a) Administrative Claim, (b) Priority Tax Claim, (c) Convenience Claim, (d) Other Secured Claim, (e) Prepetition Credit Agreement Secured Claim, (f) Priority Wage Claim, (g) Intercompany Claim, (h) Unsecured Ongoing Operations Claim or (i) Convenience Claim, but excludes Class 1A Claims and other employee-related claims otherwise provided for in this Term Sheet.

509265-0024-02208-Active.11681162.15

| | services to the Group A Debtors that are not classified as Administrative Claims or Class 4A or 6A Claims and (v) claims arising from litigation damages entered against the Group A Debtors (collectively, the "**Other General Unsecured Claims**"). |
|---|---|
| | Each holder of an allowed General Unsecured Claim against a Group A Debtor shall receive its pro rata share of (i) a percentage of the New Common Stock, as provided in Exhibit 7 hereto, that remains after giving effect to the distribution of New Common Stock to holders of Class 3A Claims and subject to dilution from the Series A Preferred Stock, the Warrants and the Management Equity Plan; and (ii) Warrants representing 15% of Reorganized Lear's outstanding New Common Stock, with the terms and conditions set forth in Exhibit 3 hereto. |
| | Impaired – entitled to vote. |
| **Class 6A—Convenience Claims** | Subject to Bankruptcy Court approval, claims below a threshold to be agreed between the Debtors, the Noteholder Steering Committee and the Prepetition Administrative Agent against the Group A Debtors shall be paid an amount equal to 25% of such claim in cash on the later of the Effective Date or the allowance of the claim. |
| | Impaired – entitled to vote. |
| **Class 7A—Existing Equity and 510(b) Claims** | Class 7A-1—Equity interest in Lear<br>Holders of the existing equity in Lear shall receive no recovery. Class 7A-1 interests include the common stock of Lear and options, warrants or other agreements to acquire the same (whether or not arising under or in connection with any employment agreement), including without limitation, any claim against the Debtors that is subordinated pursuant to section 510(b) of the Bankruptcy Code, which shall include any claim arising from the recission of a purchase or sale of any equity interest, any claim for damages arising from the purchase or sale of any equity interest, or any claim for reimbursement, contribution or indemnification for such claim. |
| | Impaired; not entitled to vote - deemed to reject. |
| | Class 7A-2—Existing equity interest in Debtor subsidiaries of Lear<br>All equity interests of Lear's Group A Debtor subsidiaries shall continue to be held by Lear and the subsidiaries of Lear holding such equity interests prior to the commencement of the Cases. |
| | Unimpaired; not entitled to vote – deemed to accept. |
| **Classified Claims and Interests**<br>**Group B Debtors** | |
| **Class 1B—Other Priority Claims** | All claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims against the Group B Debtors, shall be paid in full in cash on the later of the Effective Date or the allowance of the claim; *provided*, that, subject to Bankruptcy Court |

509265-0024-02208-Active.11681162.15

| | |
|---|---|
| | approval, priority wage claims against the Group B Debtors may be paid in full in the ordinary course of business.<br><br>Unimpaired; not entitled to vote – deemed to accept |
| **Class 2B—Other Secured Claims** | Each holder of an Other Secured Claim against the Group B Debtors shall receive the following treatment, at the option of the Group B Debtors: (a) payment in full (in cash) on the Effective Date or as soon thereafter as practicable to the extent secured; (b) delivery of collateral securing any such claim and payment of any interest required under section 506(b) of the Bankruptcy Code; or (c) other treatment rendering such claim unimpaired.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 3B—Unsecured Claims[4]** | All general unsecured claims of the Group B Debtors' creditors set forth or otherwise described in the disclosure statement, including claims under contracts and unexpired leases assumed by the Group B Debtors under the Plan of Reorganization and trade payables owed by any Group B Debtor or non-debtor subsidiary of Lear to any third party creditor, but excluding the Intercompany Claims, will be paid in the ordinary course as such claims become due. The Group B Debtors shall reserve all rights to challenge the legal basis and amount of any general unsecured claims.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **Class 4B—Existing Equity** | All equity interests of Lear's Group B Debtor subsidiaries shall continue to be held by Lear and the subsidiaries of Lear holding such equity interests prior to the commencement of the Cases.<br><br>Unimpaired; not entitled to vote – deemed to accept. |
| **GENERAL PROVISIONS** | |
| **Management Equity Plan** | On the Effective Date, Lear shall implement the Management Equity Plan (the "**Management Equity Plan**") for the benefit of certain continuing employees of the Debtors and non-management members of the Board (as defined below). The Management Equity Plan shall have the terms set forth on Exhibit 4 hereto. |
| **Employment Agreements/Other Incentive Plans** | The Plan of Reorganization shall provide for the adoption or assumption, as applicable, of the agreements between the Debtors and those executive officers of the Debtors who are parties to employment agreements with the Debtors as of the Petition Date (as defined below), which agreements shall (i) provide severance benefits to such executive officers equal to the severance benefits such executive officers are entitled to receive under their prepetition employment agreements with the Debtors and (ii) be in the form provided to the Prepetition Administrative Agent and the Noteholder Steering Committee by Lear. To the extent assumed, and as applicable, any such prepetition agreement shall be amended to eliminate provisions therein providing for the issuance of equity interests in Lear, with such |

---

[4] Includes all other claims against the Group B Debtors that are not a/an (a) Administrative Claim, (b) Priority Tax Claim, (c) Other Secured Claim, (d) Priority Wage Claim, or (e) Intercompany Claim.

7

<table>
<tr><td></td><td>interests being treated as Class 7A-1 equity interest as set forth above.

The Plan of Reorganization shall provide for the adoption or assumption of the key management incentive plan, the valued employees plan and the remaining non-equity obligations under the outside director compensation plan, the long term stock incentive plan, and the management stock purchase plan, substantially consistent with the summaries provided to the Prepetition Administrative Agent and the Noteholder Steering Committee prior to the Petition Date (as defined below); provided that all incentive plan provisions covering insiders are approved by the Bankruptcy Court. Unless otherwise rejected or terminated by the Debtors in their sole discretion on or before confirmation of the Plan of Reorganization, the Plan of Reorganization shall provide that the reorganized Debtors shall assume or reinstate all employee and retiree health, welfare and qualified and non-qualified pension plans. The restructuring contemplated by this Term Sheet will not constitute a "change in control" or "change of control" (as those terms are defined in the respective plans to be assumed). The key management incentive plan shall have the terms set forth in Exhibit 5 hereto.

After the Effective Date, Reorganized Lear shall continue or enter into any benefit, compensation, incentive or similar plans and agreements as approved by the Board.

For purposes of clarity, a list of the U.S. plans and their treatment under the Plan of Reorganization is attached as Exhibit 6 hereto.</td></tr>
<tr><td><strong>Cancellation of Instruments, Certificates and Other Documents</strong></td><td>On the Effective Date, except to the extent otherwise provided above, all instruments, certificates and other documents evidencing debt or equity interests in Lear or the other Debtors shall be cancelled, and the obligations of the Debtors thereunder, or in any way related thereto, shall be discharged.</td></tr>
<tr><td><strong>Executory Contracts and Unexpired Leases</strong></td><td>Executory contracts and unexpired leases shall be assumed or rejected, as the case may be, in the Debtors' discretion, in the Plan of Reorganization to the extent that any such executory contracts and unexpired leases have not been assumed or rejected by the Debtors in their discretion during the pendency of the chapter 11 reorganization.</td></tr>
<tr><td><strong>Ad Hoc Committee Advisor Fees</strong></td><td>The Debtors shall pay the reasonable fees and expenses of the Ad Hoc Committee Advisors (as defined in the Noteholder Support Agreement) as set forth in the Noteholder Plan Support Agreement, incurred in connection with the Debtors' chapter 11 cases without the need for any application to the Bankruptcy Court unless other required by applicable bankruptcy law or any order of the Bankruptcy Court.</td></tr>
<tr><td><strong>Retention of Jurisdiction</strong></td><td>The Bankruptcy Court shall retain jurisdiction for customary matters.</td></tr>
</table>

8

| CORPORATE GOVERNANCE/CHARTER PROVISIONS/CAPITAL STOCK/REPORTING COMPANY/1145 EXEMPTION | |
|---|---|
| **Board of Directors of Lear** | Reorganized Lear shall have a nine-person board of directors (the "**Board**"), which shall consist of eight directors and Reorganized Lear's Chairman & Chief Executive Officer. Of the eight directors: (a) no fewer than five shall be appointed by the Prepetition Administrative Agent in consultation with the Prepetition Credit Agreement Lenders party to the Plan Support Agreement and with the assistance of a nationally recognized executive search firm to be retained by the Prepetition Administrative Agent (at the expense of the Debtors); and (b) three members shall be appointed by the Noteholder Steering Committee in consultation with the other holders of Unsecured Note Claims who are parties to the Noteholder Plan Support Agreement and the creditors' committee in the Debtors' chapter 11 cases. Current directors will be included among the candidates to be considered for the new Board.<br><br>All directors of the Board shall meet the criteria set forth in the NYSE or Nasdaq, as applicable, listing requirements. |
| **Charter; Bylaws** | The charter and bylaws of each of the Debtors shall have been restated in a manner reasonably satisfactory to the Prepetition Administrative Agent and the Noteholder Steering Committee and consistent with section 1123(a)(6) of the Bankruptcy Code. |
| **Company as a Public Reporting Company** | For certain purposes, including requiring Lear to become a public reporting company under the Securities Exchange Act of 1934, as amended (the "**Exchange Act**"), the Plan of Reorganization shall require Lear as promptly as practicable following the Effective Date to file with the SEC a registration statement on Form 10 under the Exchange Act registering all securities issued under the Plan of Reorganization under the Exchange Act (the "**Form 10**"), and Lear shall use reasonable best efforts to have such registration statement declared effective by the SEC as promptly as reasonably practicable.<br><br>The Plan of Reorganization shall provide for Lear to use its reasonable best efforts to obtain a listing for the New Common Stock on NYSE or Nasdaq as soon as reasonably practicable following the effectiveness of the Form 10 (e.g., after listing requirements are satisfied).<br><br>Demand registration rights with respect to the Series A Preferred Stock and the New Common Stock to be discussed based upon the anticipated composition of holders of Series A Preferred Stock and New Common Stock on and after the Effective Date. |
| **Exemption from SEC Registration** | The issuance of all securities under the Plan of Reorganization will be exempt from SEC registration under section 1145 of the Bankruptcy Code. |
| **Debtor Releases** | Full release, to the maximum extent permitted by law, by Debtors and their estates in favor of lenders under the DIP Facilities, the Prepetition Administrative Agent, the Prepetition Credit Agreement Lenders, holders |

9

| | of Unsecured Note Claims and current and former officers, directors, employees, advisors, attorneys, professionals, accountants, investment bankers, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals) of the Debtors and such lenders, noteholders and investors from any claims and causes of action based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the chapter 11 cases, the Plan of Reorganization and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan of Reorganization (other than claims based on gross negligence or willful misconduct) arising on or prior to the Effective Date. |
|---|---|
| **Releases Among Released Parties** | Plan shall provide that each of the parties released by the Debtors shall release each other and the Debtors for pre-Effective Date matters based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the chapter 11 cases, the Plan of Reorganization and the subject matter of, or the transactions or events giving rise to, any claim or interest that is treated in the Plan of Reorganization. |
| **Indemnification/ Exculpation** | Customary indemnification and exculpation provisions. |
| **Discharge** | Customary discharge provisions. |
| **Injunction** | Customary injunction provisions. |
| **Indemnification of Prepetition Officers and Directors** | Under the Plan of Reorganization, all indemnification provisions currently in place (whether in the by-laws, certificates of incorporation, board resolutions, indemnification agreements or employment contracts) for the current and former directors, officers, employees, attorneys, accountants, investment bankers and other professionals of the Debtors shall be assumed and irrevocable and shall survive the effectiveness of the Plan of Reorganization. |
| **Tax Issues** | The terms of the Plan of Reorganization and the restructuring contemplated by this Term Sheet shall be structured to preserve favorable tax attributes of the Debtors to the extent practicable. The Debtors shall consult with the advisors to the Prepetition Administrative Agent and the advisors to the Noteholder Steering Committee on tax issues and matters of tax structure relating to the Plan of Reorganization and the restructuring contemplated by this Term Sheet. |
| **PLAN IMPLEMENTATION AND PROPOSED REORGANIZATION SCHEDULE** | |
| **Plan Support Agreement** | Prior to the commencement of the Debtors' chapter 11 cases, the Prepetition Credit Agreement Lenders and the Debtors shall execute and deliver the Lender Plan Support Agreement, and certain holders of the Unsecured Notes and the Debtors shall execute and deliver the Noteholder Plan Support Agreement. |
| **Timeline** | (i)    The Plan of Reorganization and related disclosure statement shall be filed within 60 days of the filing date of these chapter 11 cases (the "**Petition Date**"); |
| | (ii)    The Debtors shall obtain an order, in form and substance reasonably satisfactory to the Requisite Participating Lenders (as |

|  |  |  |
|---|---|---|
|  |  | defined in the Lender Plan Support Agreement) and the Requisite Participating Noteholders (as defined in the Noteholder Plan Support Agreement), approving the adequacy of the disclosure statement no later than 150 days after the Petition Date; |
|  | (iii) | The Debtors shall obtain entry by the Bankruptcy Court of an order, in form and substance reasonably satisfactory to the Requisite Participating Lenders and the Requisite Participating Noteholders, confirming the Plan of Reorganization no later than 270 days after the Petition Date; and |
|  | (iv) | The Debtors shall cause the Effective Date of the Plan of Reorganization to occur no later than 300 days after the Petition Date. |
| **Conditions Precedent to Plan Confirmation** | (i) | The Plan Support Agreements shall be in full force and effect and shall not have been terminated; |
|  | (ii) | The disclosure statement shall have been approved; |
|  | (iii) | The Prepetition Administrative Agent and the Noteholder Steering Committee shall be reasonably satisfied with all material tax matters and positions relating to the Debtors and the reorganized Debtors; |
|  | (iv) | Except as provided in this Term Sheet, including Exhibit 5 and Exhibit 6 hereof, all employment arrangements of senior management for the post-Effective Date period shall be reasonably satisfactory to the Prepetition Administrative Agent and the Noteholder Steering Committee; |
|  | (v) | The Plan of Reorganization, including any amendments, modifications or supplements thereto, and all documentation contemplated by this Term Sheet or the Plan of Reorganization, shall be in form and substance reasonably satisfactory to the Requisite Participating Lenders and the Requisite Participating Noteholders; |
|  | (vi) | There shall not have occurred a force majeure event (to be defined as a significant global disruption in the financial markets caused by outbreak of war, terrorism, or other incidents, but not adverse changes in the financial, banking or capital markets generally); and |
|  | (vii) | The Bankruptcy Court shall have entered an order confirming the Plan of Reorganization, which order shall be in form and substance reasonably satisfactory to the Debtors and the Requisite Participating Lenders and the Requisite Participating Noteholders. |
| **Conditions Precedent to Plan Consummation** | (i) | Contemporaneous effectiveness of the Exit Facility or an alternative exit financing facility provided that with respect to such alternative exit financing facility the DIP Facility shall be repaid in cash in full on the Effective Date; and |
|  | (ii) | No modification or stay of confirmation order or entry of other court order prohibiting Plan of Reorganization transactions from |

| | being consummated. |
|---|---|

509265-0024-02208-Active.11681162.15

Exhibit 1

## TERMS OF NEW TERM LOANS

| | |
|---|---|
| Borrower: | Reorganized Lear. |
| Guarantors: | Reorganized Lear's domestic subsidiaries which guarantee the Exit Facility. |
| Principal: | $600 million. |
| Maturity: | 3 years from the Effective Date |
| Interest Rate: | For the first 18-month period commencing with the consummation of the Plan of Reorganization (the "**Initial Period**"), L+550 bps with a LIBOR floor of 3.5%; for the 12-month period commencing after the Initial Period, L+650 bps with a LIBOR floor of 3.5%; and thereafter through maturity, L+750 bps with a LIBOR floor of 3.5%.

Interest rate margin will be further increased by 1.00% per annum on interest paid in PIK. |
| Call Premium: | Call premium of 2% of the principal amount of any voluntary prepayment under, or refinancing of, the New Term Loans after the second anniversary of the Effective Date, payable at the time of prepayment/ refinancing. |
| Financial Covenants: | Financial covenants to piggyback off of covenants in the Exit Facility, but to be set off of wider cushions; debt-incurrence covenant TBD. |
| Collateral: | The obligations under the New Term Loans will be secured on a silent second priority basis by a perfected security interest in the Collateral under the Exit Facility.  Silent second priority security interest in the Collateral, payment subordination, lien priority, relative rights and other creditors' rights issues in respect of the New Term Loans and the Exit Facility (and any debt refinancing or replacing such debt) to be set forth in a customary intercreditor agreement, in a form reasonably satisfactory to the parties. |

Exhibit 2

TERMS OF SERIES A PARTICIPATING PREFERRED STOCK

| | |
|---|---|
| Issuer: | Reorganized Lear. |
| Initial Face Amount: | Up to $500 million (the "**Stated Value**"), which shall be distributed pro rata to the holders of the Prepetition Credit Agreement Secured Claim in satisfaction and discharge of claims thereunder on a dollar for dollar basis. |
| Liquidation Preference: | The greater of (i) the initial Stated Value plus any accrued but unpaid dividends as of the relevant determination date (such aggregate amount, as of such date, the "**Accrued Value**"), and (ii) the amount that would then be received upon the liquidation, dissolution, or winding up of Reorganized Lear by a holder of the number of shares of New Common Stock issuable upon conversion of the Series A Preferred Stock (and assuming all of the Series A Preferred Stock were so converted) held by such holder (the "**Liquidation Value**"). |
| Dividends: | The Series A Preferred Stock shall not bear any mandatory dividends. No dividend shall be declared on the Series A Preferred Stock unless so authorized by a vote of at least six out of the eight non-management directors of Reorganized Lear. |
| | The holders of Series A Preferred Stock will participate in any dividends or distributions declared on New Common Stock (other than a dividend payable solely in additional shares of New Common Stock, which is addressed under the anti-dilution protections below) based on the number of shares of New Common Stock into which Series A Preferred Stock is convertible as of the applicable record date for such New Common Stock dividend or distribution. |
| | Reorganized Lear may not declare dividends on or repurchase any junior securities (including New Common Stock) unless dividends on Series A Preferred Stock, if any, have been paid in full in cash through the most recent dividend payment date. |
| Mandatory Redemption: | Upon liquidation of Reorganized Lear. |
| | If Reorganized Lear enters into a transaction constituting a consolidation or merger, a reclassification of its New Common Stock into securities other than New Common Stock or any statutory exchange of the outstanding shares of New Common Stock for securities of another entity (each, a "**Reorganization Event**"), each share of Series A Preferred Stock outstanding immediately prior to such Reorganization Event will remain outstanding but will become convertible, at the option of the holder, into the kind of securities, cash |

| | and other property receivable in such Reorganization Event by a holder of the number of shares of New Common Stock into which each share of Series A Preferred Stock would then be convertible. In the event of a sale of all or substantially all of the assets of Reorganized Lear, proper provision shall be made such that the holders of the Series A Preferred Stock shall receive an equivalent security in the entity acquiring such assets. |
|---|---|
| Optional Redemption: | Subject to any applicable contractual restrictions, at the option of Reorganized Lear, at any time or from time to time, in whole or in part, at a redemption price, payable in cash, equal to the greater of (i) the Accrued Value and (ii) the Liquidation Value. |
| Mandatory Conversion Date: | Three (3) years following the Effective Date, provided that the Mandatory Conversion Date shall also mean any earlier date after the first anniversary of the Effective Date, if for 20 trading days within any period of 30 consecutive trading days, the closing price of the New Common Stock exceeds 135% of the then-applicable conversion price for the Series A Preferred Stock.  The initial conversion price shall be equal to the per share Plan of Reorganization value of New Common Stock as of the Effective Date. |
| Optional Conversion: | Each share of Series A Preferred Stock may be converted at the option of the holder at any time into a number of shares of New Common Stock equal to the Accrued Value as of the conversion date (including any increase in Stated Value as a result of dividend payments that are paid in-kind) divided by the then applicable conversion price.  The initial conversion price shall be equal to the per share Plan of Reorganization value of New Common Stock as of the Effective Date. |
| Anti-Dilution: | The conversion price will be subject to proportional adjustment for any stock split, stock recombination, or stock dividend (other than the pay in-kind dividends to holders of the Series A Preferred Stock) or any distribution of rights, options, warrants or any distribution of shares of capital stock, evidences of indebtedness or other property or assets by Reorganized Lear or any of its subsidiaries in which the holders of Series A Preferred Stock do not participate on a pro rata as converted basis. |
| Ranking: | Senior to all other capital stock of Reorganized Lear with respect to dividends and liquidation. |
| Voting: | Series A Preferred Stock will vote together with the New Common Stock on all matters and not as a separate class, on an as-converted basis.  Notwithstanding the foregoing, the consent of the holders of a majority of the outstanding shares of Series A Preferred Stock, voting as a separate class, is required to: |

| | (a) amend Reorganized Lear's certificate of incorporation in a way that would alter, modify or change the rights, designations or preferences of the holders of Series A Preferred Stock; <br><br> (b) authorize or issue any other capital stock that will be senior to Series A Preferred Stock; and <br><br> (c) increase or decrease the authorized number of shares of Series A Preferred Stock. |
|---|---|
| Registration Rights: | Registration rights for the Series A Preferred Stock to be discussed based on size of issue and composition of holders of Series A Preferred Stock. |
| Transferability: | Freely transferable. |

Exhibit 3

## TERMS OF WARRANTS FOR CLASS 5A CLAIMS

| | |
|---|---|
| Warrants | The Warrants will entitle the holders thereof to acquire shares of New Common Stock representing 15% of the New Common Stock, on a fully-diluted basis, as of the Effective Date (but subject to dilution for awards under the Management Equity Plan). |
| Exercise Price per Warrant: | Exercisable at any time during the Exercise Period at a price equal to $.01 per Warrant. |
| | "Exercise Period" means the period (a) commencing on the business day following a period of 30 consecutive trading days during which the closing price of the New Common Stock on at least 20 of the trading days within such period implies a total distributable value of the Company equal to or greater than $3.3 billion and (b) ending on the Expiration Date. |
| Expiration: | The fifth anniversary of the Effective Date (the "Expiration Date"). |
| Exercise Date: | Exercisable at any time, during the Exercise Period. |
| Voting Rights: | None. |
| Anti-Dilution Provisions: | The Exercise Price per Warrant and the number of shares of common stock issuable upon exercise of the Warrants shall be subject to customary adjustment upon the occurrence of common stock splits and reverse common stock splits. |
| Reorganization Event: | Except as provided in the next sentence, upon a Reorganization Event that is consummated during the Exercise Period, each Warrant will be exercisable into the right to receive the kind and amount of consideration to which such holder would have been entitled as a result of such Reorganization Event had the Warrant been exercised immediately prior thereto.  In the event of a Reorganization Event consummated during the Exercise Period in which the only consideration payable to holders of New Common Stock is cash, each Warrant shall be entitled to receive the cash consideration to which such holder would have been entitled as a result of such Reorganization Event, less the Exercise Price, had the Warrant been exercised immediately prior thereto.  The Warrants shall expire and be cancelled following a Reorganization Event, subject to receipt of any consideration to which holders thereof are entitled as provided above.  A "Reorganization Event" shall mean any transaction in which Reorganized Lear enters into a transaction constituting (i) a consolidation or merger in which its New Common Stock is exchanged for securities of another entity, (ii) a reclassification of its New Common Stock into securities other than New Common Stock or (iii) any statutory exchange of the outstanding shares of New Common Stock for securities of another entity. |
| Transferability: | The Warrants will not be subject to any contractual restrictions on transfer other than such as are necessary to ensure compliance with U.S. federal and state securities laws.  Reorganized Lear will undertake to file a registration statement covering the Warrants and the New Common Stock underlying the Warrants and to maintain the effectiveness of the registration statement. |

Exhibit 4

## TERMS OF MANAGEMENT EQUITY PLAN

| | |
|---|---|
| Number of Shares | Equivalent to up to 10% of the New Common Stock. |
| Types of Awards | Initial awards of restricted stock granted as set forth in the section entitled "Grants" herein. Future awards, excluding the awards described herein, to be determined by the Board of Reorganized Lear, and may include, without limitation, restricted stock, restricted stock units, performance shares, performance units, stock appreciation rights, stock options, etc. |
| Pricing | Awards (other than restricted stock and restricted stock units) will have an exercise price per share equal to the fair market value on the date of grant. |
| Grants | Upon emergence, restricted stock grants equal to 2.7% of the New Common Stock, on a fully-diluted basis after giving effect to all securities exercisable or convertible into New Common Stock.<br><br>Future awards will be granted at such time(s) as the Board of Reorganized Lear shall determine. |
| Participants | Participation in the determination of the Board, provided that participation for emergence grants limited to 150 to 200 employees determined as follows:<br><br>(a) E3 and higher (approximately 100 participants), including the participants listed on Schedule A hereto in the percentage of the total award on emergence, as set forth next to such participant's title therein; and<br><br>(b) 50-100 additional participants based on performance, position criticality and other relevant factors. |
| Vesting | Emergence grants shall vest in three equal annual installments on each of the first three anniversaries of the Effective Date. Vesting of emergence grants for a particular employee shall be accelerated, in full, in the event of termination of employment of such employee by Lear without Cause or by such employee with Good Reason.<br><br>Future awards, excluding the emergence awards described herein, shall be subject to such vesting schedules and in such form as determined by the Board. |
| Expiration of Awards | Earlier of (i) ten years after grant, (ii) 30 days after termination of employment other than for death, disability or cause, (iii) one year after termination of employment by death or disability or (iv) immediately upon termination for cause. |

Schedule A

**Top 29 Executives**

| Band ($000) | Title | # of EEs | % of Total Emergence Grant Per Individual EE |
|---|---|---|---|
| Insider | CEO | 1 | 18.25% |
| Insider | Division President | 1 | 4.73% |
| Insider | Division President | 1 | 4.73% |
| Insider | CFO | 1 | 4.73% |
| Insider | SVP, General Counsel | 1 | 4.73% |
| E1 | | 2 | 1.69% |
| E2 | | 22 | 0.92% |

**Other 171 Participants**

| Band ($000) | Title | # of EEs | % of Total Emergence Grant Per Individual EE |
|---|---|---|---|
| E2 | | 2 | 0.92% |
| E3 | | 67 | 0.38% |
| 6 | | 102 | 0.11% |

Exhibit 5

<u>TERMS OF KEY MANAGEMENT INCENTIVE PLAN</u>

| Participants | 29 senior executives |
|---|---|
| Performance measures and weightings | Filing a Plan of Reorganization conforming to the Term Sheet or any other plan that the Board determines, in the exercise of its fiduciary duties, is in the best interests of the Debtors (such plans, a "<u>Satisfactory Plan</u>"), within 60 days after filing the petition: 25% of award opportunity<br><br>Emergence within 300 days from filing the petition: 50% of award opportunity<br><br>Quarterly opportunity for Adjusted Operating Earnings results: 25% of award opportunity (6.25% per quarter) |
| Award opportunity | Market competitive award opportunities set based on position responsibilities, criticality, business impact and other factors<br><br>Specified as a dollar amount which is equal to the market-based multiple of salary times an executive's current base salary<br><br>Award opportunity for filing a Satisfactory Plan and Emergence are binary.  For the Adjusted Operating Earnings award opportunity, payouts can range up to 140% of target for the particular quarter based on actual results  (8.75% per quarter) |
| Payout timing | Within 10 days following the occurrence of the event or, for the Adjusted Operating Earnings award opportunity, within 30 days of completion of the quarter<br><br>If emergence is during a quarter, the Adjusted Operating Earnings opportunity will be prorated assuming target performance<br><br>For the CEO, payout of all earned amounts will be as follows:<br>o    Upon emergence: 50%<br>o    1 year anniversary from emergence: 50% |

Exhibit 6

## TREATMENT OF U.S. BENEFIT PLANS

1.   <u>Plans to be Assumed/Adopted</u>
   - Outside Directors Compensation Plan (interest accounts totaling approximately $346,000)
   - Valued Employee Plan
   - Key Management Incentive Plan
   - Long-Term Stock Incentive Plan (cash dividend portion totaling approximately $375,000)
   - Management Stock Purchase Plan (notional cash accounts totaling approximately $160,000)
   - Qualified Plans (including 401(k) and pension plans)
   - Welfare Plans (including Estate Preservation Plan)
   - Executive Supplemental Savings Plan
   - PSP Excess Plan
   - Supplemental Employee Retirement Program (Pension Equalization Program and pension portion of Executive Supplemental Savings Plan)
   - Severance Policy

2.   <u>Plans Not to be Assumed</u>
   - Annual Incentive Compensation Plan
   - Key Employee Recognition Plan
   - Long-Term Incentive Plan (equity portion and performance awards)
   - Management Stock Purchase Plan (equity portion)
   - Outside Directors Compensation Plan (equity portion)

Exhibit 7

| | % of Fully Diluted Common Equity |
|---|---|
| Series A Preferred Stock for Prepetition Credit Agreement Secured Claims[1] | 26.2% |
| New Common Stock for Prepetition Credit Agreement Secured Claims[1] | 26.2% |
| DIP Facility Warrants[1] | 1.3% |
| Prepetition Credit Agreement Deficiency Claims[2] | 16.4% |
| Unsecured Notes Claim[2] | 29.9% |
| TOTAL | 100.0% |

(1) Subject to dilution from warrants representing 15% of Reorganized Lear's outstanding New Common Stock as set forth in Exhibit 3 and Management Equity Plan.

(2) Subject to dilution from warrants representing 15% of Reorganized Lear's outstanding New Common Stock as set forth in Exhibit 3, Management Equity Plan, and Other General Unsecured Claims not included above.

**ANNEX 1**[1]

---

[1]   **A copy of the DIP Credit Agreement has been filed with the Bankruptcy Court as <u>Exhibit C</u> of the Debtors' motion for authority, among other things, to obtain postpetition financing and use cash collateral [Docket No. 11].**

**ANNEX 2**[2]

---

[2]    A copy of the Exit Facility is attached as <u>Exhibit I</u> to the DIP Credit Agreement, which has been filed as <u>Exhibit C</u> of the Debtors' motion for authority, among other things, to obtain postpetition financing  and use cash collateral [Docket No. 11].

# EXHIBIT E

**Liquidation Analysis**

# Lear Corporation, et al.

**L E A D E R S H I P · P R O B L E M   S O L V I N G · V A L U E   C R E A T I O N**

August 2009



# Hypothetical  Liquidation Analysis



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Statement of Limitations

Statement of Limitations

This report was prepared by Alvarez & Marsal North America, LLC ("A&M") in connection with A&Ms representation of Lear Corporation (the "Company"). A&M assumes no responsibility for the unauthorized distribution or dissemination of this report or the information contained herein.

While the textual information contained herein is believed to be accurate, A&M has not independently verified any of the underlying source data which provided a basis for the information contained herein in connection with the preparation of the report. Accordingly, no representation or warranty is made by A&M as to the accuracy, reliability or completeness of this report and A&M is not responsible to any party, in any way, for any analysis contained in this report or for the future financial or operational performance of the Company or any affiliated company.

While our work may have included an analysis of financial accounting data, this engagement does not include an audit, compilation or review of any kind of any financial statements.  The management of the Company, and that of its affiliated companies, (the "Management") is responsible for any and all financial information prepared during the course of this engagement.  Accordingly, as part of this engagement, A&M does not express any opinion or other form of assurance on the financial statements or financial components referenced or relied upon herein.

In the event the services involved prospective financial or forward-looking information, this information was prepared by Management and our work did not constitute an examination, compilation or agreed-upon procedures in accordance with standards established by the American Institute of Certified Public Accountants, and A&M expresses no assurance of any kind on such information.  There will be differences between estimated and actual results, because events and circumstances frequently do not occur as expected, and those differences may be material.  A&M takes no responsibility for the achievability of the expected results anticipated by Management. Accordingly, A&M is not responsible to any party, in any way, for the future financial or operational performance of the Company or any affiliated company.

Any advice given or report issued by A&M is provided solely for the use and benefit of the Company and only in connection with the purpose in respect of which the services are provided.  Unless required by law, the Company shall not provide any advice given or report issued by us to any third party or refer to A&M or the services without A&M's prior written consent.  In no event, regardless of whether consent has been provided, shall we assume any responsibility to any third party to which any advice or report is disclosed or otherwise made available.  The Company acknowledges that no reliance shall be placed on draft reports, conclusions or advice, whether oral or written, issued by A&M as the same may be subject to further work, revision and other factors which may mean that such drafts are substantially different from any final report or advice issued.  The limiting conditions and disclaimers above are an integral part of this report and may not be read, distributed or referenced to separately.



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

**1**

# Statements Specific to Liquidation Analysis

Statements Specific to Liquidation Analysis

Lear Corporation, et al. ("Lear"), with the assistance of its restructuring and financial advisors, A&M, has prepared this hypothetical liquidation analysis (the "Liquidation Analysis") in connection with the Disclosure Statement. The Liquidation Analysis indicates the values which may be obtained by classes of Claims upon disposition of assets, pursuant to a Chapter 7 liquidation, as an alternative to continued operation of the business under the Plan. Accordingly, asset values discussed herein may be different than amounts referred to in the Plan. The Liquidation Analysis is based upon the assumptions discussed herein. All capitalized terms not defined in this Appendix have the meanings ascribed to them in the Disclosure Statement to which this Appendix is attached.

On July 7, 2009, Lear Corporation and certain of its domestic and Canadian subsidiaries (the "Debtors") filed for Chapter 11 bankruptcy protection in the Southern District of New York. As part of the Debtors proposed Plan of Reorganization, the Debtors are divided into an A and B Group. The Group A Debtors (the "Group A Debtors") refer to the Debtor entities that are guarantors and/or obligors under that certain Amended and Restated Credit Agreement dated as of April 25, 2006, plus the Debtor entities that are guarantors and/or obligors under that certain Indenture dated as of November 24, 2006, and that certain Indenture dated as of August 3, 2004. The remaining Debtors are classified as the Group B Debtors (the "Group B Debtors"). The Group A Debtors and Group B Debtors, unless otherwise mentioned, shall collectively be referred to as the Debtors.

The Liquidation Analysis has been prepared assuming that the Debtors' filed for Chapter 7 protection on July 7, 2009 (the "Liquidation Date"). During the initial 6-month period  following  the Liquidation Date, the Liquidation Analysis assumes an orderly transfer of all Debtor operations to customers or competitors, and the sale of all other non-Debtor operations as going concerns. The liquidation of the remaining assets is based on projected book values as of December 31, 2009, unless otherwise stated. These book values are assumed to be representative of the Debtors' assets and liabilities as of that date. The consolidation of the Debtor entities in the Liquidation Analysis has been prepared in a format consistent with the Plan, consisting of Group A Debtors and Group B Debtors.

The Liquidation Analysis represents an estimate of recovery values and percentages based upon a hypothetical liquidation of the Debtors if a Chapter 7 trustee (the "Trustee") were appointed by the Bankruptcy Court to convert assets into cash. The determination of the hypothetical proceeds from the liquidation of assets is an uncertain process involving the extensive use of estimates and assumptions which, although considered reasonable by Management, are inherently subject to significant business, economic and competitive uncertainties and contingencies beyond the control of the Debtors and their Management. In instances where assumptions and/or methodologies had to be utilized with regard to developing estimates or presenting the treatment of assets and claims that could potentially benefit one class of creditors as compared to the alternative, an attempt was made to utilize an assumption that was equitable to both secured creditors as well as unsecured creditors.



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Statements Specific to Liquidation Analysis

Statements Specific to Liquidation Analysis

ACCORDINGLY, NEITHER THE DEBTORS NOR THEIR ADVISORS MAKE ANY REPRESENTATION OR WARRANTY THAT THE ACTUAL RESULTS OF A LIQUIDATION OF THE DEBTORS WOULD OR WOULD NOT APPROXIMATE THE ASSUMPTIONS REPRESENTED HEREIN. ACTUAL RESULTS COULD VARY MATERIALLY.

In preparing the Liquidation Analysis, the Debtors have estimated an amount of allowed claims for each class of claimants based upon a review of the Debtors' estimated scheduled claims. Additional claims were estimated to include certain postpetition obligations, including but not limited to pension and other post-retirement benefits claims. The estimate of all allowed claims in the Liquidation Analysis is based on the par value of those claims. The estimate of the amount of allowed claims set forth in the Liquidation Analysis should not be relied upon for any other purpose, including, without limitation, any determination of the value of any distribution to be made on account of allowed claims under the Plan. The actual amount of allowed claims could be materially different from the amount of claims estimated in the Liquidation Analysis.

The Liquidation Analysis envisions the orderly transfer and liquidation of substantially all of the Debtors' U.S. operations over a 6-month period and the sale of the remaining operations as going concerns, followed by a wind-down of the Chapter 7 estate (collectively, the "Wind-Down").

An orderly Wind-Down of this magnitude would be unprecedented and fraught with considerable execution risk. It is unclear whether such a process could be accomplished in light of potential labor disruptions and the inherent uncertainty that accompanies all Wind-Downs. Nevertheless, Management believes that a Wind-Down of the U.S. operations that took into account the high degree of interdependence between the Debtors and their customers, the long testing and approval periods generally required to certify automotive products for production, and the proprietary technology employed in manufacturing many of these products would maximize recoveries to creditors. Conversely, a sudden shut-down of the Debtors' operations would likely be extremely disruptive to OEM operations, and consequently would result in lower recoveries to constituents than perceived in this Liquidation Analysis as well as lower recoveries on the going concern entities due to significant amount of customer crossover. Management believes that to maximize recovery to creditors, the Debtors would need to provide a Wind-Down period sufficient for customers to take operational control of the Debtors operations / facilities in an orderly manner. This would result in higher recoveries to constituents through enhanced realizations on receivables, sales of existing inventory to replacement suppliers, maximization of value at the non-Debtor operations (which share certain customers with the Debtors), and substantially reduced damage claims from customers.



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Statements Specific to Liquidation Analysis

Statements Specific to Liquidation Analysis

Management believes that the remaining non-Debtor operations, which are primarily located outside the United States, have greater value being sold as going concerns than in an orderly Wind-Down. Thus, in an attempt to maximize potential recovery, the Liquidation Analysis assumes the going concern sale of the remaining non-Debtor businesses. These operations are assumed to be sold within a period of six months to minimize the impact of deteriorating value resulting from their affiliation with a liquidating parent.

The Liquidation Analysis does not include estimates for the tax consequences, both foreign and domestic, that may be triggered upon the liquidation and sale events of assets in the manner described above. Such tax consequences may be material.

The Liquidation Analysis does not include recoveries resulting from any potential preference, fraudulent transfer or other litigation or avoidance actions.

The Liquidation Analysis assumes that all asset proceeds and creditor recoveries are at nominal amounts and does not consider the discounting of values over time. The discounting of values would result in lower recoveries to constituents than presented in this Liquidation Analysis.



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

4

# Contents



| | | |
|---|---|---|
| I. | Executive Summary | 6 |
| II. | Description of Assumptions / Methodology | 11 |
| – | Asset Recovery | 12 |
| – | Recovery Attributed to non-Debtor Foreign Stock | 16 |
| – | Summary of Claims | 17 |
| – | Summary of Chapter 11 Assumed Liabilities | 19 |
| – | Summary of Wind-Down Costs | 20 |
| III. | Appendices | |
| | Appendix A – Summary of Distributable Value | 22 |
| | Appendix B – Detailed Liquidation Summary | 24 |
| | Appendix C – non-Debtor Stock Recovery Estimates | 27 |
| | Appendix D – Group A Debtor Recovery Estimates | 30 |
| | Appendix E – Group B Debtor Recovery Estimates | 35 |
| | Appendix F – Liquidating non-Debtor Recovery Estimates | 39 |
| | Appendix G – Valuation Support Detail | 43 |

**ALVAREZ & MARSAL**

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# Executive Summary

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

6

# Executive Summary

## I. Executive Summary

The Liquidation Analysis assumes full recovery for the DIP facility, an estimated range of recoveries for the senior secured lenders of between 33.5% and 35.8% (including recovery on deficiency claim), and between 9.7% and 13.5% for all general unsecured creditors

Total net proceeds available for distribution are between $1.66 and $1.84 billion

Recovery breakouts for the Stock Pledges, Group A Debtors and Group B Debtors are included in Appendices C-E

*Lear Corporation, et al.*
Hypothetical Liquidation Analysis - Combined Summary

**Combined Recoveries**
**(Stock Pledges, Group A Debtors, Group B Debtors)**

*(all values in USD 000's, unless otherwise noted)*

| | Allowed Claim | Low Range | Allowed Claim | High Range |
|---|---|---|---|---|
| Net Distributable Value from Stock Pledges | | - | | - |
| Net Distributable Value Subject to Lien Basket | | 633,000 | | 633,000 |
| Net Distributable Value to Unsecured Creditors | | 1,025,693 | | 1,209,648 |
| **Total Net Distributable Proceeds** | | **1,658,693** | | **1,842,648** |
| Less: Superpriority Secured Claims | | | | |
| DIP Facility and Other | 500,000 | 500,000 | 500,000 | 500,000 |
| Payout for Superpriority Secured Claims | | **100.0%** | | **100.0%** |
| Less: Secured Claims | | | | |
| Secured Debt Holders Claims | 2,337,000 | 633,000 | 2,337,000 | 633,000 |
| **Payout % for Secured Claims** | | **27.1%** | | **27.1%** |
| **Remaining Distributable Value** | | 525,693 | | 709,648 |
| Less: Admin and Priority Claims | | | | |
| Trade Accounts Payable (Post-Petition) | | - | | - |
| Accrued Liabilities, Other Admin. and Priority | 63,012 | 63,012 | 63,012 | 63,012 |
| **Payout % for Admin. and Priority Claims** | | **100.0%** | | **100.0%** |
| **Remaining Distributable Value** | | 462,681 | | 646,636 |
| Less: General Unsecured Claims | | | | |
| Senior Debt Deficiency Claim | 1,704,000 | 150,566 | 1,704,000 | 204,493 |
| Bond Debt | 1,342,000 | 118,580 | 1,342,000 | 161,051 |
| Trade Accounts Payable | 14,651 | 2,116 | 14,651 | 3,219 |
| Intercompany Loans | 1,087,512 | 96,093 | 1,087,512 | 130,510 |
| Intercompany A/P | 62,318 | 10,361 | 62,318 | 16,114 |
| Other General Unsecureds | 569,302 | 85,684 | 569,302 | 131,249 |
| **Total Unsecured Non-Priority Claims** | **4,779,783** | **463,400** | **4,779,783** | **646,636** |
| **Payout % for G/U Claims** | | **9.7%** | | **13.5%** |
| **Memo** | | | | |
| Secured Debt Holders Claim Recovery | | 783,566 | | 837,493 |
| Total Secured Debt Holders Claim | | 2,337,000 | | 2,337,000 |
| Total Payout % for Senior Secured Debt | | 33.5% | | 35.8% |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

7

# Executive Summary

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near-term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Purpose of Analysis**

– The Hypothetical Liquidation Analysis is required to be included in the Disclosure Statement for the purpose of evaluating whether the Plan of Reorganization meets the best interest of creditors test under section 1129(a)(7) of the Bankruptcy Code. The Liquidation Analysis will be prepared assuming a Chapter 7 proceeding under the Bankruptcy Code on a hypothetical liquidation date with assets being liquidated

– The analysis assumes that the Group A and Group B Debtor assets are sold via an orderly transition to an Original Equipment Manufacturer (OEM) or competitor

▲ **Overview of Analytical Approach**

– Develop a 6-month orderly transition budget for debtor production/non-production facilities, followed by 12-month estate Wind-Down

– Given the JIT nature of Lear's operations it was assumed certain OEMs participate in an orderly Wind-Down/transfer of programs

  • Transition period assumes cooperation from customers

  • At the conclusion of the initial 6-month period, the customer will pay for all "usable" inventory and pay all "undisputed" A/R (assumed asset sale date of 12/31/09)

– Appraisals for real property are used where available

– Wind-Down costs include (but are not limited to): retention pay (incl. medical for finite period), transfer, facility clean-up, facility holding maintenance/disposal costs, trustee fees, M&E liquidation fees, real estate liquidation fees, professional fees

– Determine going-concern valuation for non-filing entities



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Executive Summary

The Production Mapping process resulted in several entities that would either be liquidated or would experience going-concern value impairment as a result of the liquidation of the Debtors

- ▲ **Overview of Analytical Approach (cont'd)**

  - – Determine treatment of claims waterfall (secured claims, priority/admin. claims, unsecured claims) and overall recoveries to claim categories

  - – Certain assumptions were made related to foreign customer attrition and foreign trade contraction

  - – A critical component of the analysis involves understanding the sales/manufacturing relationships ("Production Mapping") among the Debtors and non-Debtors

    - • Winding down Debtor production facilities has a negative impact to going concern valuation for certain non-Debtor entities in cases where there is a significant sales/manufacturing relationship that cannot be replaced or resourced

- ▲ **Production Mapping Approach**

  - – As a result of the US entities being liquidated, the Toll Manufacturing relationships will be significantly impacted. As a result we value the following entities on a liquidation basis

    - • Lear Automotive EEDS Honduras SA

    - • Consorcio Ind. Mex de Autoparts (CIMA)

    - • Lear Elect Systems de Mexico

    - • Lear Corporation Mexico, S.A. de C.V.

    - • Lear Mexicana S. de R.L. de C.V.

    - • Lear Mexican Trim Operations

    - • Lear Corporation (Vietnam) Limited



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Executive Summary

Based on this analysis, it is believed that the Debtors' proposed Plan of Reorganization satisfies the  Plan confirmation requirements under section 1129(a)(7) of the Bankruptcy Code

▲ **Production Mapping Approach (cont'd)**

– These entities are removed from the going-concern group and are assumed to be liquidated regardless of whether the stock is pledged. Due to the local laws that govern most of these entities, it was assumed that the proceeds generated from liquidating these entities are used to satisfy local creditors and no residual value was assumed to satisfy stock pledges or "flow" up to Group A or Group B unsecured creditors. Throughout this analysis, this group of entities will be referred to as the "Liquidating non-Debtors"

▲ **Conclusion**

– Based on the significantly lower estimated recoveries for both secured and unsecured creditors under this hypothetical liquidation analysis, A&M believes that the Debtors Plan and Disclosure Statement satisfies the requirements of 1129(a)(7) of the Bankruptcy Code



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# Description of Assumptions / Methodology

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Description of Assumptions / Methodology

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Asset Recovery**

– <u>Assets Subject to Lien Basket</u>

- The credit agreement provides that the senior secured lenders are entitled to a security interest on the assets of the Group A Debtors not to exceed 10% of the value of Global Consolidated Assets (the "Lien Basket")

- The categories of assets that participate in this lien basket include: accounts receivable, intercompany loans (excluded in this analysis), inventories, machinery/equipment, prepaid expenses, intellectual property and other misc. assets

- As of May 2009, Global Consolidated Assets totaled $6.3 billion, therefore, the lien basket limitation is assumed to be $633 million (10% x $6.33 billion = $633 million)

– <u>Cash and Equivalents</u>

- Cash, Cash Equivalents and Short-Term Investments include cash in the Debtors' domestic bank accounts, cash equivalents, and investments that mature within 90 days or less. The estimated recovery for this category of assets is 100%

| *(all values in USD 000's, unless otherwise noted)* | Cash & Equivalents (estimated as of 12/31/09) | | |
|---|---|---|---|
| | **Group A** | **Group B** | **Liquidating Non-Debtors** |
| Cash and Equivalents | 124,000 | 15,000 | 22,000 |
| Cash Pickup from Non Essential Overhead | 7,584 | 917 | 1,346 |
| Other Cash Adj. | (129,700) | - | - |
| DIP Proceeds | 434,699 | 65,301 | - |
| **Cash & Cash Equivalents** | **436,583** | **81,218** | **23,346** |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

## I. Asset Recovery

*The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors*

▲ **Asset Recovery (con't)**

– <u>Accounts Receivable</u>

- As a result of maintaining continued supply to their customers and assisting with the transition of their operations to OEMs or competitors, the Debtors assume collection of most of the receivables (net of reserves). Included in the Liquidation Analysis are estimated recoveries of 80% to 95% of the net book value of accounts receivable

*(all values in USD 000's, unless otherwise noted)*

| | Accounts Receivable (estimated as of 12/31/09) | | |
|---|---|---|---|
| | **Group A** | **Group B** | **Liquidating Non-Debtors** |
| A/R - Commercial Customers | 192,431 | 54,844 | 86,229 |
| A/R - Affiliated Customers | 67 | - | - |
| A/R - Factored | - | - | - |
| A/R - Securitized | (146,766) | - | - |
| A/R - Shipped Not Billed | 240 | 22 | 9 |
| **Accounts Receivable** | **45,972** | **54,866** | **86,239** |
| Accounts Receivable Reserve | (1,119) | (259) | (5) |
| **Net Trade Receivables** | **44,854** | **54,607** | **86,233** |

– <u>Intercompany Loans/Receivables</u>

- Intercompany trade relates to vertically integrated sales. Intercompany loans reflect documented loan transactions. The liquidation analysis splits intercompany A/R and A/P, and intercompany loans and does not assume the right of setoff. For example, if XYZ debtor owes ABC non-Debtor $100, but ABC non-Debtor owes XYZ Debtor $50. The analysis assumes that the $50 owed by ABC non-Debtor is an asset included in the liquidation analysis, whereas the $100 owed to ABC non-Debtor is an unsecured liability of the estate



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

**I. Asset Recovery**

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Asset Recovery (con't)**

– <u>Inventories</u>

- Inventories include raw materials, work-in-process, and finished goods, as well as spare parts and non-productive inventory. Due to the limited immediate availability of alternative product (which in many cases is none), the Liquidation Analysis assumes that customers will continue to purchase product from the Debtors for the duration of the initial 6-month period, allowing the Debtors to convert much of their inventory into finished goods. In addition, it is assumed that the remaining inventory is sold to the successor entity at approximately net book value. The liquidation values for inventory are based on the inventory balances from each Debtor's respective books and records, adjusting for items that would have limited recoveries in a liquidation, such as rework (parts not yet meeting quality control standards), excess and obsolete, damaged and defective and packaging goods. The resulting liquidation values employed in the Liquidation Analysis are equal to a blended recovery of 75% to 85% of net book value

*(all values in USD 000's, unless otherwise noted)*

| | Inventory (estimated as of 12/31/09) | | |
|---|---|---|---|
| | **Group A** | **Group B** | **Liquidating Non-Debtors** |
| Raw Material | 49,082 | 53,969 | 9,575 |
| Work In Process | 1,771 | 3,818 | 4 |
| Finished Goods | 32,508 | 21,134 | 3,589 |
| Inventory Reserves - Obsolescence Reserve | (15,870) | (8,271) | (2,302) |
| **Total Inventories** | **67,491** | **70,650** | **10,865** |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

*The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors*

▲ **Asset Recovery (con't)**

– <u>Machinery/Equipment</u>

- Machinery & equipment (which includes but is not limited to categories such as machinery, computer and manufacturing equipment, leaseholds, autos, and construction-in-progress) is assumed to have liquidation values ranging from 25% and 35% of net book value

*(all values in USD 000's, unless otherwise noted)*

| | Machinery & Equipment (estimated as of 12/31/09) | | |
| --- | --- | --- | --- |
| | Group A | Group B | Liquidating Non-Debtors |
| Total Machinery & Equipment | 629,034 | 336,890 | 75,767 |
| Accum Depreciation - Mach & Equip | (559,708) | (242,862) | (61,047) |
| **Total Machinery & Equipment** | **69,327** | **94,028** | **14,720** |

– <u>Prepaid Expense</u>

- Prepaid Expenses and Other Current Assets include deposits, investments in other non-affiliated companies, deferred charges, and other miscellaneous prepaid expenses. Recovery estimates for prepaid expenses and other current assets vary depending upon their nature and assessment of their quality during an orderly liquidation. The estimated blended recovery for this category is approximately 10%, based upon either the use of these assets during the initial 6-month period or expected de minimis recovery on these items

– <u>Land / Buildings</u>

- Because no recent appraisals exist for the Debtors' land/buildings, the fair market value of these assets was derived using 2008 and 2009 tax appraisal estimates



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

**II. Recovery Attributed to non-Debtor Foreign Stock**

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Recovery Attributed to non-Debtor Foreign Stock**

– A&M did not prepare a full valuation analysis for each of the non-Debtor entities; rather, a range of Enterprise Value / EBITDAR (EV/EBITDAR) multiples was applied to an estimate of FY 2010 EBITDAR (as adjusted) by non-Debtor legal entity

– It was assumed that the implied range of EV/EBITDAR multiples used for purposes of valuing the non-Debtor entities was between 4.0x – 5.0x (based on a median peer group multiple of 4.5x)

– To the extent that certain entities were identified in the production mapping as having significant production relationships, these entities were treated as either having (a) an impairment to 2010 EBITDAR (totaling approximately $10.3 million), or (b) were assumed to be liquidated and included in the Liquidating non-Debtors, depending on the percentage of customer business impacted by the liquidation of the North American business

– An adjustment was made to December 2009 cash totaling $371.5 million, based on expected trade contraction in the foreign operations following the announcement of a liquidation and/or sale of the Debtor operations

– Two adjustments were made to the foreign stock valuation based on customer attrition. First, the cash balance was adjusted by $19.4 million based on the Q4(2009) estimated FCF impact from the loss of approximately 10% in non-Debtor sales with an associated contribution margin of approximately 12%. Second, 2010 EBITDAR was adjusted by $92.7 million to reflect the EBITDAR impact due to the permanent loss of these customers



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

III. Summary of Claims

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Summary of Claims**

- Super-Priority Secured Claims

  • The Debtors' debtor-in-possession ("DIP") financing facility of $500 million was assumed to receive full recoveries. In order to not unfairly prejudice secured versus unsecured creditors, the recovery for the DIP was assumed to apply ratably to both Group A and Group B, based on distributable proceeds, from both Group A and Group B recoveries as well as secured and unsecured recoveries

- Secured Claims

  • Secured Claims predominately include the outstanding prepetition revolving credit facility of $1.268 billion, and prepetition term loan facility of $1.069 billion (collectively, the "Senior Secured Claims"). The Senior Secured claims have a security interest in the form of certain non-Debtor foreign stock pledges as well as a Lien Basket on certain Debtor assets not to exceed 10% of Consolidated Global Assets. For purposes of this analysis, the Lien Basket is assumed to be $633 million

  • **The Liquidation Analysis estimates a range of recoveries for the Senior Secured Claims of between 33.5% and 35.8%**



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Summary of Claims (con't)**

–   <u>Administrative / Priority Claims</u>

• Administrative and Priority Claims primarily include approximately $63.0 million for items such as accrued compensation claims, workers compensation, benefit-related expenses, non-income taxes payable, non-trade payables, and other estimated miscellaneous administrative claims. No administrative claims for postpetition intercompany payable claims from trade or loans were assumed in this analysis

• **The liquidation analysis estimates a range of recoveries for the Administrative / Priority claims of 100.0%**

–   <u>General Unsecured Claims</u>

• General Unsecured Claims include estimates for all unsecured non-priority claims arising prior to the Chapter 7 cases. Included within General Unsecured Claims are prepetition trade accounts payable, other general unsecured claims related to legal and other unsecured non-priority obligations, and prepetition inter-company trade and notes payable claims

• **The liquidation analysis estimates a range of recoveries for the General Unsecured Claims of between 9.7% and 13.5%**



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

**III. Summary of Chapter 11 Assumed Liabilities**

*The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors*

▲ **Summary of Chapter 7 Assumed Liabilities**

– <u>Trade A/P (Postpetition), Accrued Salaries and Wages , Taxes Payable,  Other Employee Benefits</u>

- In order to ensure an orderly transition of Debtor operations to successor entities, it was assumed that virtually all of the Debtor employees are hired by the successor entities, including some positions that may be deemed redundant over the long-term, as part of the transaction to purchase the operations  (the "Current Employee Obligations")

- As of the Transition Date, approximately $268.2 million and $165.7 in Current Employee Obligations and other assumed liabilities are estimated to be outstanding for the Group A and Group B Debtors, respectively

- Additionally, it was also assumed that all postpetition trade A/P would also be assumed by the successor entity in order to preserve the viability of the supply chain of the Debtors

- These assumed obligations reduce the estimated gross proceeds received from the sale of the Debtors' assets. In order to burden both the Secured and Unsecured recoveries equitably, the allocation of these assumed liabilities was based on estimated gross distributable proceeds from assets for both secured claimants and unsecured claimants



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Summary of Wind-Down Costs**

– <u>Trustee Fees</u>

- Trustee Fees includes all fees paid to the Chapter 7 Trustee by each Debtor, consistent with the fee structure set forth in the Bankruptcy Code. In light of the size of the distributions, the Chapter 7 Trustee Fee is estimated at approximately 1.0% of the non-intercompany and noncash distributable proceeds at each Debtor entity rather than the 3% maximum allowed under the Bankruptcy Code

– <u>Professional Fees</u>

- Professional Fees include the cost of liquidators, financial advisors, attorneys, and other professionals retained by the Trustee in connection with the Wind-Down of the estates (e.g., liquidation and recovery of assets, sales transaction fees, claims reconciliation, legal fees, etc.). The professional fees are estimated for each Debtor at 1.5% of estimated proceeds available for distribution

– <u>Wind-Down Costs</u>

- *Initial 6-Month Wind-Down Budget*

  – The Liquidation Analysis contemplates the consensual, orderly transition of the Debtors' U.S. operations during a 6-month period. During the Wind-Down Period, the Debtors would continue to supply their customers with goods until the end of the initial 6-month period. Management believes that a "consensual" Wind-Down, as outlined above, would yield significantly higher recoveries in a liquidation by (i) allowing for the management and collection of receivables at / or close to historical collection rates; (ii) providing a method to convert existing inventory into sales of finished goods as the Debtors continue to provide goods to their customers; (iii) providing an outlet to sell unused productive inventory to new re-sourced suppliers at approximately net book values; (iv) mitigating contract damage as a result of continuation of supply and cooperation; and (v)



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Hypothetical Liquidation Analysis Methodology

**III. Summary of Wind-Down Costs**

The Liquidation Analysis will assume that the Chapter 7 trustee will sell assets producing positive cash flow or have a reasonably good chance of producing positive cash flow in the near term for going-concern value to the extent such a sale provides the highest value to creditors

▲ **Summary of Wind-Down Costs (con't)**

– <u>Wind-Down Costs (con't)</u>

• *Initial 6-Month Wind-Down Budget (con't)*

– maximizing value in the foreign operations, which share many similar customers with the Debtors. During this period an estimate was made for certain non-essential overhead that could be removed during the initial 6-month period. The costs of this initial 6-month Wind-Down period, as well as the cash benefit resulting from the reduction of certain non-essential overhead, are reflected in the pro-forma 12/31/09 balance sheet cash for the Debtors

• *12-Month Estate Wind-Down Budget*

– Following the initial 6-month Wind-Down period involving the sale and /or transition of a majority of the Debtors' assets, it is assumed that a certain level of minimal overhead is needed to support the Wind-Down of the remaining estate affairs

– In the aggregate, total estate Wind-Down expenses for the 12-month period are estimated at approximately $14.4 million for the Group A Debtors, Group B Debtors and Liquidating non-Debtors



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# APPENDIX A
Summary of
Distributable Value

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

**ALVAREZ & MARSAL**

# Summary of Distributable Value

**Summary of Distributable Value**

***Lear Corporation, et al.***

*Hypothetical Liquidation Analysis - Summary of Distributable Value*

*(all values in USD millions, unless otherwise noted)*

| | Est. Book Value | 2010P EBITDAR | Reference Range Low | Reference Range High | Illustrative Value Range Low | Illustrative Value Range High |
|---|---|---|---|---|---|---|
| **Non-Debtor Distributable Value** | | | | | | |
| Total Non-Debtor Foreign Entities | | 126.6 | 4.0x | 5.0x | 506.3 | 632.9 |
|    Plus: Equity Interest in Affiliates | 53.7 | | | | 53.7 | 53.7 |
|    Plus: Total Cash | 594.2 | | | | 594.2 | 594.2 |
|    Plus: Lear ASC Equity Value | 143.8 | | 80.0% | 95.0% | 115.0 | 136.6 |
|    Plus: Recovery on I/C Due | 1,087.5 | | | | 96.1 | 130.5 |
|    Less: I/C Debt Owed | (1,598.8) | | | | (1,598.8) | (1,598.8) |
|    Less: Local Third Party Debt | (39.3) | | | | (39.3) | (39.3) |
| Illustrative Equity Value | | | | | - | - |
| Distributable Value % | | | | | 100.0% | 100.0% |
| **Available Equity Value** | | | | | - | - |
|   *Non-Debtor Stock Pledge Valuation Distributable Value (Less Cash)* | | | | | *(594.2)* | *(594.2)* |

| | Book Value (@ Dec-09) | | | | | |
|---|---|---|---|---|---|---|
| **Group A/B Debtor Distributable Value** | | | | | | |
| Cash | 517.8 | | 100.0% | 100.0% | 517.8 | 517.8 |
| Land/Buildings | 125.5 | | 60.0% | 80.0% | 75.3 | 100.4 |
| Accounts Receivable | 99.5 | | 80.0% | 95.0% | 79.6 | 94.5 |
| Intercompany | | | | | | |
|   Receivables | 87.7 | | | | 61.4 | 70.1 |
|   Loans | 1,597.6 | | | | 1,268.3 | 1,378.1 |
| Inventories | 138.1 | | 75.0% | 85.0% | 103.6 | 117.4 |
| Machinery & Equipment | 163.4 | | 25.0% | 35.0% | 40.8 | 57.2 |
| Prepaid Expense | 24.9 | | 10.0% | 10.0% | 2.5 | 2.5 |
| Other | | | | | | |
| Less: Assumed Liabilities | (433.8) | | | | (433.8) | (433.8) |
| Less: Wind-Down Costs | | | | | (56.7) | (61.4) |
| **Available Debtor Distributable Value** | | | | | 1,658.7 | 1,842.6 |
| *Debtor Distributable Value (Less Cash)* | | | | | *1,140.9* | *1,324.8* |
| **Total Available Distributable Value** | | | | | 1,658.7 | 1,842.6 |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# APPENDIX B
# Detailed Liquidation Summary

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

**ALVAREZ & MARSAL**

**24**

# Detailed Liquidation Summary

**Lear Corporation, et al.**

Hypothetical Liquidation Analysis - Detailed Summary

*(all values in USD 000's, unless otherwise noted)*

| | Allowed Claim | Foreign Stock Pledges | Group A Debtors | Group B Debtors | Total | Notes |
|---|---|---|---|---|---|---|
| | | | **Low Recovery Range** | | | |
| Net Distributable Value from Stock Pledges | | - | | | - | Appendix C |
| Net Distributable Value Subject to Lien Basket | | | 633,000 | - | 633,000 | Appendix D |
| Net Distributable Value to Unsecured Creditors | | | 899,600 | 126,093 | 1,025,693 | Appendix D, E |
| **Total Net Distributable Proceeds** | | - | **1,532,600** | **126,093** | **1,658,693** | |
| Less: Superpriority Secured Claims | | | | | | |
| DIP Facility and Other | 500,000 | | 434,699 | 65,301 | 500,000 | |
| Payout for Superpriority Secured Claims | | | | | **100.0%** | |
| Less: Secured Claims | | | | | | |
| Secured Debt Holders Claims | 2,337,000 | - | 633,000 | | 633,000 | |
| **Payout % for Secured Claims** | | | | | **27.1%** | |
| **Remaining Distributable Value** | | - | **464,902** | **60,792** | **525,693** | |
| Less: Admin and Priority Claims | | | | | | |
| Trade Accounts Payable (Post-Petition) | - | | - | - | - | |
| Accrued Liabilities, Other Admin. and Priority | 63,012 | | 62,292 | 720 | 63,012 | Appendix D, E |
| **Payout % for Admin. and Priority Claims** | | | | | **100.0%** | |
| **Remaining Distributable Value** | | | **402,609** | **60,071** | **462,681** | |
| Less: General Unsecured Claims | | | | | | |
| Senior Debt Deficiency Claim | 1,704,000 | | 150,566 | - | 150,566 | Appendix D, E |
| Bond Debt | 1,342,000 | | 118,580 | - | 118,580 | Appendix D, E |
| Trade Accounts Payable | 14,651 | | 900 | 1,216 | 2,116 | Appendix D, E |
| Intercompany Loans | 1,087,512 | | 96,093 | - | 96,093 | Appendix D, E |
| Intercompany A/P | 62,318 | | 3,173 | 7,189 | 10,361 | Appendix D, E |
| Other General Unsecureds | 569,302 | | 33,298 | 52,386 | 85,684 | Appendix D, E |
| **Total Unsecured Non-Priority Claims** | **4,779,783** | | **402,609** | **60,791** | **463,400** | |
| **Payout % for G/U Claims** | | | | | **9.7%** | |
| **Memo** | | | | | | |
| Total Payout % for Senior Secured Debt | | | | | 33.5% | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Detailed Liquidation Summary

**High Recovery Range**

*Lear Corporation, et al.*

Hypothetical Liquidation Analysis - Detailed Summary

*(all values in USD 000's, unless otherwise noted)*

| | Allowed Claim | Foreign Stock Pledges | Group A Debtors | Group B Debtors | Total | Notes |
|---|---|---|---|---|---|---|
| | | | **High Recovery Range** | | | |
| Net Distributable Value from Stock Pledges | | - | - | - | - | Appendix C |
| Net Distributable Value Subject to Lien Basket | | | 633,000 | - | 633,000 | Appendix D |
| Net Distributable Value to Unsecured Creditors | | | 1,043,800 | 165,848 | 1,209,648 | Appendix D, E |
| **Total Net Distributable Proceeds** | | **-** | **1,676,800** | **165,848** | **1,842,648** | |
| Less: Superpriority Secured Claims | | | | | | |
| DIP Facility and Other | 500,000 | | 434,699 | 65,301 | 500,000 | |
| **Payout for Superpriority Secured Claims** | | | | | **100.0%** | |
| Less: Secured Claims | | | | | | |
| Secured Debt Holders Claims | 2,337,000 | - | 633,000 | | 633,000 | |
| **Payout % for Secured Claims** | | | | | **27.1%** | |
| **Remaining Distributable Value** | | **-** | **609,101** | **100,547** | **709,648** | |
| Less: Admin and Priority Claims | | | | | | |
| Trade Accounts Payable (Post-Petition) | - | | - | - | - | |
| Accrued Liabilities, Other Admin. and Priority | 63,012 | | 62,292 | 720 | 63,012 | Appendix D, E |
| **Payout % for Admin. and Priority Claims** | | | | | **100.0%** | |
| **Remaining Distributable Value** | | | **546,809** | **99,826** | **646,636** | |
| Less: General Unsecured Claims | | | | | | |
| Senior Debt Deficiency Claim | 1,704,000 | | 204,493 | - | 204,493 | Appendix D, E |
| Bond Debt | 1,342,000 | | 161,051 | - | 161,051 | Appendix D, E |
| Trade Accounts Payable | 14,651 | | 1,222 | 1,997 | 3,219 | Appendix D, E |
| Intercompany Loans | 1,087,512 | | 130,510 | - | 130,510 | Appendix D, E |
| Intercompany A/P | 62,318 | | 4,309 | 11,805 | 16,114 | Appendix D, E |
| Other General Unsecureds | 569,302 | | 45,224 | 86,025 | 131,249 | Appendix D, E |
| **Total Unsecured Non-Priority Claims** | **4,779,783** | | **546,809** | **99,826** | **646,636** | |
| **Payout % for G/U Claims** | | | | | **13.5%** | |

**Memo**

Total Payout % for Senior Secured Debt          35.8%



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



**APPENDIX C**
non-Debtor Stock
Recovery Estimates

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

**27**

# Non-Debtor Stock Recovery

**Calculation of Non-Debtor Stock Recovery Distributable Value**

*Lear Corporation, et al.*

Hypothetical Liquidation Analysis - Stock Pledge Valuation

*(all values in USD millions, unless otherwise noted)*

| | Est. Book Value [a] | 2010P EBITDAR | Reference Range Low | Reference Range High | Illustrative Value Range Low | Illustrative Value Range High | Notes |
|---|---|---|---|---|---|---|---|
| Total Non-Debtor Foreign Value | | 126.6 | 4.0x | 5.0x | 506.3 | 632.9 | Appendix G |
| Plus: Equity Interest in Affiliates | 53.7 | | | | 53.7 | 53.7 | Appendix G |
| Plus: Total Cash | 594.2 | | | | 594.2 | 594.2 | Appendix G |
| Plus: Lear ASC Equity Value | 143.8 | | | | 115.0 | 136.6 | Note A |
| Plus: Recovery on I/C Due | 1,087.5 | | | | 96.1 | 130.5 | Note B |
| Less: I/C Debt Owed | (1,598.8) | | | | (1,598.8) | (1,598.8) | Note B |
| Less: Local Third Party Debt | (39.3) | | | | (39.3) | (39.3) | Appendix G |
| Illustrative Equity Value | | | | | - | - | |
| Unencumbered Value % | | | | | 100.0% | 100.0% | |
| Available Equity Value | | | | | - | - | |
| | | | | | | | |
| 100% Stock Distribution % | | | | | 0.0% | 0.0% | Note C |
| 65% Stock Pledge Distribution % | | | | | 0.0% | 65.0% | Note C |
| 35% Unencumbered Distribution % (Residual to Group A) | | | | | 0.0% | 35.0% | Note C |
| 35% Unencumbered Distribution % (Residual to Group B) | | | | | 0.0% | 0.0% | Note C |
| Unencumbered Non Pledge Stock % Distribution (Residual to Group A) | | | | | 0.0% | 0.0% | Note C |
| Unencumbered Non Pledge Stock % Distribution % (Residual to Group B) | | | | | 0.0% | 0.0% | Note C |
| | | | | | | | |
| **Total Secured Claims from Pledged Stock** | | | | | **-** | **-** | |
| Total Secured Debt Holders Claim | | | | | 2,337.0 | 2,337.0 | Note D |
| **Secured Debt Holders Claim (Net of Pledged Stock Proceeds)** | | | | | **2,337.0** | **2,337.0** | Note E |

*Remaining Distributable Value:*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| To Group A Creditors | | | | | - | - | |
| To Group B Creditors | | | | | - | - | |

*Notes:*

[a] Book value as of May 2009. Cash has been adjusted for estimated non-Debtor trade contraction and FCF loss due to customer attrition



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Notes

| Notes |
|---|

- **Note A** – The prepetition Senior Secured Lenders have a pledge of 100% of the equity in Lear ASC which is assumed to range between 80-95% of the value of accounts receivable as of 12/31/09

- **Note B** – To the extent a non-Debtor foreign entity is a lender to one of the Debtors, the recovery on this intercompany loan has been adjusted to equal the unsecured recovery % for the relevant Debtor bankruptcy. For example, if XYZ non-Debtor is owed $100 from a Group A Debtor, and the unsecured recovery % for the Group A Debtors is estimated at between 15% and 20%, the assumed recovery on this loan is estimated to be between $15 and $20. To the extent a non-Debtor foreign entity is a borrower to one of the Debtors, the recovery on this loan to the Debtors is assumed to range between 70% and 80% (with the exception of a certain $500 million intercompany loan due form Luxemburg to Lear Corporation which is assumed to recover 100%). The discount rate on the loan reflects the additional risk of default of the non-Debtor foreign entity in the event of a liquidation of the Debtors operations

- **Note C** - Distribution of total non-Debtor foreign value to each of the collateral categories, including 100% stock pledges, 65% stock pledges  and non-pledged entities, based on the equity value of each individual collateral category divided by the sum of the value of all collateral categories.

- **Note D** – Estimated claim for the prepetition Secured Debtholders

- **Note E** – The remaining Secured Debtholders' Claim after the application of pledged stock proceeds is assumed to be the beginning secured claim balance for the Group A recovery analysis



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# APPENDIX D
Group A Debtor
Recovery Estimates

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

**ALVAREZ & MARSAL**

# Group A - Proceeds Analysis

**Net Distributable Assets Subject to Lien Basket**

- The net distributable assets subject to the Lien Basket range from $1.24 billion to $1.37 billion, which exceeds the estimated Lien Basket limitation estimate of $633 million. Therefore, the prepetition secured lenders are estimated to receive the full amount of the Lien Basket value. The distributable value over the Lien Basket of between $602.1 million and $737.9 million is assumed unencumbered and available for distribution to priority, administrative and general unsecured creditors

- With the exception of a $500 million intercompany loan due from Luxemburg to Lear Corporation (assumed to be 100% recoverable), the remaining intercompany loans due from non-Debtor foreign entities is expected to receive a recovery range between 70% and 80%

**Lear Corporation, et al.**
Hypothetical Liquidation Analysis - Group A

**ASSETS**
*(all values in USD 000's, unless otherwise noted)*

| | Net Book Value | Lower Liquidation Value | | Higher Liquidation Value | | Notes |
|---|---|---|---|---|---|---|
| | | Estimated Value | Estimated Realization Rate | Estimated Value | Estimated Realization Rate | |
| **Assets Subject to Lien Basket** | | | | | | |
| Accounts Receivable | 44,854 | 35,883 | 80.0% | 42,611 | 95.0% | Note A |
| Intercompany | | | | | | |
| Receivables | 12,317 | 8,622 | 70.0% | 9,853 | 80.0% | |
| Loans | 1,555,923 | 1,239,146 | 79.6% | 1,344,739 | 86.4% | |
| Inventories | 67,491 | 50,618 | 75.0% | 57,368 | 85.0% | Note A |
| Machinery & Equipment | 69,327 | 17,332 | 25.0% | 24,264 | 35.0% | Note A |
| Prepaid Expense | 24,153 | 2,415 | 10.0% | 2,415 | 10.0% | Note A |
| Other | - | - | 0.0% | - | 0.0% | Note A |
| **Gross Distributable Value Subject to Lien Basket** | **1,774,064** | **1,354,016** | | **1,481,250** | | |
| Less: Assumed Liabilities (Attributable to Lien Basket Assets) | | | | | | |
| Accrued Salaries and Wages | 7,128 | (2,602) | | (2,387) | | Note B |
| Taxes Payable | 10,236 | (3,737) | | (3,428) | | Note B |
| Other Employee Benefits | 40,521 | (14,795) | | (13,570) | | Note B |
| Trade A/P (Post Petition) | 169,402 | (61,851) | | (56,731) | | Note B |
| Other Assumed Liabilities | 40,889 | (14,929) | | (13,693) | | Note B |
| **Distributable Assets (Net of Assumed Liabilities)** | | **1,256,102** | | **1,391,441** | | |
| Less: Attributable Wind-Down Costs | **Total Costs** | | | | | |
| Trustee Fees (% of Distributable Assets) | 1.0% | (6,330) | | (6,330) | | Note C |
| Estate Wind-down Costs | | (5,166) | | (4,719) | | Note D |
| Professional Fees | 1.5% | (9,495) | | (9,495) | | Note E |
| **Net Distributable Value Subject to Lien Basket** | | **1,235,111** | | **1,370,897** | | |
| Lien Basket Limitation | | 633,000 | | 633,000 | | |
| **Net Distributable Value Above Lien Basket** | | **602,111** | | **737,897** | | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Group A - Proceeds Analysis

## Net Distributable Assets "Not" Subject to Lien Basket

▲  Total net distributable assets "not" subject to the Lien Basket, and available for distribution to Priority, Administrative and General Unsecured creditors ranges between $899.6 million and $1.04 billion

**Lear Corporation, et al.**
Hypothetical Liquidation Analysis - Group A

### ASSETS
*(all values in USD 000's, unless otherwise noted)*

| | Net Book Value | Lower Liquidation Value | | Higher Liquidation Value | | Notes |
|---|---|---|---|---|---|---|
| | | Estimated Value | Estimated Realization Rate | Estimated Value | Estimated Realization Rate | |
| **Assets Not Subject to Lien Basket** | | | | | | |
| Net Distributable Value Above Lien Basket | | 602,111 | | 737,897 | | Note F |
| Cash and Cash Equivalents | 436,583 | 436,583 | 100.0% | 436,583 | 100.0% | Note G |
| Land Buildings | 103,375 | 62,025 | 60.0% | 82,700 | 80.0% | |
| **Gross Distributable Value Not Subject to Lien Basket** | **539,957** | **1,100,718** | | **1,257,180** | | |
| | | | | | | |
| Less: Assumed Liabilities (Attributable to Remaining Assets) | | | | | | |
| Accrued Salaries and Wages | 7,128 | (4,525) | | (4,741) | | Note B |
| Taxes Payable | 10,236 | (6,499) | | (6,808) | | Note B |
| Other Employee Benefits | 40,521 | (25,727) | | (26,951) | | Note B |
| Trade A/P (Post Petition) | 169,402 | (107,552) | | (112,671) | | Note B |
| Other Assumed Liabilities | 40,889 | (25,960) | | (27,196) | | Note B |
| **Distributable Assets (Net of Assumed Liabilities)** | | **930,456** | | **1,078,812** | | |
| | | | | | | |
| **Distributable Unencumbered Value from Foreign Stock Pledges** | | - | | - | | |
| | | Total Costs | | | | |
| Less: Attributable Wind-Down Costs | | | | | | |
| Trustee Fees (% of Distributable Assets) | 1.0% | (9,305) | | (10,788) | | Note C |
| Estate Wind-down Costs | | (7,594) | | (8,042) | | Note D |
| Professional Fees | 1.5% | (13,957) | | (16,182) | | Note E |
| | | | | | | |
| **Total Distributable Unencumbered Value** | | **899,600** | | **1,043,800** | | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Group A – Recovery Analysis

**Group A Liquidation Analysis**

- ▲ The estimated range of recoveries for prepetition Senior Secured Lenders is between 33.5% and 35.8% (including estimated recoveries from foreign stock pledges)

- ▲ The estimated range of recoveries for Group A General Unsecured creditors is between 8.8% and 12.0%.

- ▲ The DIP and Priority/Administrative claims are assumed to receive full recovery

| **RECOVERIES** | Lower Liquidation Value | | Higher Liquidation Value | | |
|---|---|---|---|---|---|
| | Estimated Allowed Claim | Estimated Recovery | Estimated Allowed Claim | Estimated Recovery | |
| *(all values in USD 000's, unless otherwise noted)* | | | | | |
| **Total Available Distributable Assets** | | 1,532,600 | | 1,676,800 | See Previous Page |
| Less: Secured Claims | | | | | |
| DIP Facility and Other | 434,699 | 434,699 | 434,699 | 434,699 | Note H |
| Secured Debt Holders Claims (Net of Pledge Stock Proceeds) | 2,337,000 | 633,000 | 2,337,000 | 633,000 | |
| Total Secured Claims | 2,771,699 | 1,067,699 | 2,771,699 | 1,067,699 | |
| **Payout % for Secured Claims** | | 38.5% | | 38.5% | |
| **Remaining Distributable Value** | | 464,902 | | 609,101 | |
| Less: Admin and Priority Claims | | | | | |
| Trade Accounts Payable (Post-Petition) | - | - | - | - | |
| Accrued Liabilities, Other Admin. and Priority | 62,292 | 62,292 | 62,292 | 62,292 | |
| **Payout % for Admin. and Priority Claims** | | 100.0% | | 100.0% | |
| **Remaining Distributable Value** | | 402,609 | | 546,809 | |
| Less: General Unsecured Claims | | | | | |
| Senior Debt Deficiency Claim | 1,704,000 | 150,566 | 1,704,000 | 204,493 | |
| Bond Debt | 1,342,000 | 118,580 | 1,342,000 | 161,051 | |
| Trade Accounts Payable | 10,184 | 900 | 10,184 | 1,222 | |
| Intercompany Loans | 1,087,512 | 96,093 | 1,087,512 | 130,510 | |
| Intercompany A/P | 35,908 | 3,173 | 35,908 | 4,309 | |
| Other General Unsecureds | 376,839 | 33,298 | 376,839 | 45,224 | |
| **Total Unsecured Non-Priority Claims** | 4,556,443 | 402,609 | 4,556,443 | 546,809 | |
| **Payout % for G/U Claims** | | 8.8% | | 12.0% | |
| **Memo** | | | | | |
| Total Payout % for Senior Secured Debt | | 33.5% | | 35.8% | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Notes

<table>
<tr><td>Notes</td></tr>
</table>

▲ **<u>Note A</u>** –   Based on proforma balances as of 12/31/09

▲ **<u>Note B</u>** –   At the conclusion of the 6-month Wind-Down period, it is assumed that all employees will become employees of the successor entities. As part of the sale of these assets, certain current employee-related liabilities, as well as all post petition trade A/P outstanding at the time of the sale are assumed by the successor entities. The assumption of these liabilities is netted against the total gross distributable value. Assumed liabilities are shared ratably between total gross distributable assets subject to lien basket and total gross distributable assets "not" subject to lien basket

▲ **<u>Note C</u>** –   Trustee fees are assumed to be 1.0% of net distributable assets. These fees are assumed on proceeds from both assets subject to lien basket and assets "not" subject to lien basket

▲ **<u>Note D</u>** –   Certain Wind-Down costs are assumed to be incurred post 12/31/09 in order to support the Wind-Down of the remaining estate affairs

▲ **<u>Note E</u>** –   Certain professional fees are assumed to be incurred post 12/31/09 in order to support the Wind-Down of the estate. These fees are assumed to be 1.5% of gross distributable proceeds

▲ **<u>Note F</u>** –   The Lien Basket limits the security interest on certain Group A assets up to 10% of Global Consolidated Assets (assumed to be $633 million for the Liquidation Analysis). Any net distributable assets over this amount are available for distribution to unsecured creditors

▲ **<u>Note G</u>** -   Based on proforma balances as of 12/31/09, including proceeds of DIP facility

▲ **<u>Note H</u>** -   The DIP claim is assumed to be distributed ratably between Group A Debtors and Group B Debtors based on Total Distributable Unencumbered Value



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# APPENDIX E
Group B Debtor
Recovery Estimates

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Group B - Proceeds Analysis

**Group B Liquidation Analysis**

▲ The net distributable assets available for distribution to Group B Debtor creditors range between $126.1 and $165.8 million

**Lear Corporation, et al.**
Hypothetical Liquidation Analysis - Group B

**ASSETS**
*(all values in USD 000's, unless otherwise noted)*

| | Net Book Value | Lower Liquidation Value Estimated Value | Estimated Realization Rate | Higher Liquidation Value Estimated Value | Estimated Realization Rate | Notes |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | 81,218 | 81,218 | 100.0% | 81,218 | 100.0% | Note A |
| Land/Buildings | 22,088 | 13,253 | 60.0% | 17,670 | 80.0% | |
| Accounts Receivable | 54,607 | 43,686 | 80.0% | 51,877 | 95.0% | Note A |
| Intercompany | | | | | | |
| Receivables | 75,338 | 52,737 | 70.0% | 60,271 | 80.0% | |
| Loans | 41,642 | 29,149 | 70.0% | 33,313 | 80.0% | |
| Inventories | 70,650 | 52,987 | 75.0% | 60,052 | 85.0% | Note A |
| Machinery & Equipment | 94,028 | 23,507 | 25.0% | 32,910 | 35.0% | Note A |
| Prepaid Expense | 734 | 73 | 10.0% | 73 | 10.0% | Note A |
| Other | - | | 0.0% | - | 0.0% | Note A |
| Total Assets | 440,305 | 296,611 | | 337,385 | | |
| Less: Assumed Liabilities | | | | | | |
| Accrued Salaries and Wages | 5,389 | (5,389) | | (5,389) | | Note B |
| Taxes Payable | 1,160 | (1,160) | | (1,160) | | Note B |
| Other Employee Benefits | 6,916 | (6,916) | | (6,916) | | Note B |
| Trade A/P (Post Petition) | 134,687 | (134,687) | | (134,687) | | Note B |
| Other Assumed Liabilities | 17,514 | (17,514) | | (17,514) | | Note B |
| **Total Distributable Assets** | | **130,944** | | **171,719** | | |
| **Distributable Unencumbered Value from Foreign Stock Pledges** | | - | | - | | |
| Less: Attributable Wind-Down Costs | Total Costs | | | | | |
| Trustee Fees (% of Distributable Assets) | 1.0% | (1,309) | | (1,717) | | Note C |
| Estate Wind-down Costs | | (1,578) | | (1,578) | | Note D |
| Professional Fees | 1.5% | (1,964) | | (2,576) | | Note E |
| **Total Distributable Unencumbered Value** | | **126,093** | | **165,848** | | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

36

# Group B – Recovery Analysis

**Group B Liquidation Analysis**

▲ The estimated range of recoveries for Group B General Unsecured creditors is between 27.2% and 44.7%.

▲ The DIP and Priority/Administrative claims are assumed to receive full recovery

| **RECOVERIES** | Lower Liquidation Value | | Higher Liquidation Value | | |
|---|---|---|---|---|---|
| *(all values in USD 000's, unless otherwise noted)* | Estimated Allowed Claim | Estimated Recovery | Estimated Allowed Claim | Estimated Recovery | |
| **Total Available Distributable Assets** | | **126,093** | | **165,848** | See Previous Page |
| Less: Secured Claims | | | | | |
| DIP Facility and Other | 65,301 | 65,301 | 65,301 | 65,301 | Note F |
| Secured Debt Holders Claims | - | | - | | |
| Total Secured Claims | 65,301 | 65,301 | 65,301 | 65,301 | |
| **Payout % for Secured Claims** | | **100.0%** | | **100.0%** | |
| **Remaining Distributable Value** | | **60,792** | | **100,547** | |
| Less: Admin and Priority Claims | | | | | |
| Trade Accounts Payable (Post-Petition) | - | | - | | |
| Accrued Liabilities, Other Admin. and Priority | 720 | 720 | 720 | 720 | |
| **Payout % for Admin. and Priority Claims** | | **100.0%** | | **100.0%** | |
| **Remaining Distributable Value** | | **60,791** | | **99,826** | |
| Less: General Unsecured Claims | | | | | |
| Senior Debt Deficiency Claim | - | - | - | - | |
| Bond Debt | - | - | - | - | |
| Trade Accounts Payable | 4,467 | 1,216 | 4,467 | 1,997 | |
| Intercompany Loans | - | - | - | - | |
| Intercompany A/P | 26,410 | 7,189 | 26,410 | 11,805 | |
| Other General Unsecureds | 192,463 | 52,386 | 192,463 | 86,025 | |
| **Total Unsecured Non-Priority Claims** | **223,340** | **60,791** | **223,340** | **99,826** | |
| **Payout % for G/U Claims** | | **27.2%** | | **44.7%** | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Notes

| Notes |
|-------|

- ▲ **<u>Note A</u>** – Based on proforma balances as of 12/31/09
- ▲ **<u>Note B</u>** – At the conclusion of the 6-month Wind-Down period, it is assumed that all employees will become employees of the successor entities. As a result as part of the sale of these assets, certain current employee-related liabilities outstanding at the time of the sale are assumed to be assumed by the successor entities. The assumption of these liabilities is netted against the total gross distributable value
- ▲ **<u>Note C</u>** – Trustee fees are assumed to be 1% of net distributable assets. These fees are assumed on proceeds from both assets subject to lien basket and assets "not" subject to lien basket
- ▲ **<u>Note D</u>** – Certain Wind-Down costs are assumed to be incurred post 12/31/09 in order to support the Wind-Down of the remaining estate affairs
- ▲ **<u>Note E</u>** – Certain professional fees are assumed to be incurred post 12/31/09 in order to support the Wind-Down of the estate. These fees are assumed to be 1.5% of gross distributable proceeds
- ▲ **<u>Note F</u>** - The DIP claim is assumed to be distributed ratably between Group A Debtors and Group B Debtors based on Total Distributable Unencumbered Value



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# APPENDIX F
Liquidating non-Debtor
Recovery Estimates

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Liquidating non-Debtor - Proceeds Analysis

**Liquidating non-Debtor Proceeds Analysis**

▲ The net distributable assets available for distribution to Liquidating non-Debtors' creditors range between $50.5 million and $74.5 million

***Lear Corporation, et al.***
Hypothetical Liquidation Analysis - Group C

**ASSETS**
*(all values in USD 000's, unless otherwise noted)*

| | Net Book Value | Lower Liquidation Value — Estimated Value | Lower Liquidation Value — Estimated Realization Rate | Higher Liquidation Value — Estimated Value | Higher Liquidation Value — Estimated Realization Rate | Notes |
|---|---|---|---|---|---|---|
| Cash and Cash Equivalents | 23,346 | 23,346 | 100.0% | 23,346 | 100.0% | Note A |
| Land/Buildings | 42,606 | 21,303 | 50.0% | 29,824 | 70.0% | Note A |
| Accounts Receivable | 86,233 | 68,987 | 80.0% | 81,922 | 95.0% | Note A |
| Intercompany | | | | | | |
| Receivables | 4,637 | 3,246 | 70.0% | 3,710 | 80.0% | |
| Loans | 1,198 | 839 | 70.0% | 958 | 80.0% | |
| Inventories | 10,865 | 8,149 | 75.0% | 9,235 | 85.0% | Note A |
| Machinery & Equipment | 14,720 | 3,680 | 25.0% | 5,152 | 35.0% | Note A |
| Prepaid Expense | 556 | 56 | 10.0% | 56 | 10.0% | Note A |
| Other | | - | 0.0% | - | 0.0% | Note A |
| Total Assets | **184,161** | **129,604** | | **154,202** | | |
| | | | | | | |
| Less: Assumed Liabilities | | | | | | |
| Accrued Salaries and Wages | 5,249 | (5,249) | | (5,249) | | Note B |
| Taxes Payable | 29,994 | (29,994) | | (29,994) | | Note B |
| Other Employee Benefits | 13,485 | (13,485) | | (13,485) | | Note B |
| Trade A/P (Post Petition) | 18,062 | (18,062) | | (18,062) | | Note B |
| Other Assumed Liabilities | 10,998 | (10,998) | | (10,998) | | Note B |
| **Total Distributable Assets** | | **51,816** | | **76,414** | | |
| **Distributable Unencumbered Value from Foreign Stock Pledges** | | **-** | | **-** | | |
| | | Total Costs | | | | |
| Less: Attributable Wind-Down Costs | | | | | | |
| Trustee Fees (% of Distributable Assets) | | 1.0% | (518) | (764) | | Note C |
| Estate Wind-down Costs | | | (45) | (45) | | Note D |
| Professional Fees | | 1.5% | (777) | (1,146) | | Note E |
| **Total Distributable Unencumbered Value** | | **50,476** | | **74,459** | | |


© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

40

# Liquidating non-Debtor – Recovery Analysis

**Liquidating non-Debtor Recovery Analysis**

▲ Due to local laws that govern most of these entities, it was assumed that the proceeds generated from liquidating these entities are used to satisfy local creditors and no residual value was assumed to satisfy stock pledges or "flow" up to Group A or Group B creditors.

| RECOVERIES | Lower Liquidation Value | | Higher Liquidation Value | | |
| --- | --- | --- | --- | --- | --- |
| | Estimated Allowed Claim | Estimated Recovery | Estimated Allowed Claim | Estimated Recovery | |
| *(all values in USD 000's, unless otherwise noted)* | | | | | |
| **Total Available Distributable Assets** | | **50,476** | | **74,459** | See Previous Page |
| | | | | | |
| Less: Secured Claims | | | | | |
| DIP Facility and Other | - | - | - | - | Note F |
| Secured Debt Holders Claims | - | - | - | - | |
| Total Secured Claims | - | - | - | - | |
| **Payout % for Secured Claims** | | **0.0%** | | **0.0%** | |
| **Remaining Distributable Value** | | **50,476** | | **74,459** | |
| | | | | | |
| Less: Admin and Priority Claims | | | | | |
| Trade Accounts Payable (Post-Petition) | - | - | - | - | |
| Accrued Liabilities, Other Admin. and Priority | 2,486 | 2,486 | 2,486 | 2,486 | |
| **Payout % for Admin. and Priority Claims** | | **100.0%** | | **100.0%** | |
| **Remaining Distributable Value** | | **47,990** | | **71,973** | |
| | | | | | |
| Less: General Unsecured Claims | | | | | |
| Senior Debt Deficiency Claim | - | - | - | - | |
| Bond Debt | - | - | - | - | |
| Trade Accounts Payable | - | - | - | - | |
| Intercompany Loans | 13,308 | 10,893 | 13,308 | 13,308 | |
| Intercompany A/P | 41,497 | 33,967 | 41,497 | 41,497 | |
| Other General Unsecureds | 3,824 | 3,130 | 3,824 | 3,824 | |
| **Total Unsecured Non-Priority Claims** | **58,629** | **47,990** | **58,629** | **58,629** | |
| **Payout % for G/U Claims** | | **81.9%** | | **100.0%** | |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Notes

| Notes |
|---|

▲ **<u>Note A</u>** – Based on proforma balances as of 12/31/09

▲ **<u>Note B</u>** – At the conclusion of the 6-month Wind-Down period, it is assumed that all employees will become employees of the successor entities. As a result as part of the sale of these assets, certain current employee-related liabilities outstanding at the time of the sale are assumed to be assumed by the successor entities. The assumption of these liabilities is netted against the total gross distributable value

▲ **<u>Note C</u>** – Trustee fees are assumed to be 1% of net distributable assets. These fees are assumed on proceeds from both assets subject to lien basket and assets "not" subject to lien basket

▲ **<u>Note D</u>** – Certain Wind-Down costs are assumed to be incurred post 12/31/09 in order to support the Wind-Down of the remaining estate affairs

▲ **<u>Note E</u>** – Certain professional fees are assumed to be incurred post 12/31/09 in order to support the Wind-Down of the estate. These fees are assumed to be 1.5% of gross distributable proceeds

▲ **<u>Note F</u>** - The DIP is not assumed to be a claimant against the Liquidating non-Debtors



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.



# APPENDIX G
## Valuation Support Detail

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

**ALVAREZ & MARSAL**

# Valuation Support Detail

**Valuation Support Detail**

*Lear Corporation, et al.*

Hypothetical Liquidation Analysis - Valuation Support

*(all values in USD millions, unless otherwise noted)*

| 2010 EBITDAR by Entity Grouping | | 2010 Sales by Entity Grouping | | May 2009 3rd Party Debt by Entity Grouping | |
|---|---|---|---|---|---|
| **Entity Category** | **Amount** | **Entity Category** | **Amount** | **Entity Category** | **Amount** |
| Group A Debtors | $    78.0 | 100% Stock Pledge | 5,554.2 | 100% Stock Pledge | 8.3 |
| Group B Debtors | 62.7 | 65% Stock Pledge | 1,570.9 | 65% Stock Pledge | 22.7 |
| Liquidating Non-Debtors | 38.1 | Non-Pledgee | 597.6 | Non-Pledgee | 8.3 |
| 100% Stock Pledge | 127.3 | **2010 Sales** | **$    7,722.6** | **Total 3rd Part Debt** | **$    39.3** |
| 65% Stock Pledge | 92.5 | | | | |
| Non-Pledgee | 20.0 | 65% Stock Pledge - Residual to Group A | 1,392.5 | 65% Stock Pledge - Residual to Group A | 17.4 |
| Other Reconciling Items | 22.8 | 65% Stock Pledge - Residual to Group B | 178.3 | 65% Stock Pledge - Residual to Group B | 5.3 |
| **Total EBITDAR** | **$    441.4** | **Total 65% Residual** | **$    1,570.9** | **Total 65% Residual** | **$    22.7** |
| | | | | | |
| 65% Stock Pledge - Residual to Group A | 93.1 | Non-Pledgee - Residual to Group A | 513.4 | Non-Pledgee - Residual to Group A | 8.3 |
| 65% Stock Pledge - Residual to Group B | (0.6) | Non-Pledgee - Residual to Group B | 84.1 | Non-Pledgee - Residual to Group B | - |
| **Total 65% Residual** | **$    92.5** | **Total Non-Pledgee Residual** | **$    597.6** | **Total Non-Pledgee Residual** | **$    8.3** |
| | | | | | |
| Non-Pledgee - Residual to Group A | 21.6 | | | | |
| Non-Pledgee - Residual to Group B | (1.6) | | | | |
| **Total Non-Pledgee Residual** | **$    20.0** | | | | |

| May 2009 Cash by Entity Grouping | | May 2009 Equity In Affiliates by Entity Grouping | | Q4 2009 Commercial Sales (5+7 FCST) | |
|---|---|---|---|---|---|
| **Entity Category** | **Amount** | **Entity Category** | **Amount** | **Entity Category** | **Amount** |
| 100% Stock Pledge | 704.7 | 100% Stock Pledge | 19.6 | 100% Stock Pledge | 1,286.8 |
| 65% Stock Pledge | 258.5 | 65% Stock Pledge | 34.1 | 65% Stock Pledge | 229.8 |
| Non-Pledgee | 21.9 | Non-Pledgee | - | Non-Pledgee | 103.1 |
| **Total Cash** | **$    985.1** | **Total Equity in Affiliates** | **$    53.7** | **Total Q4 Commercial Sales (5+7)** | **$    1,619.6** |
| | | | | | |
| 65% Stock Pledge - Residual to Group A | 247.3 | 65% Stock Pledge - Residual to Group A | 34.1 | 65% Stock Pledge - Residual to Group A | 175.3 |
| 65% Stock Pledge - Residual to Group B | 11.2 | 65% Stock Pledge - Residual to Group B | - | 65% Stock Pledge - Residual to Group B | 54.5 |
| **Total 65% Residual** | **$    258.5** | **Total 65% Residual** | **$    34.1** | **Total 65% Residual** | **$    229.8** |
| | | | | | |
| Non-Pledgee - Residual to Group A | 21.7 | Non-Pledgee - Residual to Group A | - | Non-Pledgee - Residual to Group A | 97.9 |
| Non-Pledgee - Residual to Group B | 0.2 | Non-Pledgee - Residual to Group B | - | Non-Pledgee - Residual to Group B | 5.2 |
| **Total Non-Pledgee Residual** | **$    21.9** | **Total Non-Pledgee Residual** | **$    -** | **Total Non-Pledgee Residual** | **$    103.1** |


ALVAREZ & MARSAL

© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Valuation Support Detail (cont'd)

**Summary of Adjusted Foreign Cash**

### *Lear Corporation, et al.*
Hypothetical Liquidation Analysis - Summary of Adjusted Foreign Cash Balance

*(all values in USD millions, unless otherwise noted)*

**Summary of Adjusted Foreign Non-Debtor Cash Balance**

| Entity Category | Est. Book Value [a] | Non-Debtor Q4-09 Sales % Distribution | Est. Trade Contraction [b] | Q4 FCF Loss (Due to Customer Attrition) [c] | Normalized Adj. Cash |
|---|---|---|---|---|---|
| 100% Stock Pledge | 704.7 | 79.4% | (295.2) | (15.4) | 394.1 |
| 65% Stock Pledge | 258.5 | 14.2% | (52.7) | (2.8) | 203.1 |
| Non-Pledgee | 21.9 | 6.4% | (23.6) | (1.2) | (3.0) |
| **Total Cash** | $ 985.1 | 100.0% | $ (371.5) | $ (19.4) | $ 594.2 |
| | | | | | |
| 65% Stock Pledge - Residual to Group A | 247.3 | 10.8% | (40.2) | (2.1) | 205.0 |
| 65% Stock Pledge - Residual to Group B | 11.2 | 3.4% | (12.5) | (0.7) | (2.0) |
| **Total 65% Residual** | $ 258.5 | 14.2% | $ (52.7) | $ (2.8) | $ 203.1 |
| | | | | | |
| Non-Pledgee - Residual to Group A | 21.7 | 6.0% | (22.4) | (1.2) | (1.9) |
| Non-Pledgee - Residual to Group B | 0.2 | 0.3% | (1.2) | (0.1) | (1.0) |
| **Total Non-Pledgee Residual** | $ 21.9 | 6.4% | $ (23.6) | $ (1.2) | $ (3.0) |

Notes:

[a] Estimated book value actual as of May 2009.

[b] Estimated trade contraction based on 37.5 days payable outstanding (DPO) reduction in Europe and 17.5 DPO reduction in Asia and South American, respectively

[c] Cash adjustment based on the loss of approximately 10% in Q4 2009 sales with a margin of approximately 12%, related to customer attrition



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

45

# Valuation Support Detail (cont'd)

**Summary of Adjusted Debtor Cash**

*Lear Corporation, et al.*

Hypothetical Liquidation Analysis - Summary of Adjusted Debtor Cash Balance

*(all values in USD millions, unless otherwise noted)*

| Summary of Adjusted Debtor Cash | | | | | |
|---|---|---|---|---|---|
| Entity Category | Amount (as of Dec-09) [a] | DIP Proceeds | Cash Pick-Up from Non-Essential Overhead | Bankruptcy Assumptions [b] | Adj. Cash (as of Dec-09) |
| Group A Debtors | 124.0 | 434.7 | 7.6 | (129.7) | 436.6 |
| Group B Debtors | 15.0 | 65.3 | 0.9 | - | 81.2 |
| **Total Cash** | $ 139.0 | $ 500.0 | $ 8.5 | $ (129.7) | $ 517.8 |

*Notes:*

[a] December 2009 cash balances based on May 2009 ending balance(Group A - $275 million, Group B - $20.0 million), plus FCF (excluding prepetition debt service) for the seven months ending Decemer 2009 for Group A and Group B, respectively, using the Company's 5+7 forecast (Group A ($151) million, Group B - ($5.0) million)

[b] Bankruptcy Assumptions include the overlay of various bankruptcy-related assumptions not included in the Company's 5+7 forecast, including addition of DIP cash interest ($35.8 million), professional fees ($28.5 million), D&O Insurance ($15.4 million), and financing fees ($50 million)



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Valuation Support Detail (cont'd)

**FY 2010 Non-Debtor EBITDAR Impairment Adjustments**

*Lear Corporation, et al.*
FY 2010 EBITDAR Impairment - Production Mapping

*(all values in USD millions, unless otherwise noted)*

| Estimated EBITDAR Impairment by Entity Grouping | |
| --- | --- |
| Entity Category | Amount |
| 100% Stock Pledge | 6.4 |
| 65% Stock Pledge | 1.0 |
| Non-Pledgee | 2.9 |
| **Total EBITDAR** | **$ 10.3** |
| | |
| 65% Stock Pledge - Residual to Group A | 1.0 |
| 65% Stock Pledge - Residual to Group B | - |
| **Total 65%** | **$ 1.0** |
| | |
| Non-Pledgee - Residual to Group A | 2.9 |
| Non-Pledgee - Residual to Group B | - |
| **Total Non-Pledgee** | **$ 2.9** |
| | |
| **Total Estimated EBITDAR Impairment** | **$ 10.3** |

*Lear Corporation, et al.*
FY 2010 EBITDAR Impairment - Customer Attrition

*(all values in USD millions, unless otherwise noted)*

| Sales Impairment by Entity Grouping | | | | | |
| --- | --- | --- | --- | --- | --- |
| Entity Category | 2010 Sales | Lost Sales % | Lost Sales $ | Margin Est. | EBITDAR Impact |
| 100% Stock Pledge | 5,554.2 | 10.0% | (555.4) | 12.0% | (66.6) |
| 65% Stock Pledge | 1,570.9 | 10.0% | (157.1) | 12.0% | (18.9) |
| Non-Pledgee | 597.6 | 10.0% | (59.8) | 12.0% | (7.2) |
| **Total** | **$ 7,722.6** | | **$ (772.3)** | | **$ (92.7)** |
| | | | | | |
| 65% Stock Pledge - Residual to Group A | 1,392.5 | 10.0% | (139.3) | 12.0% | (16.7) |
| 65% Stock Pledge - Residual to Group B | 178.3 | 10.0% | (17.8) | 12.0% | (2.1) |
| **Total 65%** | **$ 1,570.9** | | **$ (157.1)** | | **$ (18.9)** |
| | | | | | |
| Non-Pledgee - Residual to Group A | 513.4 | 10.0% | (51.3) | 12.0% | (6.2) |
| Non-Pledgee - Residual to Group B | 84.1 | 10.0% | (8.4) | 12.0% | (1.0) |
| **Total Non-Pledgee** | **$ 597.6** | | **$ (59.8)** | | **$ (7.2)** |
| | | | | | |
| **Total** | **$ 7,722.6** | | **$ (772.3)** | | **$ (92.7)** |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# Valuation Support Detail (cont'd)

FY 2010 EBITDAR Impairment Adjustments

### *Lear Corporation, et al.*
Hypothetical Liquidation Analysis - FY 2010 Adj. EBITDAR

*(all values in USD millions, unless otherwise noted)*

| 2010 EBITDAR by Entity Grouping (Impairment Adj.) | | | | |
|---|---|---|---|---|
| Entity Category | Amount | Production Mapping Adj. | Customer Attrition | Adj. EBITDAR |
| 100% Stock Pledge | 121.0 | (6.4) | (66.6) | 48.0 |
| 65% Stock Pledge | 91.5 | (1.0) | (18.9) | 71.6 |
| Non-Pledgee | 17.1 | (2.9) | (7.2) | 7.0 |
| **Total EBITDAR** | **$ 229.6** | **$ (10.3)** | **$ (92.7)** | **$ 126.6** |
| | | | | |
| 65% Stock Pledge - Residual to Group A | 92.1 | (1.0) | (16.7) | 74.3 |
| 65% Stock Pledge - Residual to Group B | (0.6) | - | (2.1) | (2.7) |
| **Total 65%** | **$ 91.5** | **$ (1.0)** | **$ (18.9)** | **$ 71.6** |
| | | | | |
| Non-Pledgee - Residual to Group A | 18.7 | (2.9) | (6.2) | 9.7 |
| Non-Pledgee - Residual to Group B | (1.6) | - | (1.0) | (2.7) |
| **Total Non-Pledgee** | **$ 17.1** | **$ (2.9)** | **$ (7.2)** | **$ 7.0** |



© Copyright 2008. Alvarez & Marsal Holdings, LLC. All Rights Reserved.

# EXHIBIT F

**Financial Projections**

<u>Financial Projections</u>

Management prepared the Financial Projections for the years 2009 through 2012 (the "Projection Period"). The Financial Projections are based on a number of assumptions made by management with respect to the future performance of the Reorganized Debtors' operations. Although management has prepared the Financial Projections in good faith and believes the assumptions to be reasonable, it is important to note that the Debtor can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Reorganized Debtors' financial results and must be considered. The Financial Projections should be reviewed in conjunction with a review of these assumptions, including the qualifications and footnotes set forth within.

1. General

    a. Methodology – The Financial Projections are based upon the Debtors' detailed operating forecast for 2009. For 2010 – 2012, the Financial Projections incorporate management's assumptions and initiatives, including the impact of the Debtors' operating restructuring initiatives.

    b. Plan Consummation – The operating assumptions assume that the Plan will be confirmed and consummated by December 31, 2009.

    c. Macroeconomic and Industry Environment – The Financial Projections are based on global vehicle platform production forecasts provided by CSM Worldwide. The Financial Projections assume a relatively stable global currency environment and commodity environment.

2. Projected Statements of Operations

    a. Sales – Consolidated sales includes the sale of complete automotive seat systems and the components thereof, as well as electrical distribution systems and electronic products. The Financial Projections assume North America light vehicle production of approximately 8.0 million units in 2009 growing to 13.7 million units in 2012. In Europe, light vehicle production is forecasted to be approximately 15.2 million units in 2009 and grow to 17.3 million units by 2012. During the Projection Period, sales are estimated to grow from $9.2 billion in 2009 and to $13.3 billion by 2012.

    b. Cost of Sales – Cost of Sales is projected to be 98.6% of sales in 2009 and improve to 93.0% of sales by 2012, driven by the improving global production environment and the benefit of the Company's operating restructuring actions.

    c. Selling, General, & Administrative Expenses – Selling, General & Administrative ("SG&A") expenses are projected to be 5.2% of sales in 2009, improving to 3.7% of sales in 2012 as the production environment returns to more normalized levels.

d.  EBITDAR – Pretax earnings before Interest, Miscellaneous Expense, Depreciation and Amortization, Reorganization Items and Restructuring charges ("EBITDAR") is expected to grow from $118 million in 2009 to $795 million in 2012 as global vehicle production recovers from historic lows in 2009.

e.  Reorganization Items – The 2009 Reorganization Items consist of estimated post-petition fees for professional advisors and bank fees directly attributable to the bankruptcy filing and related capital restructuring totaling $56.5 million.  For the 2009 pre-petition period, costs related to capital restructuring totaled $23.7 million and were recorded in SG&A expenses.  Reorganization Items exclude adjustments that may be approved by the bankruptcy court related to the Company's Plan of Reorganization.

f.  Interest Expense – For 2009, interest expense reflects the actual expense incurred through June and the projected expense related to the DIP facility for the second half of the year.  For 2010 through 2012, interest expense Financial Projections are based on the Company's debt structure after the Restructuring Plan is complete and reflect interest expense on the new $500 million term facility and $600 million second lien term facility.   Interest expense also includes commitment and issuance fees as well as additional expense related to approximately $50 million in other miscellaneous debt.

g.  Income Taxes – We have provided valuation allowances with respect to our deferred tax assets, including net operating losses, in several countries.  The Financial Projections assume that no tax benefit will be provided with respect to losses incurred and no tax expense will be provided with respect to income generated in these countries throughout the Projection Period.  In addition, it is assumed that in connection with our emergence from Chapter 11, our U.S. net operating loss carryovers and other tax attributes will be significantly reduced due to the cancellation of indebtedness income, with any remaining tax attributes subject to an annual limitation under Internal Revenue Code sections 382 and 383.

3.  Projected Balance Sheets and Statements of Cash Flow

The Company's projected Consolidated Balance Sheets set forth the projected consolidated financial position of the Company, after giving effect to the Proposed Reorganization.  The projected Consolidated Balance Sheets were developed based upon the December 31, 2008 balance sheet contained in the Company's Annual Report on Form 10-K for the year ended December 31, 2008, as adjusted for the Plan and projected results of operations and cash flows over the Projection Period.  These Financial Financial Projections were not prepared with a view toward compliance with published guidelines of the Securities and Exchange Commission or guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information.  The projected Consolidated

Balance Sheets do not reflect the impact of "fresh start" accounting, which could result in a material change to the projected values of assets and liabilities.

The projected Consolidated Balance Sheets contain certain pro forma adjustments as a result of the Plan Consummation.  They also include the debt and other obligations that will continue to remain outstanding and will be paid in the ordinary course of operations.  The projected cash balances reflect the effects of anticipated changes in working capital related items, including assumed increases in working capital prior to the Effective Date and subsequent improvements post-emergence.  On the Effective Date, actual cash may vary from cash reflected in the projected Consolidated Balance Sheets because of variances in the Financial Projections and potential changes in cash needs to consummate the Plan.  Additionally, the projected Consolidated Balance Sheets are presented prior to the effect of any prepayment of excess liquidity required under Article IV.H of the Plan of Reorganization.

## Lear Corporation
## Unaudited Consolidated Statement of Operations
### ($ IN MILLIONS)

|  | Pro Forma 2009 | Pro Forma 2010 | Pro Forma 2011 | Pro Forma 2012 |
|---|---|---|---|---|
| NET SALES | $9,154.4 | $11,383.7 | $12,566.7 | $13,345.0 |
| COST OF SALES | 9,022.4 | 10,878.0 | 11,779.9 | 12,405.0 |
| GROSS PROFIT | 132.0 | 505.7 | 786.8 | 940.0 |
| % of Sales | 1.4% | 4.4% | 6.3% | 7.0% |
| SELLING, GENERAL & ADMINISTRATIVE EXPENSES | 481.8 | 470.2 | 489.3 | 500.0 |
|  | 5.3% | 4.1% | 3.9% | 3.7% |
| OPERATING INCOME / (LOSS) | ($349.8) | $35.5 | $297.5 | $440.0 |
| % of Sales | -3.8% | 0.3% | 2.4% | 3.3% |
| OTHER EXPENSE, NET | (46.9) | (40.0) | (40.0) | (35.0) |
| INTEREST EXPENSE | ($172.8) | ($136.2) | ($140.7) | ($150.4) |
| REORGANIZATION ITEMS | ($51.9) | $0.0 | $0.0 | $0.0 |
| PROFIT / (LOSS) BEFORE TAXES | ($621.4) | ($140.7) | $116.8 | $254.6 |
| INCOME TAXES | (45.8) | (61.8) | (90.0) | (105.0) |
| % of Profit | -7.4% | -43.9% | 77.1% | 41.2% |
| CONSOLIDATED NET INCOME / (LOSS) | ($667.2) | ($202.5) | $26.8 | $149.6 |
| NONCONTROLLING INTERESTS | 14.6 | 16.0 | 22.0 | 25.0 |
| NET INCOME / (LOSS) ATTRIBUTABLE TO LEAR | ($681.8) | ($218.5) | $4.8 | $124.6 |
| EBITDA | ($86.4) | $330.5 | $592.5 | $735.0 |
| EBITDAR | $118.0 | $440.5 | $702.5 | $795.0 |
| VOLUMES |  |  |  |  |
| NORTH AMERICA | 8.0 | 10.0 | 12.3 | 13.7 |
| EUROPE | 15.2 | 16.1 | 17.0 | 17.3 |

## Lear Corporation

### Unaudited Consolidated Statement of Cash Flows

**($ IN MILLIONS)**

| | Pro Forma 2009 | Pro Forma 2010 | Pro Forma 2011 | Pro Forma 2012 |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| NET INCOME ATTRIBUTABLE TO LEAR | $ (681.8) | $ (218.5) | $ 4.8 | $ 124.6 |
| DEPRECIATION AND AMORTIZATION | 263.4 | 295.0 | 295.0 | 295.0 |
| CHANGE IN ENGINEERING AND TOOLING | (20.5) | 15.0 | - | - |
| CHANGE IN WORKING CAPITAL ITEMS | (288.7) | 94.6 | 34.6 | 15.8 |
| OTHER, NET | 86.2 | 13.0 | 17.2 | 15.2 |
| NET CASH PROVIDED BY OPERATING ACTIVIITES | (641.4) | 199.1 | 351.6 | 450.6 |
| | | | | |
| NET CHANGE IN SOLD ACCOUNT RECEIVABLES | (138.5) | - | - | - |
| | | | | |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| ADDITIONS TO PROPERTY, PLANTS AND EQUIPMENT | (129.7) | (175.0) | (190.0) | (235.0) |
| OTHER, NET | 7.0 | - | - | - |
| NET CASH USED IN INVESTING ACTIVITIES | (122.7) | (175.0) | (190.0) | (235.0) |
| | | | | |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| LONG-TERM DEBT, NET | 416.5 | (5.0) | (5.0) | (5.0) |
| SHORT-TERM BORROWINGS, NET | (13.5) | - | - | - |
| DECREASE IN DRAFTS | (1.0) | - | - | - |
| OTHER, NET | (90.0) | (35.0) | - | - |
| NET CASH PROVIDED BY / (USED IN) FINANCING ACTIVITIES | 312.1 | (40.0) | (5.0) | (5.0) |
| | | | | |
| EFFECT OF FOREIGN CURRENCY TRANSLATION | 19.6 | - | - | - |
| | | | | |
| **NET CHANGE IN CASH AND CASH EQUIVALENTS** | (571.0) | (15.9) | 156.6 | 210.6 |
| **CASH AND CASH EQUIVALENTS AT BEGINNING OF PERIOD** | 1,592.1 | 1,021.2 | 1,005.2 | 1,161.8 |
| **CASH AND CASH EQUIVALENTS AT END OF PERIOD** | $ 1,021.2 | $ 1,005.2 | $ 1,161.8 | $ 1,372.4 |
| | | | | |
| **FREE CASH FLOW:** | | | | |
| NET CASH PROVIDED BY OPERATING ACTIVITIES | $ (641.4) | $ 199.1 | $ 351.6 | $ 450.6 |
| ADDITIONS TO PROPERTY, PLANTS AND EQUIPMENT | (129.7) | (175.0) | (190.0) | (235.0) |
| **FREE CASH FLOW** | $ (771.1) | $ 24.1 | $ 161.6 | $ 215.6 |

# Lear Corporation
## Unaudited Consolidated Balance Sheet
### ($ IN MILLIONS)

| ASSETS | Pro Forma Dec. 31, 2009 | Pro Forma Dec. 31, 2010 | Pro Forma Dec. 31, 2011 | Pro Forma Dec. 31, 2012 |
|---|---|---|---|---|
| CASH AND CASH EQUIVALENTS | $1,021.2 | $1,005.2 | $1,161.8 | $1,372.4 |
| ACCOUNTS RECEIVABLE | 1,397.6 | 1,549.7 | 1,605.8 | 1,751.8 |
| INVENTORY | 430.1 | 481.1 | 490.0 | 499.9 |
| OTHER | 274.2 | 282.5 | 270.8 | 259.2 |
| TOTAL CURRENT ASSETS | $3,122.9 | $3,318.5 | $3,528.4 | $3,883.2 |
| NET PROPERTY, PLANT & EQUIPMENT | 1,074.9 | 960.9 | 860.9 | 805.9 |
| NET GOODWILL | 1,487.2 | 1,487.2 | 1,487.2 | 1,487.2 |
| OTHER | 520.5 | 517.5 | 517.3 | 522.1 |
| TOTAL ASSETS | $6,205.5 | $6,284.1 | $6,393.8 | $6,698.4 |

| LIABILITIES & EQUITY | | | | |
|---|---|---|---|---|
| ACCOUNTS PAYABLE | $1,102.4 | $1,480.1 | $1,558.2 | $1,712.2 |
| ACCRUED LIABILITIES | 810.9 | 719.2 | 729.0 | 735.0 |
| SHORT-TERM BORROWINGS | 30.0 | 30.0 | 30.0 | 30.0 |
| CURRENT PORTION OF LONG-TERM DEBT | 8.0 | 8.0 | 8.0 | 8.0 |
| TOTAL CURRENT LIABILITIES | $1,951.3 | $2,237.3 | $2,325.2 | $2,485.2 |
| DEFERRED LIABILITIES | 672.4 | 672.4 | 672.4 | 672.4 |
| LONG TERM DEBT: | | | | |
| TERM LOANS | 1,095.0 | 1,090.0 | 1,085.0 | 1,080.0 |
| OTHER LONG TERM DEBT | 13.2 | 13.2 | 13.2 | 13.2 |
| LONG-TERM DEBT | $1,108.2 | $1,103.2 | $1,098.2 | $1,093.2 |
| COMMON EQUITY | 1,929.5 | 1,929.5 | 1,929.5 | 1,929.5 |
| PREFERRED EQUITY | 500.0 | 500.0 | 500.0 | 500.0 |
| RETAINED EARNINGS / (DEFICIT) | 0.0 | (218.5) | (213.7) | (89.1) |
| NONCONTROLLING INTERESTS | 44.1 | 60.1 | 82.1 | 107.1 |
| EQUITY | $2,473.6 | $2,271.1 | $2,297.9 | $2,447.5 |
| TOTAL LIABILITIES & EQUITY | $6,205.5 | $6,284.1 | $6,393.8 | $6,698.4 |

# **EXHIBIT G**

**Official Committee of Unsecured Creditors Support Letter**



September 18, 2009

To all of the Unsecured Creditors of Lear Corporation:

**Re:**    **Lear Corporation, _et al.,_ Case No. 09-14326(ALG),**
      **United States Bankruptcy Court for the Southern District of New York**

We write on behalf of the Official Committee of Unsecured Creditors (the "Committee") of Lear Corporation and its affiliated debtors and debtors-in-possession in the above-referenced case (the "Debtors"). On July 15, 2009, the United States Trustee appointed the following members to the Committee: Porter Engineered Systems, Inc.; Pension Benefit Guaranty Corporation; Takata Corporation; International Union, United Automobile, Aerospace and Agricultural Implement Workers of America; Tyco Electronics Corporation; Bank of New York Mellon; and Grammer Industries, Inc.

We write in connection with the Debtors' solicitation of votes for acceptance of the Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (the "Plan") filed on September 18, 2009 (Docket No. 633). A copy of the Plan accompanies this letter. Also accompanying this letter is the Debtors' Disclosure Statement for Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code containing detailed information regarding the Debtors' and their business ("Disclosure Statement").

You should review the Disclosure Statement and Plan carefully. The Plan is the product of significant investigation and extensive arms-length discussions and negotiations between the Committee and the Debtors. The Committee believes that the Plan provides a treatment of your claim that is fair and equitable and therefore supports the Debtors' efforts to obtain approval of the Plan. _**The Committee urges you to vote to accept the Plan**_.

It is the Committee's view that the Plan benefits the holders of general unsecured claims. Among other things, the Plan proposes to (i) pay trade claims in full, (ii) provide a meaningful recovery for other unsecured creditors (especially compared to the treatment in many other automotive chapter 11 cases), and (iii) assume and honor pension obligations, domestic collective bargaining agreements, and retiree benefits without modification. _See, e.g.,_ Plan, Article III, Article V. G and H, and Article IX.E. We invite you to review the entire Plan and Disclosure Statement. Finally, the Committee believes that it is important for the Debtors to confirm the Plan quickly — confirmation is now scheduled for November 2009 — even ahead of the targeted deadlines set pre-bankruptcy by the Debtors. The Committee, therefore, recommends that all creditors review the Plan and Disclosure Statement enclosed herewith and vote in favor of the Plan.

The voting deadline is **October 26, 2009 at 5:00 p.m. (prevailing Eastern Time)**.  Please complete and submit your ballots in accordance with the instructions contained in the solicitation package so that they are received not later than **October 26, 2009 at 5:00 p.m. (prevailing Eastern Time)**.

Official Committee of Unsecured Creditors of
Lear Corporation

**LOWENSTEIN SANDLER PC**
Kenneth A. Rosen, Esq.
Sharon L. Levine, Esq.
Bruce Buechler, Esq.
Andy Winchell, Esq.
Cassandra M. Porter, Esq.