James H.M. Sprayregen, P.C.
Marc Kieselstein, P.C. (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900

   - and -

Ryan Blaine Bennett (admitted *pro hac vice*)
Paul Wierbicki (admitted *pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

Counsel to the Debtors and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEAR CORPORATION, et al.,[1] | ) Case No. 09-14326 (ALG) |
| | ) |
| Debtors. | ) Jointly Administered |
| | ) |

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each U.S. Debtors' federal tax identification number (if any), include: Lear Corporation (6776); Lear #50 Holdings, LLC (N/A); Lear Argentine Holdings Corporation #2 (7832); Lear Automotive Dearborn, Inc. (4976); Lear Automotive Manufacturing, LLC (3451); Lear Canada (5059); Lear Canada Investments Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation (Germany) Ltd. (6716); Lear Corporation Canada Ltd. (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear Corporation EEDS and Interiors (6360); Lear Corporation Global Development, Inc. (3121); Lear EEDS Holdings, LLC (4474); Lear European Operations Corporation (8411); Lear Holdings, LLC (4476); Lear Investments Company, LLC (8771); Lear Mexican Holdings Corporation (7829); Lear Mexican Holdings, LLC (4476); Lear Mexican Seating Corporation (4599); Lear Operations Corporation (5872); Lear Seating Holdings Corp. #50 (9055); Lear South Africa Limited (a non-U.S. Debtor that does not maintain a U.S. Federal tax identification number); Lear South American Holdings Corporation (1365); Lear Trim L.P. (8386); and Renosol Seating, LLC (4745). The location of the Debtors' corporate headquarters and the service address for all of the Debtors is: 21557 Telegraph Road, Southfield, Michigan 48033.

**NOTICE OF FILING OF AMENDED EXHIBITS TO PLAN SUPPLEMENT
FOR DEBTORS' FIRST AMENDED JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on September 18, 2009, the above-captioned debtors (collectively, the "Debtors") filed the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* [Docket No. 633] (as amended from time to time, the "Plan"), pursuant to which certain materials were to be filed as the supplement to the Plan (the "Plan Supplement").

**PLEASE TAKE FURTHER NOTICE** that, on October 12, 2009, the Debtors filed the Plan Supplement [Docket No. 815], which provided that certain terms of the exhibits attached thereto remained under discussion with various parties in interest and that, to the extent any such terms were to change, the Debtors would file amended documents, as necessary.

**PLEASE TAKE FURTHER NOTICE** that the Debtors hereby file the following agreed-upon, amended exhibits to the Plan Supplement:

**Exhibit D**        Other General Unsecured Claims Warrant Agreement

**Exhibit E**        Certification of Designation

**Exhibit O**        Long-Term Stock Incentive Plan[2]

**PLEASE TAKE FURTHER NOTICE** that copies of the Plan Supplement, the Plan and other documents filed in or related to the Debtors' chapter 11 cases may be obtained free of charge from Kurtzman Carson Consultants LLC, the claims agent retained by the Debtors in these chapter 11 cases, by:   (a) calling the Debtors' restructuring hotline at (866) 927-7093 within the U.S. or Canada or, outside of the U.S. or Canada, calling (310) 751-2659; (b) visiting

---

[2]    The Long-Term Stock Incentive Plan includes the Management Equity Plan (as defined in the Plan).

K&E 15843059.1

the Debtors' restructuring website at http://www.kccllc.net/lear; or (c) writing to Lear Corporation, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245. You may also obtain copies of any pleadings filed in these chapter 11 cases for a fee via PACER at http://www.nysb.uscourts.gov.

| | |
|---|---|
| New York, New York | */s/ Marc Kieselstein* |
| Dated: November 4, 2009 | James H.M. Sprayregen, P.C. |
| | Marc Kieselstein, P.C. (admitted *pro hac vice*) |
| | KIRKLAND & ELLIS LLP |
| | 601 Lexington Avenue |
| | New York, New York 10022 |
| | Telephone: (212) 446-4800 |
| | Facsimile: (212) 446-4900 |
| | - and - |
| | Ryan Blaine Bennett (admitted *pro hac vice*) |
| | Paul Wierbicki (admitted *pro hac vice*) |
| | KIRKLAND & ELLIS LLP |
| | 300 North LaSalle |
| | Chicago, Illinois 60654 |
| | Telephone: (312) 862-2000 |
| | Facsimile: (312) 862-2200 |
| | Counsel to the Debtors and |
| | Debtors in Possession |

K&E 15843059.1

## PLAN SUPPLEMENT EXHIBIT D

**Other General Unsecured Claims Warrant Agreement**

**WARRANT AGREEMENT**

by and between

LEAR CORPORATION

and

Mellon Investor Services LLC,
as Warrant Agent

Dated as of [November __], 2009

**WARRANT AGREEMENT**

This WARRANT AGREEMENT (as amended, supplemented, amended and restated or otherwise modified from time to time, this "Warrant Agreement"), is entered into as of [November ___,] 2009, by and between LEAR CORPORATION, a Delaware corporation (the "Company"), and Mellon Investor Services LLC, a New Jersey limited liability company, as warrant agent (together with any successor appointed pursuant to Section 19 hereof, the "Warrant Agent").

**WHEREAS**, pursuant to the terms and conditions of the Joint Plan of Reorganization of Lear Corporation and its debtor subsidiaries under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on August 14, 2009 in the United States Bankruptcy Court for the Southern District of New York, Case No. 09-14326 (as may be amended, supplemented or otherwise modified from time to time, the "Plan"), the Company proposes to issue Warrants (the "Warrants") entitling the holders thereof to purchase up to 8,157,250 shares of common stock, par value $0.01 per share, of the Company ("Common Stock" together with any other securities, cash or other property that may be issuable upon exercise of a Warrant as shall result from the adjustments specified in Section 12 hereof) at an exercise price of $0.01 per share of Common Stock, as may be adjusted pursuant to Section 12 hereof (the "Exercise Price");

**WHEREAS**, the Warrants are being issued pursuant to, and upon the terms and conditions set forth in, the Plan in an offering in reliance on the exemption afforded by section 1145 of the Bankruptcy Code from the registration requirements of the Securities Act of 1933, as amended (the "Securities Act"), and of any applicable state securities or "blue sky" laws;

**WHEREAS**, the Company desires the Warrant Agent to act on behalf of the Company, and the Warrant Agent is willing so to act, in connection with the issuance of Warrants and other matters as provided herein; and

**WHEREAS**, for purposes of this Warrant Agreement, "person" shall be interpreted broadly to include an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, national banking association, trust, trustee, unincorporated organization, government, governmental unit, agency, or political subdivision thereof, or other entity.

**NOW, THEREFORE**, in consideration of the premises and the mutual agreements herein set forth, the parties hereto agree as follows:

**SECTION 1      Appointment of Warrant Agent.**  The Company hereby appoints the Warrant Agent to act as warrant agent for the Company in respect of the Warrants upon the express terms and subject to the conditions herein set forth (and no implied terms), and the Warrant Agent hereby accepts such appointment.

**SECTION 2      Issuance of Warrants.**  In accordance with Section 5 hereof and the Plan and subject to the next sentence, the Company will cause to be issued to the Depository (as defined below), one or more Global Warrant Certificates (as defined below) evidencing the Warrants.  At the election of a holder of Warrants and in lieu of holding Warrants through the

1

Depository, such holder may elect to be issued Warrants by book-entry registration on the books and records of the Warrant Agent ("Book-Entry Warrants") and such Warrants shall be evidenced by statements issued by the Warrant Agent from time to time to the registered holder of book-entry Warrants reflecting such book-entry position (the "Warrant Statement"). Each Warrant entitles the holder, upon proper exercise and payment of the applicable Exercise Price, to receive from the Company, one share of Common Stock. The shares of Common Stock or (as provided pursuant to Section 12 hereof) other shares of capital stock deliverable upon proper exercise of the Warrants are referred to herein as the "Warrant Shares." The words "holder" or "holders" as used herein in respect of any Warrants or Warrant Shares, shall mean the registered holder or registered holders thereof.

      **SECTION 3**     **Warrant Certificates.** Subject to Section 6 of this Agreement, the Warrants shall be issued (1) via book-entry registration on the books and records of the Warrant Agent and evidenced by a Warrant Statement, and/or (2) in the form of one or more global certificates (the "Global Warrant Certificates"), in substantially the form set forth in Exhibit A attached hereto. The Warrant Statements and Global Warrant Certificates may bear such appropriate insertions, omissions, substitutions and other variations as are required or permitted by this Warrant Agreement, and may have such letters, numbers or other marks of identification and such legends or endorsements placed thereon as may be required to comply with any law or with any rules made pursuant thereto or with any rules of any securities exchange or as may, consistently herewith, be determined by (i) in the case of Global Warrant Certificates, the Appropriate Officers (as hereinafter defined) executing such Global Warrant Certificates, as evidenced by their execution of the Global Warrant Certificates, or (ii) in the case of a Warrant Statement, any Appropriate Officer, and all of which shall be reasonably acceptable to the Warrant Agent. The Global Warrant Certificates shall be deposited on or after the date hereof with, or with the Warrant Agent as custodian for, The Depository Trust Company (the "Depository") and registered in the name of Cede & Co., as the Depository's nominee. Each Global Warrant Certificate shall represent such number of the outstanding Warrants as specified therein, and each shall provide that it shall represent the aggregate amount of outstanding Warrants from time to time endorsed thereon and that the aggregate amount of outstanding Warrants represented thereby may from time to time be reduced or increased, as appropriate, in accordance with the terms of this Warrant Agreement.

      **SECTION 4**     **Execution of Warrant Certificates.** Global Warrant Certificates shall be signed on behalf of the Company by its Chairman of the Board, its Chief Executive Officer, or any Vice President, and by the Secretary or any Assistant Secretary (each, an "Appropriate Officer"). Each such signature upon the Global Warrant Certificates may be in the form of a facsimile or other electronically transmitted signature (including, without limitation, electronic transmission in portable document format (.pdf)) of any such Appropriate Officer and may be imprinted or otherwise reproduced on the Global Warrant Certificates and for that purpose the Company may adopt and use the facsimile or other electronically transmitted signature of any Appropriate Officer who shall have been an Appropriate Officer at the time of entering into this Warrant Agreement. If any Appropriate Officer who shall have signed any of the Global Warrant Certificates shall cease to be such Appropriate Officer before the Global Warrant Certificates so signed shall have been countersigned by the Warrant Agent or delivered by the Company, such Global Warrant Certificates nevertheless may be countersigned and delivered as

2

though such Appropriate Officer had not ceased to be such Appropriate Officer of the Company; and any Global Warrant Certificate may be signed on behalf of the Company by any person who, at the actual date of the execution of such Global Warrant Certificate, shall be a proper Appropriate Officer of the Company to sign such Global Warrant Certificate, although at the date of the execution of this Warrant Agreement any such person was not such Appropriate Officer.

Global Warrant Certificates shall be dated the date of countersignature by the Warrant Agent and shall represent one or more whole Warrants.

**SECTION 5**     <u>**Registration and Countersignature.**</u>  Upon receipt of a written order of the Company, the Warrant Agent, on behalf of the Company, shall (i) register in the Warrant Register (as defined below) the Book-Entry Warrants as well as any Global Warrant Certificates and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in this Warrant Agreement and (ii) upon receipt of the Global Warrant Certificates duly executed on behalf of the Company, countersign one or more Global Warrant Certificates evidencing Warrants and shall deliver such Global Warrant Certificates to or upon the written order of the Company. Such written order of the Company shall specifically state the number of Warrants that are to be issued as Book-Entry Warrants and the number of Warrants that are to be issued as one or more Global Warrant Certificates. A Global Warrant Certificate shall be, and shall remain, subject to the provisions of this Warrant Agreement until such time as all of the Warrants evidenced thereby shall have been duly exercised or shall have expired or been canceled in accordance with the terms hereof. Each holder of Warrants shall be bound by all of the terms and provisions of this Warrant Agreement (a copy of which is available on request to the Secretary of the Company) as fully and effectively as if such holder had signed the same.

No Global Warrant Certificate shall be valid for any purpose, and no Warrant evidenced thereby shall be exercisable, until such Global Warrant Certificate has been countersigned by the manual or facsimile signature of the Warrant Agent. Such signature by the Warrant Agent upon any Global Warrant Certificate executed by the Company shall be conclusive evidence that such Global Warrant Certificate so countersigned has been duly issued hereunder.

The Warrant Agent shall keep, at an office designated for such purpose, books (the "<u>Warrant Register</u>") in which, subject to such reasonable regulations as it may prescribe, it shall register the Book-Entry Warrants as well as any Global Warrant Certificates and exchanges and transfers of outstanding Warrants in accordance with the procedures set forth in <u>Section 6</u> of this Warrant Agreement, all in form satisfactory to the Company and the Warrant Agent.

Prior to due presentment for registration of transfer or exchange of any Warrant in accordance with the procedures set forth in this Warrant Agreement, the Warrant Agent and the Company may deem and treat the person in whose name any Warrant is registered as the absolute owner of such Warrant (notwithstanding any notation of ownership or other writing made in a Global Warrant Certificate by anyone), for the purpose of any exercise thereof, any distribution to the holder of the Warrant thereof and for all other purposes, and neither the Warrant Agent nor the Company shall be affected by notice to the contrary.

CHI:2312123.15

**SECTION 6**        **Registration of Transfers and Exchanges.**

(a)        <u>Transfer and Exchange of Global Warrant Certificates or Beneficial Interests Therein</u>.  The transfer and exchange of Global Warrant Certificates or beneficial interests therein shall be effected through the Depository, in accordance with this Warrant Agreement and the procedures of the Depository therefor.

(b)        <u>Exchange of a Beneficial Interest in a Global Warrant Certificate for a Book Entry Warrants</u>.

(i)        Any holder of a beneficial interest in a Global Warrant Certificate may, upon request, exchange such beneficial interest for a Book-Entry Warrant.  Upon receipt by the Warrant Agent from the Depository or its nominee of written instructions or such other form of instructions as is customary for the Depository on behalf of any person having a beneficial interest in a Global Warrant Certificate, the Warrant Agent shall cause, in accordance with the standing instructions and procedures existing between the Depository and Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be reduced by the number of Warrants to be represented by the Book-Entry Warrants to be issued in exchange for the beneficial interest of such person in the Global Warrant Certificate and, following such reduction, the Warrant Agent shall register in the name of the holder a Book-Entry Warrant and deliver to said Warrant holder a Warrant Statement.

(ii)        Book-Entry Warrants issued in exchange for a beneficial interest in a Global Warrant Certificate pursuant to this <u>Section 6(b)</u> shall be registered in such names as the Depository, pursuant to instructions from its direct or indirect participants or otherwise, shall instruct the Warrant Agent.  The Warrant Agent shall deliver such Warrant Statements to the persons in whose names such Warrants are so registered.

(c)        <u>Transfer and Exchange of Book Entry Warrants</u>.  Book-Entry Warrants surrendered for exchange or for registration of transfer shall be cancelled by the Warrant Agent.  Such cancelled Book-Entry Warrants shall then be disposed of by or at the direction of the Company in accordance with applicable law.  When Book-Entry Warrants are presented to or deposited with the Warrant Agent with a written request:

(i)        to register the transfer of the Book-Entry Warrants; or

(ii)        to exchange such Book-Entry Warrants for an equal number of Book-Entry Warrants of other authorized denominations,

then in each case the Warrant Agent shall register the transfer or make the exchange as requested if its requirements for such transactions are met; *provided*, *however*, that the Warrant Agent has received a written instruction of transfer in form satisfactory to the Warrant Agent, duly executed by the holder thereof or by his attorney, duly authorized in writing.

(d)        <u>Exchange or Transfer of a Book-Entry Warrant for a Beneficial Interest in a Global Warrant Certificate</u>.  Upon receipt by the Warrant Agent of appropriate written instruments of transfer with respect to a Book-Entry Warrant, in form satisfactory to the Warrant

4

Agent, together with written instructions directing the Warrant Agent to make, or to direct the Depository to make, an endorsement on the Global Warrant Certificate to reflect an increase in the number of Warrants represented by the Global Warrant Certificate equal to the number of Warrants represented by such Book-Entry Warrant (such instruments of transfer and instructions to be duly executed by the holder thereof or the duly appointed legal representative thereof or by his attorney, duly authorized in writing, such signatures to be guaranteed by an eligible guarantor institution to the extent required by the Warrant Agent or the Depositary), then the Warrant Agent shall cancel such Book-Entry Warrant on the Warrant Register and cause, or direct the Depository to cause, in accordance with the standing instructions and procedures existing between the Depository and the Warrant Agent, the number of Warrants represented by the Global Warrant Certificate to be increased accordingly. If no Global Warrant Certificates are then outstanding, the Company shall issue, and the Warrant Agent shall countersign, a new Global Warrant Certificate representing the appropriate number of Warrants.

(e)     <u>Restrictions on Transfer and Exchange of Global Warrant Certificates</u>. Notwithstanding any other provisions of this Warrant Agreement (other than the provisions set forth in <u>Section 6(f)</u>), unless and until it is exchanged in whole for a Book-Entry Warrant, a Global Warrant Certificate may not be transferred as a whole except by the Depository to a nominee of the Depository or by a nominee of the Depository to the Depository or another nominee of the Depository or by the Depository or any such nominee to a successor Depository or a nominee of such successor Depository.

(f)     <u>Book-Entry Warrants</u>. If at any time:

(i)     the Depository for the Global Warrant Certificates notifies the Company that the Depository is unwilling or unable to continue as Depository for the Global Warrant Certificates and a successor Depository for the Global Warrant Certificates is not appointed by the Company within 90 days after delivery of such notice; or

(ii)     the Company, in its sole discretion, notifies the Warrant Agent in writing that all Warrants shall be exclusively in the form of Book-Entry Warrants, then the Warrant Agent, upon written instructions signed by an Appropriate Officer of the Company and all other necessary information, shall register Book-Entry Warrants, in an aggregate number equal to the number of Warrants represented by the Global Warrant Certificates, in exchange for such Global Warrant Certificates, in such names and in such amounts as directed by the Depository or, in the absence of instructions from the Depository, the Company.

(g)     <u>Cancellation of Global Warrant Certificate</u>. At such time as all beneficial interests in Global Warrant Certificates have either been exchanged for Book-Entry Warrants, redeemed, repurchased or cancelled, all Global Warrant Certificates shall be returned to, or cancelled and retained pursuant to applicable law by, the Warrant Agent.

(h)     <u>Obligations with Respect to Transfers and Exchanges of Warrants</u>.

(i)     To permit registrations of transfers and exchanges, the Company shall execute and the Warrant Agent is hereby authorized to countersign Global Warrant Certificates and the Warrant Agent is hereby authorized to register Book-Entry Warrants, in

5

accordance with the provisions of <u>Sections 3</u> and <u>4</u> hereof and this <u>Section 6</u> and for the purpose of any distribution of additional Global Warrant Certificates contemplated by <u>Section 12</u> hereof.

(ii)     All Book-Entry Warrants and Global Warrant Certificates issued upon any registration of transfer or exchange of Book-Entry Warrants or Global Warrant Certificates shall be the valid obligations of the Company, entitled to the same benefits under this Warrant Agreement as the Book-Entry Warrants or Global Warrant Certificates surrendered upon such registration of transfer or exchange.

(iii)     No service charge shall be made to a holder of Warrants for any registration, transfer or exchange but the Company may require payment of a sum sufficient to cover any stamp or other tax or other charge that may be imposed on the holder in connection with any such exchange or registration of transfer.  The Warrant Agent shall have no obligation to effect an exchange or register a transfer unless and until any payments required by the immediately preceding sentence have been made.

(iv)     So long as the Depository, or its nominee, is the registered owner of a Global Warrant Certificate, the Depository or such nominee, as the case may be, may be treated by the Company, the Warrant Agent and any agent of the Company or the Warrant Agent as the sole owner or holder of the Warrants represented by such Global Warrant Certificate for all purposes under this Warrant Agreement.  Except as provided in <u>Sections 6(b) and 6(f)</u> hereof upon the exchange of a beneficial interest in a Global Warrant Certificate for a Book-Entry Warrants, owners of beneficial interests in a Global Warrant Certificate will not be entitled to have any Warrants registered in their names, and will not receive or be entitled to receive physical delivery of any such Warrants and will not be considered the owners or holders thereof under the Warrants or this Warrant Agreement.  Neither the Company nor the Warrant Agent, in its capacity as registrar for such Warrants, will have any responsibility or liability for any aspect of the records relating to beneficial interests in a Global Warrant Certificate or for maintaining, supervising or reviewing any records relating to such beneficial interests.  Notwithstanding the foregoing, nothing herein shall prevent the Company, the Warrant Agent or any agent of the Company or the Warrant Agent from giving effect to any written certification, proxy or other authorization furnished by the Depository or impair the operation of customary practices of the Depository governing the exercise of the rights of a holder of a beneficial interest in a Global Warrant Certificate.

(v)     Subject to <u>Sections 6(b)</u>, <u>(c)</u> and <u>(d)</u> hereof and this <u>Section 6(h)</u>, the Warrant Agent shall, upon receipt of all information required to be delivered hereunder, from time to time register the transfer of any Book-Entry Warrants in the Warrant Register and the transfer of any Global Warrant Certificates in the Warrant Register, upon surrender of the Global Warrant Certificates, representing such Warrants at the Warrant Agent Office referred to in <u>Section 20</u> hereof (the "<u>Warrant Agent Office</u>"), duly endorsed, and accompanied by a completed form of assignment (or with respect to a Book-Entry Warrant, only such completed form of assignment), duly signed by the holder thereof or by the duly appointed legal representative thereof or by a duly authorized attorney, such signature to be guaranteed by an eligible guarantor institution to the extent required by the Warrant Agent or the Depositary.

6

Upon any such registration of transfer, a new Global Warrant Certificate or a Warrant Statement, as the case may be, shall be issued to the transferee.

**SECTION 7** **Acknowledgment; Securities Law Compliance.** Each Warrant holder, by its acceptance of any Warrant under this Warrant Agreement, acknowledges and agrees that the Warrants were issued, and the Warrant Shares issuable upon exercise thereof shall be issued, pursuant to an exemption from the registration requirement of Section 5 of the Securities Act provided by Section 1145 of the Bankruptcy Code, and to the extent that a Warrant holder (or holder of Warrant Shares) is an "underwriter" as defined in Section 1145(b)(1) of the Bankruptcy Code, such holder may not be able to sell or transfer any Warrants or Warrant Shares in the absence of an effective registration statement under the Securities Act or an exemption from registration thereunder.

**SECTION 8** **Terms of Warrants; Exercise of Warrants.**

(a) Subject to the terms of this Warrant Agreement (including without limitation, Section 12(d)), each Warrant holder shall have the right, which may be exercised at any time, and from time to time, in whole or in part, during the period (x) commencing on the business day (as defined below) immediately following a period of 30 consecutive Trading Days ending prior to, but not including, such business day during which the Closing Price of the Common Stock for at least 20 of the Trading Days within such 30-day period is equal to or greater than $39.63 (as adjusted from time to time in accordance with the terms hereof, the "Trigger Price") and (y) ending at 5:00 p.m. New York City Time, on [November __,] 2014 (the "Expiration Date"), to exercise each Warrant and receive from the Company the number of fully paid and nonassessable Warrant Shares which the holder may at the time be entitled to receive on exercise of such Warrant and payment of the aggregate Exercise Price then in effect for such Warrant Shares. In addition, prior to the delivery of any Warrant Shares that the Company shall be obligated to deliver upon proper exercise of the Warrants, the Company shall comply with all applicable federal and state laws, rules and regulations which require action to be taken by the Company. Subject to the terms and conditions set forth herein, the holder may exercise the Warrants by:

(i) providing written notice of such election (the "Warrant Exercise Notice") to exercise the Warrants to the Company and the Warrant Agent no later than 5:00 p.m. New York City time, on the Expiration Date, which Warrant Exercise Notice shall be in the form of an election to purchase Warrant Shares substantially set forth either (x) in Exhibit B-1 hereto, properly completed and executed by the holder; provided that such written notice may only be submitted by a holder who holds Book-Entry Warrants or (y) in Exhibit B-2 hereto, properly completed and executed by the holder; provided that such written notice may only be submitted with respect to Warrants held through the book-entry facilities of the Depository, by or through persons that are direct participants in the Depository; and

(ii) delivering no later than 5:00 p.m. New York City time, on the business day immediately prior to the applicable Settlement Date (as defined below), such Warrants to the Warrant Agent by book-entry transfer through the facilities of the Depository, if such Warrants are represented by a Global Warrant Certificate; and

CHI:2312123.15

(iii)    paying the applicable aggregate Exercise Price for all Warrants being exercised (the "Exercise Amount"), together with all applicable taxes and charges.

The date three business days after a Warrant Exercise Notice is delivered is referred to for all purposes under this Warrant Agreement as the "Settlement Date".

(b)    For purposes of this Section 8, the following terms shall have the meanings set forth below:

"Closing Price" means on any particular date (a) if the Common Stock is then listed or quoted on a Trading Market, (i) the closing price per share of Common Stock on such date on the principal Trading Market (as reported by Bloomberg L.P. or a similar organization or agency succeeding to its functions of reporting prices) or (ii) if there shall have been no sales of Common Stock on such principal Trading Market on such day, the average of the reported closing bid and asked prices per share of Common Stock on such principal Trading Market (as reported by Bloomberg L.P. or a similar organization or agency succeeding to its functions of reporting prices), (b) if the Common Stock is not then listed or quoted on a Trading Market and if prices for the Common Stock are then reported in the "pink sheets" published by Pink OTC Markets, Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the average of the reported closing bid and asked prices per share of Common Stock so reported or (c) if the shares of Common Stock are not then publicly traded the fair market value as of such date of a share of Common Stock as reasonably determined in good faith by the Board of Directors of the Company.

"Trading Day" means (a) if the Common Stock is listed or quoted on a Trading Market, a day on which the principal Trading Market is open for business or (b) if the Common Stock is not listed or quoted on a Trading Market, a business day.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question:  the NYSE Amex Equities, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board.

(c)    To the extent a Warrant Exercise Notice is delivered in respect of a Warrant prior to 5:00 p.m., New York City time, on the Expiration Date, but the deliveries and payments specified in Sections 8(a)(ii) and 8(a)(iii) above are effected thereafter but no later than 5:00 p.m., New York City time, on the Settlement Date, the Warrants shall be nonetheless deemed exercised prior to the Expiration Date for the purposes of this Warrant Agreement.

(d)    Subject to the adjustments set forth in Section 12 hereof, each Warrant, when exercised, will entitle the holder thereof to purchase one share of Common Stock  at the Exercise Price then in effect.  Each Warrant not exercised pursuant to this Warrant Agreement prior to 5:00 p.m., New York City time, on the Expiration Date shall become void and all rights thereunder and all rights in respect thereof under this Warrant Agreement shall cease as of such time.

CHI:2312123.15

(e)     Subject to Section 8(f), the Exercise Amount shall be payable in lawful money of the United States of America either (i) by certified or official bank check made payable to the order of the Company or (ii) by wire transfer in immediately available funds to an account arranged with the Company prior to exercise.

(f)     In connection with the exercise of Warrants by the holder thereof, such holder shall have the right, in lieu of paying the Exercise Amount for such Warrants in cash (a "Cashless Exercise"), to instruct the Company to reduce the number of Warrant Shares issuable to such holder upon exercise of such Warrants by delivering to such holder a number of Warrant Shares determined in accordance with the following formula:

$$\text{Warrant Shares Issuable Following a Cashless Exercise} = W - N \quad \text{where:} \quad N = \frac{P}{C}$$

For purposes this Section 8(f), the above symbols shall have the following meanings with respect to an exercise of Warrants by a holder thereof:

"W" means the aggregate number of Warrant Shares issuable to such holder upon exercise of such Warrants prior to any reduction pursuant to this Section 8(f);

"N" means the aggregate number of Warrant Shares to be subtracted from the aggregate number of Warrant Shares issuable to such holder upon the exercise of such Warrants;

"P" means the Exercise Amount applicable to the exercise of such Warrants; and

"C" means the Closing Price on the date of exercise of such Warrants.

For purposes of Rule 144 under the Securities Act (17 CFR §230.144), the Company and the Warrant Agent agree that the exercise of Warrants in accordance with the Cashless Exercise option shall be deemed to be a conversion of such Warrants, pursuant to the terms hereof, into Warrant Shares.

(g)     Any exercise of a Warrant pursuant to the terms of this Warrant Agreement shall be irrevocable and shall constitute a binding agreement between the holder and the Company, enforceable in accordance with its terms; provided that a holder may condition its exercise of a Warrant on the consummation of a Reorganization Event (as defined below).

(h)     The Warrant Agent shall:

(i)     examine all Warrant Exercise Notices and all other documents delivered to it by or on behalf of holders to ascertain whether, on their face, such Warrant Exercise Notices and any such other documents have been executed and completed in accordance with their terms;

(ii)     where a Warrant Exercise Notice or other document appears on its face to have been improperly completed or executed or some other irregularity in connection with the exercise of the Warrant exists, the Warrant Agent shall endeavor to inform the appropriate parties (including the person submitting such instrument) of the need for fulfillment of all requirements, specifying those requirements which appear to be unfulfilled;

(iii)    inform the Company of and cooperate with and assist the Company in resolving any reconciliation problems relating to the Warrant Exercise Notices received and delivery of Warrants to the Warrant Agent's account;

(iv)    advise the Company, no later than three business days after receipt of a Warrant Exercise Notice, of (x) the receipt of such Warrant Exercise Notice and the number of Warrants exercised in accordance with the terms and conditions of this Warrant Agreement, (y) the instructions with respect to delivery of the Warrant Shares, subject to the timely receipt from the Depository of the necessary information, and (z) such other information as the Company shall reasonably require; and

(v)     subject to the Warrant Shares being made available to the Warrant Agent by or on behalf of the Company for delivery to the Depository, liaise with the Depository and endeavor to effect such delivery to the relevant accounts at the Depository in accordance with its requirements.

(i)     All questions as to the validity, form and sufficiency (including time of receipt) of a Warrant exercise shall be reasonably determined by the Company in good faith, which determination shall be final and binding.  The Warrant Agent shall incur no liability for or in respect of and, except to the extent such liability arises from the Warrant Agent's gross negligence, willful misconduct or bad faith (each as determined by a final, non appealable order of a court of competent jurisdiction), shall be indemnified and held harmless by the Company for acting or refraining from acting upon, or as a result of such determination by the Company.  The Company reserves the right to reject any and all Warrant Exercise Notices not in proper form.  Such determination by the Company shall be final and binding on the holders, absent manifest error.  Moreover, the Company reserves the absolute right to waive any of the conditions to the exercise of Warrants or defects in Warrant Exercise Notices with regard to any particular exercise of Warrants.  The Company shall be under no duty to give notice to the holders of the Warrants of any irregularities in any exercise of Warrants, nor shall it incur any liability for the failure to give such notice.

(j)     As soon as reasonably practicable after the exercise of any Warrant, the Company shall issue, or otherwise deliver, in authorized denominations to or upon the order of the holder of such Warrant either:

(i)     if such holder holds the Warrants being exercised through the Depository's book-entry transfer facilities, by same-day or next-day credit to the Depository for the account of such holder or for the account of a participant in the Depository the number of Warrant Shares to which such holder is entitled, in each case registered in such name and

10

delivered to such account as directed in the Warrant Exercise Notice by such holder or by the direct participant in the Depository through which such holder is acting; or

(ii)     if such holder holds the Warrants being exercised in the form of Book-Entry Warrants, a book-entry interest in the Warrant Shares registered on the books of the Company's stock transfer agent (the "<u>Transfer Agent</u>") or, at the Company's option, by delivery to the address designated by such holder in its Warrant Exercise Notice of a physical certificate or certificates representing the number of Warrant Shares to which such holder is entitled, in fully registered form, registered in such name or names as may be directed by such holder. Such Warrant Shares shall be deemed to have been issued and any person so designated to be named therein shall be deemed to have become a holder of record of such Warrant Shares as of the close of business on the date of the delivery thereof.

Warrants shall be exercisable during the period provided for in <u>Section 8(a)</u> at the election of the holder thereof, either as an entirety or from time to time for a portion of the number of Warrant Shares issuable upon exercise of such Warrants. If less than all of the Warrants evidenced by a Global Warrant Certificate surrendered upon the exercise of Warrants are exercised at any time prior to 5:00 p.m., New York City time, on the Expiration Date, a new Global Warrant Certificate or Certificates shall be issued for the remaining number of Warrants evidenced by the Global Warrant Certificate so surrendered, and the Warrant Agent is hereby authorized to countersign the new Global Warrant Certificate(s) pursuant to the provisions of <u>Section 5</u> hereof and this <u>Section 8</u>. The person in whose name any certificate or certificates for the Warrant Shares are to be issued (or such Warrant Shares are to be registered, in the case of a book-entry transfer) upon exercise of a Warrant shall be deemed to have become the holder of record of such Warrant Shares on the date such Warrant Exercise Notice is delivered.

(k)     For purposes of this Warrant Agreement, a "<u>business day</u>" means any day other than a Saturday, Sunday or a day on which banking institutions in New York City are authorized or obligated by law, regulation or executive order to close or remain closed. In accordance with <u>Section 14</u> hereof, no fractional shares shall be issued upon exercise of any Warrants.

(l)     All Global Warrant Certificates surrendered upon exercise of Warrants shall be cancelled by the Warrant Agent. Such cancelled Global Warrant Certificates shall then be disposed of by or at the direction of the Company in accordance with applicable law. The Warrant Agent shall (x) advise an authorized representative of the Company as directed by the Company by the end of each day on which Warrants were exercised, of (i) the number of shares of Common Stock issued upon exercise of a Warrant, (ii) the delivery of Global Warrant Certificates evidencing the balance, if any, of the shares of Common Stock issuable after such exercise of the Warrant and (iii) such other information as the Company shall reasonably require and (y) concurrently pay to the Company all funds received by the Warrant Agent in payment of the aggregate Exercise Price. The Warrant Agent shall confirm such information to the Company in writing.

(m)     The Warrant Agent shall keep copies of this Warrant Agreement and any notices given or received hereunder, and provide, at the Company's expense, copies thereof to

11

any registered holder of the Warrants requesting, in writing, such copy prior to 5:00 p.m., New York City time, on the Expiration Date. The Company shall supply the Warrant Agent from time to time with such numbers of copies of this Warrant Agreement as the Warrant Agent may reasonably request.

**SECTION 9      Payment of Taxes.**  No service charge shall be made to any holder of a Warrant for any exercise, exchange or registration of transfer of Warrants, and the Company will pay all documentary stamp taxes attributable to the initial issuance of Warrant Shares upon the exercise of Warrants; *provided*, *however*, that neither the Company nor the Warrant Agent shall be required to pay any tax or taxes which may be payable in respect of any transfer involved in the issuance of Warrant Shares or any certificates for Warrant Shares in a name other than that of the registered holder of a Warrant surrendered upon the exercise of a Warrant, and the Company and the Warrant Agent shall not be required to issue or deliver such Warrant Shares or the certificates representing the Warrant Shares unless or until the person or persons requesting the issuance thereof shall have paid to the Company the amount of such tax or shall have established to the satisfaction of the Company  and the Warrant Agent that such tax has been paid.

**SECTION 10      Mutilated or Missing Warrant Certificates.**  The Company may issue and the Warrant Agent shall countersign, upon evidence satisfactory to the Company and the Warrant Agent of the loss, theft, mutilation or destruction of the Global Warrant Certificate in lieu of the Global Warrant Certificate, a new warrant certificate of like tenor and amount in the place of any Global Warrant Certificate theretofore issued by it, alleged to have been lost, stolen, mutilated or destroyed, and the Company and the Warrant Agent may require the owner of the lost, stolen, mutilated or destroyed certificate, or such owner's legal representative, to give the Company and the Warrant Agent a bond sufficient to indemnify them against any claim that may be made against it on account of the alleged loss, theft or destruction of any such Global Warrant Certificate or the issuance of such new certificate.

**SECTION 11      Reservation of Shares of Common Stock.**

(a)      The Company will at all times reserve and keep available out of the aggregate of its authorized but unissued shares of Common Stock, for the purpose of enabling it to satisfy any obligation to issue shares of Common Stock upon exercise of Warrants, the maximum number of shares of Common Stock  that may then be deliverable upon the exercise of all outstanding Warrants, and the Transfer Agent is hereby irrevocably authorized and directed at all times to reserve such number of authorized and unissued or treasury shares of Common Stock as shall be required for such purpose. The Company will keep a copy of this Agreement on file with the Transfer Agent. The Warrant Agent is hereby irrevocably authorized and directed to requisition from time to time from the Transfer Agent stock certificates issuable upon exercise of outstanding Warrants. The Company will supply the Transfer Agent with duly executed stock certificates for such purpose and will, upon request, provide or otherwise make available any cash which may be payable as provided in Section 14. The Company will furnish the Transfer Agent with a copy of all notices of adjustments and certificates related thereto, transmitted by the Company to the Warrant Agent and each holder. The Warrant Agent shall have no duty or obligation to investigate or confirm the accuracy of the information or the genuineness of the signatures contained in such notices or certificates.

12

(b)     The Company covenants that all shares of Common Stock that may be issued upon exercise of Warrants will be, upon payment of the aggregate Exercise Price and issuance thereof, duly authorized, validly issued, fully paid, nonassessable, free of preemptive rights and free from all taxes, liens, charges and security interests with respect to the issue thereof (other than any liens, charges and security interests created by the Warrant holder or the person to which the shares of Common Stock are to be issued).

**SECTION 12     Adjustments.**  The number of shares of Common Stock for which a Warrant is exercisable and the Exercise Price and the Trigger Price shall be subject to adjustment from time to time as set forth in this Section 12.

(a)     Stock Dividends, Subdivisions, Combinations, Recapitalizations and Reclassification.

(i)     If at any time the Company shall: (A) pay a dividend on its Common Stock (or make some other distribution on its Common Stock) consisting of shares of Common Stock, (B) subdivide its outstanding shares of Common Stock into a larger number of shares of Common Stock, or (C) combine its outstanding shares of Common Stock into a smaller number of shares of Common Stock, then the number of shares of Common Stock or other shares of capital stock that a record holder of the same number of shares of Common Stock or other shares of capital stock for which a Warrant is exercisable immediately prior to any such dividend, distribution, subdivision or combination shall be adjusted so that the holder of each Warrant shall be entitled upon exercise to receive the number of shares of Common Stock or other shares of capital stock that such holder would have owned or have been entitled to receive after the happening of any of the events described above, had such Warrant been exercised immediately prior to the happening of such event (or, in the case of a dividend or distribution of Common Stock, immediately prior to the record date therefor).  An adjustment made pursuant to this Section 12(a) shall become effective immediately upon and contemporaneously with the effectiveness of such event.

(ii)     Whenever the number of shares of Common Stock purchasable upon the exercise of any Warrant is adjusted as herein provided in Section 12(a), the Exercise Price and the Trigger Price shall be adjusted to equal (A) the Exercise Price or the Trigger Price, as applicable, immediately prior to such adjustment multiplied by the number of shares of Common Stock for which a Warrant is exercisable immediately prior to such adjustment divided by (B) the number of shares of Common Stock for which a Warrant is exercisable immediately after such adjustment.

(b)     Extraordinary Dividends or Distributions.  If the Company, at any time after the date of this Agreement, pays a dividend or makes a distribution in cash, securities or other assets to the holders of Common Stock (in their capacity as such) or other shares of capital stock into which the Warrants are convertible, other than (i) a dividend or distribution described in Section 12(a)(i)(A), (ii) regular quarterly or other periodic dividends declared and paid pursuant to a dividend policy established by the Board not to exceed in any fiscal year of the Company twenty percent (20%) of the consolidated net income of the Company and its consolidated subsidiaries (determined in accordance with United States generally accepted

13

accounting principles) for the immediately preceding fiscal year, (iii) distributions made to the holders of Common Stock upon the consummation of a Reorganization Event or (iv) dividends and distributions made in connection with the Company's liquidation or dissolution (any such non-excluded dividends or distributions, an "Extraordinary Dividend"), then the Trigger Price shall be decreased, effective immediately after the effective date of such Extraordinary Dividend, dollar-for-dollar by the amount of cash and/or the fair market value (as reasonably determined in good faith by the Board of Directors of the Company, without regard to any illiquidity or minority discounts) of any securities or other assets paid or distributed on each share of Common Stock in respect of such Extraordinary Dividend.

(c)     Other Provisions Applicable to Adjustments under this Section.  The following provisions shall be applicable to the making of adjustments of the number of shares of Common Stock for which a Warrant is exercisable and the Exercise Price and the Trigger Price provided for in this Section 12:

(i)     When Adjustments to Be Made.  The adjustments required by this Section 12 shall be made whenever and as often as any specified event requiring an adjustment shall occur.  For the purpose of any adjustment, any specified event shall be deemed to have occurred at the close of business on the date of its occurrence.  All calculations shall be made to the nearest cent and to the nearest one-thousandth of a share, as the case may be.

(ii)     Fractional Interests.  In computing adjustments pursuant to this Section 12 (but subject to Section 14), fractional interests in Common Stock shall be taken into account to the nearest 1/1000th of a share,

(d)     Reorganization, Reclassification, Merger or Consolidation of the Company.

(i)     If a Reorganization Event shall occur and pursuant to the terms of any such Reorganization Event, the consideration to be paid or distributed to or otherwise received by the holders of Common Stock consists of shares of common stock of the surviving corporation or acquiring or resulting entity and/or any cash, shares of stock (not constituting common stock) or other securities or property of any nature whatsoever (including warrants or other subscription or purchase rights) (such non-common stock property hereinafter referred to as "Other Property"), then each holder of a Warrant shall have the right to receive in connection with the consummation of such Reorganization Event, upon exercise of a Warrant (if then exercisable at the time of such consummation, determined in accordance with Section 12(d)(ii)), solely the number of shares of common stock of the surviving corporation or acquiring or resulting entity and/or such amount of Other Property receivable pursuant to such Reorganization Event by a holder of the number of shares of Common Stock for which a Warrant is exercisable immediately prior to the effective time of such Reorganization Event assuming such holder of Common Stock did not exercise its rights of election, if any, as to the kind or amount of common stock or Other Property receivable upon such Reorganization Event (provided that, if the kind or amount of common stock or Other Property receivable upon such Reorganization Event is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("nonelecting share"), then for the purposes of this Section 12(d)(i) the kind

14

and amount of common stock or Other Property receivable upon such Reorganization Event for each nonelecting share shall be deemed to be the kind and amount so receivable per share by a plurality of the electing shares). The Company will not effect any Reorganization Event unless prior to the consummation thereof the successor corporation or acquiring or resulting entity (if other than the Company) shall assume by written instrument the obligation to deliver to each holder of Warrants such shares of common stock or Other Property, in accordance with the foregoing provisions, such holder may be entitled to purchase. The Company shall notify (i) in writing, the Warrant Agent at least five (5) business days prior to the consummation of any Reorganization Event of (A) the expected date of consummation of the Reorganization Event, (B) a reasonably detailed description of the consideration to be paid per share of Common Stock in the Reorganization Event to the holders of Common Stock and (C) a description of the procedures and method of payment in respect of the consideration payable to the holders of Warrants, if any, upon exercise of a Warrant and (ii) each holder of a Warrant at least twenty (20) business days prior to the consummation of any Reorganization Event of (A) the expected date of consummation of the Reorganization Event and (B) a reasonably detailed description of the consideration to be paid per share of Common Stock in the Reorganization Event to the holders of Common Stock. No failure of the Company to provide the notice provided for in the foregoing sentence shall affect the validity of the Reorganization Event or the proceedings for the cancellation of the Warrants or limit the rights of the holders of Warrants hereunder.

(ii)    The Warrants shall be exercisable in connection with a Reorganization Event if (A) at the date of consummation of such Reorganization Event, the Warrant is then exercisable in accordance with <u>Section 8(a)</u> or (B) if the value of all consideration to be received by a holder of Common Stock in respect of one share of Common Stock in the Reorganization Event, on a fully diluted per share basis, is equal to or greater than the Trigger Price. In the event the Warrants are exercisable pursuant to clause (B) above, a holder of Warrants shall have the option of exercising the Warrants prior to the consummation of such Reorganization Event, provided that the holder may condition the exercise of the Warrants on the consummation of such Reorganization Event. As of the consummation of the Reorganization Event, all of the Warrants shall be deemed to be no longer outstanding and not transferable on the books of the Company or the surviving corporation or resulting entity, and shall represent solely the right to receive the consideration payable upon exercise of the Warrants, without interest. Any Warrants that are not exercisable in connection with a Reorganization Event shall expire and be cancelled.

(iii)    For purposes hereof, a "<u>Reorganization Event</u>" shall mean any transaction which the Company enters into constituting (i) a consolidation, merger, share exchange or similar transaction of the Company with or into another person pursuant to which the Common Stock is changed into, converted into or exchanged for cash, securities or other property (whether of the Company or another person); (ii) a reorganization, recapitalization or reclassification or similar transaction in which the Common Stock is exchanged for securities other than Common Stock (other than in circumstances covered by <u>Section 12(a))</u>; or (iii) a statutory exchange of the outstanding shares of Common Stock for securities of another person (other than in connection with a consolidation, merger, share exchange or other similar transaction).

CHI:2312123.15

(iv)    Notwithstanding anything to the contrary in Section 12(d)(i), if the Company enters into a transaction (a "Specified Transaction") that would otherwise constitute a Reorganization Event, in each case in which the shares of Common Stock are exchanged for cash, securities or other property, as a result of which the holders of Common Stock immediately prior to such Specified Transaction own or hold at least a majority of the voting equity securities of the continuing or surviving entity immediately following such Specified Transaction, then Section 12(d)(i) shall not apply and as a condition to the consummation of such Specified Transaction effective provisions shall be made in the certificate of incorporation or articles of incorporation of the continuing or surviving entity, or in any contract or agreement providing for such Specified Transaction, so that so long as any Warrant remains outstanding, each Warrant, upon the exercise thereof at any time after the consummation of such Specified Transaction, shall be exercisable into (at an initial Exercise Price equal to the Exercise Price in effect immediately prior to such Specified Transaction), in lieu of the Common Stock issuable upon such exercise prior to such consummation, solely the amount of cash, securities or other property ("Substituted Property") receivable pursuant to such Specified Transaction by a holder of the number of shares of Common Stock for which a Warrant is exercisable immediately prior to the effective time of such Specified Transaction assuming such holder of Common Stock did not exercise its rights of election, if any, as to the kind or amount of Substituted Property receivable upon such Specified Transaction (provided that, if the kind or amount of Substituted Property receivable upon such Specified Transaction is not the same for each share of Common Stock in respect of which such rights of election shall not have been exercised ("nonelecting share"), then for the purposes of this Section 12(d)(iv) the kind and amount of Substituted Property receivable upon such Specified Transaction for each nonelecting share shall be deemed to be the kind and amount so receivable per share by a plurality of the electing shares); provided that, if the Trigger Price has not been achieved in accordance with Section 8(a) at the time of consummation of the Specified Transaction, then in lieu of the foregoing, any cash which would be part of the Substituted Property shall not be included in the Substituted Property but instead shall be treated as an Extraordinary Dividend in accordance with Section 12(b).  The provisions set forth herein providing for adjustments and otherwise for the protection of the holders of Warrants shall thereafter continue to be applicable on an as nearly equivalent basis as may be practicable and any such continuing or surviving entity shall expressly assume all of the obligations of the Company set forth herein to the extent applicable.  Without limiting the foregoing, in connection with any such Specified Transaction, the Trigger Price shall be adjusted to the extent reasonably determined by the board of directors (or other governing body) of the continuing or surviving entity to maintain, to the extent practicable, an equivalent intrinsic value of the Warrants immediately prior to such transaction.

(e)    Certain Limitations.  Notwithstanding anything herein to the contrary, the Company agrees not to enter into any transaction which, by reason of any adjustment hereunder, would cause the Exercise Price to be less than the par value per share of Common Stock (if any) unless the Company shall take such corporate action in order that the Company may validly and legally issue fully paid and nonassessable shares of such Common Stock at such adjusted Exercise Price.

SECTION 13    Priority Adjustments, Further Actions.  If any single action would require adjustment of the Exercise Price pursuant to more than one subsection of Section 12

CHI:2312123.15

hereof, only one adjustment shall be made and such adjustment shall be the amount of adjustment that has the highest, relative to the rights and interests of the holders of the Warrants then outstanding, absolute value.

SECTION 14    **Fractional Shares.**    The Company shall not be required to issue fractional shares of Common Stock  upon the exercise of the Warrants if it elects, if otherwise permitted, to make a cash payment in respect of any final fraction of a share upon such exercise (after aggregating all fractional shares of each holder).  If more than one Warrant shall be presented for exercise at the same time by the same holder, the number of full shares of Common Stock  that shall be issuable upon the exercise thereof shall be computed on the basis of the aggregate number of shares of Common Stock  purchasable on exercise of all of the Warrants so presented.  If any fraction of a share of Common Stock  would, except for the provisions of this Section 14, be issuable on the exercise of any Warrants (or specified portion thereof), the Company shall notify the Warrant Agent in writing of the amount to be paid in lieu of the fraction of a share of Common Stock  and concurrently pay or provide to the Warrant Agent for payment to the Warrant holder an amount in cash equal to the product of (i) such fraction of a share of Common Stock  and (ii) the Closing Price of a share of Common Stock  for the Trading Day immediately preceding the date the Warrant was presented for exercise pursuant to Section 8 hereof.  The Warrant Agent shall have no duty with respect to any payment for Warrant Shares under any Section of this Warrant Agreement relating to the payment of fractional Warrant Shares unless and until the Warrant Agent shall have received such notice and sufficient monies.

SECTION 15    **Warrant Holders not Stockholders.**    Nothing contained in this Warrant Agreement or in any of the Global Warrant Certificates shall be construed as conferring upon the holders of any Warrant (solely in its capacity as a holder of a Warrant) (i) the right to vote or to consent or to receive notice as stockholders in respect of the meetings of stockholders or the election of directors of the Company or any other matter for which stockholders are entitled to vote or to attend any such meetings or any other proceedings of the holders of Common Stock; (ii) without limiting the provisions of Section 12 hereof, the right to receive any cash dividends, stock dividends, allotments or rights or other distributions paid, allotted or distributed or distributable to the holders of Common Stock prior to, or for which the relevant record date precedes, the date of the exercise of such Warrant; or (iii) any other rights whatsoever as stockholders of the Company.  The Warrant Agent shall have no duty to monitor or enforce compliance with this provision.

SECTION 16    **Merger, Consolidation or Change of Name of Warrant Agent.**  Any person into which the Warrant Agent may be merged or converted or with which it may be consolidated, or any person resulting from any merger, conversion or consolidation to which the Warrant Agent shall be a party, or any person succeeding to all or substantially all of the corporate trust or agency business of the Warrant Agent, shall be the successor to the Warrant Agent hereunder without the execution or filing of any paper or any further act on the part of any of the parties hereto.  If, at the time such successor to the Warrant Agent by merger or consolidation succeeds to the agency created by this Warrant Agreement, any of the Global Warrant Certificates shall have been countersigned but not delivered, any such successor to the Warrant Agent may adopt the countersignature of the original Warrant Agent; and if, at that time any of the Global Warrant Certificates shall not have been countersigned, any such successor to

17

the Warrant Agent may countersign such Global Warrant Certificates either in the name of the predecessor Warrant Agent or in the name of the successor Warrant Agent; and in all such cases such Global Warrant Certificates shall have the full force and effect provided in the Global Warrant Certificates in this Warrant Agreement. If at any time the name of the Warrant Agent shall be changed and at such time any of the Global Warrant Certificates shall have been countersigned but not delivered, the Warrant Agent whose name has changed may adopt the countersignature under its prior name; and if at that time any of the Global Warrant Certificates shall not have been countersigned, the Warrant Agent may countersign such Global Warrant Certificates either in its prior name or in its changed name; and in all such cases such Global Warrant Certificates shall have the full force provided in the Global Warrant Certificates and in this Warrant Agreement.

**SECTION 17** **Warrant Agent.** The Warrant Agent undertakes only the duties and obligations expressly imposed by this Warrant Agreement upon the following terms and conditions, by all of which the Company and the holders of Warrants, by their acceptance thereof, shall be bound:

(a) The Warrant Agent may rely conclusively and shall be protected in acting upon any order, judgment, instruction, notice, demand, certificate, opinion or advice of counsel (including counsel chosen by or who may be an employee of the Warrant Agent or one of its affiliates), statement, instrument, report or other paper or document (not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability and of information therein contained) which is believed by the Warrant Agent, in good faith, to be genuine and to be signed or presented by the proper person or persons as set forth in Section 17(d).

(b) The Warrant Agent shall have no duties, responsibilities or obligations as the Warrant Agent except those which are expressly set forth herein, and in any modification or amendment hereof to which the Warrant Agent has consented in writing, and no duties, responsibilities or obligations shall be implied or inferred.

(c) The statements contained herein and in the Global Warrant Certificates shall be deemed to be statements of the Company only. The Warrant Agent assumes no responsibility for the correctness of any of the same and shall not be required to verify the same.

(d) Whenever in the performance of its duties under this Warrant Agreement the Warrant Agent deems it necessary or desirable that any fact or matter be proved or established by the Company prior to taking, suffering or omitting to take any action hereunder, such fact or matter may be deemed to be conclusively proved and established by a certificate signed by the Company's Chairman of the Board, Chief Executive Officer, President or any Vice President and delivered to the Warrant Agent; and in reliance upon such certificate, the Warrant Agent shall take any action or omit to take any action authorized under the provisions of this Warrant Agreement. In the event the Warrant Agent reasonably believes any ambiguity or uncertainty exists hereunder or in any notice, instruction, direction, request or other communication, paper or document received by the Warrant Agent hereunder, or is uncertain of any action to take hereunder, the Warrant Agent, may, following prior written notice to the

18

Company, refrain from taking any action, and shall be fully protected and shall not be liable in any way to the Company or any other person or entity for refraining from taking such action, unless the Warrant Agent receives written instructions signed by the Company which eliminates such ambiguity or uncertainty to the reasonable satisfaction of the Warrant Agent.

(e)     The Warrant Agent shall not be responsible for any failure of the Company to comply with any of the covenants contained in this Warrant Agreement (including, without limitation, any adjustment of the Exercise Price pursuant to <u>Section 12</u> hereof, the authorization or reservation of shares of Common Stock pursuant to <u>Section 11</u> hereof, and the due execution and delivery by the Company of this Warrant Agreement or any Global Warrant Certificate) or in the Global Warrant Certificates to be complied with by the Company.

(f)     The Warrant Agent may consult at any time with counsel satisfactory to it (who may be counsel for the Company or an employee of the Warrant Agent) and the Warrant Agent shall incur no liability or responsibility to the Company or any holder of any Warrant in respect of any action taken, suffered or omitted by it hereunder and in accordance with the opinion or the advice of such counsel.

(g)     The Warrant Agent shall incur no liability or responsibility for any action taken in reliance on any Global Warrant Certificate, Warrant Statement, certificate representing shares of Common Stock, notice, resolution, waiver, consent, order, certificate, or other paper, document or instrument believed by it to be genuine and to have been signed, sent or presented by the proper party or parties. The Warrant Agent shall not be bound by any notice or demand, or any waiver, modification, termination or revision of this Warrant Agreement or any of the terms hereof, unless evidenced by a writing between and signed by, the Company and the Warrant Agent. The Warrant Agent shall not be required to take instructions or directions except those given in accordance with this Warrant Agreement.

(h)     The Warrant Agent may execute and exercise any of the rights or powers hereby vested in it or perform any duty hereunder either itself or by or through its attorneys, accountants, agents or other experts, and the Warrant Agent will not be answerable or accountable for any act, default, neglect or unintentional misconduct of any such attorneys or agents or for any loss to the Company or the holders of the Warrants resulting from any such act, default, neglect or unintentional misconduct, absent gross negligence, willful misconduct or bad faith (as each is determined by a final non-appealable order of a court of competent jurisdiction) in the selection and continued employment or engagement thereof.

(i)     The Warrant Agent will not be under any duty or responsibility to insure compliance with any applicable federal or state securities laws in connection with the issuance, transfer or exchange of Global Warrant Certificates.

(j)     The Warrant Agent shall not incur any liability for not performing any act, duty, obligation or responsibility by reason of any occurrence beyond the control of the Warrant Agent (including, without limitation, any act or provision of any present or future law or regulation or governmental authority, any act of God, war, civil disorder or failure of any means of communication).

(k)     The Company agrees to pay to the Warrant Agent reasonable compensation for all services rendered by the Warrant Agent in the preparation, delivery, administration and execution of this Warrant Agreement and the exercise and performance of its duties hereunder, to reimburse the Warrant Agent for all reasonable expenses (including reasonable counsel fees), taxes (including withholding taxes) and governmental charges and other charges of any kind and nature actually incurred by the Warrant Agent in the execution, delivery and performance of its responsibilities under this Warrant Agreement and to indemnify the Warrant Agent and save it harmless against any and all liabilities, including judgments, costs and counsel fees, for anything done or omitted by the Warrant Agent, or any person acting on behalf of the Warrant Agent, in the execution, delivery and performance of its responsibilities under this Warrant Agreement except as a result of its gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable order of a court of competent jurisdiction).

(l)     The Warrant Agent, shall be under no obligation to institute any action, suit or legal proceeding or to take any other action likely to involve expense unless the Company or one or more holders of Global Warrant Certificates shall furnish the Warrant Agent with reasonable security and indemnity for any costs and expenses which may be incurred, but this provision shall not affect the power of the Warrant Agent to take such action as it may consider proper, whether with or without any such security or indemnity. All rights of action under this Warrant Agreement or under any of the Warrants may be enforced by the Warrant Agent without the possession of any of the Warrants or the production thereof at any trial or other proceeding relative thereto, and any such action, suit or proceeding instituted by the Warrant Agent shall be brought in its name as Warrant Agent and any recovery of judgment shall be for the ratable benefit of the holders of the Warrants, as their respective rights or interests may appear.

(m)     Except as otherwise prohibited by applicable law, the Warrant Agent, and any member, stockholder, director, officer or employee of the Warrant Agent, may buy, sell or deal in any of the Warrants or other securities of the Company or become pecuniarily interested in any transaction in which the Company may be interested, or contract with or lend money to the Company or otherwise act as fully and freely as though it were not Warrant Agent under this Warrant Agreement. Nothing herein shall preclude the Warrant Agent from acting in any other capacity for the Company or for any other legal entity.

(n)     The Warrant Agent shall act hereunder solely as agent for the Company, and its duties shall be determined solely by the express provisions hereof. The Warrant Agent shall not be liable for anything which it may do or refrain from doing in connection with this Warrant Agreement, except for its own gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable order of a court of competent jurisdiction); provided that in no event shall the Warrant Agent be liable for special, incidental, punitive,  indirect or consequential loss or damage of any kind whatsoever (including, without limitation, lost profits). Any liability of the Warrant Agent under this Agreement, except for liability arising out of, or in connection with, the  gross negligence, bad faith or willful misconduct (each as determined by a final, non-appealable order of a court of competent jurisdiction) of the Warrant Agent, will be limited to the amount of aggregate fees paid by the Company to the Warrant Agent.

CHI:2312123.15

(o)     The Warrant Agent shall not at any time be under any duty or responsibility to any holder of any Warrant to make or cause to be made any adjustment of the Exercise Price or number of the shares of Common Stock  or other securities or property deliverable as provided in this Warrant Agreement, or to determine whether any facts exist which may require any of such adjustments, or with respect to the nature or extent of any such adjustments, when made, or with respect to the method employed in making the same.  The Warrant Agent shall not be accountable with respect to the validity or value or the kind or amount of any shares of Common Stock  or of any securities or property which may at any time be issued or delivered upon the exercise of any Warrant or with respect to whether any such shares of Common Stock or other securities will when issued be validly issued and fully paid and nonassessable, and makes no representation with respect thereto.  The Warrant Agent shall not be accountable to confirm or verify the accuracy or necessity of any calculation.

(p)     The Company agrees to perform, execute and acknowledge and deliver or cause to be performed, executed, acknowledged and delivered all such further and other acts, instruments, and assurances as may reasonably be required by the Warrant Agent for the carrying out or performing of the provisions of this Agreement.

(q)     The Warrant Agent shall have no responsibility or liability with respect to the validity of this Agreement or with respect to the validity or execution of any Warrant (except its countersignature thereof); nor shall it be responsible for any breach by the Company of any covenant or condition contained in this Agreement or in any Warrant; nor shall it be responsible to make or be liable for any adjustments required under any provision hereof, including but not limited to Section 11 hereof, or responsible for the manner, method or amount of any such adjustment or the ascertaining of the existence of facts that would require any such adjustment; nor shall it by act hereunder be deemed to make any representation or warranty as to the authorization or reservation of any shares of Common Stock to be issued pursuant to this Agreement or any Warrant or as to whether any shares of Common Stock will, when issued, be valid and fully paid and nonassessable.

(r)     Notwithstanding anything to the contrary contained herein, the Company shall make all determinations with respect to Cashless Exercises, and the Warrant Agent shall have no duty or obligation to investigate or confirm whether the Company determination regarding the number of Shares to be issued in the event of a Cashless Exercise is accurate or correct.  Notwithstanding anything to the contrary contained herein, the Warrant Agent shall also have no duty or obligation to investigate or confirm whether any determination of the Exercise Amount under Section 8 is correct or accurate.

(s)     No provision of this Agreement shall require the Warrant Agent to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder or in the exercise of its rights, except to the extent otherwise expressly set forth herein.

(t)     Notwithstanding the foregoing, nothing in this Section 17 shall relieve the Warrant Agent from any liability arising from the Warrant Agent's transfer of any Warrant without obtaining confirmation from the Company as described in Section 6 hereof.

(u)     All rights and obligations contained in this <u>Section 17</u> and <u>Section 18</u> hereof shall survive the termination of this Warrant Agreement and the resignation, replacement or removal of the Warrant Agent.

**SECTION 18     Expenses.**  All expenses incident to the Company's performance of or compliance with this Warrant Agreement will be borne by the Company, including, without limitation: (i) all expenses of printing Global Warrant Certificates; (ii) messenger and delivery services and telephone calls; (iii) all fees and disbursements of counsel for the Company; (iv) all fees and disbursements of independent certified public accountants or knowledgeable experts selected by the Company; and (v) the Company's internal expenses (including, without limitation, all salaries and expenses of their officers and employees performing legal or accounting duties).

**SECTION 19     Change of Warrant Agent.**

(a)     If the Company terminates the Warrant Agent or the Warrant Agent shall become incapable of acting as Warrant Agent or shall resign as provided below, the Company shall appoint a successor to such Warrant Agent.  If the Company shall fail to make such appointment within a period of 30 days after it has terminated the Warrant Agent or it has been notified in writing of a resignation or incapacity by the Warrant Agent, then any holder of a Warrant may apply to any court of competent jurisdiction for the appointment of a successor to the Warrant Agent.  Pending appointment of a successor to the Warrant Agent, either by the Company or by such a court, the duties of the Warrant Agent shall be carried out by the Company.  Any successor Warrant Agent, whether appointed by the Company or by such a court, shall be a bank or trust company, in good standing, incorporated under the laws of any state or of the United States of America.  As soon as practicable after appointment of the successor Warrant Agent, the Company shall cause written notice of the change in the Warrant Agent to be given to each of the holders of the Warrants at such holder's address appearing on the Warrant Register.  After appointment, the successor to the Warrant Agent shall be vested with the same powers, rights, duties and responsibilities as if it had been originally named as Warrant Agent without further act or deed.  The former Warrant Agent shall deliver and transfer to the successor to the Warrant Agent any property at the time held by it hereunder and execute and deliver any further assurance, conveyance, act or deed necessary for the purpose.  Failure to give any notice provided for in this <u>Section 19</u>, however, or any defect therein, shall not affect the legality or validity of the appointment of a successor to the Warrant Agent.

(b)     The Warrant Agent may resign at any time and be discharged from the obligations hereby created by so notifying the Company in writing at least 30 days in advance of the proposed effective date of its resignation.  If no successor Warrant Agent accepts the engagement hereunder by such time, the Company shall act as Warrant Agent.

**SECTION 20     Notices to the Company and Warrant Agent.**  Any notice or demand authorized or permitted by this Warrant Agreement to be given or made by the Warrant Agent or by any holder of the Warrants to or on the Company to be effective shall be in writing (including by facsimile), and shall be deemed to have been duly given or made when delivered by hand, or two (2) business days after being delivered to a recognized courier (whose stated terms of

delivery are two (2) business days or less to the destination of such notice), or five (5) days after being deposited in the mail, first class and postage prepaid or, in the case of facsimile notice, when received, addressed as follows (until another address or facsimile number is filed in writing by the Company with the Warrant Agent):

> Lear Corporation
> 21557 Telegraph Drive
> Southfield, Michigan 48033
> Attn: General Counsel
> Telephone:    (248) 447-5123
> Facsimile:     (248) 447-5126

with a copy to:

> Winston & Strawn LLP
> 35 West Wacker Drive
> Chicago, Illinois 60601
> Attn:    Bruce A. Toth
>              Brian M. Schafer
> Telephone:    (312) 558-5600
> Facsimile:     (312) 558-5700

Any notice or demand pursuant to this Warrant Agreement to be given by the Company or by any holder(s) of the Warrants to the Warrant Agent shall be sufficiently given if sent in the same manner as notices or demands are to be given or made to or on the Company (as set forth above) to the Warrant Agent at the Warrant Agent Office as follows (until another address is filed in writing by the Warrant Agent with the Company):

> Mellon Investor Services LLC
> Newport Office Center VII
> 480 Washington Boulevard
> Jersey City, NJ  07310
> Attn:  Relationship Manager

**SECTION 21    Supplements and Amendments.**    The Company and the Warrant Agent may from time to time supplement or amend this Warrant Agreement (a) without the approval of any holders of Warrants in order to cure any ambiguity or to correct or supplement any provision contained herein that may be defective or inconsistent with any other provision herein, or to make any other provisions in regard to matters or questions arising hereunder that the Company may deem necessary or desirable and that shall not adversely affect the rights or interests of the holders of Warrants or (b) with the prior written consent of holders of the Warrants exercisable for a majority of the shares of Common Stock then issuable upon exercise of the Warrants then outstanding; provided, however, that the consent of each holder of a Warrant affected shall be required for any amendment of this Warrant Agreement that would (i) increase the Exercise Price or the Trigger Price or decrease the number of shares of Common Stock purchasable upon exercise of the Warrants, except that such consent shall not be required

23

for any adjustment to the Exercise Price or the Trigger Price or the number of shares of Common Stock purchasable if made pursuant to the provisions of <u>Section 12</u> hereof, (ii) alter the Company's obligation to issue Warrant Shares upon exercise of the underlying Warrant (other than pursuant to adjustments otherwise provided for in this Agreement, including the adjustments provided for in <u>Section 12</u> hereof), (iii) change the Expiration Date of the Warrants to an earlier date, (iv) waive the application of the adjustment provisions contained in <u>Section 12</u> in connection with any events to which such provisions apply or otherwise modify the adjustment provisions contained in <u>Section 12</u> in a manner that would have an adverse economic impact on the holders of Warrants, or (v) treat such holder differently in an adverse way from any other holder of Warrants. The Warrant Agent may, but shall not be obligated to, execute any amendment or supplement which affects the rights or increases the duties or obligations of the Warrant Agent.

      **SECTION 22**    **Successors.**    All the covenants and provisions of this Warrant Agreement by or for the benefit of the Company, the holders of the Warrants or the Warrant Agent shall bind and inure to the benefit of their respective successors and assigns hereunder.

      **SECTION 23**    **Termination.**    This Warrant Agreement shall terminate at 5:00 p.m., New York City time, on the Expiration Date (or, at 5:00 p.m., New York City time, on the Settlement Date with respect to any Warrant Exercise Notice delivered prior to 5:00 p.m., New York City time, on the Expiration Date). Notwithstanding the foregoing, this Warrant Agreement will terminate on such earlier date on which all outstanding Warrants have been exercised. Termination of this Warrant Agreement shall not relieve the Company or the Warrant Agent of any of their obligations arising prior to the date of such termination or in connection with the settlement of any Warrant exercised prior to 5:00 p.m., New York City time, on the Expiration Date.

      **SECTION 24**    **Governing Law.**    This Warrant Agreement and each Warrant issued hereunder shall be deemed to be a contract made under the laws of the State of New York and for all purposes shall be governed by and construed in accordance with the laws of the State of New York without giving effect to conflict of laws principles.

      **SECTION 25**    **Benefits of this Warrant Agreement.**    This Warrant Agreement shall be for the sole and exclusive benefit of the Company, the Warrant Agent and the holders of the Warrants, and nothing in this Warrant Agreement shall be construed to give to any person other than the Company, the Warrant Agent and the holders of the Warrants any legal or equitable right, remedy or claim under this Warrant Agreement. Each holder, by acceptance of a Warrant, agrees to all of the terms and provisions of this Warrant Agreement applicable thereto.

      **SECTION 26**    **Counterparts.**    This Warrant Agreement may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same instrument.

      **SECTION 27**    **Further Assurances.**    From time to time on and after the date hereof, the Company shall deliver or cause to be delivered to the Warrant Agent such further documents and instruments and shall do and cause to be done such further acts as the Warrant Agent shall

CHI:2312123.15

reasonably request (it being understood that the Warrant Agent shall have no obligation to make such request) to carry out more effectively the provisions and purposes of this Warrant Agreement, to evidence compliance herewith or to assure itself that it is protected hereunder.

**SECTION 28** **Entire Agreement.** This Warrant Agreement and the Global Warrant Certificates constitute the entire agreement of the Company, the Warrant Agent and the holders of the Warrants with respect to the subject matter hereof and supersede all prior agreements and undertakings, both written and oral, among the Company, the Warrant Agent and the holders of the Warrants with respect to the subject matter hereof. Except as expressly made herein, the Company makes no representation, warranty, covenant or agreement with respect to the Warrants.

**SECTION 29** **Severability.** Wherever possible, each provision of this Warrant Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Warrant Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Warrant Agreement; provided, however, that if such excluded or added provision shall materially affect the rights, immunities, duties or obligations of the Warrant Agent, the Warrant Agent shall be entitled to resign immediately upon notification in writing to the Company.

**SECTION 30** **Force Majeure.** In no event shall the Warrant Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

CHI:2312123.15

IN WITNESS WHEREOF, the parties hereto have caused this Warrant Agreement to be duly executed, as of the day and year first above written.

LEAR CORPORATION

By:_____
    Name: _____
    Title: _____

MELLON INVESTOR SERVICES LLC,

as Warrant Agent

By:_____
    Name: _____
    Title: _____

[Signature Page to Warrant Agreement]

**FORM OF GLOBAL WARRANT CERTIFICATE**

**FORM OF FACE OF GLOBAL WARRANT CERTIFICATE**

**VOID AFTER 5:00 P.M., NEW YORK CITY TIME, ON [NOVEMBER __], 2014**

**THE SALE, ASSIGNMENT, PLEDGE, ENCUMBRANCE, EXCHANGE OR OTHER TRANSFER OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF THE WARRANT AGREEMENT, DATED AS OF [NOVEMBER __,] 2009 (THE "WARRANT AGREEMENT"), BETWEEN THE ISSUER OF THIS CERTIFICATE AND THE WARRANT AGENT NAMED THEREIN. BY ACCEPTING ANY INTEREST IN THE SECURITIES REPRESENTED BY THIS CERTIFICATE, THE RECIPIENT OF SUCH SECURITIES SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL OF THE PROVISIONS OF THE WARRANT AGREEMENT. A COPY OF THE WARRANT AGREEMENT MAY BE OBTAINED UPON WRITTEN REQUEST TO THE CORPORATE SECRETARY OF THE ISSUER OF THIS CERTIFICATE.**

|  |  |
|---|---|
| **NO. W-1** | **WARRANT TO PURCHASE _____ SHARES OF COMMON STOCK** |

**LEAR CORPORATION**

WARRANT TO PURCHASE COMMON STOCK, PAR VALUE $0.01 PER SHARE

**CUSIP # 521865 113**
**DISTRIBUTION DATE: [NOVEMBER __,] 2009**

This Global Warrant Certificate certifies that Cede & Co., or its registered assigns, is the registered holder of a Warrant (this "Warrant") of **LEAR CORPORATION**, a Delaware corporation (the "Company"), to purchase the number of shares of common stock, par value $0.01 per share ("Common Stock"), of the Company set forth above (as adjusted from time to time in accordance with the terms of the Warrant Agreement). This Warrant expires at 5:00 p.m. New York City time on [November __,] 2014 (the "Expiration Date") and entitles the holder to purchase from the Company up to the number of fully paid and nonassessable shares of Common Stock set forth above at an exercise price of $0.01 per share of Common Stock (as adjusted from time to time in accordance with the terms of the Warrant Agreement, the "Exercise Price"). Subject to the terms and conditions set forth in the Warrant Agreement, this Warrant may be exercised at any time, and from time to time, in whole or in part, during the period (i) commencing on the business day immediately following a period of 30 consecutive Trading Days ending prior to, but not including, such business day during which the Closing Price of the Common Stock for at least 20 of the Trading Days within such 30-day period is equal to or greater than $39.63 (as adjusted from time in accordance with the terms of the Warrant Agreement, the "Trigger Price") and (ii) ending at 5:00 p.m. New York City time on the Expiration Date. The Exercise Price, the Trigger Price and the number of shares of Common Stock purchasable upon exercise of this Warrant are subject to adjustment upon the occurrence of certain events as set forth in the Warrant Agreement.

REFERENCE IS HEREBY MADE TO THE FURTHER PROVISIONS OF THIS GLOBAL WARRANT CERTIFICATE SET FORTH ON THE REVERSE HEREOF. SUCH FURTHER PROVISIONS SHALL FOR ALL PURPOSES HAVE THE SAME EFFECT AS THOUGH FULLY SET FORTH AT THIS PLACE.

This Global Warrant Certificate shall not be valid unless countersigned by the Warrant Agent.

All capitalized terms used herein and not defined herein shall have the meanings assigned to them in the Warrant Agreement.

27

**IN WITNESS WHEREOF**, the Company has caused this Global Warrant Certificate to be executed by its duly authorized officers as of the date below set forth.

Dated: _____, 2009

**LEAR CORPORATION**

By:_____
Name:  Robert E. Rossiter
Title:    Chairman, Chief Executive Officer
            and President

By: _____
Name:  Terrence B. Larkin
Title:    Senior Vice President, General
            Counsel and Corporate Secretary

Countersigned:

**MELLON INVESTOR SERVICES LLC**,
as Warrant Agent

By: _____
Name:
Title:

Address of Registered Holder for Notices (until changed in accordance with the Warrant Agreement):

_____
_____
_____
_____

**FORM OF REVERSE OF GLOBAL WARRANT CERTIFICATE**

The Warrant evidenced by this Global Warrant Certificate is a part of a duly authorized issue of Warrants to purchase up to 8,157,250 shares of Common Stock issued pursuant to the Warrant Agreement. The Warrant Agreement is hereby incorporated by reference herein and made a part of this instrument and is hereby referred to for a description of the rights, limitation of rights, obligations, duties and immunities thereunder of the Warrant Agent, the Company and the registered holders of the Warrants. All capitalized terms used but not defined herein shall have the meanings assigned to them in the Warrant Agreement.

Upon due presentment for registration of transfer of the Warrant and surrender of this Global Warrant Certificate at the office of the Warrant Agent designated for such purpose, a new Global Warrant Certificate or Global Warrant Certificates of like tenor and evidencing in the aggregate a like number of Warrants shall be issued to the transferee in exchange for this Global Warrant Certificate, subject to the limitations set forth in the Warrant Agreement, without charge except for any applicable tax or other charge.

Subject to Section 14 of the Warrant Agreement, the Company shall not be required to issue fractional shares of Common Stock.

No Warrants may be sold, exchanged or otherwise transferred in violation of the Securities Act state securities laws or other applicable law.

The Warrant does not entitle the registered holder thereof to any of the rights of a stockholder of the Company.

The Company and Warrant Agent may deem and treat the registered holder hereof as the absolute owner of this Global Warrant Certificate (notwithstanding any notation of ownership or other writing hereon made by anyone other than the Company or the Warrant Agent) for the purpose of any exercise hereof and for all other purposes, and neither the Company nor the Warrant Agent shall be affected by any notice to the contrary.

This Global Warrant Certificate is held by The Depository Trust Company (the "Depository") or its nominee in custody for the benefit of the beneficial owners hereof, and is not transferable to any Person under any circumstances except that (i) this Global Warrant Certificate may be transferred in whole pursuant to Section 6(e) of the Warrant Agreement (as hereinafter defined) and (ii) this Global Warrant Certificate may be delivered to the Warrant Agent for cancellation pursuant to Sections 6(g) and 8(l) of the Warrant Agreement.

Unless this Global Warrant Certificate is presented by an authorized representative of the Depository to the Company or the Warrant Agent for registration of transfer, exchange or payment and any certificate issued is registered in the name of Cede & Co., or such other entity as is requested by an authorized representative of the Depository (and any payment hereon is made to Cede & Co. or to such other entity as is requested by an authorized representative of the Depository), any transfer, pledge or other use hereof for value or otherwise by or to any Person is wrongful because the registered owner hereof, Cede & Co., has an interest herein.

No registration or transfer of the securities issuable pursuant to the Warrant will be recorded on the books and records of the Company or the Warrant Agent until the provisions set forth in the Warrant Agreement have been complied with.

In the event of any conflict or inconsistency between this Global Warrant Certificate and the Warrant Agreement, the Warrant Agreement shall control.

## EXHIBIT B-1

### EXERCISE FORM FOR HOLDERS
### HOLDING BOOK-ENTRY WARRANTS
(To be executed upon exercise of the Warrant(s))

The undersigned hereby irrevocably elects to exercise the right, represented by the Book-Entry Warrant(s), to purchase shares of Common Stock of Lear Corporation and (check one or both):

☐    herewith tenders in payment for _____ shares of Common Stock an amount of $_____ by certified or official bank check made payable to the order of Lear Corporation or by wire transfer in immediately available funds to an account arranged with Lear Corporation; and/or

☐    herewith tenders the Warrant(s) for _____ shares of Common Stock pursuant to the cashless exercise provision of Section 8(f) of the Warrant Agreement.

Please check below if this exercise is contingent upon the consummation of a Reorganization Event as provided in Sections 8(g) and 12(d) of the Warrant Agreement:

☐    This exercise is being made in connection with a Reorganization Event; provided, that in the event the Reorganization Event shall not be consummated, then this exercise shall be deemed to be revoked.

The undersigned requests that a statement representing the shares of Common Stock issued upon exercise of the Warrant(s) be delivered in accordance with the instructions set forth below.

Dated: _____, 20____

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE.

ALL CAPITALIZED TERMS USED HEREIN BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASSIGNED TO THEM IN THE WARRANT AGREEMENT.

CHI:2312123.15

**THE UNDERSIGNED REQUESTS THAT A STATEMENT REPRESENTING THE SHARES OF COMMON STOCK BE DELIVERED AS FOLLOWS:**

Name: _____
(Please Print)

Address: _____

_____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable):

_____

**IF SAID NUMBER OF SHARES SHALL NOT BE ALL THE SHARES PURCHASABLE UNDER THE WARRANT(S), THE UNDERSIGNED REQUESTS THAT NEW BOOK-ENTRY WARRANT(S) REPRESENTING THE BALANCE OF SUCH WARRANT(S) SHALL BE REGISTERED AS FOLLOWS:**

Name: _____
(Please Print)

Address: _____

_____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable):

_____

Signature: _____

Name: _____

Capacity in which Signing: _____

SIGNATURE GUARANTEED BY: _____

      Signatures must be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

# EXHIBIT B-2

## EXERCISE FORM FOR HOLDERS
## HOLDING WARRANTS THROUGH THE DEPOSITORY TRUST COMPANY
### TO BE COMPLETED BY DIRECT PARTICIPANT
### IN THE DEPOSITORY TRUST COMPANY
#### (To be executed upon exercise of the Warrant(s))

The undersigned hereby irrevocably elects to exercise the right, represented by Global Warrant Certificate No. _____ held for its benefit through the book-entry facilities of The Depository Trust Company (the "Depository"), to purchase _____ shares of Common Stock of Lear Corporation and (check one or both):

☐      herewith tenders in payment for such shares an amount of $_____ by certified or official bank check made payable to the order of Lear Corporation or by wire transfer in immediately available funds to an account arranged with Lear Corporation; and/or

☐      herewith tenders the Warrant(s) for _____ shares of Common Stock pursuant to the cashless exercise provision of Section 8(f) of the Warrant Agreement.

Please check below if this exercise is contingent upon the consummation of a Reorganization Event as provided in Sections 8(g) and12(d) of the Warrant Agreement:

☐      This exercise is being made in connection with a Reorganization Event; provided, that in the event the Reorganization Event shall not be consummated, then this exercise shall be deemed to be revoked.

The undersigned requests that the shares of Common Stock issuable upon exercise of the Warrant(s) be in registered form in the authorized denominations, registered in such names and delivered, all as specified in accordance with the instructions set forth below; provided, that if the shares of Common Stock are evidenced by global securities, the shares of Common Stock shall be registered in the name of the Depository or its nominee.

     Dated: _____, 20___

THIS EXERCISE NOTICE MUST BE DELIVERED TO THE WARRANT AGENT, PRIOR TO 5:00 P.M., NEW YORK CITY TIME, ON THE EXPIRATION DATE. THE WARRANT AGENT SHALL NOTIFY YOU (THROUGH THE CLEARING SYSTEM) OF (1) THE WARRANT AGENT'S ACCOUNT AT THE DEPOSITORY TO WHICH YOU MUST DELIVER YOUR WARRANT(S) ON THE EXERCISE DATE AND (2) THE ADDRESS, PHONE NUMBER AND FACSIMILE NUMBER WHERE YOU CAN CONTACT THE WARRANT AGENT AND TO WHICH WARRANT EXERCISE NOTICES ARE TO BE SUBMITTED.

ALL CAPITALIZED TERMS USED HEREIN BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASSIGNED TO THEM IN THE WARRANT AGREEMENT.

CHI:2312123.15

**NAME OF DIRECT PARTICIPANT IN THE DEPOSITORY:**

Account Name: _____
                        (Please Print)

Address: _____

_____

Contact Name: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable):

_____

Account from which Warrant(s) are Being Delivered: _____

Depository Account Number: _____

**WARRANT HOLDER DELIVERING WARRANT(S), IF OTHER THAN THE DIRECT PARTICIPANT:**

Name: _____

Contact Name: _____

Address: _____

_____

Telephone: _____

Fax: _____

Account to which the Shares of Common Stock are to be Credited: _____

Depository Account Number: _____

**FILL IN FOR DELIVERY OF THE COMMON STOCK, IF OTHER THAN TO THE PERSON DELIVERING THIS WARRANT EXERCISE NOTICE:**

Name: _____

             (Please Print)

Address: _____

             _____

Contact Name: _____

Telephone: _____

Fax: _____

Social Security Number or Other Taxpayer Identification Number (if applicable):

_____

Signature: _____

Name: _____

Capacity in which Signing: _____

Signature Guaranteed By: _____

Signatures must be guaranteed by a participant in the Securities Transfer Agent Medallion Program, the Stock Exchanges Medallion Program or the New York Stock Exchange, Inc. Medallion Signature Program.

## PLAN SUPPLEMENT EXHIBIT E

### Certification of Designation

CERTIFICATE OF DESIGNATIONS

OF

SERIES A CONVERTIBLE PARTICIPATING PREFERRED STOCK

OF

LEAR CORPORATION

_____

pursuant to Sections 151 and 303 of the

General Corporation Law of the State of Delaware

_____

The terms of the authorized Series A Convertible Participating Preferred Stock, par value $0.01 per share (the "Series A Preferred Stock"), of Lear Corporation, a corporation organized and existing under the laws of the State of Delaware (the "Corporation"), are set forth below. Capitalized terms used herein, unless otherwise defined, shall have the meanings ascribed thereto in Section 3.

Section 1.    Designation; Ranking.

The designation of this series of preferred stock shall be "Series A Convertible Participating Preferred Stock." Each share of Series A Preferred Stock shall be identical in all respects to every other share of Series A Preferred Stock. Series A Preferred Stock will rank equally with Parity Stock, if any, will rank senior to Junior Stock, if any, and will rank junior to Senior Stock, if any.  The Series A Preferred Stock shall be subordinate, and rank junior in right of payment, to all indebtedness of the Corporation.

Section 2.    Number of Shares.

The number of authorized shares of Series A Preferred Stock shall be 10,896,250. Subject to Section 6(b), such number of authorized shares may, from time to time, be increased or decreased (but not below the number of shares of Series A Preferred Stock then outstanding) by further resolution duly adopted by the Board and by the filing of a certificate pursuant to the provisions of the General Corporation Law of the State of Delaware (the "DGCL") stating that such increase or reduction has been so authorized. The Corporation shall have the authority to issue fractional shares of Series A Preferred Stock.

Section 3.    Definitions.

"Board" means the Corporation's Board of Directors or any duly authorized committee thereof.

"Closing Price" means on any particular date (a) if the Common Stock is then listed or quoted on a Trading Market, (i) the closing price per share of Common Stock on such date on the principal Trading Market (as reported by Bloomberg L.P. or a similar organization or agency succeeding to its functions of reporting prices) or (ii) if there shall have been no sales of Common Stock on such principal Trading Market on such day, the average of the reported closing bid and asked prices per share of Common Stock on such principal Trading Market (as reported by Bloomberg L.P. or a similar organization or agency succeeding to its functions of reporting prices), (b) if the Common Stock is not then listed or quoted on a Trading Market and if prices for the Common Stock are then reported in the "pink sheets" published by Pink OTC Markets, Inc. (or a similar organization or agency succeeding to its functions of reporting prices), the average of the reported closing bid and asked prices per share of Common Stock so reported or (c) if the shares of Common Stock are not then publicly traded the fair market value as of such date of a share of Common Stock as reasonably determined in good faith by the Board of Directors of the Company.

"Common Stock" means the common stock of the Corporation, par value $0.01 per share, or any other shares of the capital stock of the Corporation into which such shares of common stock shall be reclassified or changed.

"Conversion Agent" means Mellon Investor Services LLC, acting in its capacity as conversion agent for the Series A Preferred Stock, and its successors and assigns.

"Junior Stock" means the Common Stock and any other class or series of stock of the Corporation, other than Parity Stock, now existing or hereafter authorized not expressly ranking senior to the Series A Preferred Stock with respect to the payment of dividends, rights on redemption or the distribution of assets in the event of any Liquidation Event.

"Liquidation Event" means any liquidation, dissolution or winding up of the Corporation, whether voluntary or involuntary; provided that in no event shall any Organic Change or any other merger or consolidation involving, or any sale of all or substantially all of the assets of, the Corporation be deemed a Liquidation Event.

"Mandatory Conversion Date" means [November ___,] 2012; provided that the "Mandatory Conversion Date" shall also mean any earlier date after [November ___,] 2010 if for 20 Trading Days within any period of 30 consecutive Trading Days ending on such date, the Closing Price (it being understood that only clauses (a) and (b) of the definition of Closing Price shall be applicable for purposes of this definition), of the Common Stock exceeds 135% of the then-applicable Conversion Price for the Series A Preferred Stock.

"Organic Change" means (i) any consolidation, merger, share exchange or similar transaction of the Corporation with or into another Person pursuant to which the Common Stock is changed into, converted into or exchanged for cash, securities or other property (whether of the Corporation or another Person); (ii) any reorganization, recapitalization or reclassification or similar transaction in which the Common Stock is exchanged for securities other than Common Stock; or (iii) any statutory exchange of the outstanding shares of Common Stock for securities of another Person (other than in connection with a consolidation, merger, share exchange or other similar transaction).

2

"Parity Stock" means any class or series of stock of the Corporation hereafter authorized that expressly ranks equally with the Series A Preferred Stock with respect to the payment of dividends, rights on redemption or in the distribution of assets in the event of any Liquidation Event.

"Person" means any individual, corporation, estate, partnership, joint venture, association, joint-stock company, limited liability company, governmental authority, trust, or other entity.

"Senior Stock" means any class or series of stock of the Corporation hereafter authorized which expressly ranks senior to the Series A Preferred Stock and has preference or priority over the Series A Preferred Stock as to the payment of dividends, rights on redemption or in the distribution of assets on any Liquidation Event.

"Stated Value" means, in respect of each share of Series A Preferred Stock, an amount equal to $41.30 per share, subject to appropriate adjustment in the event of any stock dividend, stock split, combination or other similar recapitalization affecting the Series A Preferred Stock.

"Trading Day" means (a) if the Common Stock is listed or quoted on a Trading Market, a day on which the principal Trading Market is open for business or (b) if the Common Stock is not listed or quoted on a Trading Market, a business day.

"Trading Market" means any of the following markets or exchanges on which the Common Stock is listed or quoted for trading on the date in question: the NYSE Amex Equities, the Nasdaq Capital Market, the Nasdaq Global Market, the Nasdaq Global Select Market, the New York Stock Exchange or the OTC Bulletin Board.

Section 4.  Dividends.

(a)     General.  Except as provided in Section 4(b), the Series A Preferred Stock shall not bear any mandatory dividend.  Except as provided in Section 4(b), the declaration of any dividend payable upon the Series A Preferred Stock shall require the consent of at least seventy-five percent (75%) of the directors of the Corporation who are not employees of the Corporation.

(b)     Participation.  In the event the Corporation declares and/or pays any dividend or other distribution on the Common Stock (other than a dividend payable solely in the form of additional shares of Common Stock), the Corporation shall, at the time of such declaration or payment, declare and pay a dividend or other distribution on the Series A Preferred Stock consisting of the dividend or other distribution that would have been payable on the shares of Common Stock issuable upon conversion, in full, of the Series A Preferred Stock if the Series A Preferred Stock had been converted into Common Stock immediately prior to the record date for determination of holders entitled to receive such dividend or other distribution.

(c)     Restrictions.  So long as any shares of Series A Preferred Stock shall remain outstanding, the Corporation shall not declare, pay or set aside any dividends on shares of any

3

other class or series of capital stock of the Corporation (other than a dividend payable on Senior Stock and a dividend payable on the Common Stock payable solely in the form of additional shares of Common Stock) unless dividends on the Series A Preferred Stock (including those provided under <u>Section 4(b)</u>), if any, have been paid in full through the most recent dividend payment date.  So long as any shares of Series A Preferred Stock shall remain outstanding, the Corporation shall not redeem, repurchase or otherwise acquire directly or indirectly any Junior Stock, other than (i) repurchases of Junior Stock of departing employees and directors of the Corporation (A) in accordance with any management equity plan or agreement or independent director equity plan or agreement, as applicable, or (B) as otherwise approved by the Board and (ii) cash payments made in lieu of fractional shares of Junior Stock that would otherwise be issued upon (x) any conversion, exercise or exchange of any capital stock, option, warrant or other security that is convertible into, or exercisable or exchangeable for, Junior Stock or (y) any reverse split or other combination of Junior Stock.

(c)  <u>Record Date</u>.  The Board may fix a record date for the determination of holders of shares of the Common Stock entitled to receive payment of a dividend declared thereon, which record date shall be the same date as the record date for which holders of shares of the Series A Preferred Stock shall be entitled to receive payment of a dividend declared thereon, if applicable, and which record date shall be no more than sixty (60) days prior to the date fixed for the payment thereof.

Section 5.  <u>Liquidation Event</u>.

(a)  <u>Distributions</u>.  Subject to the rights of any Senior Stock in connection therewith, upon any Liquidation Event, each holder of Series A Preferred Stock shall be entitled to be paid, out of assets of the Corporation legally available therefor, before any distribution or payment out of the assets of the Corporation may be made to or set aside for the holders of any Junior Stock in connection with such Liquidation Event, an amount per share of Series A Preferred Stock held by such holder equal to the greater of (i) the Stated Value per share of Series A Preferred Stock held by such holder plus an amount equal to all declared and unpaid dividends, if any, with respect to such share calculated through the day immediately prior to the date of such payment (the "<u>Accrued Value</u>") and (ii) the amount that would be payable to such holder in respect of the Common Stock issuable upon conversion of a share of Series A Preferred Stock held by such holder assuming all outstanding shares of Series A Preferred Stock (including the shares of Series A Preferred Stock held by such holder) were converted into Common Stock immediately prior to the Liquidation Event in accordance with <u>Section 8</u> (the amount per share of Series A Preferred Stock paid as determined pursuant to this clause (ii), the "<u>As-Converted Per Share Amount</u>")).  Other than as expressly set forth in the immediately foregoing sentence, upon payment of the aggregate amount owed to any holder of Series A Preferred Stock (in its capacity as such) upon a Liquidation Event (as determined in accordance with the immediately foregoing sentence), no such holder of Series A Preferred Stock (in its capacity as such) shall be entitled to any further payments upon the occurrence of any Liquidation Event or otherwise.  All shares of Series A Preferred Stock in respect of which the holders have been paid the full amount to which they are entitled under this Certificate of Designations upon the occurrence of a Liquidation Event or for which the full amount to which they are entitled has been made available by the Corporation shall, automatically and without further action on the part of the Corporation or any

4

holder thereof, be cancelled effective upon payment or the making available by the Corporation of such amount.

(b) <u>Partial Distributions</u>. Subject to the rights of any Senior Stock in connection therewith, if, upon any Liquidation Event, the assets of the Corporation to be distributed in respect of the Series A Preferred Stock and any Parity Stock are insufficient to permit payment in respect thereof of the aggregate amount to which they are entitled under this Certificate of Designations upon such Liquidation Event, then the entire assets available to be distributed to the holders of Series A Preferred Stock and any Parity Stock shall be distributed *pro rata* among such holders of Series A Preferred Stock and any Parity Stock based upon the aggregate amounts to which they would otherwise be entitled upon such Liquidation Event.

(c) <u>Residual Distributions</u>. Upon payment in full of all amounts (if any) required to be paid in respect of any Senior Stock, the Series A Preferred Stock and any Parity Stock in connection with a Liquidation Event, the Junior Stock shall be entitled to receive all remaining assets of the Corporation legally available for distribution in accordance with their respective rights and preferences.

Section 6.    <u>Voting Rights</u>.

(a) The holders of the Series A Preferred Stock shall be entitled to notice of all stockholders meetings in accordance with the Corporation's bylaws and applicable law, and except as otherwise required by applicable law, the holders of the Series A Preferred Stock shall be entitled to vote on all matters submitted to the stockholders generally for a vote, voting together as a single class with the Common Stock and each other class or series of capital stock of the Corporation entitled to vote as a single class with the Common Stock. Each holder of Series A Preferred Stock shall be entitled to one vote for each share of Common Stock issuable upon conversion of the Series A Preferred Stock (assuming full conversion and aggregation of all fractional shares) held by such holder as of the record date for such vote.

(b) In addition to the voting rights provided in <u>Section 6(a)</u> to the holders of the Series A Preferred Stock, the affirmative vote of the holders of a majority of the then outstanding shares of Series A Preferred Stock, voting as a separate class, shall be required for the Corporation to, directly or indirectly, whether by merger, consolidation or otherwise: (i) amend the Certificate of Incorporation or this Certificate of Designations in a manner that adversely alters, modifies or changes the rights, designations or preferences of the holders of Series A Preferred Stock; (ii) authorize or create any class of Senior Stock or Parity Stock; or (iii) increase or decrease the authorized number of shares of Series A Preferred Stock.

Section 7.    <u>Redemption Rights</u>.

(a) <u>Optional Redemption</u>. The Corporation may, at any time and from time to time, without premium or penalty, redeem all or any portion of the shares of Series A Preferred Stock then outstanding. Upon any such redemption and unless otherwise agreed by any holder of the Series A Preferred Stock, the Corporation shall pay in cash a price per share of Series A Preferred Stock equal to the greater of (i) the Accrued Value and (ii) the As-Converted Per Share

5

Amount (reasonably determined in good faith by the Board as though a Liquidation Event had occurred on the day immediately prior to the date that the Corporation delivers the notice of redemption) (the "Redemption Price").

(b)    Notice of Redemption.    Except as otherwise provided herein, the Corporation shall publicly announce, or otherwise mail written notice to each record holder of Series A Preferred Stock of, any redemption of any Series A Preferred Stock not more than 60 nor less than 10 days prior to the date on which such redemption is to be made (the date on which such redemption is to be made, the "Redemption Date").    Any holder of Series A Preferred Stock may, by irrevocable notice to the Corporation prior to the date scheduled for such redemption, elect to convert its shares of Series A Preferred Stock into Common Stock pursuant to Section 8 prior to such redemption and may make such election contingent on the consummation of such redemption (but otherwise such election shall be unconditional to be an effective election).

(c)    Redemptions of Less than All Shares.    If the Corporation elects to redeem less than all of the shares of Series A Preferred Stock, the aggregate number of shares of Series A Preferred Stock and each class or series of Parity Stock to be redeemed shall be determined by the Corporation with respect to the holders of Series A Preferred Stock and holders of Parity Stock such that the aggregate amount payable to each such holder in respect of such shares of Series A Preferred Stock and/or Parity Stock, as the case may be, upon a Liquidation Event immediately after consummation of such redemption (and after giving effect to any conversion in connection with such redemption) bears, as nearly as practicable, the same proportion to the total amount payable to holders of Series A Preferred Stock and Parity Stock upon a Liquidation Event in respect of such shares immediately prior to consummation of such redemption (and after giving effect to any conversion in connection with such redemption).    In the event that the Series A Preferred Stock is certificated and fewer than the total number of shares of Series A Preferred Stock represented by any certificate are redeemed, a new certificate representing the number of unredeemed shares of Series A Preferred Stock shall be issued to the holder thereof without cost to such holder within five business days after surrender of the certificate representing the redeemed shares of Series A Preferred Stock.

(d)    Redemption Price.    For each share of Series A Preferred Stock which is to be redeemed hereunder, the Corporation shall pay on the Redemption Date to the holder thereof (to the extent certificated, upon surrender by such holder at the Corporation's principal office of the certificate representing such share) the Redemption Price; provided that, to the extent that such notice is provided in connection with an Organic Change, the Corporation may condition its obligations to consummate such redemption on the consummation of such Organic Change and may, without penalty or liability, withdraw any notice of redemption and its obligation to redeem thereunder if the Organic Change transaction is terminated or to be terminated.    To the fullest extent permitted by applicable law, if the Corporation pays or otherwise makes available to the holders of the Series A Preferred Stock to be redeemed the Redemption Price when and as required, the shares of Series A Preferred Stock shall be cancelled notwithstanding failure of the holder thereof to return the certificate representing such shares (if certificated).

(e)    Other Redemptions or Acquisitions.    The Series A Preferred Stock shall have no maturity date or scheduled redemption date.    Nothing herein shall be deemed to limit the right of the Corporation to repurchase Series A Preferred Stock from time to time.    In no event shall the

6

Corporation repurchase any shares of Series A Preferred Stock to the extent that such purchase would render the Corporation insolvent or otherwise violate applicable law.

Section 8.    Conversion.

(a)    Upon Election by Holders.  Any holder of Series A Preferred Stock may elect, by written notice to the Corporation at any time and from time to time, to cause the Corporation to convert all or any portion of the shares of Series A Preferred Stock held by such holder, as specified by such holder in such notice, into shares of Common Stock on the terms described below.  Notwithstanding any other provision hereof, if a conversion of Series A Preferred Stock pursuant to this Section 8(a) is to be made in connection with an Organic Change, the conversion of any shares of Series A Preferred Stock may, at the election of the holder thereof, be conditioned upon the consummation of such Organic Change, in which case such conversion shall be deemed to be effective simultaneously with the consummation of such Organic Change. A holder of Series A Preferred Stock must do each of the following in order to convert shares of Series A Preferred Stock: (i) complete and manually sign the conversion notice provided by the Conversion Agent, and deliver such notice to the Conversion Agent; (ii) to the extent certificated, deliver a certificate or certificates to the Conversion Agent representing the shares of Series A Preferred Stock to be converted to the Conversion Agent; (iii) if required by applicable law, furnish appropriate endorsements and transfer documents; and (iv) if required, pay any stock transfer, documentary, stamp or similar taxes.  The date on which a holder of Series A Preferred Stock complies with the procedures in this Section 8(a) with regard to the conversion of shares of Series A Preferred Stock (or in the case of an election conditioned upon the consummation of an Organic Change, such later date specified in a holder's written notice) is referred to as the "Conversion Date" applicable to such shares.  The Conversion Agent shall, on behalf of the holder of such Series A Preferred Stock, convert the shares of Series A Preferred Stock into shares of Common Stock in accordance with the terms of the notice delivered by such holder described above.  On the Conversion Date, the shares of Series A Preferred Stock so converted will be cancelled and will cease to be issued and outstanding (and all rights of a holder of such Series A Preferred Stock (in its capacity as such) shall terminate without further liability to, or obligation of, the Corporation effective as of the Conversion Date) and the Common Stock issued upon such conversion in respect thereof shall be issued and outstanding (and no holder of shares of Series A Preferred Stock to be converted shall have any rights prior to the Conversion Date in respect of such Common Stock issued upon conversion).

(b)    Mandatory Conversion.  On the Mandatory Conversion Date, all shares of Series A Preferred Stock then issued and outstanding shall, automatically and without further action on the part of the Corporation, any holder thereof or the Conversion Agent, be converted into shares of Common Stock on the terms described below.  The Corporation shall, promptly after the occurrence thereof, publicly announce, or otherwise provide notice to holders of Series A Preferred Stock of, the occurrence of the Mandatory Conversion Date and, in connection with such announcement or notice, in addition to any information required by applicable law or regulation, shall provide information regarding (i) the Mandatory Conversion Date; (ii) the number of shares of Common Stock to be issued upon conversion of each share of Series A Preferred Stock; and (iii) the total number of shares of Series A Common Stock issued as a result of the occurrence of the Mandatory Conversion Date.  On the Mandatory Conversion Date, the

7

shares of Series A Preferred Stock so converted will be cancelled and will cease to be issued and outstanding (and all rights of a holder of such Series A Preferred Stock (in its capacity as such) shall terminate without further liability to the Corporation effective as of the Mandatory Conversion Date) and the Common Stock issued upon such conversion in respect thereof shall be issued and outstanding (and no holder of shares of Series A Preferred Stock shall have any rights in respect of such Common Stock issued upon conversion prior to the Mandatory Conversion Date).

(c)     Effect of Conversion.  The Corporation shall, in exchange for each share of Series A Preferred Stock and, to the extent certificated, upon surrender by the holder thereof to the Conversion Agent of the certificate representing such share of Series A Preferred Stock so converted, issue to such holder a number of shares of Common Stock equal to the quotient determined by dividing (a) the Accrued Value as of the Conversion Date (including any increase in Stated Value as a result of dividend payments that are paid in-kind), by (b) the Conversion Price then in effect.  The initial "Conversion Price" shall be $41.30 and shall be subject to adjustment as expressly provided in this Section 8(c).  If the Corporation at any time subdivides (by any stock split, stock dividend or otherwise) one or more series of its outstanding shares of Common Stock into a greater number of shares, the Conversion Price in effect immediately prior to such subdivision shall be proportionately reduced; and if the Corporation at any time combines (by reverse stock split or otherwise) one or more series of its outstanding shares of Common Stock into a smaller number of shares, the Conversion Price in effect immediately prior to such combination shall be proportionately increased.

(d)     Obligations of Corporation on Conversion.  As promptly as practicable after a conversion has been effected, the Corporation shall, or shall cause the Conversion Agent to, deliver to the converting holder:

(i)     to the extent certificated, a certificate or certificates representing the number of shares of Common Stock issuable by reason of such conversion in such name or names and such denomination or denominations as the converting holder has specified; and

(ii)     to the extent certificated, a certificate representing any shares of Series A Preferred Stock which were represented by the certificate or certificates delivered to the Corporation in connection with such conversion but which were not converted.

(e)     Reservation of Common Stock.  The Corporation shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of issuance upon the conversion of the Series A Preferred Stock, such number of shares of Common Stock issuable upon the conversion of all outstanding shares of Series A Preferred Stock.

(f)     Taxes and Governmental Matters.  To the extent certificated, the issuance of certificates for shares of Common Stock pursuant to this Section 8 shall be made without charge to the holders of such Series A Preferred Stock for any issuance tax in respect thereof or other cost incurred by the Corporation in connection with such conversion and the related issuance of shares of Common Stock; provided that the Corporation shall not, however, be required to pay any such tax that may be payable in respect of any transfer involved in the issuance or delivery

8

of shares of Series A Preferred Stock, Common Stock or other securities in a name other than that in which the shares of Series A Preferred Stock with respect to which such shares or other securities are issued or delivered were registered, or in respect of any payment to any Person other than a payment to the registered holder thereof, and shall not be required to make any such issuance, delivery, or payment unless and until the Person otherwise entitled to such issuance, delivery or payment has paid to the Corporation the amount of any such tax or has established, to the Corporation's satisfaction, that such tax has been paid or is not payable.

(g)     Other Obligations of the Corporation in Respect of Conversions.  Upon any conversion of any share of Series A Preferred Stock, the Corporation shall, subject to the obligations of the holder of Series A Preferred Stock set forth in Section 8(f), take all such actions as are necessary in order to assure that the Common Stock issuable upon such conversion shall be validly duly authorized, validly issued, fully paid and nonassessable, free and clear of all taxes, liens, charges and encumbrances with respect to the issuance thereof.  The Corporation shall use commercially reasonable efforts to assist any holder of Series A Preferred Stock to ensure that shares of Common Stock issuable upon conversion may be so issued without violation of any applicable law or governmental regulation or any requirements of any domestic securities exchange upon which shares of Common Stock may be listed (except for official notice of issuance which shall be delivered as promptly as practicable by the Corporation upon each such issuance).

(h)     Fractional Shares.  Upon a conversion, the Corporation shall not be required to issue stock certificates representing fractions of shares of Common Stock if it elects, if otherwise permitted, to make a cash payment in respect of any final fraction of a share based on the Closing Price of the Common Stock on the Conversion Date or the Mandatory Conversion Date, as applicable (after aggregating all fractional shares of each holder).

(i)     Record Holder of Underlying Securities as of Conversion Date. The Person or Persons entitled to receive shares of Common Stock and/or cash, securities or other property issuable upon conversion of Series A Preferred Stock on a Conversion Date or Mandatory Conversion Date shall be treated for all purposes as the record holder(s) of such shares of Common Stock and/or securities as of the close of business on such Conversion Date or Mandatory Conversion Date, as applicable. In the event that a holder of Series A Preferred Stock shall not by written notice designate the name in which shares of Common Stock and/or cash, securities or other property (including payments of cash in lieu of fractional shares) to be issued or paid upon conversion of shares of Series A Preferred Stock should be registered or paid or the manner in which such shares should be delivered, the Corporation shall be entitled to register and deliver such shares, and make such payment, in the name of the holder shown on the records of the Corporation in any manner the Corporation in good faith deems reasonable.

Section 9.     Organic Changes.

(a)     In the event of an Organic Change, in each case in which holders of Common Stock would be entitled to receive cash, securities or other property for their shares of Common Stock, each share of Series A Preferred Stock outstanding immediately prior to such Organic Change shall (subject to redemption or conversion of such share in accordance with this

9

Certificate of Designations), without the consent of the holder thereof, upon the consummation of such Organic Change, become convertible into, in lieu of shares of Common Stock, the cash, securities and other property receivable in such Organic Change in respect of Common Stock issuable upon conversion of such share of Series A Preferred Stock (such cash, securities and other property, the "OC Property").

(b)     In the event that holders of the shares of the Common Stock have the opportunity to elect the form of consideration to be received in the Organic Change, then the "OC Property" that holders of Series A Preferred Stock shall be entitled to receive shall be determined at the option of such holders. The number of units of OC Property receivable with respect to each share of Series A Preferred Stock converted in connection with the Organic Change shall be determined from among the choices made available to the holders of the Common Stock based on the Conversion Price then in effect on the effective date of the Organic Change, determined as if the references to a "shares of Common Stock" in this Certificate of Designations were to "units of OC Property."

(c)     The terms of any agreement pursuant to which an Organic Change is effected shall include terms requiring any such successor or surviving entity to comply with the provisions of this Section 9 and ensuring that the Series A Preferred Stock (or any replacement security) will be similarly adjusted upon any subsequent transaction involving such successor or surviving entity constituting an Organic Change.

(d)     The Corporation shall provide written notice to the holders of the Series A Preferred Stock at least 20 days prior to the date on which any Organic Change shall take place and such written notice shall include, without limitation, the kind and amount of the cash, securities or other property that constitutes the OC Property. Failure to deliver such notice shall not affect the operation of this Section 9 or the validity of any Organic Change.

Section 10.     Status of Converted, Redeemed or Reacquired Shares. Shares of Series A Preferred Stock converted in accordance with this Certificate of Designations, or otherwise redeemed or purchased by the Corporation, shall be retired and shall resume the status of authorized and unissued preferred stock, undesignated as to series and available for future issuance.

Section 11.     Preemptive Rights. Holders of Series A Preferred Stock shall not have any preemptive rights.

Section 12.     Transferability.   Shares of Series A Preferred Stock shall be freely transferable, in whole or in part, without the need to obtain consent of the Corporation to assign or transfer any such shares, upon the books of the Corporation by the registered holder thereof or by a duly authorized attorney.

Section 13.     Replacement. To the extent certificated, the Corporation may issue a new Series A Preferred Stock certificate in the place of any certificate theretofore issued by it, alleged to have been lost, stolen or destroyed, and the Corporation may require the owner of the lost, stolen or destroyed certificate, or such owner's legal representative, to give the Corporation a

bond sufficient to indemnify it against any claim that may be made against it on account of the alleged loss, theft or destruction of any such certificate or the issuance of such new certificate.

Section 14.    Withholding. All payments and distributions (or deemed payments and distributions) on the shares of Series A Preferred Stock, including, without limitation, issuance of shares of Common Stock upon conversion of the Series A Preferred Stock shall be subject to withholding and backup withholding of tax to the extent required by applicable law, subject to applicable exemptions, and amounts withheld, if any, shall be treated as received by the holders thereof.

Section 15.    Record Holders. To the fullest extent permitted by applicable law, the Corporation may deem and treat the record holder of any share of the Series A Preferred Stock as the true and lawful owner thereof for all purposes, and the Corporation shall not be affected by any notice to the contrary.

Section 16.    Notices.

(a)    To Holders.  All public announcements, notices or communications to the holders of, or otherwise in respect of, the Series A Preferred Stock shall be given or delivered for purposes of this Certificate of Designations if given in writing and delivered in person or by first class mail, postage prepaid at the address of any such holder set forth in the records of the Corporation.  To the extent permitted by applicable law, all public announcements, notices or communications shall also be given or delivered for purposes of this Certificate of Designations if filed with the United States Securities Exchange Commission on Form 8-K or otherwise given or delivered in such manner as may be permitted in this Certificate of Designations, in the Certificate of Incorporation or Bylaws or by applicable law or regulation.  Furthermore, if the Series A Preferred Stock is issued in book−entry form through The Depository Trust Company or any similar facility, such notices may be given or delivered to the holders of the Series A Preferred Stock in any manner permitted by such facility and such notices will be deemed given and delivered in compliance with this Certificate of Designations.

(b)    To the Corporation.  All notices or communications to the Corporation shall be deemed given and delivered to the Corporation if given in writing and delivered in person or by first class mail, postage prepaid to the Corporation's principal place of business.

Section 17.    Other Rights.  The shares of Series A Preferred Stock shall not have any rights, preferences, privileges or voting powers or relative, participating, optional or other special rights, or qualifications, limitations or restrictions thereof, other those as expressly set forth herein or in the Certificate of Incorporation or as provided by applicable law and regulation.  The Corporation may, in its sole discretion, but shall not be required to, issue certificates representing shares of Series A Preferred Stock.

CHI:2312119.9

IN WITNESS WHEREOF, this Certificate of Designations has been executed on behalf of the Corporation by its _____ this _____ day of November 2009.

LEAR CORPORATION

By: _____

Name:

Title:

# PLAN SUPPLEMENT EXHIBIT O

## Long-Term Stock Incentive Plan[1]

---

[1]    The Long-Term Stock Incentive Plan includes the Management Equity Plan (as defined in the Plan).

**LEAR CORPORATION**
**2009 LONG-TERM STOCK INCENTIVE PLAN**

**LEAR CORPORATION**
**2009 LONG-TERM STOCK INCENTIVE PLAN**


**TABLE OF CONTENTS**

Page

Article 1.　Establishment, Objectives and Duration ................................................... 1
Article 2.　Definitions.................................................................................................. 1
Article 3.　Administration ........................................................................................... 8
Article 4.　Shares Subject to the Plan and Maximum Awards ................................... 8
Article 5.　Eligibility and Participation ................................................................... 10
Article 6.　Stock Options ......................................................................................... 10
Article 7.　Stock Appreciation Rights ..................................................................... 12
Article 8.　Restricted Stock, Restricted Stock Units and Restricted Units.............. 13
Article 9.　Performance Units, Performance Shares and Other Awards ................... 15
Article 10.　Performance Measures........................................................................... 17
Article 11.　Beneficiary Designation......................................................................... 19
Article 12.　Deferrals................................................................................................. 19
Article 13.　Rights of Employees .............................................................................. 19
Article 14.　Change in Control .................................................................................. 19
Article 15.　Amendment, Modification and Termination .......................................... 21
Article 16.　Withholding ........................................................................................... 23
Article 17.　Indemnification ...................................................................................... 23
Article 18.　Successors .............................................................................................. 24
Article 19.　Legal Construction ................................................................................. 24

Annex A  – RSU Terms and Conditions

Annex B – Stock-Settled SAR Terms and Conditions

Annex C – Cash-Settled SAR Terms and Conditions

Annex D – Stock Option Terms and Conditions

## LEAR CORPORATION
## 2009 LONG-TERM STOCK INCENTIVE PLAN

Article 1.        Establishment, Objectives and Duration

**1.1    Establishment of the Plan.**  Lear Corporation, a Delaware corporation, hereby establishes its long-term stock incentive compensation plan, to be known as the "2009 Lear Corporation Long-Term Stock Incentive Plan" as set forth in this document.  Capitalized terms used but not otherwise defined herein will have the meanings given to them in Article 2.  The Plan permits the grant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Units, Restricted Stock Units, Performance Shares, Performance Units and other cash and equity incentive awards.

The Plan is effective as of the effective date of the Company's Chapter 11 plan of reorganization, and will remain in effect as provided in Section 1.3 hereof.

**1.2    Objectives of the Plan.**  The objectives of the Plan are to optimize the profitability and growth of the Company through long-term incentives that are consistent with the Company's objectives and that link the interests of Participants to those of the Company's shareholders; to provide Participants with an incentive for excellence in individual performance; to promote teamwork among Participants; and to give the Company a significant advantage in attracting and retaining officers, key employees and directors.

The Plan is further intended to provide flexibility to the Company in its ability to motivate, attract and retain the services of Participants who make significant contributions to the Company's success, and to allow Participants to share in the success of the Company.

**1.3    Duration of the Plan.**  The Plan will commence on the Effective Date, as described in Section 1.1, and will remain in effect, subject to the right of the Committee to amend or terminate the Plan at any time pursuant to Article 15, until all Shares subject to it pursuant to Article 4 have been issued or transferred according to the Plan's provisions.  In no event may an Award be granted under the Plan on or after the ten year anniversary of the Effective Date.

Article 2.        Definitions

Whenever used in the Plan, the following terms have the meanings set forth below, and when the meaning is intended, the initial letter of the word is capitalized:

**"Affiliates"** means any corporation (or partnership, limited liability company, joint venture, or other enterprise) of which the Company owns or controls, directly or indirectly, at least fifty percent of the outstanding shares of stock normally entitled to vote for the election of directors (or comparable equity participation and voting power). Notwithstanding the foregoing, for purposes of determining whether an employee has terminated employment with the Company and all Affiliates, "Affiliates" means any corporation (or partnership, limited liability company, joint venture, or other enterprise) of which the Company owns or controls, directly or indirectly, at least ten percent of the outstanding shares of stock normally entitled to vote for the election of directors (or comparable equity participation and voting power). The minimum percentage of ownership or control in the previous sentence shall be raised from ten percent to twenty percent for purposes of determining timing of payment of an Award, or amount payable with respect to an Award, that is "deferred compensation" for purposes of Code Section 409A, if payment of such Award or amount would be accelerated or otherwise triggered by the employee's termination of employment.

**"Award"** means, individually or collectively, a grant under this Plan to a Participant of Nonqualified Stock Options, Incentive Stock Options, Stock Appreciation Rights, Restricted Stock, Restricted Units, Restricted Stock Units, Performance Shares, Performance Units or other types of equity-based or cash-based incentives hereafter approved by the Committee.

**"Award Agreement"** means an agreement entered into by the Company and a Participant setting forth the terms and provisions applicable to an Award or Awards granted to the Participant.

**"Beneficial Owner"** or **"Beneficial Ownership"** has the meaning ascribed to that term in Rule 13d-3 of the General Rules and Regulations under the Exchange Act.

**"Board"** or **"Board of Directors"** means the Board of Directors of the Company.

**"Cause"** has the meaning set forth in any unexpired employment or severance agreement between the Participant and the Company or an Affiliate. If there is no such agreement, "Cause" means:

(a)     the willful and continued failure of the Participant substantially to perform his or her duties with or for the Company or an Affiliate;

(b)     the Participant's engaging in conduct that is significantly injurious to the Company or an Affiliate, monetarily or otherwise;

(c)     the Participant's commission of a crime that is significantly injurious to the Company or an Affiliate, monetarily, reputationally or otherwise;

(d)     the Participant's abuse of illegal drugs or other controlled substances; or

(e)     the Participant's habitual intoxication.

Unless otherwise defined in the Participant's employment or severance agreement, an act or omission is "willful" for the purpose of determining whether a termination of employment was made for "cause" if it was knowingly done, or knowingly omitted to be done, by the Participant not in good faith and without reasonable belief that the act or omission was in the best interest of the Company or an Affiliate. For purposes of this Plan, if a Participant is convicted of a crime or pleads *nolo contendere* to a criminal charge, he or she will conclusively be deemed to have committed the crime. The Committee has the discretion, in other circumstances, to determine in good faith, from all the facts and circumstances reasonably available to it, whether a Participant who is under investigation for, or has been charged with, a crime will be deemed to have committed it for purposes of this Plan.

**"Change in Control"** of the Company will be deemed to have occurred (as of a particular day, as specified by the Board) as of the first day any one or more of the following paragraphs is satisfied.

(a)     Any Person (other than the Company or a trustee or other fiduciary holding securities under an employee benefit plan of the Company, or a corporation owned directly or indirectly by the shareholders of the Company in substantially the same proportions as their ownership of stock of the Company) becomes the Beneficial Owner, directly or indirectly, of securities of the Company, representing more than twenty percent of the combined voting power of the Company's then outstanding securities.

(b)     During any period of twenty-six consecutive months beginning on or after the Effective Date, individuals who at the beginning of the period constituted the Board cease for any reason (other than death, Disability or voluntary Retirement) to constitute a majority of the Board. For this purpose, any new Director whose election by the Board, or nomination for election by the Company's shareholders, was approved by a vote of at least two-thirds of the Directors then still in office, and who either were Directors at the beginning of the period or whose election or nomination for election was so approved, will be deemed to have been a Director at the beginning of any twenty-six month period under consideration.

(c)     Consummation of: (i) an agreement for the sale or disposition of all or substantially all the Company's assets; or (ii) a merger, consolidation or reorganization of the Company with or involving any other corporation, other than a merger, consolidation or reorganization that results in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity) at least fifty percent of the combined voting power of the voting securities of the Company (or such surviving entity) outstanding immediately after such merger, consolidation, or reorganization.

(d)     The shareholders of the Company approve a plan of complete liquidation or dissolution of the Company.

Notwithstanding the foregoing, if an Award, or amount payable with respect to an Award, is "deferred compensation" for purposes of Code Section 409A, and if a payment of such Award or amount would be accelerated or otherwise triggered upon a "Change in Control," then the foregoing definition is modified, to the extent necessary to avoid the imposition of an excise tax under Code Section 409A, to mean a "change in control event" as such term is defined for purposes of Code Section 409A. For purposes of clarity, if an Award would, for example, vest and be paid on a "Change in Control" as defined herein but payment of such Award would violate the provisions of Code Section 409A, then the Award shall vest but will be paid only in compliance with its terms and Code Section 409A (*i.e.,* upon a permissible payment event).

**"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**"Committee"** means, as specified in Article 3, the Compensation Committee of the Board or such other committee as may be appointed by the Board to administer the Plan.

**"Company"** means Lear Corporation, a Delaware corporation, and any successor thereto as provided in Article 17.

**"Director"** means any individual who is a member of the Board of Directors.

**"Disability"** means (a) long-term disability as defined under the long-term disability plan of the Company or an Affiliate that covers that individual, or (b) if the individual is not covered by such a long-term disability plan, disability as defined for purposes of eligibility for a disability award under the Social Security Act. Notwithstanding the foregoing, for purposes of determining the period of time after termination of employment during which a Participant may exercise an ISO, "Disability" will have the meaning set forth in Section 22(e)(3) of the Code,

which is, generally, that the Participant is unable to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of at least twelve months.

Notwithstanding the foregoing, if an Award, or amount payable with respect to an Award, is "deferred compensation" for purposes of Code Section 409A, and if a payment of such Award or amount would be accelerated or otherwise triggered upon a "Disability," then the foregoing definition is modified, to the extent necessary to avoid the imposition of an excise tax under Code Section 409A, to refer to a Participant who is "disabled," as such term is defined for purposes of Code Section 409A. For purposes of clarity, if an Award would, for example, vest and be paid on a "Disability" as defined herein but payment of such Award would violate the provisions of Code Section 409A, then the Award shall vest but will be paid only in compliance with its terms and Code Section 409A (*i.e.,* upon a permissible payment event).

**"Effective Date"** means the effective date of the Company's Chapter 11 plan of reorganization.

**"Eligible Employee"** or **"Employee"** means any employee of the Company or any of its Affiliates. Directors who are not employed by the Company or its Affiliates will also be considered Eligible Employees and Employees under this Plan.

**"Exchange Act"** means the Securities Exchange Act of 1934, as amended from time to time, or any successor act thereto.

**"Exercise Price"** means the price at which a Share may be purchased by a Participant pursuant to an Option.

**"Fair Market Value"** means:

(a)     the closing trading price of the Shares on the New York Stock Exchange or, if the Shares are not traded on the New York Stock Exchange, on the NASDAQ Stock Market or any other exchange on which they are traded; or

(b)     if the Shares are not traded on any exchange, the mean between the closing bid and asked prices of the Shares in the over-the-counter market; or

(c)     if those bid and asked prices are not available, then the fair market value as reported by any nationally recognized quotation service selected by the Committee or as determined in good faith by the Committee.

Notwithstanding the foregoing, for purposes of Awards intended to be exempt from Code Section 409A, the Fair Market Value shall be no less than the "fair market value," as such term is defined for purposes of Code Section 409A.

**"Freestanding SAR"** means an SAR that is granted independently of any Options, as described in Article 7.

**"Incentive Stock Option"** or **"ISO"** means an option to purchase Shares granted under Article 6 that is designated as an Incentive Stock Option and that is intended to meet the requirements of Code Section 422.

**"Nonqualified Stock Option"** or **"NQSO"** means an option to purchase Shares granted under Article 6 that is not intended to meet the requirements of Code Section 422.

**"Option"** means an Incentive Stock Option or a Nonqualified Stock Option, as described in Article 6.

**"Participant"** means an Eligible Employee who has been selected by the Committee to participate in the Plan pursuant to Section 5.2 and who has outstanding an Award granted under the Plan.  The term "Participant" will also include Directors who are not employees of the Company or an Affiliate for purposes of Awards under the Plan.

**"Performance-Based Exception"** means the performance-based exception from the tax deductibility limitations of Code Section 162(m) and any regulations promulgated thereunder.

**"Performance Period"** means the time period during which performance objectives must be met in order for a Participant to earn Performance Units or Performance Shares granted under Article 9.

**"Performance Share"** means an award with an initial value equal to the Fair Market Value on the date of grant which is based on the Participant's attainment of performance objectives, as described in Article 9.

**"Performance Unit"** means an award with an initial value established by the Committee at the time of grant which is based on the Participant's attainment of performance objectives, as described in Article 9.

**"Person"** has the meaning ascribed to that term in Section 3(a)(9) of the Exchange Act and used in Sections 13(d) and 14(d) thereof, including a "group" as defined in Section 13(d) thereof.

**"Plan"** means the Lear Corporation 2009 Long-Term Stock Incentive Plan, as set forth in this document.

**"Restriction Period"** means the period during which the transfer of Shares of Restricted Stock is limited in some way (based on the passage of time, the achievement of performance objectives, or the occurrence of other events as determined by the Committee, at its discretion) or the Restricted Stock is not vested.

**"Restricted Stock"** means a contingent grant of stock awarded to a Participant pursuant to Article 8.

**"Restricted Stock Unit"** means a Restricted Unit granted to a Participant, as described in Article 8, that is payable in Shares.

**"Restricted Unit"** means a notional account established pursuant to an Award granted to a Participant, as described in Article 8, that is (a) credited with amounts equal to Shares or some other unit of measurement specified in the Award Agreement, (b) subject to restrictions and (c) payable in cash or Shares.

**"Retirement"** means termination of employment on or after (a) reaching the age established by the Company as the normal retirement age in any unexpired employment or severance agreement between the Participant and the Company or an Affiliate, or, in the absence of such an agreement, the normal retirement age under the tax-qualified defined benefit retirement plan or, if none, the tax-qualified defined contribution retirement plan, sponsored by the Company or an Affiliate in which the Participant participates, or (b) reaching age fifty-five with ten years of service with the Company or an Affiliate.

**"Shares"** means the shares of common stock, $0.01 par value, of the Company, including their associated preferred share purchase rights, if applicable.

**"Stock Appreciation Right"** or **"SAR"** means an Award, granted alone or in connection with a related Option, designated as an SAR pursuant to the terms of Article 7.

**"Tandem SAR"** means an SAR that is granted in connection with a related Option pursuant to Article 7, the exercise of which requires forfeiture of the right to purchase a Share

under the related Option (and when a Share is purchased under the Option, the Tandem SAR will similarly be canceled).

Article 3.     Administration

**3.1     The Committee.**  The Plan will be administered by the Compensation Committee of the Board, or by any other Committee appointed by the Board, which Committee (unless otherwise determined by the Board) will satisfy the "nonemployee director" requirements of Rule 16b-3 under the Exchange Act and the regulations of Rule 16b-3 under the Exchange Act and the "outside director" provisions of Code Section 162(m), or any successor regulations or provisions, so long as the Company is subject to the registration requirements of the Exchange Act.  The members of the Committee will be appointed from time to time by, and serve at the discretion of, the Board of Directors.  The Committee will act by a majority of its members at the time in office and eligible to vote on any particular matter, and Committee action may be taken either by a vote at a meeting or in writing without a meeting.

**3.2     Authority of the Committee.**  Except as limited by law and subject to the provisions of this Plan, the Committee will have full power to:  select Eligible Employees to participate in the Plan; determine the sizes and types of Awards; determine the terms and conditions of Awards in a manner consistent with the Plan; construe and interpret the Plan and any agreement or instrument entered into under the Plan; establish, amend or waive rules and regulations for the Plan's administration; and (subject to the provisions of Article 15) amend the terms and conditions of any outstanding Award to the extent they are within the discretion of the Committee as provided in the Plan.  Further, the Committee will make all other determinations that may be necessary or advisable to administer the Plan.  As permitted by law and consistent with Section 3.1, the Committee may delegate some or all of its authority under the Plan.

**3.3     Decisions Binding.**  All determinations and decisions made by the Committee pursuant to the provisions of the Plan will be final, conclusive and binding on all persons, including, without limitation, the Company, its Board of Directors, its shareholders, all Affiliates, employees, Participants and their estates and beneficiaries.

Article 4.     Shares Subject to the Plan and Maximum Awards

**4.1     Number of Shares Available for Grants.**  Subject to adjustment as provided in Sections 4.2 and 4.3, the number of Shares that may be issued or transferred to Participants under the Plan is 10% of the Shares outstanding as of the Effective Date on a fully-diluted basis, giving

effect to the conversion of all warrants, preferred stock (assuming the issuance on the Effective Date of Series A Preferred Stock with an aggregate value of $500 million) and other instruments convertible into Shares outstanding as of such date (whether or not then convertible or exercisable).

Subject to adjustment as provided in Section 4.3, the maximum number of Shares and Share equivalent units that may be granted during any calendar year to any one Participant under Options, Freestanding SARs, Restricted Stock, Restricted Units, Restricted Stock Units, Performance Shares or any other Award is 500,000, which limit will apply regardless of whether the compensation is paid in Shares or in cash. The maximum number of Shares that may be issued by Options intended to be ISOs is 2,500,000. The maximum aggregate dollar amount that may be paid to any one Participant during any calendar year under Performance Units or any cash incentive Award granted under Section 9.9 is $7,500,000.

The Shares with respect to which Awards may be made will include authorized but unissued Shares, and Shares that are currently held or subsequently acquired by the Company as treasury Shares, including Shares purchased in the open market or in private transactions.

**4.2     Lapsed Awards.**  If any Award granted under this Plan is canceled, terminates, expires or lapses for any reason, any Shares subject to the Award will again be available for the grant of an Award under the Plan.  In addition, if a Share subject to an Award is not delivered because the award is settled in cash or because the Share is used to satisfy a tax withholding obligation or used to pay the Exercise Price of an Option, then that Share will thereafter be deemed to be available for grant.  The number of Shares subject to a SAR in excess of the number of Shares that are delivered to the Participant upon exercise of the SAR will not be treated as having been issued under the Plan and will be available for grant under the Plan.

**4.3     Adjustments in Authorized Shares.**

(a)     If the Shares, as currently constituted, are changed into or exchanged for a different number or kind of shares of stock or other securities of the Company or of another corporation (whether because of merger, consolidation, recapitalization, reclassification, split, reverse split, combination of shares, or other similar change in the corporate structure of the Company affecting the Shares) or if the number of Shares is increased through the payment of a stock dividend, then the Committee will substitute for or add to each Share previously appropriated, later subject to, or which may become subject to, an Award, the number and kind of shares of stock or other securities into which each outstanding

Share was changed for which each such Share was exchanged, or to which each such Share is entitled, as the case may be. Outstanding Awards will also be appropriately adjusted as to price and other terms, to the extent necessary to reflect the events described above.

(b)     Fractional Shares resulting from any adjustment in Awards pursuant to this section may be settled in cash or otherwise as the Committee determines. The Company will give notice of any adjustment to each Participant who holds an Award that has been adjusted and the adjustment (whether or not that notice is given) will be effective and binding for all Plan purposes.

Article 5.     Eligibility and Participation

**5.1     Eligibility.**     All Eligible Employees, including Eligible Employees who are members of the Board, are eligible to participate in this Plan.

**5.2     Actual Participation.**     Subject to the provisions of the Plan, the Committee will, from time to time, select those Eligible Employees to whom Awards will be granted, and will determine the nature and amount of each Award.

Article 6.     Stock Options

**6.1     Grant of Options.**     Subject to the terms and provisions of the Plan, Options may be granted to Eligible Employees in the number, and upon the terms, and at any time and from time to time, as determined by the Committee.

**6.2     Award Agreement.**     Each Option grant will be evidenced by an Award Agreement that specifies the Exercise Price, the duration of the Option, the number of Shares to which the Option pertains, the manner, time and rate of exercise or vesting of the Option, and such other provisions as the Committee determines. The Award Agreement will also specify whether the Option is intended to be an ISO or an NQSO, and whether reload options will be granted.

**6.3     Exercise Price.**     The Exercise Price for each share subject to an Option will be at least one hundred percent of the Fair Market Value on the date the Option is granted.

**6.4     Duration of Options.**     Each Option will expire at the time determined by the Committee at the time of grant, but no later than the tenth anniversary of the date of its grant.

**6.5     No Dividend Equivalents.**  Subject to Section 4.3, the Committee may not grant payments in connection with Options that are equivalent to dividends declared and paid on the Shares underlying the Options.

**6.6     Exercise of Options.**  Options will be exercisable at such times and be subject to such restrictions and conditions as the Committee in each instance approves, which need not be the same for each Award or for each Participant.

**6.7     Payment.**  The holder of an Option may exercise the Option only by delivering a written notice of exercise to the Company setting forth the number of Shares as to which the Option is to be exercised, together with full payment at the Exercise Price for the Shares and any withholding tax relating to the exercise of the Option.

The Exercise Price and any related withholding taxes will be payable to the Company in full either:  (a) in cash, or its equivalent, in United States dollars; (b) by tendering Shares owned by the Participant and duly endorsed for transfer to the Company, Shares issuable to the Participant upon exercise of the Option, or any combination of cash, certified or cashier's check and Shares described in this clause (b); or (c) by any other means the Committee determines to be consistent with the Plan's purposes and applicable law.  Cashless exercise must meet the requirements of the Federal Reserve Board's Regulation T and any applicable securities law restrictions.  For this purpose, "cashless" exercise will mean that the Participant notifies the Company it will exercise, and the Company is instructed to deliver the Share issuable on exercise to a broker, who sells the Shares and holds back the exercise price (and, often, the federal and state withholdings).  No more than the minimum required withholding may be satisfied by the tender of Shares.

**6.8     Restrictions on Share Transferability.**  The Committee may impose such restrictions on any Shares acquired through exercise of an Option as it deems necessary or advisable, including, without limitation, restrictions under applicable federal securities laws, under the requirements of any stock exchange or market upon which the Shares are then listed or traded, and under any blue sky or state securities laws applicable to the Shares.

**6.9     Termination of Employment.**  Each Option Award Agreement will set forth the extent to which the Participant has the right to exercise the Option after his or her termination of employment with the Company and all Affiliates.  These terms will be determined by the Committee in its sole discretion, need not be uniform among all Options, and may reflect, among other things, distinctions based on the reasons for termination of employment.

**6.10    Nontransferability of Options.**  Except as otherwise provided in a Participant's Award Agreement, no Option granted under the Plan may be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)). Further, except as otherwise provided in a Participant's Award Agreement, all Options will be exercisable during the Participant's lifetime only by the Participant or his or her guardian or legal representative.  The Committee may, in its discretion, require a Participant's guardian or legal representative to supply it with the evidence the Committee deems necessary to establish the authority of the guardian or legal representative to act on behalf of the Participant.

Article 7.        Stock Appreciation Rights

**7.1    Grant of SARs.**  Subject to the terms and conditions of the Plan, SARs may be granted to Participants at any time and from time to time, as determined by the Committee.  The Committee may grant Freestanding SARs, Tandem SARs or any combination of the two.

Within the limits of Article 4, the Committee will have sole discretion to determine the number of SARs granted to each Participant and, consistent with the provisions of the Plan, to determine the terms and conditions pertaining to SARs.

The grant price of a SAR will equal the Fair Market Value on the date of grant of the SAR.

**7.2    Exercise of Tandem SARs.**  Tandem SARs may be exercised for all or part of the Shares subject to the related Option, upon the surrender of the right to exercise the equivalent portion of the related Option.  A Tandem SAR may be exercised only with respect to the Shares for which its related Option is then exercisable.

**7.3    Exercise of Freestanding SARs.**  Freestanding SARs may be exercised upon whatever terms and conditions the Committee, in its sole discretion, imposes.

**7.4    Award Agreement.**  Each SAR grant will be evidenced by an Award Agreement that specifies the grant price, the term of the SAR and such other provisions as the Committee determines.

**7.5    Term of SARs.**  The term of an SAR will be determined by the Committee, in its sole discretion, but may not exceed ten years.

**7.6    Payment of SAR Amount.**   Upon exercise of an SAR, a Participant will be entitled to receive payment from the Company in an amount determined by multiplying:

> (a)      the excess (or some portion of the excess as determined at the time of the grant by the Committee) if any, of the Fair Market Value on the date of exercise of the SAR over the grant price specified in the Award Agreement; by

> (b)      the number of Shares as to which the SAR is exercised.

The payment upon SAR exercise may be made in cash, in Shares of equivalent Fair Market Value or in some combination of the two, as specified in the Award Agreement.

**7.7    Termination of Employment.**   Each SAR Award Agreement will set forth the extent to which the Participant has the right to exercise the SAR after his or her termination of employment with the Company and all Affiliates.   These terms will be determined by the Committee in its sole discretion, need not be uniform among all SARs issued under the Plan, and may reflect, among other things, distinctions based on the reasons for termination of employment.

**7.8    Nontransferability of SARs.**   Except as otherwise provided in a Participant's Award Agreement, no SAR may be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)).   Further, except as otherwise provided in a Participant's Award Agreement, all SARs will be exercisable during the Participant's lifetime only by the Participant or the Participant's guardian or legal representative. The Committee may, in its discretion, require a Participant's guardian or legal representative to supply it with evidence the Committee deems necessary to establish the authority of the guardian or legal representative to act on behalf of the Participant.

**7.9    No Dividend Equivalents.**   Subject to Section 4.3, the Committee may not grant payments in connection with SARs that are equivalent to dividends declared and paid on the Shares underlying the SARs.

Article 8.      Restricted Stock, Restricted Stock Units and Restricted Units

**8.1    Grant of Restricted Stock, Restricted Stock Units or Restricted Units.** Subject to the terms and provisions of the Plan, the Committee may, at any time and from time to

time, grant Restricted Stock, Restricted Stock Units or Restricted Units to Participants in such amounts as it determines.

**8.2**     **Award Agreement.**     Each grant of Restricted Stock, Restricted Units or Restricted Stock Units will be evidenced by an Award Agreement that specifies the Restriction Periods, the number of Shares or Share equivalent units granted, and such other provisions as the Committee determines.

**8.3**     **Nontransferability.**     Restricted Stock, Restricted Units and Restricted Stock Units granted herein may not be sold, transferred, pledged, assigned, or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)), until the end of the applicable Restriction Period as specified in the Award Agreement, or upon earlier satisfaction of any other conditions specified by the Committee in its sole discretion and set forth in the Award Agreement.  All rights with respect to Restricted Stock, Restricted Units and Restricted Stock Units will be available during the Participant's lifetime only to the Participant or the Participant's guardian or legal representative.  The Committee may, in its discretion, require a Participant's guardian or legal representative to supply it with evidence the Committee deems necessary to establish the authority of the guardian or legal representative to act on behalf of the Participant.

**8.4**     **Other Restrictions.**   Subject to Article 11, the Committee may impose such other conditions or restrictions on any Restricted Stock, Restricted Units or Restricted Stock Units as it deems advisable including, without limitation, restrictions based upon the achievement of specific performance objectives (Company-wide, business unit, individual, or any combination of them), time-based restrictions on vesting following the attainment of the performance objectives, and restrictions under applicable federal or state securities laws.  The Committee may provide that restrictions established under this Section 8.4 as to any given Award will lapse all at once or in installments.

The Company will retain the certificates representing Shares of Restricted Stock in its possession until all conditions and restrictions applicable to the Shares have been satisfied.

**8.5**     **Payment of Awards.**   Except as otherwise provided in this Article 8, Shares covered by each Restricted Stock grant will become freely transferable by the Participant after the last day of the applicable Restriction Period, and Share equivalent units covered by a Restricted Unit or Restricted Stock Unit will be paid out in cash or Shares to the Participant following the last day of the applicable Restriction Period, or on a later date provided in the Award Agreement.

**8.6** **Voting Rights.** During the Restriction Period, Participants holding Shares of Restricted Stock may exercise full voting rights with respect to those Shares.

**8.7** **Dividends and Other Distributions.** During the Restriction Period, Participants awarded Shares of Restricted Stock, Restricted Units or Restricted Stock Units hereunder will be credited with regular cash dividends or dividend equivalents paid on those Shares or with respect to those Share equivalent units. Dividends may be paid currently, accrued as contingent cash obligations, or converted into additional Shares of Restricted Stock, upon such terms as the Committee establishes.

The Committee may apply any restrictions it deems advisable to the crediting and payment of dividends and other distributions. Without limiting the generality of the preceding sentence, if the grant or vesting of Restricted Stock is designed to qualify for the Performance-Based Exception, the Committee may apply any restrictions it deems appropriate to the payment of dividends declared with respect to the Restricted Stock, so that the dividends and the Restricted Stock continue to be eligible for the Performance-Based Exception.

**8.8** **Termination of Employment.** Each Award Agreement will set forth the extent to which the Participant has the right to retain unvested Restricted Stock, Restricted Stock Units or Restricted Units after his or her termination of employment with the Company or an Affiliate. These terms will be determined by the Committee in its sole discretion, need not be uniform among all Awards of Restricted Stock, and may reflect, among other things, distinctions based on the reasons for termination of employment.

Article 9.    Performance Units, Performance Shares and Other Awards

**9.1** **Grant of Performance Units or Performance Shares.** Subject to the terms of the Plan, Performance Units or Performance Shares may be granted to Participants in such amounts and upon such terms, and at any time and from time to time, as the Committee determines.

**9.2** **Value of Performance Units and Performance Shares.** Each Performance Unit will have an initial value established by the Committee at the time of grant. Each Performance Share will have an initial value equal to the Fair Market Value on the date of grant. The Committee will set performance objectives in its discretion which, depending on the extent to which they are met, will determine the number or value (or both) of Performance Units or Performance Shares that will be paid out to the Participant. For purposes of this Article 9, the

time period during which the performance objectives must be met will be called a "Performance Period" and will be set by the Committee in its discretion.

        **9.3**    **Earning of Performance Units and Performance Shares.**  Subject to the terms of this Plan, after the applicable Performance Period has ended, the holder of Performance Units or Performance Shares will be entitled to receive payout on the number and value of Performance Units or Performance Shares earned by the Participant over the Performance Period, to be determined as a function of the extent to which the corresponding performance objectives have been achieved.

        **9.4**    **Award Agreement.**  Each grant of Performance Units or Performance Shares will be evidenced by an Award Agreement specifying the material terms and conditions of the Award (including the form of payment of earned Performance Units or Performance Shares), and such other provisions as the Committee determines.

        **9.5**    **Form and Timing of Payment of Performance Units and Performance Shares.**  Except as provided in Article 12, payment of earned Performance Units and Performance Shares will be made as soon as practicable after the close of the applicable Performance Period, in a manner determined by the Committee in its sole discretion.  The Committee will pay earned Performance Units and Performance Shares in the form of cash, in Shares, or in a combination of cash and Shares, as specified in the Award Agreement. Performance Shares may be paid subject to any restrictions deemed appropriate by the Committee.

        **9.6**    **Termination of Employment Due to Death or Disability.**  Unless determined otherwise by the Committee and set forth in the Participant's Award Agreement, if a Participant's employment is terminated by reason of death or Disability during a Performance Period, the Participant will receive a prorated payout of the Performance Units or Performance Shares, as specified by the Committee in its discretion in the Award Agreement.  Payment of earned Performance Units and Performance Shares will be made at a time specified by the Committee in its sole discretion and set forth in the Participant's Award Agreement.

        **9.7**    **Termination of Employment for Other Reasons.**  If a Participant's employment terminates during a Performance Period for any reason other than death or Disability, the Participant will forfeit all Performance Units and Performance Shares to the Company, unless the Participant's Award Agreement provides otherwise.

        **9.8**    **Nontransferability.**  Except as otherwise provided in a Participant's Award Agreement, Performance Units and Performance Shares may not be sold, transferred, pledged,

assigned or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)). Further, except as otherwise provided in a Participant's Award Agreement, a Participant's rights under the Plan will be exercisable during the Participant's lifetime only by the Participant or Participant's guardian or legal representative. The Committee may, in its discretion, require a Participant's guardian or legal representative to supply it with evidence the Committee deems necessary to establish the authority of the guardian or legal representative to act on behalf of the Participant.

**9.9     Other Awards.**   In addition to the Awards described in Articles 6 through 8 and Sections 9.1 through 9.8 above, and subject to the terms of the Plan, the Committee may grant other incentives payable in cash or Shares under the Plan as it determines to be in the best interests of the Company and subject to such other terms and conditions as it deems appropriate.

Article 10.     Performance Measures

Unless and until the Committee proposes and the Company's shareholders approve a change in the general performance measures set forth in this Article 10, the performance measure(s) to be used for purposes of Awards designed to qualify for the Performance-Based Exception will be chosen from among the following alternatives:

(a)     net earnings;

(b)     operating earnings or income;

(c)     earnings growth;

(d)     net sales growth;

(e)     net income (absolute or competitive growth rates comparative);

(f)     net income applicable to common stock;

(g)     cash flow, including operating cash flow, free cash flow, discounted cash flow return on investment, and cash flow in excess of cost of capital;

(h)     earnings per share of common stock;

(i)     return on shareholders equity (absolute or peer-group comparative);

(j)     stock price (absolute or peer-group comparative);

(k)     absolute and/or relative return on common shareholders equity;

(l)     absolute and/or relative return on capital;

(m)     absolute and/or relative return on assets;

(n)     economic value added (income in excess of cost of capital);

(o)     customer satisfaction;

(p)     quality metrics;

(q)     expense reduction; and

(r)     ratio of operating expenses to operating revenues.

The Committee may specify any reasonable definition of the performance measures it uses. Such definitions may provide for reasonable adjustments and may include or exclude items, including but not limited to: investment gains and losses; extraordinary, unusual or non-recurring items; gains or losses on the sale of assets; effects of changes in accounting principles or the application thereof; asset impairment charges; effects of currency fluctuations; acquisitions, divestitures, or financing activities; recapitalizations, including stock splits and dividends; expenses for restructuring or productivity initiatives; discontinued operations; and other non-operating items.

The Committee will have the discretion to adjust targets set for preestablished performance objectives; however, Awards designed to qualify for the Performance-Based Exception may not be adjusted upward, except to the extent permitted under Code Section 162(m), to reflect accounting changes or other events.

If Code Section 162(m) or other applicable tax or securities laws change to allow the Committee discretion to change the types of performance measures without obtaining shareholder approval, the Committee will have sole discretion to make such changes without obtaining shareholder approval. In addition, if the Committee determines it is advisable to grant Awards that will not qualify for the Performance-Based Exception, the Committee may grant Awards that do not so qualify.

Article 11.     Beneficiary Designation

Each Participant may, from time to time, name any beneficiary or beneficiaries (who may be named contingently or successively) to whom any benefit under the Plan is to be paid in case the Participant should die before receiving any or all of his or her Plan benefits.  Each beneficiary designation will revoke all prior designations by the same Participant, must be in a form prescribed by the Committee, and must be made during the Participant's lifetime.  If the Participant's designated beneficiary predeceases the Participant or no beneficiary has been designated, benefits remaining unpaid at the Participant's death will be paid to the Participant's estate or other entity described in the Participant's Award Agreement.

Article 12.     Deferrals

The Committee may, consistent with the requirements of Section 409A, permit a Participant to defer receipt of cash or Shares that would otherwise be due to him or her by virtue of an Option or SAR exercise, the lapse or waiver of restrictions on Restricted Stock, Restricted Stock Units, Restricted Units or other Awards, or the satisfaction of any requirements or objectives with respect to Performance Units, Performance Shares or other Awards.  If any such deferral election is permitted, the Committee will, in its sole discretion, establish rules and procedures for such deferrals consistent with the requirements of Section 409A.

Article 13.     Rights of Employees

**13.1     Employment.**  Nothing in the Plan will interfere with or limit in any way the right of the Company or any affiliate of the Company (as defined in federal securities laws) to terminate any Participant's employment at any time, or confer upon any Participant any right to continue in the employ of the Company or any Affiliate.

**13.2     Participation.**  No Eligible Employee will have the right to receive an Award under this Plan, or, having received any Award, to receive a future Award.

Article 14.     Change in Control

**14.1     Treatment of Outstanding Awards.**  Upon the occurrence of a Change in Control, unless otherwise specifically prohibited under applicable laws, or by the rules and regulations of any governing governmental agencies or national securities exchanges:

(a)     any and all outstanding Options and SARs will become immediately exercisable (and will deemed to be exercisable immediately prior to the Change in Control), and will remain exercisable throughout their entire term (the "Vested Options and SARs"); provided, however, that, with respect to Vested Options and SARs that are not exercised in connection with the Change in Control, such Vested Options and SARs will be subject to the provisions of Section 14.1(e) below, as applicable;

(b)     any Restriction Periods or other restrictions imposed on Restricted Stock, Restricted Stock Units and Restricted Units will lapse, except that the degree of vesting associated with those awards that is conditioned on the achievement of performance conditions will be determined as set forth in Section 14.1(c) or Section 14.1(d), as applicable;

(c)     except as otherwise provided in the Award Agreement, the vesting of all Performance Units and Performance Shares will be accelerated as of the effective date of the Change in Control, and Participants will be paid in cash, within thirty days after the effective date of the Change in Control, a pro rata amount based on an assumed achievement of all relevant performance objectives at target levels, and upon the length of time within the Performance Period that elapsed prior to the effective date of the Change in Control;

(d)     notwithstanding the foregoing, if the Committee determines that actual performance to the effective date of the Change in Control exceeds target levels, the prorated payouts made pursuant to Sections 14.1(b) and (c) will be made at levels commensurate with the actual performance (determined by extrapolating the actual performance to the end of the Performance Period) based on the length of time within the Performance Period that elapsed prior to the Change in Control; and

(e)(i)  if the Company is a party to an agreement that is reasonably likely to result in a Change in Control, such agreement may provide for: (A) the continuation of the Vested Options and SARs by the Company, if the Company is the surviving corporation; (B) the assumption of the Vested Options and SARs by the surviving corporation or its parent or subsidiary; (C) the substitution by the surviving corporation or its parent or subsidiary of equivalent awards for the Vested Options and SARs; or (D) settlement of the Vested Options and SARs for the Change in Control Price (less, to the extent applicable, the per share exercise or grant price),

or, if the per share exercise or grant price equals or exceeds the Change in Control Price, such Vested Options and SARs shall terminate and be canceled.

(ii) to the extent that Restricted Stock, Restricted Units and Restricted Stock Units settle in Shares in accordance with their terms upon a Change in Control, such Shares shall be entitled to receive as a result of the Change in Control transaction the same consideration as the Shares held by shareholders of the Company as a result of the Change in Control transaction.

For purposes of this Section 14.1(e), Change in Control Price shall mean the Fair Market Value of a Share upon a Change in Control. To the extent that the consideration paid in any such Change in Control transaction consists all or in part of securities or other non-cash consideration, the value of such securities or other non-cash consideration shall be determined in good faith by the Committee.

**14.2 Termination, Amendment and Modifications of Change in Control Provisions.** Notwithstanding any other provision of this Plan or any provision in an Award Agreement, this Article 14 may not be terminated, amended or modified on or after the effective date of a Change in Control in a way that would adversely affect any Award in any material way theretofore granted to a Participant, unless the Participant gives his or her prior written consent to the termination, amendment or modification.

Article 15. Amendment, Modification and Termination

**15.1 Amendment, Modification and Termination.** Subject to Section 14.2, the Committee or Board may at any time and from time to time, alter, amend, modify or terminate the Plan in whole or in part. The Committee or Board will not, however, increase the number of Shares that may be issued or transferred to Participants under the Plan, as described in the first sentence of Section 4.1 (and subject to adjustment as provided in Sections 4.2 and 4.3).

Subject to the terms and conditions of the Plan, the Committee may modify, extend or renew outstanding Awards under the Plan, or accept the surrender of outstanding Awards (to the extent not already exercised) and grant new Awards in substitution of them (to the extent not already exercised). Except as provided in Sections 4.3 and 15.2, the Committee will not, however, modify any outstanding Option or SAR so as to specify a lower Exercise Price or grant price (and will not cancel an Option or SAR and substitute for it an Option or SAR with a lower Exercise price or grant price), without the approval of the Company's shareholders. In addition, except as provided in Sections 4.3 and 15.2, the Committee may not cancel an outstanding

Option or SAR whose Exercise Price or grant price is equal to or greater than the current Fair Market Value of a Share and substitute for it another Award without the prior approval of the Company's shareholders. Notwithstanding the foregoing, no alteration, modification or termination of an Award will, without the prior written consent of the Participant, adversely alter or impair any rights or obligations under any Award already granted under the Plan.

**15.2 Adjustment of Awards Upon the Occurrence of Certain Unusual or Nonrecurring Events.** The Committee may, using reasonable care, make adjustments in the terms and conditions of, and the criteria included in, Awards in order to prevent dilution or enlargement of the benefits or potential benefits intended to be made available under the Plan (i) in recognition of unusual or nonrecurring events (including, without limitation, the events described in Section 4.3) affecting the Company or its financial statements, (ii) in recognition of changes in applicable laws, regulations, or accounting principles, or (iii) whenever the Committee determines that such adjustments are necessary, equitable and/or appropriate. In the case of an Award designed to qualify for the Performance-Based Exception, the Committee will take care not to make an adjustment that would disqualify the Award.

**15.3 Awards Previously Granted.** No termination, amendment or modification of the Plan will adversely affect in any material way any Award already granted, without the written consent of the Participant who holds the Award.

**15.4 Compliance with Code Section 162(m) and Code Section 409A.** Awards will comply with the requirements of Code Section 162(m), unless the Committee determines that such compliance is not desired with respect to an Award available for grant under the Plan. In addition, if changes are made to Code Section 162(m) to permit greater flexibility as to any Award available under the Plan, the Committee may, subject to this Article 15, make any adjustments it deems appropriate. The Plan and Awards, and all amounts payable with respect to Awards, are intended to comply with, or be exempt from, Code Section 409A and the interpretative guidance thereunder and shall be construed, interpreted and administered accordingly. If an unintentional operational failure occurs with respect to Code Section 409A, any affected Participant or beneficiary shall fully cooperate with the Company to correct the failure to the extent possible in accordance with any correction procedure established by the U.S. Department of the Treasury. If a Participant is a "specified employee" (as such term is defined for purposes of Code Section 409A) at the time of his or her termination of employment, no amount that is subject to Code Section 409A and that becomes payable by reason of such termination of employment shall be paid to the Participant before the earlier of (i) the expiration of the six-month period measured from the date of the Participant's termination of employment, and (ii) the date of the Participant's death. A termination of employment shall be deemed to

occur only if it is a "separation from service" within the meaning of Code Section 409A, and references in the Plan and any Award Agreement to "termination," "termination of employment," or like terms shall mean a "separation from service."  A separation from service shall be deemed to occur if it is anticipated that the level of services the Participant will perform after a certain date (whether as an employee or as an independent contractor) will permanently decrease to no more than twenty percent (20%) of the average level of services provided by the Participant in the immediately preceding thirty-six (36) months.

Article 16.     Withholding

**16.1     Tax Withholding.**  The Company will have the power and the right to deduct or withhold, or require a Participant to remit to the Company, an amount sufficient to satisfy federal, state, and local taxes, domestic or foreign, required by law or regulation to be withheld with respect to any taxable event arising under this Plan.  No Award Agreement will permit reload options to be granted in connection with any Shares used to pay a tax withholding obligation.

**16.2     Share Withholding.**  With respect to withholding required upon the exercise of Options or SARs, upon the lapse of restrictions on Restricted Stock, or upon any other taxable event arising as a result of Awards granted hereunder, the Company may satisfy the minimum withholding requirement for supplemental wages, in whole or in part, by withholding Shares having a Fair Market Value (determined on the date the Participant recognizes taxable income on the Award) equal to the minimum withholding tax required to be collected on the transaction. The Participant may elect, subject to the approval of the Committee, to deliver the necessary funds to satisfy the withholding obligation to the Company, in which case there will be no reduction in the Shares otherwise distributable to the Participant.

Article 17.     Indemnification

Each person who is or has been a member of the Committee or the Board will be indemnified and held harmless by the Company from and against any loss, cost, liability, or expense that may be imposed upon or reasonably incurred by him or her in connection with or as a result of any claim, action, suit or proceeding to which he or she may be a party or in which he or she may be involved by reason of any action taken, or failure to act, under the Plan.  Each such person will also be indemnified and held harmless by the Company from and against any and all amounts paid by him or her in a settlement approved by the Company, or paid by him or her in satisfaction of any judgment, of or in a claim, action, suit or proceeding against him or her and described in the previous sentence, so long as he or she gives the Company an opportunity,

at its own expense, to handle and defend the claim, action, suit or proceeding before he or she undertakes to handle and defend it.  The foregoing right of indemnification will not be exclusive of any other rights of indemnification to which a person who is or has been a member of the Committee or the Board may be entitled under the Company's Certificate of Incorporation or By-Laws, as a matter of law, or otherwise, or any power that the Company may have to indemnify him or her or hold him or her harmless.

Article 18.    Successors

All obligations of the Company under the Plan or any Award Agreement will be binding on any successor to the Company, whether the existence of the successor results from a direct or indirect purchase of all or substantially all of the business or assets of the Company or both, or a merger, consolidation, or otherwise.

Article 19.    Legal Construction

**19.1    Number.**  Except where otherwise indicated by the context, any plural term used in this Plan includes the singular and a singular term includes the plural.

**19.2    Severability.**  If any provision of the Plan is held illegal or invalid for any reason, the illegality or invalidity will not affect the remaining parts of the Plan, and the Plan will be construed and enforced as if the illegal or invalid provision had not been included.

**19.3    Requirements of Law.**  The granting of Awards and the issuance of Share or cash payouts under the Plan will be subject to all applicable laws, rules, and regulations, and to any approvals by governmental agencies or national securities exchanges as may be required.

**19.4    Securities Law Compliance.**  As to  any individual who is, on the relevant date, an officer, director or ten percent beneficial owner of any class of the Company's equity securities that is registered pursuant to Section 12 of the Exchange Act, all as defined under Section 16 of the Exchange Act, transactions under this Plan are intended to comply with all applicable conditions of Rule 16b-3 under the Exchange Act, or any successor rule.  To the extent any provision of the Plan or action by the Committee fails to so comply, it will be deemed null and void, to the extent permitted by law and deemed advisable by the Committee.

**19.5    Awards to Foreign Nationals and Employees Outside the United States.**  To the extent the Committee deems it necessary, appropriate or desirable to comply with foreign law or practice and to further the purposes of this Plan, the Committee may, without amending the

Plan, (i) establish rules applicable to Awards granted to Participants who are foreign nationals, are employed outside the United States, or both, including rules that differ from those set forth in this Plan, and (ii) grant Awards to such Participants in accordance with those rules.

**19.6     Unfunded Status of the Plan.**  The Plan is intended to constitute an "unfunded" plan for incentive and deferred compensation.  With respect to any payments or deliveries of Shares not yet made to a Participant by the Company, the Participant's rights are no greater than those of a general creditor of the Company.  The Committee may authorize the establishment of trusts or other arrangements to meet the obligations created under the Plan, so long as the arrangement does not cause the Plan to lose its legal status as an unfunded plan.

**19.7     Governing Law.**  To the extent not preempted by federal law, the Plan and all agreements hereunder will be construed in accordance with and governed by the laws of the State of Michigan without giving effect to principles of conflicts of law.

*     *     *     *     *

LEAR CORPORATION
2009 LONG-TERM STOCK INCENTIVE PLAN

<u>2009 RESTRICTED STOCK UNIT TERMS AND CONDITIONS</u>

1.      <u>Definitions</u>.   Any term capitalized herein but not defined will have the meaning set forth in the Plan.

2.      <u>Grant and Vesting of Restricted Stock Units</u>.

(a)      As of the Grant Date specified in the letter that accompanies this document, the Employee will be credited with the number of Restricted Stock Units set forth in the letter that accompanies this document.  Each Restricted Stock Unit is a notional amount that represents one unvested share of Common Stock, $0.01 par value, of the Company (the "Common Stock").  Each Restricted Stock Unit constitutes the right, subject to the terms and conditions of the Plan and this document, to distribution of a Share if and when the Restricted Stock Unit vests.  If the Employee's employment with the Company and all of its Affiliates terminates before the date that all of the Restricted Stock Units vest, his or her right to receive the Shares underlying unvested Restricted Stock Units will be only as provided in Section 4.

(b)      One-third of the Restricted Stock Units will vest on each of the first three anniversaries of the Grant Date.  Notwithstanding anything contained herein to the contrary, the right of an Employee to receive Shares underlying a Restricted Stock Unit will be forfeited if the Committee determines, in its sole discretion, that (i) the Employee has entered into a business or employment relationship that is detrimentally competitive with the Company or substantially injurious to the Company's financial interests; or (ii) the Employee has been discharged from employment with the Company or an Affiliate for Cause.

3.      <u>Rights as a Stockholder</u>.

(a)      Unless and until a Restricted Stock Unit has vested and the Share underlying it has been distributed to the Employee, the Employee will not be entitled to vote in respect of that RSU or that Share.

(b)      If the Company declares a cash dividend on its shares, then, on the payment date of the dividend, the Employee will be credited with dividend equivalents equal to the amount of cash dividend per share multiplied by the number of Restricted Stock Units credited to the Employee through the record date.  The dollar amount credited to an Employee under the preceding sentence will be credited to an account ("Account") established for the Employee for bookkeeping purposes only on the books of the Company.  The amounts credited to the Account will be credited as of the last day of each month with interest, compounded monthly, until the amount credited to the Account is paid to the Employee.  The rate of interest

credited under the previous sentence will be the prime rate of interest as reported by the Midwest edition of the Wall Street Journal for the second business day of each quarter on an annual basis. The balance in the Account will be subject to the same terms regarding vesting and forfeiture as the Employee's Restricted Stock Units awarded under the accompanying letter and this document, and will be paid in cash in a single sum at the time that the Shares associated with the Employee's Restricted Stock Units are delivered (or forfeited at the time that the Employee's Restricted Stock Units are forfeited).

4.     Termination of Employment.  Subject to the forfeiture provisions of clause 2(b) above, an Employee's right to receive the Shares underlying his or her Restricted Stock Units after termination of his or her employment will be only as follows:

(a)     End of Service.  If the Employee experiences an End of Service Date, the Employee will be entitled to receive the Shares underlying any Restricted Stock Units that have then vested.  In addition, the Employee will be entitled to receive immediately the Shares underlying the number of Restricted Stock Units, if any, that have not yet vested but would have vested under Section 2 if the Employee's End of Service Date had been 24 months following his actual End of Service Date.  The Employee will forfeit the right to receive Shares underlying any Restricted Stock Units that have not yet vested or would not have vested in the next 24 months as described in the preceding sentence.  The Employee's "End of Service Date" is the date of his or her retirement after attaining age 55 and completing ten years of service.

(b)     Other Termination of Employment.  If an Employee's employment with the Company shall be terminated for Disability or by the Company for any reason other than Cause, upon the Employee's death or, for an Employee who is a party to an employment or severance agreement with the Company, by the Employee for Good Reason (as defined in the Employee's employment or severance agreement), the Employee will be immediately entitled to receive the Shares underlying all of the Restricted Stock Units that have not yet vested under Section 2 above.  If an Employee's employment with the Company terminates for any reason other than those provided in Section 4(a) or the first sentence of this Section 4(b),  the Employee or his or her estate (in the event of his or her death after termination) will forfeit the right to receive Shares underlying any Restricted Stock Units that have not yet vested.  For each Employee who is a party to an employment or severance agreement with the Company, for purposes of this Section 4, the term "Disability" shall mean "Incapacity" as defined in such Employee's employment or severance agreement, as applicable.

5.     Timing and Form of Payment.  Except as provided in this Section or in clause 2(b) or Section 4, once a Restricted Stock Unit vests, the Employee will be entitled to receive a Share in its place.  Delivery of the Share will be made as soon as administratively feasible after its associated Restricted Stock Unit vests.  Shares will be credited to an account established for the benefit of the Employee with the Company's administrative agent.  The Employee will have full legal and beneficial ownership with respect to the Shares at that time.

6.     <u>Assignment and Transfers</u>.  The Employee may not assign, encumber or transfer any of his or her rights and interests under the Award described in this document, except, in the event of his or her death, by will or the laws of descent and distribution.

7.     <u>Withholding Tax</u>.  The Company and any Affiliate will have the right to retain Shares or cash that are distributable to the Employee hereunder to the extent necessary to satisfy any withholding taxes, whether federal or state, triggered by the distribution of Shares or cash pursuant to the Award reflected in this document.

8.     <u>Securities Law Requirements</u>.

(a)     The Restricted Stock Units are subject to the further requirement that, if at any time the Committee determines in its discretion that the listing or qualification of the Shares subject to the Restricted Stock Units under any securities exchange requirements or under any applicable law, or the consent or approval of any governmental regulatory body, is necessary as a condition of, or in connection with, the issuance of Shares under it, then Shares will not be issued under the Restricted Stock Units, unless the necessary listing, qualification, consent or approval has been effected or obtained free of any conditions not acceptable to the Committee.

(b)     No person who acquires Shares  pursuant to the Award reflected in this document may, during any period of time that person is an affiliate of the Company (within the meaning of the rules and regulations of the Securities and Exchange Commission under the Securities Act of 1933 (the "1933 Act")) sell the Shares, unless the offer and sale is made pursuant to (i) an effective registration statement under the 1933 Act, which is current and includes the Shares to be sold, or (ii) an appropriate exemption from the registration requirements of the 1933 Act, such as that set forth in Rule 144 promulgated under the 1933 Act. With respect to individuals subject to Section 16 of the Exchange Act, transactions under this Award are intended to comply with all applicable conditions of Rule 16b-3, or its successors under the Exchange Act.  To the extent any provision of the Award or action by the Committee fails to so comply, the Committee may determine, to the extent permitted by law, that the provision or action will be null and void.

9.     <u>No Limitation on Rights of the Company</u>.  Subject to Sections 4.3 and 15.2 of the Plan, the grant of the Award described in this document will not in any way affect the right or power of the Company to make adjustments, reclassification or changes in its capital or business structure, or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

10.     <u>Plan, Restricted Stock Units and Award Not a Contract of Employment</u>. Neither the Plan, the Restricted Stock Units nor any other right or interest that is part of the Award reflected in this document is a contract of employment, and no terms of employment of the Employee will be affected in any way by the Plan, the Restricted Stock Units, the Award, this document or related instruments, except as specifically provided therein.   Neither the establishment of the Plan nor the Award will be construed as conferring any legal rights upon the

Employee for a continuation of employment, nor will it interfere with the right of the Company or any Affiliate to discharge the Employee and to treat him or her without regard to the effect that treatment might have upon him or her as an Employee.

11. <u>Employee to Have No Rights as a Stockholder</u>. Except as provided in Section 3 above, the Employee will have no rights as a stockholder with respect to any Shares subject to the Restricted Stock Units prior to the date on which he or she is recorded as the holder of those Shares on the records of the Company.

12. <u>Notice</u>. Any notice or other communication required or permitted hereunder must be in writing and must be delivered personally, or sent by certified, registered or express mail, postage prepaid. Any such notice will be deemed given when so delivered personally or, if mailed, three days after the date of deposit in the United States mail, in the case of the Company to 21557 Telegraph Road, Southfield, Michigan, 48033, Attention: General Counsel and, in the case of the Employee, to the last known address of the Employee in the Company's records.

13. <u>Governing Law</u>. This document and the Award will be construed and enforced in accordance with, and governed by, the laws of the State of Michigan, determined without regard to its conflict of law rules.

14. <u>Code Section 409A</u>. Notwithstanding any other provision in this Restricted Stock Unit document, if an Employee is a "specified employee" (as such term is defined for purposes of Code Section 409A) at the time of his or her termination of employment, no amount that is subject to Code Section 409A and that becomes payable by reason of such termination of employment shall be paid to the Employee before the earlier of (i) the expiration of the six-month period measured from the date of the Employee's termination of employment, and (ii) the date of the Employee's death.

15. <u>Plan Document Controls</u>. The rights granted under this Restricted Stock Unit document are in all respects subject to the provisions of the Plan to the same extent and with the same effect as if they were set forth fully therein. If the terms of this document or the Award conflict with the terms of the Plan document, the Plan document will control.

LEAR CORPORATION
2009 LONG-TERM STOCK INCENTIVE PLAN

STOCK-SETTLED STOCK APPRECIATION RIGHT TERMS AND CONDITIONS

      1.     <u>Definitions</u>.  Any term capitalized herein but not defined will have the meaning set forth in the Plan.

      2.     <u>Term, Vesting and Exercise of the SAR</u>.

      (a)     If the Employee remains employed by the Company, the SAR will expire seven years from the Grant Date.  If the Employee terminates employment with the Company before the seventh anniversary of the Grant Date, his or her right to exercise the SAR after termination of his or her employment will be only as provided in Section 3.

      (b)     The SAR will vest and become exercisable as to one-third of the Shares to which the SAR relates on each of the first three anniversaries of the Grant Date.  If the Employee experiences an End of Service Date, the SAR will vest as to those Shares underlying the SAR, if any, that have not yet vested but would have vested hereunder if the Employee's End of Service Date had been 24 months following his actual End of Service Date.  The Employee will forfeit that portion of the SAR which has not yet vested or would not have vested in the next 24 months as described in the preceding sentence.  Notwithstanding anything contained herein to the contrary, the right of an Employee to exercise the SAR will be forfeited if the Committee determines, in its sole discretion, that (i) the Employee has entered into a business or employment relationship which is detrimentally competitive with the Company or substantially injurious to the Company's financial interests; or (ii) the Employee has been discharged from employment with the Company or an Affiliate for Cause.

      (c)     The SAR may be exercised by written notice to the Company indicating the number of Shares to which the SAR relates being exercised.  When the SAR is vested and exercisable, it may be exercised in whole at any time or in part from time to time as to any or all full Shares under the SAR.  Notwithstanding the foregoing, the SAR may not be exercised for fewer than 100 Shares at any one time or, if fewer, all the Shares that are then subject to the SAR.

      (d)     Any amount due to the Employee upon exercise of the SAR will be paid in Shares.  The number of Shares delivered to Employee upon exercise of the SAR will be based on the amount, if any, by which the Fair Market Value of a Share on the date of exercise exceeds the grant price ("Grant Price") of the SAR.  The Employee will not receive a distribution of Shares if the Fair Market Value on the date of exercise does not exceed the Grant Price.  The Employee's distribution of Shares upon exercise of the SAR will be calculated by dividing

(x) the aggregate dollar difference between the Fair Market Value of a Share on the date of exercise and the Grant Price for all SARs so exercised by (y) the Fair Market Value of a Share on the date of exercise; provided, that the amount of Shares delivered to the Employee shall be subject to any minimum withholding as specified in clause 4 hereof.

        3.    <u>Termination of Employment</u>.  Subject to the forfeiture provisions in clause 2(b) above, an Employee's right to exercise the SAR after termination of his or her employment will be only as follows:

        (a)    <u>End of Service</u>.  If the Employee experiences an End of Service Date, the SAR will immediately vest, in accordance with Section 2(b) hereof, as to those Shares underlying the SAR, if any, that have not yet vested but would have vested hereunder if the Employee's End of Service Date had been 24 months following his actual End of Service Date, and the Employee will have the right for thirteen months following his or her End of Service Date (but not later than the date on which the SAR would otherwise expire), to exercise the SAR. If the Employee dies prior to the end of the thirteen-month period after the End of Service Date, his or her estate will have the right to exercise the SAR within thirteen months following the Employee's End of Service Date (but not later than the date on which the SAR would otherwise expire).  The Employee's "End of Service Date" is the date of his or her retirement after attaining age 55 and completing ten years of service.

        (b)    <u>Disability, Death, Not for Cause or Good Reason Termination</u>.  If an Employee's employment with the Company and all Affiliates shall be terminated for Disability or by the Company for any reason other than Cause, upon the Employee's death or, for an Employee who is a party to an employment or severance agreement with the Company, by the Employee for Good Reason (as defined in the Employee's employment or severance agreement), the SAR will immediately vest and become exercisable as to all Shares to which the SAR relates, and the Employee (or in the case of death, the Employee's estate) will have the right for a period of thirteen months following the date of the termination (but not later than the date on which the SAR would otherwise expire) to exercise the SAR.  For each Employee who is a party to an employment or severance agreement with the Company, for purposes of this Section 3(b), the term "Disability" shall mean "Incapacity" as defined in such Employee's employment or severance agreement, as applicable.

        (c)    <u>Other Termination</u>.  If an Employee's employment with the Company and all Affiliates terminates for any reason other than those provided in clauses 3(a) or (b), the Employee or his or her estate (in the event of his or her death after the Employee's termination): (i) may, within the 30-day period following the termination, exercise the SAR to the extent that it was vested and exercisable on the date his or her employment terminated; and (ii) will forfeit the SAR to the extent that it was not vested and exercisable on the date his or her employment terminated.

        4.    <u>Medium and Time of Payment</u>.  Any withholding tax, up to the minimum withholding requirement for supplemental wages may be paid with Shares issuable to the

Employee upon exercise under this SAR. Shares used to satisfy any minimum required withholding tax will be valued at their Fair Market Value as of the date of exercise.

5.        <u>Transferability of SAR and Shares Acquired Upon Exercise of SAR</u>.  This SAR is transferable only by will or the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)).  The SAR will be exercisable during the Employee's lifetime only by the Employee or by his or her guardian or legal representative.  The Committee may, in its discretion, require a guardian or legal representative to supply it with evidence the Committee deems necessary to establish the authority of the guardian or legal representative to exercise the SAR on behalf of the Employee.  Except as limited by applicable securities laws and the provisions of Section 6 hereof, Shares acquired upon exercise of this SAR will be freely transferable.

6.        <u>Securities Law Requirements</u>.

(a)      If required by the Company, the notice of exercise of the SAR must be accompanied by the Employee's written representation: (i) that the stock being acquired is purchased for investment and not for resale or with a view to its distribution; (ii) acknowledging that the stock has not been registered under the Securities Act of 1933, as amended (the "1933 Act"); and (iii) agreeing that the stock may not be sold or transferred unless either there is an effective Registration Statement for it under the 1933 Act, or in the opinion of counsel for the Company, the sale or transfer will not violate the 1933 Act.  This SAR will not be exercisable in whole or in part, nor will the Company be obligated to sell or issue any Shares subject to the SAR, if exercise and sale (or issuance) may, in the opinion of counsel for the Company, violate the 1933 Act (or other federal or state statutes having similar requirements), as it may be in effect at that time, or cause the Company to violate the terms of Section 4.1 of the Plan.

(b)      The SAR is subject to the further requirement that, if at any time the Committee determines in its discretion that the registration, listing or qualification of the Shares subject to the SAR under any federal securities law, securities exchange requirements or under any other applicable law, or the consent or approval of any governmental regulatory body, is necessary as a condition of, or in connection with, the granting of the SAR or the issuance of Shares under it, the SAR may not be exercised in whole or in part, unless the necessary registration, listing, qualification, consent or approval has been effected or obtained free of any conditions not acceptable to the Committee.

(c)      No person who acquires Shares  pursuant to this SAR may, during any period of time that person is an affiliate of the Company (within the meaning of the rules and regulations of the Securities and Exchange Commission under the 1933 Act) sell the Shares, unless the offer and sale is made pursuant to (i) an effective registration statement under the 1933 Act, which is current and includes the Shares to be sold, or (ii) an appropriate exemption from the registration requirements of the 1933 Act, such as that set forth in Rule 144 promulgated under the 1933 Act.  With respect to individuals subject to Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"),  transactions under this SAR are intended to

comply with all applicable conditions of Rule 16b-3, or its successors under the Exchange Act. To the extent any provision of the SAR or action by the Committee fails to so comply, the Committee may determine, to the extent permitted by law, that the provision or action will be null and void.

7.     <u>No Obligation to Exercise SAR</u>. The granting of the SAR imposes no obligation upon the Employee (or upon a transferee of an Employee) to exercise the SAR.

8.     <u>No Limitation on Rights of the Company</u>. Subject to Sections 4.3 and 15.2 of the Plan, the grant of the SAR will not in any way affect the right or power of the Company to make adjustments, reclassification or changes in its capital or business structure, or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

9.     <u>Plan and SAR Not a Contract of Employment</u>. Neither the Plan nor this SAR is a contract of employment, and no terms of employment of the Employee will be affected in any way by the Plan, this SAR or related instruments except as specifically provided therein. Neither the establishment of the Plan nor this SAR will be construed as conferring any legal rights upon the Employee for a continuation of employment, nor will it interfere with the right of the Company or any Affiliate to discharge the Employee and to treat him or her without regard to the effect that treatment might have upon him or her as an Employee.

10.     <u>Employee to Have No Rights as a Stockholder</u>. The Employee will have no rights as a stockholder with respect to any Shares subject to the SAR prior to the date on which he or she is recorded as the holder of those Shares on the records of the Company.

11.     <u>No Deferral Rights</u>. Notwithstanding anything in Article 12 of the Plan to the contrary, there shall be no deferral of payment, delivery or receipt of any amounts hereunder.

12.     <u>Notice</u>. Any notice or other communication required or permitted hereunder must be in writing and must be delivered personally, or sent by certified, registered or express mail, postage prepaid. Any such notice will be deemed given when so delivered personally or, if mailed, three days after the date of deposit in the United States mail, in the case of the Company to 21557 Telegraph Road, Southfield, Michigan, 48033, Attention: General Counsel and, in the case of the Employee, to the last known address of the Employee in the Company's records.

13.     <u>Governing Law</u>. This document and the SAR will be construed and enforced in accordance with, and governed by, the laws of the State of Michigan, determined without regard to its conflict of law rules.

14.     <u>Plan Document Controls</u>. The rights granted under this SAR document are in all respects subject to the provisions of the Plan to the same extent and with the same

effect as if they were set forth fully herein. If the terms of this document or the SAR conflict with the terms of the Plan document, the Plan document will control.

LEAR CORPORATION
2009 LONG-TERM STOCK INCENTIVE PLAN

<u>CASH-SETTLED STOCK APPRECIATION RIGHT TERMS AND CONDITIONS</u>

1.    <u>Definitions</u>.  Any term capitalized herein but not defined will have the meaning set forth in the Plan.

2.    <u>Term, Vesting and Exercise of the SAR</u>.

(a)    If the Employee remains employed by the Company, the SAR will expire seven years from the Grant Date.  If the Employee terminates employment with the Company before the seventh anniversary of the Grant Date, his or her right to exercise the SAR after termination of his or her employment will be only as provided in Section 3.

(b)    The SAR will vest and become exercisable as to one-third of the Shares to which the SAR relates on each of the first three anniversaries of the Grant Date.  If the Employee experiences an End of Service Date, the SAR will vest as to those Shares underlying the SAR, if any, that have not yet vested but would have vested hereunder if Employee's End of Service Date had been 24 months following his actual End of Service Date.  The Employee will forfeit that portion of the SAR which has not yet vested or would not have vested in the next 24 months as described in the preceding sentence.  Notwithstanding anything contained herein to the contrary, the right of an Employee to exercise the SAR will be forfeited if the Committee determines, in its sole discretion, that (i) the Employee has entered into a business or employment relationship which is detrimentally competitive with the Company or substantially injurious to the Company's financial interests; or (ii) the Employee has been discharged from employment with the Company or an Affiliate for Cause.

(c)    The SAR may be exercised by written notice to the Company indicating the number of Shares to which the SAR relates being exercised.  When the SAR is vested and exercisable, it may be exercised in whole at any time or in part from time to time as to any or all full Shares under the SAR.  Notwithstanding the foregoing, the SAR may not be exercised for fewer than 100 Shares at any one time or, if fewer, all the Shares that are then subject to the SAR.

(d)    Any amount due to the Employee upon exercise of the SAR will be paid in cash.  The amount delivered to Employee upon exercise of the SAR will be based on the amount, if any, by which the Fair Market Value of a Share on the date of exercise exceeds the grant price ("Grant Price") of the SAR.  The Employee will not receive a distribution of cash if the Fair Market Value on the date of exercise does not exceed the Grant Price.  The Employee's distribution of cash upon exercise of the SAR will be the aggregate dollar difference between the

Fair Market Value of a Share on the date of exercise and the Grant Price for all SARs so exercised; provided, that the amount delivered to Employee shall be subject to the minimum withholding tax for supplemental wages.

        3.     <u>Termination of Employment</u>.  Subject to the forfeiture provisions in clause 2(b) above, an Employee's right to exercise the SAR after termination of his or her employment will be only as follows:

        (a)     <u>End of Service</u>.  If the Employee experiences an End of Service Date, the SAR will immediately vest, in accordance with Section 2(b) hereof, as to those Shares underlying the SAR, if any, that have not yet vested but would have vested hereunder if the Employee's End of Service Date had been 24 months following his actual End of Service Date, and the Employee will have the right for thirteen months following his or her End of Service Date (but not later than the date on which the SAR would otherwise expire), to exercise the SAR. If the Employee dies prior to the end of the thirteen-month period after the End of Service Date, his or her estate will have the right to exercise the SAR within thirteen months following the Employee's End of Service Date (but not later than the date on which the SAR would otherwise expire).  The Employee's "End of Service Date" is the date of his or her retirement after attaining age 55 and completing ten years of service.

        (b)     <u>Disability, Death, Not for Cause or Good Reason Termination</u>.  If an Employee's employment with the Company and all Affiliates shall be terminated for Disability or by the Company for any reason other than Cause, upon the Employee's death or, for an Employee who is a party to an employment or severance agreement with the Company, by the Employee for Good Reason (as defined in the Employee's employment or severance agreement), the SAR will immediately vest and become exercisable as to all Shares to which the SAR relates, and the Employee (or in the case of death, the Employee's estate) will have the right for a period of thirteen months following the date of the termination (but not later than the date on which the SAR would otherwise expire) to exercise the SAR.  For each Employee who is a party to an employment or severance agreement with the Company, for purposes of this Section 3(b), the term "Disability" shall mean "Incapacity" as defined in such Employee's employment or severance agreement, as applicable.

        (c)     <u>Other Termination</u>.  If an Employee's employment with the Company and all Affiliates terminates for any reason other than those provided in clauses 3(a) or (b), the Employee or his or her estate (in the event of his or her death after the Employee's termination): (i) may, within the 30-day period following the termination, exercise the SAR to the extent that it was vested and exercisable on the date his or her employment terminated; and (ii) will forfeit the SAR to the extent that it was not vested and exercisable on the date his or her employment terminated.

4.      Transferability of SAR.  This SAR is transferable only by will or the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)).  The SAR will be exercisable during the Employee's lifetime only by the Employee or by his or her guardian or legal representative.  The Committee may, in its discretion, require a guardian or legal representative to supply it with evidence the Committee deems necessary to establish the authority of the guardian or legal representative to exercise the SAR on behalf of the Employee.

5.      Securities Law Requirements.

(a)     This SAR will not be exercisable in whole or in part, if exercise may, in the opinion of counsel for the Company, violate the Securities Act of 1933, as amended (or other federal or state statutes having similar requirements), as it may be in effect at that time, or cause the Company to violate the terms of Section 4.1 of the Plan.

(b)     The SAR is subject to the further requirement that, if at any time the Committee determines in its discretion that the registration, listing or qualification of the Shares subject to the SAR under any federal securities law, securities exchange requirements or under any other applicable law, or the consent or approval of any governmental regulatory body, is necessary as a condition of, or in connection with, the granting of the SAR, the SAR may not be exercised in whole or in part, unless the necessary registration, listing, qualification, consent or approval has been effected or obtained free of any conditions not acceptable to the Committee.

(c)     With respect to individuals subject to Section 16 of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), transactions under this SAR are intended to comply with all applicable conditions of Rule 16b-3, or its successors under the Exchange Act.  To the extent any provision of the SAR or action by the Committee fails to so comply, the Committee may determine, to the extent permitted by law,  that the provision or action will be null and void.

6.      No Obligation to Exercise SAR.  The granting of the SAR imposes no obligation upon the Employee (or upon a transferee of an Employee) to exercise the SAR.

7.      No Limitation on Rights of the Company.  Subject to Sections 4.3 and 15.2 of the Plan, the grant of the SAR will not in any way affect the right or power of the Company to make adjustments, reclassification or changes in its capital or business structure, or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

8.      Plan and SAR Not a Contract of Employment.  Neither the Plan nor this SAR is a contract of employment, and no terms of employment of the Employee will be affected in any way by the Plan, this SAR or related instruments except as specifically provided therein.  Neither the establishment of the Plan nor this SAR will be construed as conferring any legal rights upon the Employee for a continuation of employment, nor will it interfere with the right of

the Company or any Affiliate to discharge the Employee and to treat him or her without regard to the effect that treatment might have upon him or her as an Employee.

9. <u>Employee to Have No Rights as a Stockholder</u>. The Employee will have no rights as a stockholder with respect to any Shares subject to the SAR prior to the date on which he or she is recorded as the holder of those Shares on the records of the Company.

10. <u>No Deferral Rights</u>. Notwithstanding anything in Article 12 of the Plan to the contrary, there shall be no deferral of payment, delivery or receipt of any amounts hereunder.

11. <u>Notice</u>. Any notice or other communication required or permitted hereunder must be in writing and must be delivered personally, or sent by certified, registered or express mail, postage prepaid. Any such notice will be deemed given when so delivered personally or, if mailed, three days after the date of deposit in the United States mail, in the case of the Company to 21557 Telegraph Road, Southfield, Michigan, 48033, Attention: General Counsel and, in the case of the Employee, to the last known address of the Employee in the Company's records.

12. <u>Governing Law</u>. This document and the SAR will be construed and enforced in accordance with, and governed by, the laws of the State of Michigan, determined without regard to its conflict of law rules.

13. <u>Plan Document Controls</u>. The rights granted under this SAR document are in all respects subject to the provisions of the Plan to the same extent and with the same effect as if they were set forth fully herein. If the terms of this document or the SAR conflict with the terms of the Plan document, the Plan document will control.

LEAR CORPORATION
2009 LONG-TERM STOCK INCENTIVE PLAN

NONTRANSFERABLE NONQUALIFIED STOCK OPTION TERMS AND CONDITIONS

1.      Definitions.  Any term capitalized herein but not defined will have the meaning set forth in the Plan.

2.      Term, Vesting and Exercise of the Stock Option.

(a)      If the Employee remains employed by the Company, the Option will expire seven years from the Grant Date.  If the Employee terminates employment with the Company before the seventh anniversary of the Grant Date, his or her right to exercise the Option after termination of his or her employment will be only as provided in Section 3.

(b)      The Option will vest and become exercisable as to one-third of the Shares to which the Option relates on each of the first three anniversaries of the Grant Date.  If the Employee experiences an End of Service Date, the Option will vest as to those Shares underlying the Option, if any, that have not yet vested but would have vested hereunder if the Employee's End of Service Date had been 24 months following his actual End of Service Date.  The Employee will forfeit that portion of the Option which has not yet vested or would not have vested in the next 24 months as described in the preceding sentence.  Notwithstanding anything contained herein to the contrary, the right of an Employee to exercise the Option will be forfeited if the Committee determines, in its sole discretion, that (i) the Employee has entered into a business or employment relationship which is detrimentally competitive with the Company or substantially injurious to the Company's financial interests; or (ii) the Employee has been discharged from employment with the Company or an Affiliate for Cause.

(c)      The Option may be exercised by written notice to the Company indicating the number of Shares being purchased.  The notice must be signed by the Employee and must be accompanied by full payment of the Exercise Price in accordance with Section 4.  When the Option is vested and exercisable, it may be exercised in whole at any time or in part from time to time as to any or all full Shares under the Option.  Notwithstanding the foregoing, the Option may not be exercised for fewer than 100 Shares at any one time or, if fewer, all the Shares that are then subject to the Option.

3.      Termination of Employment.  Subject to the forfeiture provisions in clause 2(b) above, an Employee's right to exercise the Option after termination of his or her employment will be only as follows:

(a)  <u>End of Service</u>.  If the Employee experiences an End of Service Date, the Option will immediately vest, in accordance with Section 2(b) hereof, as to those Shares underlying the Option, if any, that have not yet vested but would have vested hereunder if the Employee's End of Service Date had been 24 months following his actual End of Service Date, and the Employee will have the right for thirteen months following his or her End of Service Date (but not later than the date on which the Option would otherwise expire), to exercise the Option.  If the Employee dies prior to the end of the thirteen-month period after the End of Service Date, his or her estate will have the right to exercise the Option within thirteen months following the Employee's End of Service Date (but not later than the date on which the Option would otherwise expire).  The Employee's "End of Service Date" is the date of his or her retirement after attaining age 55 and completing ten years of service.

(b)  <u>Disability, Death, Not for Cause, or Good Reason Termination</u>.  If an Employee's employment with the Company and all Affiliates shall be terminated for Disability or by the Company for any reason other than Cause, upon the Employee's death or, for an Employee who is a party to an employment or severance agreement with the Company, by the Employee for Good Reason (as defined in the Employee's employment or severance agreement), the Option will immediately vest and become exercisable as to all Shares to which the Option relates, and the Employee (or in the case of death, the Employee's estate) will have the right for a period of thirteen months following the date of the termination (but not later than the date on which the Option would otherwise expire) to exercise the Option.  For each Employee who is a party to an employment or severance agreement with the Company, for purposes of this Section 3(b), the term "Disability" shall mean "Incapacity" as defined in such Employee's employment or severance agreement, as applicable.

(c)  <u>Other Termination</u>.  If an Employee's employment with the Company and all Affiliates terminates for any reason other than those provided in clauses 3(a) or (b), the Employee or his or her estate (in the event of his or her death after the Employee's termination): (i) may, within the 30-day period following the termination, exercise the Option to the extent that it was vested and exercisable on the date his or her employment terminated; and (ii) will forfeit the Option to the extent that it was not vested and exercisable on the date his or her employment terminated.

4.  <u>Medium and Time of Payment</u>.

(a)  The Exercise Price must be paid in United States dollars.  The Exercise Price may be paid in cash, by certified check, by cashier's check, with Shares, or using any combination of those forms of payment, or by means of a cashless exercise or by any other means the Committee determines to be consistent with the Plan's purpose and applicable law, in accordance with the terms of Section 6.7 of the Plan.  A certified or cashier's check used to pay all or part of the Exercise Price must be made payable to the order of the Company at the time of purchase.

(b)     Any withholding tax, up to the minimum withholding requirement for supplemental wages may be paid with Shares issuable to the Employee upon exercise under this Option.  Shares used to satisfy the Exercise Price and/or any minimum required withholding tax will be valued at their Fair Market Value as of the date of exercise.

5.      <u>Transferability of Option and Shares Acquired Upon Exercise of Option</u>.  This Option is transferable only by will or the laws of descent and distribution, or pursuant to a domestic relations order (as defined in Code Section 414(p)).  The Option will be exercisable during the Employee's lifetime only by the Employee or by his or her guardian or legal representative.  The Committee may, in its discretion, require a guardian or legal representative to supply it with evidence the Committee deems necessary to establish the authority of the guardian or legal representative to exercise the Option on behalf of the Employee.  Except as limited by applicable securities laws and the provisions of Section 6 hereof, Shares acquired upon exercise of this Option will be freely transferable.

6.      <u>Securities Law Requirements</u>.

(a)     If required by the Company, the notice of exercise of the Option must be accompanied by the Employee's written representation: (i) that the stock being acquired is purchased for investment and not for resale or with a view to its distribution; (ii) acknowledging that the stock has not been registered under the Securities Act of 1933, as amended (the "1933 Act"); and (iii) agreeing that the stock may not be sold or transferred unless either there is an effective Registration Statement for it under the 1933 Act, or in the opinion of counsel for the Company, the sale or transfer will not violate the 1933 Act.  This Option will not be exercisable in whole or in part, nor will the Company be obligated to sell or issue any Shares subject to the Option, if exercise and sale (or issuance) may, in the opinion of counsel for the Company, violate the 1933 Act (or other federal or state statutes having similar requirements), as it may be in effect at that time, or cause the Company to violate the terms of Section 4.1 of the Plan.

(b)     The Option is subject to the further requirement that, if at any time the Committee determines in its discretion that the registration, listing or qualification of the Shares subject to the Option under any federal securities law, securities exchange requirements or under any other applicable law, or the consent or approval of any governmental regulatory body, is necessary as a condition of, or in connection with, the granting of the Option or the issuance of Shares under it, the Option may not be exercised in whole or in part, unless the necessary registration, listing, qualification, consent or approval has been effected or obtained free of any conditions not acceptable to the Committee.

(c)     No person who acquires Shares  pursuant to this Option may, during any period of time that person is an affiliate of the Company (within the meaning of the rules and regulations of the Securities and Exchange Commission under the 1933 Act) sell the Shares, unless the offer and sale is made pursuant to (i) an effective registration statement under the 1933 Act, which is current and includes the Shares to be sold, or (ii) an appropriate exemption from the registration requirements of the 1933 Act, such as that set forth in Rule 144 promulgated

under the 1933 Act. With respect to individuals subject to Section 16 of the Exchange Act, transactions under this Option are intended to comply with all applicable conditions of Rule 16b-3, or its successors under the Exchange Act. To the extent any provision of the Option or action by the Committee fails to so comply, the Committee may determine, to the extent permitted by law, that the provision or action will be null and void.

7. <u>No Obligation to Exercise Option</u>. The granting of the Option imposes no obligation upon the Employee (or upon a transferee of an Employee) to exercise the Option.

8. <u>No Limitation on Rights of the Company</u>. Subject to Sections 4.3 and 15.2 of the Plan, the grant of the Option will not in any way affect the right or power of the Company to make adjustments, reclassification or changes in its capital or business structure, or to merge, consolidate, dissolve, liquidate, sell or transfer all or any part of its business or assets.

9. <u>Plan and Option Not a Contract of Employment</u>. Neither the Plan nor this Option is a contract of employment, and no terms of employment of the Employee will be affected in any way by the Plan, this Option or related instruments except as specifically provided therein. Neither the establishment of the Plan nor this Option will be construed as conferring any legal rights upon the Employee for a continuation of employment, nor will it interfere with the right of the Company or any Affiliate to discharge the Employee and to treat him or her without regard to the effect that treatment might have upon him or her as an Employee.

10. <u>Employee to Have No Rights as a Stockholder</u>. The Employee will have no rights as a stockholder with respect to any Shares subject to the Option prior to the date on which he or she is recorded as the holder of those Shares on the records of the Company. The Employee will not have the rights of a stockholder until he or she has paid the Exercise Price in full.

11. <u>No Deferral Rights</u>. Notwithstanding anything in Article 12 of the Plan to the contrary, there shall be no deferral of payment, delivery or receipt of any amounts hereunder.

12. <u>Notice</u>. Any notice or other communication required or permitted hereunder must be in writing and must be delivered personally, or sent by certified, registered or express mail, postage prepaid. Any such notice will be deemed given when so delivered personally or, if mailed, three days after the date of deposit in the United States mail, in the case of the Company to 21557 Telegraph Road, Southfield, Michigan, 48033, Attention: General Counsel and, in the case of the Employee, to the last known address of the Employee in the Company's records.

13. <u>Governing Law</u>. This document and the Option will be construed and enforced in accordance with, and governed by, the laws of the State of Michigan, determined without regard to its conflict of law rules.

14.  <u>Plan Document Controls</u>.  The rights granted under this Option document are in all respects subject to the provisions of the Plan to the same extent and with the same effect as if they were set forth fully herein.  If the terms of this document or the Option conflict with the terms of the Plan document, the Plan document will control.