**UNITED STATES BANKRUPTCY COURT**              <u>**NOT FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re:

                                                Chapter 11
LEAR CORPORATION, *et al.*,

                                                Case No. 09-14326 (ALG)

                          Reorganized Debtors.   (Jointly Administered)
-----------------------------------------------------------------x

<u>**POST-TRIAL MEMORANDUM OF OPINION**</u>

A P P E A R A N C E S :

THOMPSON COBURN LLP
*Co-Counsel to the Debtors and Debtors in Possession*
55 East Monroe Street, 37th Floor
Chicago, Illinois 60603
   By:  Kal K. Shah, Esq.
        J. David Duffy, Esq.
        Emily L. Peel, Esq.


KIRKLAND & ELLIS LLP
*Co-Counsel to the Debtors and Debtors in Possession*
300 North LaSalle
Chicago, Illinois 60654
   By:  Michael B. Slade, Esq.
        Ryan Blaine Bennett, Esq.


LEE, TRAN & LIANG, APLC
*Co-Counsel to Actuate Corporation*
601 Figueroa Street, Suite 4025
Los Angeles, California 90017
   By:  James M. Lee, Esq.
        Enoch H. Liang, Esq.
        Daniel J. Taylor, Esq.


NORTON & ASSOCIATES, LLC
*Co-Counsel to Actuate Corporation*
8 West 40th Street, 12th Floor
New York, New York 10018
   By:  Michael E. Norton, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the objection (ECF No. 1523) (the "Objection") of the above-captioned reorganized debtors (collectively, the "Debtors") to the claim[1] of Actuate Corporation ("Actuate").[2]  The Debtors seek to disallow and expunge the Claim in its entirety.

The Claim is based on the alleged breach of a software licensing agreement between Actuate and Lear Corporation ("Lear"), one of the Debtors, pursuant to which Lear purchased software products and accompanying maintenance, support and upgrades from Actuate for use on a specified number of central processing units or "CPUs."  Actuate asserts that Lear used unauthorized copies of the software on additional CPUs, and thus exceeded the scope of the agreement.  The Debtors counter that Actuate was aware of Lear's use of the software, and the Claim is therefore barred by the affirmative defenses of statute of limitations, consent and acquiescence, laches and equitable estoppel.  The Debtors also argue that both the contractual language and the parties' course of conduct indicate that Lear operated within the terms of the agreement.  The Court held a three day trial on the Objection.  For the reasons set forth below, the Objection is granted.

## BACKGROUND

The Debtors are a global supplier of automotive seating and electrical power management systems.  Actuate develops and licenses business intelligence and enterprise reporting software that is used to organize and deliver data related to manufacturing and other business activities.

---

[1] Actuate filed a *Proof of 'Cure Claim' Arising Out of Assumed Executory Contract*, on December 9, 2009, which was designated as claim number 2251 on the Debtors' claims register (the "Claim").  The Claim was filed in response to the Debtors' chapter 11 plan of reorganization, pursuant to which the Debtors proposed to assume the agreement for the use of Actuate's software.  The Claim was filed in the amount of $1,144,000.

[2] While the Debtors' chapter 11 cases are assigned to the Honorable Allan L. Gropper, as of October 29, 2010, all issues related to the Objection have been referred to the Honorable Sean H. Lane.

In 2001, Lear began searching for software to fulfill its quality assurance reporting needs.  It was specifically looking for a product that could interface with its business data repositories to generate reports on Lear's product quality.  Lear selected Actuate as a vendor and the parties began contract negotiations in late 2001.

## A.        The Agreement Between the Parties

The parties' contract negotiations began with a template software license agreement provided by Actuate.  During the course of negotiations, the template agreement underwent several rounds of edits.  On November 13, 2001, Michael Sheridan, Actuate's Vice President of Sales, emailed a redlined version of the agreement (the "Redlined Version") to Lillian Somerville, Lear's Director of Collaboration and Data Analysis.  Sheridan's accompanying email stated, "Here is the completed Agreement as we discussed.  Look forward to hearing from you later today or in morning."  (Actuate Tr. Ex. 60, Lear Tr. Ex. 101.)

The Redlined Version included additional language and edits regarding the authorized use of the software and a licensee's obligations if found out of compliance:

> 2.01  Grant.  Actuate grants to Licensee, subject to the terms and conditions set forth in this Agreement, a perpetual, non-exclusive, non-transferable license to use the Software solely for internal business purposes . . . . Licensee is only licensed to use Software for which it has paid Actuate a license fee.  <u>In addition, Actuate "Client Software" products are licensed for installation on a client machine and for use by a single individual user.  Actuate Client Software products may not be used as, without limitation, a multi-user server platform to run, distribute and/or store reports.  Every processor on the served where Actuate server products are installed must be licensed . . . .</u>

> 10.14    Audit.  Upon reasonable notice to Licensee, Licensee agrees to permit Actuate or its designated third party to conduct an audit of Licensee's computer systems to ensure that Licensee is not using more Software than Licensee has licensed hereunder . . . . If any audit determines that Licensee is out of compliance with this Agreement, Licensee shall ~~immediately~~ <u>promptly</u> ~~remove the unlicensed Software from its systems or shall~~ pay for such Software <u>at the then current list price</u> upon receipt of an invoice from Actuate.

(Actuate Tr. Ex. 60, Lear Tr. Ex. 101) (formatting in original.)

On November 15, 2001, Paul Geesey, Lear's Director of Global Non-Manufacturing Operations signed a different version of the agreement (the "November 15 Version"). The November 15 Version was essentially the same in content as the Redlined Version but for paragraph 10.14, which addressed a licensee out of compliance with the agreement. (Actuate Tr. Ex. 6, Lear Tr. Ex. 1.) While Section 10.14 of the Redlined Version required Lear to pay the current list price for unlicensed use of software, the November 15 Version gave Lear the option of either paying for the unlicensed software or immediately removing it from Lear's system:

> 10.14   Audit.   Upon reasonable notice to Licensee, Licensee agrees to permit Actuate or its designated third party to conduct an audit of Licensee's computer systems to ensure that Licensee is not using more Software than Licensee has licensed hereunder . . . . If any audit determines that Licensee is out of compliance with this Agreement, Licensee shall immediately promptly remove the unlicensed Software from its systems or shall pay for such Software at the then current list price upon receipt of an invoice from Actuate.

(Actuate Tr. Ex. 6, Lear Tr. Ex. 1.)

Lear mailed executed copies of the November 15 Version to Actuate. (Hr'g Tr. 106:5-109:9, July 20, 2011; 12:6-22, July 21, 2011.) Lear contends that the November 15 Version governs the relationship between the parties, but was unable to produce at trial a copy of the November 15 Version that had been countersigned by Actuate. For its part, Actuate claims that it never agreed to the November 15 Version. Given the absence of an agreement signed by both parties, Actuate claims that the parties' relationship is governed by a Software License and Services Agreement (the "Click-Through Agreement"), which is a licensing agreement that a Lear employee was required to accept, or "click-through," each time a piece of the software was installed or upgraded on Lear's system. Without accepting a new version of the Click-Through Agreement, the installation or upgrade of the software on Lear's system cannot continue. Actuate contends that the most recent version of the Click-Through Agreement accepted by Lear – Version 9, Service Pack 3 – governs the relationship of the parties.

4

The Click-Through Agreement provided a license for use of the software on one computer:

> [U]pon Your acceptance of this SLA, payment of the proper license fees, and subject to terms and conditions of this SLA, Actuate hereby grants You a . . . license to install one (1) copy of the Software on one (1) computer and to upload, Access [sic], execute and use that copy so installed in the working memory of the authorized computer for Your internal business purposes.

(Actuate Tr. Ex. 51, Section 1.1.)

With respect to damages for an unauthorized use of the software, the Click-Through Agreement provided that the user must pay for the additional license at market rates:

> If You are out of compliance, You shall, in addition to any other rights and remedies Actuate may have, promptly pay for the costs of the audit and for the licenses that are required for Your actual use based on the higher of Actuate's non-discounted list prices in effect (a) when You originally acquired the Software, or (b) at the time Your non-compliance is discovered by Actuate.

(Actuate Tr. Ex. 51, Section 7.7.)

Both the November 15 Version and the Click-Through Agreement allowed Lear to make one back-up copy of the software.   The November 15 Version provided that "Licensee shall not copy or modify any portion of the Software or Documentation; provided, however, Licensee may make one (1) copy of the Software for disaster recovery purposes."   (Actuate Tr. Ex. 60 and 6, Lear Tr. Ex. 101 and 1, § 2.03.)[3]   The phrase "disaster recovery" was not defined.   Lear testified that it had never used the software installed on its development server in an actual instance of disaster recovery.  (Hr'g Tr. 235:17-20, July 20, 2011; Turnquist Depo. Tr. 128:16-19, March 4, 2011.)

---

[3] Exhibit B to the November 15 Version, which discussed Actuate's standard maintenance service policy, also made reference to a "pre-deployment environment" in juxtaposition to a "production environment."  (*See* Lear Tr. Ex. 1, 101) ("The Actuate system is failing in a pre-deployment environment which will result in a significant delay in the deployment of the customer's system into production.  This type of problem severely impacts the schedule of the rollout of the customer's production system.  Typically, the problem will have to occur in a period where all implementations have been completed and the customer is in the process of testing the production environment or the staging environment just prior to going into production.")

Similarly, the Click-Through Agreement provided for retaining a "back-up" copy of the software:

> After You have installed a copy of the Software in accordance with this SLA, You may keep the original copy (as downloaded or delivered on a CD) for archival and back-up purposes.  If any mandatory, non-waivable laws of any jurisdictions permit You to create one or more back-up emergency restart copies, You may exercise such rights, but except for such mandatory, non-waivable rights, You agree not to create any additional copies of the Software or accompanying documentation.  You shall keep any back-up copy separate from any actively used computer programs or documentation and shall not install such copy until actually needed for emergency restart use.

(Actuate Tr. Ex. 51, Section 1.6.)

## B.    The Purchase and Use of the Software

On November 16, 2001,[4] Lear issued a purchase order to Actuate for $164,490 (Lear Tr. Ex. 2), to obtain a two-CPU license for the software, along with maintenance and support services.  Actuate's licensing agreements define a CPU as "a single core (if applicable) of a single processor on a single computer."  (*See* Actuate Findings of Fact, n.1.)  At the time of the parties' business relationship, computers typically had "dual-core" processors.  Since the Actuate software was licensed on a per-core basis (as opposed to per computer) Lear's servers, which ran dual-core processors, required a two CPU license.  (*See* Actuate Findings of Fact, n.1.)  In December 2001, Actuate employees travelled to Lear and installed the software onto a Lear server with two CPUs named ActuateProd1.  (Hr'g Tr. 113:4-9, July 20, 2011; Lear Tr. Ex. 9.)

The software was a "web reporting application" (Hr'g Tr. 97:12-20, July 20, 2011), that "enable[d] large companies to integrate, transform and deliver data as information to all of their stakeholders on an enterprise basis."  (Hr'g Tr. 154:16-20, July 21, 2011.)  The core component of the software was "the Actuate iServer [that] generates and renders and delivers the reports."

---

[4] The effective date of the November 15 Version was listed as November 16, 2001 (Actuate Tr. Ex. 6, Lear Tr. Ex. 1).

(Hr'g Tr. 155:15-18, July 21, 2011.)  The software was used by Lear in the quality department to "speed[] up the process of getting data from [Lear's] customers and then analyzing that data and report it back to management to make decisions.  They're responsible for the quality in the plants.  So to make sure that if a product went out the door and had a defect of some kind, we would get that information from the customer; and they needed a way to manage that report on it and look at the data to make . . . management decisions."  (Hr'g Tr. 98:1-9, July 20, 2011.)

The maintenance package purchased by Lear included periodic upgrades and patches to the software, with the first upgrade provided in 2002 and installed directly onto ActuateProd1.  It immediately caused Lear's computer system to crash.  As a result, Lear was unable to use the server or the updated version of the software and was therefore without the ability to generate reports for several days.[5]  To resolve the problem, Actuate agreed to the installation of a copy of the software on a backup computer, ultimately named ActuateDev1, and Lear used the secondary copy on ActuateDev1 to implement the upgrade.  (Hr'g Tr. 127:15-128:20, July 20, 2011.)[6]

---

[5]        A. In the summer of 2002 Actuate released the next version of software, which was version 6.
Q. Okay. And what happened then?
A. We -- we had a huge problem. When version 6 got applied all the fonts the reports changed and basically everything we had ready in production or ready to go into production, they were useless. Almost to the point where you'd say it's you know, it's not even useful at that point with regards to ownership. . .
Q. What was the consequence to the quality group of that?
A. Well, they couldn't use any of the reports we blocked.  So -- so what we actually did was we took version 6 off the server, we reloaded version 5 and put the reports back into production so then we could figure out what was wrong with version 6.

(Hr'g Tr. 123:12-124:3, July 20, 2011.)

[6] Ms. Somerville testified:

Q. And now we talked about the crash in 2002, right?
A. Right.
Q. And what happened again? Then you implemented another computer in 2002, is that right?
A. Right. We contacted Actuate, told them we were having this issue, we requested one CPU key because we didn't really have another server, and we put it on a desktop test machine, which only has one CPU at that time, and asked for a key, which they delivered and we installed on Actuate.

Actuate provided a one-CPU license key for the installation of the software on ActuateDev1.

(Hr'g Tr. 127:17-23, July 20, 2011.)[7]

Lear subsequently began to use ActuateDev1 as a pre-deployment or "development"

server to install all software updates, even after ActuateProd1 was back up and running.  Lear

would use ActuateDev1 to test upgrades in an isolated environment so as to vet them before they

were put onto the development server.  (Hr'g Tr. 128:12-14; 140:20-21 July 20, 2011.)  Once a

software installation was successful on the development server, it was then rolled out onto the

"live" production servers on ActuateProd1.  Lear found that this process eliminated the risk of

the crash it suffered when previously updating the software in early 2002.  Lear maintains,

however, that ActuateDev1 was never used for any actual production work, a claim supported by

the evidence at trial.  (Hr'g Tr. 136: 5-7, 139:12-23, 145:17-19, 235:18-236:2, July 20, 2011;

Turnquist Depo. Tr. 102:2-9, March 4, 2011.)  ActuateDev1, however, was used for volume

testing "to make sure that every report was vetted and not introduce a disaster to [Lear's]

production environment," and such testing was a "high value service."  (Hr'g Tr. 227:15-228:9;

---

Q. So [one] CPU then instead of two?
A. Yes.
Q. Now, at that time, you didn't enter into a new grievance issue?
A. No.
Q. Did they -- did Lear -- did Actuate ask you to pay separately for this one CPU environment?
A. No.
Q. And how do you know that you were authorized to use that one CPU environment?
A. Well, in -- in a IT environment, you really never install anything on production machines. Since we were so early and our cycle here it -- it got put on this machine, which in hindsight wasn't a good practice. Now we always test everything in a isolated environment before it gets to crucial production to prevent this kind of thing.
Q. Okay.
A. So this becomes our -- our upgrade and our disaster in case we have an issue.
Q. Okay. A couple things I want to focus in on. First, this is something that Actuate helped put in place, is that right?
A. Yes.

(Hr'g Tr. 127:15-128:20, July 20, 2011.)

[7] On or about February 14, 2003, Lear upgraded ActuateDev1 to a two-CPU server by using a license key provided for beta testing, which was set to expire on May 31, 2003.  (*See* Lear Tr. Ex. 202; Hr'g Tr. 94:18-95:7, July 22, 2011.)

235:24-326:2, July 20, 2011.)  There is no evidence that Actuate ever informed Lear, prior to

2009, that its use of ActuateDev1 as a development server was unauthorized.  (Hr'g Tr. 34:20-

23, July 22, 2011.)

Between 2001 and 2004, Lear paid Actuate approximately $110,000 in additional

maintenance fees and license upgrades for its two CPU license.  In March 2004, Lear purchased

two additional CPU licenses for the software, along with accompanying maintenance and

support, for a total of $162,180.  (*See* Lear Tr. Ex. 313.)  This software was installed onto a

computer named ActuateProd2.  By the middle of 2004, therefore, Lear had purchased a total of

four CPU licenses for the software, two of which were implemented on ActuateProd1, and the

other two on ActuateProd2.  Lear continued to use ActuateDev1 as a development server for the

installation of software updates.  Between 2004 and 2009, Lear paid Actuate approximately

$400,000 for continued maintenance, upgrades and support.

In 2007, Actuate for the first time began including definitions for "development" and

"disaster recovery" in its contracts.  In 2001, when the parties began their relationship, neither

term was defined in Actuate's template agreement or its click-through agreement.  (*See* Lear Tr.

Ex. 1; Lear Tr. Ex. 4.)  In 2007, however, Actuate's template agreement was modified to include

definitions for both terms.  (*See* Lear Tr. Ex. 105.)  The click-through agreement was also

amended to include these definitions.  (*See* Lear Tr. Ex. 4.)  Similarly, Actuate's price list from

2001 did not include a development license or define "development," "multi-under testing" or

"staging."  (*See* Lear Tr. Ex. 100.)  These distinctions only appeared later in Actuate's pricing.

(*See*, e.g., Lear Tr. Ex. 102, Actuate Tr. Ex. 44.)[8]  By 2005, Actuate began offering a limited use

---

[8] As Lear's expert explained, updates create a risk of software or system crashes and errors, especially
in the 2001 through 2005 timeframe, when computers were less sophisticated.  (*See* Lear Tr. Ex. 500.)
Even today, upgrades are still recognized as creating a higher risk of crashes and errors, and it is
therefore standard industry best practice to use a development environment to implement updates or
patches before they are rolled out on a live operational server environment.  (*See* Lear Tr. Ex. 500.)

license for development.  (*See* Lear Tr. Ex. 102.)  But Lear states that it was never told by

Actuate prior to 2009 that it was required to pay for use of the development server.  (*See* Hr'g Tr.

306:1-7, July 20, 2011.)  Actuate offered no evidence that it made any effort to inform its

customers of these changes or how the terms should be interpreted.

 Prior to 2009, Actuate and Lear maintained a positive relationship.[9]  During this time,

Lear regularly provided Actuate with information regarding the specifics of Lear's use of the

software.  This information was shared repeatedly with Actuate sales personnel, some of whom

came to tour the Lear facilities in person.  (*See* Hr'g Tr. 164:6-167:3, July 20, 2011; Turnquist

Depo. Tr. 11:13-22, 35:5-22, 103:1-104:5, 107:13-21, 108:15-17, 108:25-109:22, March 4,

2011.)  As Ms. Somerville, Lear's Director of Collaboration and Data Analysis, explained at

trial, it would be difficult for an Actuate salesperson to offer a client like Lear new software

products unless he or she was familiar with the client's current computer system and how the

Actuate software was utilized.  (*See* Hr'g Tr. 164:22-165:10, July 20, 2011.)  Ms. Somerville

testified that:

> It was [Lear's] standard practice that when we got a new [Actuate] salesperson in
> we would go through a process to educate them on how Lear used their software.
> We would talk about the deployment, we would talk about the users that used the
> reports, what kind of reports. We would typically actually do a demonstration of
> the capabilities, how we'd leverage the software to fit our business need.

(Hr'g Tr. 164:12-18, July 20, 2011.)  The information provided to Actuate's sales personnel in

this process included identifying the Lear hardware and the number of servers being used.  (*See*

Hr'g Tr. 166:10-18, July 20, 2011.)

---

[9] At Actuate's request, Lear even performed beta testing in 2003 for Actuate's software, using
ActuateDev1 to carry out the testing.  For this beta-testing, Lear was granted a beta license key for use
of the software on ActuateDev1, which was scheduled to expire on May 31, 2003.  (*See* Lear Tr. Ex.
202.)

When calling for support assistance, Lear also provided information to Actuate technical support representatives regarding the use of a development server in addition to the production server on which Lear was running the software.  (*See* Hr'g Tr. 178:2-24, July 20, 2011; Turnquist Depo. Tr. 121:11-122:6, March 4, 2011; Lear Tr. Ex. 602.)  In June 2003, for example, Lear personnel stated to Actuate technical support that they were using the software on both a production and a development server, and provided a screenshot from both ActuateProd1 and ActuateDev1.  (*See* Lear Tr. Ex. 832.)  At this time, Lear had only a two CPU license for the software, and had not yet purchased the additional two CPU license that was used for ActuateProd2.  But it was almost a year after the crash of 2002 and the installation of the software on ActuateDev1 with Actuate's knowledge.  This pattern continued until the parties' eventual falling out in 2009.  For instance, in the fall of 2005, Lear provided Actuate technical support with a screenshot showing use of all three servers at once.  (*See* Lear Tr. Ex. 1094.)  At no time during these communications between Lear and Actuate technical support did Actuate ever raise issue with Lear's use of the software.

To activate the software, Actuate provided license keys, alpha-numeric codes that were entered by an administrator after the installation of software.  Over the course of the parties' relationship, Actuate distributed license keys through numerous means, including a customer service portal and in response to direct email requests from customers.  Typically, Lear obtained its license keys either through an Actuate customer service portal or direct email requests to Actuate's licensing group.  (*See* Lear Ex. 24-37; Hr'g Tr. 164:11-23, 344:10-13, July 21, 2011; A new key would be needed to activate additional software purchases or to update existing software.  (Hr'g Tr. 153:1-6, July 20, 2011.)  On July 22, 2008, Lear's administrator of the Actuate software, Eric Turnquist, executed a License Key Destruction Confirmation Agreement (the "License Key Destruction Agreement"), certifying that the then-current license keys 23254

for ActuateProd1 and 30372 for ActuateDev1 had been destroyed.  This agreement provided, in

part:

> Licensee has recently downloaded or will download new license key(s) ("New Key(s)") to replace existing license key(s) for Actuate software (the "Old Key(s)") . . . . In consideration of the value of such download privileges and other valuable consideration, Licensee acknowledges and agrees:
>
> (a) it will immediately and permanently (i) destroy the Old Key(s) and (ii) stop all use of the Old Key(s).
> (b) the New Key(s) will only be used with Actuate software that has been properly licensed and paid for by Licensee.
> (c)  it will (i) pay Actuate for any unlicensed use of the License Key(s) at a price equal to the full list price for the Actuate software to which the License Key(s) relate at the time the unlicensed use is discovered; and (ii) will immediately remit to Actuate the applicable license and any associated maintenance and back-maintenance fees.  (Actuate Tr. Ex. 15.)

In 2009, Actuate implemented new license key technology referred to as "node locking,"

which prevented a license key from being used more than once.  (*See* Hr'g Tr. 335:1-2, July 21,

2011.)  Subsequent to the introduction of the "node-locking" technology, Lear attempted to

implement a software upgrade using its established procedures.  It used its first license key to

perform and qualify the update on AcuateDev1, and then used a second key to upgrade the

software on AcuateProd1.  At this point, Lear then attempted to upgrade the software on

ActuateProd2, but was blocked from doing so by Actuate's node-locking feature.  Lear then

requested another license key from Actuate for ActuateProd2.  In response, Actuate stated that

Lear had already used its allotted license keys for four CPUs, was not authorized to use the

software on another CPU, and that Lear's conduct appeared to be inconsistent with its earlier

representation that it had destroyed the old license keys.  The parties then engaged in further

discussions about Lear's use of the software, disagreeing about whether Lear was exceeding its

license agreement.

Unable to resolve this issue with Actuate, Lear uninstalled the software from ActuateDev1 on June 17, 2009.  Lear believed that this action was consistent with the terms of Section 10.14 of the November 15 Version, which provided for the removal of software in cases of non-compliance.  Lear continued to operate the software on ActuateProd1, but was unable to continue to use ActuateProd2 as of June 17, 2009, because a license key was needed to complete the software upgrade and Actuate refused to supply one (Hr'g Tr. 204:19-205:10, July 20, 2011); this was the case despite the fact that Lear had pre-paid for maintenance and support on four CPU's through the end of 2009.  (*See* Hr'g Trs. 77:4-19, July 22, 2011; 150:12-25, 205:20-206:11, July 20, 2011; Lear Ex. 15, 21 (stating that current maintenance contract expires on 3/2/2010), 23.)  Actuate subsequently terminated maintenance and support services for all CPUs at Lear, but did not reimburse Lear for the pre-paid maintenance and support.

On July 7, 2009, the Debtors filed for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  On September 18, 2009, the Debtors filed the *Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* (ECF Doc. No. 633) (the "Plan").  On November 5, 2009, the Court entered an order confirming the Plan (ECF Doc. No. 1070) (the "Confirmation Order").  The Plan became effective on November 9, 2009 (the "Effective Date").  Under the terms of the Plan, the Debtors assumed certain executory contracts, including its licenses for the Actuate software.  Claims for cure of assumed executory contracts were to be filed by December 9, 2009*.  See Notice of (I) Entry of Order Confirming Debtors' First Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, (II) Occurrence of Effective Date and (III) Deadlines for Filing Certain Claims and Requests for Payment*, ECF Doc. No. 1018.   In response, Actuate filed its Claim, seeking damages for the unauthorized use of its software on six CPU's –two CPUs more than provided for by Lear's licenses – and requesting damages in the amount of $1,144.000.

13

Actuate claims two components of damages. First, it seeks payment of the current list price for the software at the time its breach was discovered. Actuate maintains that it did not discover the breach until 2009, at which time the software list price for two CPUs totaled $572,000.[10] Second, it seeks damages in the form of unpaid maintenance fees of 20% of the license fee per year. Actuate requests such maintenance in the amount of $572,200 for the five year period from November 16, 2005 through November 15, 2010. Lear maintains that Actuate is not entitled to any damages, that Lear's use of the software was permitted and that, in any event, Actuate knew how Lear used the software. Finally, Lear argues that any damages owed to Actuate must be reduced by the damage caused by Actuate for failing to honor the pre-paid maintenance obligation under the agreement.

## DISCUSSION

### A.    Affirmative Defenses

Lear raises several affirmative defenses with regard to the Claim, including consent and acquiescence, laches, equitable estoppel, unclean hands and statute of limitations. As the Court agrees that the Claim was not brought prior to the expiration of the applicable four-year statute of limitations, the Court grants the Objection on that basis.

### 1.    Statute of Limitations

Under California law, an action based on breach of contract must be brought within four years of accrual. *See* Cal. Civ. Proc. Code § 337.[11] "In ordinary tort and contract actions, the statute of limitations . . . begins to run upon the occurrence of the last element essential to the cause of action. Even the plaintiff's ignorance of the cause of action, or of the identity of the

---

[10] Even though Lear did not use ActuateDev1 as a production server, Actuate seeks payment for a traditional production license rather than a more limited development license.

[11] The parties agree that California law applies to their dispute. (*See* Lear Findings of Fact, ¶ 34; Actuate Findings of Fact, § II (A).)

wrongdoer, does not toll the statute." *Gutierrez v. Mofid*, 39 Cal. 3d 892, 899 (1985) (internal

quotations and citations omitted).

Nonetheless, the statute of limitations defense is subject to the "'discovery rule,' which

postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the

cause of action." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005) (internal

citations and quotations omitted).  Thus, the statute of limitations does not begin to run until "[a]

plaintiff has reason to discover a cause of action when he or she has reason at least to suspect a

factual basis for its elements."  *Id.* (internal citations and quotations omitted).  As more fully

explained by the California Supreme Court:

> Under the discovery rule, suspicion of one or more of the elements of a cause of
> action, coupled with knowledge of any remaining elements, will generally trigger
> the statute of limitations period. . . . In so using the term "elements," we do not
> take a hypertechnical approach to the application of the discovery rule. Rather
> than examining whether the plaintiffs suspect facts supporting each specific legal
> element of a particular cause of action, we look to whether the plaintiffs have
> reason to at least suspect that a type of wrongdoing has injured them.

*Id.* at 807 (internal citations and quotations omitted).

> The discovery rule does not encourage dilatory tactics because plaintiffs are
> charged with presumptive knowledge of an injury if they have information of
> circumstances to put [them] on inquiry or if they have the opportunity to obtain
> knowledge from sources open to [their] investigation.  In other words, plaintiffs
> are required to conduct a reasonable investigation after becoming aware of an
> injury, and are charged with knowledge of the information that would have been
> revealed by such an investigation.

 *Id.* at 807-08 (internal citations and quotations omitted); *see also Creekridge Townhome Owners*

*Ass'n, Inc. v. C. Scott Whitten, Inc.*, 177 Cal. App. 4th 251, 258 (2009) ("Discovery occurs when

the plaintiff suspects, or reasonably should suspect, that someone has done something wrong to

the plaintiff, causing the injury (here, 'wrong' is not used in a technical sense, but in a lay one). .

. . A plaintiff has reason to suspect when he has *notice or information of circumstances to put a*

*reasonable person on inquiry.*") (internal citations and quotations omitted); *Gutierrez*, 39 Cal. 3d

at 897 ("[T]he uniform California rule is that a limitations period dependent on discovery of the

cause of action begins to run no later than the time the plaintiff learns, or should have learned,

the *facts* essential to his claim.")

The Debtors filed for bankruptcy on July 7, 2009 and Actuate filed the Claim on

December 9, 2009.  For the Claim to be time barred, Actuate must have or should have known of

Lear's conduct prior to July 2005.[12]  Based on the totality of the evidence at trial – most of which

was not disputed – the Court concludes that Actuate knew, or had reason to know of Lear's use

of the software on ActuateDev1 before that date.

As a starting point, the Court looks to how AcuateDev1 came into use.[13]  After

experiencing a crash in its production environment, Lear urgently sought help from Actuate.

After communications between the two, Actuate agreed to the installation of the software on

ActuateDev1, clearly an effort to keep a valued new customer happy.  Actuate gave Lear a

license key for the installation of the software of ActuateDev1.  It is clear, therefore, that Actuate

authorized and was aware of the use of ActuateDev1 from the start, at a time when Lear already

had the software installed on two CPUs on ActuateProd1.  It is also clear from the credible

evidence that all parties were aware that the software was being installed on ActuateDev1 in

2002 to supplement  – rather than replace – the authorized use of the software on the two servers

of ActuateProd1, where Actuate had installed the software only a few months earlier in

---

[12] Lear contends that Actuate's claim is barred if Actuate knew or should have known of any claim prior to December 2005.  (*See* Lear Findings of Fact ¶ 71.)  Actuate does not provide its position on what specific date should apply.  Neither party explicitly discusses the effect on the statute of limitations of the Debtors' bankruptcy filing on July 7, 2009.  In an abundance of caution, the Court will consider the bankruptcy filing as tolling any filing deadline.  (*See* 11 U.S.C. § 108(c).)

[13] It is clear from the evidence at trial that the purported unauthorized use relates to ActuateDev1.  It is undisputed that, in November 2001, Lear purchased a two CPU license that was installed by Actuate on two CPUs of ActuateProd1.  Then without the purchase of any additional licenses, Lear began using the software on ActuateDev1 in 2002.  Indeed, the parties at trial focused on the extent of the use of ActuateDev1, including whether it was used as a disaster recovery server, and communications between the parties regarding its use.

December 2001. (Hr'g Tr. 127:15-25, 128:18-20, July 20, 2011; Lear Tr. Ex. 26). Thus, Actuate itself installed two CPUs of software on ActuateProd1 and then subsequently permitted the use of the software on an additional computer, ActuateDev1, without the purchase of an additional license.

There is no evidence that Actuate ever took any steps to tell Lear that use of the software on this additional server, ActuateDev1, was unauthorized. Nor was there any evidence that Actuate ever communicated to Lear that there was an expiration date on Lear's use of the software of ActuateDev1. This fact is relevant because Actuate was careful to communicate such limitations on other occasions, such as when Actuate provided a license key for beta testing of software in February 2003, noting that the key would expire a few months later on May 31, 2003.[14]

Given all these facts, the Court concludes that Actuate knew or had reason to know in 2002 of a potential claim against Lear for unauthorized use of the software on ActuateDev1, to the extent that Actuate disapproved of that use. This alone was enough to start the running of the statute of limitations.[15]

Moreover, numerous other facts confirm that Actuate knew of the continued use of the software on ActuateDev1. First, Ms. Somerville testified that when Actuate sales representatives began working on the Lear account, Lear would provide them with a detailed presentation on how it utilized the software. (Hr'g Tr. 164:6-167:3, July 20, 2011). During these presentations, the sales representative would be "walked through the whole process of how [Lear] used the

---

[14] To the extent that any party may argue that the beta license is relevant to the statute of limitations inquiry, the Court rejects that notion as a red herring. Lear began unlicensed use of ActuateDev1 in 2002, well before any issuance of a license key for beta testing.

[15] There is no evidence that Actuate did, in fact, disapprove of such use by Lear until 2009, after Actuate had made an internal decision to monetize the development use of the software by its clients. Of course, Lear immediately ceased use of the software after Actuate complained to Lear.

software, how it was implemented . . . the entire environment . . . . It would include the number of boxes or servers . . . [and Lear] would talk about [its] development strategy, how [Lear] worked and how [Lear] deployed." (Hr'g Tr. 166:11-18, July 20, 2011). Ms. Somerville testified that she personally sat through such a presentation with several Actuate representatives, including an Actuate sales representative named Maria Bayer after Ms. Bayer's assignment to the Lear account. (Hr'g Tr. 166:21-167:3, July 20, 2011). This presentation must have occurred prior to June 2005, by which time Ms. Bayer was engaging in negotiations with Lear regarding an agreement to cap Lear's maintenance costs. (Lear Tr. Ex. 11, 12, 13). It is clear from the evidence presented that Actuate's sales representatives to Lear turned over on a frequent basis. (*See* Lear Tr. Ex. 601.) So while there is no doubt that at least one Actuate sales representative knew of these facts prior to July 2005, it appears very likely that others did as well. (*See* Hr'g Tr. 164:6-165:10, 165:22-167:3, July 20, 2011.)

Actuate attacks the general credibility of Ms. Somerville's testimony, pointing to inconsistencies between her interrogatories and her testimony on a variety of issues, including the Redlined Version, the dates on which the software was installed on various computers and which computers certain license keys were run on. But the Court finds Ms. Somerville's testimony to be generally credible, and none of the inconsistencies pointed out by Actuate go the issue of Actuate having notice of Lear's use of the software on ActuateDev1. Indeed, the discrepancies identified are not particularly troubling given her credible demeanor and the fact that the events she testified to took place in some instances up to ten years prior to her testimony.[16]

---

[16] Actuate never introduced any evidence to rebut Ms. Somerville's testimony about the knowledge of Actuate's sales personnel as to Lear's use of the software. In any event, Ms. Somerville's testimony is consistent with the testimony of Eric Turnquist, who testified almost identically at his deposition. (Turnquist Depo. Tr. 11:13-22, 35:5-22, 103:1-104:5, 107:13-21, 108:13-17, 108:25-109:22, March 4, 2011.) Mr. Turnquist stated that he had discussions with the sales representatives of Lear's use of the

Additional undisputed facts confirm the Court's conclusion that Lear knew or should have known of its potential claim against Lear well before July 2005.  For example, Actuate received knowledge of the use of the software through the technical support process, pursuant to which Lear would open a technical support "ticket" with Actuate, which discussed the issue Lear was having with the software.  These tickets explicitly discussed the use of Lear's servers.  (*See* Hr'g Tr. 173:4-174:15, 178:2-17, July 20, 2011; Lear Trial Ex. 602 (compilation of all support tickets); Lear Ex. 832 (Lear identifying to Actuate technical support the use of its production and development servers, as well as attaching screen shots, and asking why a fix was working on one machine and not the other at a time in June 2003 when Lear had only a two CPU license); Lear Ex. 917 (Actuate technical support asking in February 2004 whether Lear was "able to test the code in development environment?"  This was also during a time when Lear had only a two CPU license, prior to the purchase of additional software in March 2004.))[17]  Clearly, Actuate's technical personnel were aware as far back as 2003 and 2004 that Lear was simultaneously using a development server in addition to the production server where Actuate itself had installed the software on two CPUs.  While Actuate argues that these technical support interactions did not specifically identify the number of CPUs on each server, Actuate had installed the software on two CPUs on ActuateProd1 and thus had reason to know that use on any other computer would technically be beyond the scope of Lear's two CPU license during this period.  Moreover,

---

software, including use of the development server.  (Turnquist Depo. Tr. 108:15-17, 108:25-109:22, March 4, 2011.)  Additionally, certain Actuate sales representatives "visited Lear and saw the environment," including the server room. (Turnquist Depo. Tr. 103:21-104:3, March 4, 2011.)  Mr. Turnquist testified that these visits went as far back as 2002. (Turnquist Depo. Tr. 35:5-36:7, March 4, 2011.)

[17] Actuate continued to be aware of Lear's use of a development server.  (*See also* Lear Ex. 821 (Actuate technical support identifying and discussing use of both a production and a development server in March 2003.  When an issue Actuate employee specifically asked, "Thus far, have you been able to test with a different eSpreadsheet report?  *Does the problem persist on Development server?* BTW, I have not received any update on the Production problem we've discussed yesterday.")) (emphasis added).

Actuate acknowledges that "[c]omputers and servers at the relevant time period typically had 'dual-core' processors" and that because "Actuate licenses its software on a 'per core' basis, rather than a per processor or per computer basis" "a single server, such as each of Lear's, running a 'dual core' processor requires two 'CPU' licenses." *Actuate Findings of Fact and Conclusions of Law* at 1-2 n. 1.[18]  Looking at the information provided to both Actuate's sales representatives and technical support staff, it is clear that Actuate knew or should have known well before July 2005 of Lear's use of the software on ActuateDev1.  When these facts are combined with the fact that Actuate agreed to the initial installation of the software on ActuateDev1, the Court finds that Actuate had more than adequate information to start the running of the statute of limitations.

Actuate appears to concede that its employees were aware of Lear's use of the software through this process.  (Hr'g Tr. 29:2-9, 54:23-55:5, July 22, 2011.)  Indeed, Actuate presented no testimony on this issue.  Actuate's only fact witness at trial was Dylan Boudraa, who admitted to having no knowledge of these events prior to 2008.  (*See* Hr'g Tr. 23:13-14, 38:19-22, July 22, 2011.)[19]  Actuate instead argues that its breach of contract claim does not go to Lear's use of the development server itself, but rather to the fact that Lear was running its software on more CPU's than permitted by its four CPU license.  The Court rejects this argument because it ignores the facts of this case.  Lear specifically purchased licenses for software that was installed directly onto ActuateProd1 and ActuateProd2. If a breach did occur, it was at the point when

---

[18] Furthermore, Mr. Turnquist testified with respect to such tech support calls that [e]very time you would call in, they would ask you who you were, which company, which server, the server name. They would ask how many CPUs.  It was every single call that was part of the information that was taken from Actuate."  (Turnquist Depo. Tr. 121:20-24, March 4, 2011.)

[19] Mr. Boudraa became a compliance officer at Actuate in July 2008 and his job is to monitor software licensing and compliance and manage licensing disputes.  (*See* Hr'g Tr. 264:20-265:13, July 21, 2011.) Part of his compensation is based on the success of compliance disputes such as this case.  (*See* Hr'g Tr. 265:20-266:10, July 21, 2011.)

Lear engaged in the unauthorized use of the software on ActuateDev1, for which it admittedly never purchased a license.

Actuate further asserts that it did not discover Lear's alleged breach until 2009 at the earliest, appearing to imply that the appropriate compliance employees at Actuate were not on notice of Lear's use of the software. But the evidence demonstrates that Actuate was clearly put on notice in many different ways much earlier than 2009. And to the extent that Actuate seeks to specifically disavow the knowledge of its sales personnel, this too ignores the evidence that Actuate sales personnel did pay attention to such licensing issues. In fact, it was an Actuate sales employee that brought to Actuate's attention the fact that Lear was using the software on more than four CPUs. (*See* Hr'g Tr. 176:20-24, 177:6-17, July 21, 2011; Actuate Trial Ex. 40.) Under California law, Actuate was charged with knowledge of such information:

> [P]laintiffs are charged with presumptive knowledge of an injury if they have information of circumstances to put [them] on inquiry or if they have the opportunity to obtain knowledge from sources open to [their] investigation. In other words, plaintiffs are required to conduct a reasonable investigation after becoming aware of an injury, and are charged with knowledge of the information that would have been revealed by such an investigation.

*Fox*, 35 Cal. 4th at 807-08 (internal citations and quotations omitted). Actuate provides no reason why it should not be charged with the undisputed knowledge of both its sales force and technical support staff as to the use of the software during the period from 2001 through 2008.

Given the facts here, one might wonder why Actuate complained of unauthorized use of its software in 2009 if it previously knew and assented to Lear's use of the software of ActuateDev1. The answer appears to be changes in Actuate's internal policies. The testimony at trial made clear that there was a shift in the policies at Actuate as the years passed that had nothing to do with Actuate's relationship with Lear. For the majority of the time that Actuate and Lear worked together, in fact, the parties maintained an amiable legal relationship; when

21

issues arose, they were quickly and easily addressed for the sake of maintaining the ongoing

business relationship.  For instance, an issue arose in June 2005 regarding whether the cost of

Lear's maintenance for the software would be capped at 10% as provided for in the November

15 Version.  (*See* Lear Tr. Ex. 11, 12, 13.)  During that time, the Actuate sales representative

Maria Bayer characterized Lear as a "very good customer who has not been treated the way they

deserve."  (*See* Lear Tr. Ex. 11.)  Actuate ultimately decided it would "agree to a 10 percent cap

and honor the intent of the unsigned contract."  (*See* Lear Tr. Ex. 11.)  Notably, after approving

the cap, the Actuate executive then asked "Now, what is the possibility of them buying more

software?"  (*See* Lear Tr. Ex. 11.)

It appears that at some point, however, Actuate changed its policies regarding the

permissible use of its software, with an eye towards increasing its revenue by requiring payment

for use of the software for less than production use.  For example, Actuate took several steps to

tighten up its contractual language.  When the parties began their contractual relationship in

2001, neither the Click-Through Agreement nor the November 15 Version contained definitions

for either "development" or "disaster recovery."  As of 2007, Actuate had revised its template

agreements to include definitions for these terms.  (*See* Lear Tr. Ex. 105.)  By 2005, Actuate's

pricing changed as well.  For instance, in 2001, the price list did not provide for a development

license, or define the phrases "development," "multi-user testing" or "staging," though these

distinctions were incorporated in subsequent years.  (*See* Lear Tr. Ex. 100, 102; Actuate Tr. Ex.

44.)  But there is no evidence that Actuate made its customers aware of these changes or that

Lear otherwise knew of the changes.  (*See* Hr'g Tr. 9:22-10:9, July 22, 2011.)

Given the importance here of when parties learned various facts, this case is a clear

example of the important policy underlying the statute of limitations.  The "fundamental purpose

of the statute is to give defendants reasonable repose, that is, to protect parties from defending

22

stale claims." *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1112 (1988); *see also Davies v. Krasna*, 14 Cal. 3d 502, 512 (1975) (discussing the "practical purpose that a statute of limitations serves in our legal system. The fundamental purpose of such statutes is to protect potential defendants by affording them an opportunity to gather evidence while facts are still fresh.")  The evidence presented at trial amply demonstrated the difficulties inherent in prosecuting a stale claim such as this.  For instance, Actuate did not produce one witness to testify with first-hand knowledge regarding the parties' dealings between 2001 through 2008.  In the same vein, Ms. Somerville remarked that there was confusion over which version of the November 15 Version had been signed by Mr. Geesey because Lear had moved four to five times and in that process the Actuate file had been rearranged and certain documents stapled together.  (*See* Hr'g Tr. 219:16-220:1, July 20, 2011.)  In fact, so much time has passed that the servers in question became obsolete, and Lear reformatted one and destroyed the other.

But based on the facts that were presented to the Court, the Court concludes that Actuate received adequate knowledge for the statute of limitations to begin running prior to July 2005.  Actuate itself installed software on two CPUs on AcuateProd1 and acquiesced to the installation of the software onto ActuateDev1, without Lear receiving an additional license or setting any deadline for the expiration of the use of the software on ActuateDev1.  After the installation on ActuateDev1 in 2002, Lear continued to use the software on ActuateDev1 with Actuate's knowledge.  Actuate has failed to provide evidence to rebut any of these central facts, and Actuate's witness admitted that he had not reviewed or investigated anything that took place between the parties prior to 2008.  The Court therefore holds that Actuate's Claim is barred by the statute of limitations.

B.    **Allegations of Misconduct**

Throughout the trial and related motion practice, Actuate has complained of misconduct by Lear in allegedly avoiding responsibility for payment of the software.  The allegations consist of two principle parts.  First, Actuate contends that Lear concealed its unauthorized use of the software by creating fake license keys for the software.  Second, Actuate contends that Lear improper destroyed the computers at issue in this case so that Actuate could not discover the full scope of Lear's use of the software.

The Court rejects both of these arguments.  While there was some improper behavior by Lear employees, the limited misconduct does not affect the Court's ruling that the statute of limitation has expired on Actuate's claim.  In any event, Actuate has not proven that Lear engaged in any concerted cover-up by Lear relating to use of the software.

1.  License Keys

As to first issue regarding the creation of false license keys, Actuate points to the actions of Eric Turnquist, Lear's administrator of the Actuate software.  Turnquist certified in 2008 to the destruction of license keys 23254 for Prod1 and key 30372 for ActuateDev1.  Notwithstanding that certification, Actuate alleges that Lear continued to use license key 23254 on ActuateProd2.  In 2009, Actuate confronted Lear regarding the license key issue and Lear's alleged overuse of the software.  (See Actuate Tr. Ex. 47.)  Lear denied the allegation, investigated the matter, and provided its findings to Actuate.  Thereafter, on or about June 25, 2009, Lear requested another upgrade for ActuateProd2, claiming that it had used license key 23255 on the server.  Lear provided backup for this license key in the form of emails, license key files and computer log files that referenced the use of license key 23255 on ActuateProd2.  (*See* Lear Tr. Ex. 30, 31, 32.)  Both parties concede that license key 23255 was not genuine and that Actuate never issued the key to Lear.  Actuate argues that Lear altered its backup files before

24

emailing them to Actuate, in what it believes was a concerted effort by several different levels of

Lear employees to mislead Actuate.  Lear appears to place the blame for these emails on Eric

Turnquist, suggesting that he acted as a rogue employee in providing such false license keys to

Actuate.  Notably, Mr. Turnquist had been terminated by Lear due in part for his failure to fully

cooperate in the investigation that Lear conducted with respect to the license keys.  (*See* Hr'g Tr.

299:10-300:21, July 20, 2011.)

As a threshold matter, Actuate's argument fails to change the outcome of this case

because these false license keys does not have any bearing on Actuate's knowledge – for statute

of limitations purposes - that Lear was using the software on ActuateDev1.  Indeed, Actuate

presented no evidence that Turnquist's actions lulled Actuate to sleep as to its rights.  Such an

argument would be difficult to make given Actuate's practices regarding the issuance of license

keys prior to 2009.  Prior to implementing "node locking" in 2009, Actuate permitted its clients

to seek license keys on its own – as necessary and seemingly without limit - from a "self-serve"

window on a Actuate's website/ by email from Actuate.  (*See* Hr'g Tr. 164:20-165:22, July 21,

2011.)[20]  And even after Actuate went to its "node locking" system in 2009, Actuate itself was of

the view that the false license key issue was a "red herring" when it came to whether Lear was

engaged in the authorized use of Actuate software. (*See* Actuate Tr. Ex. 33.)   In fact, once the

"node locking" system was in place, a false license key could not have been used to access the

software (*See* Hr'g Tr. 51:12-16, July 22, 2011).

Actuate contends that Lear's misconduct prevents Lear from the benefits of asserting

equitable defenses, such as the statute of limitations.  *See Actuate Proposed Findings of Fact and*

---

[20] Actuate's lone witness Mr. Boudraa repeatedly made the point that, as the licensee, Lear was
responsible to be compliant with the terms of the contract, with Actuate having no responsibility for
catching Lear in the act of violating those terms.  That is correct.  That fact does not alter, however, the
analysis for statute of limitations purposes as to when Actuate knew or had reason to discover any
breach of that contract.

*Conclusions of Law* at 41-42.  But Actuate has not proven the elements of such a "unclean

hands" argument.  As the California Court of Appeals explained, there is a three-pronged test to

determine whether the particular misconduct is a bar to the alleged claim for relief depends on

(1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the

misconduct to the claimed injuries.  *Blain v. Doctor's Co.*, 222 Cal. App. 3d 1048, 1060 (Cal Ct.

App. 1990); *accord Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 618-21 (Cal. Ct.

App. 1992); *CrossTalk Prod., Inc. v. Jacobson*, 65 Cal. App. 4th 631, 641-43 (Cal. Ct. App.

1998).  "The doctrine of unclean hands does not deny relief to a [party] guilty of any past

misconduct; only misconduct directly related to the matter in which he seeks relief triggers the

defense."  *Kendall-Jackson Winery, Ltd. v. Superior Court*, 76 Cal. App. 4th 970, 974 (Cal. Ct.

App. 1999).  Thus, the determination of the unclean hands defense "cannot be distorted into a

proceeding to try the general morals of the parties."  *Fibreboard Paper Prod. Corp.*, 227 Cal.

App. 2d 675, 729 (Cal. Ct. App. 1964).

"Whether the doctrine of unclean hands applies is a question of fact."  *Kendall-Jackson

Winery*, 76 Cal. App. 4th at 979.  The facts here do not support its application here as to Lear.

The only credible and supported evidence of related misconduct here is Mr. Turnquist's creation

of false license keys.  But there is no credible evidence that his actions were approved or

sanctioned by Lear management, and the Court finds Ms. Somerville credible in testifying that

she did not know anything about it.  (*See* Hr'g Tr. 249:12-250:3, July 20, 2011.)  The Court

further rejects the notion that Lear used these license keys in an attempt to conceal its use of the

software from Actuate, as such a claim is inconsistent with all of Lear's other conduct here,

including Lear's transparency about the use of the software with Actuate sales and technical

support personnel.  It is also inconsistent with the open manner in which Lear requested and

received permission to use the software on its development server, ActuateDev1.  The Court

therefore finds that the credible evidence does not support Actuate's unclean hands argument.

Thus, this allegation of misconduct is not sufficiently related to the statute of limitations defense

asserted in this case so as to assert the doctrine of unclean hands.[21]

### 2.    Destruction of Evidence

Actuate also complains that Lear improperly concealment and destroyed evidence by

deleting the software from the ActuateDev1 server, despite having been told by Actuate not to

remove any of the software installations.  Lear has taken the position, however, that it was

following the terms of the November 15 Version, which provided that Lear could uninstall the

software as a remedy to overdeployment.  (Actuate Tr. Ex. 6, Lear Tr. Ex. 1, § 10.14.)  While the

Court has doubts that the November 15 Version controls the contractual relationship between the

parties, it does provide an explanation for why Lear reasonably thought it was permissible to

uninstall the software from ActuateDev1.  Furthermore, it appears that the deletion took place on

June 17, 2009, before Actuate ever told Lear not to make any further changes to the installed

software.  (*See* Lear Tr. Ex. 14; Actuate Tr. Ex. 66.)  And while the Debtors completely

reformatted and redeployed the ActuateDev1 server in February 2010, the log files detailing the

software's use were still intact.  (Hr'g Tr. 203:7-204:5, July 20, 2011.)

Actuate also cites to the destruction of the ActuateProd2 server in late 2010, which took

place despite the fact that a "litigation hold" had been placed on the server.  While this Court

does not condone the destruction of evidence under any circumstances, Lear did offer a rational

---

[21] In the course of the trial, the Court never received a satisfactory explanation as to why Mr. Turnquist used the false license keys.  During his deposition, Mr. Turnquist testified that he had not knowingly falsified documents.  (*See* Turnquist Depo. Tr. 82:1, March 4, 2011.)  When directly asked if he had falsified the email, he stated that "some e-mails I may have gotten, and I may have changed some things when I was saving them for my own documentation, because we had no formal process.  So I could not tell you, you know, I knowingly falsified a document purposely."  (Turnquist Depo. Tr. 79:23-80:4, March 4, 2011.)  Based on the prior practice of obtaining such license keys upon request at the self serve window, it is unclear what significance, if any, employees at Lear placed on such license keys.

explanation as to how the server came to be destroyed.   At that time, the server was not

functional.  Actuate had refused to provide a new key to Lear and so the server had sat idle for an

extended period of time.  (Hr'g Tr. 206:12-14, July 20, 2011.)  Because it was an unused asset,

the server was repurposed for a different use and the operating system was updated.   (Hr'g Tr.

206:14-207:9-25, July 20, 2011.)   By that time, Lear had changed its naming convention for

servers, renaming this server Ap08.  (Hr'g Tr. 207:10-13, July 20, 2011.)  The system

subsequently began having operational issues and would not stay powered up.  (Hr'g Tr. 208:5-

8, July 20, 2011.)  The year-end process of recycling machines subsequently took place, and

because the server had been renamed, it was not properly identified as ActuateProd2 and

inadvertently destroyed.  (Hr'g Tr. 208:13-23, July 20, 2011.)

Actuate relied upon these facts in its *Motion for a Terminating Sanction Against Lear
Corporation*, which was filed after trial and sought to strike Lear's objection to Actuate's claim.

Actuate argued that the actions taken by Lear constituted sanctionable spoliation of evidence.

Actuate requested terminating sanctions striking Lear's objections or in the alternative for the

Court to draw adverse evidentiary inferences against Lear.  The Court denied the motion at a

hearing on November 9, 2011, because the motion had not been brought on a timely basis and

because several of the issues raised were more appropriately addressed in the context of evidence

at trial and not as a basis for sanctions relating to a discovery issue.  The Court did, however,

take an adverse inference against Lear that ActuateDev1 was a high value server with multiple

users.

Given these facts, the Court rejects Actuate's request for relief based on alleged misconduct, given the credible testimony of Lear's witnesses, who provided the only testimony of events from 2001 up to 2009.[22]

## **CONCLUSION**

For the reasons set forth above, the Objection is granted.  The Debtors should settle an order on five days' notice.

Dated: New York, New York
      October 19, 2012

                            */s/ Sean H. Lane*             
                            UNITED STATES BANKRUPTCY JUDGE

---

[22] Notably, Lear has raised its own "unclean hands" argument against Actuate.  Lear notes that half of Actuate's requested damages relate to maintenance services for the software.  Lear notes that Actuate has denied maintenance to Lear for which Lear has already paid, for several years on the four CPU's for which Lear admittedly has a license.  Actuate has also refused to provide Lear with a key to update the software on these same four CPUs.  This has made the software and the four CPU's for which Lear has licensed the software, virtually unusable.  Lear contends that Actuate's actions run afoul of the bedrock principle of California contract law that "he who seeks to enforce a contract must show that he has complied with the conditions and agreements of the contract on his part to be performed." *Pry Corp. of Am. v. Leach*, 177 Cal. App. 2d 632, 639 (Cal. Ct. App. 1960) (citing Cameron *v. Burnham*, 146 Cal. 580, 584 (Cal. 1905)); *see also Loral Corp. v. Moyes*, 174 Cal. App. 3d 268, 280 (Cal. Ct. App. 1985) ("The requirement of performance may be excused by the other party's breach.").  But as Lear has made clear that it does not seek any damages in connection with this purported breach of contract by Actuate, there is no need for the Court to resolve the issue.